**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ROMIT CHAKRABORTY, | ) | |
| | ) | Case No. 26-cv-00106 |
| Plaintiff, | ) | |
| | ) | Judge: Hon. Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge: Hon. Albert Berry, III |
| LAURA GAGLIARDI, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT DR. LAURA GAGLIARDI'S RULE 12(b)(6) MOTION TO DISMISS

NOW COMES Defendant Dr. Laura Gagliardi, by and through her undersigned counsel, Johnson & Bell, Ltd., respectfully moves this Court pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss all four counts of Plaintiff Romit Chakraborty's First Amended Complaint for failure to state a claim upon which relief can be granted, for these reasons:

- *First*, Plaintiff's claim for fraudulent inducement fails because his own exhibits show that Dr. Gagliardi hired and treated him as a staff employee; a brief post-departure misnomer on a website does not establish a fraudulent intent to induce Plaintiff to join the group four months earlier. The allegations also lack the particularity required by Rule 9(b).

- *Second*, Plaintiff's claim for defamation *per se* fails because a qualified privilege applies to the single internal email that Dr. Gagliardi sent to Plaintiff and the HR department, and Plaintiff has not and cannot allege abuse of that privilege. Plaintiff's claim for defamation likewise fails regarding Dr. Gagliardi's alleged statements to her industry colleague, Professor Head-Gordon, because the statements are classic non-actionable opinions under Illinois law.

- *Third*, Plaintiff's tortious interference claim fails because Plaintiff identifies no specific business expectancy, only vague hope of faculty positions, and his own exhibits show his PsiQuantum termination was "cause-based," breaking any chain of causation attributable to Dr. Gagliardi.

- *Fourth*, Plaintiff's claim for intentional infliction of emotional distress fails because the alleged conduct - internal HR communications and professional opinions among industry colleagues - do not constitute extreme and outrageous behavior under Illinois law.

Page 1 of 16

**FACTS**

Plaintiff Romit Chakraborty, Ph.D. ("Chakraborty"), was a staff researcher who worked in Dr. Laura Gagliardi's ("Gagliardi") chemistry research laboratory at the University of Chicago ("the University") for approximately eight months, from November 2023 to July 2024. (Plaintiff's Amended Complaint, "Pl. Am. Comp." Doc. #11 ¶17; Complaint, Doc. #1, ¶30). Gagliardi is the Richard and Kathy Leventhal Professor in the Department of Chemistry and the Pritzker School of Molecular Engineering at the University of Chicago. (Doc. #1, ¶9).

Before he was hired by the University, Chakraborty had lengthy 5-year post-doctoral research appointment, but failed to finish up his work for his post-doctoral advisor at the University of California at Berkeley, Dr. Martin Head-Gordon. (Doc.#1.1, Ex. D, Page ID #39). Chakraborty's productivity was low, as evidenced by only two papers authored by him, into which his advisor, Professor Martin Head-Gordon had to put considerable personal effort to bring them to an acceptable standard. (Doc. #1.1, Ex. D, Page ID #39). Chakraborty's collaborators at Berkeley likewise did not feel that Chakraborty's performance merited a recommendation letter. (Doc.#1.1, Ex. D, Page ID #39).

Following this extended post-doc period, on August 31, 2023, Gagliardi extended an offer to Chakraborty, appointing him to a probationary staff position in the Department of Chemistry in the Gagliardi Group at an annual salary of $67,933.08. (Doc. #11, ¶2; Ex. 1, Ex. 5, PageID #115). Chakraborty began work in Gagliardi's research group on or about November 27, 2023. (Doc. #11, ¶17). The University issued Chakraborty a staff identification card identifying him as a staff researcher. (Doc. #11, Ex. 2). However, Chakraborty made a poor impression on Gagliardi because she believed he was distracted by large language models (LLMs), and he was not as good a team player as Gagliardi had hoped. (Doc. #1.1, Ex. D, PageID#39). Gagliardi was strongly

dissatisfied with Chakraborty's performance during his time with her research group. (Doc. #1.1, Ex. D, PageID#39).

