

**BC**

**FILED**
6/15/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**GMC**

| | | |
|---|---|---|
| ROMIT CHAKRABORTY, Ph.D. | ) ) ) | **United States District Court** **Northern District of Illinois** |
| | ) | **Chakraborty v. Gagliardi** |
| Plaintiff, | ) | Case No. 1:26-cv-00106 |
| | ) | |
| v. | ) ) | Judge Hon. Jorge L. Alonso Magistrate Judge Hon. Albert Berry III |
| LAURA GAGLIARDI | ) ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### I. INTRODUCTION

Plaintiff Romit Chakraborty respectfully requests that the Court take judicial notice of two sworn declarations filed in the Superior Court of California, County of Santa Clara (Case No. 25CV461149), attached hereto as Exhibits A and B. These public court records establish a direct factual dispute regarding the proximate cause and privilege arguments advanced in Defendant's Rule 12(b)(6) Motion to Dismiss (Doc. #18), specifically rendering Defendant's grounds for dismissing Count II (Defamation Per Se), Count III (Tortious Interference), and Count IV (Intentional Infliction of Emotional Distress) improper at the pleading stage.

### II. RULE

Pursuant to Federal Rule of Evidence 201(b)(2), a court may judicially notice a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Federal courts routinely take judicial notice of public court documents from state court proceedings to establish the fact of such litigation and

the representations made therein. *See Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996). Furthermore, in the Seventh Circuit, a court ruling on a Rule 12(b)(6) motion may take judicial notice of matters of public record without converting the motion to one for summary judgment. *Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012).

### III. ANALYSIS

### A. The Judicially Noticed Records Defeat Defendant's Proximate Cause Severance (Counts III & IV)

To defeat Count III (Tortious Interference) and Count IV (Intentional Infliction of Emotional Distress), Defendant's Motion to Dismiss (Doc. #18) and Reply (Doc. #23) rely heavily on an extrinsic email from Professor Martin Head-Gordon to argue that Plaintiff's departure from PsiQuantum Corp. was a "cause-based termination" resulting from a failure to "perform adequately." (Doc. #18, PageID #165, #166). Defendant leverages this "poor performance" narrative to argue that the termination "breaks any chain of causation" attributable to Defendant's conduct. (Doc. #23, PageID #201).

The judicially noticeable state court records dismantle this narrative. In the attached sworn declarations filed concurrently on April 2, 2025, Arvin Kakekhani (Manager of Quantum Solutions Science) and Tara Shapowal (Director of HR Operations)—both acting as authorized agents for PsiQuantum Corp.—state under penalty of perjury that Plaintiff's termination was based solely on behavioral "insubordination" and "challenging my authority," explicitly abandoning the "performance" pretext relied upon by Defendant. *(See Ex. A, Kakekhani Decl. ¶ 4, 11, 12; Ex. B, Shapowal Decl. ¶ 7).* Because the terminating employer officially swore the termination was unrelated to academic or scientific competence, Defendant cannot use that

termination as a shield to sever liability for her own independent attacks on Plaintiff's scientific competence and integrity.

## B. The Judicially Noticed Records Expose Contradictions in Defendant's Privilege Defenses (Count II)

This shifting pretext is further compounded by Defendant's contradictory filings on this Court's docket regarding Count II (Defamation Per Se). Defendant's Motion to Dismiss asks this Court to protect her defamatory statements as "subjective characterizations of an employee's job performance." (Doc. #23, PageID #199).

However, Defendant simultaneously filed formal Responses to Requests for Admission (Doc. #22) flatly denying that Plaintiff performed work to be evaluated. Specifically, Defendant stated: "Defendant denies that Plaintiff 'performed research' according to Defendant's definition..." (Doc. #22, RFA No. 27, PageID #193), and similarly denied that Plaintiff "performed work." (Doc. #22, RFA No. 16, PageID #191).

Defendant cannot simultaneously ask this Court to dismiss the First Amended Complaint by characterizing her statements as protected opinions on Plaintiff's "poor performance" (Doc. #18, #23), while formally denying under Rule 36 that Plaintiff even "performed research" in her laboratory (Doc. #22), while the actual terminating employer swears under penalty of perjury in state court that the termination was for "insubordination" (Exhibits A & B).

## IV. CONCLUSION

The judicially noticeable public records from the Santa Clara Superior Court, when viewed alongside Defendant's own docketed admissions (Doc. #22), establish that the factual premises of Defendant's proximate cause and qualified privilege defenses are actively disputed, shifting, and contradictory. Because these material facts are highly contested, they are inappropriate for resolution under Rule 12(b)(6). Defendant's Motion to Dismiss must be denied.

Dated: June 16, 2026

Respectfully submitted,

/s/ Romit Chakraborty

 Romit Chakraborty, Ph.D.

Plaintiff Pro Se

2261 Market Street, STE 72927

San Francisco,

CA 94114

romit.chakraborty@gmail.com

+1 773-816-8338

**INDEX OF EXHIBITS**

**Exhibit A:** Declaration of Arvin Kakekhani in Support of Defendant PsiQuantum, Corp.'s Opposition to Plaintiff's Motion for Temporary Restraining Order, filed April 2, 2025, in the Superior Court of California, County of Santa Clara (Case No. 25CV461149).

**Exhibit B:** Declaration of Tara Shapowal in Support of Defendant PsiQuantum, Corp.'s Opposition to Plaintiff's Motion for Temporary Restraining Order, filed April 2, 2025, in the Superior Court of California, County of Santa Clara (Case No. 25CV461149).

# EXHIBIT A

Declaration of Arvin Kakekhani in Support of Defendant PsiQuantum, Corp.'s Opposition to Plaintiff's Motion for Temporary Restraining Order, filed April 2, 2025, in the Superior Court of California, County of Santa Clara (Case No. 25CV461149).

BRIAN K. NAGATANI (CSB NO. 208632)
HIXSON NAGATANI LLP
2021 The Alameda, Suite 240
San Jose, CA 95126
Telephone: +1.408.486.9955
Facsimile: +1.408.727.6617
brian@hnemploymentlaw.com

Attorneys for Defendant,
PSIQUANTUM, CORP.

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/2/2025 12:17 PM
Reviewed By: C. Roman
Case #25CV461149
Envelope: 18824973**

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

ROMIT CHAKRABORTY,

Plaintiff,

v.

PSIQUANTUM, CORP.,

Defendants.

Case No.: 25CV461149

**DECLARATION OF ARVIN KAKEKHANI IN SUPPORT OF DEFENDANT PSIQUANTUM, CORP.'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Arvin Kakekhani, declare and state as follows:

1. I am Manager, Quantum Solutions Science, for Defendant PsiQuantum, Corp. ("PsiQuantum" or the "Company"). I have held this position since October 2024. Prior to this, I held the position of Staff Quantum Solutions Scientist for PsiQuantum. I make this declaration in support of Defendant's Opposition to Plaintiff's Motion for Temporary Restraining Order.

2. PsiQuantum is on a mission to build and deploy the world's first useful quantum computers. Quantum computing applies the laws of quantum mechanics to simulate and solve complex problems that are too difficult for the current genre of classical computers.

3. I was the supervisor of Plaintiff Romit Chakraborty ("Plaintiff") during his entire tenure at PsiQuantum. Plaintiff began working for the Company on October 28, 2024.

Hixson
Nagatani LLP

1

KAKEKHANI DEC. IN SUPPORT OF OPPOSITION TO MOTION FOR TRO, Case No. 25CV461149

4. During Plaintiff's brief period of employment, he repeatedly acted in an insubordinate fashion.

5. For example, during a one-on-one between Plaintiff and me, Plaintiff aggressively moved towards me, pointing angrily at me and raising his voice. After this incident, I did not feel comfortable having one-on-one meetings with Plaintiff any longer.

6. During another meeting, the Plaintiff repeatedly attacked a colleague's work, refusing to back down even after I intervened multiple times and asked him to stop the argument.

7. On multiple occasions, Plaintiff refused to follow my verbal and written instructions regarding previously established managerial and procedural arrangements – for example, which team member was assigned to manage specific meetings, or the process for changing meeting dates and times.

8. I also requested that Plaintiff remain open to listening to ideas of other employees who had prior industry experience, while Plaintiff refused to listen.

9. Team members also expressed concerns to me about Plaintiff's behavior, stating that it was negatively affecting the work environment and diminishing their productivity.

10. In another instance, Plaintiff argued at length with me – and later with other team members – after being asked to follow a clear instruction not to use personal accounts for Company-related work and data. Despite being told multiple times in that meeting that this was standard procedure and Company policy, he continued to argue in a dismissive manner.

11. I made it clear to Plaintiff that I am responsible for managing the team and providing timely feedback to its members. Nonetheless, he continued to challenge my authority and accused me of micromanaging when I reminded him of the group's standard procedures and asked him to focus on his primary projects.

12. For these reasons, among others, PsiQuantum had no choice but to terminate Plaintiff's employment.

13. Prior to terminating Plaintiff's employment, the Company requested that he provide a progress report on work he had done so that it could transition his duties to other employees.

14.     During his employment, Plaintiff questioned me on one occasion about why he was not placed on an interview panel.  He did not claim such conduct related to his national origin, or any other protected class, and he did not in any way claim that such action was discriminatory.

