

| | | |
|---|---|---|
| ROMIT CHAKRABORTY, Ph.D., | ) | **United States District Court** |
| | ) | **Northern District of Illinois** |
| Plaintiff, | ) | |
| | ) | Chakraborty v. Gagliardi |
| v. | ) | Case No. 1:26-cv-00106 |
| | ) | Judge: Hon. Jorge L. Alonso |
| LAURA GAGLIARDI, | ) | Magistrate Judge: Hon. Albert Berry III |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Romit Chakraborty, Ph.D. ("Plaintiff"), for his Second Amended Complaint against Defendant Laura Gagliardi ("Defendant"), alleges as follows:

### I. NATURE OF THE ACTION

1. This action arises from Defendant Laura Gagliardi's false and professionally destructive statements about Plaintiff's official title, research performance, integrity, and professional ability in quantum chemistry.

2. Defendant executed a University of Chicago offer letter appointing Plaintiff to a staff position titled "Quantum-AI Researcher," and the University issued Plaintiff a staff identification card. (Exs. 1, 2.)

3. On January 3, 2025, after Plaintiff sought correction of title and employment records, Defendant wrote that "The title 'Quantum-AI Researcher' is totally made up by you," while acknowledging that Plaintiff had been hired as staff because he was too senior to be hired as a postdoc. (Ex. 3.)

4. Defendant also communicated negative factual assertions or factual premises about Plaintiff's performance to Professor Martin Head-Gordon, Plaintiff's former postdoctoral advisor and a key

1

senior referee; Defendant has admitted that she communicated with Professor Head-Gordon before January 2025 concerning Plaintiff and that one or more communications concerned Plaintiff's performance. (Exs. 7, 12, 13.)

5. Defendant's discovery responses identify no contemporaneous written warning, disciplinary notice, performance improvement plan, annual review, email, memorandum, note, or record supporting the performance criticisms communicated or relied on. (Exs. 12-14.)

6. The challenged statements and conduct impaired Plaintiff's professional standing, title accuracy, publication pathway, reference network, and concrete academic and industry opportunities, including Oxford-related funding pathways, the University of New Mexico open-rank search, and the PsiQuantum opportunity. (Exs. 8, 11.)

7. Plaintiff previously resolved an employment dispute with PsiQuantum. That resolution did not release Defendant and did not compensate Plaintiff for Defendant's independent torts alleged here.

<h2 style="text-align:center">II. PARTIES, JURISDICTION, VENUE, AND TIMELINESS</h2>

8. Plaintiff is a citizen of India and uses a U.S. mailing address at 2261 Market Street, STE 72927, San Francisco, California 94114.

9. Defendant is a citizen of Illinois and, at all relevant times, was a professor employed by the University of Chicago in Chicago, Illinois.

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the action is between a citizen of a foreign state and a citizen of Illinois, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2) because Defendant resides in this District and a substantial part of the events giving rise to the claims occurred in Chicago, Illinois.

12. Plaintiff filed this action on January 5, 2026. The January 3, 2025 title publication was timely pleaded because January 3, 2026 was a Saturday and January 4, 2026 was a Sunday. (Ex. 3.)

### III. FACTUAL ALLEGATIONS

#### A. Recruitment, Alternatives, and Staff-Status Reliance

13. Before accepting the University of Chicago appointment, Plaintiff had concrete alternative pathways, including an AdsGency AI Head of Research contract and an Oxford-related grant pathway. (Exs. 8, 10.)

14. The AdsGency AI contract, effective May 22, 2023, offered Plaintiff the Head of Research role with $72,000 annual salary, semi-monthly pay, employment benefits, and a revenue-based commission structure. (Ex. 10.)

15. In June 2023, Plaintiff contacted Defendant after an Expression of Interest campaign with the Department of Chemistry at the University of Oxford that enabled Plaintiff to pursue Oxford-related research-grant applications as a principal-investigator applicant. (Ex. 8.)

16. Plaintiff approached Defendant for mentorship and an independent early-career research opportunity, not demotion into an ordinary postdoctoral role. Defendant initially indicated that she could mentor Plaintiff and later indicated that she could hire Plaintiff as a postdoctoral researcher.

17. Defendant asked Plaintiff about his then-current Berkeley salary of approximately $72,000 and stated in substance that she could not pay more than approximately $60,000 for the contemplated position.

18. Professor Martin Head-Gordon had informed Defendant and Plaintiff that Plaintiff was beyond the ordinary postdoctoral scale and had conducted numerous grant-related meetings in Professor Head-Gordon's absence.

19. As Plaintiff later reported to the Office of the Provost, the Office of the Provost initially prevented Plaintiff's hire as a postdoctoral researcher in July 2023. Defendant therefore knew before acceptance that ordinary postdoctoral classification had been rejected or prevented and that staff status was professionally material. (Ex. 5.)

**B. Staff Appointment and Research Mandate**

20. Defendant recruited or permitted Plaintiff to pursue work involving large language models, foundation models, artificial intelligence, active-space selection, and computational quantum chemistry. (Exs. 4, 12.)

21. On August 31, 2023, Defendant executed a written offer letter appointing Plaintiff as a staff employee with the title "Quantum-AI Researcher," in the Chemistry Department, reporting to Defendant. (Ex. 1.)

22. The offer letter identified monthly pay, University staff benefits, staff resources, probationary period, and eligibility for the University's Annual Merit Process. (Ex. 1.)

23. Plaintiff commenced work on or about November 27, 2023, and the University issued Plaintiff an identification card listing his classification as "STAFF." (Ex. 2.)

24. From the start of Plaintiff's tenure, Defendant nevertheless introduced Plaintiff to group members and others as a postdoc, maintained or permitted postdoctoral classification, and complained in group settings about paying Plaintiff staff-level salary and benefits.

25. Defendant acknowledged on January 3, 2025 that Plaintiff "was hired as a staff scientist because [he was] too senior to be hired as a postdoc." (Ex. 3.)

**C. PsiQuantum Opportunity and Defendant's Professional Overlap**

26. On July 25, 2024, PsiQuantum offered Plaintiff employment as Senior Quantum Solutions Computational Chemist, reporting to Arvin Kakekhani. (Ex. 11.)

27. The PsiQuantum offer was concrete and valuable: $188,000 annual salary, 8% variable bonus eligibility, relocation assistance up to $10,000, employee benefits, and a 20,000-share stock-option grant with 25% vesting after 12 months of continuous service. (Ex. 11.)

28. Plaintiff's LLM, machine-learning, active-space, DFT, and quantum-chemistry work was material to the PsiQuantum opportunity.

29. Defendant knew before January 2025 that Plaintiff had been employed by PsiQuantum; she admitted that knowledge in discovery, and her produced website/departure communications state that Plaintiff "now works at PsiQuantum." (Exs. 12, 14.)

30. Defendant admitted that she communicated with PsiQuantum personnel concerning a collaboration, proposal, grant, project, contract, award, or partnership; communicated concerning the NQAC Project; communicated concerning the NQAC Project before April 24, 2026; and publicly reposted or endorsed a PsiQuantum-related announcement. (Ex. 12.)

31. The public announcement reflected that PsiQuantum was partnering with Professor Laura Gagliardi at the University of Chicago and UL Research Institutes on a National Quantum Algorithm Center Grand Challenges project to develop a fault-tolerant quantum-computing workflow to model electrocatalysts. (Ex. 15.)

32. Plaintiff pleads the PsiQuantum collaboration facts as context for Defendant's knowledge, professional overlap, motive, foreseeability, and the materiality of Plaintiff's title, reputation, research scope, and senior scientific references, not as a separate cause of action based on the collaboration itself.

**D. Misclassification and Title Publication**

33. Despite the written staff appointment, Defendant maintained or permitted Plaintiff's public listing under "Postdoctoral Researchers," and a member of Defendant's group referred to Plaintiff as a "postdoc" in written communications. (Exs. 5, 6.)

34. On January 3, 2025, Plaintiff requested correction of his official title and employment records. Defendant responded that Plaintiff had been hired as staff because he was too senior to be hired as a postdoc, but also wrote: "The title 'Quantum-AI Researcher' is totally made up by you." (Ex. 3.)

35. The statement was false. The title "Quantum-AI Researcher" appeared in the written offer letter executed by Defendant. (Ex. 1.)

36. Defendant later answered an interrogatory by stating that the Gagliardi Group, with Plaintiff's help, "made up" a title and role for Plaintiff and gave him the enhanced status of a staff position; Defendant also denied in response to a request for admission that she wrote the January 3, 2025 title statement, even though the email contains that statement. (Exs. 3, 12, 13.)

37. On January 6, 2025, University personnel requested that the Gagliardi Group website be updated to accurately reflect Plaintiff as staff with the title "Quantum-AI Researcher." Defendant responded that she was "not sure where" the title came from, called Plaintiff "a very difficult group member," and proposed removing him from the website. (Ex. 9.)

38. University personnel responded that Plaintiff's offer letter showed "Job Title: Quantum-AI Researcher," that the offer letter was the source of the title, and that the website should be amended rather than removing Plaintiff completely. (Ex. 9.)

**E. Publication, Oxford-Related Pathway, and Reference-Dependent Opportunities**

39. Plaintiff's Oxford-related and early-career opportunities depended on continued publication activity, accurate affiliation and title records, senior academic references, and preservation of his independent research profile. (Exs. 5, 8.)

40. In November 2024, after Plaintiff transitioned to PsiQuantum, Plaintiff followed up with Defendant from his PsiQuantum email about finishing and communicating ongoing work from Defendant's group. Defendant responded in substance that it had been good to have Plaintiff in the group but that the group was not looking for a quick publication.

41. On January 5, 2025, Plaintiff wrote to the Office of the Provost seeking guidance on publication of work conducted during his University of Chicago tenure, explaining that he had produced research that would benefit the field, that Defendant did not wish to be involved or credited, and that he needed guidance on publication and affiliation. (Ex. 5.)

42. Defendant admitted that Plaintiff requested support, approval, clarification, or non-objection concerning publication, presentation, online dissemination, or professional use of Publication/Research Materials, while denying that any such materials existed and identifying no restrictions or supporting documents. (Exs. 12-14.)

43. Plaintiff had concrete prospective opportunities requiring accurate records, publication activity, and support, including the University of New Mexico open-rank faculty search and Oxford-related funding and expression-of-interest pathways. (Ex. 8.)

44. On December 20, 2024, the University of New Mexico informed Plaintiff that his application remained in the pool and asked him to confirm continued interest and provide updated materials by January 5, 2025. On December 31, 2024, Plaintiff forwarded the opportunity to Defendant and asked whether she would support his application. Defendant declined on January 1, 2025. (Ex. 8.)

## F. Professor Head-Gordon Communications

45. Plaintiff relied on references from senior academics, including Professor Head-Gordon, who had previously provided strong written support for Plaintiff's faculty-level candidacy and independent academic potential. (Ex. 7.)

46. On January 5, 2025, Plaintiff contacted Professor Head-Gordon for professional advice after his PsiQuantum termination. Plaintiff described his technical work, absence of prior performance warnings, loss of access to work records, immigration consequences, and reputational concerns. He did not ask Professor Head-Gordon to evaluate his University of Chicago performance or to contact Defendant. (Ex. 7.)

47. On January 6, 2025, Professor Head-Gordon responded that Plaintiff had made a poor impression on Defendant because he was apparently "distracted by LLMs," was not as good a team player as Defendant had hoped, and Defendant had reached out because of strong dissatisfaction with Plaintiff's performance. Professor Head-Gordon then questioned Plaintiff's honesty, professional suitability, and suitability for academia or industry. (Ex. 7.)

48. Defendant has admitted communications with Professor Head-Gordon concerning Plaintiff before January 2025 and concerning Plaintiff's performance, and her verified interrogatory answers identify March 2024 and July 2024 discussions in which she expressed concerns about Plaintiff's progress and lack of concrete results. (Exs. 12, 13.)

49. Defendant further contends that Plaintiff made no persistent progress, made no progress developing LLM ideas, and produced no publications, conference publications, or research materials, but she has identified no contemporaneous written performance warning, disciplinary notice, performance improvement plan, annual review, email, memorandum, note, or record supporting those criticisms. (Exs. 12-14.)

50. Following Defendant's communications, Professor Head-Gordon withdrew or materially reduced his prior support for Plaintiff. In Plaintiff's field, withdrawal or impairment of support from a primary referee materially impairs competitiveness for academic and professional opportunities.

### G. Harm

51. Plaintiff's field is small, specialized, reputation-driven, and dependent on senior references, accurate institutional records, research credibility, publication activity, and professional title accuracy.

52. Plaintiff had concrete alternative and prospective economic opportunities, including the AdsGency AI contract, Oxford-related funding and expression-of-interest pathways, the University of New Mexico open-rank search, the PsiQuantum offer and employment opportunity, and reference relationships needed to support those opportunities. (Exs. 7, 8, 10, 11.)

53. Defendant's document responses identify no documents supporting any contention that Plaintiff's termination from PsiQuantum, rather than Defendant's communications or conduct, caused the harm alleged here, and no documents supporting any contention that Defendant's communications did not cause or contribute to Plaintiff's alleged professional, reputational, immigration-related, or emotional-distress damages. (Ex. 14.)

54. Plaintiff suffered reputational injury, loss of professional support, lost opportunities, lost income and earning capacity, impairment of grant and publication pathways, immigration-related and relocation-related consequences, and consequential economic harm.

55. Plaintiff also suffered severe emotional distress and physical symptoms including anxiety, insomnia, crying, chest pain, depressive symptoms, and exacerbation of chronic migraines, and sought medical and psychiatric evaluation and treatment.

56. On February 23, 2026, Dr. Yasha Rastgar confirmed that Plaintiff was an established patient under his care, was being treated for anxiety disorder and attentional and executive-function disorder, required continued treatment and monitoring, and faced a meaningful risk of clinical deterioration if treatment were interrupted or discontinued. (Ex. 16.)

57. Plaintiff will produce additional relevant and proportional medical records in discovery subject to appropriate privacy protections, including a HIPAA-qualified protective order or confidentiality order.

## IV. CAUSES OF ACTION

## COUNT I - FRAUDULENT INDUCEMENT

58. Plaintiff realleges paragraphs 1 through 57 as though fully set forth herein.

59. False statement or material omission. Defendant represented that Plaintiff would hold a staff-level University of Chicago appointment with the title "Quantum-AI Researcher," reporting to Defendant, and would perform research involving LLMs, active-space selection, artificial intelligence, and computational quantum chemistry. (Exs. 1, 4.)

60. Defendant omitted or concealed material facts concerning her intent and willingness to recognize Plaintiff's staff status, title, non-postdoctoral classification, publication pathway, and staff-level professional role after the appointment began.

61. Present fact and materiality. These representations and omissions concerned present facts regarding appointment, title, reporting structure, classification, compensation, benefits, and research mandate, not generalized future hopes. Defendant knew those facts were material

10

because Plaintiff was too senior for ordinary postdoctoral hiring, had alternative professional pathways, and required accurate title, publication, and reference support. (Exs. 5, 8, 10.)

62. Knowledge or reckless disregard. Defendant knew or recklessly disregarded that ordinary postdoctoral treatment was inconsistent with the offer, the Provost-related intervention, and Plaintiff's professional circumstances. (Exs. 1, 3, 5.)

63. Intent to induce. Defendant made the representations and omissions to induce Plaintiff to accept the University of Chicago appointment, defer alternative opportunities, and perform work in Defendant's group under the represented staff title and research mandate.

64. Justifiable reliance. Plaintiff reasonably relied by accepting the appointment, forgoing or deferring alternative pathways including AdsGency AI, investing professional effort in Defendant's group, and using the staff title and research direction in professional planning. (Ex. 10.)

65. Falsity or misleading character. Defendant later treated or permitted Plaintiff to be treated as a postdoctoral-level researcher, delayed or opposed quick publication of ongoing work, denied the source of the title, proposed removal from the website, and accused Plaintiff of making up the title despite executing the offer letter containing that title. (Exs. 1, 3, 5, 9.)

66. Damages. Plaintiff suffered relocation-related losses, lost income and earning capacity, impairment of professional opportunities, impairment of grant and publication pathways, loss or impairment of alternative opportunities, reputational harm, and consequential economic losses.

## COUNT II - DEFAMATION PER SE

67. Plaintiff realleges paragraphs 1 through 66 as though fully set forth herein.

68. Title statement - false statement of fact. Defendant published the statement "The title 'Quantum-AI Researcher' is totally made up by you" to Plaintiff and University personnel during a dispute over Plaintiff's official title and institutional record. (Ex. 3.)

69. The title statement concerned Plaintiff, was false, and was objectively verifiable because Defendant executed the offer letter identifying Plaintiff's title as "Quantum-AI Researcher" and University personnel later confirmed that the offer letter was the source of the title. (Exs. 1, 3, 9.)

70. Defamatory meaning and per se category. In context, the title statement asserted that Plaintiff fabricated an official professional credential. It imputes dishonesty, fabrication of credentials, lack of integrity in employment duties, and prejudice in Plaintiff's profession.

71. No innocent construction. The statement is not reasonably susceptible to an innocent construction because Defendant did not merely express uncertainty; she stated that the title was "totally made up by you" while having executed the offer letter containing that title. (Exs. 1, 3.)

72. Fault and privilege abuse. Defendant knew or recklessly disregarded the statement's falsity because she executed the offer letter, knew Plaintiff was hired as staff rather than an ordinary postdoctoral researcher, knew of the Provost-related postdoctoral hiring issue, and had access to University title records. Any qualified privilege was abused by knowledge of falsity or reckless disregard. (Exs. 1, 3, 5, 9.)

