**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ROMIT CHAKRABORTY, | ) | |
| | ) | Case No. 26-cv-00106 |
| Plaintiff, | ) | |
| | ) | Judge: Hon. Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge: Hon. Albert Berry, III |
| LAURA GAGLIARDI, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT DR. LAURA GAGLIARDI'S RULE 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS

Defendant Dr. Laura Gagliardi, by and through her undersigned counsel, Johnson & Bell, Ltd., respectfully moves this Court pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. This is Plaintiff's third attempt to state claims for the same four causes of action. Plaintiff continues to fail to state viable causes of action, and thus Defendant seeks Judgment on the Pleadings pursuant to Rule 12(c) for the following reasons:

- *First*, Plaintiff has failed to allege Defendant engaged in any conduct amounting to fraudulent inducement; his allegations and exhibits establish that Defendant hired and paid him as a staff employee; his brief post-departure misnomer on the website and Defendant's decision to politely decline to recommend him do not establish a fraudulent intent to induce Plaintiff to join the group eight months earlier, nor did these things cause Plaintiff's later career failures.

- *Second*, Plaintiff's claim for defamation *per se* fails because a qualified privilege applies to the single internal email that Defendant sent to the HR department, and Plaintiff cannot allege abuse of that privilege. Plaintiff's claim for defamation likewise fails regarding Defendant's alleged statements regarding performance to her industry colleague, Professor Head-Gordon, were either classic non-actionable opinions, true statements, or both.

- *Third*, Plaintiff's tortious interference claim fails because Plaintiff identifies no specific business expectancy, but instead asserts only a vague hope that he might obtain a faculty position somewhere, and there is no evidence that Defendant interfered with his efforts to get any job.

- *Fourth*, Plaintiff's claim for intentional infliction of emotional distress fails because the alleged conduct - internal HR communications and professional opinions among industry colleagues - does not constitute extreme and outrageous actional behavior under Illinois law or the failure to recommend Plaintiff, and the most reasonable basis for his alleged distress is the abrupt loss of Plaintiff's current job at PsiQuantum and the unemployment and immigration troubles that followed.

1

**FACTS**

Plaintiff Romit Chakraborty ("Plaintiff"), was a staff researcher who worked in Defendant Dr. Laura Gagliardi's ("Defendant") chemistry research laboratory at the University of Chicago ("the University") for approximately eight months, from November 2023 to July 2024. (Plaintiff's Second Amended Complaint, "Pl. 2d Am. Comp." Doc. #45 ¶21). Defendant is the Richard and Kathy Leventhal Professor in the Department of Chemistry and the Pritzker School of Molecular Engineering at the University of Chicago. (Doc. #1, ¶9). Plaintiff left Defendant's employment – voluntarily – after eight months to work at a private industry job in Palo Alto, California. (Doc. #45 ¶26).

Before he was hired by the Gagliardi Group research lab at the University of Chicago, Plaintiff had a longer-than-usual 5-year post-doctoral research appointment during which Plaintiff's productivity was low, as evidenced by only two papers authored by him, into which his advisor at University of California at Berkley, Professor Martin Head-Gordon had to put considerable effort to bring them to an acceptable standard. (Doc. #45, Page ID #585). Plaintiff has disclosed that he has since been diagnosed with attentional and executive-function disorder. (Doc. #45, ¶56; Ex. 16, PageID #649).

On August 31, 2023, Defendant extended an offer to Plaintiff at an annual salary of $67,933.08. (Doc. #45, ¶21; Ex. 1, PageID #564-565). Plaintiff accepted the job and began work in Defendant's group on or about November 27, 2023. (Doc. #45, ¶14, ¶23). The University issued Plaintiff a staff identification card identifying him as a staff researcher and paid him as a staff member. (Doc. #45, Ex. 2, PageID #567). However, Plaintiff made a poor impression on Defendant; she believed he was distracted by large language models (LLMs), and Defendant concluded that Plaintiff was not as good a team player as Defendant had hoped. (Doc. #45, PageID #587). Defendant was strongly dissatisfied with Plaintiff's performance during his time with her research group. (Doc. #45, PageID #587). Defendant found Plaintiff to be a "difficult" group member. (Doc. #45, Ex. 9, Page ID #604).