In July 2024, approximately eight months after starting at the University, Chakraborty accepted an offer of employment from Psi Quantum Corp., a quantum-computing company in Palo Alto, California. (Doc. #1 ¶30). Plaintiff ended his employment with the University in October 2024, without completing a single year of service, and relocated to California. (Doc. #1, ¶30).

Plaintiff began at Psi Quantum on October 28, 2024. (Doc. #1 ¶ 32.) Six weeks later, on December 10, 2024, Psi Quantum terminated Plaintiff's employment in a fifteen-minute meeting, confiscated his work laptop, and revoked his digital access. (Doc. #1, ¶35). Psi Quantum cited "performance and teamwork" as the reasons for the termination. (Doc. #11, Ex. D). Plaintiff appealed the termination internally. (Doc. #1 ¶36.) Psi Quantum placed him on paid administrative leave and ultimately resolved his employment dispute by way of a confidential settlement executed on October 20, 2025. (Doc. #1, ¶36, Ex. I.) Chakraborty disclosed that he settled with Psi Quantum and that the settlement included "back-pay, limited non-wage damages, and his attorneys' fees." (Doc #1 ¶6.) Gagliardi was not a party to that settlement, was not consulted regarding it, and Chakraborty has not alleged that Gagliardi played any role in Psi Quantum's decision to terminate him. (Doc #1 ¶7, Page ID #33.)

On December 31, 2024, Chakraborty sent Gagliardi an email asking her to support him as a referee for an open-rank faculty search at the University of New Mexico. (Doc. #11, Ex. 8, PageID #138). On January 1, 2025, Gagliardi politely declined: "Dear Romit, I am sorry but I will not be able to write a letter of support. Thank you for your understanding." (Doc. #11, Ex. 8, PageID #138)). Plaintiff replied the same day, "Thank you for your response." (Doc. #11, Ex. 8 PageID #139)).

Two days later, on January 3, 2025, Plaintiff emailed the University of Chicago's human-resources partner, Monica Lugo, and carbon copied Gagliardi, requesting that the University update his "official title" on the Gagliardi Group website and asking for any "Annual Merit Process records" from his time at the University. (Doc. #1-1, Ex. B, PageID #27). On the evening of January 3, 2025, Gagliardi responded to Chakraborty's email as follows:

> Dear Romit,
>
> You were hired as a staff scientist because you were too senior to be hired as a postdoc.
> However, on our website we have only two categories: postdocs and graduate student and this is why you are under postdocs.
> The title 'Quantum-AI Researcher' is totally made up by you.
> We didn't do an annual merit review because you stayed less than one year so there are no related documents.
>
> Best, Laura

(Doc. #11, Ex. 3, PageID #109).

Less than two hours after receiving Gagliardi's January 3, 2025, email, Chakraborty sent Gagliardi an email at 1:42 a.m. on January 4, 2025. (Doc. #1-1, Ex. B, Page ID #28-29), disclosing that he had been terminated by Psi Quantum on December 10, 2024, and that he was "forced to rely on memory to reconstruct events for potential legal proceedings." (Doc. #1-1, Ex. B, Page ID #28), Plaintiff explicitly identified the purpose of his outreach to Defendant:

> I am doing so since you were my most recent advisor, and I am afraid that PsiQuantum may want to tarnish my credibility . . . . You also have many connections in the industry, and I need a new job.

(Doc. #1-1, Ex. B, Page ID #28). The email closed by warning Defendant that "all communications will be in escrow, and I do not assume legal liabilities for any other person informed of this if the contents of this email were to proliferate." (Doc. #1-1, Ex. B, PageID #28), About twelve hours

later, at 2:25 p.m. on January 4, 2025, Plaintiff followed up with a one-line postscript: "P.S. They

will also try to assassinate my character." ((Doc. 1-1, Ex. B, Page ID #29).