All of the facts set forth herein are based on my personal knowledge, and if called as a witness, I could testify competently thereto.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed in Palo Alto, California on April 2, 2025.

_____
ARVIN KAKEKHANI

Hixson
Nagatani LLP

KAKEKHANI DEC. IN SUPPORT OF OPPOSITION TO MOTION FOR TRO, Case No. 25CV461149

# EXHIBIT B

Declaration of Tara Shapowal in Support of Defendant PsiQuantum, Corp.'s Opposition to Plaintiff's Motion for Temporary Restraining Order, filed April 2, 2025, in the Superior Court of California, County of Santa Clara (Case No. 25CV461149).

BRIAN K. NAGATANI (CSB NO. 208632)
HIXSON NAGATANI LLP
2021 The Alameda, Suite 240
San Jose, CA 95126
Telephone: +1.408.486.9955
Facsimile: +1.408.727.6617
brian@hnemploymentlaw.com

Attorneys for Defendant,
PSIQUANTUM, CORP.

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/2/2025 12:17 PM
Reviewed By: C. Roman
Case #25CV461149
Envelope: 18824973**

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| ROMIT CHAKRABORTY,<br><br>                     Plaintiff,<br><br>    v.<br><br>PSIQUANTUM, CORP.,<br><br>                     Defendants. | Case No.: 25CV461149<br><br>**DECLARATION OF TARA SHAPOWAL IN SUPPORT OF DEFENDANT PSIQUANTUM, CORP.'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

I, Tara Shapowal, declare and state as follows:

1.      I am Director, HR Operations, for Defendant PsiQuantum, Corp. ("PsiQuantum" or the "Company"). I have held this position since June 2024. I make this declaration in support of Defendant's Opposition to Plaintiff's Motion for Temporary Restraining Order.

2.      In my position as Director, HR Operations, I am responsible for oversight of PsiQuantum's hiring and personnel records at its headquarters in Palo Alto, California. As Director, HR Operations, I have access to personnel files for all current and former PsiQuantum employees and I have knowledge of how these files are maintained and kept. PsiQuantum maintains these personnel files in the regular course of business on-site at its Palo Alto location. PsiQuantum maintains offer letters in its employees' personnel files in the regular course of

Hixson
Nagatani LLP

1

SHAPOWAL DEC. IN SUPPORT OF OPPOSITION TO MOTION FOR TRO, Case No. 25CV461149

business.  The Company generates offer letters at or near the time it makes an offer of employment to candidates for employment with the Company.

3.  Attached hereto as Exhibit A is a true and correct copy of Plaintiff's offer letter from his personnel file.  Based on the offer letter, on or about July 25, 2024, PsiQuantum made an offer of employment to Plaintiff as a Senior Quantum Solutions Computational Chemist, reporting to Arvin Kakekhani.

4.  On December 10, 2024, after being notified of his termination, Plaintiff emailed me asking that the Company re-evaluate its termination decision.  Attached hereto as Exhibit B is a true and correct copy of the December 10, 2024 email I received from Plaintiff.

5.  In response, the Company agreed to extend Plaintiff's employment until January 10, 2025 as a good faith measure to assist him with the terms of his O1 Visa which allowed him a longer period of time to find another position despite having no obligation to do so.

6.  On January 7, 2025, Plaintiff stated: "I will be filing a lawsuit in Santa Clara County if PsiQuantum fails to address the non-negotiable requirement of extending my employment on the payroll until March 10, 2025. This extension is critical for me to secure a new O-1A sponsor and avoid further irreparable harm to my career and well-being."  Attached hereto as Exhibit C is a true and correct copy of the January 7, 2025 email I received from Plaintiff.

7.  In response, on January 21, 2025, the Company agreed to extend Plaintiff's employment through March 10, 2025, exactly as he requested, providing him with full pay and benefits in order to allow him adequate time to address his claimed visa issues and expand his timeline to find another position that would allow him to remain in the country despite having no obligation to do so, and going above and beyond what it would do for an employee who was terminated for insubordination.  Attached hereto as Exhibit D is a true and correct copy of the January 21, 2025 email I sent to Plaintiff documenting the Company's agreement.

8.  Despite agreeing to exactly what Plaintiff requested, on February 25, 2025, Plaintiff emailed the Company requesting to extend his employment until April 10, 2025, threatening to consider formal legal avenues if his concerns remained unmet.  Attached hereto as Exhibit E is a

Hixson
Nagatani LLP

SHAPOWAL DEC. IN SUPPORT OF OPPOSITION TO MOTION FOR TRO, Case No. 25CV461149

true and correct copy of the February 25, 2025 email I received from Plaintiff.

9. I informed Plaintiff that the Company would be unable to negotiate the termination date any further. Attached hereto as Exhibit F is a true and correct copy of the February 27, 2025 email I sent to Plaintiff.

All of the facts set forth herein are based on my personal knowledge, and if called as a witness, I could testify competently thereto.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed in Palo Alto, California on April 2, 2025.

*Tara Shapowal*

TARA SHAPOWAL

Hixson
Nagatani LLP

SHAPOWAL DEC. IN SUPPORT OF OPPOSITION TO MOTION FOR TRO, Case No. 25CV461149

# EXHIBIT A



700 Hansen Way
Palo Alto, CA 94304


July 25, 2024

Romit Chakraborty
romit@uchicago.edu

Dear Romit,


PsiQuantum, Corp., (the "Company") is pleased to offer you employment on the following terms:

**1. Position**. Your title will be **Senior Quantum Solutions Computational Chemist** and you will report to **Arvin Kakekhani.** This is a full-time position working out of **Palo Alto, CA**. While you render services to the Company, you will not engage in any other employment, consulting, or other business activity (whether fulltime or part-time) that would create a conflict of interest with the Company. By signing this letter agreement, you confirm to the Company that you have no contractual commitments or other legal obligations that would prohibit you from performing your duties for the Company.

**2. Cash Compensation**. The Company will pay you a starting salary at the rate of **$188,000.00** per year, payable in accordance with the Company's standard payroll schedule and subject to applicable deductions and withholdings. This salary will be subject to periodic review and adjustments at the Company's discretion.

**3. Variable Bonus.** You are eligible for a variable bonus of **8%**. The bonus you receive will be determined based on milestones set by your manager. Once milestones are completed, bonuses will be payable during the next merit cycle. To be eligible for the current year's variable bonus, you must onboard by July 31st of that year. If hired after July 31st, the variable bonus will be payable the following year.

**4. Relocation Assistance Budget.** In addition, we offer a relocation assistance budget of up to **$10,000.00.** Once you relocate to the Bay Area, you will be reimbursed for qualifying expenses once you submit receipts to our expense portal. The Relocation Assistance Budget is conditioned upon your continued employment with the Company for one year. Any remaining budget unused after one year of relocation will be forfeited. If you leave the Company prior to your one-year anniversary, you will be required to repay the expenses reimbursed to you, in full, within thirty (30) days of your departure from the Company.

**5. Employee Benefits**. As a regular employee of the Company, you will be eligible to participate in a number of Company-sponsored benefits. In addition, you will be entitled to paid vacation in accordance with the Company's vacation policy, as in effect from time to time.

**6. Stock Options.** Subject to the approval of the Company's Board of Directors or its Compensation Committee, you will be granted an option to purchase **20,000** shares of the Company's Common Stock (the "Option"). The exercise price per share of the Option will be determined by the Board of Directors when the Option is granted. The Option will be subject to the terms and conditions applicable to options



HR Initial_____

granted under the stock option plan in effect at the time of the grant and the applicable stock option agreement. You will vest in 25% of the Option shares after 12 months of continuous service, and the balance will vest in equal monthly installments over the next 36 months of continuous service, as described in the applicable stock option agreement.

**7. Proprietary Information and Inventions Agreement**. Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's standard Proprietary Information and Inventions Agreement, a copy of which is attached hereto as **Exhibit A**.

**8. Employment Relationship**. Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations that may have been made to you are superseded by this letter agreement. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation, and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company (other than you).

**9. Background Investigations and Reference Checks**. The Company reserves the right to conduct background investigations and/or reference checks on all its potential employees. This employment offer is therefore contingent upon a clearance of such a background investigation and/or reference check, if any.

**10. Export Control**. This offer is contingent upon receipt of any export license or other approval that may be required under United States export control laws and regulations. We are not obligated to apply for any export license or other approval that may be required, nor can we guarantee that the United States Government will issue an export license or other approval, in the event that we do file an application. If for any reason PsiQ does not receive any required license from the U.S. government within an established time frame provided by the company, PsiQ may terminate your employment.

**11. Tax Matters.**
    **a. Withholding**. All forms of compensation referred to in this letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.
    **b. Tax Advice**. You are encouraged to obtain your own tax advice regarding your compensation from the Company. You agree that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities, and you will not make any claim against the Company, or its Board of Directors related to tax liabilities arising from your compensation.