73. Performance statements - false factual premises. Defendant also published negative factual assertions or factual premises to Professor Head-Gordon, including that Plaintiff had not made progress or lacked concrete results, and later contended that Plaintiff made no persistent progress and produced no publications or research materials. (Exs. 7, 12, 13.)

74. Those performance statements were factual and verifiable because progress, concrete results, publications, research materials, warnings, reviews, and contemporaneous records are matters capable of proof or disproof.

75. The performance statements are defamatory per se because they impute inability to perform employment duties and lack of professional ability in a specialized, reference-dependent scientific field.

76. Defendant knew or recklessly disregarded the falsity or unsupported nature of the performance statements because she has admitted no written performance warning, disciplinary notice, performance improvement plan, or annual review, and has identified no contemporaneous written record supporting the criticisms. (Exs. 12-14.)

77. Damages. Plaintiff suffered presumed damages and actual damages, including reputational harm, loss of reference support, impairment of academic and professional opportunities, lost income and earning capacity, and consequential economic harm.

## COUNT III - TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

78. Plaintiff realleges paragraphs 1 through 77 as though fully set forth herein.

79. Reasonable expectancies. Plaintiff had reasonable prospective economic expectancies, including the University of New Mexico open-rank search, Oxford-related funding and expression-of-interest pathways, publication-based grant opportunities, the PsiQuantum opportunity, and valuable reference relationships needed for those opportunities. (Exs. 7, 8, 11.)

80. Concrete opportunities. UNM informed Plaintiff that his application remained in the pool and requested updated materials by January 5, 2025; Plaintiff forwarded the opportunity to

13

Defendant and asked for support. Plaintiff also had Oxford-related funding pathways and a signed PsiQuantum offer with defined compensation and equity terms. (Exs. 8, 11.)

81. Defendant's knowledge. Defendant knew of the UNM opportunity, knew or had reason to know of Plaintiff's Oxford-related publication and funding pathway, knew Plaintiff had worked at PsiQuantum, and knew Plaintiff relied on accurate records, publication activity, and senior references. (Exs. 5, 8, 12, 14.)

82. Intentional and unjustified interference. Defendant interfered by publishing the false title statement, maintaining or permitting postdoctoral misclassification, delaying or opposing quick publication of ongoing work, declining support for a live faculty-search opportunity, and communicating unsupported negative performance assertions to Professor Head-Gordon.

83. The interference was unjustified because it rested on false or recklessly unsupported assertions concerning Plaintiff's credentials, staff status, research work, performance, publication record, and professional suitability.

84. Causation. Defendant's conduct caused, contributed to, and materially impaired Plaintiff's ability to secure reference support, update application materials, publish or communicate ongoing work, maintain research credibility, pursue grant applications, compete for identified opportunities, and mitigate harm after the PsiQuantum termination.

85. Damages. Plaintiff's expectancies failed to ripen, were delayed, or were materially impaired, causing lost professional opportunities, lost income and earning capacity, reputational harm, impairment of grant and publication pathways, immigration-related and relocation-related consequences, and consequential losses.

### COUNT IV - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

86. Plaintiff realleges paragraphs 1 through 85 as though fully set forth herein.

87. Extreme and outrageous conduct. Defendant held supervisory and reputational authority over Plaintiff and knew that Plaintiff's career depended on accurate title records, publication activity, senior references, and truthful statements in a small, specialized field.

88. Defendant's conduct went beyond ordinary workplace disagreement because she repeatedly treated or permitted Plaintiff to be treated as a postdoctoral-level researcher despite his staff appointment, complained about staff salary and benefits, delayed or opposed publication, communicated unsupported negative performance assertions to Plaintiff's key referee, and accused Plaintiff of fabricating the official title she had executed. (Exs. 1, 3, 5, 7, 9, 12-14.)

89. Intent or reckless knowledge. Defendant knew Plaintiff was in a critical professional and immigration-sensitive transition involving academic and industry opportunities, and acted intentionally or with reckless disregard of the high probability that her conduct would cause severe emotional distress.

90. Severe distress. Plaintiff's distress was severe and medically significant, including anxiety, insomnia, crying episodes, chest pain, depressive symptoms, chronic-migraine exacerbation, and the need for medical and psychiatric treatment.

91. Medical confirmation. Dr. Rastgar confirmed that Plaintiff was an established patient under his care, was treated for anxiety disorder and attentional/executive-function disorder, required continued treatment and monitoring, and faced meaningful risk of clinical deterioration if treatment were interrupted. (Ex. 16.)

92. Causation. Defendant's conduct caused or substantially contributed to Plaintiff's severe emotional distress. Relevant and proportional medical records will be produced in discovery subject to appropriate privacy protections.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and award:

Compensatory damages;

Presumed damages for defamation per se;

Special damages including lost academic and professional opportunities;

Punitive damages as allowed by law;

Costs of suit; and

Such other relief as the Court deems just and proper.

## VI. JURY DEMAND

Plaintiff demands trial by jury.

Dated: July 15, 2026

Respectfully submitted,

/s/ Romit Chakraborty
Romit Chakraborty, Ph.D.
Plaintiff Pro Se
2261 Market Street, STE 72927
San Francisco, CA 94114
Telephone: +1 773-816-8338
Email: romit.chakraborty@gmail.com

# INDEX OF EXHIBITS

Exhibit 1: Offer Letter dated August 31, 2023 appointing Plaintiff as Quantum-AI Researcher.

Exhibit 2: University of Chicago Staff Identification Card reflecting Plaintiff's staff classification.

Exhibit 3: January 3, 2025 title email containing the statement: "The title 'Quantum-AI Researcher' is totally made up by you."

Exhibit 4: Research proposal on active-space selection using large language models, funded under the Azure Accelerate Foundation Models Research program.

Exhibit 5: Email correspondence with the Office of the Provost regarding correction of Plaintiff's title and publication rights.

Exhibit 6: Messages from Bhavnesh Jangid reflecting internal classification of Plaintiff as a postdoctoral researcher.

Exhibit 7: Head-Gordon reference record, including prior support, Plaintiff's January 5, 2025 outreach, and Professor Head-Gordon's January 6, 2025 response.

Exhibit 8: Professional opportunities and damages materials, including University of New Mexico, Oxford-related, University of Central Florida, and related academic-opportunity materials.

Exhibit 9: Defendant-produced website/title email chain, Bates 000001-000007.

Exhibit 10: AdsGency AI Employment Contract dated May 22, 2023 for Head of Research position.

Exhibit 11: PsiQuantum Offer Letter dated July 25, 2024 for Senior Quantum Solutions Computational Chemist position.

Exhibit 12: Defendant's responses to Plaintiff's First, Second, Third, and Fourth Requests for Admission.

Exhibit 13: Defendant's verified answers to Plaintiff's First, Second, Third, and Fourth Sets of Interrogatories.

Exhibit 14: Defendant's responses to Plaintiff's First, Second, Third, and Fourth Sets of Requests for Production, including Bates 000001-000007.

Exhibit 15: Public PsiQuantum collaboration announcement and Defendant's LinkedIn repost/endorsement dated April 24, 2026.

Exhibit 16: Limited care-verification letter from Dr. Yasha Rastgar dated February 23, 2026.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III


# EXHIBIT 1

# Offer Letter dated August 31, 2023 appointing Plaintiff as Quantum-AI Researcher.


Cited in Proposed Second Amended Complaint: ¶¶ 2, 21-22, 35, 59, 65, 69, 71-72, 88


Exhibit packet to [Proposed] Second Amended Complaint



8/31/2023

Romit Chakraborty
5527 S Everett Avenue
Chicago, Illinois  60637

Dear Romit,

I am delighted to formally extend this employment offer at the University of Chicago. We are committed to attracting and retaining high caliber talent to support our mission of excellence in creating and disseminating knowledge rooted in rigorous inquiry. Accordingly, you are being offered the position of Quantum-AI Researcher in the Chemistry department, reporting to Laura Gagliardi, Professor, with a tentative start date of 10/01/2023. Your annual pay will be $67,933.08 to be paid on a monthly pay cycle, equivalent of $5,661.09 per month.

Employment is contingent upon:
- Confirmation that you are legally authorized to work in the United States.
- Satisfactory completion of all applicable background and/or motor vehicle record checks, and drug screening test.
- Acknowledgment of mandated reporting requirements under the Illinois Abused and Neglected Child Reporting Act.
- Receipt of positive reference check results.

During your first six months of employment, you will be a probationary employee. At all times, your employment will be "at-will," which means that you or the University can terminate your employment at any time for any lawful reason.

The University's Annual Merit Process (AMP) is the formal process for reviewing employee performance and base pay levels, with a common review of July 1 for all monthly paid employees. You will be eligible for review during AMP and pay will be determined upon performance.

The University of Chicago offers a comprehensive benefits package, including health and welfare, retirement, and paid time off options, all of which are subject to change from time to time. Summary details of these plans are published on the [University's Human Resources website](#).
- Your eligibility for benefits begins on your first day of employment.
- Enrollment must be completed within your first 31 days of employment.
- Benefit counselors will be available during orientation to answer your benefits questions.
- Documentation for each of your dependents (e.g., copy of marriage certificate for spouse, birth certificate for children) is required before their coverage will be effective.

Additionally, as a valued University staff employee, you will have access to University resources such as fitness facilities and libraries, and you can participate in a variety of University-sponsored and Hyde Park neighborhood arts, cultural and educational events.



Maintaining a positive work environment, and promoting a workplace free from discrimination and harassment, supports the academic and research mission of the University by ensuring all members of our community can contribute to their fullest potential. Our "Getting to Know UChicago" new hire orientation will help facilitate your transition to the University of Chicago. To prepare for this session, I encourage you to review http://staffnewhire.uchicago.edu/.

If you have any questions about benefits or onboarding, please contact Raven Jones, your Human Resources Partner, at rjones16@uchicago.edu.

Your signature on the final page of this employment offer letter confirms your acceptance of this offer of at-will employment. Please upload a signed copy of this employment offer on your candidate portal, to confirm your acceptance. After you confirm your acceptance, you will receive an email message from Raven Jones regarding next steps in the onboarding process.

Romit, your new colleagues and I are delighted to have you join Chemistry department. I know your skills, energy and commitment will help to ensure our continued success and create opportunities for your professional growth. I look forward to working with you. Please contact me at lgagliardi@uchicago.edu with any questions.

Sincerely,

Laura Gagliardi

Professor

Chemistry Department

Your signature will confirm the agreed upon base pay, start date and other terms of your employment as described in this employment offer letter. This offer shall remain open until 9/7/2023. Any acceptance received after this date will be considered invalid.

I have read and I understand this offer of employment, and I accept the offer. I understand that my employment is contingent upon satisfactory completion of all applicable background and/or motor vehicle record checks, drug screening test.

Date:      08/31/2023
_____

Dept: Chemistry
_____

Job Title: Quantum-AI Researcher
_____

Printed Name:

ROMIT CHAKRABORTY_____

Signature:   *Romit Chakraborty*
_____

EX0005

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III


# EXHIBIT 2

# University of Chicago Staff Identification Card reflecting Plaintiff's staff classification.


Cited in Proposed Second Amended Complaint: ¶¶ 2, 23


Exhibit packet to [Proposed] Second Amended Complaint



# THE UNIVERSITY OF CHICAGO



Classification

**STAFF**

Card Issued

**11/2023**

ROMIT
CHAKRABORTY



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III


# EXHIBIT 3

# January 3, 2025 title email containing the statement: "The title 'Quantum-AI Researcher' is totally made up by you."


Cited in Proposed Second Amended Complaint: ¶¶ 3, 12, 25, 34-36, 65, 68-72, 88


Exhibit packet to [Proposed] Second Amended Complaint

 **Gmail**                                         **Romit Chakraborty <romit.chakraborty@gmail.com>**

## Correction of Official Title and AMP records

**Laura Gagliardi** <lgagliardi@uchicago.edu>                         3 January 2025 at 23:51
To: Romit Chakraborty <romit.chakraborty@gmail.com>, Monica Lugo <lugom@uchicago.edu>

Dear Romit,


You were hired as a staff scientist because you were too senior to be hired as a postdoc.

However, on our website we have only two categories: postdocs and graduate student and this is why you are under postdocs.

The title "Quantum-AI Researcher" is totally made up by you.

We didn't do an annual merit review because you stayed less than one year so there are no related documents.


Best

Laura

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-----------------------------------------------------------------------

[Quoted text hidden]

Redacted

Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III

# EXHIBIT 4

# Research proposal on active-space selection using large language models, funded under the Azure Accelerate Foundation Models Research program.

Cited in Proposed Second Amended Complaint: ¶¶ 20-21, 59

Exhibit packet to [Proposed] Second Amended Complaint

## University / Institution

University of Chicago

## Your profile webpage URL (optional)

https://gagliardigroup.uchicago.edu/

## Proposal Title

Computational Intelligence in Active Space Selection: A Frontier Hypothesis for Multireference Simulations

## Proposal Summary (1 to 2 pages)

**Please limit your document to 2 pages. Accepted file formats: .pdf, .doc and .docx.**

Gagliardi_Azure_v2.pdf

*Proposal summary: goals, scope of the research, expected outcomes, potential impact*

---

By participating in the Accelerate Foundation Models Academic Research program, you give Microsoft permission to collect and use personal information you provide to review your proposal(s).

Your response to this CFP is subject to Microsoft's Terms of Use (https://www.microsoft.com/en-us/legal/terms-of-use).

You may withdraw or delete your submission at any time by contacting the Microsoft Research Accelerate Foundation Models Research Team at msfmr@microsoft.com.

For more information about Microsoft Privacy Practices, please visit Microsoft Privacy Statement (https://privacy.microsoft.com/en-us/privacystatement)

EX0011

Redacted

# Computational Intelligence in Active Space Selection: A Frontier Hypothesis for Multireference Simulations

Professor Laura Gagliardi

*Richard and Kathy Leventhal Professor of Chemistry and Molecular Engineering, University of Chicago*

Romit Chakraborty

*Lawrence Berkeley National Laboratory and University of California, Berkeley*

The principal objective of this research project is to improve the computational efficiency and accuracy of material simulations, particularly those that require a multireference framework. The project aims to combine the capabilities of Large Language Models (LLMs) with existing active space techniques to automate the efficient partitioning of Hilbert spaces and enable more accurate multireference calculations.

## INTRODUCTION

The quest for accuracy and efficiency has long been a compelling narrative in computational quantum chemistry. [1] A paradigm shift is afoot, heralded by the fusion of traditional computational methodologies with emergent machine learning technologies [2–4]. As we stand at this crossroads, the central question arises: Can we harness the latent capabilities of Large Language Models (LLMs) to transcend the limitations of existing computational models, particularly in the domain of multireference simulations? This proposal endeavors to answer this question in the affirmative, outlining a research agenda that marries the rigor of wavefunction-based methods and with the adaptability and computational prowess of LLMs.

The quest is not merely an academic exercise but a venture with profound implications for the future of material science, quantum chemistry, and even our transition to sustainable energy solutions. In essence, we propose a novel interdisciplinary approach that seeks to redefine the boundaries of what is computationally feasible, opening new vistas in the accurate and efficient simulation of complex material systems.

## GOALS

Traditional wavefunction-based methods are limited by the exponential complexity of large Hilbert spaces. Likewise, Density Functional Theory (DFT), despite its popularity, often fails to accurately describe systems that require a multireference treatment. To address these limitations, we plan to:

1. **Develop an Integrated Computational Framework:** We aim to construct a methodology that fuses fine-tuned Large Language Models (LLMs) with existing active space techniques. This combined approach will simplify the Hilbert spaces, making multireference calculations more efficient and accurate.

2. **Implement Specialized Active Space Techniques:** Our project will utilize specialized in-house scientific methods for selecting the active space necessary for full Configuration Interaction (CI) calculations. These methods will be compatible with the mathematical frameworks of Complete Active Space Self-Consistent Field (CASSCF) and Complete Active Space Configuration Interaction (CASCI). [5, 6]

3. **Automate Active Space Selection:** Automation will be a key feature in our approach. We will develop algorithms to intelligently select relevant active spaces based on the system's characteristics, thus reducing the scope for human error and enhancing computational efficiency. [7–11]

4. **Benchmark Against Existing Methods:** A vital part of our research will involve benchmarking our new computational approaches against existing methods. This will serve to validate the reliability of our methodology and may set a new standard for multireference calculations.

## SCOPE

1. **Integration with Electronic Structure Code:** Our first step involves employing the LLM interface to integrate with well-established electronic structure codes, with a focus on PySCF.

2. **Adaptive Training:** We plan to adapt LLMs using a vectorized index of pertinent research papers and academic literature that concentrate on active space selection, allowing the models to be highly specialized. This falls under the purview of fine-tuned LLMs wherein a foundational model is provided a context for decision making by providing locally curated data and specializes in perfecting a particular task.

EX0012

3. **Benchmarking and Validation:** Rigorous validation exercises will be undertaken to compare our methodology with traditional computational techniques. This will provide an empirical foundation to assess the efficacy of our approach.

4. **Reinforcement Learning:** As a final step, we plan to incorporate reinforcement learning algorithms to enable our computational agent to make increasingly better active space selections based on a predefined loss function.

## USE OF RESOURCES

Resources will be allocated with a focus on model development, computational experiments, and performance evaluation. We plan to make use of Azure OpenAI services and open-source models like Llama for fine-tuning and deploying LLMs. Additionally, we intend to operate within the sandboxing capabilities of Azure Cloud to facilitate high-performance computational agents.

## EXPECTED OUTCOMES

1. **Validated LLM-Interface:** A robust interface between LLMs and PySCF will be developed and validated.