In July 2024, approximately eight months after starting at the Gagliardi Group, Plaintiff accepted an offer of employment from PsiQuantum Corp., a quantum-computing company in Palo Alto, California. (Doc. #45 ¶26). Plaintiff ended his employment with the Gagliardi Group in October 2024, without completing a single year of service, and relocated to California. (Doc. #1, ¶30).

Plaintiff began his new job at PsiQuantum on October 28, 2024. (Doc. #45, Page ID #585). On November 4, 2024, Monica Lugo, in the Department of Human Resources at the University of Chicago, emailed Plaintiff, copying Defendant, and let him know that he had been added to the Previous Members page and requested that he let her know if he'd like any changes to that posting. (Doc. #45, Ex. 9, Page ID #599). Plaintiff responded, "Thank you for everything in Chicago! I hope I wasn't too much of a chore to be around. Best, Romit." (Doc. #45, Ex. 9, PageID #600).

Six weeks later, on December 10, 2024, Psi Quantum abruptly terminated Plaintiff's employment in a fifteen-minute meeting, confiscated his work laptop, and revoked his digital access. (Doc. #45, Ex. 7, Page ID #585). Psi Quantum cited "performance and teamwork" as the reasons for the termination. (Doc. #45, Ex. 7, Page ID #585).[1]

On December 31, 2024, Plaintiff sent Defendant an email asking her to support him for a faculty position at the University of New Mexico. (Doc. #45, Ex. 8, PageID #593). On January 1, 2025, Defendant politely declined: "Dear Romit, I am sorry but I will not be able to write a letter of support. Thank you for your understanding." (Doc. #45, Ex. 8, PageID #594). Plaintiff replied, "Thank you for your response." (Doc. #45, Ex. 8 PageID #595).

Two days later, on January 3, 2025, Plaintiff emailed Monica Lugo, and carbon copied Defendant, requesting that the University update his official title from postdoctoral to "staff capacity" on the Gagliardi Group website and asking for any "Annual Merit Process" records from his time at the University. (Doc. #45, ¶34; Doc. #1-1, Ex. B, PageID #27). On the evening of January 3, 2025, Defendant responded to Plaintiff's email as follows:

Dear Romit,

---

[1] As part of this lawsuit, Plaintiff filed a "Request for Judicial Notice in Opposition to Defendant's Motion to Dismiss" (Doc. #26) which has not been ruled on and this Court ordered on June 18, 2026 that it would rule on that motion alongside the motion to dismiss. The Request for Judicial Notice included the Affidavit of Plaintiff's Psi Quantum supervisor, Arvin Kakekhani, who testified as follows: Plaintiff "repeatedly acted in an insubordinate fashion" and during a one-on-one meeting, "aggressively moved toward me, pointing angrily at me and raising his voice. After this meeting I did not feel comfortable having one-on-one meetings with Plaintiff any longer." During another meeting, the "Plaintiff repeatedly attacked a colleague's work, refusing to back down even after I intervened multiple times and asked him to stop the argument." The affiant provided other examples of behavior that formed the basis for the termination from PsiQuantum, none of which mentioned Defendant or communication with Defendant. Plaintiff disclosed that he settled with Psi Quantum and that the settlement included "back-pay, limited non-wage damages, and his attorneys' fees." (Doc #1 ¶6.)

3

> You were hired as a staff scientist because you were too senior to be hired as a postdoc. However, on our website we have only two categories: postdocs and graduate student and this is why you are under postdocs. The title 'Quantum-AI Researcher' is totally made up by you.
> We didn't do an annual merit review because you stayed less than one year so there are no related documents.
>
> Best, Laura

(Doc. #45, Ex. 3, PageID #569).

Plaintiff sent Defendant an email at 1:42 a.m. on January 4, 2025, disclosing that he had been terminated by Psi Quantum on December 10, 2024, and that he was "forced to rely on memory to reconstruct events for potential legal proceedings." (Doc. #1-1, Ex. B, Page ID #28), Plaintiff explicitly identified the purpose of his outreach to Defendant:

> I am doing so since you were my most recent advisor, and I am afraid that PsiQuantum may want to tarnish my credibility . . . . You also have many connections in the industry, and I need a new job.