On January 5, 2025, at 2:21 a.m., Gagliardi responded one final time:

> Dear Romit,
>
> I am sorry for your situation. I wish you all the best, but I will not be able to help you in the future. Please discuss your situation with Martin and whomever you think is appropriate but stop emailing me. Once you have recovered what you need from the U Chicago email address, we will have no further communication. Thank you for your understanding.

(Doc #1-1, Ex. B, PageID #29)

Twelve minutes later, at 2:33 a.m., Chakraborty replied: "Hi Laura, Thank you for your

response. I shall honour your wishes." (Doc. #1-1, Ex. B, PageID #29). That January 5, 2025,

exchange is the last direct communication between the parties reflected anywhere in the record.

At 10:12 p.m. on January 5, 2025, Chakraborty emailed his former post-doctoral advisor,

Professor Martin Head-Gordon, at the University of California at Berkeley. (Doc. #1-1, Ex. D,

PageID #38-39). Chakraborty's email recounted in detail the December 10, 2024, Psi Quantum

termination, and his thoughts of abandoning traditional quantum chemistry to pursue work at "the

intersection of quantum and AI." (Doc. #1-1, Ex. D, PageID #38-39):

> Dear Martin,
>
> I hope you've been well.
>
> I'm writing to share some recent news about my recent employment at PsiQuantum and to ask for your perspective as I reassess my career path.
>
> …
>
> …on December 10[th], ***I was abruptly terminated in a 15-minute unscheduled meeting, with immediate confiscation of my work laptop and revocation of all digital access. The cited reasons were performance and teamwork***, yet none of these concerns had ever been raised, documented or even verbally insinuated prior to this unscheduled meeting.
>
> Thank you for taking the time to read this, Martin. I apologize for not reaching out with better news and will respect whatever level of advice you feel comfortable offering.
>
> Regards,

Romit
Romit Chakraborty, MS, PhD, UChicago 2017
Senior Quantum Solutions Computational Chemist
Psi Quantum
Palo Alto, California

Doc. #1.1, Ex. D, Page ID #38-39.

Within twenty-four hours, Professor Martin Head-Gordon replied with a candid letter assessing Plaintiff's entire "post-doctoral trajectory":

Dear Romit,

First, my personal commiserations about this extremely bad news –

…

This is not the time to sugar-coat things, so I will not.

I suggest you look at your entire post-doctoral trajectory and then take a long look in the mirror. … Consider the following evidence (looking at just the bottom line – not causes or excuses):

i) You made a poor impression on Laura because you were (apparently) distracted by LLMs. You were also not as good a team player as she had hoped. I do not know the remaining details, but recall she reached out to me because of her strong dissatisfaction with your performance.

ii) You failed to finish up your work with me, probably because, as your wrote to me just 5 days ago, you "cannot sustain prolonged interest" in those topics. For a 5-year post-doc, your productivity was low, a evidenced by only two first author papers. I had to put considerable personal effort into both of them to bring them to a standard I was happy with. So did your collaborators. Jeff Long felt your collaborative performance could not merit a recommendation letter.

iii) You failed to perform adequately at Psi Quantum in a quantum chemistry role, leading to cause-based termination after only 5 weeks or so.

To me this adds up to lots of missed opportunities that cast doubt on how interested in quantum chemistry you are, as well as how suitable you are for a job in academia or industry. In blunt performance -assessment terms, you have underperformed at every step (sometimes very significantly).

…

Sincerely,

Martin

P.S. Drop the false Psi Quantum affiliation from your emails, etc. It casts doubt on your honesty.

(Doc. #1-1, Ex. D, PageID #39).