**12. Interpretation, Amendment and Enforcement**. This letter agreement and Exhibit A constitute the complete agreement between you and the Company, contain all the terms of your employment with the Company and supersede any prior agreements, representations, or understandings (whether written, oral or implied) between you and the Company. This letter agreement may not be amended or modified, except by an express written agreement signed by both you and a duly authorized officer of the Company. The terms of this letter agreement and the resolution of any disputes as to the meaning, effect, performance, or validity of this letter agreement or arising out of, related to, or in any way connected with, this letter agreement, your employment with the Company or any other relationship between you and the Company (the "Disputes") will be governed by California law, excluding laws relating to conflicts



HR Initial

or choice of law. You and the Company submit to the exclusive personal jurisdiction of the federal and state courts located in San Mateo County, California, in connection with any Dispute or any claim related to any Dispute.

We hope that you will accept our offer to join the Company. You may indicate your agreement with these terms and accept this offer by signing and dating both the enclosed duplicate original of this letter agreement and the enclosed Proprietary Information and Inventions Agreement and returning them to me. This offer, if not accepted, will expire at the close of business on **July 30, 2024**. As required by law, your employment with the Company is contingent upon your providing legal proof of your identity and authorization to work in the United States. Your employment is also contingent upon your anticipated start date of **October 28, 2024** with the Company.

Very truly yours,

*Kris Werner*

Kris Werner, Head of Human Resources
PsiQuantum, Corp.

I have read and accept this employment offer:

Signed by:

*Romit Chakraborty*

5C94DB45701746A...

07/25/2024 | 4:29 PM PDT

**Romit Chakraborty**

**Attachment**
Exhibit A: Proprietary Information and Inventions Agreement



HR Initial_____

## PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

The following confirms and memorializes an agreement that **PsiQuantum, Corp.**, a Delaware corporation ("Company") and I (_____Romit Chakraborty_____) have had since the commencement of my employment (which term, for purposes of this agreement, shall be deemed to include any relationship of service to Company that I may have had prior to actually becoming an employee) with Company in any capacity and that is and has been a material part of the consideration for my employment by Company:

1.        I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement or my employment with Company.  I will not violate any agreement with or rights of any third party or, except as expressly authorized by Company in writing hereafter, use or disclose my own or any third party's confidential information or intellectual property when acting within the scope of my employment or otherwise on behalf of Company.  Further, I have not retained anything containing any confidential information of a prior employer or other third party, whether or not created by me.

2.        Company shall own, and I hereby assign to Company, all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, *sui generis* database rights and all other intellectual property rights of any sort  throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas and information (collectively, "Inventions") made or conceived or reduced to practice, in whole or in part, by me during the term of my employment with Company (collectively, "Company Inventions"), and I will promptly disclose all Company Inventions to Company.  The term "Company Inventions" will not include any Invention that (a) I cannot be required to so assign by law (including, without limitation, pursuant to the applicable statutory provision for my state of employment set forth in Appendix A, if any), or (b) otherwise meets all of the following requirements: (i) the Invention is developed entirely on my own time, (ii) the Invention is developed entirely without use of any of Company's facilities, equipment, Proprietary Information (as defined below) or other assets and (iii) the Invention is not useful with or related to the business of Company or Company's actual or demonstrably anticipated research or development. Without disclosing any third party confidential information, I will also disclose anything I believe is excluded by the foregoing so that Company can make an independent assessment.  I shall further assist Company, at Company's expense, to further evidence, record and perfect the foregoing assignment and to perfect, obtain, maintain, enforce, and defend any rights specified to be so owned or assigned.  I hereby irrevocably designate and appoint Company as my agent and attorney-in-fact, coupled with an interest and with full power of substitution, to act for and in my behalf to execute and file any document and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by me.  If I wish to clarify that something created by me prior to my employment that relates to Company's actual or proposed business is not within the scope of the foregoing assignment, I have listed it on Appendix B in a manner that does not violate any third party rights or disclose any confidential information. Without limiting Section 1 or Company's other rights and remedies, if, when acting within the scope of my employment or otherwise on behalf of Company, I use or (except pursuant to this Section 2) disclose my own or any third party's confidential information or intellectual property (or if any Company Invention cannot be

fully made, used, reproduced, distributed and otherwise exploited without using or violating the foregoing), Company will have, and I hereby grant Company a perpetual, irrevocable, worldwide royalty-free, non-exclusive, sublicensable right and license to exploit and exercise all such confidential information and intellectual property rights.

3. To the extent allowed by law, paragraph 2 includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively "Moral Rights"). To the extent I retain any such Moral Rights under applicable law, I hereby ratify and consent to any action that may be taken with respect to such Moral Rights by or authorized by Company and agree not to assert any Moral Rights with respect thereto. I will confirm any such ratifications, consents and agreements from time to time as requested by Company.

4. I agree that all Company Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I develop, learn or obtain during the term of my employment that relate to Company or the business or demonstrably anticipated business of Company or that are received by or for Company in confidence, constitute "Proprietary Information." I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information. However, I shall not be obligated under this paragraph with respect to information I can document is or becomes readily publicly available without restriction through no fault of mine. Upon termination of my employment, I will promptly return to Company all items containing or embodying Proprietary Information (including all copies), except that I may keep my personal copies of (i) my compensation records, (ii) materials distributed to shareholders generally and (iii) this Agreement. I also recognize and agree that I have no expectation of privacy with respect to Company's telecommunications, networking or information processing systems (including, without limitation, stored computer files, email messages and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice.

5. To the extent permitted by law, I agree that during my employment by the Company and for one year thereafter I will not solicit any employee or contractor of the Company to terminate his or her employment or contractor status with the Company.

6. I agree that during the term of my employment with Company (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Company, and I will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company.

7. I agree that this Agreement is not an employment contract for any particular term and that I have the right to resign and Company has the right to terminate my employment at will, at any time, for any or no reason, with or without cause. In addition, this Agreement does not purport to set forth all of the terms and conditions of my employment, and, as an employee of Company, I have obligations to Company which are not set forth in this Agreement. However, the terms of this Agreement govern over any inconsistent terms and can only be changed by a subsequent written agreement signed by the President of Company.

8.      I agree that my obligations under paragraphs 2, 3, 4 and 5 of this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary on my part, and that Company is entitled to communicate my obligations under this Agreement to any future employer or potential employer of mine.  My obligations under paragraphs 2, 3 and 4 also shall be binding upon my heirs, executors, assigns, and administrators and shall inure to the benefit of Company, it subsidiaries, successors and assigns.

9.      Any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the State of California, without regard to the conflict of laws provisions thereof.  I further agree that if one or more provisions of this Agreement are held to be illegal or unenforceable under applicable law, such illegal or unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms. This Agreement is fully assignable and transferable by Company, but any purported assignment or transfer by me is void. I also understand that any breach of this Agreement will cause irreparable harm to Company for which damages would not be an adequate remedy, and, therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond.

10.      Pursuant to the federal Defend Trade Secrets Act of 2016, I acknowledge receipt of the following notice: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order."  I further understand that nothing contained in this Agreement limits my ability to (A) communicate with any federal, state or local governmental agency or commission, including to provide documents or other information, without notice to Company, or (B) share compensation information concerning myself or others, except that this does not permit me to disclose compensation information concerning others that I obtain because my job responsibilities require or allow access to such information.

[Remainder of Page Intentionally Left Blank]

Docusign Envelope ID: 98E71B01-0E70-4380-9328-A279405D0B7D

**I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY, IN DUPLICATE, WITH THE UNDERSTANDING THAT COMPANY WILL RETAIN ONE COUNTERPART AND THE OTHER COUNTERPART WILL BE RETAINED BY ME.**

07/25/2024 | 4:29 PM PDT

_____, 20____

Employee

Signed by:

Romit Chakraborty

5C94DB45701746A

Signature

Romit Chakraborty

Name (Printed)

Accepted and Agreed to:

**PsiQuantum, Corp.**

By _____

Name    Jeremy O'Brien

Title    CEO

ACTIVE/100815738.1

<u>APPENDIX A</u>

**If I am employed by Company in California, California Labor Code Section 2870 is as follows:**

Application of provision providing that employee shall assign or offer to assign rights in invention to employer.

(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)     Result from any work performed by the employee for his employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**If I am employed by Company in Delaware, Title 19, Section 805 of the Delaware Code Ann. is as follows:**

Any provision in an employment agreement which provides that the employee shall assign or offer to assign any of the employee's rights in an invention to the employee's employer shall not apply to an invention that the employee developed entirely on the employee's own time without using the employer's equipment, supplies, facility or trade secret information, except for those inventions that; (i) relate to the employer's business or actual or demonstrably anticipated research or development, or (ii) result from any work performed by the employee for the employer. To the extent a provision in an employment agreement purports to apply to the type of invention described, it is against the public policy of this State and is unenforceable. An employer may not require a provision of an employment agreement made unenforceable under this section as a condition of employment or continued employment.

**If I am employed by Company in Illinois, Chapter 765, Section 1060/2 of the Illinois Compiled Statutes is as follows:**

(1)     A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or

demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this State and is to that extent void and unenforceable. The employee shall bear the burden of proof in establishing that his invention qualifies under this subsection.

(2)     An employer shall not require a provision made void and unenforceable by subsection (1) of this Section as a condition of employment or continuing employment. This Act shall not preempt existing common law applicable to any shop rights of employers with respect to employees who have not signed an employment agreement.