2. **Comprehensive Benchmarks:** An exhaustive set of benchmarks will be produced to validate the efficacy of our methodology.

3. **Comparative Analysis:** A thorough analysis comparing the performance of different language models, such as OpenAI and Llama, will be conducted.

4. **Academic Publications:** Our findings will be disseminated through academic publications that elucidate both the methodology and its broader scientific implications.

## POTENTIAL IMPACT

The project is expected to have a far-reaching impact. It will introduce a novel paradigm for understanding state-to-state dynamics and electron correlations—areas where conventional DFT methods fall short. Furthermore, the project has the potential to accelerate the pace of material discovery, especially in critical areas like sustainable energy solutions.

The concept of promoting agency within an intelligence that can infer not only based on text, and images, but also on live computations is a new research paradigm that is unique within the context of research both in LLMs, and in electronic structure theory. Furthermore, by optimizing the partitioning of Hilbert spaces, the research offers a de-novo paradigm for the use of large language models in advancing the state-of-the-art in electronic structure theory. The quintessence of this initiative lies in its potential to accelerate the pace of material discovery, furnishing precise insights into systems with bespoke attributes, a pressing challenge in materials design especially when it comes to facilitating our transition away from fossil fuels.

We appreciate the opportunity of partnering with Azure AI in this endeavor.

---

[1] C. Duan, F. Liu, A. Nandy, and H. J. Kulik, Data-driven approaches can overcome the cost–accuracy trade-off in multireference diagnostics, J. Chem. Theory Comput. **16**, 4373 (2020).

[2] A. Vaswani, N. Shazeer, N. Parmar, J. Uszkoreit, L. Jones, A. N. Gomez, L. Kaiser, and I. Polosukhin, Attention is all you need, Adv. Neural Inf. Process. **30** (2017).

[3] A. Lunghi and S. Sanvito, Computational design of magnetic molecules and their environment using quantum chemistry, machine learning and multiscale simulations, Nat. Rev. Chem. **6**, 761 (2022).

[4] N. Fu, L. Wei, Y. Song, Q. Li, R. Xin, S. S. Omee, R. Dong, E. M. D. Siriwardane, and J. Hu, Material transformers: deep learning language models for generative materials design, Mach. Learn.: Sci. Technol. **4**, 015001 (2023).

[5] J. Olsen, The casscf method: A perspective and commentary, Int. J. Quantum Chem. **111**, 3267 (2011).

[6] P.-Å. Malmqvist and B. O. Roos, The casscf state interaction method, Chem. Phys. Lett. **155**, 189 (1989).

[7] C. J. Stein and M. Reiher, autocas: A program for fully automated multiconfigurational calculations, J. Comput. Chem. **40**, 2216 (2019).

[8] D. S. King, D. G. Truhlar, and L. Gagliardi, Machine-learned energy functionals for multiconfigurational wave functions, J. Phys. Chem. Lett. **12**, 7761 (2021).

[9] D. S. King and L. Gagliardi, A ranked-orbital approach to select active spaces for high-throughput multireference computation, J. Chem. Theory Comput. **17**, 2817 (2021).

[10] W. Jeong, S. J. Stoneburner, D. King, R. Li, A. Walker, R. Lindh, and L. Gagliardi, Automation of active space selection for multireference methods via machine learning on chemical bond dissociation, J. Chem. Theory Comput. **16**, 2389 (2020).

[11] D. S. King, M. R. Hermes, D. G. Truhlar, and L. Gagliardi, Large-scale benchmarking of multireference vertical-excitation calculations via automated active-space selection, J. Chem. Theory Comput. **18**, 6065 (2022).

Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III

# EXHIBIT 5

# Email correspondence with the Office of the Provost regarding correction of Plaintiff's title and publication rights.

Cited in Proposed Second Amended Complaint: ¶¶ 19, 33, 39-42, 61-62, 65, 72, 81, 88

Exhibit packet to [Proposed] Second Amended Complaint



**Romit Chakraborty <romit.chakraborty@gmail.com>**

## Assistance with Accurate Title Representation and Publication
8 messages

---

**Romit Chakraborty** <romit.chakraborty@gmail.com>                    5 January 2025 at 10:40
To: provost@uchicago.edu
Cc: srushford@uchicago.edu

Dear Office of the Provost,

I hope this message finds you well. I am writing to request your urgent assistance concerning the accurate reflection of my recent appointment in the Gagliardi Group and to seek guidance on publishing work I conducted during that period.

From 27 November 2023 to 25 October 2024, I was employed as a Staff Researcher in Quantum AI under Professor Gagliardi. It was the Office of the Provost that initially prevented my hire as a postdoctoral researcher in July 2023, so I trust the University has documentation affirming my staff appointment. Please also find the offer letter attached.

1. **Title Representation:** On the Gagliardi Group's website, I am currently misidentified as a former postdoc. Although I have approached Professor Gagliardi and other local channels about correcting this error, the listing remains unchanged.

2. **Publication Guidance:** Furthermore, while my tenure was brief, I produced research that I believe would benefit the field. Professor Gagliardi has wished not to be involved or credited, but I would like to publish this work online. May I kindly request any guidance on how to proceed with publication under these circumstances?

This matter is somewhat urgent because I am navigating significant career and immigration considerations , and my professional record should accurately reflect my staff position at the university rather than a postdoctoral appointment. Additionally, I am re-evaluating my career trajectory, and part of it entails getting recognition for the intellectual work I put in during my brief recent tenure as a Staff Researcher in Quantum-AI.

Please be assured that I bring this to your attention in good faith, with no wish to create tension. I am, however, concerned about the potential for retaliation or reputational harm if the matter is not addressed in a timely fashion.

Thank you for your consideration. If you require any further documentation, I shall gladly provide it. I appreciate your response and any support you can offer.

Sincerely,
Romit Chakraborty, MS '13, PhD '17
Senior Quantum Solutions Computational Chemist
PsiQuantum
Palo Alto, California

---

 **New+Hire+Employment+2023-08-31.pdf**
95K

---

**Romit Chakraborty** <romit.chakraborty@gmail.com>                    17 January 2025 at 10:59
To: provost@uchicago.edu
Cc: srushford@uchicago.edu

To the Office of the Provost,

I am following up briefly about 1 and 2 above.

Sincerely,
Romit

EX0015
Redacted

Romit Chakraborty, Ph.D.

Senior Quantum Solutions Computational Chemist

PsiQuantum | Palo Alto, California

M.S. (2013), Ph.D. (2017), University of Chicago

[Quoted text hidden]

---

**Susan Rushford** <srushford@uchicago.edu>                     17 January 2025 at 11:39
To: Romit Chakraborty <romit.chakraborty@gmail.com>

Hello, Professor Chakraborty,

I would like to acknowledge receipt of this follow-up email. I have been assured that you will receive a response from either Geertrui Spaepen (Associate Provost for Operations and Initiatives) or from Mario Moreno Zepeda (Chief of Staff, Office of the Provost). I know they have been working with PME (Pritzker School of Molecular Engineering) and PSD (Physical Sciences Division) on your request from the time of your initial email. I don't believe the Office of the Provost has jurisdiction to make these changes without the involvement of at least one of these departments. I've asked again if they could please update you on their progress facilitating these requests.

Thank you!

**Sue Rushford**

Executive Assistant to the Provost

**Office of the Provost | The University of Chicago**

srushford@uchicago.edu

773.702.8825

[Quoted text hidden]

---

**Romit Chakraborty** <romit.chakraborty@gmail.com>                     17 January 2025 at 11:51
To: Susan Rushford <srushford@uchicago.edu>

Dear Susan,

Thank you for your response, and for the work you have been doing on those lines.
Small erratum though, I am not a Professor. As for 1, and 2:
1. I did notice that my title was appropriately reflected on the Gagliardi group website this week (see lower left of the screenshot). On the other hand, as you may confirm from the upper left of the page, I am still being listed under Postdoctoral Researchers. This part is not accurate. A simple solution from the front-end development point of view would be to just shift me into the 'Undergraduate students & Visiting Scholars' tab. This should be easy to do.

EX0016

Redacted



2.  It would be immensely helpful to know what the right affiliations should be for the soon to be published work. The first draft should be ready by Jan 31st.

Best wishes,
Romit

Romit Chakraborty, Ph.D.
Senior Quantum Solutions Computational Chemist
PsiQuantum | Palo Alto, California
M.S. (2013), Ph.D. (2017), University of Chicago

[Quoted text hidden]

---

**Susan Rushford** <srushford@uchicago.edu>                                    17 January 2025 at 11:56
To: Romit Chakraborty <romit.chakraborty@gmail.com>

Apologies on your title. That has always been the most difficult part of addressing people in the university, for me, as I come from the corporate world.

I will be sure to pass along your additional information outlined below. Again, I'm not clear who exactly is working on resolving this, but I can assure you that Geertrui and Mario have been tackling this job.

Thank you!

**Sue Rushford**

Executive Assistant to the Provost

**Office of the Provost | The University of Chicago**

srushford@uchicago.edu

773.702.8825

---

**From:** Romit Chakraborty <romit.chakraborty@gmail.com>
**Sent:** Friday, January 17, 2025 1:52 PM

EX0017

Redacted

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III


# EXHIBIT 6


# Messages from Bhavnesh Jangid reflecting internal classification of Plaintiff as a postdoctoral researcher.


Cited in Proposed Second Amended Complaint: ¶ 33


Exhibit packet to [Proposed] Second Amended Complaint

# Exhibit 6 — Text Message Transcript and Authentication

I, Romit Chakraborty, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

(1) Exhibit 6 is a true and correct screenshot of an Apple Messages conversation between me and Bhavnesh Jangid.

(2) The screenshot displays a conversation dated "Mon, 23 Dec at 3:10 pm" (as shown in the application UI).

(3) The transcript below is a verbatim reproduction of the messages visible in Exhibit 6, in the order displayed.

(4) For integrity verification, the cryptographic hashes of the underlying screenshot file are provided below.

| | |
|---|---|
| **File** | Bhavnesh_calling_me_a_postdoc.png |
| **Size (bytes)** | 171,961 |
| **SHA-256** | 5c522d7ac200eb962d24202e5e18548a495d053585c35c78711ab042a8d72345 |
| **SHA-512** | 4367e539a8e8d9a7ad63f1b74ecae56bef3d2b6a371fa45ded9af9658d4a1ba0 18e07db31fc722000373359fb2467cf7e7364c0cdef388242c445dad96117b30 |
| **Hash computed (UTC)** | 2026-02-26 08:47:17 |

## Transcript (verbatim; order as displayed):

| Sender | Message |
|---|---|
| Bhavnesh Jangid | Nope |
| Bhavnesh Jangid | I didn't change it all. |
| Bhavnesh Jangid | I didn't have access to it. |
| Bhavnesh Jangid | As per I know, generally postdoc doesn't have access to their data after 1 month |
| Bhavnesh Jangid | Even to their email |
| Romit Chakraborty | Yeah |
| Romit Chakraborty | But I am an alum |
| Romit Chakraborty | And for the last time |
| Romit Chakraborty | I was 'not' a postdoc |
| Romit Chakraborty | And Laura extended my account access till Dec 24th |
| Romit Chakraborty | I had planned to back my data up by then |
| Romit Chakraborty | But then suddenly got locked out on Dec 16th |
| Romit Chakraborty | Who is in charge of the cnet account? |
| Romit Chakraborty | Email? |
| Romit Chakraborty | Hey bhavnesh, what's the email for IT for this sort of thing? |
| Bhavnesh Jangid | Yeah |
| Bhavnesh Jangid | Then you should have access to your data |
| Bhavnesh Jangid | You should email RCC, they will be close by tmrw noon |

| Bhavnesh Jangid | IT department probably. |
|---|---|
| Bhavnesh Jangid | I generally raise the ticket on their website. Not sure of specific email though but this might work : itservices@uchicago.edu |

Executed on March 31, 2026.

/s/ Romit Chakraborty, Ph.D.



If you are somewhat serious about squash, you will gut the strings every few months. So you'll have to go to the store in any case.

This also applies to tennis racquets and strings.

Imran, the guy at Strings Attached is awesome, and will help you choose. He's a former pro.

Mon, 23 Dec at 3:10 pm

Hey Bhavnesh, Did you change my cnet password by any chance?

I need to back up data on my rcc account

And my UChicago email...

Asking just in case that you did

Nope

I didn't change it all.

I didn't have access to it.

As per I know, generally postdoc doesn't have access to their data after 1 month

Even to their email

Yeah

But I am an alum

And for the last time

I was *not* a postdoc

Yeah

And Laura extended my account access till Dec 24th

I had planned to back my data up by then

Then you should have access to your data

But then suddenly got locked out on Dec 16th

You should email RCC, they will be close by tmrw noon

Who is in charge of the cnet account?

IT department probably.

Email?

Hey bhavnesh, what's the email for IT for this sort of thing?

I generally raise the ticket on their website. Not sure of specific email though but this might work : itservices@uchicago.edu

Thanks for sharing Bhavnesh. I hope that you're well!

EX0023

Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III

# EXHIBIT 7

# Head-Gordon reference record, including prior support, Plaintiff's January 5, 2025 outreach, and Professor Head-Gordon's January 6, 2025 response.

Cited in Proposed Second Amended Complaint: ¶¶ 4, 45-47, 52, 73, 79, 88

Exhibit packet to [Proposed] Second Amended Complaint

# UNIVERSITY OF CALIFORNIA, BERKELEY



PROFESSOR MARTIN HEAD-GORDON
KENNETH S. PITZER DISTINGUISHED PROFESSOR
DEPARTMENT OF CHEMISTRY
(510) 642-5957; mhg@cchem.berkeley.edu

September 16, 2022

To Whom It May Concern:

## RE: Dr. Romit Chakraborty

I am writing to very strongly support Dr. Romit Chakraborty's application for an Assistant Professor position. Romit has been a postdoctoral researcher in my electronic structure theory group at Berkeley since August 2017, working on modeling hydrogen binding in metal organic frameworks (MOFs), as well as thinking about needs for new methodologies for this applications purpose. Romit is a skilled theoretical chemist, who built up a strong background in formal theory during his graduate research at the University of Chicago with David Mazziotti, and has now complemented this experience by developing the data analysis, workflow, and deep chemical understanding necessary to perform successful chemical applications. With these skills, Romit has very significant accomplishments emerging from his Berkeley work, as I will describe below, and has built a strong foundation for a successful independent career.

At Berkeley, Romit's work on hydrogen binding in MOFs has been a direct collaboration with Jeff Long's experimental group for the most part. As nanoporous materials, MOFs have extraordinarily large surface areas per unit volume, and also exhibit remarkable diversity in the chemical composition associated with stable frameworks, of which the vast majority remain unexplored as of today. MOFs are therefore promising functional materials for gas storage, separations, catalysis, and much more. Romit has provided the computational quantum chemistry results that confirm experimentally measured hydrogen binding energies and binding sites, for MOFs synthesized by the Long group. Perhaps more importantly, Romit's calculations have also provided significant insight into the way in which the materials function. Altogether, there are 5 major projects that Romit has largely completed to date – two of which were his initiative (items 1 and 5 below), two in which he supported Long group efforts (items 2 and 3 below), and collaborations with another group member (item 4). He has a variety of other projects underway, has also made code contributions to the latest version of the Q-Chem program.

(1) *Cooperative reversible binding of multiple hydrogen molecules at a single site in a synthesizable MOF*. I rate this project as Romit's most important scientific discovery at Berkeley, because finding a material of this type is one of the leading barriers to progress in making usable hydrogen storage materials. While I and others discussed with Romit the significance of designing a material that could do this, it is important to note that the specific material is Romit's invention. Based on projects 2, 3 and 5 below, Romit realized that V(II) in an undercoordinated metal site would be a strong candidate for the binding of multiple hydrogens. With this in mind, he performed a large series of numerical experiments that ultimately revealed a very promising candidate to be the first coordination sphere of a stabilized vanadium(II) site in MFU-4l, which is a synthesizable material (by transmetallation from an existing MFU-4*l* framework). He predicts uptake of two dihydrogens per metal site, and, most remarkably, with a suitable choice of halogen counter-ion, there is positive cooperativity in the binding: the second hydrogen binds stronger than the first! He has used energy decomposition analysis to interrogate the nature of the binding to reveal chemical influences at play in realizing optimal utility. Romit's findings represent a novel route towards enhancing volumetric storage in a MOF that may, in principle, be replicable across different framework topologies. I also note that Romit wrote the software necessary used to compute anharmonic vibrational energy levels in this study, which was essential to going beyond the standard harmonic approximation for obtaining reliable enthalpies and entropies of binding. This work is submitted for publication.

(2) *Observation of an intermediate to H2 binding in a metal–organic framework.* Coordinatively-unsaturated metal sites within certain zeolites and metal–organic frameworks can strongly adsorb various

molecules. While materials of this type bearing electron-rich metal centers can chemisorb guests amenable to redox activity or covalent bond formation, few studies have examined the kinetic profile of such a process. In collaboration with Jeff Long's group, Romit performed calculations to show that H2 binding at trigonal pyramidal Cu(I) sites in the Cu(I)-MFU-4*l* MOF occurs via the intermediacy of a metastable physisorbed precursor species. In situ powder neutron diffraction experiments enable direct observation and crystallographic characterization of this intermediate along the reaction coordinate leading to chemisorption, the first time that this has been accomplished for any material. Romit showed that the activation barrier separating the precursor species from the ground state complex is associated with a shift in the Cu(I) position that enhances $\pi$-backbonding with H2. This work was published in the Journal of the American Chemical Society (2021).