(Doc. #1-1, Ex. B, Page ID #28). The email closed by warning Defendant that "all communications will be in escrow, and I do not assume legal liabilities for any other person informed of this if the contents of this email were to proliferate." (Doc. #1-1, Ex. B, PageID #28), About twelve hours later, at 2:25 p.m. on January 4, 2025, Plaintiff followed up with a one-line postscript: "P.S. They will also try to assassinate my character." ((Doc. 1-1, Ex. B, Page ID #29).

On January 5, 2025, at 2:21 a.m., Defendant responded one final time:

> Dear Romit,
>
> I am sorry for your situation. I wish you all the best, but I will not be able to help you in the future. Please discuss your situation with Martin and whomever you think is appropriate but stop emailing me. Once you have recovered what you need from the U Chicago email address, we will have no further communication. Thank you for your understanding.

(Doc #1-1, Ex. B, PageID #29)

Twelve minutes later, at 2:33 a.m., Plaintiff replied: "Hi Laura, Thank you for your response. I shall honour your wishes." (Doc. #1-1, Ex. B, PageID #29).

4

At 10:12 p.m. on January 5, 2025, Plaintiff emailed his former post-doctoral advisor, Professor Martin Head-Gordon, at the University of California at Berkeley. (Doc. #45, Ex. 7, PageID #585-586). Plaintiff's email recounted in detail the December 10, 2024, Psi Quantum termination:

> Dear Martin,
>
> I hope you've been well.
>
> I'm writing to share some recent news about my recent employment at PsiQuantum and to ask for your perspective as I reassess my career path.
>
> …
>
> …on December 10th, ***I was abruptly terminated in a 15-minute unscheduled meeting, with immediate confiscation of my work laptop and revocation of all digital access. The cited reasons were performance and teamwork***, yet none of these concerns had ever been raised, documented or even verbally insinuated prior to this unscheduled meeting.
>
> Thank you for taking the time to read this, Martin. I apologize for not reaching out with better news and will respect whatever level of advice you feel comfortable offering.
>
> Regards,
>
> Romit
> Romit Chakraborty, MS, PhD, UChicago 2017
> Senior Quantum Solutions Computational Chemist
> Psi Quantum
> Palo Alto, California

(Doc. #45, Ex. 7, Page ID #585-586).

Within twenty-four hours, Professor Martin Head-Gordon replied with a candid letter assessing Plaintiff's entire "post-doctoral trajectory":

> Dear Romit,
>
> First, my personal commiserations about this extremely bad news –
>
> …
>
> This is not the time to sugar-coat things, so I will not.
>
> I suggest you look at your entire post-doctoral trajectory and then take a long look in the mirror. … Consider the following evidence (looking at just the bottom line – not causes or excuses):
>
> i) You made a poor impression on Laura because you were (apparently) distracted by LLMs. You were also not as good a team player as she had hoped. I do not know the remaining details, but recall she reached out to me because of her strong dissatisfaction with your performance.

5

ii)      You failed to finish up your work with me, probably because, as your wrote to me just 5 days ago, you "cannot sustain prolonged interest" in those topics. For a 5-year post-doc, your productivity was low, a evidenced by only two first author papers. I had to put considerable personal effort into both of them to bring them to a standard I was happy with. So did your collaborators. Jeff Long felt your collaborative performance could not merit a recommendation letter.

iii)     You failed to perform adequately at Psi Quantum in a quantum chemistry role, ***leading to cause-based termination after only 5 weeks or so***.

To me this adds up to lots of missed opportunities that cast doubt on how interested in quantum chemistry you are, as well as how suitable you are for a job in academia or industry. In blunt performance -assessment terms, you have underperformed at every step (sometimes very significantly). …

Sincerely,

Martin

P.S. Drop the false Psi Quantum affiliation from your emails, etc. It casts doubt on your honesty.

(Doc. #45, Ex. 7, PageID #587).

Plaintiff did not accept Professor Head-Gordon's advice. He instead replied with a series of cursory messages over the next thirty minutes. (Doc. #1-1, Ex. D, Page ID#40-41). Several emails were exchanged thereafter, ending with the following form Head-Gordon on February 10, 2025:

Hi Romit,

I am in turn not quite sure what to say. In the absence of a direct conversation, your email comments must speak for themselves, I'm afraid. In your latest message it is unclear if you are apologizing (first part of PS) or excusing yourself (rest of message).

(Doc. #1-1, Ex. D, Page ID#43).