Plaintiff did not accept Professor Head-Gordon's advice. He instead replied with a series of cursory messages over the next thirty minutes. (Doc. #1-1, Ex. D, Page ID#40-41). Several emails were exchanged thereafter, ending with the following form Head-Gordon on February 10, 2025:

Hi Romit,

I am in turn not quite sure what to say. In the absence of a direct conversation, your email comments must speak for themselves, I'm afraid. In your latest message it is unclear if you are apologizing (first part of PS) or excusing yourself (rest of message).

(Doc. #1-1, Ex. D, Page ID#43).

As of January 17, 2025, the Gagliardi Group website was updated, and Chakraborty's title was changed, per his request, to "Staff Scientist with Title Quantum AI Researcher." (Doc. #11, Ex. 5, PageID #116). Although the only available organizational tabs on the Gagliardi Group website are (1) "Postdoctoral Researchers," (2) "Graduate Students," and (3) "Undergraduates Summer Students and Visiting Scholars," – none of which accurately describe Chakraborty – Chakraborty requested that he be listed on the "Undergraduates Summer Students and Visiting Scholars" tab. The University ultimately complied with his request and listed him under the "Undergraduates Summer Students and Visiting Scholars" tab, per his request. (Doc. #11, ¶25)

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads factual content that allows the Court to draw

a reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Mere labels and conclusions, or a formulaic recitation of the elements of a cause of action, are insufficient. *Twombly*, 550 U.S. at 555. Where a complaint attaches exhibits, those exhibits are considered part of the complaint and may be relied upon by the Court; indeed, where an exhibit contradicts a conclusory allegation, the exhibit controls. *See* Fed. R. Civ. P. 10(c); *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005). For fraud claims, Federal Rule of Civil Procedure 9(b) further requires that a party "state with particularity the circumstances constituting the fraud or mistake."

### ARGUMENT

**I.    Count I for Fraudulent Inducement Fails Because Plaintiff's Claims are Contradicted by His Own Exhibits**

Chakraborty's claim for fraudulent inducement fails because he alleges no false statement made by Gagliardi that induced him to come to the University of Chicago which thereby caused him harm.  Under Illinois law, the elements of fraudulent inducement are: (1) a false statement of material fact; (2) made with knowledge that the statement is false; (3) the defendant intended that the statement would induce the plaintiff to act; (4) the plaintiff justifiably relied on the statement; and (5) the plaintiff suffered damages arising from that reliance. *Abazari v. Rosalind Franklin University of Medicine and Science*, 2015 IL App (2d) 140952. Federal Rules of Civil Procedure 9(b) requires specificity when pleading fraud. Fed. R. Civ. Pro. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake").  There is a high standard for pleading claims of fraud, as the complaint must contain specific allegations from which fraud is the necessary or probable inference, including what representations were made, when they were made, who made them and to whom they were made. *Feis Equities, LLC v. Sompo International Holdings, LTD*, 2020 Il App (1st) 191072 (dismissing for lack of specificity

of fraud allegations); *First Mercury Insurance Co. v. Ciolino*, 2018 IL App (1st) 171532 (dismissing on grounds that reliance was not reasonable). In *Abazari*, the court affirmed the dismissal of an action for fraud against a college and medical university after plaintiff was unable to obtain a residency in podiatric medicine after graduation. *Abazari* at ¶1.

Plaintiff's Complaint fails to allege any facts suggesting that he did not enjoy the benefit of a staff level position during his employment. Indeed, he contends that he *actually* held such a position and attached photo of his "staff" ID to prove it. His post-departure complaint that the Gagliardi website identified him as a "post doc" does not evidence any untoward treatment of him during his employment; nor do Gagliardi's "subsequent [post departure] classification and statements." (Doc. #11, ¶41). Plaintiff's fraudulent inducement claim rests on the premise that he was promised a staff position but then "treated like a post-doc." (Doc. #11, ¶ 41). That theory is contradicted at every turn by his own pleading and its attached exhibits.