(3)     If an employment agreement entered into after January 1, 1984, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

**If I am employed by Company in Kansas, Sections 44-130 of the Kansas Labor and Industries Code is as follows:**

(a)     Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facilities or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

      (1)     The invention relates to the business of the employer or to the employer's actual or demonstrably
anticipated research or development; or

      (2)     The invention results from any work performed by the employee for the employer.

(b)     Any provision in an employment agreement which purports to apply to an invention which it is prohibited from applying to under subsection (a), is to that extent against the public policy of this state and is to that extent void and unenforceable. No employer shall require a provision made void and unenforceable by this section as a condition of employment or continuing employment.

(c)     If an employment agreement contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer shall provide, at the time the agreement is made, a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

Docusign Envelope ID: 98E71B01-0E70-4380-9328-A279405D0B7D

(1)     The invention relates directly to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)     The invention results from any work performed by the employee for the employer.

(d)     Even though the employee meets the burden of proving the conditions specified in this section, the employee shall disclose, at the time of employment or thereafter, all inventions being developed by the employee, for the purpose of determining employer and employee rights in an invention.

**If I am employed by Company in Minnesota, Section 181.78 of the Minnesota Labor, Industry Code is as follows:**

Subdivision 1. Inventions not related to employment. Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

Subdivision 2. Effect of subdivision 1. No employer shall require a provision made void and unenforceable by subdivision 1 as a condition of employment or continuing employment.

Subdivision 3. Notice to employee. If an employment agreement entered into after August 1, 1977 contains a provision requiring the employee to assign or offer to assign any of the employee's rights in any invention to an employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer.

**If I am employed by Company in North Carolina, §§ 66-57.1 and 66-57.2 of the North Carolina Gen. Stat. is as follows:**

§ 66-57.1.  Employee's right to certain inventions.

Any provision in an employment agreement which provides that the employee shall assign or offer to assign any of his rights in an invention to his employer shall not apply to an invention that the employee developed entirely on his own time without using the employer's equipment,

ACTIVE/100815738.1

supplies, facility or trade secret information except for those inventions that (i) relate to the employer's business or actual or demonstrably anticipated research or development, or (ii) result from any work performed by the employee for the employer. To the extent a provision in an employment agreement purports to apply to the type of invention described, it is against the public policy of this State and is unenforceable. The employee shall bear the burden of proof in establishing that his invention qualifies under this section.

§ 66-57.2. Employer's rights.

An employer may not require a provision of an employment agreement made unenforceable under G.S. 66-57.1 as a condition of employment or continued employment. An employer, in an employment agreement, may require that the employee report all inventions developed by the employee, solely or jointly, during the term of his employment to the employer, including those asserted by the employee as nonassignable, for the purpose of determining employee or employer rights. If required by a contract between the employer and the United States or its agencies, the employer may require that full title to certain patents and inventions be in the United States.

**If I am employed by Company in Utah, Sections 34-39-2 and 34-39-3 of Utah Code Ann. are as follows:**
34-39-2. Definitions.
As used in this chapter:

(1) "Employment invention" means any invention or part thereof conceived, developed, reduced to practice, or created by an employee which is:
(a) conceived, developed, reduced to practice, or created by the employee:
  (i) within the scope of his employment;
  (ii) on his employer's time; or
  (iii) with the aid, assistance, or use of any of his employer's property, equipment, facilities, supplies, resources, or intellectual property;
(b) the result of any work, services, or duties performed by an employee for his employer;
(c) related to the industry or trade of the employer; or
(d) related to the current or demonstrably anticipated business, research, or development of the employer.

(2) "Intellectual property" means any and all patents, trade secrets, know-how, technology, confidential information, ideas, copyrights, trademarks, and service marks and any and all rights, applications, and registrations relating to them.

34-29-3. Scope of Act -- When agreements between an employee and employer are enforceable or unenforceable with respect to employment inventions -- Exceptions.
(1) An employment agreement between an employee and his employer is not enforceable against the employee to the extent that the agreement requires the employee to assign or license, or to offer to assign or license, to the employer any right or intellectual property in or to an invention that is:
(a) created by the employee entirely on his own time; and

ACTIVE/100815738.1

(b) not an employment invention.

(2) An agreement between an employee and his employer may require the employee to assign or license, or to offer to assign or license, to his employer any or all of his rights and intellectual property in or to an employment invention.

(3) Subsection (1) does not apply to:
(a) any right, intellectual property or invention that is required by law or by contract between the employer and the United States government or a state or local government to be assigned or licensed to the United States; or
(b) an agreement between an employee and his employer which is not an employment agreement.

(4) Notwithstanding Subsection (1), an agreement is enforceable under Subsection (1) if the employee's employment or continuation of employment is not conditioned on the employee's acceptance of such agreement and the employee receives a consideration under such agreement which is not compensation for employment.

(5) Employment of the employee or the continuation of his employment is sufficient consideration to support the enforceability of an agreement under Subsection (2) whether or not the agreement recites such consideration.

(6) An employer may require his employees to agree to an agreement within the scope of Subsection (2) as a condition of employment or the continuation of employment.

(7) An employer may not require his employees to agree to anything unenforceable under Subsection (1) as a condition of employment or the continuation of employment.

(8) Nothing in this chapter invalidates or renders unenforceable any employment agreement or provisions of an employment agreement unrelated to employment inventions.

**If I am employed by Company in Washington, Section 49.44.140 of the Revised Code of Washington is as follows:**

(1)     A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

(2)     An employer shall not require a provision made void and unenforceable by subsection (1) of this section as a condition of employment or continuing employment.

Docusign Envelope ID: 98E71B01-0E70-4380-9328-A279405D0B7D

(3)      If an employment agreement entered into after September 1, 1979, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

Docusign Envelope ID: 98E71B01-0E70-4380-9328-A279405D0B7D

<u>APPENDIX B</u>

PRIOR MATTER

# EXHIBIT B

**From:** Romit Chakraborty <romit@uchicago.edu>
**Sent:** Tuesday, December 10, 2024 9:42 PM
**To:** HR <hr@psiquantum.com>; Tara Shapowal <tshapowal@psiquantum.com>
**Cc:** Christine Keelan <ckeelan@psiquantum.com>; Nicole Chatelin-Tembrevilla <ntembrevilla@psiquantum.com>; Sarah Mangano <smangano@psiquantum.com>
**Subject:** Re Termination: Humbly Asking for Understanding and a Path Forward at PsiQuantum

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Dear Tara,
(cc: Christine, Nicole, Sarah, HR)

I hope this message finds you well.

I am writing to you about the recent decision to end my employment at PsiQuantum, scheduled for December 20th and communicated today, on December 10th. I am grateful for the opportunity I've had to contribute to PsiQuantum's mission so far, and I hope to clarify the circumstances while reaffirming my dedication to the company's success.

When I joined PsiQuantum on October 28th, it was with genuine enthusiasm for the company's groundbreaking vision and deep confidence in its leadership—particularly in Arvin's exceptional expertise and forward-looking approach to quantum computing for chemistry. These qualities inspired my decision to join and continue to guide my commitment to

PsiQuantum's goals.

Over the past six weeks, I have relocated, adapted my career trajectory, and fully immersed myself in the team's work and vision. I delivered results on assigned tasks, presented my progress at team meetings, and remained consistently available for the regular one-on-one sessions described as non-negotiable with my manager—sessions I looked forward to for guidance and alignment but did not have the opportunity to hold recently (past 2-3 weeks). While I understand that workloads can be heavy and schedules tight, I believe these discussions would have provided valuable clarity and direction.

On December 5th, I was asked—on short notice—to provide a performance summary. Although the timeline was tight, I fully met the expectations, submitted a thorough report by the adjusted deadline of December 9th, discussed my progress and data during that day's meeting, and immediately shared all underlying code and data to foster transparency and collaboration.

I appreciate that concerns have been raised regarding performance and teamwork at the termination meeting today. This was the first time I heard about them. I would have welcomed more explicit guidance or defined expectations so I could address these issues proactively. I believe there is an opportunity for understanding, alignment, and growth with open dialogue. While I understand that concerns about my performance and teamwork were shared with me today—after the decision to terminate my employment had already been made—I never received the clear expectations or guidance that would have allowed me to address these issues proactively, meet the team's standards, and fully demonstrate my potential.

As you know, my transition from the University of Chicago to PsiQuantum involved securing an O-1A visa. This was a significant investment of time and effort for both the company and me. A sudden termination leaves me with a very limited 60-day window—compounded by a holiday period when most companies are not actively hiring—to secure new sponsorship. This situation puts my legal status and professional future in the U.S. in jeopardy. I humbly ask that you re-evaluate the decision, reflecting on the mutual investments made, the lack of predefined standards on performance and teamwork that were cited as the reason, and seek a solution that respects everyone's interests.

I remain fully committed to PsiQuantum's objectives. I am ready to embrace additional training, more frequent alignment meetings, or structured performance benchmarks to ensure all expectations are met. I truly believe that, through open communication and a collaborative spirit, I can contribute meaningfully to the company's success and support the values that make PsiQuantum exceptional.