(3) *Modeling binding of hydrogen to V(II)btdd:* Experiments from Jeff Long's group show that hydrogen is remarkably strongly bound to this MOF. Romit has performed calculations characterizing the origin of the binding strength, as well as reproducing the experimental result via his calculations. A critical role for charge-transfer between V(II) and hydrogen emerges from these calculations, which were published in the Journal of the American Chemical Society in 2021.

(4) *Modeling pressure-induced spin cross-over in transition metal complexes*. Spin state switching on external stimuli is a phenomenon with wide applicability, ranging from molecular electronics to gas activation in nanoporous frameworks. Working with another postdoc in my group, Romit modeled the spin crossover as a function of the hydrostatic pressure in octahedrally coordinated transition metal centers by applying a field of effective nuclear forces that compress the molecule towards its centroid. For spin crossover in first-row transition metals coordinated by hydrogen, nitrogen, and carbon monoxide, we find the pressure required for spin transition to be a function of the ligand position in the spectrochemical sequence. While pressures on the order of 1 GPa are required to flip spins in homogeneously ligated octahedral sites, we demonstrate a fivefold decrease in spin transition pressure for the archetypal strong field ligand carbon monoxide in octahedrally coordinated Fe(II) in [Fe(II)(NH3)5CO] interactions. This very interesting proof of concept study was published in ChemPhysChem in 2019, and it nicely shows Romit's ability to develop theory, as well as to apply it.

(5) *A study of binding of diverse gas molecules in 3 classes of MOFs.* While MOFs are recognized to be promising candidates for gas separations, there is a lack of existing computational work that takes a broad and fundamental view of this scientific challenge. On his own initiative, Romit has worked to fill this gap, with a careful yet exciting comparative study of three promising frameworks (one from the MFU-4l class and one from the btdd class, which interact strongly with gases, as well as the classic MOF-5 which is a weaker binder) interacting with a diversity of industrially relevant gases (including H2, N2, O2, CH4, C2H6, C2H2, NO, CO2, SO2, NH3, H2O). Romit is able to draw a range of interesting and significant conclusions about the separations that are most efficiently (and least efficiently) performed by each class of framework, as well as the underlying reasons for these conclusions. This is a very data-rich study that I think will also have a very significant impact on the materials chemistry community. Romit is part-way through writing up his exciting results.

Romit is an ambitious and talented young scientist. His Berkeley postdoc accomplishments are a combination of very challenging collaborative projects with several different members of the Long group, and two projects of real practical significance that he has initiated himself. Altogether this work is a strong portfolio in computational materials chemistry modeling. Indeed, he has also got other projects on the boil that I have omitted from the list above! Altogether, Romit is an excellent candidate for a junior faculty position, and I give his application my strong support!

Sincerely,

Martin Head-Gordon
Kenneth S. Pitzer Distinguished Professor

EX0027

 **Gmail**

**Romit Chakraborty <romit.chakraborty@gmail.com>**

## Hard News

**Romit Chakraborty** <romit.chakraborty@gmail.com>                    5 January 2025 at 22:12
To: Martin HEAD-GORDON <mhg@cchem.berkeley.edu>

Dear Martin,

I hope you've been well.
I'm writing to share some news about my recent employment at PsiQuantum and to ask for your perspective as I reassess my career path. Although I understand your time is limited, and that you may want your involvement with this issue, I felt like I should reach out to engage your insight on the matter.

I began working at PsiQuantum on October 28th, having relocated from Chicago to Palo Alto. I was granted an O-1A visa by the United States Citizenship and Immigration Services for Extraordinary Ability in the Sciences on October 25th, 2024, specifically for my contributions to the field of quantum chemistry and for me to be able to take on the role of Senior Quantum Solutions Computational Chemist.

Within the first six weeks (leading up to December 9th), I:

- Participated in 20+ video-recorded discussions that covered:
  - Technical, scientific, and conceptual aspects of Comprehensive Quantum Chemistry Methodology (CQCM)
  - Business and operational dimensions of quantum chemistry solutions
- Delivered a talk on November 19th titled *"AI Assistants and All that Jazz"*, video recorded and well received.
- Conducted a paper review on November 22nd (*"Deep Gaussian Processes for Multifidelity Modeling"*), also video recorded.
- Presented a one-hour session on December 2nd (*"Active Space Selection for Atomisation Energy Calculations"*), which received positive feedback from key consultants, including Professors Janus Eriksen and Sohrab Ismael-Baegi. This session was also recorded.
- Submitted a 19-page progress report (plus a 10-page addendum and source code) on December 9th, containing tables, figures, derivations, source code, and source code usage instructions, and electronic structure data—compiled on effectively one working day's notice.

Despite these documented contributions, on December 10th, I was abruptly terminated in a 15-minute unscheduled meeting, with immediate confiscation of my work laptop and revocation of all digital access. The cited reasons were performance and teamwork, yet none of these concerns had ever been raised, documented, or even verbally insinuated prior to this unscheduled meeting. Notably, the December 9th progress report was requested immediately after I asked for transparency in hiring a new team member per company policy.

The termination has been highly stressful, to say the least, not only because I had just relocated and changed careers but also due to the immigration consequences jeopardising my legal status in the U.S. and limiting the time I have to pursue remedies. I'm working purely from memory, as all my digital records were seized, leaving me without documentation to clarify or defend my performance. I accept responsibility for imperfections on my part, and strongly suspect retaliation and worry there may be efforts to tarnish my credibility or even assassinate my character to justify the firing. I'm sharing this with you because of the severity of its impact on my career trajectory, livelihood, immigration status, and physical and mental well-being.

While I understand if you must prioritise your obligations and may wish to remain minimally involved, I would it would be great to have your advice on how best to proceed.
My current strategy is to

i) induce discovery to clear my name in the above
ii) leverage my skill set in quantum chemistry and programming multimodal large language models (quantum chemistry + AI) to
    a) find a new employer, or
    b) start my venture

I am pursuing both i) and ii) in equal measure and am confident that I will secure my livelihood if I keep working hard. I have savings that will last me for a while, but the 60-day grace period to leave the country starts on Jan 10th.

Thank you for taking the time to read this, Martin. I apologise for not reaching out with better news and will respect whatever level of advice you feel comfortable offering.

Regards,
Romit
Romit Chakraborty**,** MS, PhD, UChicago 2017
Senior Quantum Solutions Computational Chemist
PsiQuantum
Palo Alto, California

 **Gmail**

**Romit Chakraborty <romit.chakraborty@gmail.com>**

## Hard News

**Martin Head-Gordon** <m_headgordon@berkeley.edu>                        6 January 2025 at 13:23
To: Romit Chakraborty <romit.chakraborty@gmail.com>

Dear Romit,

First, my personal commiserations about this extremely bad news -- I fully realize what a difficult situation you have found yourself in. To be terminated after only 5 weeks at PsiQuantum indicates a disastrous start, either through team interactions or performance or both.  I am very sorry to hear this news.

Second, one piece of strong advice.  Drop any effort at "discovery to clear (your) name".  It is a waste of time, and distracts you from moving forwards (i.e. finding something new). PsiQuantum's decision will have been reviewed at several levels of management, with a range of inputs. You must assume they made a valid decision.

Third, regarding lessons. This is not the time to sugar-coat things, so I will not.

I suggest you carefully look at your entire post-doctoral trajectory and then take a long look in the mirror.  Remember your visa was granted for "contributions to the field of quantum chemistry".  But maybe you were/are not that interested in this field. Consider the following evidence (looking at just the bottom line -- not causes or excuses):
   i) You made a poor impression on Laura because you were (apparently) distracted by LLMs. You were also not as good a team player as she hoped. I do not know the remaining details, but recall she reached out to me because of her strong dissatisfaction with your performance.
   ii) You failed to finish up your work with me, probably because, as you wrote to me just 5 days ago, you "cannot sustain prolonged interest" in those topics. For a 5-year postdoc, your productivity was low, as evidenced by only two first author papers. I had to put considerable personal effort into both of them to bring them to a standard I was happy with. So did
Redacted
   iii) You failed to perform adequately at PsiQuantum in a quantum chemistry role, leading to cause-based termination after only 5 weeks or so.

To me this adds up to lots of missed opportunities that cast doubt on how interested in quantum chemistry you are, as well as how suitable you are for a job in  academia or industry.  In blunt performance-assessment terms, you have underperformed at every step (sometimes very significantly).

Of course I wish you all the best in the future, as evidenced by investing 5 years of support into your career development, as well as supporting you for the position with Laura and innumerable academic positions and most recently PsiQuantum. But, facing the bare facts (above), the pattern that has caused your current problem looks pretty clear to me.

The main questions for you to think about as you move forwards are (in my opinion). (i) What lessons can you learn from the (somewhat depressing) bottom line facts of your 3 postgraduate experiences? (ii) What implications do those lessons have for your next career step?

I hope this is of some use for thinking about your path forwards. I think it is important for you to learn from your past so you do not repeat such mistakes in the future.

Sincerely,

Martin

P.S.  Drop the false PsiQuantum affiliation from your emails, etc. It casts doubt on your honesty.

EX0028

Redacted

Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III

# EXHIBIT 8

# Professional opportunities and damages materials, including University of New Mexico, Oxford-related, University of Central Florida, and related academic-opportunity materials.

Cited in Proposed Second Amended Complaint: ¶¶ 6, 13, 15, 39, 43-44, 52, 61, 79-81

Exhibit packet to [Proposed] Second Amended Complaint

 Gmail

## Room for EPSRC application

3 messages

**Romit Chakraborty** &lt;romit.chakraborty@gmail.com&gt;
To: Katie Winter &lt;katie.winter@chem.ox.ac.uk&gt;

31 December 2024 at 14:36

Dear Katie,

I trust that you are well.
It's been a whirlwind year for me, one where I moved from Berkeley back to Chicago and then to Cupertino, where I now reside and work for PsiQuantum. My apologies for catching you unawares with this:
Is there room for turning in the EPSRC funding application with Oxford this year or early next year?

Sincerely,
Romit

Romit Chakraborty**, Ph.D.**
Senior Quantum Solutions Computational Chemist
**PsiQuantum**
Palo Alto, California

**Katie Winter** &lt;katie.winter@chem.ox.ac.uk&gt;
To: Romit Chakraborty &lt;romit.chakraborty@gmail.com&gt;

2 January 2025 at 00:54

Dear Romit,

Great to hear from you and congratulations on your new role at PsiQuantum.

Unfortunately the EPSRC Open fellowship closed permanently on the 12th of December.

As your year of support has now expired you would need to reapply through our expression of interest process in order to submit further applications.

Best wishes,

Katie

[Quoted text hidden]

**Romit Chakraborty** &lt;romit.chakraborty@gmail.com&gt;
To: Katie Winter &lt;katie.winter@chem.ox.ac.uk&gt;

2 January 2025 at 01:13

EX0034

Hi Katie,

Thank you for your response.
I wish you a very happy new year!

Sincerely,
Romit

Romit Chakraborty**, Ph.D.**
Senior Quantum Solutions Computational Chemist
**PsiQuantum**
Palo Alto, California

[Quoted text hidden]

EX0035

EX0037

**X5 PI OUTPUT REPORT**

| | |
|---|---|
| **Department:** | DN  Physical and Theoretical Chemistry |
| **Funder:** | EC  European Commission |
| **Exported by** | |

| | |
|---|---|
| **Project Title** | QuantSim |
| **X5 Ref No** | 2310DN001/AG5 |
| **Lead Department** | DN  Physical and Theoretical Chemistry |
| **Costing Type** | Application              0.00 |
| **Scheme** | 125% DI only recovery, with inflation |
| **PI** | Dr. Romit Chakraborty |
| **Start Date** | 12/1/2024 |
| **Duration (mths)** | 60.00 |
| **End Date** | 11/30/2029 |
| **Currency** | EUR |
| **Rate** | 1.25 |

| | Name / Funder Budget Heading | Role / Description | Duration | Total Cost | Funded % | Total Grant | RoE Total | Year 1 Cost | Year 2 Cost | Year 3 Cost | Year 4 Cost | Year 5 Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STAFF COSTS** | | | | | | | | | | | | |
| | Dr. Romit Chakraborty | Principal Investigator | 60 | £362,289.94 | 125.00% | £362,289.94 | 452,862.47 | £64,090.21 | £68,051.95 | £72,194.85 | £76,625.05 | £81,327.88 |
| | Pdra 1 | Researcher | 42 | £205,832.91 | 125.00% | £205,832.91 | 257,291.14 | £35,931.61 | £56,787.35 | £60,278.43 | £52,835.52 | £0.00 |
| **Total Staff Costs** | | | | £568,122.85 | | £568,122.85 | 710,153.61 | £100,021.82 | £124,839.30 | £132,473.28 | £129,460.57 | £81,327.88 |
| **NON-STAFF COSTS** | | | | | | | | | | | | |
| | Equipment | Equipment | | £160,000.00 | 125.00% | £160,000.00 | 174,400.00 | £160,000.00 | £0.00 | £0.00 | £0.00 | £0.00 |
| | Other: Publications | Other: Publications | | £30,000.00 | 125.00% | £30,000.00 | 37,500.00 | £5,999.99 | £6,000.01 | £6,000.00 | £6,000.00 | £6,000.00 |
| | Travel | Travel | | £30,000.00 | 125.00% | £30,000.00 | 37,500.00 | £5,999.99 | £6,000.01 | £6,000.00 | £6,000.00 | £6,000.00 |
| | Travel | Training | | | | | 10,000.00 | | | | | |
| | Other: Consumables | Other: Consumables | | £11,999.97 | 125.00% | £11,999.97 | 14,999.99 | £2,400.00 | £2,400.00 | £2,399.99 | £2,399.99 | £2,399.99 |
| | Other: Other | Audit fees | | £7,999.99 | 125.00% | £7,999.99 | 9,999.99 | £1,600.00 | £1,599.99 | £1,600.00 | £1,600.00 | £1,600.00 |
| | Other: Other | Software Licenses | | | | | 10,166.00 | £8,132.80 | £0.00 | £0.00 | £0.00 | £0.00 |
| | Other: Other | Recruitment | | £1,000.00 | 125.00% | £1,000.00 | 1,249.99 | £1,000.00 | £0.00 | £0.00 | £0.00 | £0.00 |
| | Personnel: Students | Student | | £149,165.94 | 125.00% | £149,165.94 | 186,457.44 | £7,531.46 | £45,818.38 | £50,375.32 | £45,440.78 | £0.00 |
| **Total Non-staff Costs** | | | | £390,165.90 | | £390,165.90 | 482,273.41 | £192,664.24 | £61,818.39 | £66,375.31 | £61,440.77 | £15,999.99 |
| **Total Estates** | | | | £237,814.97 | 0.00% | £0.00 | 0.00 | £44,225.63 | £54,556.44 | £56,193.12 | £53,032.14 | £29,807.64 |
| **Total Inf Technician Costs** | | | | £5,408.37 | 0.00% | £0.00 | 0.00 | £1,005.78 | £1,240.72 | £1,277.94 | £1,206.05 | £677.88 |
| **Total Indirect Costs** | | | | £672,781.68 | 0.00% | £0.00 | 0.00 | £125,114.89 | £154,340.86 | £158,971.08 | £150,028.64 | £84,326.21 |
| **Total Additional Indirect Costs** | | | | | | £239,572.21 | 299,465.25 | | | | | |
| **Oxford Total** | | | | £1,874,293.77 | | £1,197,860.96 | €1,491,892.27 | £463,032.36 | £396,795.71 | £415,290.73 | £395,168.17 | £212,139.60 |
| **External Collaborators** | | | | | | | | | | | | |
| **Collaborator Total** | | | | £0.00 | | £0.00 | 0.00 | | | | | |
| **Project Total** | | | | £1,874,293.77 | | £1,197,860.96 | 1,491,892.27 | | | | | |

College of Sciences

| | | | Total Startup | |
|---|---|---|---|---|
| | | | Total Allocated | $784,579 |
| | | | Unallocated | -$784,579 |