On January 5, 2025, Plaintiff emailed the Office of the Provost of the University of Chicago to request that his title on the Gagliardi Group website be changed from "postdoc" to staff member. (Doc. #45, Ex. 5, Page ID #575). On January 6, 2025, The Office of Academic Affairs emailed Defendant, and two other individuals asked that Plaintiff's title be updated. (Doc. #45, Ex. 9, Page ID#604). Defendant responded, saying "I am not sure where the title "Quantum AI Researcher" came from. [Plaintiff] has been a very difficult group member and he is pushing on this. I will remove him from the website. Please let me know I this is acceptable." (Doc. #29, Ex. 9, PageID #445). On January 6, 2025, the Provost's Office responded that it was reasonable to amend the website rather than remove him completely, which might cause other issues as they knew [Plaintiff] was paying close attention to this,

and attached the copy of his offer letter which outlined the job title of "Quantum-AI Researcher." (Doc. #45, Ex. 9, PageID #603).  On January 17, 2025, Plaintiff followed up with the Office of the Provost, and the website was updated. Plaintiff's title was changed, per his request, to "Staff Scientist with Title Quantum AI Researcher." (Doc. #45, Ex. 5, PageID #575-576).  Although the only available organizational tabs on the Gagliardi Group website are (1) "Postdoctoral Researchers," (2) "Graduate Students," and (3) "Undergraduates Summer Students and Visiting Scholars," (Doc. #45, Ex. 5, Page ID #577) Plaintiff requested that he be listed on the "Undergraduates Summer Students and Visiting Scholars" tab. (Doc. #45, Ex. 5, PageID #576).

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "after pleadings are closed – but early enough not to delay trial - a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c) "The pleadings include the complaint, the answers and any written instruments attached as exhibits." *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 453 (7th Cir. 1998); *see* Fed. R. Civ. P. 10(c)("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Judgment on the pleadings are reviewed under the same standard as a motion to dismiss under Rule 12(b).  *Id.* Like Rule 12(b) motions, courts grant a Rule 12(c) motion only if "it appears beyond a doubt that the plaintiff cannot prove any set of facts that would support his claim for relief." *Id.* (*citing Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993)).  Courts will review facts in the light most favorable to the nonmoving party. *Id*. (*citations omitted*).  However, courts are not obliged to ignore facts in the complaint that undermine plaintiff's claim or to assign any weight unsupported conclusions of law. *Id*. (*citing R.J.R. Serv., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1989)).

### ARGUMENT

I.      **Count I for Fraudulent Inducement Fails Because Plaintiff's Allegations and Exhibits Contradict the Allegation that Defendant Fraudulently Induced Him to Take Any Action**

Plaintiff's claim for fraudulent inducement fails because he alleges no false statement made by Defendant that falsely induced him to work for her or do anything else, and his own exhibits contradict his claims.

Under Illinois law, the elements of fraudulent inducement are: (1) a false statement of material fact; (2) made with knowledge that the statement is false; (3) the defendant intended that the statement would induce the

plaintiff to act; (4) the plaintiff justifiably relied on the statement; and (5) the plaintiff suffered damages arising from that reliance. *Abazari v. Rosalind Franklin University of Medicine and Science*, 2015 IL App (2d) 140952. Federal Rule of Civil Procedure 9(b) requires specificity when pleading fraud. Fed. R. Civ. Pro. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake"). There is a high standard for pleading claims of fraud, as the complaint must contain specific allegations from which fraud is the necessary or probable inference, including what representations were made, when they were made, who made them and to whom they were made. *Feis Equities, LLC v. Sompo International Holdings, LTD*, 2020 Il App (1st) 191072 (dismissing for lack of specificity of fraud allegations); *First Mercury Insurance Co. v. Ciolino*, 2018 IL App (1st) 171532 (dismissing on grounds that reliance was not reasonable). In *Abazari*, the court affirmed the dismissal of an action for fraud against a college and medical university after plaintiff was unable to obtain a residency in podiatric medicine after graduation. *Abazari* at ¶1.

Plaintiff's Second Amended Complaint alleges that Defendant "represented that Plaintiff would hold a staff-level research job" and perform certain research, and that Defendant "omitted or concealed material facts concerning her intent and willingness to recognize Plaintiff's staff status title, non-postdoctoral classification, publication pathway, and staff-level professional role after the appointment began." (Doc. #45, ¶¶59, 60).