First, Plaintiff alleges, and his Exhibit 1 confirms, that Dr. Gagliardi executed an offer letter on August 31, 2023 appointing him as a "Quantum-AI Researcher" in a staff position. (Doc. #11, ¶16; Ex. 1). Second, Plaintiff alleges that the University issued him an identification card with the classification "STAFF." (Doc. #11, ¶18; Ex. 2). Third, Plaintiff does not allege that he was denied any staff-level benefit, compensation, or condition of employment during his tenure. His employment was simply "at-will" per the offer letter, and he remained for approximately eight months. (Doc. #11 ¶17; Doc. #1, ¶30).

The supposed "fraud" consists entirely of post-departure events: a December 23, 2024 reference to him as a "postdoc" on the group website (Doc. #11, ¶ 20), and Gagliardi's January 3, 2025, email characterizing his title as "made up" (Doc. #11, ¶ 22). These are post-departure communications, not statements made to induce his initial employment. They cannot retroactively

transform a lawfully performed employment contract into a fraud. *See Abazari*, 2015 IL App (2d) 140952 at ¶ 1 (affirming dismissal of fraud claim by graduate who failed to achieve anticipated career outcome).

Since Plaintiff cannot point to a false statement made at the time of hire, and because his own exhibits demonstrate he received the staff appointment he was promised, Count I must be dismissed.

> **II.    Count II for Defamation Fails because Qualified Privilege Covers the Single Internal Email and the Alleged Comments to an Industry Colleague are Classic Non-Actionable Opinions**

*The Email*

Plaintiff alleges that Gagliardi published the statement, "the title Quantum AI Researcher is totally made up by you." Doc. #11, ¶45, and cites an email from Gagliardi to Chakraborty and Monica Lugo at the University of Chicago Human Resources department. Doc. #11, Ex. 3, Page ID #109.

The defamation claim based on the statement in the internal email is covered by a qualified privilege, and Plaintiff did not – and cannot – properly allege abuse of the privilege. Plaintiff admits that the only other recipient of that email was "University Human Resources." (Doc. #11, ¶3). Communications concerning employment issues with an HR department enjoy a qualified privilege. A qualified privilege "is based on the policy of protecting honest communications of misinformation in certain favored circumstances in order to facilitate the availability of correct information." *Kuwik v. Starmark*, 156 Ill. 2d 16, 27 (1993). Such conditional or qualified privilege falls into three classes: "(1) situations in which some interest of the person who publishes the defamatory matter is involved; (2) situations in which some interest of the person to whom the matter is published or some other third person is involved; (3) situations in which a recognized interest of the public is concerned." *Id.* at 29. "Whether a statement is protected by… a qualified

or conditional, privilege is a question of law for the court." *Layne v. Builders Plumbing Supply Co.*, 210 Ill. App. 3d 966, 969 (2d Dist. 1991). In making that determination, "the court only looks to the occasion itself to determine as a matter of law and general policy whether the occasion created a recognized duty or interest that makes the communication privileged." *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 871 (1st Dist. 1995).

This scenario was protected by a qualified privilege. Gagliardi's response to Plaintiff's inquiry was limited to Plaintiff and a single person in HR. See *Cianci v. Pettibone Corp.*, 298 Ill. App. 3d 419, 426 (1st Dist. 1998) (limited disclosure of the statement to people who had an interest supported the existence of a qualified privilege).