Thank you for your time, understanding, and any help you can give in reviewing this decision

and facilitating a constructive follow-up discussion. With goodwill, I hope we can identify a positive path forward for all involved.

Sincerely,
Romit

# EXHIBIT C

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

**Via Email**
PsiQuantum Inc.
700 Hansen Way
Palo Alto, CA 94036

**Date:** January 7, 2025

**To**: HR and Legal Departments, PsiQuantum

**Re: Abrupt & Potentially Unlawful Termination — Demand for Resolution**

Dear PsiQuantum Team,

I am Dr. Romit Chakraborty, writing on my own behalf (pro se) regarding the abrupt termination of my employment at PsiQuantum. I was notified on December 10, 2024, with an initial effective date of December 20, later extended to January 10, 2025—yet without any revised termination letter or separation agreement. I seek an amicable resolution to the substantial harm I have experienced and reiterate my request that all relevant digital records be preserved.

In light of the lack of meaningful response thus far and the imminent termination date, I will be filing a lawsuit in Santa Clara County if PsiQuantum fails to address the non-negotiable requirement of extending my employment on the payroll until March 10, 2025. This extension is critical for me to secure a new O-1A sponsor and avoid further irreparable harm to my career and well-being.

---

**1. Background**

1.  **High-Stakes Relocation & O-1A Constraints**

    ○   I relocated from Chicago and began at PsiQuantum on October 28, 2024, after spending over 96 days obtaining an O-1A visa.

    ○   During my short six-week tenure, I delivered significant scientific output: a 19-page progress report + 10-page addendum prepared on December 9, multiple video-recorded talks (e.g., "Active Space Selection for Atomisation Energy Calculations" on Dec 2), and over 20 recorded discussions on Comprehensive Quantum Chemistry Methodology (CQCM).

- Possible rebuttals may involve selective anecdotal evidence, which I was never made privy to in any documented form or even via verbal insinuation before the Dec 10 termination meeting. Possible rebuttals may also include lack of fit, not stated in any form to date.

- If performance or teamwork were issues, then why were no 1:1 alignment meetings with the direct manager, Arvin Kakekhani, completed in the three weeks before the termination? My manager deemed them non-negotiable, and I was available for them. I even asked specifically for them on a number of occasions (see ref. internal Slack records)

- Until the December 10 termination meeting, no one mentioned "performance" or "teamwork" concerns. This abrupt firing, at the onset of my 60-day visa grace period, severely compromises my legal status and job-search prospects (exacerbated by the holiday hiring slowdown).

2. **Termination Meeting & Confiscation**

- The termination meeting on December 10 was unscheduled and lasted about 15 minutes. My work laptop was confiscated immediately, and I lost all access to Slack, PsiQuantum email, and my Carta account—depriving me of crucial records essential to any defense.

- Despite a standard separation agreement clause advising consultation with an attorney, Mr. Arvin Kakekhani explicitly told me not to seek legal counsel, in the presence of Ms. Tara Shapoval (HR).

3. **Preservation Requests Ignored**

- Since December 12, I have repeatedly asked PsiQuantum to preserve Slack messages, Overleaf documents, code repositories, and especially my December 9 progress report—yet have received no acknowledgment.

- This raises serious concerns about potential spoliation or a coordinated narrative being constructed to retroactively justify my termination.

4. **Alleged Retaliation & Lack of Performance Documentation**

- My abrupt firing followed closely after I requested transparency in a new hire's selection process on December 5–6, suggesting a retaliatory motive.

- No documented performance issues or PIP preceded this firing, indicating the "performance and teamwork" explanation may be pretextual.

---

**2. Demands for Amicable Resolution**

1. **Extend Payroll to March 10, 2025 (Non-Negotiable)**

- I must remain on payroll until March 10 so I can reasonably secure another employer and file a new O-1A petition. Terminating me sooner inflicts further irreparable immigration and financial harm.

2. **Severance**

- Given my annual salary ($188,000 + 8% bonus) and the reliance I placed on at least a one-year tenure, I request severance reflecting this expectation.

3. **Equity (25% Vesting or Cash Equivalent)**

My offer letter promised 20,000 shares over four years, with 25% vested after 12 months. I request either the 5,000 shares or an equivalent cash payout, recognizing I joined in good faith anticipating at least the first vesting milestone.

4. **Six Months of COBRA Subsidy**

   ○ With an abrupt holiday termination and immediate health coverage risk, PsiQuantum should subsidize COBRA for six months to prevent a gap in coverage.

5. **Neutral & Factual Reference**

   ○ I request an impartial written reference confirming my scientific code contributions, presentations, and other documented work. This ensures my professional reputation is not unfairly marred.

6. **Damages**

   ○ Beyond the above terms, I seek additional compensation for the disruption to my O-1A status, the emotional distress, and the potential long-term career harm. These damages remain open to negotiation in good faith.

---

### 3. Punitive Damages & Legal Precedent

- Malice / Oppression: The abrupt nature, lack of performance documentation, and exploitation of my immigration status could signify malice or reckless disregard under California law (Civil Code § 3294).

- Pretextual Rationale: Courts often follow the McDonnell Douglas burden-shifting framework. Here, the absence of any documented performance concerns until December 10 strongly suggests pretext.

- Public Policy: Deterring employers from exploiting highly skilled immigrants' visa vulnerabilities upholds the broader public interest.

- Number of People Affected: This is a common issue that involves many Indians in the US. I would have cause to fight for our rights as immigrant workers in the US.

I reserve the right to pursue punitive damages and cite relevant case law (e.g., *Zhang v. American Gem Seafoods*, *Kolstad v. American Dental Ass'n*) if these demands remain unresolved.

---

### 4. Preservation of Records (Reiterated)

Once more, I insist that PsiQuantum preserve all relevant digital data—Slack messages, Overleaf docs, ChatGPT logs, code repositories, and especially the December 9 progress report. My immediate loss of access intensifies the risk of spoliation. Failure to confirm preservation by January 10 will compel me to file suit pro se to ensure no further evidence is destroyed.

---

### 5. Conclusion & Response

I humbly ask you to respond on or before January 10, 2025, confirming the non-negotiable extension of my payroll date to March 10 and addressing all remaining demands. In the event of no satisfactory response, I will file a civil complaint in Santa Clara County, to be followed by formal discovery. I remain open to resolving this matter amicably should PsiQuantum wish to avoid protracted litigation.

Sincerely,
Dr. Romit Chakraborty (Pro Se)

20990 Valley Green Drive, Cottage 692

Cupertino, CA 95014
Phone: +1 (773) 816-8338
Email: romit.chakraborty@gmail.com

Romit Chakraborty, Ph.D.
Senior Quantum Solutions Computational Chemist
PsiQuantum | Palo Alto, California
M.S. (2013), Ph.D. (2017), University of Chicago



# EXHIBIT D

On Tue, 21 Jan 2025 at 16:55, Tara Shapowal <tshapowal@psiquantum.com> wrote:

Hi Romit,

Thank you for your message.  Although it's not PsiQuantum's general practice to negotiate matters such as this, in a show of good faith to allow you adequate time to address your immigration needs, we will extend your employment through March 10, 2025.  During this period, you will remain on paid administrative leave.  Additionally, at the conclusion of your paid administrative leave, the Company will offer you a severance package in exchange for your agreement to the Company's standard separation agreement.  In fairness to other employees who have previously been let go, we cannot negotiate this amount.

Further, I want to reassure you that the Company has retained all relevant documentation in this matter.  While the Company disagrees with a number of the remaining statements in your email, we do not believe it would be productive to engage in a back-and-forth on those issues and the Company's choice not to reply should not be interpreted as agreement with any of the other matters contained in your message.

We wish you the best in your future endeavors.

**Tara Shapowal-Lau**
Director, HR Operations

C +1 267 897 0349
E tshapowal@psiquantum.com



---

**From:** Romit Chakraborty <romit.chakraborty@gmail.com>
**Sent:** Tuesday, January 7, 2025 3:06 PM
**To:** HR <hr@psiquantum.com>; PsiQ Legal <legal@psiquantum.com>
**Subject:** Re: Abrupt & Potentially Unlawful Termination — Demand for Resolution

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

**Via Email**
PsiQuantum Inc.
700 Hansen Way
Palo Alto, CA 94036

**Date:** January 7, 2025

**To:** HR and Legal Departments, PsiQuantum

**Re: Abrupt & Potentially Unlawful Termination — Demand for Resolution**

Dear PsiQuantum Team,

I am Dr. Romit Chakraborty, writing on my own behalf (pro se) regarding the abrupt termination of my employment at PsiQuantum. I was notified on December 10, 2024, with an initial effective date of December 20, later extended to January 10, 2025—yet without any revised termination letter or separation agreement. I seek an amicable resolution to the substantial harm I have experienced and reiterate my request that all relevant digital records be preserved.

In light of the lack of meaningful response thus far and the imminent termination date, I will be filing a lawsuit in Santa Clara County if PsiQuantum fails to address the non-negotiable requirement of extending my employment on the payroll until March 10, 2025. This extension is critical for me to secure a new O-1A sponsor and avoid further irreparable harm to my career and well-being.