**BUDGET PLANNING WORKSHEET**
Standard Budget Ledger

| Faculty Name | Hire Date | | | | | |
|---|---|---|---|---|---|---|
| *Chakraborty, Romit* | *08/08/xx* | | | | | |
| | | | 12 months Jul-Jun 2025 | 12 months Jul-Jun 2026 | 12 months Jul-Jun 2027 | |

| Budget Category | Sub-Budget Category | Description | FY2024-25 | FY2025-26 | FY2026-27 | July 1 - 8/6/26 only for summer | TOTAL |
|---|---|---|---|---|---|---|---|
| Faculty-Staff Salary-Benefits | Staff Salary | | | | | | $ - |
| | Faculty Salary | Summer 2025 | $ 16,000.00 | $ 8,000.00 | $ - | $ - | $ 24,000.00 |
| | Faculty Salary | Summer 2026 | | | | $ - | |
| | Faculty Salary | | | | | | |
| | Benefits | | $ 5,120.00 | $ 5,120.00 | $ 5,120.00 | $ - | $ 15,360.00 |
| OPS Salary & Benefits | Hourly - Student | | | | | | $ - |
| | Graduate Contracts | | $ - | $ 84,264.00 | $ 84,264.00 | $ 10,000.00 | $ 178,528.00 |
| | Benefits | | $ - | $ 17,045.28 | $ 17,045.28 | $ 200.00 | $ 34,290.56 |
| | Post Doc | | $ 76,800.00 | $ 76,800.00 | $ 76,800.00 | | $ 230,400.00 |
| | Adjunct Faculty | | | | | | $ - |
| Scholarships & Fellowships | Scholarships & Fellowships | | | | | | $ - |
| Travel | Travel | | $ 6,000.00 | $ 6,000.00 | $ 4,000.00 | | $ 16,000.00 |
| | Moving | | $ 5,000.00 | | | | $ 5,000.00 |
| | | | | | | | $ - |
| Capital Assets & Construction | Other Assets | | | | | | $ - |
| | Furniture | | $ 2,000.00 | $ - | $ - | | $ 10,000.00 |
| | Equipment | | | | | | $ - |
| | Construction | | | | | | $ - |
| | Computer Equipment | | $ 111,000.00 | $ - | $ 75,000.00 | | $ 186,000.00 |
| Furniture & Equipment | Rental | | | | | | $ - |
| | Furniture | | | | | | $ - |
| | Equipment | | | | | | $ - |
| IT Expenses | Software Purchase | | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | | $ 15,000.00 |
| | Software Maintenance | | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | | $ 6,000.00 |
| | Other IT Expenses | | $ 14,000.00 | $ 14,000.00 | $ 14,000.00 | | $ 42,000.00 |
| | IT Services & Supplies | | | | | | $ - |
| | Hardware Maintenance | | | | | | $ - |
| | Computer Equipment | | | | | | $ - |
| Repairs & Maintenance | Repairs & Maintenance | | | | | | $ - |
| Other Non-Operating Expenses | Transfers to University Depts | | | | | | $ - |
| | Transfers to Other Entity | | | | | | $ - |
| | Other Non-Operating Expenses | | | | | | $ - |
| Other Operating Expenses | Supplies | | $ 6,000.00 | $ 2,000.00 | $ 2,000.00 | | $ 14,000.00 |
| | Resale Services & Supplies | | | | | | $ - |
| | Rent | | | | | | $ - |
| | Other Operating Expenses | | | | | | $ - |
| | Office Expense | | | | | | $ - |
| | Insurance | | | | | | $ - |
| | Dues & Subscriptions | | | | | | $ - |
| Professional Services | Professional Services | | | | | | $ - |
| | Marketing & Advertising | | $ 4,000.00 | $ 2,000.00 | $ 2,000.00 | | $ 8,000.00 |
| | Consulting Services | | | | | | $ - |
| Utilities & Communication | Utilities | | | | | | $ - |
| | Telecom | | | | | | $ - |
| **TOTAL** | | | $ 252,920.00 | $ 222,229.28 | $ 287,229.28 | $ 10,200.00 | $ 784,578.56 |

**Provide a short summary how this supports your research plan**

**Overview:** I aim to establish a molecular electronic structure theory research group at the University of Central Florida, comprising 2-3 graduate students and two postdocs. Most calculations will utilise ARCC facilities at the University of Central Florida, accessible through personal computers. Ideally, I would like as much of the funds to be unrestricted wherever possible. Below is an estimate of startup costs for my proposed research group:

**High-Performance Computing (HPC)**
I want to purchase supercomputing nodes on the ARCC facilities, specifically the Stokes facility for CPU and Newton for GPU nodes. By utilising existing resources at UCF, the proposed budget is approximately 2x more cost-efficient for DPH (dedicated processor hours) than building a cluster independently. A 70/30 split in expenditure between GPU and CPU nodes is proposed to reflect current trends in the building compute infrastructure and the existing computational processing demands for electronic structure code. This split also reflects the electronic structure research the group will specialise in, which involves processing GPU-optimized electronic structure codes for systems with open and periodic boundary conditions, multiscale models with the lattice Boltzmann methods, and conventional electronic structure codes.

Faculty

Chair/Director Approval

Dean Approval

67

EX0036


## APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico

**Samuel Mascarenas** <samascarenas@unm.edu>
To: Vice President for Research <vpr@unm.edu>
Cc: Greg Trejo <gtrejo@unm.edu>

20 December 2024 at 11:25

Good Afternoon, Applicant!

Thank you for applying to The University of New Mexico's Open Rank in Quantum Information Science & Engineering, req27555. You applied for this position last year, but your application is still in the pool and so it will be evaluated by the search committee. Before the evaluation process begins, we wanted to make sure that you were still interested in the position. Please notify us by end of day January 5th 2025 to let us know if you are still interested. If we do not hear from you by January 5th, we will remove you from the pool. Also, if you are interested in updating any of your application materials, please send me your updated information by end of business day on January 5th. (If you have already reached out to me with your updated documents, and I have responded back to you confirming receipt then you will be evaluated by the search committee with your new materials, and you can disregard this email.)

You can refer to the job posting here. Requisition: 27555 - Open Rank in Quantum Information Science & Engineering - UNM Jobs Career Site :: The University of New Mexico

Thank you, and I hope you have a happy holiday season!

-Sam
**Sam Mascarenas, MBA (he/him/his)**
Department Human Resources Rep
Office of the Vice President for Research
The University of New Mexico
Scholes Hall, Suite 327
MSC05 3480
1 University of New Mexico
Albuquerque, NM 87131
Office: 505-277-2949
samascarenas@unm.edu | research.unm.edu

EX0038



EX0039

 

## APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico

**Romit Chakraborty** <romit.chakraborty@gmail.com>                    31 December 2024 at 14:33
To: Laura Gagliardi <lgagliardi@uchicago.edu>

Hi Laura,

I trust you are well.
I would like to update materials for this application I had made whilst at Berkeley. Would you kindly consent to your support?

Sincerely,
Romit

Romit Chakraborty**, Ph.D.**
Senior Quantum Solutions Computational Chemist
**PsiQuantum**
Palo Alto, California


---------- Forwarded message ---------
From: **Samuel Mascarenas** <samascarenas@unm.edu>
Date: Fri, 20 Dec 2024 at 11:25
Subject: APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico
To: Vice President for Research <vpr@unm.edu>
Cc: Greg Trejo <gtrejo@unm.edu>


[Quoted text hidden]

EX0040


## APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico

**Laura Gagliardi** <lgagliardi@uchicago.edu>                                   1 January 2025 at 03:51
To: Romit Chakraborty <romit.chakraborty@gmail.com>

Dear Romit,

I am sorry but I will not be able to write a letter of support.

Thank you for your understanding.

Laura


---------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
---------------------------------------------------------------------

[Quoted text hidden]

EX0041

 

## APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico

**Romit Chakraborty** <romit.chakraborty@gmail.com>
To: Laura Gagliardi <lgagliardi@uchicago.edu>

1 January 2025 at 05:03

Hi Laura,

Thank you for your response.

Romit

Romit Chakraborty**, Ph.D.**
Senior Quantum Solutions Computational Chemist
**PsiQuantum**
Palo Alto, California

[Quoted text hidden]

EX0042

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III


# EXHIBIT 9

# Defendant-produced website/title email chain, Bates 000001-000007.


Cited in Proposed Second Amended Complaint: ¶¶ 7, 29, 37-38, 65, 69, 72, 88


Exhibit packet to [Proposed] Second Amended Complaint

**Bobbi Wilson**

---

| | |
|---|---|
| **From:** | Caroline K. Vickrey <vickreyc@jbltd.com> |
| **Sent:** | Tuesday, June 9, 2026 11:00 AM |
| **To:** | Georgia A. Arvanitis |
| **Subject:** | FW: Romit departure |

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, May 25, 2026 3:18 AM
**To:** Caroline K. Vickrey <vickreyc@jbltd.com>
**Subject:** FW: Romit departure

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-----------------------------------------------------------------------

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Date:** Sunday, May 24, 2026 at 5:51 AM
**To:** Monica Lugo <lugom@uchicago.edu>
**Subject:** FW: Romit departure

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-----------------------------------------------------------------------

**From:** Romit Chakraborty <romit@uchicago.edu>
**Date:** Wednesday, November 6, 2024 at 12:50 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>; Monica Lugo <lugom@uchicago.edu>
**Subject:** Re: Romit departure

000001

Hi Mónica, Laura,

Thank you for everything in Chicago!
I hope I wasn't too big of a chore to be around 🟠 ☺

Best,
Romit

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, November 4, 2024 12:26 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Re: Romit departure

Great thank you!

--------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
--------------------------------------------------------------------

**From:** Monica Lugo <lugom@uchicago.edu>
**Date:** Monday, November 4, 2024 at 12:24 PM
**To:** Romit Chakraborty <romit@uchicago.edu>, Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

I added the news. Let me know if you'd like any changes.

All best,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

**From:** Monica Lugo <lugom@uchicago.edu>
**Sent:** Monday, November 4, 2024 9:59 AM
**To:** Romit Chakraborty <romit@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

Dear Romit,

You are now added to the Previous Members page. I am working on the news post. Could you please send me your title? If you still have the job description, that would be very helpful.

Thank you,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

---

**From:** Romit Chakraborty <romit@uchicago.edu>
**Sent:** Sunday, November 3, 2024 2:40 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

P.S. We're working on a professional web presence; this is best rn
https://www.psiquantum.com/research



## Research — PsiQuantum

Explore PsiQuantum's innovative research in quantum error correction, algorithms, and architecture for quantum computing.

www.psiquantum.com

Have a good weekend!

---

**From:** Romit Chakraborty <romit@uchicago.edu>
**Sent:** Sunday, November 3, 2024 2:32 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

Hi Laura, Monica,

Yes!
rchakraborty@psiquantum.com
Quantum Solutions @ PsiQuantum.

Sincerely,
Romit

---

**From:** Monica Lugo <lugom@uchicago.edu>
**Sent:** Saturday, November 2, 2024 6:35 PM

000003

**To:** Laura Gagliardi <lgagliardi@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Re: Romit departure

Hi Laura,

Most certainly.  Romit, could you send me information about your new job?  I will add your LinkedIn page to the past members.


Thank you,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Saturday, November 2, 2024 1:14:58 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Romit departure

Hi Monica
Could you update the website and move Romit from current to past members?
He now works at PsiQuantum

Romit: when you have a new email address and professional page, please let us know.


Monica: could you please also add to the group news about Romit starting his new job.

Thank you
Laura

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering,
James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-----------------------------------------------------------------------

# Bobbi Wilson

| | |
|---|---|
| **From:** | Caroline K. Vickrey <vickreyc@jbltd.com> |
| **Sent:** | Tuesday, June 9, 2026 11:03 AM |
| **To:** | Georgia A. Arvanitis |
| **Subject:** | FW: Need website update |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Friday, April 10, 2026 2:00 PM
**To:** Caroline K. Vickrey <vickreyc@jbltd.com>
**Subject:** FW: Need website update

---------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
---------------------------------------------------------------------

**From:** Sharon Bryant <sbryant1@uchicago.edu>
**Date:** Monday, January 6, 2025 at 9:24 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>, Ben Anderson <baanderson@uchicago.edu>, La Toya Cobbins <lcobbins@uchicago.edu>, Monica Lugo <lugom@uchicago.edu>
**Subject:** RE: Need website update

Hi Laura, thanks for your quick response. While I'm not aware of the history, the request came from Romit via the Provost's Office and it is reasonable to have the website accurately reflect his employment and title, so I would suggest amending the website rather than removing him completely (which might cause other issues as we know Romit is paying close attention to this).

I have a copy of his offer letter where it outlines: "Job Title: Quantum-AI Researcher" and that's where the title comes from.

I'd be happy to have a quick call to hear more about the concerns, if useful.

000005

Thanks,
Sharon

**Sharon Bryant | The University of Chicago**
Director of Academic Affairs and Chief of Staff
Division of the Physical Sciences
5640 S. Ellis Avenue, room 399C
Chicago, IL 60637
[sbryant1@uchicago.edu](mailto:sbryant1@uchicago.edu) | 773.795.3665

---

**From:** Laura Gagliardi <[lgagliardi@uchicago.edu](mailto:lgagliardi@uchicago.edu)>
**Sent:** Monday, January 6, 2025 9:02 AM
**To:** Sharon Bryant <[sbryant1@uchicago.edu](mailto:sbryant1@uchicago.edu)>; Ben Anderson <[baanderson@uchicago.edu](mailto:baanderson@uchicago.edu)>; La Toya Cobbins
<[lcobbins@uchicago.edu](mailto:lcobbins@uchicago.edu)>; Monica Lugo <[lugom@uchicago.edu](mailto:lugom@uchicago.edu)>
**Subject:** Re: Need website update

Sharon
I am not sure where the title "Quantum-AI Researcher" came from.
Romit has been a very difficult group member and he is pushing on this.
I will remove him from the website. Please let me know if this is acceptable.
Laura


-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: [lgagliardi@uchicago.edu](mailto:lgagliardi@uchicago.edu)
Group Web Site: [https://gagliardigroup.uchicago.edu](https://gagliardigroup.uchicago.edu)
-------------------------------------------------------------------------

---

**From:** Sharon Bryant <[sbryant1@uchicago.edu](mailto:sbryant1@uchicago.edu)>
**Date:** Monday, January 6, 2025 at 8:35 AM
**To:** Laura Gagliardi <[lgagliardi@uchicago.edu](mailto:lgagliardi@uchicago.edu)>, Ben Anderson <[baanderson@uchicago.edu](mailto:baanderson@uchicago.edu)>, La Toya
Cobbins <[lcobbins@uchicago.edu](mailto:lcobbins@uchicago.edu)>
**Subject:** Need website update
Good morning Laura, Ben, and La Toya,

Happy new year! I am writing to request that this website ([https://gagliardigroup.uchicago.edu/previous-members/](https://gagliardigroup.uchicago.edu/previous-members/)) be updated to accurately reflect Romit Chakraborty's position as a staff member with title Quantum-AI Researcher. I'm not sure who is responsible for website updates, so I'm writing you all.

Please confirm when the change has been made.

Thank you,
Sharon

**Sharon Bryant | The University of Chicago**
Director of Academic Affairs and Chief of Staff
Division of the Physical Sciences
5640 S. Ellis Avenue, room 399C

000006

Chicago, IL 60637
sbryant1@uchicago.edu | 773.795.3665

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III


# EXHIBIT 10

# AdsGency AI Employment Contract dated May 22, 2023 for Head of Research position.


Cited in Proposed Second Amended Complaint: ¶¶ 13-14, 52, 61, 64


Exhibit packet to [Proposed] Second Amended Complaint

# *EMPLOYMENT CONTRACT*

This Employment Contract (this "Contract") is made effective as of May 22, 2023, by and between AdsGency AI of 37559 Cape Cod Road, Newark, California, 94560 and Romit Chakraborty of 2134 McGee Ave, Apt G, Berkeley, California, 94703.

    A. AdsGency AI is engaged in the business of software services. Romit Chakraborty will primarily perform the job duties at the following location: 2134 McGee Ave, Apt G, Berkeley, California.

    B. AdsGency AI desires to have the services of Romit Chakraborty.

    C. Romit Chakraborty is an at will employee of AdsGency AI. Either party is able to terminate the employment agreement at any time.

Therefore, the parties agree as follows:

**1. EMPLOYMENT.** AdsGency AI shall employ Romit Chakraborty as a(n) Head of Research. Romit Chakraborty accepts and agrees to such employment, and agrees to be subject to the general supervision, advice and direction of AdsGency AI and AdsGency AI's supervisory personnel. Romit Chakraborty shall provide to AdsGency AI the following services:

Grow, mentor, and lead the AdsGency's AI, data science, and data engineering team.
Ensuring that team members are clear about expected standards of performance,
motivated and developed to provide effective and efficient services.
? Building on the AdsGency's AI roadmap, lead the development of the AdsGency AI and data
science vision, strategy and capability plan.
? Develop the AdsGency's data platform, and integrate the latest data models and data
pipelines, establishing a model management approach that is best in class for
responsible data use.
? Provide expertise in statistics and probability, and the evaluation of data use,
algorithms, and models by external organizations. Developing an approach to
critical data science forensics to support AdsGency's ability to regulate the use of
AI.
? Represent the AdsGency in situations where expertise in AI and data science is required
e.g. meeting representative bodies and information rights interest groups, giving
evidence to Parliamentary committees, speaking at conferences and taking part in
media activity.

Romit Chakraborty shall also perform (i) such other duties as are customarily performed by an employee in a similar position, and (ii) such other and unrelated services and duties as may be assigned to Romit Chakraborty from time to time by AdsGency AI.

**2. BEST EFFORTS OF EMPLOYEE.** Romit Chakraborty agrees to perform faithfully, industriously, and to the best of Romit Chakraborty's ability, experience, and talents, all of the duties that may be required by the express and implicit terms of this Contract, to the reasonable satisfaction of AdsGency AI. Such duties shall be provided at such place(s) as the needs, business, or opportunities of AdsGency AI may require from time to time.

**3. COMPENSATION OF EMPLOYEE.** As compensation for the services provided by Romit Chakraborty under this Contract, AdsGency AI will pay Romit Chakraborty an annual salary of $72,000.00 payable semi-

monthly on the fifteenth day and the last day of the month and subject to applicable federal, state, and local withholding. Upon termination of this Contract, payments under this paragraph shall cease; provided, however, that Romit Chakraborty shall be entitled to payments for periods or partial periods that occurred prior to the date of termination and for which Romit Chakraborty has not yet been paid, and for any commission earned in accordance with AdsGency AI's customary procedures, if applicable. Accrued vacation will be paid in accordance with state law and AdsGency AI's customary procedures. This section of the Contract is included only for accounting and payroll purposes and should not be construed as establishing a minimum or definite term of employment.

**4. COMMISSION PAYMENTS.** In addition to the payments under the preceding paragraph, AdsGency AI will make commission payments to Romit Chakraborty based on 5% of company revenue performances pool. This commission will be paid monthly on the last day of the following month.

*Accounting*. AdsGency AI shall maintain records in sufficient detail for purposes of determining the amount of the commission. AdsGency AI shall provide to Romit Chakraborty a written accounting that sets forth the manner in which the commission payment was calculated.