Although Plaintiff's allegations are complicated and obtuse, the facts are clear: he was a staff researcher and was paid as one. His own complaint alleges, and Exhibit 1 confirms, that Defendant actually executed an offer letter on August 31, 2023, appointing him as a "Quantum-AI Researcher" in a staff position, as promised. (Doc. #45, ¶59; Ex. 1). Second, Plaintiff alleges that the University issued him an identification card with the classification "STAFF" as Defendant promised. (Doc. #45, Ex. 2). Third, there is no allegation that he was denied any staff-level benefit, compensation, or condition of employment during his tenure. Instead, he was hired and remained an "at-will" staff employee per the offer letter, and he remained for approximately eight months, starting in November 2023 until July 2024, when he quit for another job. (Doc. #45, Ex. 1; ¶¶23, 26).

Defendant's remaining alleged "fraud" consists entirely of post-departure events: Plaintiff claims that Defendant "treated or permitted Plaintiff to be treated as a postdoctoral-level researcher, delayed or opposed quick publication of ongoing work, denied the source of the title, proposed removal from the website, and accused Plaintiff

8

of making up the title despite executing the officer letter despite executing the offer letter containing that title." (Doc. #45, ¶65). Whatever this means, an examination of Plaintiff's citations reveals that they refer to the offer as a staff member and staff member ID badge or the post-departure December 2024 emails about the title on the website. (Doc. #45, ¶65, Exs. 1, 3, 5, 9). These post-departure communications about the website cannot retroactively transform a lawfully performed employment relationship into fraud. *See Abazari*, 2015 IL App (2d) 140952 at ¶ 1 (affirming dismissal of fraud claim by graduate who failed to achieve anticipated career outcome).

Since Plaintiff cannot point to a false statement made at the time of hire, his own exhibits demonstrate he received the staff appointment he was promised, and the remaining allegations concern vague allegations of "treatment" on the website after Plaintiff's employment with Defendant ended, Plaintiff has failed to establish a fraudulent inducement to do anything, and Defendant is entitled to judgment as a matter of law on Count I.

II.     **Count II for Defamation Fails Because Qualified Privilege Covers the Single Internal Email and the Alleged Comments to an Industry Colleague are Either Classic Non-Actionable Opinions, True Statements, or Both**

Plaintiff's claims for defamation fail because the single email he relies on was privileged and Defendant's isolated statements about Plaintiff's performance were either classic non-actionable opinions, true statements, or both. Count II must be dismissed.

### *The Internal Email*

The email Defendant sent to the University's human resources department is not defamation because it is protected by qualified privilege: it was narrow in scope, directed to only one individual within the University, and sent solely to verify Plaintiff's accurate listing on the website.

A privileged communication is one which, except for the occasion on which or the circumstances under which it is made, might be defamatory and actionable. *Kuwik v. Starmark*, 156 Ill. 2d 16, 27 (1993). Communications made in good faith, limited in scope and only to the proper parties, are protected by a qualified privilege. *Id*. at 27. A qualified privilege "is based on the policy of protecting honest communications of misinformation in certain favored circumstances in order to facilitate the availability of correct information." *Id.* at 24. "The qualified privilege serves to enhance a defamation plaintiff's burden of proof." *Id.* Such conditional or

qualified privilege falls into three classes: "(1) situations in which some interest of the person who publishes the defamatory matter is involved; (2) situations in which some interest of the person to whom the matter is published or some other third person is involved; (3) situations in which a recognized interest of the public is concerned." *Id.* at 29. "Whether a statement is protected by… a qualified or conditional, privilege is a question of law for the court." *Layne v. Builders Plumbing Supply Co.*, 210 Ill. App. 3d 966, 969 (2d Dist. 1991); *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 871 (1st Dist. 1995) (courts look to duty or interest that required the communication to determine whether it is privileged).

Qualified privilege is extended to situations that involve the interests of the third person employer, to correct the situation or otherwise respond. *See Cianci v. Pettibone Corp.*, 298 Ill. App. 3d 419, 426 (1st Dist. 1998) (affirming summary judgment on the basis of qualified privilege where there was limited disclosure of the statement to a third person, the employer, who had an interest in the information). When a qualified privilege exists, the burden shifts, and "the plaintiff must show 'a direct intention to injure another, or… a reckless disregard of [the defamed party's] rights and of the consequences that may result to him.'" *Kuwik,* 156 Ill. 2d at 30.