When a qualified privilege exists, the burden shifts, and "the plaintiff must show 'a direct intention to injure another, or… a reckless disregard of [the defamed party's] rights and of the consequences that may result to him.'" *Kuwik* at 30. Here, after Plaintiff's inquiry about the proper identification of his job title, Gagliardi gave an inaccurate response to him and a single person in HR. Plaintiff knew that Gagliardi was wrong, and the HR recipient had the ability to determine the accuracy of the statement. Indeed, Plaintiff's own exhibits show that the misdescription was resolved to his satisfaction approximately one week later. Plaintiff cannot coax bad faith or an intention to harm out of this scenario. *Huon v. Beatty*, 407 Ill. App. 3d 1185 (1st Dist. 2011) (affirming dismissal of complaint where qualified privilege applied, and "no malice or bad faith on the part of the defendants… can reasonably be inferred from the factual allegations in the amended complaint."). *Gist v. Macon County Sheriffs Dept.*, 284 Ill. App. 3d 367, 374 (4th Dist. 1996) (dismissal of defamation complaint affirmed where plaintiff failed to plead facts showing abuse of qualified privilege; "plaintiff set forth no facts tending to show that either of the defendants acted in bad faith in circulating the flyer…. The flyer at issue here was limited in

Page 11 of 16

scope…."); *Tamburo v. Dworkin*, 2013 WL 5408540 at 1209 (N.D. Ill. Sept. 26, 2013) (plaintiff did not show an abuse of the qualified privilege where defendant believed statements to be true and publication was limited in scope); *Izadifar v. Loyola University*, 2005 U.S. Dist. LEXIS 13602 at 20-21 (N.D. Ill. 2005) (a qualified privilege existed and the plaintiff failed to proffer evidence of the abuse of the privilege; "unsubstantiated statements [of] bias" did not suffice); *Vickers v. Abbott Labs*, 308 Ill. App. 3d 393, 404-06 (1st Dist. 1999) (no showing of abuse of qualified privilege other than "speculation"). *Larson v. Decatur Memorial Hospital*, 236 Ill. App. 3d 796, 804-05 (4th Dist. 1992) (the plaintiff could not show actual malice to defeat a qualified privilege where person making statements believed the truth of them).

### *The Telephone Call*

Plaintiff also alleges that Gagliardi communicated "statements" to a "key referee" that contributed to reputational harm. Doc. #11, ¶49. This key referee is identified at Martin Head-Gordon, and the statements are alleged to be that Plaintiff made a poor impression because he was "distracted by LLMs" and described Plaintiff as having performed poorly, despite having recruited Plaintiff to pursue LLM-based research. Doc. #11, ¶5.

The defamation claim based on the statements to Martin Head-Gordon are classic, non-actionable opinion: "distracted by LLMs," "not a good team player as she hoped," "had a strong dissatisfaction with your performance." Under Illinois law, the test for fact or opinion is whether the statement is "capable of objective verification as true or false." *Doherty v. Kahn*, 289 Ill. App. 3d 544, 557 (1st Dist. 1987). In *Doherty*, the defendants' statements to potential customers that "plaintiff was 'incompetent,' 'lazy,' 'dishonest,' 'cannot manage a business,' and/or 'lacks the ability to perform landscaping services' were deemed 'mere expressions of opinion.'" Here, Gagliardi's purported statements to Head-Gordon were even fuzzier than that. *See also Hopewell*

*v. Vitullo*, 299 Ill. App. 3d (1st Dist. 1998) (employer's statement that plaintiff was "fired for incompetence" was non-actionable opinion); *Wilkow v. Forbes*, 241 F. 3d 552, 555 (7th Cir. 2001) (subjective statement not actionable).

Notably, the very framing of Head-Gordon's retransmission of Gagliardi's statements, set forth in a letter that also independently assesses Plaintiff's "postgraduate trajectory" and encourages him to "take a long look in the mirror", underscores the subjective, evaluative character of the statements at issue. They reflect a supervisor's assessment, not verifiable statements of fact, therefore, Count II must be dismissed.

### III. Count III for Tortious Interference with Prospective Economic Advantage Fails Because Plaintiff Has Alleged Only a Vague Hope for a Faculty Level Position in a Competitive Reputation Driven Field

To state a claim for tortious interference with prospective economic advantage under Illinois law, a plaintiff must allege a reasonable expectancy of a future business relationship, defendant's knowledge of that expectancy, intentional interference inducing a breach of that expectancy, and resulting damages. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484 (1998). Critically, the expectancy must be specific and reasonable, not merely speculative.