---

**1. Background**

1.  **High-Stakes Relocation & O-1A Constraints**

    o   I relocated from Chicago and began at PsiQuantum on October 28, 2024, after spending over 96 days obtaining an O-1A visa.

    o   During my short six-week tenure, I delivered significant scientific output: a 19-page progress report + 10-page addendum prepared on December 9, multiple video-recorded talks (e.g., "Active Space Selection for Atomisation Energy Calculations" on Dec 2), and over 20 recorded discussions on Comprehensive Quantum Chemistry Methodology (CQCM).

    o   Possible rebuttals may involve selective anecdotal evidence, which I was never made privy to in any documented form or even via verbal insinuation before the Dec 10 termination meeting. Possible rebuttals may also include lack of fit, not stated in any form to date.

    o   If performance or teamwork were issues, then why were no 1:1 alignment meetings with the direct manager, Arvin Kakekhani, completed in the three weeks before the termination? My manager deemed them non-negotiable, and I was available for them. I even asked specifically for them on a number of occasions (see ref. internal Slack records)

    o   Until the December 10 termination meeting, no one mentioned "performance" or "teamwork" concerns. This abrupt firing, at the onset of my 60-day visa grace period, severely compromises my legal status and job-search prospects (exacerbated by the holiday hiring slowdown).

2. **Termination Meeting & Confiscation**

   ○ The termination meeting on December 10 was unscheduled and lasted about 15 minutes. My work laptop was confiscated immediately, and I lost all access to Slack, PsiQuantum email, and my Carta account—depriving me of crucial records essential to any defense.

   ○ Despite a standard separation agreement clause advising consultation with an attorney, Mr. Arvin Kakekhani explicitly told me not to seek legal counsel, in the presence of Ms. Tara Shapoval (HR).

3. **Preservation Requests Ignored**

   ○ Since December 12, I have repeatedly asked PsiQuantum to preserve Slack messages, Overleaf documents, code repositories, and especially my December 9 progress report—yet have received no acknowledgment.

   ○ This raises serious concerns about potential spoliation or a coordinated narrative being constructed to retroactively justify my termination.

4. **Alleged Retaliation & Lack of Performance Documentation**

   ○ My abrupt firing followed closely after I requested transparency in a new hire's selection process on December 5–6, suggesting a retaliatory motive.

   ○ No documented performance issues or PIP preceded this firing, indicating the "performance and teamwork" explanation may be pretextual.

---

**2. Demands for Amicable Resolution**

1. **Extend Payroll to March 10, 2025 (Non-Negotiable)**

   ○ I must remain on payroll until March 10 so I can reasonably secure another employer and file a new O-1A petition. Terminating me sooner inflicts further irreparable immigration and financial harm.

2. **Severance**

   ○ Given my annual salary ($188,000 + 8% bonus) and the reliance I placed on at least a one-year tenure, I request severance reflecting this expectation.

3. **Equity (25% Vesting or Cash Equivalent)**

   ○ My offer letter promised 20,000 shares over four years, with 25% vested after 12 months. I request either the 5,000 shares or an equivalent cash payout, recognizing I joined in good faith anticipating at least the first vesting milestone.

4. **Six Months of COBRA Subsidy**

   ○ With an abrupt holiday termination and immediate health coverage risk, PsiQuantum should subsidize COBRA for six months to prevent a gap in coverage.

5. **Neutral & Factual Reference**

   ○ I request an impartial written reference confirming my scientific code contributions, presentations, and other documented work. This ensures my professional reputation is not unfairly marred.

6. **Damages**

   ○ Beyond the above terms, I seek additional compensation for the disruption to my O-1A status, the emotional distress, and the potential long-term career harm. These damages remain open to negotiation in good faith.

---

**3. Punitive Damages & Legal Precedent**

- Malice / Oppression: The abrupt nature, lack of performance documentation, and exploitation of my immigration status could signify malice or reckless disregard under California law (Civil Code § 3294).

- Pretextual Rationale: Courts often follow the McDonnell Douglas burden-shifting framework. Here, the absence of any documented performance concerns until December 10 strongly suggests pretext.

- Public Policy: Deterring employers from exploiting highly skilled immigrants' visa vulnerabilities upholds the broader public interest.

- Number of People Affected: This is a common issue that involves many Indians in the US. I would have cause to fight for our rights as immigrant workers in the US.

I reserve the right to pursue punitive damages and cite relevant case law (e.g., *Zhang v. American Gem Seafoods*, *Kolstad v. American Dental Ass'n*) if these demands remain unresolved.

---

**4. Preservation of Records (Reiterated)**

Once more, I insist that PsiQuantum preserve all relevant digital data—Slack messages, Overleaf docs, ChatGPT logs, code repositories, and especially the December 9 progress report. My immediate loss of access intensifies the risk of spoliation. Failure to confirm preservation by January 10 will compel me to file suit pro se to ensure no further evidence is destroyed.

---

**5. Conclusion & Response**

I humbly ask you to respond on or before January 10, 2025, confirming the non-negotiable extension of my payroll date to March 10 and addressing all remaining demands. In the event of no satisfactory response, I will file a civil complaint in Santa Clara County, to be followed by formal discovery. I remain open to resolving this matter amicably should PsiQuantum wish to avoid protracted litigation.

Sincerely,
Dr. Romit Chakraborty (Pro Se)

20990 Valley Green Drive, Cottage 692
Cupertino, CA 95014
Phone: +1 (773) 816-8338
Email: romit.chakraborty@gmail.com

Romit Chakraborty, Ph.D.
Senior Quantum Solutions Computational Chemist
PsiQuantum | Palo Alto, California
M.S. (2013), Ph.D. (2017), University of Chicago



# EXHIBIT E

**From:** Romit Chakraborty <romit.chakraborty@gmail.com>
**Sent:** Tuesday, February 25, 2025 3:16 PM
**To:** Tara Shapowal <tshapowal@psiquantum.com>; HR <hr@psiquantum.com>
**Cc:** PsiQ Legal <legal@psiquantum.com>; romit@uchicago.edu <romit@uchicago.edu>
**Subject:** Final Payroll Extension Request and Proposed Separation Terms

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Hi Tara and All,

First, thank you for extending my administrative leave through March 10. This has given me time to refine my application materials, pursue initial networking conversations, and address the health challenges that intensified over the holidays, when legal and immigration concerns took center stage.

Regrettably, the abrupt December 10, 2024, termination notice has had significant impacts on my immigration status, professional references, career trajectory, and a chronic health condition I've managed for over 14 years. Between December 10 and January 21, I faced considerable uncertainty, which undermined my ability to search for new employment opportunities— unfortunately, it even resulted in missing the final round for a University of Oxford professorship (deadline December 12).

In light of these circumstances, a severance of only two weeks' pay plus one month of COBRA, with a March 10 payroll cutoff, appears insufficient. I respectfully request:

1. Extension of final payroll date to April 10, 2025, in order to address ongoing recovery, immigration advocacy, and career impacts.
2. Receipt of the proposed separation agreement that is cognizant of the Jan 7th letter of demands by Tuesday, March 4, so there is reasonable time to assess whether it appropriately addresses the harm I've encountered.

While I am hopeful we can resolve this amicably, I am prepared to consider formal legal avenues if these concerns remain unmet. Finally, I appreciate your confirmation that PsiQuantum is preserving pertinent documentation (e.g., Overleaf, Slack, ChatGPT logs, recorded meetings, and other digital records). Please let me know if you need any additional information. I look forward to finding a fair, mutually beneficial solution.

Sincerely,
Romit

Romit Chakraborty, Ph.D.
M.S. (2013), Ph.D. (2017), University of Chicago
Ph: +1 773-816-8338
20990 Valley Green Drive, Cottage 692, Cupertino, CA 95014.
[Google Scholar](#) | [LinkedIn](#) | [Portfolio](#) | [GitHub](#)

On Sat, 8 Feb 2025 at 20:03, Romit Chakraborty <[romit.chakraborty@gmail.com](mailto:romit.chakraborty@gmail.com)> wrote:

> Dear Tara, All,
>
> I hope this finds you in good health and spirits.
> Received with thanks.
>
> Regards,
> Romit
>
> Romit Chakraborty, Ph.D.
> Senior Quantum Solutions Computational Chemist
> PsiQuantum | Palo Alto, California
> M.S. (2013), Ph.D. (2017), University of Chicago
>
>
> On Tue, 21 Jan 2025 at 16:55, Tara Shapowal <[tshapowal@psiquantum.com](mailto:tshapowal@psiquantum.com)> wrote:
>
>> Hi Romit,
>>
>> Thank you for your message. Although it's not PsiQuantum's general practice to negotiate matters such as this, in a show of good faith to allow you adequate time to address your immigration needs, we will extend your employment through March 10, 2025. During this period, you will remain on paid administrative leave. Additionally, at the conclusion of your paid administrative leave, the Company will offer you a severance package in exchange for your agreement to the Company's standard separation agreement. In fairness to other employees who have previously been let go, we cannot negotiate this amount.
>>
>> Further, I want to reassure you that the Company has retained all relevant documentation in this matter. While the Company disagrees with a number of the remaining statements in your email, we do not believe it would be productive to engage in a back-and-forth on those issues and the Company's choice not to reply should not be interpreted as agreement with any of the other matters contained in your message.
>>
>> We wish you the best in your future endeavors.