*Right to Inspect*. Romit Chakraborty, or Romit Chakraborty's agent, shall have the right to inspect AdsGency AI's records for the limited purpose of verifying the calculation of the commission payments, subject to such restrictions as AdsGency AI may reasonably impose to protect the confidentiality of the records. Such inspections shall be made during reasonable business hours as may be set by AdsGency AI.

*Death of the Employee*. If Romit Chakraborty dies during the term of this Contract, Romit Chakraborty shall be entitled to payments or partial commission payments for the period ending with the date of Romit Chakraborty's death.

**5. EXPENSE REIMBURSEMENT.** AdsGency AI will reimburse Romit Chakraborty for "out-of-pocket" expenses incurred by Romit Chakraborty in accordance with AdsGency AI's policies in effect from time to time.

**6. RECOMMENDATIONS FOR IMPROVING OPERATIONS.** Romit Chakraborty shall provide AdsGency AI with all information, suggestions, and recommendations regarding AdsGency AI's business, of which Romit Chakraborty has knowledge, that will be of benefit to AdsGency AI.

**7. CONFIDENTIALITY.** Romit Chakraborty recognizes that AdsGency AI has and will have information regarding the following:
- inventions
- products
- product design
- processes
- technical matters
- trade secrets
- copyrights
- customer lists
- prices
- costs
- discounts
- business affairs
- future plans
- Employment, financial data, investors relationship information and all related to AdsGency AI information

and other vital information items (collectively, "Information") which are valuable, special and unique assets of AdsGency AI. Romit Chakraborty agrees that Romit Chakraborty will not at any time or in any manner, either directly or indirectly, divulge, disclose, or communicate any Information to any third party without the prior written consent of AdsGency AI. Romit Chakraborty will protect the Information and treat it as strictly confidential. A violation by Romit Chakraborty of this paragraph shall be a material violation of this Contract and will justify legal and/or equitable relief.

This Agreement is in compliance with the Defend Trade Secrets Act and provides civil or criminal immunity to any individual for the disclosure of trade secrets: (i) made in confidence to a federal, state, or local government official, or to an attorney when the disclosure is to report suspected violations of the law; or (ii) in a complaint or other document filed in a lawsuit if made under seal.

**8. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Romit Chakraborty has disclosed (or has threatened to disclose) Information in violation of this Contract, AdsGency AI shall be entitled to an injunction to restrain Romit Chakraborty from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. AdsGency AI shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

**9. CONFIDENTIALITY AFTER TERMINATION OF EMPLOYMENT.** The confidentiality provisions of this Contract shall remain in full force and effect for a period of 2 years after the voluntary or involuntary termination of Romit Chakraborty's employment. During such period, neither party shall make or permit the making of any public announcement or statement of any kind that Romit Chakraborty was formerly employed by or connected with AdsGency AI.

**10. EMPLOYEE'S INABILITY TO CONTRACT FOR EMPLOYER.** Romit Chakraborty shall not have the right to make any contracts or commitments for or on behalf of AdsGency AI without first obtaining the express written consent of AdsGency AI.

**11. BENEFITS.** Romit Chakraborty shall be entitled to employment benefits, as provided by AdsGency AI's policies in effect during the term of employment. These benefits include:
- Vacation
- Personal Leave
- Health Insurance

**12. TERM/TERMINATION.** Romit Chakraborty's employment under this Contract shall be for an unspecified term on an "at will" basis. This Contract may be terminated by AdsGency AI upon 15 days written notice, and by Romit Chakraborty upon 15 days written notice. If Romit Chakraborty is in violation of this Contract, AdsGency AI may terminate employment without notice and with compensation to Romit Chakraborty only to the date of such termination. The compensation paid under this Contract shall be Romit Chakraborty's exclusive remedy.

**13. TERMINATION FOR DISABILITY.** AdsGency AI shall have the option to terminate this Contract, if Romit Chakraborty becomes permanently disabled and is no longer able to perform the essential functions of the position with reasonable accommodation. AdsGency AI shall exercise this option by giving 30 days written notice to Romit Chakraborty.

**14. COMPLIANCE WITH EMPLOYER'S RULES.** Romit Chakraborty agrees to comply with all of the rules and regulations of AdsGency AI.

**15. RETURN OF PROPERTY.** Upon termination of this Contract, Romit Chakraborty shall deliver to AdsGency AI all property which is AdsGency AI's property or related to AdsGency AI's business (including keys, records, notes, data, memoranda, models, and equipment) that is in Romit Chakraborty's possession or

under Romit Chakraborty's control. Such obligation shall be governed by any separate confidentiality or proprietary rights agreement signed by Romit Chakraborty.

**16. NOTICES.** All notices required or permitted under this Contract shall be in writing and shall be deemed delivered when delivered in person or on the third day after being deposited in the United States mail, postage paid, addressed as follows:

Employer:

AdsGency AI
Xinran Liu
CEO
37559 Cape Cod Road
Newark, California 94560

Employee:

Romit Chakraborty
2134 McGee Ave, Apt G
Berkeley, California 94703

Such addresses may be changed from time to time by either party by providing written notice in the manner set forth above.

**17. ENTIRE AGREEMENT.** This Contract contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Contract supersedes any prior written or oral agreements between the parties.

**18. AMENDMENT.** This Contract may be modified or amended, if the amendment is made in writing and is signed by both parties.

**19. SEVERABILITY.** If any provisions of this Contract shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**20. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Contract shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Contract.

**21. APPLICABLE LAW.** This Contract shall be governed by the laws of the State of California.

**22. SIGNATORIES.** This Contract shall be signed by Xinran Liu, CEO on behalf of AdsGency AI and by Romit Chakraborty in an individual capacity. This Contract is effective as of the date first above written.

By: _____      Date: _____05/22/2023_____

Xinran Liu, CEO
AdsGency AI


By: _Romit Chakraborty_

Romit Chakraborty

Date: 05/26/2023

\* Please note that my ability to execute this offer is contingent on obtaining the appropriate work authorization - RC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III


# EXHIBIT 11


# PsiQuantum Offer Letter dated July 25, 2024 for Senior Quantum Solutions Computational Chemist position.


Cited in Proposed Second Amended Complaint: ¶¶ 6, 26-27, 52, 79-80


Exhibit packet to [Proposed] Second Amended Complaint

Docusign Envelope ID: 98E71B01-0E70-4380-9328-A279405D0B7D



700 Hansen Way
Palo Alto, CA 94304

July 25, 2024

Romit Chakraborty
romit@uchicago.edu

Dear Romit,

PsiQuantum, Corp., (the "Company") is pleased to offer you employment on the following terms:

**1. Position**. Your title will be **Senior Quantum Solutions Computational Chemist** and you will report to **Arvin Kakekhani.** This is a full-time position working out of **Palo Alto, CA**. While you render services to the Company, you will not engage in any other employment, consulting, or other business activity (whether fulltime or part-time) that would create a conflict of interest with the Company. By signing this letter agreement, you confirm to the Company that you have no contractual commitments or other legal obligations that would prohibit you from performing your duties for the Company.

**2. Cash Compensation**. The Company will pay you a starting salary at the rate of **$188,000.00** per year, payable in accordance with the Company's standard payroll schedule and subject to applicable deductions and withholdings. This salary will be subject to periodic review and adjustments at the Company's discretion.

**3. Variable Bonus.** You are eligible for a variable bonus of **8%**. The bonus you receive will be determined based on milestones set by your manager. Once milestones are completed, bonuses will be payable during the next merit cycle. To be eligible for the current year's variable bonus, you must onboard by July 31st of that year. If hired after July 31st, the variable bonus will be payable the following year.

**4. Relocation Assistance Budget.** In addition, we offer a relocation assistance budget of up to **$10,000.00.** Once you relocate to the Bay Area, you will be reimbursed for qualifying expenses once you submit receipts to our expense portal. The Relocation Assistance Budget is conditioned upon your continued employment with the Company for one year. Any remaining budget unused after one year of relocation will be forfeited. If you leave the Company prior to your one-year anniversary, you will be required to repay the expenses reimbursed to you, in full, within thirty (30) days of your departure from the Company.

**5. Employee Benefits**. As a regular employee of the Company, you will be eligible to participate in a number of Company-sponsored benefits. In addition, you will be entitled to paid vacation in accordance with the Company's vacation policy, as in effect from time to time.

**6. Stock Options.** Subject to the approval of the Company's Board of Directors or its Compensation Committee, you will be granted an option to purchase **20,000** shares of the Company's Common Stock (the "Option"). The exercise price per share of the Option will be determined by the Board of Directors when the Option is granted. The Option will be subject to the terms and conditions applicable to options



HR Initial_____

granted under the stock option plan in effect at the time of the grant and the applicable stock option agreement. You will vest in 25% of the Option shares after 12 months of continuous service, and the balance will vest in equal monthly installments over the next 36 months of continuous service, as described in the applicable stock option agreement.

**7. Proprietary Information and Inventions Agreement**. Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's standard Proprietary Information and Inventions Agreement, a copy of which is attached hereto as **Exhibit A**.

**8. Employment Relationship**. Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations that may have been made to you are superseded by this letter agreement. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation, and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company (other than you).

**9. Background Investigations and Reference Checks**. The Company reserves the right to conduct background investigations and/or reference checks on all its potential employees. This employment offer is therefore contingent upon a clearance of such a background investigation and/or reference check, if any.

**10. Export Control**. This offer is contingent upon receipt of any export license or other approval that may be required under United States export control laws and regulations. We are not obligated to apply for any export license or other approval that may be required, nor can we guarantee that the United States Government will issue an export license or other approval, in the event that we do file an application. If for any reason PsiQ does not receive any required license from the U.S. government within an established time frame provided by the company, PsiQ may terminate your employment.

**11. Tax Matters.**
> **a. Withholding**. All forms of compensation referred to in this letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.
> **b. Tax Advice**. You are encouraged to obtain your own tax advice regarding your compensation from the Company. You agree that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities, and you will not make any claim against the Company, or its Board of Directors related to tax liabilities arising from your compensation.

**12. Interpretation, Amendment and Enforcement**. This letter agreement and Exhibit A constitute the complete agreement between you and the Company, contain all the terms of your employment with the Company and supersede any prior agreements, representations, or understandings (whether written, oral or implied) between you and the Company. This letter agreement may not be amended or modified, except by an express written agreement signed by both you and a duly authorized officer of the Company. The terms of this letter agreement and the resolution of any disputes as to the meaning, effect, performance, or validity of this letter agreement or arising out of, related to, or in any way connected with, this letter agreement, your employment with the Company or any other relationship between you and the Company (the "Disputes") will be governed by California law, excluding laws relating to conflicts



HR Initial_____

or choice of law. You and the Company submit to the exclusive personal jurisdiction of the federal and state courts located in San Mateo County, California, in connection with any Dispute or any claim related to any Dispute.

We hope that you will accept our offer to join the Company. You may indicate your agreement with these terms and accept this offer by signing and dating both the enclosed duplicate original of this letter agreement and the enclosed Proprietary Information and Inventions Agreement and returning them to me. This offer, if not accepted, will expire at the close of business on **July 30, 2024**. As required by law, your employment with the Company is contingent upon your providing legal proof of your identity and authorization to work in the United States. Your employment is also contingent upon your anticipated start date of **October 28, 2024** with the Company.

Very truly yours,

*Kris Werner*

Kris Werner, Head of Human Resources
PsiQuantum, Corp.

I have read and accept this employment offer:

Signed by:

*Romit Chakraborty*

5C94DB45701746A...

07/25/2024 | 4:29 PM PDT

**Romit Chakraborty**

**Attachment**
Exhibit A: Proprietary Information and Inventions Agreement



HR Initial_____

# 2024 Benefits at a Glance



PsiQuantum offers a competitive salary, 401(k) plan, and meaningful benefits to inspire you to have fun and live well. This flyer gives you a highlight of your available benefit plan options. PsiQuantum sponsors the majority of the premium cost of the medical, dental, and vision plans. The applicable per-pay-period contribution premium is listed for each plan.

## Plan Contributions

The cost for medical, dental, and vision benefits is shared by you and PsiQuantum. Your benefit contributions will be taken on a pre-tax salary reduction basis over 26 pay periods. (Should you choose to waive your medical benefit (due to having coverage elsewhere) you will receive a monthly waiver stipend of $100 (additional taxable income).

There is no cost to you for life and disability benefits; premiums are fully sponsored by PsiQuantum. Additional costs apply for voluntary products as outlined in this document and in ADP.

| CONTRIBUTIONS | | | |
|---|---|---|---|
| | **Employee Only** | **Employee + Spouse** | **Employee + Child(ren)** | **Employee + Family** |
| Anthem HDHP* | $0.00 | $74.06 | $49.38 | $129.61 |
| Anthem PPO | $53.45 | $149.67 | $117.60 | $221.83 |
| Kaiser HDHP* | $0.00 | $53.33 | $44.44 | $88.88 |
| Kaiser HMO | $36.61 | $102.52 | $91.54 | $146.46 |
| MetLife Dental | $2.28 | $5.57 | $7.76 | $12.03 |
| MetLife Vision | $0.67 | $1.18 | $1.21 | $2.35 |
| Life & Disability | No cost, paid by PsiQuantum | | | |
| Voluntary Accident | $3.62 | $6.30 | $7.42 | $9.30 |
| Voluntary Critical Illness | Age banded rates | | | |
| Voluntary Hospital | $8.01 | $21.32 | $13.89 | $27.20 |
| Voluntary Life | Age banded rates | | | |
| Voluntary Pre-Paid Legal | $8.65 | | | |
| Care.com | No cost, paid by PsiQuantum | | | |
| Modern Health | No cost, paid by PsiQuantum | | | |
| Pre-Tax Benefits | Self-directed up to IRS maximum | | | |
| 401k | Self-directed up to IRS maximum | | | |

*If you choose to enroll in the HDHP, you will automatically be enrolled in a health savings account (HSA). If you are not eligible to open and contribute to an HSA, you must notify PsiQuantum in writing within 30 days of your eligibility date. See the HSA section for more details.

Docusign Envelope ID: 98E71B01-0E70-4380-9328-A279405D0B7D

# 2024 Benefits at a Glance

 PsiQ

## Pre-Tax Accounts

- **Flexible Spending Arrangements:** Set aside pre-tax payroll dollars* to use for qualified healthcare expenses or for qualified childcare expenses for your children age 12 and younger.
- **Commuter Plans:** Load funds onto a Commuter Debit Card using pre-tax payroll reductions*. Commuter funds can then be used for qualified transit or parking expenses.
- **Health Savings Account (HSA):** If you enroll in the HDHP, PsiQuantum will contribute to your HSA account each month ($157.50 for Employee Only; $315.00 for Employee + Dependents). Maximize savings and contribute to your tax-preferred HSA using pre-tax payroll deductions*.
  *IRS annual contribution limits apply. Subject to IRS regulations. See plan documents for details and limitations.*

## Protection for Peace of Mind

- PsiQuantum provides all benefit-eligible employees with company paid life insurance and disability insurance. In addition to these plans, you may purchase additional coverage at reasonable rates.
- **Life and AD&D Insurance:** Employer paid coverage equal to 2x your earnings to a maximum of $500,000.
- **Optional Life:** Purchase additional life and AD&D coverage for yourself in $10,000 increments to a maximum of $150,000. You can also purchase coverage for your spouse in $5,000 increments to a maximum of $75,000, and/or coverage for child(ren) in flat amount of $1,000, $2,000, $4,000, $5,000, or $10,000. Rates are based on age; see plan details for additional information. Guaranteed issue amounts may apply.
- **Short-Term Disability:** If you are sick or injured and unable to work, after 7 days this plan pays a weekly benefit equal to 66.67% of your covered pre-disability earnings, to a maximum weekly benefit of $3,500, combined with other sources.
- **Long-Term Disability:** If you continue to be unable to work due to illness or injury after 90 days, this plan pays a monthly benefit equal to 66.67% of your covered pre-disability earnings, to a maximum monthly benefit of $15,000, combined with other sources. This benefit is payable to Social Security normal retirement age.

## Employee Discounts and Other Benefits

- **Fitness and Wellness Reimbursement:** PsiQuantum provides a Fitness & Wellness reimbursement of $200 quarterly with Forma.
- **Employee Assistance Program (EAP):** Employees physical and financial health is a priority. We offer many different channels of support for those managing through stressful financial situations.
- **Nationwide Pet Insurance:** Save 5% on pet insurance and receive additional perks for your pet.
- **Working Advantage**: Employees and dependents can take advantage of a discount program to save up to 60% on ticketed events and online shopping.
- **Business Travel Accident**: Full-time employees and their dependents are eligible to participate in PsiQuantum's Business Travel Accident Plan through Zurich. You are covered 24/7 for accidents that may occur while on a business trip. Your benefits include AD&D and Travel Assist, which is available when traveling 100+ miles from your place of residency.

## Retirement • Empower 401(k) Plan

Employees may participate in PsiQuantum's qualified 401(k) retirement savings plan and may make traditional tax-deferred and/or Roth after-tax contributions into a variety of investment options. PsiQuantum will contribute $0.50 per dollar up to $5,000. Employees may participate in PsiQuantums qualified 401(k) retirement savings plan and may make traditional tax-deferred and/or Roth after-tax contributions into a variety of investment options.

## Paid Time Off

- PTO: Eligible non-exempt (hourly) employees will accrue 3.33 hours per pay period for vacation.
- DTO: Eligible exempt (salaried) employees received unlimited time off (subject to supervisor approval)
- Sick leave: Eligible exempt and non-exempt employees receive 80 of sick time up front.
- PsiQuantum offers 10 paid holidays each year, and a paid shutdown is observed at the end of the year.
- We offer competitive parental leave with a dedicated Leave of Absence Consultant.

Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III

# EXHIBIT 12

# Defendant's responses to Plaintiff's First, Second, Third, and Fourth Requests for Admission.

Cited in Proposed Second Amended Complaint: ¶¶ 4-5, 20, 29-30, 36, 42, 48-49, 76, 81, 88

Exhibit packet to [Proposed] Second Amended Complaint

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ROMIT CHAKRABORTY, | ) | |
| | ) | Case No. 26-cv-00106 |
| Plaintiff, | ) | |
| | ) | Judge: Hon. Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge: Hon. Albert Berry, III |
| LAURA GAGLIARDI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST, SECOND, THIRD AND**
**FOURTH SETS OF REQUESTS FOR ADMISSION**

NOW COMES Defendant, LAURA GAGLIARDI, by and through her attorneys, JOHNSON & BELL, LTD., and for her Response to Plaintiff's First, Second, Third and Fourth Requests for Admission Pursuant to Rule 36 of the Federal Rules of Civil Procedure, states as follows:

REQUEST FOR ADMISSION NO. 1: Admit that Defendant possessed actual knowledge that Plaintiff's cap-exempt H-1B visa status was subject to a strict 60-day statutory grace period following the termination of his employment at the University of Chicago.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 2: Admit that Defendant possessed actual knowledge that Plaintiff's subsequent O-1A visa status was subject to a strict 60-day statutory grace period following the termination of his employment at PsiQuantum Corp.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 3: Admit that Defendant, or an individual acting under Defendant's direct instruction or authority, authorized the revocation of Plaintiff's institutional IT, server, and data access prior to the previously agreed upon date Dec 24, 2024.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 4: Admit that the text messages transmitted between Plaintiff and Bhavnesh Jangid, attached as Exhibit 6 to Plaintiff's First Amended Complaint, are authentic representations of communications that occurred within Defendant's research group.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 5: Admit that before January 6, 2025, Defendant communicated with Professor Martin Head-Gordon concerning Plaintiff.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 6: Admit that one or more communications between Defendant and Professor Martin Head-Gordon concerned Plaintiff's performance in Defendant's research group.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 7: Admit that Defendant communicated to Professor Martin Head-Gordon that Plaintiff had made a poor impression on Defendant, or words to that effect.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 8: Admit that Defendant communicated to Professor Martin Head-Gordon that Plaintiff was "distracted by LLMs," or words to that effect.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 9: Admit that Defendant communicated to Professor Martin Head-Gordon that Plaintiff was not as good a team player as Defendant had hoped, or words to that effect.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 10: Admit that Defendant did not issue Plaintiff any written performance warning, disciplinary notice, performance improvement plan, or written annual review during Plaintiff's employment at the University of Chicago.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 11: Admit that Plaintiff's August 31, 2023 offer letter identified Plaintiff's position as "Quantum-AI Researcher."

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 12: Admit that before sending the January 3, 2025 email containing the Title Statement, Defendant knew that Plaintiff's offer letter identified his position as "Quantum-AI Researcher."

**RESPONSE: Objection, this Request is vague as to the phrase "email containing the Title Statement" which is an undefined phrase and thus Defendant cannot admit or deny this Request as written.**

REQUEST FOR ADMISSION NO. 13: Admit that on January 3, 2025, Defendant wrote to Plaintiff and University of Chicago Human Resources that "The title 'Quantum-AI Researcher' is totally made up by you," or words to that effect.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 14: Admit that before sending the January 3, 2025 email containing the Title Statement, Defendant did not ask University of Chicago Human Resources to verify the title stated in Plaintiff's offer letter.

**RESPONSE: Objection, this Request is vague as to the phrase "email containing the Title Statement" which is an undefined phrase and thus Defendant cannot admit or deny this Request as written.**

REQUEST FOR ADMISSION NO. 15: Admit that by January 17, 2025, the Gagliardi Group website identified Plaintiff as "Staff Scientist with Title Quantum AI Researcher," or words to that effect.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 16: Admit that Plaintiff performed work in Defendant's group involving large language models, foundation models, artificial intelligence, active-space selection, or computational quantum chemistry.

**RESPONSE: Defendant denies that Plaintiff "performed work" according to her definition of "performed work."**

REQUEST FOR ADMISSION NO. 17: Admit that work involving large language models, foundation models, artificial intelligence, active-space selection, or computational quantum chemistry was within the research scope Plaintiff was recruited or permitted to pursue in Defendant's group.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 18: Admit that Defendant's Motion to Dismiss relies on Professor Head-Gordon's January 2025 statements concerning Plaintiff's performance, honesty, suitability, and termination from PsiQuantum.

**RESPONSE: Objection, this Request seeks a legal conclusion which is inappropriate for a Request to Admit Facts pursuant to Rule 36.**

REQUEST FOR ADMISSION NO. 19: Admit that Defendant has communicated with PsiQuantum Personnel concerning a research collaboration, proposal, grant, project, contract, award, or partnership.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 20: Admit that Defendant has communicated with PsiQuantum Personnel concerning the NQAC Project.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 21: Admit that before April 24, 2026, Defendant communicated with PsiQuantum Personnel concerning the NQAC Project.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 22: Admit that before December 10, 2024, Defendant communicated with PsiQuantum Personnel concerning any research collaboration, proposal, project, grant, partnership, quantum chemistry workflow, quantum algorithm, electrocatalyst, or fault-tolerant quantum computing application.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 23: Admit that Defendant publicly reposted or endorsed a PsiQuantum announcement concerning a collaboration involving Defendant, the University of Chicago, UL Research Institutes, and/or the National Quantum Algorithm Center.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 24: Admit that Defendant posted or reposted the statement "Can't wait to start this journey!" in connection with a PsiQuantum-related collaboration, or words to that effect.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 25: Admit that Defendant was aware, before January 2025, that Plaintiff had been employed by PsiQuantum.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 26: Admit that Defendant communicated with any PsiQuantum Personnel concerning Plaintiff at any time.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 27: Admit that Plaintiff performed research in Defendant's group concerning quantum chemistry, artificial intelligence, active-space selection, large language models, foundation models, or quantum algorithms.

**RESPONSE: Defendant denies that Plaintiff "performed research" according to Defendant's definition of "performed research."**

REQUEST FOR ADMISSION NO. 28: Admit that Plaintiff requested support, approval, clarification, or non-objection from Defendant concerning publication, presentation, online dissemination, or professional use of Publication/Research Materials.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 29: Admit that Defendant declined, withheld, opposed, conditioned, or delayed support for Plaintiff's publication, presentation, online dissemination, or professional use of Publication/Research Materials.

**RESPONSE: Deny. As Plaintiff presented no Publications/Research Materials to Defendant, Defendant had nothing to decline, withhold, oppose, condition, or delay support of for publication, presentation, online dissemination, or professional use.**

REQUEST FOR ADMISSION NO. 30: Admit that Defendant is not aware of any written agreement assigning Plaintiff's University of Chicago research to PsiQuantum.

**RESPONSE: Objection, this Request assumes that Plaintiff had research from the University of Chicago which could be assigned, which Defendant denies.**

REQUEST FOR ADMISSION NO. 31: Admit that Defendant is not aware of any written agreement prohibiting Plaintiff from accurately describing non-confidential research he performed while affiliated with Defendant's group.

**RESPONSE: Objection, this Request assumes that Plaintiff "performed research" which Defendant denies.**

REQUEST FOR ADMISSION NO. 32: Admit that before April 2026, Defendant understood that Plaintiff was seeking employment or professional opportunities in the same quantum chemistry, quantum computing, and quantum-AI professional ecosystem in which Defendant was communicating with PsiQuantum personnel.

**RESPONSE: Deny.**

Respectfully submitted,

JOHNSON & BELL, LTD.

By: /s/Caroline K. Vickrey
   One of the attorneys for Defendant,
   Laura Gagliardi

Caroline K. Vickrey – ARDC #6210332
Georgia A. Arvanitis – ARDC #6352525
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 Fax
vickreyc@jbltd.com
arvanitisg@jbtd.com

Page 6 of 6

Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III

# EXHIBIT 13

# Defendant's verified answers to Plaintiff's First, Second, Third, and Fourth Sets of Interrogatories.

Cited in Proposed Second Amended Complaint: ¶¶ 4-5, 11, 36, 42, 48-49, 73, 76, 88

Exhibit packet to [Proposed] Second Amended Complaint

| ROMIT CHAKRABORTY, | ) | |
|---|---|---|
| | ) | Case No. 26-cv-00106 |
| Plaintiff, | ) | |
| | ) | Judge: Hon. Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge: Hon. Albert Berry, III |
| LAURA GAGLIARDI, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DEFENDANT'S ANSWERS TO PLAINTIFF'S FIRST, SECOND, THIRD AND FOURTH SETS OF INTERROGATORIES</u>

NOW COMES Defendant, LAURA GAGLIARDI, by and through one of her attorneys,

JOHNSON & BELL, LTD., and for her Answers to Plaintiff's First, Second, Third and Fourth

Sets of Interrogatories, state as follows:

INTERROGATORY NO. 1: Identify the exact date, time, and medium (e.g., phone, email, text message, in-person) of the communication between Defendant and Dr. Martin Head-Gordon referenced in Dr. Head-Gordon's January 2025 email (Plaintiff's FAC, Exhibit 7) wherein Defendant expressed "strong dissatisfaction" with Plaintiff's performance.

**<u>ANSWER</u>:  Dr. Gagliardi discussed Plaintiff's performance in person with Dr. Martin Head-Gordon at a conference in France in July of 2024.  She does not recall the exact date or time.**

INTERROGATORY NO. 2: Identify by name, title, and institutional affiliation every individual who participated in, was consulted regarding, or was copied on communications discussing the decision to terminate Plaintiff's IT, email, and data access in December 2024.

**<u>ANSWER</u>: None. Data access termination occurs automatically through the University's IT department.**

INTERROGATORY NO. 3: Identify by name, title, and institutional/corporate affiliation every prospective employer, academic institution, or professional reference to whom Defendant (or anyone acting on Defendant's behalf) provided a reference, evaluation, or commentary regarding Plaintiff between January 1, 2024, and the present.

**<u>ANSWER</u>: None.**

INTERROGATORY NO. 4: Identify every communication between Defendant and Professor Martin Head-Gordon concerning Plaintiff from August 1, 2023 through February 28, 2025,

including the date, medium, participants, subject matter, substance, and documents reflecting or relating to each communication.

**ANSWER: Dr. Gagliardi discussed Plaintiff with Dr. Martin Head-Gordon at an American Chemical Society conference in March of 2024. Dr. Gagliardi expressed hopes that Plaintiff would do well, and expressed concerns that so far he had not made any progress. Dr. Gagliardi discussed Plaintiff again with Dr. Martin Head-Gordon at the conference in France in July 2024, and expressed her dissatisfaction with his lack of any concrete results.**

INTERROGATORY NO. 5: Identify every person to whom Defendant communicated any statement concerning Plaintiff's performance, teamwork, honesty, title, suitability for academia, suitability for industry, work on LLMs, termination from PsiQuantum, or professional reputation.

**ANSWER: Nobody other than Dr. Martin Head-Gordon.**

INTERROGATORY NO. 6: State the complete factual basis for any contention by Defendant that Plaintiff was "distracted by LLMs," not a good team player, performed poorly, or was unsuitable for academia or industry, and identify all documents supporting each contention.

**ANSWER: Dr. Gagliardi denies that the above interrogatory accurately describes her comments about Plaintiff, and objects to this interrogatory insofar as it is best answered in narrative format at a deposition. Without waiving these objections, some of the bases for her opinions were that Plaintiff made no persistent progress on any project, and while he had new ideas about how to use LLMs in several different areas, he never made any progress in actually developing those ideas, which resulted in no publications for conferences or any research materials at all.**

INTERROGATORY NO. 7: State the complete factual basis for Defendant's January 3, 2025 statement that the title "Quantum-AI Researcher" was "totally made up by you," and identify all documents reviewed or relied upon before making that statement.

**ANSWER: When Plaintiff applied for a position in the Gagliardi Group, he had too much prior professional experience for the post-doc position, because the University has a rule that six years after your PhD you can no longer be a post-doc. Thus, the Gagliardi Group created a position specifically for Plaintiff. The Gagliardi Group, with Plaintiff's help, "made up" a title and a role for him – "Quantum AI Researcher" -- and gave him the enhanced status of a staff position.**

INTERROGATORY NO. 8: Identify all records, documents, meetings, emails, memoranda, notes, or communications reflecting any performance concern, criticism, warning, supervision issue, teamwork issue, or dissatisfaction concerning Plaintiff during his employment in Defendant's research group.

**ANSWER: None; Plaintiff had not yet received his first annual review when he announced his departure for PsiQuantum.**

INTERROGATORY NO. 9: Identify every communication between Defendant and any PsiQuantum Personnel from January 1, 2024 through the present concerning the NQAC Project, including the date, participants, medium, subject matter, and documents reflecting each communication.

**ANSWER: Objection, relevance. Discussions with PsiQuantum did not start until 2026, after Plaintiff's employment there ended, so they are irrelevant to Plaintiff's employment with either the Gagliardi Group or with PsiQuantum. See also Answer to Interrogatory No. 10.**

INTERROGATORY NO. 10: Identify every communication between Defendant and any PsiQuantum Personnel concerning Plaintiff, Plaintiff's employment, Plaintiff's termination, Plaintiff's research, Plaintiff's publications, Plaintiff's reputation, Plaintiff's title, Plaintiff's use of LLMs, Plaintiff's suitability for academia or industry, or Plaintiff's professional prospects.

**ANSWER: None.**

INTERROGATORY NO. 11: Describe every occasion on which Plaintiff requested Defendant's support, approval, clarification, or non-objection concerning publication, presentation, online dissemination, or professional use of Publication/Research Materials, and state Defendant's response, reason, and all persons involved.

**ANSWER: Dr. Gagliardi objects to this Interrogatory as it assumes that Plaintiff had Publications/Research Materials, which Dr. Gagliardi denies. Without waiving said objection, none.**

INTERROGATORY NO. 12: Identify all contracts, grants, proposals, awards, memoranda of understanding, collaboration agreements, project documents, or institutional arrangements involving Defendant, the University of Chicago, PsiQuantum, UL Research Institutes, the National Quantum Algorithm Center, or the NQAC Project.

**ANSWER: Dr. Gagliardi objects to this Interrogatory as it seeks the identification of documents containing third-party confidential, proprietary, or trade-secret information all of which is irrelevant to this lawsuit, as discussions with PsiQuantum did not begin until 2026, after Plaintiff was terminated from PsiQuantum.**

INTERROGATORY NO. 13: For each Publication/Research Material, or category of Publication/Research Materials, that Defendant contends Plaintiff may not publish, present, post, cite, describe, share, retain, display, submit, or otherwise use for employment, grant, portfolio, preprint, manuscript, interview, litigation, or other professional purposes, identify:

(a) the specific material or category of materials at issue;
(b) every restriction Defendant contends applies, including whether Defendant contends the material is confidential, trade secret, unpublished, restricted, University of Chicago-owned, PsiQuantum-owned, third-party-owned, sponsor-restricted, contractually restricted, policy-restricted, or otherwise non-disclosable;

(c) the complete factual and legal basis for each asserted restriction, including any contract, policy, confidentiality obligation, intellectual-property assignment, invention-disclosure document, grant or sponsor condition, employment agreement, institutional rule, publication policy, or other source of authority on which Defendant relies;

(d) the date on which Defendant first became aware of each asserted restriction;

(e) whether Defendant or anyone acting with or for Defendant communicated any such restriction to Plaintiff, and if so, the date, medium, participants, and substance of each such communication; and

(f) all documents and persons with knowledge supporting each asserted restriction. If Defendant does not contend that any Publication/Research Material is restricted from Plaintiff's professional use, state so expressly.

**<u>ANSWER</u>: Objection, this Interrogatory assumes that Plaintiff had Publications/Research Material which Dr. Gagliardi denies. Without waiving said objection, none.**

Respectfully submitted,

JOHNSON & BELL, LTD.

By: /s/ *Caroline K. Vickrey*
One of the attorneys for Defendant,
Laura Gagliardi

Caroline K. Vickrey – ARDC #6210332
Georgia A. Arvanitis – ARDC #6352525
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 Fax
vickreyc@jbltd.com
arvanitisg@jbtd.com

## **<u>VERIFICATION</u>**

I, Laura Gagliardi, Defendant in the above-entitled cause, certify, under penalty of perjury, based on my personal knowledge, information and belief formed after reasonable inquiry, that the foregoing Answers to Interrogatories are complete, true and correct.


_Laura Gagliardi_

_____
                                         Laura Gagliardi

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III


# EXHIBIT 14

# Defendant's responses to Plaintiff's First, Second, Third, and Fourth Sets of Requests for Production, including Bates 000001-000007.


Cited in Proposed Second Amended Complaint: ¶¶ 5, 29, 42, 49, 53, 76, 81, 88


Exhibit packet to [Proposed] Second Amended Complaint

| | | |
|---|---|---|
| ROMIT CHAKRABORTY, | ) | |
| | ) | Case No. 26-cv-00106 |
| Plaintiff, | ) | |
| | ) | Judge: Hon. Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge: Hon. Albert Berry, III |
| LAURA GAGLIARDI, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST, SECOND, THIRD AND FOURTH SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS

NOW COMES Defendant, LAURA GAGLIARDI, by and through her attorneys, JOHNSON & BELL, LTD., and for her Response to Plaintiff's First, Second, Third and Fourth Request for Production Pursuant to Rules 26, 33, 34 and 36 of the Federal Rules of Civil Procedure, states as follows:

REQUEST FOR PRODUCTION NO. 1: Produce all documents and native communications between Defendant and Dr. Martin Head-Gordon from October 1, 2024, to the present.