Plaintiff alleges defamation *per se* from an internal email by Defendant stating, "the title Quantum AI Researcher is totally made up by you" and copied "University personnel," -- Monica Lugo of the Human Resources Department at the University of Chicago. (Doc. #45, ¶¶3, 34, 68; Ex. 3, Page ID #569; Doc. #1-1, Ex. B, PageID #27). This email is not defamatory because it responded to the email that Plaintiff sent to Defendant and Monica Lugo, it was limited in scope and sent only in response to that one person in the human resources department, for the narrow purpose of determining the Plaintiff's accurate listing on the website.

Plaintiff cannot coax bad faith or an intention to harm out of that one internal email. Email correspondence suggests that Defendant truthfully did not know where Plaintiff's title came from. (Doc. #45, Ex. 9, PageID #604) ("I am not sure where the title "Quantum-AI Researcher came from."). Plaintiff supplied the offer letter to prove his title, and the HR recipient took steps to correct the misdescription on the website resolved to his satisfaction approximately one week later. There was no "publication" outside of the human resources department, and the

misnomer was corrected within a week to Plaintiff's satisfaction[2]. (Doc. #45, Ex. 5, PageID #576). These facts fall squarely within qualified immunity, do not suggest any bad faith, and do not amount to defamation *per se*. They were simply a business communication that quickly and promptly solved a business issue.

*Statements About Plaintiff's Performance*

Next, Plaintiff alleges that Defendant defamed him when she spoke to Plaintiff's post-doctoral advisor, Dr. Martin Head-Gordon. (Doc. #45, ¶73). Plaintiff alleges: "[Defendant] published negative factual assertions or factual premises to Professor Head-Gordon, including that Plaintiff had not made progress or lacked concrete results, and later contended that Plaintiff made no persistent progress and produced no publications or research materials." (Doc. #45, ¶73). Plaintiff cites Defendant's own answers to discovery as support for these allegations – that "***Plaintiff made no persistent progress on any project, and while he had new ideas about how to use LLMs in several different areas, he never made any persistent progress in actually developing those ideas, which resulted in no publications for conferences or any research materials at all***." (Doc. #45, ¶73, Ex. 13). Plaintiff explains that these statements are defamatory because they impute inability to perform employment duties and lack of professional ability in a specialized, reference-dependent scientific field." (Doc. #45, ¶75). Oddly, Plaintiff does not directly deny Defendant's statements about his lack of concrete results or published research; nor does he point to any concrete results or publications to suggest the falsity of these statements; instead he claims that he wasn't warned about them: "Defendant knew or recklessly disregarded the falsity or unsupported nature of the performance statements because she has admitted no written performance warning, disciplinary notice, performance improvement plan, or annual review… " (Doc. #45, ¶76).

Truth is a defense to a defamation action. *American Int'l Hosp. v. Chicago Tribune Co.*, 136 Ill. App. 3d 1019, 1022 (1st Dist. 1985). Only "substantial truth" is required for this defense, which may be raised by a motion to dismiss. *Id*. (*citing Farnsworth v. Tribune Co.*, 43 Ill.2d 286, 293-94 (1969); *Kilbane v. Sabonjian*, 38 Ill. App. 3d 172 (2d Dist. 1976)("it is not necessary to show the literal truth of the inoffensive details; showing the truth of the gist or the sting of the defamatory imputation is sufficient")).

---

[2] There was also an opportunity to correct the misnomer back in November when Monica Lugo alerted Plaintiff about the posting when it first went live.  Plaintiff could have quickly reviewed it and corrected it then.

Statements of opinions are not actionable under Illinois law. Under Illinois law, the test for fact or opinion is whether the statement is "capable of objective verification as true or false." *Doherty v. Kahn*, 289 Ill. App. 3d 544, 557 (1st Dist. 1987). In *Doherty*, the defendants' statements to potential customers that "plaintiff was 'incompetent,' 'lazy,' 'dishonest,' 'cannot manage a business,' and/or 'lacks the ability to perform landscaping services' were deemed 'mere expressions of opinion.'" *See also Hopewell v. Vitullo*, 299 Ill. App. 3d 513, 517 (1st Dist. 1998) (employer's statement that plaintiff was "fired for incompetence" was non-actionable opinion); *Wilkow v. Forbes*, 241 F. 3d 552, 555 (7th Cir. 2001) (subjective statement not actionable).