Plaintiff's Count III fails on multiple independent grounds. Plaintiff fails to identify any of the purported "faculty level positions" he expected to obtain, and the exhibits to his Complaint show that he found a job at a highly reputable company – PsiQuantum – but was fired after 5 weeks in a "cause-based termination." (Doc. #11, Ex. 7). Plaintiff identifies no specific prospective employer or concrete opportunity. He references only a general hope of obtaining "faculty level positions" (Doc. #11, ¶ 52) without identifying any particular search, institution, or offer that was lost as a result of Dr. Gagliardi's conduct. The University of New Mexico application referenced in Exhibit 8 was still pending as of January 5, 2025, after Plaintiff's own email to Dr. Gagliardi,

and the outcome of that search is not alleged to have been caused by her conduct. This is fatal. *Sheth v. The National Association of Realtors*, 2025 WL 1167852 (tortious interference claim dismissed on Rule 12(b)(6) motion: "Sheth has not pled facts sufficient to show she had a reasonable expectation…. 'the hope of receiving a job offer is not a sufficient expectancy.'" (quoting *Anderson v. Van Dorpel*, 172 Ill. 2d 399, 408 (1996)).

Moreover, the alleged statements to Head-Gordon are non-actionable opinion (see Section II above), so they cannot form the basis of a tortious interference claim. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 157 (1989) (the interference must be "without justification"). Therefore, Count III must be dismissed.

> **IV.     Count IV for Intentional Infliction of Emotional Distress Fails Because Plaintiff Has Failed to Allege Outrageous Behavior and Plaintiff was Dismissed for Cause from PsiQuantum, Breaking the Chain of Causation**

To state a claim for intentional infliction of emotional distress ("IIED") under Illinois law, a plaintiff must allege: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew there was a high probability that the conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress. *Canmegi v. Advocate South Suburban Hosp.*, 364 Ill. App. 3d 446 (1st Dist. 2006). A complaint alleging IIED "must be specific and detailed beyond what is normally considered permissible in pleading a tort action." *Welsh v. Commonwealth Edison Co.*, 306 Ill. App. 3d 148, 155 (1999). The conduct must "go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Taliani v. Resurrection*, 2018 IL App (3d) 160327 at ¶ 26. "Fright, horror, grief, shame, humiliation, worry and other such mental conditions alone are not actionable; the distress must be so severe that no reasonable person could be expected to endure it." *Id.*

The conduct he alleges consists of two categories: (1) an internal HR email containing an inaccurate statement about his title, which was corrected within approximately one week to his admitted satisfaction; and (2) professional reference communications to a colleague that consist of honest performance assessments. Neither category, singly or together, remotely approaches the "extreme and outrageous" threshold.

Moreover, the fact that Plaintiff is experiencing emotional distress arising from his unemployment, his "cause-based" termination from Psi Quantum, and his difficulty obtaining academic positions does not convert Gagliardi's conduct into the cause of that distress. It is reasonable to infer, at the pleading stage, that the distress, to the extent it exists and is severe, flows from Plaintiff's own professional circumstances, not from Gagliardi's limited and legally privileged communications. For the reasons stated above, Count IV of the complaint must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant Dr. Laura Gagliardi respectfully requests that this Court dismiss all four counts of Plaintiff's First Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), and for such other relief that this Honorable Court deems just and equitable.

Respectfully submitted,

JOHNSON & BELL, LTD.

/s/Caroline K. Vickrey
One of the Attorneys for Defendant,
Dr. Laura Gagliardi

Caroline K. Vickrey – ARDC #6210332
Georgia A. Arvanitis – ARDC #6352525
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770

(312) 372-9818 Fax
vickreyc@jbltd.com
arvanitisg@jbtd.com