**Tara Shapowal-Lau**

Director, HR Operations

C +1 267 897 0349

E [tshapowal@psiquantum.com](mailto:tshapowal@psiquantum.com)

Ψ PsiQuantum

---

**From:** Romit Chakraborty <[romit.chakraborty@gmail.com](mailto:romit.chakraborty@gmail.com)>
**Sent:** Tuesday, January 7, 2025 3:06 PM
**To:** HR <[hr@psiquantum.com](mailto:hr@psiquantum.com)>; PsiQ Legal <[legal@psiquantum.com](mailto:legal@psiquantum.com)>
**Subject:** Re: Abrupt & Potentially Unlawful Termination — Demand for Resolution

> **[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

**Via Email**
PsiQuantum Inc.
700 Hansen Way
Palo Alto, CA 94036

**Date:** January 7, 2025

**To**: HR and Legal Departments, PsiQuantum

**Re: Abrupt & Potentially Unlawful Termination — Demand for Resolution**

Dear PsiQuantum Team,

I am Dr. Romit Chakraborty, writing on my own behalf (pro se) regarding the abrupt termination of my employment at PsiQuantum. I was notified on December 10, 2024, with an initial effective date of December 20, later extended to January 10, 2025—yet without any revised termination letter or separation agreement. I seek an amicable resolution to the substantial harm I have experienced and reiterate my request that all relevant digital records be preserved.

In light of the lack of meaningful response thus far and the imminent termination date, I will be filing a lawsuit in Santa Clara County if PsiQuantum fails to address the non-negotiable requirement of extending my employment on the payroll until March 10, 2025. This extension is critical for me to secure a new O-1A sponsor and avoid further irreparable harm to my career and well-being.

---

**1. Background**

1.  **High-Stakes Relocation & O-1A Constraints**

    -   I relocated from Chicago and began at PsiQuantum on October 28, 2024, after spending over 96 days obtaining an O-1A visa.

- During my short six-week tenure, I delivered significant scientific output: a 19-page progress report + 10-page addendum prepared on December 9, multiple video-recorded talks (e.g., "Active Space Selection for Atomisation Energy Calculations" on Dec 2), and over 20 recorded discussions on Comprehensive Quantum Chemistry Methodology (CQCM).

- Possible rebuttals may involve selective anecdotal evidence, which I was never made privy to in any documented form or even via verbal insinuation before the Dec 10 termination meeting. Possible rebuttals may also include lack of fit, not stated in any form to date.

- If performance or teamwork were issues, then why were no 1:1 alignment meetings with the direct manager, Arvin Kakekhani, completed in the three weeks before the termination? My manager deemed them non-negotiable, and I was available for them. I even asked specifically for them on a number of occasions (see ref. internal Slack records)

- Until the December 10 termination meeting, no one mentioned "performance" or "teamwork" concerns. This abrupt firing, at the onset of my 60-day visa grace period, severely compromises my legal status and job-search prospects (exacerbated by the holiday hiring slowdown).

2. **Termination Meeting & Confiscation**

- The termination meeting on December 10 was unscheduled and lasted about 15 minutes. My work laptop was confiscated immediately, and I lost all access to Slack, PsiQuantum email, and my Carta account—depriving me of crucial records essential to any defense.

- Despite a standard separation agreement clause advising consultation with an attorney, Mr. Arvin Kakekhani explicitly told me not to seek legal counsel, in the presence of Ms. Tara Shapoval (HR).

3. **Preservation Requests Ignored**

- Since December 12, I have repeatedly asked PsiQuantum to preserve Slack messages, Overleaf documents, code repositories, and especially my December 9 progress report—yet have received no acknowledgment.

- This raises serious concerns about potential spoliation or a coordinated narrative being constructed to retroactively justify my termination.

4. **Alleged Retaliation & Lack of Performance Documentation**

- My abrupt firing followed closely after I requested transparency in a new hire's selection process on December 5–6, suggesting a retaliatory motive.

- No documented performance issues or PIP preceded this firing, indicating the "performance and teamwork" explanation may be pretextual.

---

**2. Demands for Amicable Resolution**

1. **Extend Payroll to March 10, 2025 (Non-Negotiable)**

- I must remain on payroll until March 10 so I can reasonably secure another employer and file a new O-1A petition. Terminating me sooner inflicts further irreparable immigration and financial harm.

2. **Severance**

   o Given my annual salary ($188,000 + 8% bonus) and the reliance I placed on at least a one-year tenure, I request severance reflecting this expectation.

3. **Equity (25% Vesting or Cash Equivalent)**

   o My offer letter promised 20,000 shares over four years, with 25% vested after 12 months. I request either the 5,000 shares or an equivalent cash payout, recognizing I joined in good faith anticipating at least the first vesting milestone.

4. **Six Months of COBRA Subsidy**

   o With an abrupt holiday termination and immediate health coverage risk, PsiQuantum should subsidize COBRA for six months to prevent a gap in coverage.

5. **Neutral & Factual Reference**

   o I request an impartial written reference confirming my scientific code contributions, presentations, and other documented work. This ensures my professional reputation is not unfairly marred.

6. **Damages**

   o Beyond the above terms, I seek additional compensation for the disruption to my O-1A status, the emotional distress, and the potential long-term career harm. These damages remain open to negotiation in good faith.

---

**3. Punitive Damages & Legal Precedent**

- Malice / Oppression: The abrupt nature, lack of performance documentation, and exploitation of my immigration status could signify malice or reckless disregard under California law (Civil Code § 3294).

- Pretextual Rationale: Courts often follow the McDonnell Douglas burden-shifting framework. Here, the absence of any documented performance concerns until December 10 strongly suggests pretext.

- Public Policy: Deterring employers from exploiting highly skilled immigrants' visa vulnerabilities upholds the broader public interest.

- Number of People Affected: This is a common issue that involves many Indians in the US. I would have cause to fight for our rights as immigrant workers in the US.

I reserve the right to pursue punitive damages and cite relevant case law (e.g., *Zhang v. American Gem Seafoods*, *Kolstad v. American Dental Ass'n*) if these demands remain unresolved.

---

**4. Preservation of Records (Reiterated)**

Once more, I insist that PsiQuantum preserve all relevant digital data—Slack messages, Overleaf docs, ChatGPT logs, code repositories, and especially the December 9 progress report. My immediate loss of access intensifies the risk of spoliation. Failure to confirm preservation by January 10 will compel me to file suit pro se to ensure no further evidence is destroyed.

---

**5. Conclusion & Response**

I humbly ask you to respond on or before January 10, 2025, confirming the non-negotiable extension of my

payroll date to March 10 and addressing all remaining demands. In the event of no satisfactory response, I will file a civil complaint in Santa Clara County, to be followed by formal discovery. I remain open to resolving this matter amicably should PsiQuantum wish to avoid protracted litigation.

Sincerely,
Dr. Romit Chakraborty (Pro Se)

20990 Valley Green Drive, Cottage 692
Cupertino, CA 95014
Phone: +1 (773) 816-8338
Email: romit.chakraborty@gmail.com

Romit Chakraborty, Ph.D.
Senior Quantum Solutions Computational Chemist
PsiQuantum | Palo Alto, California
M.S. (2013), Ph.D. (2017), University of Chicago

# EXHIBIT F

On Thu, 27 Feb 2025 at 09:36, Tara Shapowal <tshapowal@psiquantum.com> wrote:

Hi Romit,

As we previously advised you, it is not PsiQuantum's general practice to negotiate matters such as this. Thus, the Company has already been far more generous with you than is their standard practice. Given that, we are unable to negotiate your March 10, 2025 separation date or your severance offer any further.

Best,

**Tara Shapowal-Lau**
Director, HR Operations

C +1 267 897 0349
E tshapowal@psiquantum.com

Ψ PsiQuantum

**From:** Romit Chakraborty <romit.chakraborty@gmail.com>
**Sent:** Tuesday, February 25, 2025 3:16 PM
**To:** Tara Shapowal <tshapowal@psiquantum.com>; HR <hr@psiquantum.com>
**Cc:** PsiQ Legal <legal@psiquantum.com>; romit@uchicago.edu <romit@uchicago.edu>
**Subject:** Final Payroll Extension Request and Proposed Separation Terms

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Hi Tara and All,

First, thank you for extending my administrative leave through March 10. This has given me time to refine my application materials, pursue initial networking conversations, and address the health challenges that intensified over the holidays, when legal and immigration concerns

took center stage.

Regrettably, the abrupt December 10, 2024, termination notice has had significant impacts on my immigration status, professional references, career trajectory, and a chronic health condition I've managed for over 14 years. Between December 10 and January 21, I faced considerable uncertainty, which undermined my ability to search for new employment opportunities—unfortunately, it even resulted in missing the final round for a University of Oxford professorship (deadline December 12).

In light of these circumstances, a severance of only two weeks' pay plus one month of COBRA, with a March 10 payroll cutoff, appears insufficient. I respectfully request:

1. Extension of final payroll date to April 10, 2025, in order to address ongoing recovery, immigration advocacy, and career impacts.
2. Receipt of the proposed separation agreement that is cognizant of the Jan 7th letter of demands by Tuesday, March 4, so there is reasonable time to assess whether it appropriately addresses the harm I've encountered.