**RESPONSE: Objection, overly broad and unduly burdensome. Dr. Gagliardi's communications with Dr. Martin Head-Gordon regarding Plaintiff were in person at two separate conferences. There are no email communications with Dr. Martin Head-Gordon about Plaintiff.**

REQUEST FOR PRODUCTION NO. 2: Produce all documents and native communications between Defendant and University of Chicago Human Resources, or any other University administrative personnel, regarding Plaintiff's job title, employment classification, or departure from the university.

**RESPONSE: Pursuant to Illinois Supreme Court Rule 213(e), see emails contained within Defendant's Document Production and identified as bates 000001-000007.**

REQUEST FOR PRODUCTION NO. 3: Produce all documents, communications, contracts, consulting agreements, grant drafts, and partnership agreements between Defendant (or any laboratory/research group directed by Defendant) and PsiQuantum Corp. This request specifically

includes, but is not limited to, any communications or documentation concerning the National Quantum Algorithm Center (NQAC).

**RESPONSE: Objection, relevance. Any such documents were exchanged after Plaintiff's termination from PsiQuantum and long after his employment with the Gagliardi Group and are thus irrelevant to this lawsuit.**

REQUEST FOR PRODUCTION NO. 4: Produce all documents and native communications (including emails, text messages, and direct messages) between Defendant and Dr. Martin Head-Gordon from March 1, 2024, to September 30, 2024.

**RESPONSE: See Response to Request No. 1.**

REQUEST FOR PRODUCTION NO. 5: Produce all documents, native communications, and server log metadata concerning the removal, modification, or alteration of Plaintiff's name, title, and profile from the Gagliardi group website between August 1, 2023, and the present.

**RESPONSE: See Response to Request No. 2.**

REQUEST FOR PRODUCTION NO. 6: Produce all documents and native communications between Defendant and any third-party academic institution, potential employer, or professional reference regarding Plaintiff from January 1, 2024, to the present.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 7: Produce all communications between Defendant and Professor Martin Head-Gordon concerning Plaintiff.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 8: Produce all communications between Defendant and any academic referee, prospective employer, industry colleague, University of Chicago administrator, or PsiQuantum employee concerning Plaintiff's performance, teamwork, honesty, title, suitability for academia or industry, work on LLMs, termination from PsiQuantum, or professional reputation.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 9: Produce all documents relating to Defendant's January 3, 2025 statement that Plaintiff's title "Quantum-AI Researcher" was "totally made up by you."

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 10: Produce all documents, drafts, screenshots, archived pages, change logs, emails, or communications concerning Plaintiff's listing on the Gagliardi

Group website, including any classification of Plaintiff as a postdoctoral researcher, staff scientist, Quantum-AI Researcher, visitor, or other category.

**RESPONSE: See Response to Request No. 2.**

REQUEST FOR PRODUCTION NO. 11: Produce all documents supporting any contention that Plaintiff performed poorly, was distracted by LLMs, was not a good team player, was dishonest, or was unsuitable for academia or industry.

**RESPONSE: See Response to Request No. 2.**

REQUEST FOR PRODUCTION NO. 12: Produce all documents concerning Plaintiff's access to University of Chicago email, data, computational resources, group data, repositories, or research files from December 1, 2024 through January 31, 2025.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 13: Produce all calendar entries, notes, emails, memoranda, messages, or other records concerning any meeting or discussion in which Plaintiff's performance, title, research direction, group status, access, or departure from the University of Chicago was discussed.

**RESPONSE: See Response to Request No. 2.**

REQUEST FOR PRODUCTION NO. 14: Produce all nonprivileged documents Defendant relied upon, reviewed, cited, or intends to rely upon in support of any defence based on qualified privilege, opinion, lack of causation, lack of damages, or Plaintiff's alleged PsiQuantum "cause-based termination."

**RESPONSE: See the documents attached as Exhibits to Plaintiff's original Complaint and First Amended Complaint in this lawsuit.**

REQUEST FOR PRODUCTION NO. 15: Produce all nonprivileged communications between Defendant and PsiQuantum Personnel, University of Chicago administrators, UL Research Institutes personnel, or National Quantum Algorithm Center personnel concerning the NQAC Project.

**RESPONSE: Objection, relevance. Any such documents were exchanged after Plaintiff's termination from PsiQuantum and long after his employment with the Gagliardi Group and are thus irrelevant to this lawsuit.**

REQUEST FOR PRODUCTION NO. 16: Produce all communications between Defendant and any PsiQuantum Personnel concerning Plaintiff.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 17: Produce all communications between Defendant and any PsiQuantum Personnel that include any of the following terms: "Romit," "Chakraborty," "Quantum-AI," "LLM," "large language model," "foundation model," "active space," "quantum chemistry," "publication," "IP," "confidential," "termination," "postdoc," "staff scientist," or "title."

**RESPONSE: Objection, overly broad and unduly burdensome. Without waiving said objection, Dr. Gagliardi has no communications with PsiQuantum about Romit Chakraborty.**

REQUEST FOR PRODUCTION NO. 18: Produce all documents concerning Plaintiff's requests to publish, present, post, share, cite, describe, or otherwise use Publication/Research Materials.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 19: Produce all documents concerning any restriction, objection, condition, warning, reservation, or refusal relating to Plaintiff's publication, presentation, posting, sharing, citation, description, or professional use of Publication/Research Materials.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 20: Produce documents sufficient to show the date, scope, participants, institutional parties, and subject matter of any collaboration, grant, project, contract, proposal, award, or partnership involving Defendant, the University of Chicago, PsiQuantum, UL Research Institutes, the National Quantum Algorithm Center, or the NQAC Project.

**RESPONSE: Objection, relevance. Any such documents were exchanged after Plaintiff's termination from PsiQuantum and long after his employment with the Gagliardi Group and are thus irrelevant to this lawsuit.**

REQUEST FOR PRODUCTION NO. 21: Produce all public announcements, LinkedIn posts, reposts, drafts, screenshots, internal circulation emails, or communications concerning Defendant's public endorsement, repost, or announcement of a PsiQuantum-related collaboration.

**RESPONSE: Objection, relevance.**

REQUEST FOR PRODUCTION NO. 22: Produce all nonprivileged communications with University of Chicago administrators, technology transfer personnel, departmental personnel, research administrators, or publication-related personnel concerning Plaintiff's research, title, publication rights, professional use of research, data access, or departure from Defendant's group.

**RESPONSE: See Response to Request No. 2.**

REQUEST FOR PRODUCTION NO. 23: Produce all documents supporting any contention that Plaintiff's termination from PsiQuantum, rather than Defendant's communications or conduct, caused the harm alleged in the First Amended Complaint.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 24: Produce all documents supporting any contention that Defendant's communications with Professor Head-Gordon, PsiQuantum Personnel, University of Chicago Human Resources, or any other third party did not cause or contribute to Plaintiff's alleged professional, reputational, immigration-related, or emotional-distress damages.

**RESPONSE: None. Investigation continues.**

REQUEST FOR PRODUCTION NO. 25: Produce all documents identified, relied upon, reviewed, or referenced in responding to Interrogatory No. 13, including any contract, policy, confidentiality obligation, intellectual-property assignment, invention-disclosure document, grant or sponsor condition, employment agreement, institutional rule, publication policy, communication, or other document supporting any contention that Plaintiff may not publish, present, post, cite, describe, share, retain, display, submit, or otherwise use any Publication/Research Material for professional purposes.

**RESPONSE: Objection, this Request assumes that Plaintiff had Publications/Research Material, which Dr. Gagliardi denies. Without waiving said objection, none.**

Respectfully submitted,

JOHNSON & BELL, LTD.

By:  /s/ *Caroline K. Vickrey*
One of the attorneys for Defendant,
Laura Gagliardi

Caroline K. Vickrey – ARDC #6210332
Georgia A. Arvanitis – ARDC #6352525
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 Fax
vickreyc@jbltd.com
arvanitisg@jbtd.com

# Bobbi Wilson

| | |
|---|---|
| **From:** | Caroline K. Vickrey <vickreyc@jbltd.com> |
| **Sent:** | Tuesday, June 9, 2026 11:00 AM |
| **To:** | Georgia A. Arvanitis |
| **Subject:** | FW: Romit departure |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, May 25, 2026 3:18 AM
**To:** Caroline K. Vickrey <vickreyc@jbltd.com>
**Subject:** FW: Romit departure

--------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
--------------------------------------------------------------------------

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Date:** Sunday, May 24, 2026 at 5:51 AM
**To:** Monica Lugo <lugom@uchicago.edu>
**Subject:** FW: Romit departure

--------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
--------------------------------------------------------------------------

**From:** Romit Chakraborty <romit@uchicago.edu>
**Date:** Wednesday, November 6, 2024 at 12:50 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>; Monica Lugo <lugom@uchicago.edu>
**Subject:** Re: Romit departure

Hi Mónica, Laura,

Thank you for everything in Chicago!
I hope I wasn't too big of a chore to be around 🟠 ☺

Best,
Romit

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, November 4, 2024 12:26 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Re: Romit departure

Great thank you!

----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
----------------------------------------------------------------------

**From:** Monica Lugo <lugom@uchicago.edu>
**Date:** Monday, November 4, 2024 at 12:24 PM
**To:** Romit Chakraborty <romit@uchicago.edu>, Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

I added the news.  Let me know if you'd like any changes.

All best,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

---

**From:** Monica Lugo <lugom@uchicago.edu>
**Sent:** Monday, November 4, 2024 9:59 AM
**To:** Romit Chakraborty <romit@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

Dear Romit,

You are now added to the Previous Members page.  I am working on the news post.  Could you please send me your title?  If you still have the job description, that would be very helpful.

Thank you,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

**From:** Romit Chakraborty <romit@uchicago.edu>
**Sent:** Sunday, November 3, 2024 2:40 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

P.S. We're working on a professional web presence; this is best rn
https://www.psiquantum.com/research



## Research — PsiQuantum

Explore PsiQuantum's innovative research in quantum error correction, algorithms, and architecture for quantum computing.

www.psiquantum.com

Have a good weekend!

**From:** Romit Chakraborty <romit@uchicago.edu>
**Sent:** Sunday, November 3, 2024 2:32 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

Hi Laura, Monica,

Yes!
rchakraborty@psiquantum.com
Quantum Solutions @ PsiQuantum.

Sincerely,
Romit

**From:** Monica Lugo <lugom@uchicago.edu>
**Sent:** Saturday, November 2, 2024 6:35 PM

**To:** Laura Gagliardi <lgagliardi@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Re: Romit departure

Hi Laura,

Most certainly.  Romit, could you send me information about your new job?  I will add your LinkedIn page to the past members.


Thank you,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Saturday, November 2, 2024 1:14:58 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Romit departure

Hi Monica
Could you update the website and move Romit from current to past members?
He now works at PsiQuantum

Romit: when you have a new email address and professional page, please let us know.


Monica: could you please also add to the group news about Romit starting his new job.

Thank you
Laura

-------------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering,
James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-------------------------------------------------------------------------

| | |
|---|---|
| **From:** | Caroline K. Vickrey <vickreyc@jbltd.com> |
| **Sent:** | Tuesday, June 9, 2026 11:03 AM |
| **To:** | Georgia A. Arvanitis |
| **Subject:** | FW: Need website update |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Friday, April 10, 2026 2:00 PM
**To:** Caroline K. Vickrey <vickreyc@jbltd.com>
**Subject:** FW: Need website update

---------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
---------------------------------------------------------------------

**From:** Sharon Bryant <sbryant1@uchicago.edu>
**Date:** Monday, January 6, 2025 at 9:24 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>, Ben Anderson <baanderson@uchicago.edu>, La Toya Cobbins <lcobbins@uchicago.edu>, Monica Lugo <lugom@uchicago.edu>
**Subject:** RE: Need website update

Hi Laura, thanks for your quick response. While I'm not aware of the history, the request came from Romit via the Provost's Office and it is reasonable to have the website accurately reflect his employment and title, so I would suggest amending the website rather than removing him completely (which might cause other issues as we know Romit is paying close attention to this).

I have a copy of his offer letter where it outlines: "Job Title: Quantum-AI Researcher" and that's where the title comes from.

I'd be happy to have a quick call to hear more about the concerns, if useful.

000005

Thanks,
Sharon

**Sharon Bryant | The University of Chicago**
Director of Academic Affairs and Chief of Staff
Division of the Physical Sciences
5640 S. Ellis Avenue, room 399C
Chicago, IL 60637
sbryant1@uchicago.edu | 773.795.3665

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, January 6, 2025 9:02 AM
**To:** Sharon Bryant <sbryant1@uchicago.edu>; Ben Anderson <baanderson@uchicago.edu>; La Toya Cobbins <lcobbins@uchicago.edu>; Monica Lugo <lugom@uchicago.edu>
**Subject:** Re: Need website update

Sharon
I am not sure where the title "Quantum-AI Researcher" came from.
Romit has been a very difficult group member and he is pushing on this.
I will remove him from the website. Please let me know if this is acceptable.
Laura

------------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
------------------------------------------------------------------------

---

**From:** Sharon Bryant <sbryant1@uchicago.edu>
**Date:** Monday, January 6, 2025 at 8:35 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>, Ben Anderson <baanderson@uchicago.edu>, La Toya Cobbins <lcobbins@uchicago.edu>
**Subject:** Need website update
Good morning Laura, Ben, and La Toya,

Happy new year! I am writing to request that this website (https://gagliardigroup.uchicago.edu/previous-members/) be updated to accurately reflect Romit Chakraborty's position as a staff member with title Quantum-AI Researcher. I'm not sure who is responsible for website updates, so I'm writing you all.

Please confirm when the change has been made.

Thank you,
Sharon

**Sharon Bryant | The University of Chicago**
Director of Academic Affairs and Chief of Staff
Division of the Physical Sciences
5640 S. Ellis Avenue, room 399C

000006

Chicago, IL 60637
sbryant1@uchicago.edu | 773.795.3665

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III


# EXHIBIT 15

# Public PsiQuantum collaboration announcement and Defendant's LinkedIn repost/endorsement dated April 24, 2026.


Cited in Proposed Second Amended Complaint: ¶¶ 30-31


Exhibit packet to [Proposed] Second Amended Complaint

   Home  2 My Network  Jobs  Messaging  25 Notifications  Me ▾  For Business ▾  Learning

Premium

### Romit Chakraborty, Ph. D. 

Quantum x AI

Cupertino, California

+ Experience

---

**Profile viewers** 170

View all analytics

🔸 **Your Premium features**

---

**Laura Gagliardi** 🛡️ · 1st

--

8h · 🌐

Can't wait to start this journey!

**PsiQuantum**
79,565 followers
11h · 🌐

Utility-scale, fault-tolerant quantum computers have the potential to unlock transformative clean-energy technologies—but only if researchers and private-sector leaders form robust partnerships to help prepare for the arrival of these systems.

That's why PsiQuantum is partnering with Professor **Laura Gagliardi** at the **University of Chicago** and **UL Research Institutes** on a Grand Challenges project awarded by the National Quantum Algorithm Center (NQAC). Together, researchers will develop a proof-of-concept, fault-tolerant quantum computing

workflow to model electrocatalysts, which accelerate the chemical reactions underpinning key clean-energy technologies.

This new initiative marks the beginning of an exciting new chapter in PsiQuantum's history of collaboration with researchers at the cutting-edge of fault-tolerant quantum applications. PsiQuantum has officially joined the NQAC at the **Illinois Quantum and Microelectronics Park**, reflecting our company's ambition to forge cross-cutting research partnerships to help make the most of the utility-scale systems we will build and deploy.

Rishu Khurana and 22 others

Reactions



+15

Like

Comment

Repost

Send

Add a comment...

Ad ⋯



Your Company Page is waiting — see what's new

View Page

About     Accessibility     Help Center     Privacy & Terms ▼     Ad Choices     Advertising

Business Services ▼     Get the LinkedIn app     More

Linked in LinkedIn Corporation © 2026

Romit Chakraborty, Ph.D. v. Laura Gagliardi
Case No. 1:26-cv-00106
Judge Hon. Jorge L. Alonso
Magistrate Judge Hon. Albert Berry III

# EXHIBIT 16

## Limited care-verification letter from Dr. Yasha Rastgar dated February 23, 2026.

Cited in Proposed Second Amended Complaint: ¶¶ 56, 91

Exhibit packet to [Proposed] Second Amended Complaint

Elevate Mind and Wellness
9100 Wilshire Blvd
East Tower Suite 333 #1036,
Beverly Hills CA 90212
(P): 310-425-3558
(F): 651-666-1450


February 23, 2026


To Whom It May Concern,


I am writing to confirm that Romit Chakraborty (                    ) is currently an established patient under my care.

Romit is being treated for an anxiety disorder as well as an attentional and executive-function disorder.  Based on my clinical assessment, continued treatment and regular monitoring are medically indicated at this time. Romit is engaged in an active phase of care, and interruption or discontinuation of treatment at this stage would not be advisable, as either would carry a meaningful risk of clinical deterioration.

At present, it is anticipated that ongoing psychiatric follow-up will be required for a minimum of 12 months, with stabilization and treatment optimization constituting the current clinical objectives.

As a board-certified physician in the state of California (license #A168243), I am available for contact regarding Romit's care. Please do not hesitate to contact my office directly if any further clinical information is required, following procurement of written consent.


Sincerely,

Yasha Rastgar, MD
NPI: 1003270745