The failure to issue favorable reviews to an associate is not sufficient to overcome the application of a qualified privilege that applies to communications among employees within an employer and forms no basis for a defamation claim. *See Huon v. Beatty*, 407 Ill. App. 3d 1185 (1st Dist. 2011) (affirming dismissal of complaint for defamation and applying qualified immunity, finding "no malice or bad faith on the part of the defendants" can reasonably be inferred from the allegation of the failure to issue a favorable review to an associate). Moreover, Plaintiff's complaints about the absence of advance warning about Defendant's opinions about him is a red herring – ***this is not a wrongful termination lawsuit*** where warnings and progressive discipline are relevant. Plaintiff voluntarily left the Gagliardi Group for an industry job in Palo Alto. The absence of advance notice about Defendant's assessment of his poor performance simply is not relevant to a defamation claim. *Compare, e.g., Ress v. Office of State Comptroller*, 329 Ill. App. 3d 136 (1st Dist. 2002).

For these reasons, Plaintiff's defamation claim fails and Defendant is entitled to judgment as a matter of law on Count II.

### III. Count III for Tortious Interference with Prospective Economic Advantage Fails Because Plaintiff Has Alleged Only Vague and Speculative Hopes for Future Jobs

To state a claim for tortious interference with prospective economic advantage under Illinois law, a plaintiff must allege a reasonable expectancy of a future business relationship, defendant's knowledge of that expectancy, intentional interference inducing a breach of that expectancy, and resulting damages. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484 (1998). A plaintiff must also allege damage caused by the defendant's interference. *McPherson v. McDonal's USA, LLC*, 2026 U.S. Dist. LEXIS 65852 (N.D. Ill.) at 74 (granting a motion to dismiss

a claim based on the hope or opportunity of a future business opportunity). Critically, the expectancy must be specific and reasonable, not merely speculative. *Id*. *Sheth v. The National Association of Realtors*, 2025 WL 1167852 (tortious interference claim dismissed on Rule 12(b)(6) motion: "[Plaintiff] has not pled facts sufficient to show she had a reasonable expectation…. 'the hope of receiving a job offer is not a sufficient expectancy.'" (quoting *Anderson v. Van Dorpel*, 172 Ill. 2d 399, 408 (1996)).

Plaintiff's claim for tortious interference with prospective economic advantage fails because it seeks to blame his former employer for his own downstream career failures. After PsiQuantum abruptly fired Plaintiff, he returned to Defendant to request a reference. Defendant declined to do so, as was her prerogative and the prerogative of anybody asked to provide a reference. Saying "no" to a reference request cannot, without more, constitute a tortious interference because the law does not mandate saying "yes" and thus a decision to decline a reference request reflects the exercise of judgment, not evidence of an intent to interfere with future job opportunities.

Here, Plaintiff's Count III fails on multiple grounds. Plaintiff alleges that Defendant "interfered by publishing the false statement, maintaining or permitting postdoctoral misclassification, delaying or opposing quick publication of ongoing work, declining support for a live faculty-search opportunity, and communicating unsupported negative performance assertions to Professor Head-Gordon." (Doc. #45, ¶82). This multifaceted allegation does not withstand scrutiny.

First, Plaintiff has identified no more than vague hopes of speculative future "opportunities." His alleged "opportunity" at the University of New Mexico ("UNM"), mentioned repeatedly throughout his Second Amended Complaint, amounted, in reality, to an application that made it into a pool as of December 20, 2024, and still required an updated expression of interest and additional materials which included letters of reference. (Doc. #45, Ex. 8, PageID #593). Plaintiff repeatedly references the "Oxford-related funding and expression-of-interest pathways" (Doc. #45, ¶6, 52, Exs. 8, 10, 11), which sounds like an impressive lead and is peppered heavily throughout his Second Amended Complaint, but an examination of his exhibits reveals only that this Oxford opportunity for a funding application fellowship closed **shortly** before he emailed to inquire about it on December 31, 2024, right after PsiQuantum fired him. (Doc. #45, Ex. 8, PageID #589). Clearly, these "lost opportunities" are nothing more than speculative hopes for future jobs to which Plaintiff never actually applied for.