While I am hopeful we can resolve this amicably, I am prepared to consider formal legal avenues if these concerns remain unmet. Finally, I appreciate your confirmation that PsiQuantum is preserving pertinent documentation (e.g., Overleaf, Slack, ChatGPT logs, recorded meetings, and other digital records). Please let me know if you need any additional information. I look forward to finding a fair, mutually beneficial solution.

Sincerely,
Romit

Romit Chakraborty, Ph.D.
M.S. (2013), Ph.D. (2017), University of Chicago
Ph: +1 773-816-8338
20990 Valley Green Drive, Cottage 692, Cupertino, CA 95014.
[Google Scholar](#) | [LinkedIn](#) | [Portfolio](#) | [GitHub](#)

On Sat, 8 Feb 2025 at 20:03, Romit Chakraborty <[romit.chakraborty@gmail.com](mailto:romit.chakraborty@gmail.com)> wrote:

> Dear Tara, All,
>
> I hope this finds you in good health and spirits.
> Received with thanks.
>
> Regards,
> Romit
>
> Romit Chakraborty, Ph.D.
> Senior Quantum Solutions Computational Chemist
> PsiQuantum | Palo Alto, California
> M.S. (2013), Ph.D. (2017), University of Chicago

On Tue, 21 Jan 2025 at 16:55, Tara Shapowal <tshapowal@psiquantum.com> wrote:

Hi Romit,

Thank you for your message. Although it's not PsiQuantum's general practice to negotiate matters such as this, in a show of good faith to allow you adequate time to address your immigration needs, we will extend your employment through March 10, 2025. During this period, you will remain on paid administrative leave. Additionally, at the conclusion of your paid administrative leave, the Company will offer you a severance package in exchange for your agreement to the Company's standard separation agreement. In fairness to other employees who have previously been let go, we cannot negotiate this amount.

Further, I want to reassure you that the Company has retained all relevant documentation in this matter. While the Company disagrees with a number of the remaining statements in your email, we do not believe it would be productive to engage in a back-and-forth on those issues and the Company's choice not to reply should not be interpreted as agreement with any of the other matters contained in your message.

We wish you the best in your future endeavors.

**Tara Shapowal-Lau**
Director, HR Operations

C +1 267 897 0349
E tshapowal@psiquantum.com



**From:** Romit Chakraborty <romit.chakraborty@gmail.com>
**Sent:** Tuesday, January 7, 2025 3:06 PM
**To:** HR <hr@psiquantum.com>; PsiQ Legal <legal@psiquantum.com>
**Subject:** Re: Abrupt & Potentially Unlawful Termination — Demand for Resolution

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

**Date:** January 7, 2025

**To**: HR and Legal Departments, PsiQuantum

**Re: Abrupt & Potentially Unlawful Termination — Demand for Resolution**

Dear PsiQuantum Team,

I am Dr. Romit Chakraborty, writing on my own behalf (pro se) regarding the abrupt termination of my employment at PsiQuantum. I was notified on December 10, 2024, with an initial effective date of December 20, later extended to January 10, 2025—yet without any revised termination letter or separation agreement. I seek an amicable resolution to the substantial harm I have experienced and reiterate my request that all relevant digital records be preserved.

In light of the lack of meaningful response thus far and the imminent termination date, I will be filing a lawsuit in Santa Clara County if PsiQuantum fails to address the non-negotiable requirement of extending my employment on the payroll until March 10, 2025. This extension is critical for me to secure a new O-1A sponsor and avoid further irreparable harm to my career and well-being.

---

**1. Background**

1. **High-Stakes Relocation & O-1A Constraints**

   - I relocated from Chicago and began at PsiQuantum on October 28, 2024, after spending over 96 days obtaining an O-1A visa.

   - During my short six-week tenure, I delivered significant scientific output: a 19-page progress report + 10-page addendum prepared on December 9, multiple video-recorded talks (e.g., "Active Space Selection for Atomisation Energy Calculations" on Dec 2), and over 20 recorded discussions on Comprehensive Quantum Chemistry Methodology (CQCM).

   - Possible rebuttals may involve selective anecdotal evidence, which I was never made privy to in any documented form or even via verbal insinuation before the Dec 10 termination meeting. Possible rebuttals may also include lack of fit, not stated in any form to date.

   - If performance or teamwork were issues, then why were no 1:1 alignment meetings with the direct manager, Arvin Kakekhani, completed in the three weeks before the termination? My manager deemed them non-negotiable, and I was available for them. I even asked specifically for them on a number of occasions (see ref. internal Slack records)

   - Until the December 10 termination meeting, no one mentioned "performance" or "teamwork" concerns. This abrupt firing, at the onset of my 60-day visa grace period, severely compromises my legal status and job-search prospects (exacerbated by the holiday hiring slowdown).

2. **Termination Meeting & Confiscation**

   - The termination meeting on December 10 was unscheduled and lasted about 15 minutes. My work laptop was confiscated immediately, and I lost all access to Slack, PsiQuantum email,

and my Carta account—depriving me of crucial records essential to any defense.

○ Despite a standard separation agreement clause advising consultation with an attorney, Mr. Arvin Kakekhani explicitly told me not to seek legal counsel, in the presence of Ms. Tara Shapoval (HR).

3. **Preservation Requests Ignored**

○ Since December 12, I have repeatedly asked PsiQuantum to preserve Slack messages, Overleaf documents, code repositories, and especially my December 9 progress report—yet have received no acknowledgment.

○ This raises serious concerns about potential spoliation or a coordinated narrative being constructed to retroactively justify my termination.

4. **Alleged Retaliation & Lack of Performance Documentation**

○ My abrupt firing followed closely after I requested transparency in a new hire's selection process on December 5–6, suggesting a retaliatory motive.

○ No documented performance issues or PIP preceded this firing, indicating the "performance and teamwork" explanation may be pretextual.

---

## 2. Demands for Amicable Resolution

1. **Extend Payroll to March 10, 2025 (Non-Negotiable)**

○ I must remain on payroll until March 10 so I can reasonably secure another employer and file a new O-1A petition. Terminating me sooner inflicts further irreparable immigration and financial harm.

2. **Severance**

○ Given my annual salary ($188,000 + 8% bonus) and the reliance I placed on at least a one-year tenure, I request severance reflecting this expectation.

3. **Equity (25% Vesting or Cash Equivalent)**

○ My offer letter promised 20,000 shares over four years, with 25% vested after 12 months. I request either the 5,000 shares or an equivalent cash payout, recognizing I joined in good faith anticipating at least the first vesting milestone.

4. **Six Months of COBRA Subsidy**

○ With an abrupt holiday termination and immediate health coverage risk, PsiQuantum should subsidize COBRA for six months to prevent a gap in coverage.

5. **Neutral & Factual Reference**

○ I request an impartial written reference confirming my scientific code contributions, presentations, and other documented work. This ensures my professional reputation is not unfairly marred.

6. **Damages**

- Beyond the above terms, I seek additional compensation for the disruption to my O-1A status, the emotional distress, and the potential long-term career harm. These damages remain open to negotiation in good faith.

## 3. Punitive Damages & Legal Precedent

- Malice / Oppression: The abrupt nature, lack of performance documentation, and exploitation of my immigration status could signify malice or reckless disregard under California law (Civil Code § 3294).

- Pretextual Rationale: Courts often follow the McDonnell Douglas burden-shifting framework. Here, the absence of any documented performance concerns until December 10 strongly suggests pretext.

- Public Policy: Deterring employers from exploiting highly skilled immigrants' visa vulnerabilities upholds the broader public interest.

- Number of People Affected: This is a common issue that involves many Indians in the US. I would have cause to fight for our rights as immigrant workers in the US.

I reserve the right to pursue punitive damages and cite relevant case law (e.g., *Zhang v. American Gem Seafoods*, *Kolstad v. American Dental Ass'n*) if these demands remain unresolved.

## 4. Preservation of Records (Reiterated)

Once more, I insist that PsiQuantum preserve all relevant digital data—Slack messages, Overleaf docs, ChatGPT logs, code repositories, and especially the December 9 progress report. My immediate loss of access intensifies the risk of spoliation. Failure to confirm preservation by January 10 will compel me to file suit pro se to ensure no further evidence is destroyed.

## 5. Conclusion & Response

I humbly ask you to respond on or before January 10, 2025, confirming the non-negotiable extension of my payroll date to March 10 and addressing all remaining demands. In the event of no satisfactory response, I will file a civil complaint in Santa Clara County, to be followed by formal discovery. I remain open to resolving this matter amicably should PsiQuantum wish to avoid protracted litigation.

Sincerely,
Dr. Romit Chakraborty (Pro Se)

20990 Valley Green Drive, Cottage 692
Cupertino, CA 95014
Phone: +1 (773) 816-8338
Email: romit.chakraborty@gmail.com

Romit Chakraborty, Ph.D.
Senior Quantum Solutions Computational Chemist
PsiQuantum | Palo Alto, California
M.S. (2013), Ph.D. (2017), University of Chicago