13

Second, Defendant's alleged acts of "interference" do not constitute intentional acts that rise to the level of tortious interference. Plaintiff's claim here appears to be that his brief misnomer on the Gagliardi Group website was the reason why he did not attain a professorship at the UNM or obtain the "Oxford-related funding pathway." Regardless, there is no allegation that Defendant tried to mislabel Plaintiff to derail the UNM job application, nor that the UNM even saw Plaintiff's title or based its decision not to hire Plaintiff on a brief misnomer, which was likely corrected before Plaintiff submitted his full application and paperwork. The notion that this prestigious job would be derailed by a brief mislabeling on a website that would be easily contradicted by Plaintiff's own documentation belies this allegation.

To the extent Plaintiff is alleging that he lost these opportunities because Defendant "delayed or opposed quick publication of ongoing work," is a vague and confusing allegation. (Doc. #45, ¶82). What does Plaintiff mean by "opposed quick publication of ongoing work" – does that mean publication of incomplete work? If that is what it means, there is no obligation by Defendant to publish Plaintiff's work – complete or incomplete – but especially not incomplete work.

For all of the reasons above, Plaintiff's Count III for tortious interference with prospective economic advantage fails and judgment as a matter of law in favor of the Defendant must be entered on Count III.

### IV. Count IV for Intentional Infliction of Emotional Distress Fails Because Plaintiff Has Failed to Allege Outrageous Behavior and Termination from PsiQuantum Is the Logical Cause of his Distress, not Defendant

Plaintiff's claims for intentional infliction for emotional distress must be dismissed because Plaintiff has failed to allege sufficiently outrageous behavior by Defendant. Further, there is no question that Plaintiff voluntarily quit his University job. It thus is reasonable to infer that Plaintiff's alleged emotional distress was caused by PsiQuantum's decision to abruptly fire him, his subsequent unemployment, and his immigration issues, not Defendant's actions.

To state a claim for intentional infliction of emotional distress ("IIED") under Illinois law, a plaintiff must allege: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew there was a high probability that the conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress. *Canmegi v. Advocate South Suburban Hosp.*, 364 Ill. App. 3d 446 (1st

Dist. 2006). A complaint alleging IIED "must be specific and detailed beyond what is normally considered permissible in pleading a tort action." *Welsh v. Commonwealth Edison Co.*, 306 Ill. App. 3d 148, 155 (1999). The conduct must "go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Taliani v. Resurrection*, 2018 IL App (3d) 160327 at ¶ 26. "Fright, horror, grief, shame, humiliation, worry and other such mental conditions alone are not actionable; the distress must be so severe that no reasonable person could be expected to endure it." *Id.*

Here, Plaintiff's claim is based on two actions: (1) an internal HR email containing an inaccurate statement about his title, which was corrected within approximately one week to his admitted satisfaction; and (2) professional reference communications to a colleague that consist of honest performance assessments. Neither, singly or together, remotely approaches the "extreme and outrageous" threshold.

Moreover, emotional distress flowing from Plaintiff's unemployment, his "cause-based" termination from Psi Quantum, and his difficulty obtaining academic positions, thereafter, cannot as a matter of reason and the absence of evidence, convert Defendant's conduct into the cause of Plaintiff's distress. If anything, when he left Defendant's employ, Plaintiff was experiencing no distress – he had just obtained a dream job in Palo Alto. It is reasonable to infer, at the pleading stage, that any distress, if actual and severe, flows from Plaintiff's own subsequent professional failure, not from Defendant's limited and legally privileged communications, or personal opinions of his performance.

For the reasons stated above, Count IV of the complaint fails as a matter of law and a ruling in favor of Defendant must be entered with regard to Count IV.

## CONCLUSION

For the foregoing reasons, Defendant Dr. Laura Gagliardi respectfully requests that this Court dismiss all four counts of Plaintiff's First Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(c), and for such other relief that this Honorable Court deems just and equitable.

Respectfully submitted,

JOHNSON AND BELL, LTD.

/s/Caroline K. Vickrey
One of the Attorneys for Defendant
Dr. Laura Gagliardi

Caroline K. Vickrey – ARDC #6210332
Georgia A. Arvanitis – ARDC #6352525
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 Fax
vickreyc@jbltd.com
arvanitisg@jbtd.com
Firm No. 06347

16