FILED
11/12/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC

Case No: 1:26-CV-00106

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

| | |
|---|---|
| ROMIT CHAKRABORTY, Ph.D.,<br>Plaintiff,<br><br>v.<br><br>LAURA GAGLIARDI,<br>Defendant. | Case No. 1:26-cv-00106<br>Judge Jorge L. Alonso<br>Magistrate Judge Albert Berry III |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

Plaintiff Romit Chakraborty, Ph.D., appearing pro se, moves under Federal Rules of Civil Procedure 15(a)(2) and 15(d) for leave to file the proposed Third Amended Complaint (TAC) with its Exhibits 1-28, attached as Exhibit A. To the extent an earlier scheduling provision requires modification, Plaintiff also seeks relief under Rule 16(b)(4) for this amendment only. In support, Plaintiff states:

## I. Relief and grounds

1. The TAC incorporates material evidence obtained after the July 31, 2026 Second Amended Complaint (SAC): Defendant's October 12 deposition and three third-party productions from the University of Chicago, the University of California, Berkeley, and PsiQuantum. The University records address recruitment and staff classification; Berkeley records particularize professional-reference communications; selected PsiQuantum records establish report-transmission and employment chronology. It retains the four existing tort claims, adds one claim under 42 U.S.C. § 1981 against the same Defendant, and alleges no new defendant or unrelated transaction. The proposed pleading identifies the new factual basis for each theory and distinguishes allegations from inferences requiring proof. Proposed paragraphs 108A-108D and Exhibit 28 document the May relocation context, subsequent visa and mitigation efforts, and November 6, 2026 accelerator nonselection. They add no accelerator-related liability theory or separate damages demand.

2. Leave will permit the Court to address a concrete, complete pleading informed by discovery obtained to date. Plaintiff does not concede a defect in the SAC. He seeks leave before

disposition of the pending Rule 12 motion, rather than asking the Court to decide a complaint that omits the material October record.

**II. Procedural record and diligence**

3. The Court granted leave to file the SAC on July 29, 2026 and denied the earlier dismissal motion as moot (Dkt. 44). The SAC was filed July 31 (Dkt. 45). Defendant's Rule 12(c) motion for judgment on the pleadings (Dkt. 49) has been fully briefed since September 16, 2026, under Dkt. 51. The July 22 and September 16 scheduling orders set November 30, 2026, as the fact-discovery cutoff (Dkts. 42, 60); neither sets a pleading-amendment deadline. Thus, the October 12 deposition and October 23 University production postdate completion of the Rule 12(c) briefing. The Berkeley and PsiQuantum productions provide additional particulars identified below and in Exhibit A.

4. Defendant's October 12 testimony addressed her intention when Plaintiff accepted the staff appointment, her nondisclosure of that intention, her approval of the official position, and her explanation that the opportunity to remain in the United States was what mattered. The October 23 University production supplied the rejected postdoctoral request, internal staff-hiring decisions, worker classification, compensation, mentoring plan, and sponsorship records. These are identified in TAC ¶¶17-36, 47-50 and Exs. 17-18.

5. Plaintiff sought written consent on October 25. Defense counsel replied October 26 that she needed to review the proposed amendment. On November 2 at 12:17 a.m. Central, Plaintiff emailed the proposed TAC and exhibit index to defense counsel, expressly identifying the added § 1981 count and requesting consent under Rule 15(a)(2) and consultation. The transmission included the proposed pleading and index, without the exhibit documents. At the parties' November 11, 2026 meet-and-confer, defense counsel expressly declined to stipulate to filing the proposed TAC. Plaintiff states that oral response from his firsthand participation in the conference. This motion is therefore presented for decision, not as agreed.

6. The present motion follows review and integration of Defendant's sworn testimony and the UChicago, Berkeley, and PsiQuantum productions. These sources supply material particulars concerning recruitment, official classification, reference communications, and employment chronology; the TAC identifies each source and the claim it supports. Plaintiff does not contend that every underlying event was newly discovered. The November 6 nonselection and November 10 feedback response postdate the earlier proposed draft and are incorporated promptly. Plaintiff seeks leave on November 12, 2026, eighteen days before the November 30 fact-discovery cutoff. The sequence is material: completed Rule 12(c) briefing on September

16; Defendant's deposition on October 12; University production on October 23; request for consent on October 25; transmission of the proposed pleading and index on November 2; express refusal to stipulate on November 11; and this motion on November 12. The Berkeley and PsiQuantum records are identified by exhibit and Bates number in the proposed pleading and in paragraphs 13 and 17 below.

**III. Governing standards**

7. Rule 15(a)(2) directs that leave be freely given when justice so requires. The relevant considerations are undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice, and futility. Foman v. Davis, 371 U.S. 178, 182 (1962). The question is not simply how many versions have been filed, but whether a recognized ground warrants refusing this particular amendment. Rule 15(d) permits supplementation, on reasonable notice and just terms, concerning events after the pleading to be supplemented. Plaintiff invokes it for the post-SAC events within TAC paragraphs 108A-108D, documented in Exhibit 28; the antecedent relocation context is included under Rule 15(a)(2).

8. Futility ordinarily turns on the legal sufficiency of the proposed pleading under Rule 12(b)(6), accepting its factual allegations as true and assessing plausibility. Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana, 786 F.3d 510, 524, 526 (7th Cir. 2015). Plaintiff must plead a viable claim; he need not establish the disputed facts by a preponderance in seeking leave. The attached documents and qualifications remain part of the proposed pleading and cannot be disregarded.

9. If an applicable amendment deadline has expired, Rule 16(b)(4) requires good cause, principally diligence, before Rule 15 is considered. Alioto v. Town of Lisbon, 651 F.3d 715, 719-20 (7th Cir. 2011). Plaintiff identifies the October evidence, its bearing on the amendments, and the October 25-November 2 consent and drafting sequence. He requests any necessary modification for this pleading only; the existence of time remaining in discovery is not his sole basis for good cause.

**IV. The amendments state specific facts supporting the claims**

10. Fraudulent inducement. The TAC identifies the August 31, 2023 written staff offer, Defendant's approval, the prior rejection of the postdoctoral route, and her admitted existing intention at acceptance to treat the position as postdoctoral without disclosure. TAC ¶¶17-36, 115-124; Ex. 17, Gagliardi Dep. 14:1-5, 16:6-19, 18:12-16; Ex. 18, UNIVERSITY OF CHICAGO 001, 047-050, 174-175. The theory is an affirmative account rendered materially misleading by a concealed existing reservation, with actual acceptance, relocation, committed

effort, and identified net reliance loss. It does not rest on a guaranteed publication, research outcome, or fiduciary duty inferred from supervision alone.

11. Defamation. Count II identifies the January 3, 2025 communication to Plaintiff and administrator Monica Lugo accusing Plaintiff of wholly making up his official title, despite the approved offer supplied with his correction request. TAC ¶¶51-60, 125-136; Exs. 1, 3, 23A-B. The pleaded factual falsehood concerns Plaintiff's supposed invention of an institutional credential, not whether an unusual title existed or whether Defendant preferred a different professional label. The approval and supplied offer also specify the alleged knowing or reckless abuse of a conditional privilege.

12. The TAC expressly separates the January publication from the 2024 performance communications. It does not contend that discovery revives a known, time-barred publication or that deposition testimony constitutes a new defamatory publication. TAC ¶¶11-13, 134. It invokes relation back under Rule 15(c)(1)(B) to the original January 5, 2026 filing for the same pleaded occurrences. The January 3, 2026 anniversary fell on Saturday; the next business day was January 5. See 5 ILCS 70/1.11. The earlier events remain relevant to the independently pleaded conduct and reference chronology, subject to each claim's own requirements.

13. Interference and distress. Berkeley records supply the dated reference channel: Head-Gordon's March 29, 2024 relay of criticism and April 3 conditional suspension of further faculty letters. TAC ¶¶63-84, 137-145; Ex. 19D-E, UCB_000135, UCB_000137. The TAC identifies live UCF and UNM candidacies and separates Oxford funding pathways, while acknowledging Head-Gordon's additional unfinished-paper condition and later industry assistance. It does not characterize a budget as a job offer or infer a university's ultimate reason solely from a restricted reference. The distress count pleads the cumulative recruitment, professional-record, and reference conduct, Defendant's authority and contemporaneous knowledge, and severe physical and functional consequences. TAC ¶¶95-114, 146-154. It neither relabels every unfavorable evaluation as outrageous nor assigns every employment or medical consequence to Defendant.

14. Section 1981. The proposed count identifies Plaintiff's own authorized staff employment, the approved role and represented review process, Defendant's personal decisions, and alleged impairment because of noncitizenship. TAC ¶¶47-50, 155-164. Section 1981(b)-(c) reaches the performance and enjoyment of contractual terms and benefits and nongovernmental discrimination. The Seventh Circuit has stated that § 1981 addresses race or alienage discrimination. St. Louis v. Alverno College, 744 F.2d 1314, 1317 (7th Cir. 1984). Private

alienage discrimination is expressly recognized in Anderson v. Conboy, 156 F.3d 167, 180 (2d Cir. 1998). The at-will character of employment does not itself eliminate the contractual predicate. Walker v. Abbott Laboratories, 340 F.3d 471, 476-78 (7th Cir. 2003).

15. The count pleads but-for causation, as required by Comcast Corp. v. National Ass'n of African American-Owned Media, 589 U.S. 327, 341 (2020). Its factual basis is Defendant's explanation connecting the irrelevance of the approved professional distinction to Plaintiff's ability to remain in the country, her admitted retained intention, implementation of postdoctoral treatment, and response to correction. Ex. 17, Gagliardi Dep. 14:1-5, 15:21-17:9, 21:7-19; TAC ¶161. Plaintiff alleges impairment of equal administration of the staff relationship; he acknowledges actual staff pay, benefits, and the July compensation increase. The theory does not equate lawful sponsorship costs or national origin with intentional alienage discrimination. Those express limits identify the disputed inference rather than substitute an unsupported conclusion for it.

**V. The record supports leave without undue prejudice**

16. The proposed amendments concern the same individual, employment relationship, classification, research supervision, and professional communications already examined in party depositions and third-party discovery. The § 1981 claim is new, but its operative events and documentary sources substantially overlap the existing record. Defendant received the proposed count before this motion. Plaintiff does not claim that no further discovery could be appropriate; he requests that any specific need be identified and addressed proportionately under the Court's existing management authority.

17. Selected PsiQuantum production pages document staff-role verification, the December 9 report transmittal, HR's December 12 confirmation that the termination decision was final, and the March 10, 2025 formal employment end. The March 2025 Hennefarth hiring correspondence separately records the professional significance assigned to staff-scientist experience; it is not alleged to establish citizenship or Defendant's role in that hiring decision. Ex. 27; PSIQ SUBP RESP 0001, 0003, 1380-1383, 2101, 2371, 2398, 2425-2426. The January 4-5 correspondence documents Plaintiff's notice of career and immigration jeopardy and Defendant's refusal of further assistance. Ex. 23C-D; TAC ¶97A. The TAC identifies the purpose and limits of each record; consulting contacts and the chronology do not themselves establish a negative reference or participation in termination.

18. This motion is noticed for November 18, 2026, twelve days before fact discovery closes on November 30. Because Dkt. 49 has been fully briefed since September 16, Plaintiff requests

prompt consideration of leave, if practicable before disposition of Dkt. 49, so the Court can determine whether the discovery-informed pleading should govern further proceedings. Plaintiff requests directions concerning the effect of an authorized and separately filed TAC on Dkt. 49; he does not ask the Court to disregard the completed briefing or decide disputed evidence on this motion. Merely lodging Exhibit A does not supersede the SAC or moot Dkt. 49. Plaintiff requests three days after leave is granted to file the authorized TAC separately, and a response under Rule 15(a)(3) or a schedule the Court sets. He seeks no automatic stay or alteration of the November 30 discovery cutoff through this motion. If the Court declines to permit Count V, Plaintiff alternatively requests leave to incorporate the factual amendments into Counts I-IV; those amendments have an independent basis in the discovery obtained to date.

## VI. Requested order

For these reasons, Plaintiff requests that the Court (1) grant leave under Rules 15(a)(2) and 15(d) to file the proposed TAC and its Exhibits 1-28, attached as Exhibit A, or alternatively permit the factual amendments to Counts I-IV if Count V is not allowed; (2) make any necessary Rule 16(b)(4) modification for that amendment only; (3) allow three days from the order to file the authorized pleading separately; and (4) give appropriate directions concerning Dkt. 49 and Defendant's response to the amended pleading.

Dated: November 12, 2026

Respectfully submitted,

/s/ Romit Chakraborty
Romit Chakraborty, Ph.D.
Plaintiff pro se
2261 Market Street, STE 72927
San Francisco, California 94114
Telephone: +1 773-816-8338
Email: romit.chakraborty@gmail.com

# CERTIFICATE OF SERVICE

I certify that on November 12, 2026, I served a true and correct copy of the foregoing Motion for Leave to File Third Amended Complaint, including Exhibit A (the proposed Third Amended Complaint and Exhibits 1-28) by electronic mail upon counsel for Defendant Laura Gagliardi at the following email addresses:

Caroline K. Vickrey
vickreyc@jbltd.com

Kaitlyn M. McCaskill
mccaskillk@jbltd.com

Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603

Respectfully submitted,

/s/ Romit Chakraborty
Romit Chakraborty, Ph.D.
Plaintiff pro se
2261 Market Street, STE 72927
San Francisco, California 94114
Telephone: +1 773-816-8338
Email: romit.chakraborty@gmail.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

| | |
|---|---|
| ROMIT CHAKRABORTY, Ph.D., | Case No. 1:26-cv-00106 |
| Plaintiff, | Judge Jorge L. Alonso |
| v. | Magistrate Judge Albert Berry III |
| LAURA GAGLIARDI, | |
| Defendant. | |

**EXHIBIT A**

**PROPOSED THIRD AMENDED COMPLAINT**

**WITH EXHIBITS 1-28**

Submitted with Plaintiff's motion for leave under Federal Rules of Civil Procedure 15(a)(2) and 15(d). The complaint is followed by the exhibit index and supporting exhibits. Original Bates identifiers and transcript page and line citations remain controlling.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

| | |
|---|---|
| ROMIT CHAKRABORTY, Ph.D.,<br>Plaintiff,<br><br>v.<br><br>LAURA GAGLIARDI,<br>Defendant. | Case No. 1:26-cv-00106<br><br>Judge Jorge L. Alonso<br><br>Magistrate Judge Albert Berry III |

**PROPOSED THIRD AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Romit Chakraborty, Ph.D., appearing pro se, alleges as follows against Defendant Laura Gagliardi.

Exhibits 1-28 accompany this proposed complaint. Exhibit 17 contains the full deposition transcript; Exhibit 18 contains selected University of Chicago records. Exhibits 19 and 23-26 contain the identified email and institutional records described on their covers. Exhibit 27 adds selected PsiQuantum production pages. Exhibit 28 contains the May-November 2026 relocation, visa, and accelerator records concerning mitigation. Deposition citations use printed pages and lines; production citations use original Bates identifiers. The exhibit index identifies the attached source pages. Detailed treatment notes are not attached; Exhibit 16 is the care-verification letter.

**Nature of the Action**

1. This action concerns Defendant Laura Gagliardi's recruitment of Plaintiff into a University of Chicago staff research appointment, her concealment of her contrary intention concerning his professional status, and her subsequent false factual statements about his official title and research performance to University personnel and his principal former academic adviser.

2. The University appointed Plaintiff as a staff employee with the official title "Quantum-AI Researcher" after the proposed postdoctoral appointment was rejected. Defendant approved the staff appointment and nevertheless intended at acceptance to treat Plaintiff as a postdoctoral researcher. Her contemporaneous recruitment records and subsequent admissions identify that intention. She later accused Plaintiff of wholly making up the official title that the University had adopted and that she had approved.

3. Defendant also communicated to Professor Martin Head-Gordon that Plaintiff had made no progress, had produced no concrete results, and was not doing anything in her group. Plaintiff alleges that these statements rested on false, objectively verifiable premises about research he actually performed and materials he provided within the authorized research program, and that the statements impaired professional support and identified economic opportunities.

4. Plaintiff asserts fraudulent inducement, defamation per se, tortious interference with prospective economic advantage, intentional infliction of emotional distress, and intentional alienage discrimination in the terms, conditions, and benefits of employment under 42 U.S.C. § 1981. Defendant's October 12, 2026 deposition and institutional productions corroborate and particularize the conduct alleged here. Plaintiff alleges facts within his own

experience on personal knowledge and other facts on information and belief where the supporting circumstances are stated.

**Parties and Basis for Jurisdiction and Venue**

5. Plaintiff Romit Chakraborty, Ph.D., is a citizen of India and a theoretical and computational chemist. He earned his Ph.D. at the University of Chicago and thereafter conducted postdoctoral research at the University of California, Berkeley and Lawrence Berkeley National Laboratory under Professor Martin Head-Gordon. Plaintiff was a non-U.S. citizen during the employment relationship at issue.

6. Defendant Laura Gagliardi is a citizen of Illinois and, at all relevant times, was a professor employed by the University of Chicago. She recruited Plaintiff, provided funding for his appointment, supervised his research, and directed the research group in which he worked. (Gagliardi Dep. 7:7-12.)

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2). Plaintiff is a citizen of India, Defendant is alleged to be a citizen of Illinois, and the amount in controversy exceeds $75,000, exclusive of interest and costs. The pleaded economic, reputational, and emotional-distress injuries are attributable to Defendant's conduct as specified below.

8. The Court also has original jurisdiction under 28 U.S.C. § 1331 over Count V, which arises under 42 U.S.C. § 1981. As an alternative to the independently alleged diversity basis, the Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the related state-law claims because they arise from the same recruitment, staff appointment, treatment, and professional communications as the federal claim.

9. Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) because Defendant resides in this District and a substantial part of the recruitment, supervision, professional classification, and communications at issue occurred in this District.

10. Plaintiff previously resolved an employment dispute with PsiQuantum. This action seeks recovery for Defendant's own conduct alleged below. Plaintiff seeks only loss attributable to Defendant and does not seek duplicate compensation for the same injury; any legally required credit will be applied.

**Timeliness and Continuity of the Claims**

11. Plaintiff commenced this action on January 5, 2026. The January 3, 2025 title publication was timely challenged because January 3, 2026 was a Saturday and January 4, 2026 was a Sunday, making January 5 the next business day. See 5 ILCS 70/1.11.

12. Defendant's March and July 2024 conversations with Head-Gordon took place outside Plaintiff's presence. Head-Gordon relayed specified March criticisms to Plaintiff on March 29, 2024, and Plaintiff received the April 3 correspondence concerning performance and conditional suspension of further faculty letters. Head-Gordon's January 6, 2025 response later expressly identified Defendant's outreach and dissatisfaction in his broader adverse assessment; Defendant's verified answers and deposition further specified the March and July conversations. The dates of the underlying communications and Plaintiff's contemporaneous knowledge are distinguished from the dates on which third-party production corroborated their content. (UC Berkeley native emails UCB_000135, UCB_000137; Ex. 7; Ex. 13, answers 1 and 4; Gagliardi Dep. 76:4-11.)

13. This proposed amendment particularizes the recruitment, title publication, professional-reference communications, and resulting harms alleged in the prior pleadings. Plaintiff

invokes relation back under Federal Rule of Civil Procedure 15(c)(1)(B) for claims arising from conduct, transactions, or occurrences set out or attempted to be set out in the original pleading. Relation back is to the original filing date; subsequent discovery and deposition testimony are evidence of earlier acts and are not alleged to restart an expired limitations period. Count II seeks recovery for the timely January 3, 2025 title publication identified in paragraph 11; earlier communications also supply context for the other independently pleaded claims.

**Recruitment and the Undisclosed Intention at Acceptance**

14. In June 2023, Plaintiff approached Defendant for mentorship and an early-career research opportunity supporting his progression toward an independent scientific career. He had pursued an Oxford-related expression-of-interest and funding pathway and had an AdsGency AI Head of Research contract effective May 22, 2023. (Exs. 8 and 10.)

15. The AdsGency contract described a Head of Research position with a $72,000 annual salary, employment benefits, and a commission stated as "5% of company revenue performances pool." It was an at-will arrangement, and Plaintiff's ability to perform was expressly contingent on appropriate work authorization. Plaintiff alleges that he did not take up this identified alternative in reliance on the represented Chicago appointment. The stated annual salary is a compensation rate, not a guarantee of a year of employment or proof that commissions accrued. (Ex. 10.)

16. On June 27, 2023, Oxford's Chemistry Management Board approved Plaintiff's expression of interest and welcomed applications for EPSRC Open Fellowship and ERC Starting Grant funding. A same-day clarification provided departmental application support for one year, with physical access to the University contingent on a fellowship award. On February 19,

2024, Oxford's research facilitator explained that the Open Fellowship was independent and would permit Plaintiff to run his own group. These communications identify a specific, conditional academic pathway. (Ex. 19F, UCB_000023 and UCB_000025; Ex. 19G, UCB_000136, containing the February 19 exchange also identified in the production as UCB_000130.)

17. On June 21, 2023, Defendant proposed a postdoctoral appointment, potentially shared with Professor Juan de Pablo, and stated that the highest salary they could offer was $60,000 per year. In a July 6 memorandum requesting permission for a seventh-year postdoctoral appointment, she described his appointment as "mission critical" and referred to his "unique visa situation." The proposed appointment was for one year. (UChicago Production 057-058, 179.)

18. On June 29, 2023, Head-Gordon sent Defendant a recommendation he had written for Plaintiff's faculty applications. In the accompanying email, he described Plaintiff as an "off-scale" postdoctoral candidate, stated that he wrote extremely well, cooperated efficiently in large teams, and worked with minimal supervision, and said that Plaintiff had given presentations on his behalf. The email proposed a further postdoctoral opportunity at that stage of recruitment, before the University rejected that appointment route. (Ex. 19A; UC Berkeley Production UCB_000034-000035.)

19. In the same correspondence, Defendant acknowledged the recommendation but expressed concern that Plaintiff's primary focus was obtaining a position to maintain his visa status while seeking a faculty position. She predicted that continued job hunting might reduce his dedication to acquiring new skills and knowledge. On June 30, Head-Gordon called those concerns reasonable and expressly suggested that Defendant raise them with Plaintiff; the

correspondents arranged a telephone discussion. Plaintiff relies on the dated exchange as evidence of the concerns Defendant held during recruitment and her awareness of his employment and immigration circumstances. (Ex. 19A; UC Berkeley Production UCB_000034-000035.)

20. On July 13, 2023, the Provost's Office declined the external seventh-year postdoctoral request and recommended a staff-scientist appointment. On July 14, Ericka Evans reported that Defendant could not afford a $70,000 staff-scientist salary and had initially been interested only in a postdoctoral hire. Hannah Lawrence recommended using the Research Professional classification in light of the budget and H-1B compensation requirements. The University thereafter pursued staff hiring. (UChicago Production 049-050, 174-175; Gagliardi Dep. 8:2-11; 11:17-25.)

21. The July 14-17, 2023 correspondence records what Defendant disclosed at that stage. She sent Plaintiff the Provost's rejection and explained that a research-scientist appointment involved a different financial commitment, "also because of your visa requirement," and that such an appointment for a limited period would not make sense to her. She then asked about his commitment and sought Head-Gordon's advice on the research-scientist route. On July 17, Head-Gordon called Plaintiff a strong faculty candidate, endorsed the potential move, and promised continued strong support for his faculty applications. Plaintiff's concealment allegation concerns Defendant's retained intention to treat the later approved staff appointment as postdoctoral; it does not treat these expressly communicated financial and duration concerns as undisclosed. (Ex. 19B; UC Berkeley native email UCB_000043.)

22. On August 31, 2023, after the postdoctoral request was rejected, the University issued an offer under Defendant's name appointing Plaintiff as "Quantum-AI Researcher" in the

Chemistry Department, reporting to Defendant. Defendant approved the position description. The resulting University worker record classified Plaintiff as Staff and Research Professional, Analyst. (Ex. 1; UChicago Production 001, 047-048; Gagliardi Dep. 18:12-16.)

23. The offer provided annual pay of $67,933.08, staff benefits and resources, a six-month probationary period, at-will employment, and eligibility for the Annual Merit Process with a common July 1 review. The University's payroll records show a July 1, 2024 merit compensation change increasing monthly base pay from $5,661.09 to $5,802.62. Plaintiff's actual staff employment and compensation are distinct from Defendant's undisclosed intention concerning his professional treatment. (Ex. 1; UChicago Production 010, 047-048.)

24. Defendant admitted in response to Request for Admission No. 17 that work involving LLMs, foundation models, artificial intelligence, active-space selection, or computational quantum chemistry was within the research scope Plaintiff was recruited or permitted to pursue. The joint computing-resource proposal identified Defendant and Plaintiff and specified LLM integration with PySCF, model adaptation using an index of active-space research literature, benchmarking, reinforcement learning, and scientific publications. Defendant acknowledged writing the proposal with Plaintiff and that its research directions were within her group's interests. (Ex. 12, RFA 17; Ex. 4, EX0012-13; Gagliardi Dep. 20:6-17; 21:4-6.)

25. The University's produced preappointment mentoring plan, naming Defendant as faculty adviser, likewise identified development of automated active-space methodologies using LLMs. It specified weekly research discussions, presentations, publication encouragement,

and career-development guidance. Plaintiff cites that proposed plan as contemporaneous evidence of the research Defendant contemplated and knew about. It did not grant principal-investigator status. (UChicago Production 054.)

26. The staff classification, official title, and research assignment were material to Plaintiff's decision because the postdoctoral route had been rejected and he sought a professional record supporting further scientific opportunities. He relied on the approved written terms and their recognition of his actual research role. He did not understand the staff status and title to be merely nominal designations that Defendant would disregard or later attribute to his unilateral invention.

27. When Plaintiff accepted, Defendant already intended to treat him like a postdoctoral researcher. Asked that question under oath, she answered "Yes." Asked whether she told him before acceptance that she intended to treat the position as equivalent to a postdoctoral appointment, she answered: "No. Because it was irrelevant." These answers concern her intention at acceptance, after the University's postdoctoral refusal and staff offer. (Gagliardi Dep. 14:1-5; 16:6-19.)

28. In explaining her intended treatment, Defendant testified: "The title and everything else is irrelevant. I gave you an opportunity to stay in the U.S. for another period of time. That's the only thing that matters." This explanation accompanied her admission that she intended postdoctoral treatment when Plaintiff accepted and had not disclosed that intention before acceptance. Defendant also asserted an oral understanding and described financial commitment and the absence of an established working relationship as reasons she would not ordinarily hire a staff scientist; Plaintiff disputes her account of his agreement as alleged below. (Gagliardi Dep. 14:1-25; 15:21-16:19; 17:1-9.)

29. Defendant explained that for her Plaintiff "was a postdoc" and that she would not otherwise have hired a staff scientist without an established working relationship. She later stated: "We called it quantum AI researcher, but it had no connection with reality." Her testimony concerning the role she intended to recognize accords with the earlier internal report that she was initially interested only in a postdoctoral hire. (UChicago Production 174; Gagliardi Dep. 14:8-20; 16:10-19; 36:5-12.)

30. Plaintiff did not agree that his staff appointment and official title could be disregarded or represented to others as an ordinary postdoctoral appointment. He alleges that Defendant failed to disclose her contrary existing intention before acceptance. Her description of an oral understanding to the contrary is disputed.

31. Defendant had undertaken to describe and offer the position and to act as Plaintiff's research mentor and supervisor. Plaintiff placed trust in her experience and control over the proposed appointment. By presenting the staff appointment and official title as operative terms while withholding her existing contrary reservation, Defendant communicated a materially misleading account of the professional role she intended to recognize.

32. On August 22, 2023, Plaintiff asked University personnel, copying Defendant, to accelerate onboarding because his Berkeley employment was to end September 10. The University's Office of International Affairs explained that it required a valid offer before initiation of the departmental H-1B request and estimated about 50 days for the described institutional processing, filing, adjudication, and receipt sequence even with premium processing. On August 23, Defendant asked Head-Gordon to extend Plaintiff's Berkeley contract, explaining that otherwise he would have to return to India until the visa was ready. Berkeley's visa adviser responded that there was no time to prepare and file an extension.

The exchange establishes Defendant's contemporaneous knowledge of the transition risk and her efforts to obtain an extension; Plaintiff had thanked her for those efforts. (Ex. 19C; UC Berkeley native email UCB_000051.)

33. Plaintiff accepted and signed the written offer on August 31, 2023, relocated to Chicago, and committed his professional time and effort to the represented research program. He began work on or about November 27, 2023, and remained in the appointment through October 2024. The University issued him an identification card showing "STAFF." (Exs. 1, 2 and 5; UChicago Production 001, 022.)

34. Had Defendant disclosed that she already intended to disregard the material professional distinction and treat the official role as an administrative device for a postdoctoral placement, Plaintiff would not have accepted on the same terms and would have pursued his identified alternative pathways.

35. In reliance on the represented Chicago appointment and professional role, Plaintiff did not take up the AdsGency AI Head of Research position described in paragraph 15. He alleges that disclosure of Defendant's retained intention would have changed that choice. The foregone AdsGency opportunity is a distinct inducement-related injury, evaluated under the actual contract's at-will, compensation, and work-authorization terms and the compensation Plaintiff received at Chicago. (Ex. 10; Plaintiff's account of his acceptance and foregone alternative.)

36. Defendant implemented the treatment she had intended. Asked how she treated Plaintiff differently from her postdoctoral researchers, she answered: "I didn't treat you differently." She acknowledged suggesting that he be placed under postdocs on the group website.

Plaintiff received real staff pay and benefits while Defendant treated and identified him within the group as a postdoctoral researcher. (Gagliardi Dep. 21:7-19; 22:24-23:6.)

**Research Performed and Known to Defendant**

37. During his appointment, Plaintiff performed LLM-based workflow, active-space-selection, and computational quantum-chemistry research, prepared materials, and gave presentations. His Chicago work was separate from his earlier Berkeley projects. On March 21, 2024, Matthew Hermes emailed Plaintiff, copying Defendant and Daniel King, about their discussion the preceding night concerning LASSCF with periodic boundary conditions. Hermes described a staged implementation and proposed an initial hydrogen-chain calculation. The email documents a specific technical interaction and proposed work known to Defendant before April 3; it does not establish completed calculations or publication-ready results. (Ex. 4; UChicago Production 054; Ex. 25A.)

38. Defendant expressly authorized exploratory work. Asked about the job posting's LLM and AI-powered simulation tasks, she testified: "We talked about these concepts, and I said you are free to explore all of them." She described "maybe weekly meetings" in which different uses of LLMs were discussed, and explained that projects initially involve exploration before a deeper direction develops. Her stated criticism was the depth, focus, and results of that work. (Gagliardi Dep. 47:25-49:5; 53:13-21.)

39. On April 12, 2024, Plaintiff emailed Defendant about an accepted conference abstract describing an LLM-based active-space-selection workflow and computations using a back-end engine, referring to his summary at that week's active-space meeting. The recovered email supplies the contemporaneous communication. When shown that description at deposition, Defendant identified its subject as "Agentic workflow for active space selection

using LLM." She disputed that submission of the abstract established completion of the work. Plaintiff relies on the research subject and notice to Defendant, not on an admission that the project was publication-ready. (Ex. 25B; Gagliardi Dep. 63:7-64:6.)

40. On July 10, 2024, Plaintiff asked Defendant whether he could send his slide on automated active-space selection using large language models by midnight. Defendant agreed and said the next morning was acceptable. At deposition, she acknowledged having a slide that "utilized part of what you sent me" and offered to send it, while characterizing it as a plan rather than completed results. Plaintiff relies on the dated scheduling exchange and her separate acknowledgment of receipt and use. Neither fixes delivery before the July conversation with Head-Gordon. (Ex. 25C; Gagliardi Dep. 61:1-9; 69:7-19.)

41. On October 24, 2024, Plaintiff gave a research presentation concerning active-space selection, including methodological and numerical content. When questioned about that presentation, Defendant could not recall its scientific content, numerical content, or whether she attended. (Gagliardi Dep. 112:16-113:14; 116:19-117:17.)

42. Defendant acknowledged Plaintiff's presentations and his ability to review scientific literature professionally. She also described him as smart and acknowledged that he had read the literature, while criticizing his project focus. Plaintiff relies on the activities and communications she acknowledged, together with the actual research record, to identify what she knew about his work. (Gagliardi Dep. 66:1-6; 113:1-14.)

43. Plaintiff disputes factual assertions that he performed no research activity within the authorized scope or supplied no research materials. He worked on the authorized topics, generated materials, communicated work to Defendant, and presented research. He distinguishes those activities and communications from Defendant's assessment of their

depth, quality, or publication readiness. Each alleged false statement is assessed against the work performed and materials communicated by its own publication date.

44. On November 15, 2024, after moving to PsiQuantum, Plaintiff wrote to Defendant apologizing for not producing a paper, stated that he had an idea for a paper, and requested a meeting. On November 16, Defendant replied: "I think you should focus on your current work. We do not just want to have a quick publication for the sake of it." She wished him well in the next chapter of his career. Plaintiff alleges that this response curtailed the proposed continuation of collaborative publication work and impaired the publication record needed for further academic applications. The exchange concerns an idea and request to discuss it, not delivery of a completed manuscript or an express prohibition on every possible publication. (Ex. 21, reproducing Dkt. 62, pp. 19–21, source communications B–C.)

45. The staff offer described the Annual Merit Process as the formal process for reviewing employee performance and base pay, with a common July 1 review date, and made Plaintiff eligible for review. On April 2, 2024, PSD Human Resources Generalist Luisana Romero announced the 2023-2024 Performance Review Process to the staff mailing list, provided access to forms and resources, and directed employees to supervisors for individual evaluation timelines. Plaintiff received that announcement. It documents an actual review cycle during his employment, not merely a process inferred from a later website. (Ex. 1; Ex. 26A.)

46. On January 3, 2025, Defendant wrote that no annual merit review had been done because Plaintiff stayed less than one year. Asked at deposition whether she completed the assessment identified in the offer, she answered "No," explaining that she lacked enough

material after six or seven months. Workday separately displays no performance-review items. The April 3 criticism does not state that it completed the Annual Merit Process. Plaintiff acknowledges the July 1 merit compensation adjustment; his allegation concerns the omitted performance-review process, not absence of a pay action. (Exs. 3, 12, RFA 10; Gagliardi Dep. 27:4-9; 50:20-53:12; UChicago Production 010, 022; Ex. 19E.)

**Equal Treatment of the Staff Appointment**

47. Plaintiff's approved staff appointment was an actual employment relationship. The offer identified the Quantum-AI Researcher role, reporting relationship, staff benefits, and eligibility for the Annual Merit Process. Plaintiff performed work and received staff compensation and benefits. He alleges unequal treatment in recognition of the approved role and participation in the represented performance-review process, rather than nonpayment of staff compensation. (Ex. 1; UChicago Production 001, 010, 022, 047-048.)

48. Defendant approved the position description, supervised Plaintiff, participated in his group classification, and stated that she had not conducted his annual merit review. Plaintiff began in November 2023 and remained employed beyond July 1, 2024. The April staff notice contemplated individual evaluations and unit-specific deadlines. A July 3 Chemistry notice separately addressed salary statements and cautioned that some new-to-role or recently promoted employees would not receive increases. Plaintiff alleges exclusion from the represented performance-review process, not a guaranteed rating, increase, or written form; he acknowledges his actual increase. (Exs. 1, 3, 26A-B; Gagliardi Dep. 18:12-16; 52:5-53:12; UChicago Production 001, 010, 022.)

49. Plaintiff alleges that Defendant's treatment was because of his noncitizenship, not simply an assessment of research quality. The inference rests on the contemporaneous visa-focused

recruitment correspondence, her retained postdoctoral intention despite approval of staff employment, her nondisclosure of that intention, and her explanation linking the irrelevance of the title to an opportunity to remain in the United States. Plaintiff alleges that she treated immigration assistance as a reason to discount his equal entitlement to the approved employment terms. (Ex. 19A–B; Gagliardi Dep. 14:1–5; 15:21–16:19.)

50. Plaintiff disputes Defendant's assertion that he agreed that the staff terms had no independent professional significance. Defendant also cited financial commitment, duration, and the absence of an established working relationship, and the August 2023 exchange records her assistance with a proposed Berkeley extension. Plaintiff does not allege that sponsorship costs or compliance with work-authorization requirements were themselves unlawful; his allegation is that, once the authorized staff relationship existed, Defendant intentionally discounted its substantive recognition and formal evaluation because he was a noncitizen. (Ex. 19B–C; Gagliardi Dep. 14:8–20; 16:20–17:9.)

**The Title Publications and Response to Correction**

51. Defendant maintained or permitted Plaintiff's listing under "Postdoctoral Researchers" despite his staff appointment. Internal group communications also referred to him as a postdoc. Plaintiff sought correction of the professional record. (Exs. 5 and 6.)

52. On January 3, 2025, Defendant sent an email to Plaintiff and Monica Lugo in response to Plaintiff's request concerning his title and Annual Merit Process records. Plaintiff's request copied Defendant, expressly identified the official title, and attached his August 31 offer letter. Defendant replied: "You were hired as a staff scientist because you were too senior to be hired as a postdoc," and "The title 'Quantum-AI Researcher' is totally made up by you." She also stated that no annual merit review had been done because he stayed less than one

year. Lugo was a third-person recipient, separately identified as Executive Assistant and Managing Director of CD4DC and CCTCh. (Exs. 3, 23A-B; Ex. 20, PSIQ SUBP RESP 0248, for Lugo's role.)

53. Plaintiff alleges that, in the context of a request to correct an official employment record, the statement falsely attributed the claimed professional designation to Plaintiff's unilateral invention and denied its institutional source. The designation was the official title in the approved University offer, which Plaintiff was entitled to use.

54. Defendant had approved the position description and participated in the appointment. Her verified answer states that the group, with Plaintiff's help, created the title and role and gave him enhanced staff status. Moreover, the correction request to which she replied expressly identified the attached offer as confirmation of the title. Plaintiff alleges knowledge or reckless disregard from that combination of prior approval, institutional adoption, and contemporaneous notice, not merely from later discovery of the offer. The attachment record does not establish that she opened the file. (Ex. 13, answer 7; Gagliardi Dep. 18:12-16; Ex. 23A-B.)

55. At deposition, Defendant authenticated the January 3 email and said: "Maybe it was -- the statement there is inaccurate." She later explained that "we made up" the title to arrange the appointment. These answers corroborate authorship and her participation in creating the adopted title. (Gagliardi Dep. 35:17-22; 115:8-16.)

56. On January 6, 2025, Sharon Bryant requested that the website accurately reflect Plaintiff's staff position and title. Defendant replied to Bryant, Ben Anderson, La Toya Cobbins, and Monica Lugo: "I am not sure where the title 'Quantum-AI Researcher' came from. Romit

has been a very difficult group member and he is pushing on this. I will remove him from the website. Please let me know if this is acceptable." (Ex. 9, Bates 000006.)

57. Bryant responded that Plaintiff's request was reasonable, identified the offer letter as the source of the title, and suggested amending the website rather than removing Plaintiff completely. (Ex. 9, Bates 000005.)

58. Defendant acknowledged receiving Plaintiff's correction request and proposing removal after that request. She also acknowledged deciding to eliminate the listing after realizing the title mattered to Plaintiff. (Gagliardi Dep. 24:10-25:5; 31:2-11.)

59. By January 17, 2025, the website's title text had been corrected, but Plaintiff reported to the Provost's Office that he remained under the "Postdoctoral Researchers" category. He requested correction of that remaining classification and guidance on the affiliation for his research. (Ex. 5, EX0016-17; Ex. 12, RFA 15.)

60. Plaintiff alleges that Defendant used the correction dispute to circulate an adverse account of his professional standing and to seek his exclusion from the group record. The falsity alleged concerns Plaintiff's entitlement to the official title and institutional recognition, including Defendant's attribution of the title solely to him while denying or disclaiming its approved source.

**Prior Reference Support and Communications to the Former Adviser**

61. Head-Gordon was Plaintiff's former postdoctoral adviser and a central senior scientific reference. His September 16, 2022 letter supported Plaintiff for an assistant-professor position, described independent projects, called him an excellent candidate for a junior-faculty position, and gave his application strong support. Defendant requested and read his reference during recruitment. Head-Gordon's January 6, 2025 email also confirmed his

prior support for Plaintiff's academic applications, the Chicago appointment, and PsiQuantum. (Ex. 7; Gagliardi Dep. 73:12-20.)

62. Defendant knew the favorable reference and the importance of Head-Gordon's support to Plaintiff's professional opportunities. She identified Head-Gordon and David Mazziotti as prior letter writers and urged Plaintiff to consult them for professional assistance. Head-Gordon's prior Berkeley role was distinct from Defendant's supervision of the Chicago research program. (Gagliardi Dep. 73:5-20.)

63. In March 2024, at an American Chemical Society conference, Defendant discussed Plaintiff with Head-Gordon and stated that Plaintiff had not made progress. In July 2024, at a conference in France, she again discussed Plaintiff and expressed dissatisfaction with his lack of concrete results. (Ex. 13, answers 1 and 4.)

64. A March 29, 2024 email from Head-Gordon supplies a contemporaneous account of the March conversation. He reported that Defendant had criticized the time Plaintiff devoted to the automatic-active-space AI project and described a meeting interaction in which voices, including Plaintiff's, were raised. Plaintiff responded that day that he had not raised his voice, that the other participant was a computer-science postdoc outside Defendant's group, and that he had divided the research into six-month and one-year stages. The exchange records the communicated criticism and Plaintiff's contemporaneous dispute of its factual premises. (Ex. 19D; UC Berkeley native email UCB_000135.)

65. On April 3, 2024, Defendant emailed Plaintiff and Ericka Evans, copying Head-Gordon, under the subject "Your research progress." She criticized his absence from that morning's meeting without prior notice, described his participation as "lacking in depth and dedication" and his involvement as "superficial," acknowledged his faculty search and

interviews, and requested a six-month research plan. This email concerns the adequacy of participation; it does not literally state that no work existed. Plaintiff distinguishes its wording from the oral statements addressed below and from the formal-review process addressed in paragraphs 45-48. (Ex. 19E; UCB_000137, April 3 message.)

66. Head-Gordon forwarded that email to Plaintiff on April 3 and expressly linked Defendant's criticism to questioning the accuracy of his recommendation and his prior support. He then stated that he would not write further faculty-support letters until he discussed Plaintiff's Chicago performance with Defendant after approximately four months and Plaintiff completed two remaining Berkeley papers without neglecting Chicago work. Defendant thanked him that evening, reported a long discussion with Plaintiff, and promised updates. The chain documents an actual conditional restriction of further reference support in response to her communication, before Plaintiff's PsiQuantum employment, while also identifying Head-Gordon's separate unfinished-paper condition. (Ex. 19E; UCB_000137, April 3-4 chain.)

67. At deposition, Defendant described the July conversation as telling Head-Gordon that nothing had changed since March, that no body of work had been presented to her, and that concrete results were lacking. Her testimony supplies her account of the earlier conversation; it is not a contemporaneous transcript of that conversation. (Gagliardi Dep. 76:4-11.)

68. Asked whether she expressed negative thoughts to Head-Gordon, Defendant testified: "I just said that you were not doing anything in my group. You were not working towards a project related to my interests and to the grant that I used to pay you." She said she expressed disappointment because Head-Gordon had asked her to hire Plaintiff and she

regarded the hire as a favor to him. She also described her concern as a lack of meaningful research progress. (Gagliardi Dep. 120:12-20; 121:9-22.)

69. On January 5, 2025, Plaintiff contacted Head-Gordon for professional advice following the end of his active work at PsiQuantum. Plaintiff described his scientific contributions, loss of access to work records, and professional and immigration concerns. (Ex. 7.)

70. On January 6, 2025, Head-Gordon wrote that Plaintiff had made a poor impression on Defendant because he was apparently "distracted by LLMs" and had not been as good a team player as she hoped. He recalled that Defendant had reached out to him because of strong dissatisfaction with Plaintiff's performance. He expressly included that account among the premises for questioning Plaintiff's suitability for work in academia or industry. The email identifies Defendant's outreach as a source, beyond the sequence in time. (Ex. 7, EX0028.)

71. Head-Gordon also expressed his own criticisms of earlier Berkeley work and conclusions about PsiQuantum. Plaintiff alleges that Defendant's false factual account of the separate Chicago work materially contributed to his adverse assessment and the impairment of support. His views concerning other employment do not independently establish what Plaintiff performed or supplied to Defendant in Chicago. Plaintiff does not attribute those independent views to Defendant. (Ex. 7.)

72. The January 6 email included Head-Gordon's own instruction to assume PsiQuantum had made a valid decision and his postscript: "Drop the false PsiQuantum affiliation from your emails, etc. It casts doubt on your honesty." Those passages document the breadth of his adverse assessment. Plaintiff does not allege, based on those passages alone, that Defendant supplied the PsiQuantum account or authored the honesty accusation. (Ex. 7, EX0028.)

73. Plaintiff alleges that Defendant's communications caused Head-Gordon to withdraw or materially reduce professional support. The April 3 chain records a conditional suspension in response to her criticism, and the January 6, 2025 email incorporates her dissatisfaction into his later adverse assessment. Defendant denied influencing that assessment and instead described Plaintiff as having been fired from PsiQuantum after 'three weeks or four weeks.' When challenged, she conceded, 'Maybe it’s incorrect' and 'I don’t know the details.' Plaintiff began October 28 and stopped active work December 10, approximately six weeks later; the formal employment end was March 10, 2025. The April suspension preceded his PsiQuantum employment and cannot be explained by its later end. Plaintiff acknowledges the separate Berkeley-paper condition and does not allege that the suspension necessarily remained permanent or uninterrupted. (Exs. 7, 19E, 27; Gagliardi Dep. 138:18-139:14.)

74. Defendant knew the approved research scope, authorized exploration, and discussed Plaintiff's LLM work. The March 21 Hermes email copied her on a specific technical exchange before April 3; the April 12 email preceded the July conversation. These communications bear on the factual premises she conveyed, separately from whether she considered the work adequate. The March 21 exchange does not establish what she knew before the earlier ACS conversation, and the July slide's delivery relative to the July conversation remains unspecified. The Azure proposal identifies authorized interests, not necessarily the separate salary-funding grant. (Exs. 4, 25A-C; Gagliardi Dep. 47:25-49:5; 61:1-9; 63:7-64:6; 69:7-19; 120:12-121:22.)

**Identified Opportunities Known to Defendant**

75. Plaintiff pursued faculty and research opportunities requiring accurate institutional records, research activity, publications, and senior scientific references. These included the

University of Central Florida search documented in March 2024, the University of New Mexico open-rank search, and distinct Oxford-related funding pathways. These were identified research and appointment opportunities, subject to their stated competitive and funding conditions. (Ex. 8; UC Berkeley native records UCB_000123, UCB_000135, UCB_000136.)

76. On March 28, 2024, Plaintiff reported completing a UCF on-site interview for a tenure-track molecular-electronics and machine-learning position, with four candidates for one opening; Head-Gordon confirmed contacting the chair on March 29. On July 23, Plaintiff reported that UCF had requested detailed startup-fund and office-space information about a month earlier and that he remained in contact with the chair, without a formal offer. Head-Gordon replied that UCF was "still in play." Plaintiff alleges this specific continuing candidacy, not a guaranteed appointment. The April restriction on further faculty letters arose during that process; the present correspondence does not establish UCF's eventual decision or its reasons. (Ex. 19D-E; Ex. 24B; Plaintiff's account of his UCF contacts.)

77. On December 20, 2024, UNM informed Plaintiff that his prior application for its open-rank Quantum Information Science and Engineering position, requisition 27555, remained in the pool and would be evaluated. It requested confirmation of continued interest and any updated materials by January 5, 2025. (Ex. 8, EX0038.)

78. On December 31, 2024, Plaintiff forwarded that identified opportunity to Defendant and requested her support. Defendant declined on January 1, 2025. Plaintiff pleads the exchange to establish her knowledge of a live search and his need for professional support. (Ex. 8, EX0040-41.)

79. On January 6, 2025, UNM accommodated Plaintiff's request to supply updated materials. Plaintiff sent them that day, and Samuel Mascarenas confirmed that they had been added and were the materials the search committee would evaluate. Plaintiff therefore does not allege that Defendant prevented all submission to UNM. He alleges impairment of the publication, institutional-record, and reference support with which he competed in the live search. The receipt confirmation does not state the eventual hiring decision or its reasons. (Ex. 22, January 6 correspondence.)

80. Plaintiff pursued distinct Oxford-related funding routes. The QuantSim application and its X5 costing concerned the European Commission / ERC route. A separate January 2, 2025 Oxford email advised that the EPSRC Open Fellowship had permanently closed on December 12 and that Plaintiff's year of Oxford support had expired, requiring another expression-of-interest application. The costing was not an awarded grant and is not a budget approved for the later EPSRC route. (Ex. 8, Oxford correspondence and X5 PI Output Report, EX0037.)

81. Oxford's November 2, 2023 host-institution letter addressed a concrete ERC application and committed to hosting and engaging Plaintiff if the proposal was retained and the grant agreement successfully concluded. On March 29, 2024, Plaintiff informed Oxford that the ERC proposal had not succeeded while reporting that he was continuing work on the separate EPSRC proposal. Those dates distinguish the already unsuccessful ERC application from subsequent reference impairment and from the later EPSRC closure. Plaintiff does not attribute the ERC outcome to the April 3 suspension of letters. (Ex. 19G–H; UC Berkeley native records UCB_000123, UCB_000136.)

82. Plaintiff alleges that impairment of his publication and reference record, together with the disruption surrounding PsiQuantum's December 10, 2024 separation notification, prevented him from completing the EPSRC submission before the December 12 closure. Plaintiff's personal account concerns the interruption of his preparation and submission, not a grant already awarded. The December notification is distinct from the later administrative end of PsiQuantum employment. Plaintiff attributes to Defendant only the effects of her own recruitment, professional-record, publication, and reference-related conduct, not all consequences of PsiQuantum's independent acts. The Oxford correspondence separately identifies expiration of host support and the need for a renewed expression of interest. (Ex. 8; Ex. 19G, UCB_000136; Plaintiff's account of the December notification and missed submission.)

83. Before the April 3 criticism, Plaintiff had informed Defendant on March 26 that he was completing his Florida site visit. She asked how it went, and he replied that four candidates were interviewing for one position. Plaintiff identifies that visit as the UCF interview described in the March 28 Berkeley correspondence. The March 26 email does not name UCF; the July 18-19 exchange expressly identifies the possible UCF tenure-track offer. These communications establish notice of a concrete faculty candidacy, separately from her general awareness of his search. (Exs. 19D, 24A, 24C; Gagliardi Dep. 100:11-101:12.)

84. Plaintiff alleges impairment of his academic trajectory and identified UCF, UNM, and Oxford pathways through the restriction of faculty-reference support and the disputed Chicago record. He does not allege that Head-Gordon ceased all assistance: in July 2024 Head-Gordon reported an upcoming PsiQuantum reference check, while Plaintiff described industry applications undertaken with Defendant's knowledge and support. That industry

assistance is distinct from the April restriction on further faculty letters. The nature, duration, and effect of the restriction on each academic opportunity are assessed separately. (Ex. 19E; Ex. 24A-B.)

85. PsiQuantum offered Plaintiff a Senior Quantum Solutions Computational Chemist position on July 25, 2024, with $188,000 base annual pay, bonus eligibility, relocation assistance, benefits, and stock-option terms. Defendant knew of Plaintiff's transition and encouraged him to accept. Plaintiff began active work on October 28 and was directed to stop work December 10, 2024. A December 9 email transmitted his progress report and scientific notes to Kakekhani. On December 12, PsiQuantum HR expressly stated that the termination decision was final and extended the effective date from December 20 to January 10, 2025. The March 10 HR and stock-administration emails identify March 10 as the eventual official last day. Thus the December decision, end of active work, and later formal employment end are distinct. The transmittal establishes delivery of the identified attachments, not their scientific quality. (Exs. 11, 27; PSIQ SUBP RESP 2101, 2371, 2398, 2425-2426; Gagliardi Dep. 122:7-9.)

86. The offer followed an internal recommendation on July 17, 2024, from Kakekhani to Stratton Sclavos, copying Philipp Ernst. Kakekhani reported a panel-interview consensus favoring Plaintiff's hiring, with "Strong Yes" assessments from himself, Ernst, and Tess. He described Plaintiff as a "genius," identified his broad quantum-chemistry capabilities, and explained the immediate usefulness of his DFT experience to an anticipated EDDC project. This contemporaneous assessment supplies an independent favorable recruitment baseline preceding the offer. (Ex. 20; PSIQ SUBP RESP 1627.)

87. Kakekhani's July 17 recommendation draft to Ernst attached Plaintiff's CV, which identified his University of Chicago role as "Staff Scientist in Quantum AI," with Defendant as advisor, separately from his Berkeley/LBNL postdoctoral appointment. Plaintiff cites the CV to establish what was disclosed within the hiring materials; the University's own offer and worker record establish his official appointment and title. Kakekhani's reference to a six-year postdoctoral appointment expressly concerned Berkeley. (Ex. 20; PSIQ SUBP RESP 1623-1624, 1627; Ex. 1; UChicago Production 001, 047-048.)

88. PsiQuantum's production includes a Checkr report requested by PsiQuantum and completed August 1, 2024. For Chicago, the employment-verification page records Plaintiff's supplied title as "Quantum AI Staff Researcher" and the separately labeled employer response as "Research Professional, Analyst - REREPP1E." It separately records the Berkeley position as "Postdoc - Employee." Defendant is listed as the Chicago manager, but the report does not identify her as the source of the employer response. These records distinguish Plaintiff's Chicago staff role from his earlier Berkeley postdoctoral appointment within the hiring materials. (PSIQ SUBP RESP 0001, 0003.)

89. Defendant admitted paid consulting for PsiQuantum before December 10, 2024 and active discussions to author a DARPA collaboration grant before that date. She dated the consulting to summer 2024. Separately, the April 2026 announcement identified a PsiQuantum-related NQAC collaboration; she acknowledged a University grant written with PsiQuantum's name and described PsiQuantum's role as minor. These are separately dated relationships and are not alleged to be the same grant. (Ex. 15; Gagliardi Dep. 81:5-12; 123:19-125:5.) A separate preserved public post by Defendant announced Matthew

Hennefarth's Ph.D. defense and anticipated start at PsiQuantum 'in a month,' thanking Gregory Engel and David Mazziotti for serving on his committee. The screenshot does not state an absolute publication date; Plaintiff relies on the announcement itself, not as proof that Defendant procured the appointment. (Ex. 15.)

90. PsiQuantum's produced correspondence further specifies Defendant's relationship with Kakekhani. On June 12, 2024, he approached her about research collaboration and consultancy opportunities. On June 21, Defendant thanked him for their meeting the preceding day and offered further discussion of potential consulting. On June 25, he sent her a full-time molecular-quantum-chemistry vacancy for circulation to interested students and postdoctoral researchers. That recruitment email did not identify Plaintiff. (Ex. 20; PSIQ SUBP RESP 0059, 0248, 0341.)

91. The production also contains arrangements and an acceptance for a July 15, 2024 call, followed by an August 12 invitation expressly describing a collaboration kickoff addressing PsiQuantum's problems of interest and future knowledge sharing. Defendant accepted that invitation. These records identify contemporaneous communications and scheduled collaboration activity; an invitation or acceptance alone does not establish attendance or the substance of an unrecorded conversation. (Ex. 20; PSIQ SUBP RESP 0627, 1109-1113, 1191-1195.)

92. After categorically denying communications with PsiQuantum about Plaintiff, Defendant acknowledged possible informal communications with Arvin Kakekhani concerning Plaintiff's transition and start date. Asked whether she said a 21-day departure difference would not affect the project, she answered: "Presumably so, yes." (Gagliardi Dep. 68:8-9; 78:1-4; 80:2-13; 84:20-85:5; 119:10-18.)

93. Abhishek Mitra was copied on the September 4 invitation for a September 7, 2024 collaboration meeting and was directly addressed, with Defendant, on the September 20 invitation for a September 21 meeting. The corresponding calendar records identify the scheduled meeting dates, which differ from the dates the invitations were sent. These records identify Mitra as a recipient of relevant collaboration communications, without establishing that a meeting concerned Plaintiff. (Ex. 20; PSIQ SUBP RESP 1130, 1134-1135, 1137, 1159, 1166.)

94. The correspondence and testimony establish Defendant's professional contact, paid consulting, and collaboration discussions with PsiQuantum during 2024, before PsiQuantum's December 10 decision to stop Plaintiff's work. Her response to Request for Admission No. 22 denied pre-December 10, 2024 communications concerning any research collaboration or related project; the 2024 emails and deposition admissions supply contrary evidence. Her interrogatory answers separately asserted that discussions began only in 2026. The later NQAC announcement remains distinct from the earlier consulting and collaboration record. Plaintiff relies on the documented chronology, Defendant's knowledge and access to relevant participants, and her acknowledged transition communications. The records do not themselves establish a negative reference or participation in PsiQuantum's termination decision. (Exs. 12-13, 20; Gagliardi Dep. 81:5-12, 123:19-125:5.)

94A. PsiQuantum's March 7-13, 2025 hiring correspondence concerning Matthew Hennefarth records the professional significance assigned to staff-scientist experience. On March 12, Ernst described Hennefarth's more senior role in his group as 'essentially as a staff scientist to my understanding.' On March 13, Kakekhani supported a proposed $175,000 base salary and $15,000 sign-on payment by citing Hennefarth's promotion to Staff Scientist at UCLA

and Mitra's assessment that his skills matched a staff scientist's. HR had questioned the qualifying experience and requested justification; these pages do not establish approval of the proposed increase. Plaintiff relies on the correspondence as context for the professional and economic significance of accurate staff-role recognition, not as proof of Hennefarth's citizenship or Defendant's participation in the hiring negotiation. (Ex. 27; PSIQ SUBP RESP 1380-1383.)

**Research Continuity and Notice of Harm**

95. After moving to PsiQuantum, Plaintiff contacted Defendant about completing and communicating work begun during his University appointment. Defendant declined further scientific involvement and said the group was not seeking a quick publication. Plaintiff sought guidance from the Provost's Office about publishing the work and accurately identifying its institutional affiliation. (Ex. 5.)

96. Defendant confirmed language that subsequent work using the data would be "exclusively yours and not associated with the University of Chicago" and stated that she wanted to disconnect herself from Plaintiff scientifically. She also acknowledged allowing Plaintiff to retrieve the materials he had produced. Plaintiff alleges that her disassociation instruction and denial of the research record created uncertainty and impaired continuity of his professional use of the work. (Gagliardi Dep. 105:1-20; 106:5-24; 108:2-14.)

97. Defendant's July 6, 2023 recruitment memorandum expressly identified Plaintiff's visa situation as relevant to the time-sensitive appointment. The University's later H-1B support letter requested a Quantum-AI Researcher petition period of November 1, 2023 through October 31, 2026; the staff offer remained at will. In January 2025, Plaintiff informed Defendant in writing of serious career and immigration jeopardy and his need for further

work, and she acknowledged receiving that account. The recruitment context and the later specific notice are separately dated facts. (UChicago Production 047, 057, 154; Gagliardi Dep. 99:3-18.)

97A. On January 4, 2025, Plaintiff described his December 10 termination after approximately six weeks, the resulting career and immigration jeopardy, and his need for work records and employment assistance. He asked Defendant for support and noted her industry connections. On January 5, Defendant replied that she could not help him in the future, directed him to discuss his situation with Head-Gordon or others, asked him to 'stop emailing me,' and stated that communication would cease after he recovered needed University emails. This exchange supplies contemporaneous notice of the crisis and Defendant's response, alongside the separately documented 2024 PsiQuantum contacts; it does not establish that she caused the termination. (Ex. 23C-D.)

98. Defendant controlled Plaintiff's group classification, supervised the research record, and knew that her statements to a primary referee could affect his standing in a small, specialized profession. Her March, April, and July 2024 performance communications and January 2025 title statements affected different parts of that professional record. Plaintiff sought correction of his official title and classification.

99. Plaintiff's alleged economic injuries follow three distinct causal paths: foregoing the AdsGency AI Head of Research position in reliance on the represented Chicago appointment; impairment of his academic trajectory through the publication and senior-reference record used for UCF, Oxford, UNM, and subsequent faculty applications; and separate PsiQuantum-related employment consequences to the extent attributable to Defendant's own acts. The PsiQuantum contacts and hiring records described in paragraphs

85–94 identify the present evidence concerning the third path. The amounts and limitations of the underlying compensation and opportunity records are set out below. Plaintiff seeks loss caused by Defendant, not a mechanical sum of mutually exclusive career paths.

**Economic Harm: Amounts, Causal Paths, and Nonduplication**

100. AdsGency reliance pathway. Plaintiff alleges that accepting the represented Chicago role displaced the Head of Research opportunity effective May 22, 2023. The contract states annual base salary of $72,000, benefits, and "5% of company revenue performances pool." Plaintiff's claim concerns the net loss from that choice, subject to the contract's at-will and work-authorization conditions, actual availability, and the compensation he received at Chicago. No amount of earned commission is alleged without the relevant revenue and eligibility records. (Ex. 10.)

101. UCF opportunity and value. Plaintiff's March 2024 on-site faculty interview and Head-Gordon's March 29 confirmation of contact with the chair preceded the April 3 restriction on further faculty letters. The College of Sciences Budget Planning Worksheet in Plaintiff's name identifies a proposed research program totaling $784,578.56 in startup resources. It separately identifies $24,000 in Faculty Salary—Summer 2025, comprising $16,000 and $8,000. The worksheet is a proposed budget, not an executed employment offer; its startup total describes institutional research support rather than Plaintiff's personal lost wages. (Ex. 8, UCF worksheet, EX0036; Ex. 19D–E.)

102. The UCF worksheet does not state an annual base salary or the number of compensated months underlying its $24,000 summer-salary component. Plaintiff therefore does not annualize that component or treat the proposed startup total as personal wages. He alleges economic injury from impairment of the pending candidacy and reference support, with the

compensation period, actual loss, and connection to UCF's decision to be established from the opportunity-specific evidence. (Ex. 8, EX0036; Ex. 19D-E.)

103. Oxford opportunity and value. The QuantSim X5 PI Output Report identifies Plaintiff as Principal Investigator for a proposed 60-month project and lists £362,289.94 in his PI staff-cost line, with annual figures of £64,090.21, £68,051.95, £72,194.85, £76,625.05, and £81,327.88. The report also lists an Oxford Total of £1,874,293.77 and Total Grant of £1,197,860.96. Plaintiff relies on the PI line as a documented staff-cost benchmark for the proposed independent-research pathway, not as proof of net salary, awarded funding, or an unconditional five-year employment contract; any employer on-cost component must be distinguished from personal remuneration. The larger project totals are not claimed as personal lost earnings. (Ex. 8, X5 report, EX0037.)

104. The QuantSim costing concerns the ERC / European Commission application, which Plaintiff reported unsuccessful by March 29, 2024. Plaintiff does not attribute that outcome to the later April 3 letter suspension or the January 2025 title accusation. His later EPSRC theory concerns interruption of a separately pursued application through the alleged publication and reference impairment and the December disruption. The earlier costing documents the proposed pathway's scale; it does not establish the amount of an EPSRC award or continuing host approval after the stated support period expired. (Ex. 8; Ex. 19F–G.)

105. UNM and additional academic cycles. The live UNM application and its accepted January 6 update identify a concrete candidacy, but the materials cited here do not state a UNM salary. Plaintiff claims the effect of impaired professional records and reference support on that candidacy and on additional faculty applications he alleges he could not pursue. The

loss of a particular opportunity is to be connected to its timing, requirements, available references, and result; no UNM salary is supplied by borrowing the UCF or Oxford figures. (Exs. 8 and 22.)

106. PsiQuantum compensation pathway. The July 25, 2024 offer states $188,000 annual base compensation, eligibility for an 8% variable bonus subject to the offer's conditions, relocation assistance up to $10,000 on the stated reimbursement and repayment terms, and a proposed 20,000-share option award subject to board approval. The option terms specify a 25% vesting cliff after twelve months of continuous service—5,000 options—with the balance governed by the remaining vesting terms. These are compensation and award terms, not a calculation of accrued bonus, actual relocation spending, or realized option value. (Ex. 11.)

107. Plaintiff alleges separate PsiQuantum-related consequential injury only to the extent Defendant's own acts caused it. The favorable July hiring assessment, her consulting contacts, transition communications, and the work and employment chronology identify relevant participants and dates. They do not themselves establish that she transmitted a false Chicago-postdoc description or caused termination. Any wage or equity loss attributed to her requires that causal connection and the actual employment, grant, vesting, and valuation records; the offer alone supplies no dollar value for the options. (Exs. 11, 20, 27; Gagliardi Dep. 80:2-13; 84:20-85:5; 119:10-18.)

108. Relocation, treatment, and mitigation. Plaintiff claims actual relocation and transition expenses caused by the alleged inducement, treatment expenses attributable to the alleged distress or aggravation, and lost or delayed earnings caused by the pleaded acts. Amounts will be tied to receipts, billing, payroll, and income records rather than the ceilings of

proposed benefits. Plaintiff continued pursuing scientific work, business development, and consulting; those efforts and any resulting earnings must be included in the net-loss calculation. His August 5, 2026 progress note records ongoing company work, research, litigation activity, and some consulting income. (August 5, 2026 treatment note, p. 1; not attached to this public pleading.)

108A. Following the loss of his U.S. employment, Plaintiff departed the United States on May 20, 2026 and relocated to India. He alleges that his employment and immigration circumstances compelled that relocation. In a May 11 email concerning newly offered contract work, he explained that his move was scheduled for May 20 and that he needed to onboard and work from overseas to comply with U.S. work-authorization requirements. On May 20, he confirmed returning his apartment keys and leaving furniture for disposal. (Ex. 28A-B.) His efforts to restore his U.S. career consequently required pursuing opportunities from abroad and obtaining the necessary visa and travel permissions.

108B. As part of his mitigation efforts, Plaintiff pursued commercialization of his scientific work through Point Reyes Sound, Inc. On September 24, 2026, the company was selected as a semifinalist for Duality, part of Alchemist Chicago, and invited to the October 19-23 bootcamp, leaving 25 calendar days before its start. On September 25, the organizers initially described in-person bootcamp attendance as mandatory, later indicated that alternative bootcamp arrangements might be possible, and stated that in-person attendance would be imperative if he advanced to the main program. On September 28, the University's Polsky Center supplied an emergency B-1/B-2 appointment letter explaining that the urgent timing could not reasonably have been anticipated, investor and institutional meetings had fixed schedules, and inability to attend risked significant loss of opportunity.

By October 7, Plaintiff reported completing his DS-160, transmitting an emergency appointment request, paying visa fees, and booking lodging, while still awaiting an appointment. (Ex. 28C-F.)

108C. Plaintiff repeatedly checked appointment availability for Chennai, Hyderabad, Kolkata, Mumbai, and New Delhi but could obtain no bookable appointment sequence in India permitting timely attendance at the bootcamp's start. His preserved New Delhi VAC screen, archived October 3, displays "No Slots Available" at the OFC/biometrics stage; that screen records a particular result at that stage, while the repeated searches at the other locations are Plaintiff's firsthand account. (Ex. 28G.) On October 16, he obtained express approval for remote participation, then participated remotely and presented his company's pitch. On October 28, after the bootcamp, he reported securing a consular appointment and continued preparing to attend the main program in person if selected. (Ex. 28H-I.) This chronology identifies the short notice, unsuccessful appointment efforts, and remote participation through which he pursued the opportunity from India.

108D. On November 6, 2026, Alchemist Chicago notified Plaintiff that Point Reyes Sound would not advance as a finalist; Shyama Majumdar confirmed that the decision also applied to Duality. The notice praised the team and Plaintiff's drive, reported review-committee interest in the company, and attributed nonselection to the strength and size of the bootcamp batch and limited finalist places. Plaintiff requested individualized feedback. On November 10, the organizers said they would provide feedback over the coming month. (Ex. 28J-L.) These events document a concrete but unsuccessful mitigation opportunity and the practical constraints on Plaintiff's efforts to restore his career. Plaintiff does not infer from nonselection alone that Defendant participated in or caused that decision. The

prospective investment was financing for the company on specified terms; it is not included as Plaintiff's personal wages or an automatic measure of his damages.

109. Plaintiff does not aggregate the full wages of AdsGency, UCF, Oxford, and PsiQuantum as though he could simultaneously hold all positions. He seeks compensation for the supported alternative path or period, and for distinct nonoverlapping injuries, with applicable offsets for actual earnings and payments compensating the same injury. Losses preceding January 2025 are attributed only to earlier conduct; the January title publications are alleged to cause additional reputational and subsequent opportunity-related harm. The institutional resource budgets are not included dollar-for-dollar in a personal-income total.

110. Plaintiff also suffered severe and sustained emotional distress with anxiety, insomnia, crying episodes, chest pain, depressive symptoms, exacerbation of chronic migraines, and the need for medical and psychiatric evaluation and treatment. These symptoms impaired his functioning and exceeded transient disappointment.

111. On February 23, 2026, Dr. Yasha Rastgar confirmed that Plaintiff was an established patient receiving treatment for an anxiety disorder and an attentional and executive-function disorder; continued treatment and regular monitoring were medically indicated; interruption posed a meaningful risk of deterioration; and at least twelve additional months of psychiatric follow-up were anticipated. (Ex. 16.)

112. The February 19, 2025 progress note records Plaintiff's report of emotional and physical collapse, isolation, and diminished professional and personal support after the December job disruption, with anxiety and stressed mood described as moderate to severe. The September 12, 2025 note records his report of grief over the collapse of his professional network and fallout with former mentors, earlier frequent crying episodes, and continuing

anxiety and sleep difficulty, while also documenting improvement from earlier months. These are contemporaneous clinical records of symptoms and reported circumstances, not independent verification of each third party's conduct. (February 19 and September 12, 2025 treatment notes, p. 1 of each; not attached to this public pleading.)

113. The May 6, 2026 note records stress in the setting of litigation involving his former employer and a university professor, immigration concerns, and continued scientific and company activity. The August 5, 2026 note records ongoing concern about the damaged academic support network, relocation to India, continued research and business work, and consulting activity. Plaintiff alleges that Defendant's conduct contributed to his sustained distress and aggravation while acknowledging other stressors, periods of improvement, and continued functioning. (May 6 and August 5, 2026 treatment notes, p. 1 of each; not attached to this public pleading.)

114. Plaintiff alleges that Defendant's conduct caused or substantially contributed to the injuries described above, including aggravation of preexisting conditions. He does not attribute every symptom, immigration event, or employment loss to Defendant. Plaintiff seeks damages attributable to her acts, with appropriate credit for compensation and prior recovery for the same injury. Relevant medical, mitigation, and damages records will be used subject to applicable privacy protections.

**Count I Fraudulent Inducement**

115. Plaintiff incorporates paragraphs 1-114, which state the common factual allegations, as though fully set forth here.

116. Defendant made and approved the material representation in the August 31, 2023 offer issued to Plaintiff: a staff appointment as Quantum-AI Researcher reporting to her, with the

stated staff employment terms. The date, issuer, recipient, medium, content, and circumstances of the written representation are identified in paragraphs 17-27. The separately authorized research program is described in paragraph 24.

117. The representation was materially misleading because Defendant withheld her existing intention to regard Plaintiff only as a postdoc and to disregard the professional significance of the approved title. The documents show the postdoctoral request, its rejection, and the staff offer before acceptance; her testimony supplies the retained intention and nondisclosure at acceptance. The alleged deception concerns that undisclosed reservation, while the University actually provided staff employment and pay.

118. Defendant had a duty to disclose the material reservation because she undertook to describe and offer the role, affirmatively presented the staff appointment and title as operative, and knew that withholding her existing contrary intention made that account misleading. Plaintiff relied on her superior knowledge of the role she intended to recognize and her control of the recruitment.

119. Defendant knew the omitted facts and the misleading character of her account. Her initial postdoctoral plan, the University's rejection, her approval of the written staff terms, and her admitted intent at acceptance identify the sequence. Her subsequent unchanged postdoc treatment and group classification implemented the earlier intention. The research plan corroborates a genuine defined assignment and her knowledge of it; the fraud claim does not depend on a promise of successful results or a guaranteed publication.

120. Defendant intended the misleading account to induce Plaintiff to accept the appointment, relocate, commit professional effort, and defer alternatives. Her July 6 recruitment memorandum described the hire as mission critical and time-sensitive; she then approved

the staff route while retaining the undisclosed postdoc intention she admitted. Plaintiff alleges inducement from that combination of contemporaneous acts and testimony.

121. Plaintiff actually and justifiably relied on the approved written staff terms and the professional role they represented. He accepted, relocated, invested his professional effort, and deferred or impaired the alternatives described above. He did not agree that the approved status could be publicly disclaimed or treated as his private invention.

122. Plaintiff would have acted differently had Defendant disclosed her existing intention, including declining the appointment on those terms and pursuing the identified alternatives. The official offer, staff classification, and rejection of postdoctoral appointment made his reliance reasonable.

123. As a direct and proximate result of his reliance, Plaintiff incurred relocation and transition expenses, committed professional effort, and impaired the identified AdsGency alternative, causing economic injury. The $72,000 salary rate and conditional commission terms identify the alternative's stated value; recoverable net loss depends on the period the alternative remained available, work authorization, actual compensation received, and the loss caused by the misleading recruitment. Plaintiff seeks the net reliance-related loss described in the economic-harm allegations, not the gross sum of all later career opportunities. (Exs. 1, 10.)

124. Defendant's acts were knowing and deliberate. Plaintiff requests compensatory damages, punitive damages to the extent permitted by law and supported by proof, costs, and the other relief requested below.

**Count II Defamation Per Se**

125. Plaintiff incorporates paragraphs 1-114, which state the common factual allegations, as though fully set forth here.

126. On January 3, 2025, Defendant published to Monica Lugo, in addition to Plaintiff, the statement: "The title 'Quantum-AI Researcher' is totally made up by you." This was a publication about Plaintiff to a third person. Its date, medium, author, recipients, wording, and context are identified above and in Exhibit 3.

127. The statement was false in its contextual assertion that Plaintiff was claiming a designation of his own unilateral invention rather than seeking recognition of the University's approved title. The institutional source was the written offer Defendant approved. Her own explanation identifies collective creation and adoption of the title.

128. In the official-record correction context, the accusation imputed that Plaintiff was falsely claiming an official employment designation of his own invention. Plaintiff alleges that it impugned his professional honesty, rather than merely describing an uncommon title. The same email acknowledged that he had been hired as a staff scientist; the challenged assertion concerns his purported invention of the particular official title, not a denial that he held any staff appointment. (Ex. 3.)

129. Defendant knew that the title was an institutional designation rather than Plaintiff's unilateral invention. She approved the position description and offer, and she later acknowledged the collective creation of the title. These facts identify the institutional source of the designation and her own contemporaneous knowledge. (Exs. 1, 3, 18; Gagliardi Dep. 18:12-16; 36:5-12.)

130. Plaintiff's correction request supplied the August 31, 2023 offer and asked for confirmation of the official employment record. Defendant replied to that request with the accusation that the title was totally made up by Plaintiff, copying administrator Monica Lugo. Thus the institutional source was expressly before Defendant when she communicated the accusation to a third person. (Exs. 3, 23A-B.)

131. In that setting, the challenged words conveyed an objectively verifiable assertion about who created and authorized an employment designation. Plaintiff alleges that the words accused him of inventing an official credential and seeking its recognition as authentic. The title's institutional adoption, Defendant's approval, and the attached offer make the assertion susceptible to proof or disproof. (Exs. 1, 3, 18, 23A-B.)

132. The email's acknowledgment of staff employment does not make the challenged assertion true: the accusation addressed the source and authenticity of the particular official title. Plaintiff does not allege defamation merely because the title was unusual or because Defendant used the word postdoc. The alleged falsehood is that he invented the official designation himself. (Exs. 1, 3.)

133. Plaintiff alleges abuse of any conditional privilege through knowing or reckless factual misdescription. Defendant had approved the role and received the confirming offer with Plaintiff's correction request, yet attributed its official title wholly to his invention when responding to an administrator. Those specific facts support knowledge of falsity or reckless disregard, rather than an inference drawn solely from the recipient's internal or external status. (Exs. 1, 3, 23A-B; Gagliardi Dep. 18:12-16; 36:5-12.)

134. The earlier research-performance communications described in paragraphs 63-74 remain part of the factual sequence concerning Defendant's knowledge, Plaintiff's professional-

reference record, and the separately pleaded claims. They are not asserted as independently timely publications in this count merely because discovery later corroborated their content. Nor are Defendant's discovery responses or deposition testimony pleaded as new actionable publications.

135. The January 3, 2025 title accusation is defamatory per se because, in the pleaded employment-record context, it imputes dishonesty in claiming an official professional credential and prejudices Plaintiff in his profession. Plaintiff seeks presumed damages to the extent permitted and proven reputational and economic injury attributable to that publication, including subsequent impairment of the professional record; he does not attribute prepublication losses to it.

136. Defendant's knowing or reckless January 3, 2025 publication caused the resulting harm pleaded above. Plaintiff requests compensatory damages, presumed damages as permitted, punitive damages to the extent permitted and supported by proof, costs, and the other relief requested below.

**Count III Tortious Interference With Prospective Economic Advantage**

137. Plaintiff incorporates paragraphs 1-114, which state the common factual allegations, as though fully set forth here.

138. Plaintiff had reasonable expectancies through identified competitive faculty and research pathways. UCF progressed from a March on-site interview to a request for startup-fund and office-space detail and continuing chair contact reported in July. UNM retained a live application and accepted updated materials. Oxford provided conditional institutional support for distinct funding applications. Plaintiff does not equate those stages with offers

or awards. Each expectancy is tied to its viable period; the unsuccessful ERC application is not attributed to the later April restriction on letters. (Exs. 8, 19D-H, 22, 24B.)

139. Senior references, accurate appointment records, and an actual research record were material to the identified opportunities. Head-Gordon had supported faculty applications, the Chicago hire, and PsiQuantum and was a primary referee. His reference relationship was a channel through which Plaintiff pursued the identified economic expectancies; its impairment also caused reputational harm independently of any particular hiring decision.

140. Defendant knew before April 3 that Plaintiff was completing a Florida site interview involving four candidates for one position: he told her on March 26, and she asked about its outcome. Plaintiff identifies that visit as UCF; the July exchange names UCF expressly. By December 31, Defendant separately knew of the live UNM search because Plaintiff forwarded it and sought support. Her knowledge is alleged at the supported dates, not retroactively from later notices. (Ex. 8, EX0040-41; Exs. 19D, 24A, 24C.)

141. Defendant intentionally interfered by communicating the false factual account of Plaintiff's work to Head-Gordon, publishing the false title accusation to University personnel, and resisting accurate professional classification while proposing removal in response to correction requests. Her instructions disassociating the research and her denial of its existence further impaired the professional record used to pursue those opportunities.

142. The interference was unjustified because it rested on knowingly or recklessly false factual premises about Plaintiff's official status and actual work. The claim concerns those affirmative communications and acts affecting third parties and the professional record relevant to the identified opportunities; Defendant's refusal to supply a favorable letter is

pleaded as context for her knowledge and the practical effect of the impaired reference pathway.

143. Defendant's false Chicago account materially contributed to Head-Gordon's restriction of faculty support, as shown by his favorable prior recommendations, March 29 chair contact, express April 3 linkage between Defendant's criticism and withholding further faculty letters, and January 6, 2025 use of her account. Plaintiff alleges that the restriction affected a UCF candidacy continuing into July, not merely a hypothetical later search. He acknowledges Head-Gordon's separate unfinished-paper condition and later industry-reference assistance. The causal claim concerns impaired support for particular live academic opportunities; these communications alone do not establish why a university ultimately declined to hire him. (Exs. 7, 19D-E, 24B.)

144. As a direct and proximate result of Defendant's interference, Plaintiff alleges that particular live economic expectancies failed to ripen, were delayed, or were materially impaired, causing lost or delayed income and impairment of earning capacity. The opportunity-specific sequence and the documentary values are stated in the common factual allegations. UCF's proposed startup resources and Oxford's research-budget totals are not pleaded as Plaintiff's personal wages. UNM received his updated materials; his claim concerns impaired competitiveness and reference support rather than non-submission. Plaintiff seeks the economic loss attributable to the alleged interference, without treating a budget or a restricted reference alone as proof of a hiring or funding outcome.

145. The interference was deliberate and undertaken with knowledge of the importance of Plaintiff's professional record and references. Plaintiff requests compensatory damages,

punitive damages to the extent permitted and supported by proof, costs, and the other relief requested below.

**Count IV Intentional Infliction of Emotional Distress**

146. Plaintiff incorporates paragraphs 1-114, which state the common factual allegations, as though fully set forth here.

147. Defendant exercised substantial supervisory and reputational authority over Plaintiff. She funded and supervised his appointment, controlled his group classification, knew his reliance on Head-Gordon, and had influence in the specialized research community. Her recruitment memorandum, the July and August 2023 correspondence, and sponsorship records show awareness that employment and immigration circumstances were linked. The January 2025 communication supplied later notice of the particular career and immigration jeopardy Plaintiff then described. (UChicago Production 047, 057, 154; UC Berkeley native emails UCB_000043, UCB_000051; Gagliardi Dep. 99:3-18.)

148. Defendant engaged in a connected course of conduct comprising misleading recruitment about the professional role she intended to recognize; continued postdoc classification despite staff appointment; false categorical communications about Plaintiff's work to his primary referee; the accusation that he wholly invented the official title she approved; and proposed professional exclusion when he sought correction.

149. Plaintiff alleges extreme and outrageous conduct in the cumulative use of that authority to procure his reliance, disregard the professional role she had approved, convey a materially false nonperformance account to a known principal referee, and accuse him of inventing an official title while responding to his requests for correction. The alleged conduct targeted the professional record and support needed to obtain further scientific work. Its seriousness

is pleaded in the context of her authority, knowledge of the actual record, and the circumstances known at the time of each act.

150. Defendant knew Plaintiff depended on accurate employment records, professional references, and the ability to communicate his research. Her July 2023 memorandum acknowledged his visa situation during recruitment. The January 4-5, 2025 exchange separately informed her of the specific career and immigration jeopardy following the end of active PsiQuantum work. The dated request and response are set out in paragraph 97A and Exhibit 23C-D. Plaintiff relies on the knowledge established at each date; the later notice is not alleged to establish earlier awareness of that particular crisis.

151. Defendant intended severe emotional distress or knew there was a high probability her conduct would cause it. Plaintiff alleges that state of mind from her deliberate professional misdescriptions despite knowledge of the appointment and research record, their communication to his principal referee, and her response to correction requests. He relies on her supervisory authority and the employment and immigration circumstances known to her at each relevant time, not merely on the fact that distress later occurred.

152. Plaintiff suffered severe and prolonged distress, including anxiety, insomnia, crying episodes, chest pain, depressive symptoms, aggravation of chronic migraines, impaired functioning, and the need for continuing medical and psychiatric care. The duration, intensity, physical manifestations, and treatment needs exceeded ordinary upset.

153. The February 23, 2026 care-verification letter and the dated progress notes corroborate continuing care and the reported duration and intensity of symptoms. The notes also document improvement, continuing research and business activity, and multiple stressors. Plaintiff relies on his account and the properly supported clinical record to connect

Defendant's acts to the distress and any aggravation; the notes are not pleaded as an expert allocation of all harm to Defendant. (Ex. 16; the dated treatment notes described in paragraphs 112–113 are not attached to this public pleading.)

154. Defendant's course of conduct proximately caused or substantially contributed to that severe distress and its physical and functional consequences, including exacerbation of any preexisting condition. Plaintiff requests compensatory damages, punitive damages to the extent permitted and supported by proof, costs, and the other relief requested below.

**Count V Intentional Alienage Discrimination under 42 U.S.C. § 1981**

155. Plaintiff incorporates the common factual allegations in paragraphs 1-114, including the economic-harm and treatment allegations, as though fully set forth here. This count is asserted against Defendant individually for her own intentional participation in the conduct described below.

156. At the relevant times, Plaintiff was a citizen of India and not a citizen of the United States. He entered and performed an authorized employment relationship with the University of Chicago under the August 31, 2023 staff offer. The relationship included the Quantum-AI Researcher role, staff employment terms, and eligibility for the Annual Merit Process. Plaintiff invokes equal contractual rights based on alienage, not a claim that a particular national origin or immigration-processing requirement alone establishes discrimination. (Ex. 1; UChicago Production 001, 047–048, 153–154.)

157. Section 1981 protects equal rights in the making, performance, modification, and termination of contracts and the enjoyment of their benefits, privileges, terms, and conditions, including protection against nongovernmental discrimination. The contractual

relationship identified here is Plaintiff's own staff employment, not a third party's prospective grant or contract. 42 U.S.C. § 1981(a)–(c).

158. Defendant approved the position description, supervised Plaintiff, participated in his classification within the group, and made the decisions concerning her evaluation and recognition of his work. Although the University paid staff compensation and benefits, she retained and implemented an intention to treat the appointment as postdoctoral and stated that she did not conduct his annual merit review. (Gagliardi Dep. 14:1-5; 18:12-16; 21:7-19; 22:24-23:6; 52:5-19; Exs. 1 and 3.)

159. Plaintiff alleges impairment of equal enjoyment of his approved staff role and the represented performance-review process. The actual 2023-2024 staff-review announcement confirms that individual evaluations were being administered during his employment; Defendant later stated that she had not performed his annual merit review. His claim concerns denial of the process and recognition of the approved role, including her disavowal of the title after he supplied the offer, not a guaranteed rating, publication, or raise. He acknowledges the processed pay increase and alleges distinct professional-record injury. (Exs. 1, 3, 23A-B, 26A-B; Gagliardi Dep. 52:5-53:12; UChicago Production 010, 022.)

160. The alleged discrimination was because of Plaintiff's noncitizenship. Defendant knew his employment and sponsorship circumstances, expressed recruitment concerns centered on maintaining his visa while seeking faculty employment, and later explained her disregard of the approved professional distinction by saying that the opportunity to stay in the United States was the only thing that mattered. Plaintiff alleges that she treated the immigration

benefit as a substitute for recognizing the independent employment terms she had approved. (Ex. 19A–B; Gagliardi Dep. 15:21–16:19.)

161. Plaintiff alleges that his non-U.S.-citizen status was a but-for cause of Defendant's denial of equal recognition and administration of his staff employment: absent that status, she would not have treated permission to remain in the United States as a substitute for the professional terms she had approved. The inference rests on her stated explanation for disregarding the title, her admitted intention at acceptance, her implementation of postdoctoral treatment, and her response to correction requests. Plaintiff disputes her claimed oral understanding that the professional distinction had no independent significance. (Gagliardi Dep. 14:1-5; 15:21-17:9; 18:12-16; 21:7-19; Exs. 3, 9, 19A-B.)

162. The count does not rest on a disparate impact from lawful work-authorization rules or on a mere reference to visa costs. Plaintiff acknowledges the disclosed financial and duration concerns, Defendant's attempt to assist with a Berkeley extension, and his receipt of staff pay, benefits, and a July merit compensation adjustment. He alleges that those facts do not account for her intentional denial of equal recognition and administration of the approved relationship because he was a noncitizen. (Ex. 19B–C; UChicago Production 010; Gagliardi Dep. 14:8–20.)

163. Defendant is liable under this count for the discriminatory acts in which she personally participated, not merely because she was Plaintiff's supervisor. Plaintiff alleges impairment of his own contractual rights and resulting professional-record injury, consequential economic loss, and emotional distress to the extent caused by that discrimination. The separately described opportunity values are not a substitute for proving causation or a distinct additional recovery for an injury already compensated under another count.

164. Plaintiff requests compensatory damages for injury caused by the violation, nominal damages if a violation is established without proof of compensable loss, punitive damages to the extent permitted and supported by proof, costs, and other lawful relief. Plaintiff does not seek double recovery for overlapping injuries.

**Prayer for Relief**

WHEREFORE, Plaintiff requests judgment against Defendant and the following relief:

A. Compensatory damages for the injuries attributable to Defendant;

B. Presumed damages on Count II to the extent permitted for defamation per se;

C. Special damages, including proven relocation and transition expenses, impairment of identified economic opportunities, lost or delayed income and earning capacity, and related consequential losses;

D. Punitive damages to the extent permitted by law and supported by the evidence;

E. Costs of suit, and interest to the extent authorized by law;

F. Nominal damages under Count V if a violation is established without compensable loss; and

G. Such other relief as the Court deems fit, without duplicate recovery.

**Jury Demand**

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 12, 2026

Respectfully submitted,
/s/ Romit Chakraborty
Romit Chakraborty, Ph.D.
Plaintiff pro se
2261 Market Street, STE 72927
San Francisco, California 94114
Telephone: +1 773-816-8338
Email: romit.chakraborty@gmail.com

# EXHIBIT INDEX


| Exhibit | Record | A pages |
|---|---|---|
| 1 | August 31, 2023 staff offer | 55-57 |
| 2 | University staff identification card | 58-59 |
| 3 | January 3, 2025 title email | 60-61 |
| 4 | LLM and active-space proposal | 62-65 |
| 5 | Provost title and publication emails | 66-69 |
| 6 | Jangid classification messages | 70-73 |
| 7 | Head-Gordon reference correspondence | 74-79 |
| 8 | UCF, Oxford and UNM opportunity records | 80-89 |
| 9 | Website and title emails 000001-000007 | 90-97 |
| 10 | AdsGency Head of Research contract | 98-103 |
| 11 | PsiQuantum offer and benefit terms | 104-109 |
| 12 | Responses to requests for admission | 110-116 |
| 13 | Verified interrogatory answers | 117-122 |
| 14 | Production responses and emails | 123-135 |


A page numbers identify this Exhibit A; source Bates and transcript page numbers remain controlling.

# EXHIBIT INDEX CONTINUED


| Exhibit | Record | A pages |
|---|---|---|
| 15 | Public collaboration and Hennefarth announcements | 136-140 |
| 16 | February 23, 2026 care letter | 141-142 |
| 17 | Full October 12, 2026 deposition | 143-308 |
| 18 | Selected University subpoena records | 309-355 |
| 19 | Berkeley records and email printouts | 356-384 |
| 20 | Selected PsiQuantum hiring and contact records | 385-412 |
| 21 | November 2024 email transcriptions | 413-416 |
| 22 | UNM January 6, 2025 update acceptance | 417-420 |
| 23 | January 2025 title and assistance correspondence | 421-425 |
| 24 | 2024 candidacy and reference emails | 426-430 |
| 25 | Contemporaneous research emails | 431-434 |
| 26 | Staff review and salary-cycle notices | 435-437 |
| 27 | PsiQuantum staff, hiring, report and termination records | 438-450 |
| 28 | Migration, visa, and accelerator records | 451-467 |


A page numbers identify this Exhibit A; source Bates and transcript page numbers remain controlling.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

# EXHIBIT 1

## August 31, 2023 staff offer

Original source pages follow; original page labels and Bates identifiers are retained.

THE UNIVERSITY OF CHICAGO

8/31/2023

Romit Chakraborty
5527 S Everett Avenue
Chicago, Illinois 60637

Dear Romit,

I am delighted to formally extend this employment offer at the University of Chicago. We are committed to attracting and retaining high caliber talent to support our mission of excellence in creating and disseminating knowledge rooted in rigorous inquiry. Accordingly, you are being offered the position of Quantum-AI Researcher in the Chemistry department, reporting to Laura Gagliardi, Professor, with a tentative start date of 10/01/2023. Your annual pay will be $67,933.08 to be paid on a monthly pay cycle, equivalent of $5,661.09 per month.

Employment is contingent upon:

- Confirmation that you are legally authorized to work in the United States.
- Satisfactory completion of all applicable background and/or motor vehicle record checks, and drug screening test.
- Acknowledgment of mandated reporting requirements under the Illinois Abused and Neglected Child Reporting Act.
- Receipt of positive reference check results.

During your first six months of employment, you will be a probationary employee. At all times, your employment will be “at-will,” which means that you or the University can terminate your employment at any time for any lawful reason.

The University’s Annual Merit Process (AMP) is the formal process for reviewing employee performance and base pay levels, with a common review of July 1 for all monthly paid employees. You will be eligible for review during AMP and pay will be determined upon performance.

The University of Chicago offers a comprehensive benefits package, including health and welfare, retirement, and paid time off options, all of which are subject to change from time to time. Summary details of these plans are published on the University’s Human Resources website.

- Your eligibility for benefits begins on your first day of employment.
- Enrollment must be completed within your first 31 days of employment.
- Benefit counselors will be available during orientation to answer your benefits questions.
- Documentation for each of your dependents (e.g., copy of marriage certificate for spouse, birth certificate for children) is required before their coverage will be effective.

Additionally, as a valued University staff employee, you will have access to University resources such as fitness facilities and libraries, and you can participate in a variety of University-sponsored and Hyde Park neighborhood arts, cultural and educational events.

THE UNIVERSITY OF CHICAGO

Maintaining a positive work environment, and promoting a workplace free from discrimination and harassment, supports the academic and research mission of the University by ensuring all members of our community can contribute to their fullest potential. Our “Getting to Know UChicago” new hire orientation will help facilitate your transition to the University of Chicago. To prepare for this session, I encourage you to review http://staffnewhire.uchicago.edu/.

If you have any questions about benefits or onboarding, please contact Raven Jones, your Human Resources Partner, at rjones16@uchicago.edu.

Your signature on the final page of this employment offer letter confirms your acceptance of this offer of at-will employment. Please upload a signed copy of this employment offer on your candidate portal, to confirm your acceptance. After you confirm your acceptance, you will receive an email message from Raven Jones regarding next steps in the onboarding process.

Romit, your new colleagues and I are delighted to have you join Chemistry department. I know your skills, energy and commitment will help to ensure our continued success and create opportunities for your professional growth. I look forward to working with you. Please contact me at lgagliardi@uchicago.edu with any questions.

Sincerely,

Laura Gagliardi
Professor
Chemistry Department

Your signature will confirm the agreed upon base pay, start date and other terms of your employment as described in this employment offer letter. This offer shall remain open until 9/7/2023. Any acceptance received after this date will be considered invalid.

I have read and I understand this offer of employment, and I accept the offer. I understand that my employment is contingent upon satisfactory completion of all applicable background and/or motor vehicle record checks, drug screening test.

Date: 08/31/2023

Dept: Chemistry

Job Title: Quantum-AI Researcher

Printed Name: ROMIT CHAKRABORTY

Signature: Romit Chakraborty

EX0005

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

# EXHIBIT 2

## University of Chicago staff identification card

Original source pages follow; original page labels and Bates identifiers are retained.


THE UNIVERSITY OF
CHICAGO
Classification
STAFF
Card Issued
11/2023
ROMIT
CHAKRABORTY

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

# EXHIBIT 3

## January 3, 2025 title-correction email

Original source pages follow; original page labels and Bates identifiers are retained.

Gmail **Romit Chakraborty <romit.chakraborty@gmail.com>**

# Correction of Official Title and AMP records

**Laura Gagliardi** <lgagliardi@uchicago.edu> 3 January 2025 at 23:51
To: Romit Chakraborty <romit.chakraborty@gmail.com>, Monica Lugo <lugom@uchicago.edu>

Dear Romit,

You were hired as a staff scientist because you were too senior to be hired as a postdoc.

However, on our website we have only two categories: postdocs and graduate student and this is why you are under postdocs.

The title "Quantum-AI Researcher" is totally made up by you.

We didn’t do an annual merit review because you stayed less than one year so there are no related documents.

Best

Laura

------------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
--------------------------------------------------------------------------

[Quoted text hidden]

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 4

## LLM / active-space research proposal

Original source pages follow; original page labels and Bates identifiers are retained.

### University / Institution

University of Chicago

### Your profile webpage URL (optional)

https://gagliardigroup.uchicago.edu/

### Proposal Title

Computational Intelligence in Active Space Selection: A Frontier Hypothesis for Multireference Simulations

### Proposal Summary (1 to 2 pages)

**Please limit your document to 2 pages. Accepted file formats: .pdf, .doc and .docx.**

Gagliardi_Azure_v2.pdf

*Proposal summary: goals, scope of the research, expected outcomes, potential impact*

---

By participating in the Accelerate Foundation Models Academic Research program, you give Microsoft permission to collect and use personal information you provide to review your proposal(s).

Your response to this CFP is subject to Microsoft's Terms of Use (https://www.microsoft.com/en-us/legal/terms-of-use).

You may withdraw or delete your submission at any time by contacting the Microsoft Research Accelerate Foundation Models Research Team at msfmr@microsoft.com.

For more information about Microsoft Privacy Practices, please visit Microsoft Privacy Statement (https://privacy.microsoft.com/en-us/privacystatement)

# Computational Intelligence in Active Space Selection: A Frontier Hypothesis for Multireference Simulations

Professor Laura Gagliardi
*Richard and Kathy Leventhal Professor of Chemistry and Molecular Engineering, University of Chicago*

Romit Chakraborty
*Lawrence Berkeley National Laboratory and University of California, Berkeley*

The principal objective of this research project is to improve the computational efficiency and accuracy of material simulations, particularly those that require a multireference framework. The project aims to combine the capabilities of Large Language Models (LLMs) with existing active space techniques to automate the efficient partitioning of Hilbert spaces and enable more accurate multireference calculations.

## INTRODUCTION

The quest for accuracy and efficiency has long been a compelling narrative in computational quantum chemistry. [1] A paradigm shift is afoot, heralded by the fusion of traditional computational methodologies with emergent machine learning technologies [2–4]. As we stand at this crossroads, the central question arises: Can we harness the latent capabilities of Large Language Models (LLMs) to transcend the limitations of existing computational models, particularly in the domain of multireference simulations? This proposal endeavors to answer this question in the affirmative, outlining a research agenda that marries the rigor of wavefunction-based methods and with the adaptability and computational prowess of LLMs.

The quest is not merely an academic exercise but a venture with profound implications for the future of material science, quantum chemistry, and even our transition to sustainable energy solutions. In essence, we propose a novel interdisciplinary approach that seeks to redefine the boundaries of what is computationally feasible, opening new vistas in the accurate and efficient simulation of complex material systems.

## GOALS

Traditional wavefunction-based methods are limited by the exponential complexity of large Hilbert spaces. Likewise, Density Functional Theory (DFT), despite its popularity, often fails to accurately describe systems that require a multireference treatment. To address these limitations, we plan to:

1. **Develop an Integrated Computational Framework:** We aim to construct a methodology that fuses fine-tuned Large Language Models (LLMs) with existing active space techniques. This combined approach will simplify the Hilbert spaces, making multireference calculations more efficient and accurate.

2. **Implement Specialized Active Space Techniques:** Our project will utilize specialized in-house scientific methods for selecting the active space necessary for full Configuration Interaction (CI) calculations. These methods will be compatible with the mathematical frameworks of Complete Active Space Self-Consistent Field (CASSCF) and Complete Active Space Configuration Interaction (CASCI). [5, 6]

3. **Automate Active Space Selection:** Automation will be a key feature in our approach. We will develop algorithms to intelligently select relevant active spaces based on the system's characteristics, thus reducing the scope for human error and enhancing computational efficiency. [7–11]

4. **Benchmark Against Existing Methods:** A vital part of our research will involve benchmarking our new computational approaches against existing methods. This will serve to validate the reliability of our methodology and may set a new standard for multireference calculations.

## SCOPE

1. **Integration with Electronic Structure Code:** Our first step involves employing the LLM interface to integrate with well-established electronic structure codes, with a focus on PySCF.

2. **Adaptive Training:** We plan to adapt LLMs using a vectorized index of pertinent research papers and academic literature that concentrate on active space selection, allowing the models to be highly specialized. This falls under the purview of fine-tuned LLMs wherein a foundational model is provided a context for decision making by providing locally curated data and specializes in perfecting a particular task.

3. **Benchmarking and Validation:** Rigorous validation exercises will be undertaken to compare our methodology with traditional computational techniques. This will provide an empirical foundation to assess the efficacy of our approach.

4. **Reinforcement Learning:** As a final step, we plan to incorporate reinforcement learning algorithms to enable our computational agent to make increasingly better active space selections based on a predefined loss function.

## USE OF RESOURCES

Resources will be allocated with a focus on model development, computational experiments, and performance evaluation. We plan to make use of Azure OpenAI services and open-source models like Llama for fine-tuning and deploying LLMs. Additionally, we intend to operate within the sandboxing capabilities of Azure Cloud to facilitate high-performance computational agents.

## EXPECTED OUTCOMES

1. **Validated LLM-Interface:** A robust interface between LLMs and PySCF will be developed and validated.

2. **Comprehensive Benchmarks:** An exhaustive set of benchmarks will be produced to validate the efficacy of our methodology.

3. **Comparative Analysis:** A thorough analysis comparing the performance of different language models, such as OpenAI and Llama, will be conducted.

4. **Academic Publications:** Our findings will be disseminated through academic publications that elucidate both the methodology and its broader scientific implications.

## POTENTIAL IMPACT

The project is expected to have a far-reaching impact. It will introduce a novel paradigm for understanding state-to-state dynamics and electron correlations—areas where conventional DFT methods fall short. Furthermore, the project has the potential to accelerate the pace of material discovery, especially in critical areas like sustainable energy solutions.

The concept of promoting agency within an intelligence that can infer not only based on text, and images, but also on live computations is a new research paradigm that is unique within the context of research both in LLMs, and in electronic structure theory. Furthermore, by optimizing the partitioning of Hilbert spaces, the research offers a de-novo paradigm for the use of large language models in advancing the state-of-the-art in electronic structure theory. The quintessence of this initiative lies in its potential to accelerate the pace of material discovery, furnishing precise insights into systems with bespoke attributes, a pressing challenge in materials design especially when it comes to facilitating our transition away from fossil fuels.

We appreciate the opportunity of partnering with Azure AI in this endeavor.


[1] C. Duan, F. Liu, A. Nandy, and H. J. Kulik, Data-driven approaches can overcome the cost–accuracy trade-off in multireference diagnostics, J. Chem. Theory Comput. **16**, 4373 (2020).

[2] A. Vaswani, N. Shazeer, N. Parmar, J. Uszkoreit, L. Jones, A. N. Gomez, Ł. Kaiser, and I. Polosukhin, Attention is all you need, Adv. Neural Inf. Process. **30** (2017).

[3] A. Lunghi and S. Sanvito, Computational design of magnetic molecules and their environment using quantum chemistry, machine learning and multiscale simulations, Nat. Rev. Chem. **6**, 761 (2022).

[4] N. Fu, L. Wei, Y. Song, Q. Li, R. Xin, S. S. Omee, R. Dong, E. M. D. Siriwardane, and J. Hu, Material transformers: deep learning language models for generative materials design, Mach. Learn.: Sci. Technol. **4**, 015001 (2023).

[5] J. Olsen, The casscf method: A perspective and commentary, Int. J. Quantum Chem. **111**, 3267 (2011).

[6] P.-Å. Malmqvist and B. O. Roos, The casscf state interaction method, Chem. Phys. Lett. **155**, 189 (1989).

[7] C. J. Stein and M. Reiher, autocas: A program for fully automated multiconfigurational calculations, J. Comput. Chem. **40**, 2216 (2019).

[8] D. S. King, D. G. Truhlar, and L. Gagliardi, Machine-learned energy functionals for multiconfigurational wave functions, J. Phys. Chem. Lett. **12**, 7761 (2021).

[9] D. S. King and L. Gagliardi, A ranked-orbital approach to select active spaces for high-throughput multireference computation, J. Chem. Theory Comput. **17**, 2817 (2021).

[10] W. Jeong, S. J. Stoneburner, D. King, R. Li, A. Walker, R. Lindh, and L. Gagliardi, Automation of active space selection for multireference methods via machine learning on chemical bond dissociation, J. Chem. Theory Comput. **16**, 2389 (2020).

[11] D. S. King, M. R. Hermes, D. G. Truhlar, and L. Gagliardi, Large-scale benchmarking of multireference vertical-excitation calculations via automated active-space selection, J. Chem. Theory Comput. **18**, 6065 (2022).

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 5

## Provost correspondence on title, classification, and publication

Original source pages follow; original page labels and Bates identifiers are retained.

Gmail

Romit Chakraborty <romit.chakraborty@gmail.com>

## Assistance with Accurate Title Representation and Publication

8 messages

**Romit Chakraborty** <romit.chakraborty@gmail.com> 5 January 2025 at 10:40
To: provost@uchicago.edu
Cc: srushford@uchicago.edu

Dear Office of the Provost,

I hope this message finds you well. I am writing to request your urgent assistance concerning the accurate reflection of my recent appointment in the Gagliardi Group and to seek guidance on publishing work I conducted during that period.

From 27 November 2023 to 25 October 2024, I was employed as a Staff Researcher in Quantum AI under Professor Gagliardi. It was the Office of the Provost that initially prevented my hire as a postdoctoral researcher in July 2023, so I trust the University has documentation affirming my staff appointment. Please also find the offer letter attached.

1. **Title Representation:** On the Gagliardi Group's website, I am currently misidentified as a former postdoc. Although I have approached Professor Gagliardi and other local channels about correcting this error, the listing remains unchanged.

2. **Publication Guidance:** Furthermore, while my tenure was brief, I produced research that I believe would benefit the field. Professor Gagliardi has wished not to be involved or credited, but I would like to publish this work online. May I kindly request any guidance on how to proceed with publication under these circumstances?

This matter is somewhat urgent because I am navigating significant career and immigration considerations , and my professional record should accurately reflect my staff position at the university rather than a postdoctoral appointment. Additionally, I am re-evaluating my career trajectory, and part of it entails getting recognition for the intellectual work I put in during my brief recent tenure as a Staff Researcher in Quantum-AI.

Please be assured that I bring this to your attention in good faith, with no wish to create tension. I am, however, concerned about the potential for retaliation or reputational harm if the matter is not addressed in a timely fashion.

Thank you for your consideration. If you require any further documentation, I shall gladly provide it. I appreciate your response and any support you can offer.

Sincerely,
Romit Chakraborty, MS '13, PhD '17
Senior Quantum Solutions Computational Chemist
PsiQuantum
Palo Alto, California

**New+Hire+Employment+2023-08-31.pdf**
95K

**Romit Chakraborty** <romit.chakraborty@gmail.com> 17 January 2025 at 10:59
To: provost@uchicago.edu
Cc: srushford@uchicago.edu

To the Office of the Provost,

I am following up briefly about 1 and 2 above.

Sincerely,
Romit

Romit Chakraborty, Ph.D.
Senior Quantum Solutions Computational Chemist
PsiQuantum | Palo Alto, California
M.S. (2013), Ph.D. (2017), University of Chicago

[Quoted text hidden]

---

**Susan Rushford** <srushford@uchicago.edu> 17 January 2025 at 11:39
To: Romit Chakraborty <romit.chakraborty@gmail.com>

Hello, Professor Chakraborty,

I would like to acknowledge receipt of this follow-up email. I have been assured that you will receive a response from either Geertrui Spaepen (Associate Provost for Operations and Initiatives) or from Mario Moreno Zepeda (Chief of Staff, Office of the Provost). I know they have been working with PME (Pritzker School of Molecular Engineering) and PSD (Physical Sciences Division) on your request from the time of your initial email. I don't believe the Office of the Provost has jurisdiction to make these changes without the involvement of at least one of these departments. I've asked again if they could please update you on their progress facilitating these requests.

Thank you!

**Sue Rushford**

Executive Assistant to the Provost

**Office of the Provost | The University of Chicago**

srushford@uchicago.edu

773.702.8825

[Quoted text hidden]

---

**Romit Chakraborty** <romit.chakraborty@gmail.com> 17 January 2025 at 11:51
To: Susan Rushford <srushford@uchicago.edu>

Dear Susan,

Thank you for your response, and for the work you have been doing on those lines.
Small erratum though, I am not a Professor. As for 1, and 2:
1. I did notice that my title was appropriately reflected on the Gagliardi group website this week (see lower left of the screenshot). On the other hand, as you may confirm from the upper left of the page, I am still being listed under Postdoctoral Researchers. This part is not accurate. A simple solution from the front-end development point of view would be to just shift me into the 'Undergraduate students & Visiting Scholars' tab. This should be easy to do.




2. It would be immensely helpful to know what the right affiliations should be for the soon to be published work. The first draft should be ready by Jan 31st.

Best wishes,
Romit

Romit Chakraborty, Ph.D.
Senior Quantum Solutions Computational Chemist
PsiQuantum | Palo Alto, California
M.S. (2013), Ph.D. (2017), University of Chicago

[Quoted text hidden]

---

**Susan Rushford** <srushford@uchicago.edu> 17 January 2025 at 11:56
To: Romit Chakraborty <romit.chakraborty@gmail.com>

Apologies on your title. That has always been the most difficult part of addressing people in the university, for me, as I come from the corporate world.

I will be sure to pass along your additional information outlined below. Again, I'm not clear who exactly is working on resolving this, but I can assure you that Geertrui and Mario have been tackling this job.

Thank you!

**Sue Rushford**

Executive Assistant to the Provost

**Office of the Provost | The University of Chicago**

srushford@uchicago.edu

773.702.8825

---

**From:** Romit Chakraborty <romit.chakraborty@gmail.com>
**Sent:** Friday, January 17, 2025 1:52 PM

EX0017

[redacted]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

# EXHIBIT 6

## Bhavnesh Jangid classification messages

Original source pages follow; original page labels and Bates identifiers are retained.

# Exhibit 6 — Text Message Transcript and Authentication

I, Romit Chakraborty, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:
(1) Exhibit 6 is a true and correct screenshot of an Apple Messages conversation between me and Bhavnesh Jangid.
(2) The screenshot displays a conversation dated "Mon, 23 Dec at 3:10 pm" (as shown in the application UI).
(3) The transcript below is a verbatim reproduction of the messages visible in Exhibit 6, in the order displayed.
(4) For integrity verification, the cryptographic hashes of the underlying screenshot file are provided below.

| | |
|---|---|
| **File** | Bhavnesh_calling_me_a_postdoc.png |
| **Size (bytes)** | 171,961 |
| **SHA-256** | 5e522d7ae200eb962d24202e5e18548a495d053585e35e78711ab042a8d72345 |
| **SHA-512** | 4367e539a8e8d9a7ad63f1b74ecae56bef3d2b6a371fa45ded9af9658d4a1ba0<br>18e07db31fe722000373359fb2467ef7e7364e0edef388242e445dad96117b30 |
| **Hash computed (UTC)** | 2026-02-26 08:47:17 |

## Transcript (verbatim; order as displayed):

| Sender | Message |
|---|---|
| Bhavnesh Jangid | Nope |
| Bhavnesh Jangid | I didn't change it all. |
| Bhavnesh Jangid | I didn't have access to it. |
| Bhavnesh Jangid | As per I know, generally postdoc doesn't have access to their data after 1 month |
| Bhavnesh Jangid | Even to their email |
| Romit Chakraborty | Yeah |
| Romit Chakraborty | But I am an alum |
| Romit Chakraborty | And for the last time |
| Romit Chakraborty | I was 'not' a postdoc |
| Romit Chakraborty | And Laura extended my account access till Dec 24th |
| Romit Chakraborty | I had planned to back my data up by then |
| Romit Chakraborty | But then suddenly got locked out on Dec 16th |
| Romit Chakraborty | Who is in charge of the cnet account? |
| Romit Chakraborty | Email? |
| Romit Chakraborty | Hey bhavnesh, what's the email for IT for this sort of thing? |
| Bhavnesh Jangid | Yeah |
| Bhavnesh Jangid | Then you should have access to your data |
| Bhavnesh Jangid | You should email RCC, they will be close by tmrw noon |

| | |
|---|---|
| Bhavnesh Jangid | IT department probably. |
| Bhavnesh Jangid | I generally raise the ticket on their website. Not sure of specific email though but this might work : itservices@uchicago.edu |

Executed on March 31, 2026.

/s/ Romit Chakraborty, Ph.D.


If you are somewhat serious about squash, you will get the strings every few months. So you'll have to go to the store in any case.
This also applies to tennis racquets and strings.
Hey Bhavnesh, Did you change my password by any chance?
I need to back up data on my account
And my UChicago email...
Asking just in case that you did
Nope
I didn't change it at all.
I didn't have access to it.
As per I know, generally postdoc doesn't have access to their data after 1 month
Even to their email
Yeah
But I am an alum
And for the last time
Yeah
I had planned to back my data up by then
Then you should have access to your data
But then suddenly got locked out on Dec
You should email RCC, they will be close by tmrw noon
Who is in charge of the account?
IT department probably
Email?
Hey Bhavnesh, what's the email for IT for this sort of thing?
I generally raise the ticket on their website. Not sure of specific email though but this might work

EX0023

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 7

## Head-Gordon recommendation and January 2025 correspondence

Original source pages follow; original page labels and Bates identifiers are retained.

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO | SANTA BARBARA • SANTA CRUZ

PROFESSOR MARTIN HEAD-GORDON
KENNETH S. PITZER DISTINGUISHED PROFESSOR
DEPARTMENT OF CHEMISTRY
(510) 642-5957; mhg@cchem.berkeley.edu

September 16, 2022

To Whom It May Concern:

RE: Dr. Romit Chakraborty

I am writing to very strongly support Dr. Romit Chakraborty's application for an Assistant Professor position. Romit has been a postdoctoral researcher in my electronic structure theory group at Berkeley since August 2017, working on modeling hydrogen binding in metal organic frameworks (MOFs), as well as thinking about needs for new methodologies for this applications purpose. Romit is a skilled theoretical chemist, who built up a strong background in formal theory during his graduate research at the University of Chicago with David Mazziotti, and has now complemented this experience by developing the data analysis, workflow, and deep chemical understanding necessary to perform successful chemical applications. With these skills, Romit has very significant accomplishments emerging from his Berkeley work, as I will describe below, and has built a strong foundation for a successful independent career.

At Berkeley, Romit's work on hydrogen binding in MOFs has been a direct collaboration with Jeff Long's experimental group for the most part. As nanoporous materials, MOFs have extraordinarily large surface areas per unit volume, and also exhibit remarkable diversity in the chemical composition associated with stable frameworks, of which the vast majority remain unexplored as of today. MOFs are therefore promising functional materials for gas storage, separations, catalysis, and much more. Romit has provided the computational quantum chemistry results that confirm experimentally measured hydrogen binding energies and binding sites, for MOFs synthesized by the Long group. Perhaps more importantly, Romit's calculations have also provided significant insight into the way in which the materials function. Altogether, there are 5 major projects that Romit has largely completed to date – two of which were his initiative (items 1 and 5 below), two in which he supported Long group efforts (items 2 and 3 below), and collaborations with another group member (item 4). He has a variety of other projects underway, has also made code contributions to the latest version of the Q-Chem program.

(1) *Cooperative reversible binding of multiple hydrogen molecules at a single site in a synthesizable MOF.* I rate this project as Romit's most important scientific discovery at Berkeley, because finding a material of this type is one of the leading barriers to progress in making usable hydrogen storage materials. While I and others discussed with Romit the significance of designing a material that could do this, it is important to note that the specific material is Romit's invention. Based on projects 2, 3 and 5 below, Romit realized that V(II) in an undercoordinated metal site would be a strong candidate for the binding of multiple hydrogens. With this in mind, he performed a large series of numerical experiments that ultimately revealed a very promising candidate to be the first coordination sphere of a stabilized vanadium(II) site in MFU-4l, which is a synthesizable material (by transmetallation from an existing MFU-4*l* framework). He predicts uptake of two dihydrogens per metal site, and, most remarkably, with a suitable choice of halogen counter-ion, there is positive cooperativity in the binding: the second hydrogen binds stronger than the first! He has used energy decomposition analysis to interrogate the nature of the binding to reveal chemical influences at play in realizing optimal utility. Romit's findings represent a novel route towards enhancing volumetric storage in a MOF that may, in principle, be replicable across different framework topologies. I also note that Romit wrote the software necessary used to compute anharmonic vibrational energy levels in this study, which was essential to going beyond the standard harmonic approximation for obtaining reliable enthalpies and entropies of binding. This work is submitted for publication.

(2) *Observation of an intermediate to H2 binding in a metal–organic framework.* Coordinatively-unsaturated metal sites within certain zeolites and metal–organic frameworks can strongly adsorb various

EX0026

molecules. While materials of this type bearing electron-rich metal centers can chemisorb guests amenable to redox activity or covalent bond formation, few studies have examined the kinetic profile of such a process. In collaboration with Jeff Long's group, Romit performed calculations to show that H2 binding at trigonal pyramidal Cu(I) sites in the Cu(I)-MFU-4*l* MOF occurs via the intermediacy of a metastable physisorbed precursor species. In situ powder neutron diffraction experiments enable direct observation and crystallographic characterization of this intermediate along the reaction coordinate leading to chemisorption, the first time that this has been accomplished for any material. Romit showed that the activation barrier separating the precursor species from the ground state complex is associated with a shift in the Cu(I) position that enhances $\pi$-backbonding with H2. This work was published in the Journal of the American Chemical Society (2021).

(3) *Modeling binding of hydrogen to V(II)btdd:* Experiments from Jeff Long's group show that hydrogen is remarkably strongly bound to this MOF. Romit has performed calculations characterizing the origin of the binding strength, as well as reproducing the experimental result via his calculations. A critical role for charge-transfer between V(II) and hydrogen emerges from these calculations, which were published in the Journal of the American Chemical Society in 2021.

(4) *Modeling pressure-induced spin cross-over in transition metal complexes*. Spin state switching on external stimuli is a phenomenon with wide applicability, ranging from molecular electronics to gas activation in nanoporous frameworks. Working with another postdoc in my group, Romit modeled the spin crossover as a function of the hydrostatic pressure in octahedrally coordinated transition metal centers by applying a field of effective nuclear forces that compress the molecule towards its centroid. For spin crossover in first-row transition metals coordinated by hydrogen, nitrogen, and carbon monoxide, we find the pressure required for spin transition to be a function of the ligand position in the spectrochemical sequence. While pressures on the order of 1 GPa are required to flip spins in homogeneously ligated octahedral sites, we demonstrate a fivefold decrease in spin transition pressure for the archetypal strong field ligand carbon monoxide in octahedrally coordinated Fe(II) in [Fe(II)(NH3)5CO] interactions. This very interesting proof of concept study was published in ChemPhysChem in 2019, and it nicely shows Romit's ability to develop theory, as well as to apply it.

(5) *A study of binding of diverse gas molecules in 3 classes of MOFs.* While MOFs are recognized to be promising candidates for gas separations, there is a lack of existing computational work that takes a broad and fundamental view of this scientific challenge. On his own initiative, Romit has worked to fill this gap, with a careful yet exciting comparative study of three promising frameworks (one from the MFU-4l class and one from the btdd class, which interact strongly with gases, as well as the classic MOF-5 which is a weaker binder) interacting with a diversity of industrially relevant gases (including H2, N2, O2, CH4, C2H6, C2H2, NO, CO2, SO2, NH3, H2O). Romit is able to draw a range of interesting and significant conclusions about the separations that are most efficiently (and least efficiently) performed by each class of framework, as well as the underlying reasons for these conclusions. This is a very data-rich study that I think will also have a very significant impact on the materials chemistry community. Romit is part-way through writing up his exciting results.

Romit is an ambitious and talented young scientist. His Berkeley postdoc accomplishments are a combination of very challenging collaborative projects with several different members of the Long group, and two projects of real practical significance that he has initiated himself. Altogether this work is a strong portfolio in computational materials chemistry modeling. Indeed, he has also got other projects on the boil that I have omitted from the list above! Altogether, Romit is an excellent candidate for a junior faculty position, and I give his application my strong support!

Sincerely,

Martin Head-Gordon

Martin Head-Gordon
Kenneth S. Pitzer Distinguished Professor

Gmail

Romit Chakraborty <romit.chakraborty@gmail.com>

# Hard News

**Romit Chakraborty** <romit.chakraborty@gmail.com> 5 January 2025 at 22:12
To: Martin HEAD-GORDON <mhg@cchem.berkeley.edu>

Dear Martin,

I hope you've been well.
I'm writing to share some news about my recent employment at PsiQuantum and to ask for your perspective as I reassess my career path. Although I understand your time is limited, and that you may want your involvement with this issue, I felt like I should reach out to engage your insight on the matter.

I began working at PsiQuantum on October 28th, having relocated from Chicago to Palo Alto. I was granted an O-1A visa by the United States Citizenship and Immigration Services for Extraordinary Ability in the Sciences on October 25th, 2024, specifically for my contributions to the field of quantum chemistry and for me to be able to take on the role of Senior Quantum Solutions Computational Chemist.

Within the first six weeks (leading up to December 9th), I:

- Participated in 20+ video-recorded discussions that covered:
  - Technical, scientific, and conceptual aspects of Comprehensive Quantum Chemistry Methodology (CQCM)
  - Business and operational dimensions of quantum chemistry solutions
- Delivered a talk on November 19th titled *"AI Assistants and All that Jazz"*, video recorded and well received.
- Conducted a paper review on November 22nd (*"Deep Gaussian Processes for Multifidelity Modeling"*), also video recorded.
- Presented a one-hour session on December 2nd (*"Active Space Selection for Atomisation Energy Calculations"*), which received positive feedback from key consultants, including Professors Janus Eriksen and Sohrab Ismael-Baegi. This session was also recorded.
- Submitted a 19-page progress report (plus a 10-page addendum and source code) on December 9th, containing tables, figures, derivations, source code, and source code usage instructions, and electronic structure data—compiled on effectively one working day's notice.

Despite these documented contributions, on December 10th, I was abruptly terminated in a 15-minute unscheduled meeting, with immediate confiscation of my work laptop and revocation of all digital access. The cited reasons were performance and teamwork, yet none of these concerns had ever been raised, documented, or even verbally insinuated prior to this unscheduled meeting. Notably, the December 9th progress report was requested immediately after I asked for transparency in hiring a new team member per company policy.

The termination has been highly stressful, to say the least, not only because I had just relocated and changed careers but also due to the immigration consequences jeopardising my legal status in the U.S. and limiting the time I have to pursue remedies. I'm working purely from memory, as all my digital records were seized, leaving me without documentation to clarify or defend my performance. I accept responsibility for imperfections on my part, and strongly suspect retaliation and worry there may be efforts to tarnish my credibility or even assassinate my character to justify the firing. I'm sharing this with you because of the severity of its impact on my career trajectory, livelihood, immigration status, and physical and mental well-being.

While I understand if you must prioritise your obligations and may wish to remain minimally involved, I would it would be great to have your advice on how best to proceed.
My current strategy is to

i) induce discovery to clear my name in the above
ii)leverage my skill set in quantum chemistry and programming multimodal large language models (quantum chemistry + AI) to
  a) find a new employer, or
  b) start my venture

I am pursuing both i) and ii) in equal measure and am confident that I will secure my livelihood if I keep working hard. I have savings that will last me for a while, but the 60-day grace period to leave the country starts on Jan 10th.

Thank you for taking the time to read this, Martin. I apologise for not reaching out with better news and will respect whatever level of advice you feel comfortable offering.

Regards,
Romit
Romit Chakraborty, MS, PhD, UChicago 2017
Senior Quantum Solutions Computational Chemist
PsiQuantum
Palo Alto, California

Gmail **Romit Chakraborty <romit.chakraborty@gmail.com>**

---

## Hard News

---

**Martin Head-Gordon** <m_headgordon@berkeley.edu> 6 January 2025 at 13:23
To: Romit Chakraborty <romit.chakraborty@gmail.com>

Dear Romit,

First, my personal commiserations about this extremely bad news -- I fully realize what a difficult situation you have found yourself in. To be terminated after only 5 weeks at PsiQuantum indicates a disastrous start, either through team interactions or performance or both. I am very sorry to hear this news.

Second, one piece of strong advice. Drop any effort at "discovery to clear (your) name". It is a waste of time, and distracts you from moving forwards (i.e. finding something new). PsiQuantum's decision will have been reviewed at several levels of management, with a range of inputs. You must assume they made a valid decision.

Third, regarding lessons. This is not the time to sugar-coat things, so I will not.

I suggest you carefully look at your entire post-doctoral trajectory and then take a long look in the mirror. Remember your visa was granted for "contributions to the field of quantum chemistry". But maybe you were/are not that interested in this field. Consider the following evidence (looking at just the bottom line -- not causes or excuses):
i) You made a poor impression on Laura because you were (apparently) distracted by LLMs. You were also not as good a team player as she hoped. I do not know the remaining details, but recall she reached out to me because of her strong dissatisfaction with your performance.
ii) You failed to finish up your work with me, probably because, as you wrote to me just 5 days ago, you "cannot sustain prolonged interest" in those topics. For a 5-year postdoc, your productivity was low, as evidenced by only two first author papers. I had to put considerable personal effort into both of them to bring them to a standard I was happy with. So did [redacted]
iii) You failed to perform adequately at PsiQuantum in a quantum chemistry role, leading to cause-based termination after only 5 weeks or so.

To me this adds up to lots of missed opportunities that cast doubt on how interested in quantum chemistry you are, as well as how suitable you are for a job in academia or industry. In blunt performance-assessment terms, you have underperformed at every step (sometimes very significantly).

Of course I wish you all the best in the future, as evidenced by investing 5 years of support into your career development, as well as supporting you for the position with Laura and innumerable academic positions and most recently PsiQuantum. But, facing the bare facts (above), the pattern that has caused your current problem looks pretty clear to me.

The main questions for you to think about as you move forwards are (in my opinion). (i) What lessons can you learn from the (somewhat depressing) bottom line facts of your 3 postgraduate experiences? (ii) What implications do those lessons have for your next career step?

I hope this is of some use for thinking about your path forwards. I think it is important for you to learn from your past so you do not repeat such mistakes in the future.

Sincerely,

Martin

P.S. Drop the false PsiQuantum affiliation from your emails, etc. It casts doubt on your honesty.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

# EXHIBIT 8

## UNM, Oxford, UCF, and academic-opportunity records

Original source pages follow; original page labels and Bates identifiers are retained.

Gmail

Romit Chakraborty <romit.chakraborty@gmail.com>

# Room for EPSRC application

3 messages

**Romit Chakraborty** <romit.chakraborty@gmail.com> 31 December 2024 at 14:36
To: Katie Winter <katie.winter@chem.ox.ac.uk>

Dear Katie,

I trust that you are well.
It's been a whirlwind year for me, one where I moved from Berkeley back to Chicago and then to Cupertino, where I now reside and work for PsiQuantum. My apologies for catching you unawares with this:
Is there room for turning in the EPSRC funding application with Oxford this year or early next year?

Sincerely,
Romit

Romit Chakraborty**, Ph.D.**
Senior Quantum Solutions Computational Chemist
**PsiQuantum**
Palo Alto, California

**Katie Winter** <katie.winter@chem.ox.ac.uk> 2 January 2025 at 00:54
To: Romit Chakraborty <romit.chakraborty@gmail.com>

Dear Romit,

Great to hear from you and congratulations on your new role at PsiQuantum.

Unfortunately the EPSRC Open fellowship closed permanently on the 12th of December.

As your year of support has now expired you would need to reapply through our expression of interest process in order to submit further applications.

Best wishes,

Katie

[Quoted text hidden]

**Romit Chakraborty** <romit.chakraborty@gmail.com> 2 January 2025 at 01:13
To: Katie Winter <katie.winter@chem.ox.ac.uk>

EX0034

Hi Katie,

Thank you for your response.
I wish you a very happy new year!

Sincerely,
Romit

Romit Chakraborty**, Ph.D.**
Senior Quantum Solutions Computational Chemist
**PsiQuantum**
Palo Alto, California

[Quoted text hidden]

**X5 PI OUTPUT REPORT**

| | |
|---|---|
| **Department:** | DN Physical and Theoretical Chemistry |
| **Funder:** | EC European Commission |
| **Exported by** | |

| | | |
|---|---|---|
| **Project Title** | QuantSim | |
| **X5 Ref No** | 2310DN001/AG5 | |
| **Lead Department** | DN Physical and Theoretical Chemistry | |
| **Costing Type** | Application | 0.00 |
| **Scheme** | 125% DI only recovery, with inflation | |
| **PI** | Dr. Romit Chakraborty | |
| **Start Date** | 12/1/2024 | |
| **Duration (mths)** | 60.00 | |
| **End Date** | 11/30/2029 | |
| **Currency** | EUR | |
| **Rate** | 1.25 | |

| | Name / Funder Budget Heading | Role / Description | Duration | Total Cost | Funded % | Total Grant | RoE Total | Year 1 Cost | Year 2 Cost | Year 3 Cost | Year 4 Cost | Year 5 Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STAFF COSTS** | | | | | | | | | | | | |
| | Dr. Romit Chakraborty | Principal Investigator | 60 | £362,289.94 | 125.00% | £362,289.94 | 452,862.47 | £64,090.21 | £68,051.95 | £72,194.85 | £76,625.05 | £81,327.88 |
| | Pdra 1 | Researcher | 42 | £205,832.91 | 125.00% | £205,832.91 | 257,291.14 | £35,931.61 | £56,787.35 | £60,278.43 | £52,835.52 | £0.00 |
| **Total Staff Costs** | | | | **£568,122.85** | | **£568,122.85** | **710,153.61** | **£100,021.82** | **£124,839.30** | **£132,473.28** | **£129,460.57** | **£81,327.88** |
| **NON-STAFF COSTS** | | | | | | | | | | | | |
| | Equipment | Equipment | | £160,000.00 | 125.00% | £160,000.00 | 174,400.00 | £160,000.00 | £0.00 | £0.00 | £0.00 | £0.00 |
| | Other: Publications | Other: Publications | | £30,000.00 | 125.00% | £30,000.00 | 37,500.00 | £5,999.99 | £6,000.01 | £6,000.00 | £6,000.00 | £6,000.00 |
| | Travel | Travel | | £30,000.00 | 125.00% | £30,000.00 | 37,500.00 | £5,999.99 | £6,000.01 | £6,000.00 | £6,000.00 | £6,000.00 |
| | Travel | Training | | | | | 10,000.00 | | | | | |
| | Other: Consumables | Other: Consumables | | £11,999.97 | 125.00% | £11,999.97 | 14,999.99 | £2,400.00 | £2,400.00 | £2,399.99 | £2,399.99 | £2,399.99 |
| | Other: Other | Audit fees | | £7,999.99 | 125.00% | £7,999.99 | 9,999.99 | £1,600.00 | £1,599.99 | £1,600.00 | £1,600.00 | £1,600.00 |
| | Other: Other | Software Licenses | | | | | 10,166.00 | £8,132.80 | £0.00 | £0.00 | £0.00 | £0.00 |
| | Other: Other | Recruitment | | £1,000.00 | 125.00% | £1,000.00 | 1,249.99 | £1,000.00 | £0.00 | £0.00 | £0.00 | £0.00 |
| | Personnel: Students | Student | | £149,165.94 | 125.00% | £149,165.94 | 186,457.44 | £7,531.46 | £45,818.38 | £50,375.32 | £45,440.78 | £0.00 |
| **Total Non-staff Costs** | | | | **£390,165.90** | | **£390,165.90** | **482,273.41** | **£192,664.24** | **£61,818.39** | **£66,375.31** | **£61,440.77** | **£15,999.99** |
| **Total Estates** | | | | £237,814.97 | 0.00% | £0.00 | 0.00 | £44,225.63 | £54,556.44 | £56,193.12 | £53,032.14 | £29,807.64 |
| **Total Inf Technician Costs** | | | | £5,408.37 | 0.00% | £0.00 | 0.00 | £1,005.78 | £1,240.72 | £1,277.94 | £1,206.05 | £677.88 |
| **Total Indirect Costs** | | | | £672,781.68 | 0.00% | £0.00 | 0.00 | £125,114.89 | £154,340.86 | £158,971.08 | £150,028.64 | £84,326.21 |
| **Total Additional Indirect Costs** | | | | | | £239,572.21 | 299,465.25 | | | | | |
| **Oxford Total** | | | | **£1,874,293.77** | | **£1,197,860.96** | **€1,491,892.27** | **£463,032.36** | **£396,795.71** | **£415,290.73** | **£395,168.17** | **£212,139.60** |
| **External Collaborators Collaborator Total** | | | | **£0.00** | | **£0.00** | **0.00** | | | | | |
| **Project Total** | | | | **£1,874,293.77** | | **£1,197,860.96** | **1,491,892.27** | | | | | |

EX0037

UNIVERSITY OF CENTRAL FLORIDA
College of Sciences

| | |
|---|---|
| Total Startup | |
| Total Allocated | $784,579 |
| Unallocated | -$784,579 |

**BUDGET PLANNING WORKSHEET**
Standard Budget Ledger

| Faculty Name | Hire Date |
|---|---|
| Chakraborty, Romit | 08/08/xx |

| Budget Category | Sub-Budget Category | Description | FY2024-25 (12 months Jul-Jun 2025) | FY2025-26 (12 months Jul-Jun 2026) | FY2026-27 (12 months Jul-Jun 2027) | July 1 - 8/6/26 only for summer | TOTAL |
|---|---|---|---|---|---|---|---|
| Faculty-Staff Salary-Benefits | Staff Salary | | | | | | $ - |
| | Faculty Salary | Summer 2025 | $ 16,000.00 | $ 8,000.00 | $ - | $ - | $ 24,000.00 |
| | Faculty Salary | Summer 2026 | | | | $ - | |
| | Faculty Salary | | | | | | |
| | Benefits | | $ 5,120.00 | $ 5,120.00 | $ 5,120.00 | $ - | $ 15,360.00 |
| OPS Salary & Benefits | Hourly - Student | | | | | | $ - |
| | Graduate Contracts | | $ - | $ 84,264.00 | $ 84,264.00 | $ 10,000.00 | $ 178,528.00 |
| | Benefits | | $ - | $ 17,045.28 | $ 17,045.28 | $ 200.00 | $ 34,290.56 |
| | Post Doc | | $ 76,800.00 | $ 76,800.00 | $ 76,800.00 | | $ 230,400.00 |
| | Adjunct Faculty | | | | | | $ - |
| Scholarships & Fellowships | Scholarships & Fellowships | | | | | | $ - |
| Travel | Travel | | $ 6,000.00 | $ 6,000.00 | $ 4,000.00 | | $ 16,000.00 |
| | Moving | | $ 5,000.00 | | | | $ 5,000.00 |
| | | | | | | | $ - |
| Capital Assets & Construction | Other Assets | | | | | | $ - |
| | Furniture | | $ 2,000.00 | $ - | $ - | | $ 10,000.00 |
| | Equipment | | | | | | $ - |
| | Construction | | | | | | $ - |
| | Computer Equipment | | $ 111,000.00 | $ - | $ 75,000.00 | | $ 186,000.00 |
| Furniture & Equipment | Rental | | | | | | $ - |
| | Furniture | | | | | | $ - |
| | Equipment | | | | | | $ - |
| IT Expenses | Software Purchase | | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | | $ 15,000.00 |
| | Software Maintenance | | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | | $ 6,000.00 |
| | Other IT Expenses | | $ 14,000.00 | $ 14,000.00 | $ 14,000.00 | | $ 42,000.00 |
| | IT Services & Supplies | | | | | | $ - |
| | Hardware Maintenance | | | | | | $ - |
| | Computer Equipment | | | | | | $ - |
| Repairs & Maintenance | Repairs & Maintenance | | | | | | $ - |
| Other Non-Operating Expenses | Transfers to University Depts | | | | | | $ - |
| | Transfers to Other Entity | | | | | | $ - |
| | Other Non-Operating Expenses | | | | | | $ - |
| Other Operating Expenses | Supplies | | $ 6,000.00 | $ 2,000.00 | $ 2,000.00 | | $ 14,000.00 |
| | Resale Services & Supplies | | | | | | $ - |
| | Rent | | | | | | $ - |
| | Other Operating Expenses | | | | | | $ - |
| | Office Expense | | | | | | $ - |
| | Insurance | | | | | | $ - |
| | Dues & Subscriptions | | | | | | $ - |
| Professional Services | Professional Services | | | | | | $ - |
| | Marketing & Advertising | | $ 4,000.00 | $ 2,000.00 | $ 2,000.00 | | $ 8,000.00 |
| | Consulting Services | | | | | | $ - |
| Utilities & Communication | Utilities | | | | | | $ - |
| | Telecom | | | | | | $ - |
| **TOTAL** | | | **$ 252,920.00** | **$ 222,229.28** | **$ 287,229.28** | **$ 10,200.00** | **$ 784,578.56** |

**Provide a short summary how this supports your research plan**

**Overview:** I aim to establish a molecular electronic structure theory research group at the University of Central Florida, comprising 2-3 graduate students and two postdocs. Most calculations will utilise ARCC facilities at the University of Central Florida, accessible through personal computers. Ideally, I would like as much of the funds to be unrestricted wherever possible. Below is an estimate of startup costs for my proposed research group:

**High-Performance Computing (HPC)**

I want to purchase supercomputing nodes on the ARCC facilities, specifically the Stokes facility for CPU and Newton for GPU nodes. By utilising existing resources at UCF, the proposed budget is approximately 2x more cost-efficient for DPH (dedicated processor hours) than building a cluster independently. A 70/30 split in expenditure between GPU and CPU nodes is proposed to reflect current trends in the building compute infrastructure and the existing computational processing demands for electronic structure code. This split also reflects the electronic structure research the group will specialise in, which involves processing GPU-optimized electronic structure codes for systems with open and periodic boundary conditions, multiscale models with the lattice Boltzmann methods, and conventional electronic structure codes.

Faculty

Chair/Director Approval

Dean Approval



EX0036

Gmail

Romit Chakraborty <romit.chakraborty@gmail.com>

**APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico**

**Samuel Mascarenas** <samascarenas@unm.edu> 20 December 2024 at 11:25
To: Vice President for Research <vpr@unm.edu>
Cc: Greg Trejo <gtrejo@unm.edu>

Good Afternoon, Applicant!

Thank you for applying to The University of New Mexico's Open Rank in Quantum Information Science & Engineering, req27555. You applied for this position last year, but your application is still in the pool and so it will be evaluated by the search committee. Before the evaluation process begins, we wanted to make sure that you were still interested in the position. Please notify us by end of day January 5th 2025 to let us know if you are still interested. If we do not hear from you by January 5th, we will remove you from the pool. Also, if you are interested in updating any of your application materials, please send me your updated information by end of business day on January 5th. (If you have already reached out to me with your updated documents, and I have responded back to you confirming receipt then you will be evaluated by the search committee with your new materials, and you can disregard this email.)

You can refer to the job posting here. Requisition: 27555 - Open Rank in Quantum Information Science & Engineering - UNM Jobs Career Site :: The University of New Mexico

Thank you, and I hope you have a happy holiday season!

-Sam
**Sam Mascarenas, MBA (he/him/his)**
Department Human Resources Rep
Office of the Vice President for Research
The University of New Mexico
Scholes Hall, Suite 327
MSC05 3480
1 University of New Mexico
Albuquerque, NM 87131
Office: 505-277-2949
samascarenas@unm.edu | research.unm.edu

OFFICE OF THE
VICE PRESIDENT
FOR RESEARCH

Gmail

Romit Chakraborty <romit.chakraborty@gmail.com>

# APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico

**Romit Chakraborty** <romit.chakraborty@gmail.com> 31 December 2024 at 14:33
To: Laura Gagliardi <lgagliardi@uchicago.edu>

Hi Laura,

I trust you are well.
I would like to update materials for this application I had made whilst at Berkeley. Would you kindly consent to your support?

Sincerely,
Romit

Romit Chakraborty**, Ph.D.**
Senior Quantum Solutions Computational Chemist
**PsiQuantum**
Palo Alto, California

---------- Forwarded message ---------
From: **Samuel Mascarenas** <samascarenas@unm.edu>
Date: Fri, 20 Dec 2024 at 11:25
Subject: APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico
To: Vice President for Research <vpr@unm.edu>
Cc: Greg Trejo <gtrejo@unm.edu>

[Quoted text hidden]

EX0040

Gmail

Romit Chakraborty <romit.chakraborty@gmail.com>

# APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico

**Laura Gagliardi** <lgagliardi@uchicago.edu> 1 January 2025 at 03:51
To: Romit Chakraborty <romit.chakraborty@gmail.com>

Dear Romit,

I am sorry but I will not be able to write a letter of support.

Thank you for your understanding.

Laura

------------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
--------------------------------------------------------------------------

[Quoted text hidden]

Gmail

Romit Chakraborty <romit.chakraborty@gmail.com>

# APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico

**Romit Chakraborty** <romit.chakraborty@gmail.com> 1 January 2025 at 05:03
To: Laura Gagliardi <lgagliardi@uchicago.edu>

Hi Laura,

Thank you for your response.

Romit

Romit Chakraborty**, Ph.D.**
Senior Quantum Solutions Computational Chemist
**PsiQuantum**
Palo Alto, California

[Quoted text hidden]

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 9

## Website and title emails, Bates 000001–000007

Original source pages follow; original page labels and Bates identifiers are retained.

**Bobbi Wilson**

| | |
|---|---|
| **From:** | Caroline K. Vickrey <vickreyc@jbltd.com> |
| **Sent:** | Tuesday, June 9, 2026 11:00 AM |
| **To:** | Georgia A. Arvanitis |
| **Subject:** | FW: Romit departure |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, May 25, 2026 3:18 AM
**To:** Caroline K. Vickrey <vickreyc@jbltd.com>
**Subject:** FW: Romit departure

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-------------------------------------------------------------------------

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Date:** Sunday, May 24, 2026 at 5:51 AM
**To:** Monica Lugo <lugom@uchicago.edu>
**Subject:** FW: Romit departure

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-------------------------------------------------------------------------

**From:** Romit Chakraborty <romit@uchicago.edu>
**Date:** Wednesday, November 6, 2024 at 12:50 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>; Monica Lugo <lugom@uchicago.edu>
**Subject:** Re: Romit departure

Hi Mónica, Laura,

Thank you for everything in Chicago!
I hope I wasn't too big of a chore to be around

Best,
Romit

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, November 4, 2024 12:26 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Re: Romit departure

Great thank you!

------------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
--------------------------------------------------------------------------

---

**From:** Monica Lugo <lugom@uchicago.edu>
**Date:** Monday, November 4, 2024 at 12:24 PM
**To:** Romit Chakraborty <romit@uchicago.edu>, Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

I added the news.  Let me know if you'd like any changes.

All best,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

---

**From:** Monica Lugo <lugom@uchicago.edu>
**Sent:** Monday, November 4, 2024 9:59 AM
**To:** Romit Chakraborty <romit@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

Dear Romit,

You are now added to the Previous Members page. I am working on the news post. Could you please send me your title? If you still have the job description, that would be very helpful.

Thank you,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

---

**From:** Romit Chakraborty <romit@uchicago.edu>
**Sent:** Sunday, November 3, 2024 2:40 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

P.S. We're working on a professional web presence; this is best rn
https://www.psiquantum.com/research

Research — PsiQuantum

Explore PsiQuantum's innovative research in quantum error correction, algorithms, and architecture for quantum computing.

www.psiquantum.com

Have a good weekend!

---

**From:** Romit Chakraborty <romit@uchicago.edu>
**Sent:** Sunday, November 3, 2024 2:32 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

Hi Laura, Monica,

Yes!
rchakraborty@psiquantum.com
Quantum Solutions @ PsiQuantum.

Sincerely,
Romit

---

**From:** Monica Lugo <lugom@uchicago.edu>
**Sent:** Saturday, November 2, 2024 6:35 PM

**To:** Laura Gagliardi <lgagliardi@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Re: Romit departure

Hi Laura,

Most certainly.  Romit, could you send me information about your new job?  I will add your LinkedIn page to the past members.

Thank you,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Saturday, November 2, 2024 1:14:58 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Romit departure

Hi Monica
Could you update the website and move Romit from current to past members?
He now works at PsiQuantum

Romit: when you have a new email address and professional page, please let us know.

Monica: could you please also add to the group news about Romit starting his new job.

Thank you
Laura

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering,
James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-----------------------------------------------------------------------

**Bobbi Wilson**

| | |
|---|---|
| **From:** | Caroline K. Vickrey <vickreyc@jbltd.com> |
| **Sent:** | Tuesday, June 9, 2026 11:03 AM |
| **To:** | Georgia A. Arvanitis |
| **Subject:** | FW: Need website update |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Friday, April 10, 2026 2:00 PM
**To:** Caroline K. Vickrey <vickreyc@jbltd.com>
**Subject:** FW: Need website update


-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-------------------------------------------------------------------------


**From:** Sharon Bryant <sbryant1@uchicago.edu>
**Date:** Monday, January 6, 2025 at 9:24 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>, Ben Anderson <baanderson@uchicago.edu>, La Toya Cobbins <lcobbins@uchicago.edu>, Monica Lugo <lugom@uchicago.edu>
**Subject:** RE: Need website update

Hi Laura, thanks for your quick response. While I'm not aware of the history, the request came from Romit via the Provost's Office and it is reasonable to have the website accurately reflect his employment and title, so I would suggest amending the website rather than removing him completely (which might cause other issues as we know Romit is paying close attention to this).

I have a copy of his offer letter where it outlines: "Job Title: Quantum-AI Researcher" and that's where the title comes from.

I'd be happy to have a quick call to hear more about the concerns, if useful.

Thanks,
Sharon

**Sharon Bryant | The University of Chicago**
Director of Academic Affairs and Chief of Staff
Division of the Physical Sciences
5640 S. Ellis Avenue, room 399C
Chicago, IL 60637
sbryant1@uchicago.edu | 773.795.3665

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, January 6, 2025 9:02 AM
**To:** Sharon Bryant <sbryant1@uchicago.edu>; Ben Anderson <baanderson@uchicago.edu>; La Toya Cobbins <lcobbins@uchicago.edu>; Monica Lugo <lugom@uchicago.edu>
**Subject:** Re: Need website update

Sharon
I am not sure where the title "Quantum-AI Researcher" came from.
Romit has been a very difficult group member and he is pushing on this.
I will remove him from the website. Please let me know if this is acceptable.
Laura

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-------------------------------------------------------------------------

---

**From:** Sharon Bryant <sbryant1@uchicago.edu>
**Date:** Monday, January 6, 2025 at 8:35 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>, Ben Anderson <baanderson@uchicago.edu>, La Toya Cobbins <lcobbins@uchicago.edu>
**Subject:** Need website update
Good morning Laura, Ben, and La Toya,

Happy new year! I am writing to request that this website (https://gagliardigroup.uchicago.edu/previous-members/) be updated to accurately reflect Romit Chakraborty's position as a staff member with title Quantum-AI Researcher. I'm not sure who is responsible for website updates, so I'm writing you all.

Please confirm when the change has been made.

Thank you,
Sharon

**Sharon Bryant | The University of Chicago**
Director of Academic Affairs and Chief of Staff
Division of the Physical Sciences
5640 S. Ellis Avenue, room 399C

Chicago, IL 60637
sbryant1@uchicago.edu | 773.795.3665

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 10

## AdsGency AI Head of Research contract

Original source pages follow; original page labels and Bates identifiers are retained.

# *EMPLOYMENT CONTRACT*

This Employment Contract (this "Contract") is made effective as of May 22, 2023, by and between AdsGency AI of 37559 Cape Cod Road, Newark, California, 94560 and Romit Chakraborty of 2134 McGee Ave, Apt G, Berkeley, California, 94703.

A. AdsGency AI is engaged in the business of software services. Romit Chakraborty will primarily perform the job duties at the following location: 2134 McGee Ave, Apt G, Berkeley, California.

B. AdsGency AI desires to have the services of Romit Chakraborty.

C. Romit Chakraborty is an at will employee of AdsGency AI. Either party is able to terminate the employment agreement at any time.

Therefore, the parties agree as follows:

**1. EMPLOYMENT.** AdsGency AI shall employ Romit Chakraborty as a(n) Head of Research. Romit Chakraborty accepts and agrees to such employment, and agrees to be subject to the general supervision, advice and direction of AdsGency AI and AdsGency AI's supervisory personnel. Romit Chakraborty shall provide to AdsGency AI the following services:

Grow, mentor, and lead the AdsGency's AI, data science, and data engineering team.
Ensuring that team members are clear about expected standards of performance,
motivated and developed to provide effective and efficient services.
? Building on the AdsGency's AI roadmap, lead the development of the AdsGency AI and data
science vision, strategy and capability plan.
? Develop the AdsGency's data platform, and integrate the latest data models and data
pipelines, establishing a model management approach that is best in class for
responsible data use.
? Provide expertise in statistics and probability, and the evaluation of data use,
algorithms, and models by external organizations. Developing an approach to
critical data science forensics to support AdsGency's ability to regulate the use of
AI.
? Represent the AdsGency in situations where expertise in AI and data science is required
e.g. meeting representative bodies and information rights interest groups, giving
evidence to Parliamentary committees, speaking at conferences and taking part in
media activity.

Romit Chakraborty shall also perform (i) such other duties as are customarily performed by an employee in a similar position, and (ii) such other and unrelated services and duties as may be assigned to Romit Chakraborty from time to time by AdsGency AI.

**2. BEST EFFORTS OF EMPLOYEE.** Romit Chakraborty agrees to perform faithfully, industriously, and to the best of Romit Chakraborty's ability, experience, and talents, all of the duties that may be required by the express and implicit terms of this Contract, to the reasonable satisfaction of AdsGency AI. Such duties shall be provided at such place(s) as the needs, business, or opportunities of AdsGency AI may require from time to time.

**3. COMPENSATION OF EMPLOYEE.** As compensation for the services provided by Romit Chakraborty under this Contract, AdsGency AI will pay Romit Chakraborty an annual salary of $72,000.00 payable semi-

monthly on the fifteenth day and the last day of the month and subject to applicable federal, state, and local withholding. Upon termination of this Contract, payments under this paragraph shall cease; provided, however, that Romit Chakraborty shall be entitled to payments for periods or partial periods that occurred prior to the date of termination and for which Romit Chakraborty has not yet been paid, and for any commission earned in accordance with AdsGency AI's customary procedures, if applicable. Accrued vacation will be paid in accordance with state law and AdsGency AI's customary procedures. This section of the Contract is included only for accounting and payroll purposes and should not be construed as establishing a minimum or definite term of employment.

**4. COMMISSION PAYMENTS.** In addition to the payments under the preceding paragraph, AdsGency AI will make commission payments to Romit Chakraborty based on 5% of company revenue performances pool. This commission will be paid monthly on the last day of the following month.

*Accounting*. AdsGency AI shall maintain records in sufficient detail for purposes of determining the amount of the commission. AdsGency AI shall provide to Romit Chakraborty a written accounting that sets forth the manner in which the commission payment was calculated.

*Right to Inspect*. Romit Chakraborty, or Romit Chakraborty's agent, shall have the right to inspect AdsGency AI's records for the limited purpose of verifying the calculation of the commission payments, subject to such restrictions as AdsGency AI may reasonably impose to protect the confidentiality of the records. Such inspections shall be made during reasonable business hours as may be set by AdsGency AI.

*Death of the Employee*. If Romit Chakraborty dies during the term of this Contract, Romit Chakraborty shall be entitled to payments or partial commission payments for the period ending with the date of Romit Chakraborty's death.

**5. EXPENSE REIMBURSEMENT.** AdsGency AI will reimburse Romit Chakraborty for "out-of-pocket" expenses incurred by Romit Chakraborty in accordance with AdsGency AI's policies in effect from time to time.

**6. RECOMMENDATIONS FOR IMPROVING OPERATIONS.** Romit Chakraborty shall provide AdsGency AI with all information, suggestions, and recommendations regarding AdsGency AI's business, of which Romit Chakraborty has knowledge, that will be of benefit to AdsGency AI.

**7. CONFIDENTIALITY.** Romit Chakraborty recognizes that AdsGency AI has and will have information regarding the following:

- inventions
- products
- product design
- processes
- technical matters
- trade secrets
- copyrights
- customer lists
- prices
- costs
- discounts
- business affairs
- future plans
- Employment, financial data, investors relationship information and all related to AdsGency AI information

and other vital information items (collectively, "Information") which are valuable, special and unique assets of AdsGency AI. Romit Chakraborty agrees that Romit Chakraborty will not at any time or in any manner, either directly or indirectly, divulge, disclose, or communicate any Information to any third party without the prior written consent of AdsGency AI. Romit Chakraborty will protect the Information and treat it as strictly confidential. A violation by Romit Chakraborty of this paragraph shall be a material violation of this Contract and will justify legal and/or equitable relief.

This Agreement is in compliance with the Defend Trade Secrets Act and provides civil or criminal immunity to any individual for the disclosure of trade secrets: (i) made in confidence to a federal, state, or local government official, or to an attorney when the disclosure is to report suspected violations of the law; or (ii) in a complaint or other document filed in a lawsuit if made under seal.

**8. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Romit Chakraborty has disclosed (or has threatened to disclose) Information in violation of this Contract, AdsGency AI shall be entitled to an injunction to restrain Romit Chakraborty from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. AdsGency AI shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

**9. CONFIDENTIALITY AFTER TERMINATION OF EMPLOYMENT.** The confidentiality provisions of this Contract shall remain in full force and effect for a period of 2 years after the voluntary or involuntary termination of Romit Chakraborty's employment. During such period, neither party shall make or permit the making of any public announcement or statement of any kind that Romit Chakraborty was formerly employed by or connected with AdsGency AI.

**10. EMPLOYEE'S INABILITY TO CONTRACT FOR EMPLOYER.** Romit Chakraborty shall not have the right to make any contracts or commitments for or on behalf of AdsGency AI without first obtaining the express written consent of AdsGency AI.

**11. BENEFITS.** Romit Chakraborty shall be entitled to employment benefits, as provided by AdsGency AI's policies in effect during the term of employment. These benefits include:

- Vacation
- Personal Leave
- Health Insurance

**12. TERM/TERMINATION.** Romit Chakraborty's employment under this Contract shall be for an unspecified term on an "at will" basis. This Contract may be terminated by AdsGency AI upon 15 days written notice, and by Romit Chakraborty upon 15 days written notice. If Romit Chakraborty is in violation of this Contract, AdsGency AI may terminate employment without notice and with compensation to Romit Chakraborty only to the date of such termination. The compensation paid under this Contract shall be Romit Chakraborty's exclusive remedy.

**13. TERMINATION FOR DISABILITY.** AdsGency AI shall have the option to terminate this Contract, if Romit Chakraborty becomes permanently disabled and is no longer able to perform the essential functions of the position with reasonable accommodation. AdsGency AI shall exercise this option by giving 30 days written notice to Romit Chakraborty.

**14. COMPLIANCE WITH EMPLOYER'S RULES.** Romit Chakraborty agrees to comply with all of the rules and regulations of AdsGency AI.

**15. RETURN OF PROPERTY.** Upon termination of this Contract, Romit Chakraborty shall deliver to AdsGency AI all property which is AdsGency AI's property or related to AdsGency AI's business (including keys, records, notes, data, memoranda, models, and equipment) that is in Romit Chakraborty's possession or

under Romit Chakraborty's control. Such obligation shall be governed by any separate confidentiality or proprietary rights agreement signed by Romit Chakraborty.

**16. NOTICES.** All notices required or permitted under this Contract shall be in writing and shall be deemed delivered when delivered in person or on the third day after being deposited in the United States mail, postage paid, addressed as follows:

Employer:

AdsGency AI
Xinran Liu
CEO
37559 Cape Cod Road
Newark, California 94560

Employee:

Romit Chakraborty
2134 McGee Ave, Apt G
Berkeley, California 94703

Such addresses may be changed from time to time by either party by providing written notice in the manner set forth above.

**17. ENTIRE AGREEMENT.** This Contract contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Contract supersedes any prior written or oral agreements between the parties.

**18. AMENDMENT.** This Contract may be modified or amended, if the amendment is made in writing and is signed by both parties.

**19. SEVERABILITY.** If any provisions of this Contract shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**20. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Contract shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Contract.

**21. APPLICABLE LAW.** This Contract shall be governed by the laws of the State of California.

**22. SIGNATORIES.** This Contract shall be signed by Xinran Liu, CEO on behalf of AdsGency AI and by Romit Chakraborty in an individual capacity. This Contract is effective as of the date first above written.

By: ______________________ Date: 05/22/2023

Xinran Liu, CEO
AdsGency AI

By: Romit Chakraborty (signature) Date: 05/26/2023

Romit Chakraborty

* Please note that my ability to execute this offer is contingent on obtaining the appropriate work authorization - RC

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 11

## PsiQuantum employment offer and benefits

Original source pages follow; original page labels and Bates identifiers are retained.

PsiQuantum
700 Hansen Way
Palo Alto, CA 94304

July 25, 2024

Romit Chakraborty
romit@uchicago.edu

Dear Romit,

PsiQuantum, Corp., (the "Company") is pleased to offer you employment on the following terms:

**1. Position**. Your title will be **Senior Quantum Solutions Computational Chemist** and you will report to **Arvin Kakekhani.** This is a full-time position working out of **Palo Alto, CA**. While you render services to the Company, you will not engage in any other employment, consulting, or other business activity (whether fulltime or part-time) that would create a conflict of interest with the Company. By signing this letter agreement, you confirm to the Company that you have no contractual commitments or other legal obligations that would prohibit you from performing your duties for the Company.

**2. Cash Compensation**. The Company will pay you a starting salary at the rate of **$188,000.00** per year, payable in accordance with the Company's standard payroll schedule and subject to applicable deductions and withholdings. This salary will be subject to periodic review and adjustments at the Company's discretion.

**3. Variable Bonus.** You are eligible for a variable bonus of **8%**. The bonus you receive will be determined based on milestones set by your manager. Once milestones are completed, bonuses will be payable during the next merit cycle. To be eligible for the current year's variable bonus, you must onboard by July 31st of that year. If hired after July 31st, the variable bonus will be payable the following year.

**4. Relocation Assistance Budget.** In addition, we offer a relocation assistance budget of up to **$10,000.00.** Once you relocate to the Bay Area, you will be reimbursed for qualifying expenses once you submit receipts to our expense portal. The Relocation Assistance Budget is conditioned upon your continued employment with the Company for one year. Any remaining budget unused after one year of relocation will be forfeited. If you leave the Company prior to your one-year anniversary, you will be required to repay the expenses reimbursed to you, in full, within thirty (30) days of your departure from the Company.

**5. Employee Benefits**. As a regular employee of the Company, you will be eligible to participate in a number of Company-sponsored benefits. In addition, you will be entitled to paid vacation in accordance with the Company's vacation policy, as in effect from time to time.

**6. Stock Options.** Subject to the approval of the Company's Board of Directors or its Compensation Committee, you will be granted an option to purchase **20,000** shares of the Company's Common Stock (the "Option"). The exercise price per share of the Option will be determined by the Board of Directors when the Option is granted. The Option will be subject to the terms and conditions applicable to options

DS
RC
HR Initial___________

granted under the stock option plan in effect at the time of the grant and the applicable stock option agreement. You will vest in 25% of the Option shares after 12 months of continuous service, and the balance will vest in equal monthly installments over the next 36 months of continuous service, as described in the applicable stock option agreement.

**7. Proprietary Information and Inventions Agreement**. Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's standard Proprietary Information and Inventions Agreement, a copy of which is attached hereto as **Exhibit A**.

**8. Employment Relationship**. Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations that may have been made to you are superseded by this letter agreement. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation, and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company (other than you).

**9. Background Investigations and Reference Checks**. The Company reserves the right to conduct background investigations and/or reference checks on all its potential employees. This employment offer is therefore contingent upon a clearance of such a background investigation and/or reference check, if any.

**10. Export Control**. This offer is contingent upon receipt of any export license or other approval that may be required under United States export control laws and regulations. We are not obligated to apply for any export license or other approval that may be required, nor can we guarantee that the United States Government will issue an export license or other approval, in the event that we do file an application. If for any reason PsiQ does not receive any required license from the U.S. government within an established time frame provided by the company, PsiQ may terminate your employment.

**11. Tax Matters.**

- **a. Withholding**. All forms of compensation referred to in this letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.
- **b. Tax Advice**. You are encouraged to obtain your own tax advice regarding your compensation from the Company. You agree that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities, and you will not make any claim against the Company, or its Board of Directors related to tax liabilities arising from your compensation.

**12. Interpretation, Amendment and Enforcement**. This letter agreement and Exhibit A constitute the complete agreement between you and the Company, contain all the terms of your employment with the Company and supersede any prior agreements, representations, or understandings (whether written, oral or implied) between you and the Company. This letter agreement may not be amended or modified, except by an express written agreement signed by both you and a duly authorized officer of the Company. The terms of this letter agreement and the resolution of any disputes as to the meaning, effect, performance, or validity of this letter agreement or arising out of, related to, or in any way connected with, this letter agreement, your employment with the Company or any other relationship between you and the Company (the "Disputes") will be governed by California law, excluding laws relating to conflicts

DS

HR Initial

or choice of law. You and the Company submit to the exclusive personal jurisdiction of the federal and state courts located in San Mateo County, California, in connection with any Dispute or any claim related to any Dispute.

We hope that you will accept our offer to join the Company. You may indicate your agreement with these terms and accept this offer by signing and dating both the enclosed duplicate original of this letter agreement and the enclosed Proprietary Information and Inventions Agreement and returning them to me. This offer, if not accepted, will expire at the close of business on **July 30, 2024**. As required by law, your employment with the Company is contingent upon your providing legal proof of your identity and authorization to work in the United States. Your employment is also contingent upon your anticipated start date of **October 28, 2024** with the Company.

Very truly yours,

Kris Werner

Kris Werner, Head of Human Resources
PsiQuantum, Corp.

I have read and accept this employment offer:

Signed by:
Romit Chakraborty
5C94DB45701746A...

07/25/2024 | 4:29 PM PDT

**Romit Chakraborty**

**Attachment**
Exhibit A: Proprietary Information and Inventions Agreement

DS
RC
HR Initial__________

# 2024 Benefits at a Glance

PsiQ

PsiQuantum offers a competitive salary, 401(k) plan, and meaningful benefits to inspire you to have fun and live well. This flyer gives you a highlight of your available benefit plan options. PsiQuantum sponsors the majority of the premium cost of the medical, dental, and vision plans. The applicable per-pay-period contribution premium is listed for each plan.

## Plan Contributions

The cost for medical, dental, and vision benefits is shared by you and PsiQuantum. Your benefit contributions will be taken on a pre-tax salary reduction basis over 26 pay periods. (Should you choose to waive your medical benefit (due to having coverage elsewhere) you will receive a monthly waiver stipend of $100 (additional taxable income).

There is no cost to you for life and disability benefits; premiums are fully sponsored by PsiQuantum. Additional costs apply for voluntary products as outlined in this document and in ADP.

| CONTRIBUTIONS | | | | |
|---|---|---|---|---|
| | **Employee Only** | **Employee + Spouse** | **Employee + Child(ren)** | **Employee + Family** |
| Anthem HDHP* | $0.00 | $74.06 | $49.38 | $129.61 |
| Anthem PPO | $53.45 | $149.67 | $117.60 | $221.83 |
| Kaiser HDHP* | $0.00 | $53.33 | $44.44 | $88.88 |
| Kaiser HMO | $36.61 | $102.52 | $91.54 | $146.46 |
| MetLife Dental | $2.28 | $5.57 | $7.76 | $12.03 |
| MetLife Vision | $0.67 | $1.18 | $1.21 | $2.35 |
| Life & Disability | No cost, paid by PsiQuantum | | | |
| Voluntary Accident | $3.62 | $6.30 | $7.42 | $9.30 |
| Voluntary Critical Illness | Age banded rates | | | |
| Voluntary Hospital | $8.01 | $21.32 | $13.89 | $27.20 |
| Voluntary Life | Age banded rates | | | |
| Voluntary Pre-Paid Legal | $8.65 | | | |
| Care.com | No cost, paid by PsiQuantum | | | |
| Modern Health | No cost, paid by PsiQuantum | | | |
| Pre-Tax Benefits | Self-directed up to IRS maximum | | | |
| 401k | Self-directed up to IRS maximum | | | |

*If you choose to enroll in the HDHP, you will automatically be enrolled in a health savings account (HSA). If you are not eligible to open and contribute to an HSA, you must notify PsiQuantum in writing within 30 days of your eligibility date. See the HSA section for more details.

# 2024 Benefits at a Glance

PsiQ

## Pre-Tax Accounts

- **Flexible Spending Arrangements:** Set aside pre-tax payroll dollars* to use for qualified healthcare expenses or for qualified childcare expenses for your children age 12 and younger.
- **Commuter Plans:** Load funds onto a Commuter Debit Card using pre-tax payroll reductions*. Commuter funds can then be used for qualified transit or parking expenses.
- **Health Savings Account (HSA):** If you enroll in the HDHP, PsiQuantum will contribute to your HSA account each month ($157.50 for Employee Only; $315.00 for Employee + Dependents). Maximize savings and contribute to your tax-preferred HSA using pre-tax payroll deductions*.

  **IRS annual contribution limits apply. Subject to IRS regulations. See plan documents for details and limitations.*

## Protection for Peace of Mind

- PsiQuantum provides all benefit-eligible employees with company paid life insurance and disability insurance. In addition to these plans, you may purchase additional coverage at reasonable rates.
- **Life and AD&D Insurance:** Employer paid coverage equal to 2x your earnings to a maximum of $500,000.
- **Optional Life:** Purchase additional life and AD&D coverage for yourself in $10,000 increments to a maximum of $150,000. You can also purchase coverage for your spouse in $5,000 increments to a maximum of $75,000, and/or coverage for child(ren) in flat amount of $1,000, $2,000, $4,000, $5,000, or $10,000. Rates are based on age; see plan details for additional information. Guaranteed issue amounts may apply.
- **Short-Term Disability:** If you are sick or injured and unable to work, after 7 days this plan pays a weekly benefit equal to 66.67% of your covered pre-disability earnings, to a maximum weekly benefit of $3,500, combined with other sources.
- **Long-Term Disability:** If you continue to be unable to work due to illness or injury after 90 days, this plan pays a monthly benefit equal to 66.67% of your covered pre-disability earnings, to a maximum monthly benefit of $15,000, combined with other sources. This benefit is payable to Social Security normal retirement age.

## Employee Discounts and Other Benefits

- **Fitness and Wellness Reimbursement:** PsiQuantum provides a Fitness & Wellness reimbursement of $200 quarterly with Forma.
- **Employee Assistance Program (EAP):** Employees physical and financial health is a priority. We offer many different channels of support for those managing through stressful financial situations.
- **Nationwide Pet Insurance:** Save 5% on pet insurance and receive additional perks for your pet.
- **Working Advantage**: Employees and dependents can take advantage of a discount program to save up to 60% on ticketed events and online shopping.
- **Business Travel Accident**: Full-time employees and their dependents are eligible to participate in PsiQuantum's Business Travel Accident Plan through Zurich. You are covered 24/7 for accidents that may occur while on a business trip. Your benefits include AD&D and Travel Assist, which is available when traveling 100+ miles from your place of residency.

## Retirement • Empower 401(k) Plan

Employees may participate in PsiQuantum's qualified 401(k) retirement savings plan and may make traditional tax-deferred and/or Roth after-tax contributions into a variety of investment options. PsiQuantum will contribute $0.50 per dollar up to $5,000. Employees may participate in PsiQuantums qualified 401(k) retirement savings plan and may make traditional tax-deferred and/or Roth after-tax contributions into a variety of investment options.

## Paid Time Off

- PTO: Eligible non-exempt (hourly) employees will accrue 3.33 hours per pay period for vacation.
- DTO: Eligible exempt (salaried) employees received unlimited time off (subject to supervisor approval)
- Sick leave: Eligible exempt and non-exempt employees receive 80 of sick time up front.
- PsiQuantum offers 10 paid holidays each year, and a paid shutdown is observed at the end of the year.
- We offer competitive parental leave with a dedicated Leave of Absence Consultant.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

# EXHIBIT 12

## Responses to requests for admission

Original source pages follow; original page labels and Bates identifiers are retained.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ROMIT CHAKRABORTY, | ) | |
| | ) | Case No. 26-cv-00106 |
| Plaintiff, | ) | |
| | ) | Judge: Hon. Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge: Hon. Albert Berry, III |
| LAURA GAGLIARDI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST, SECOND, THIRD AND FOURTH SETS OF REQUESTS FOR ADMISSION**

NOW COMES Defendant, LAURA GAGLIARDI, by and through her attorneys, JOHNSON & BELL, LTD., and for her Response to Plaintiff's First, Second, Third and Fourth Requests for Admission Pursuant to Rule 36 of the Federal Rules of Civil Procedure, states as follows:

REQUEST FOR ADMISSION NO. 1: Admit that Defendant possessed actual knowledge that Plaintiff's cap-exempt H-1B visa status was subject to a strict 60-day statutory grace period following the termination of his employment at the University of Chicago.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 2: Admit that Defendant possessed actual knowledge that Plaintiff's subsequent O-1A visa status was subject to a strict 60-day statutory grace period following the termination of his employment at PsiQuantum Corp.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 3: Admit that Defendant, or an individual acting under Defendant's direct instruction or authority, authorized the revocation of Plaintiff's institutional IT, server, and data access prior to the previously agreed upon date Dec 24, 2024.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 4: Admit that the text messages transmitted between Plaintiff and Bhavnesh Jangid, attached as Exhibit 6 to Plaintiff's First Amended Complaint, are authentic representations of communications that occurred within Defendant's research group.

**<u>RESPONSE</u>: Deny.**

REQUEST FOR ADMISSION NO. 5: Admit that before January 6, 2025, Defendant communicated with Professor Martin Head-Gordon concerning Plaintiff.

**<u>RESPONSE</u>: Admit.**

REQUEST FOR ADMISSION NO. 6: Admit that one or more communications between Defendant and Professor Martin Head-Gordon concerned Plaintiff's performance in Defendant's research group.

**<u>RESPONSE</u>: Admit.**

REQUEST FOR ADMISSION NO. 7: Admit that Defendant communicated to Professor Martin Head-Gordon that Plaintiff had made a poor impression on Defendant, or words to that effect.

**<u>RESPONSE</u>: Deny.**

REQUEST FOR ADMISSION NO. 8: Admit that Defendant communicated to Professor Martin Head-Gordon that Plaintiff was "distracted by LLMs," or words to that effect.

**<u>RESPONSE</u>: Deny.**

REQUEST FOR ADMISSION NO. 9: Admit that Defendant communicated to Professor Martin Head-Gordon that Plaintiff was not as good a team player as Defendant had hoped, or words to that effect.

**<u>RESPONSE</u>: Deny.**

REQUEST FOR ADMISSION NO. 10: Admit that Defendant did not issue Plaintiff any written performance warning, disciplinary notice, performance improvement plan, or written annual review during Plaintiff's employment at the University of Chicago.

**<u>RESPONSE</u>: Admit.**

REQUEST FOR ADMISSION NO. 11: Admit that Plaintiff's August 31, 2023 offer letter identified Plaintiff's position as "Quantum-AI Researcher."

**<u>RESPONSE</u>: Admit.**

REQUEST FOR ADMISSION NO. 12: Admit that before sending the January 3, 2025 email containing the Title Statement, Defendant knew that Plaintiff's offer letter identified his position as "Quantum-AI Researcher."

**<u>RESPONSE</u>: Objection, this Request is vague as to the phrase "email containing the Title Statement" which is an undefined phrase and thus Defendant cannot admit or deny this Request as written.**

REQUEST FOR ADMISSION NO. 13: Admit that on January 3, 2025, Defendant wrote to Plaintiff and University of Chicago Human Resources that "The title 'Quantum-AI Researcher' is totally made up by you," or words to that effect.

**<u>RESPONSE</u>: Deny.**

REQUEST FOR ADMISSION NO. 14: Admit that before sending the January 3, 2025 email containing the Title Statement, Defendant did not ask University of Chicago Human Resources to verify the title stated in Plaintiff's offer letter.

**<u>RESPONSE</u>: Objection, this Request is vague as to the phrase "email containing the Title Statement" which is an undefined phrase and thus Defendant cannot admit or deny this Request as written.**

REQUEST FOR ADMISSION NO. 15: Admit that by January 17, 2025, the Gagliardi Group website identified Plaintiff as "Staff Scientist with Title Quantum AI Researcher," or words to that effect.

**<u>RESPONSE</u>: Admit.**

REQUEST FOR ADMISSION NO. 16: Admit that Plaintiff performed work in Defendant's group involving large language models, foundation models, artificial intelligence, active-space selection, or computational quantum chemistry.

**<u>RESPONSE</u>: Defendant denies that Plaintiff "performed work" according to her definition of "performed work."**

REQUEST FOR ADMISSION NO. 17: Admit that work involving large language models, foundation models, artificial intelligence, active-space selection, or computational quantum chemistry was within the research scope Plaintiff was recruited or permitted to pursue in Defendant's group.

**<u>RESPONSE</u>: Admit.**

REQUEST FOR ADMISSION NO. 18: Admit that Defendant's Motion to Dismiss relies on Professor Head-Gordon's January 2025 statements concerning Plaintiff's performance, honesty, suitability, and termination from PsiQuantum.

**<u>RESPONSE</u>: Objection, this Request seeks a legal conclusion which is inappropriate for a Request to Admit Facts pursuant to Rule 36.**

REQUEST FOR ADMISSION NO. 19: Admit that Defendant has communicated with PsiQuantum Personnel concerning a research collaboration, proposal, grant, project, contract, award, or partnership.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 20: Admit that Defendant has communicated with PsiQuantum Personnel concerning the NQAC Project.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 21: Admit that before April 24, 2026, Defendant communicated with PsiQuantum Personnel concerning the NQAC Project.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 22: Admit that before December 10, 2024, Defendant communicated with PsiQuantum Personnel concerning any research collaboration, proposal, project, grant, partnership, quantum chemistry workflow, quantum algorithm, electrocatalyst, or fault-tolerant quantum computing application.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 23: Admit that Defendant publicly reposted or endorsed a PsiQuantum announcement concerning a collaboration involving Defendant, the University of Chicago, UL Research Institutes, and/or the National Quantum Algorithm Center.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 24: Admit that Defendant posted or reposted the statement "Can't wait to start this journey!" in connection with a PsiQuantum-related collaboration, or words to that effect.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 25: Admit that Defendant was aware, before January 2025, that Plaintiff had been employed by PsiQuantum.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 26: Admit that Defendant communicated with any PsiQuantum Personnel concerning Plaintiff at any time.

**RESPONSE: Deny.**

REQUEST FOR ADMISSION NO. 27: Admit that Plaintiff performed research in Defendant's group concerning quantum chemistry, artificial intelligence, active-space selection, large language models, foundation models, or quantum algorithms.

**RESPONSE: Defendant denies that Plaintiff "performed research" according to Defendant's definition of "performed research."**

REQUEST FOR ADMISSION NO. 28: Admit that Plaintiff requested support, approval, clarification, or non-objection from Defendant concerning publication, presentation, online dissemination, or professional use of Publication/Research Materials.

**RESPONSE: Admit.**

REQUEST FOR ADMISSION NO. 29: Admit that Defendant declined, withheld, opposed, conditioned, or delayed support for Plaintiff's publication, presentation, online dissemination, or professional use of Publication/Research Materials.

**RESPONSE: Deny. As Plaintiff presented no Publications/Research Materials to Defendant, Defendant had nothing to decline, withhold, oppose, condition, or delay support of for publication, presentation, online dissemination, or professional use.**

REQUEST FOR ADMISSION NO. 30: Admit that Defendant is not aware of any written agreement assigning Plaintiff's University of Chicago research to PsiQuantum.

**RESPONSE: Objection, this Request assumes that Plaintiff had research from the University of Chicago which could be assigned, which Defendant denies.**

REQUEST FOR ADMISSION NO. 31: Admit that Defendant is not aware of any written agreement prohibiting Plaintiff from accurately describing non-confidential research he performed while affiliated with Defendant's group.

**RESPONSE: Objection, this Request assumes that Plaintiff "performed research" which Defendant denies.**

REQUEST FOR ADMISSION NO. 32: Admit that before April 2026, Defendant understood that Plaintiff was seeking employment or professional opportunities in the same quantum chemistry, quantum computing, and quantum-AI professional ecosystem in which Defendant was communicating with PsiQuantum personnel.

**RESPONSE: Deny.**

Respectfully submitted,

JOHNSON & BELL, LTD.

By: /s/Caroline K. Vickrey
One of the attorneys for Defendant,
Laura Gagliardi

Caroline K. Vickrey – ARDC #6210332
Georgia A. Arvanitis – ARDC #6352525
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 Fax
vickreyc@jbltd.com
arvanitisg@jbtd.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 13

## Verified interrogatory answers

Original source pages follow; original page labels and Bates identifiers are retained.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ROMIT CHAKRABORTY, | ) | |
| | ) | Case No. 26-cv-00106 |
| Plaintiff, | ) | |
| | ) | Judge: Hon. Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge: Hon. Albert Berry, III |
| LAURA GAGLIARDI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S ANSWERS TO PLAINTIFF'S FIRST, SECOND, THIRD AND FOURTH SETS OF INTERROGATORIES**

NOW COMES Defendant, LAURA GAGLIARDI, by and through one of her attorneys, JOHNSON & BELL, LTD., and for her Answers to Plaintiff's First, Second, Third and Fourth Sets of Interrogatories, state as follows:

INTERROGATORY NO. 1: Identify the exact date, time, and medium (e.g., phone, email, text message, in-person) of the communication between Defendant and Dr. Martin Head-Gordon referenced in Dr. Head-Gordon's January 2025 email (Plaintiff's FAC, Exhibit 7) wherein Defendant expressed "strong dissatisfaction" with Plaintiff's performance.

**ANSWER: Dr. Gagliardi discussed Plaintiff's performance in person with Dr. Martin Head-Gordon at a conference in France in July of 2024. She does not recall the exact date or time.**

INTERROGATORY NO. 2: Identify by name, title, and institutional affiliation every individual who participated in, was consulted regarding, or was copied on communications discussing the decision to terminate Plaintiff's IT, email, and data access in December 2024.

**ANSWER: None. Data access termination occurs automatically through the University's IT department.**

INTERROGATORY NO. 3: Identify by name, title, and institutional/corporate affiliation every prospective employer, academic institution, or professional reference to whom Defendant (or anyone acting on Defendant's behalf) provided a reference, evaluation, or commentary regarding Plaintiff between January 1, 2024, and the present.

**ANSWER: None.**

INTERROGATORY NO. 4: Identify every communication between Defendant and Professor Martin Head-Gordon concerning Plaintiff from August 1, 2023 through February 28, 2025,

including the date, medium, participants, subject matter, substance, and documents reflecting or relating to each communication.

**<u>ANSWER</u>: Dr. Gagliardi discussed Plaintiff with Dr. Martin Head-Gordon at an American Chemical Society conference in March of 2024. Dr. Gagliardi expressed hopes that Plaintiff would do well, and expressed concerns that so far he had not made any progress. Dr. Gagliardi discussed Plaintiff again with Dr. Martin Head-Gordon at the conference in France in July 2024, and expressed her dissatisfaction with his lack of any concrete results.**

INTERROGATORY NO. 5: Identify every person to whom Defendant communicated any statement concerning Plaintiff's performance, teamwork, honesty, title, suitability for academia, suitability for industry, work on LLMs, termination from PsiQuantum, or professional reputation.

**<u>ANSWER</u>: Nobody other than Dr. Martin Head-Gordon.**

INTERROGATORY NO. 6: State the complete factual basis for any contention by Defendant that Plaintiff was "distracted by LLMs," not a good team player, performed poorly, or was unsuitable for academia or industry, and identify all documents supporting each contention.

**<u>ANSWER</u>: Dr. Gagliardi denies that the above interrogatory accurately describes her comments about Plaintiff, and objects to this interrogatory insofar as it is best answered in narrative format at a deposition. Without waiving these objections, some of the bases for her opinions were that Plaintiff made no persistent progress on any project, and while he had new ideas about how to use LLMs in several different areas, he never made any progress in actually developing those ideas, which resulted in no publications for conferences or any research materials at all.**

INTERROGATORY NO. 7: State the complete factual basis for Defendant's January 3, 2025 statement that the title "Quantum-AI Researcher" was "totally made up by you," and identify all documents reviewed or relied upon before making that statement.

**<u>ANSWER</u>: When Plaintiff applied for a position in the Gagliardi Group, he had too much prior professional experience for the post-doc position, because the University has a rule that six years after your PhD you can no longer be a post-doc. Thus, the Gagliardi Group created a position specifically for Plaintiff. The Gagliardi Group, with Plaintiff's help, "made up" a title and a role for him – "Quantum AI Researcher" -- and gave him the enhanced status of a staff position.**

INTERROGATORY NO. 8: Identify all records, documents, meetings, emails, memoranda, notes, or communications reflecting any performance concern, criticism, warning, supervision issue, teamwork issue, or dissatisfaction concerning Plaintiff during his employment in Defendant's research group.

**<u>ANSWER</u>: None; Plaintiff had not yet received his first annual review when he announced his departure for PsiQuantum.**

INTERROGATORY NO. 9: Identify every communication between Defendant and any PsiQuantum Personnel from January 1, 2024 through the present concerning the NQAC Project, including the date, participants, medium, subject matter, and documents reflecting each communication.

**ANSWER: Objection, relevance. Discussions with PsiQuantum did not start until 2026, after Plaintiff's employment there ended, so they are irrelevant to Plaintiff's employment with either the Gagliardi Group or with PsiQuantum. See also Answer to Interrogatory No. 10.**

INTERROGATORY NO. 10: Identify every communication between Defendant and any PsiQuantum Personnel concerning Plaintiff, Plaintiff's employment, Plaintiff's termination, Plaintiff's research, Plaintiff's publications, Plaintiff's reputation, Plaintiff's title, Plaintiff's use of LLMs, Plaintiff's suitability for academia or industry, or Plaintiff's professional prospects.

**ANSWER: None.**

INTERROGATORY NO. 11: Describe every occasion on which Plaintiff requested Defendant's support, approval, clarification, or non-objection concerning publication, presentation, online dissemination, or professional use of Publication/Research Materials, and state Defendant's response, reason, and all persons involved.

**ANSWER: Dr. Gagliardi objects to this Interrogatory as it assumes that Plaintiff had Publications/Research Materials, which Dr. Gagliardi denies. Without waiving said objection, none.**

INTERROGATORY NO. 12: Identify all contracts, grants, proposals, awards, memoranda of understanding, collaboration agreements, project documents, or institutional arrangements involving Defendant, the University of Chicago, PsiQuantum, UL Research Institutes, the National Quantum Algorithm Center, or the NQAC Project.

**ANSWER: Dr. Gagliardi objects to this Interrogatory as it seeks the identification of documents containing third-party confidential, proprietary, or trade-secret information all of which is irrelevant to this lawsuit, as discussions with PsiQuantum did not begin until 2026, after Plaintiff was terminated from PsiQuantum.**

INTERROGATORY NO. 13: For each Publication/Research Material, or category of Publication/Research Materials, that Defendant contends Plaintiff may not publish, present, post, cite, describe, share, retain, display, submit, or otherwise use for employment, grant, portfolio, preprint, manuscript, interview, litigation, or other professional purposes, identify:

(a) the specific material or category of materials at issue;
(b) every restriction Defendant contends applies, including whether Defendant contends the material is confidential, trade secret, unpublished, restricted, University of Chicago-owned, PsiQuantum-owned, third-party-owned, sponsor-restricted, contractually restricted, policy-restricted, or otherwise non-disclosable;

(c) the complete factual and legal basis for each asserted restriction, including any contract, policy, confidentiality obligation, intellectual-property assignment, invention-disclosure document, grant or sponsor condition, employment agreement, institutional rule, publication policy, or other source of authority on which Defendant relies;
(d) the date on which Defendant first became aware of each asserted restriction;
(e) whether Defendant or anyone acting with or for Defendant communicated any such restriction to Plaintiff, and if so, the date, medium, participants, and substance of each such communication; and
(f) all documents and persons with knowledge supporting each asserted restriction. If Defendant does not contend that any Publication/Research Material is restricted from Plaintiff's professional use, state so expressly.

**ANSWER: Objection, this Interrogatory assumes that Plaintiff had Publications/Research Material which Dr. Gagliardi denies. Without waiving said objection, none.**

Respectfully submitted,

JOHNSON & BELL, LTD.

By: /s/ *Caroline K. Vickrey*
One of the attorneys for Defendant,
Laura Gagliardi

Caroline K. Vickrey – ARDC #6210332
Georgia A. Arvanitis – ARDC #6352525
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 Fax
vickreyc@jbltd.com
arvanitisg@jbtd.com

## VERIFICATION

I, Laura Gagliardi, Defendant in the above-entitled cause, certify, under penalty of perjury, based on my personal knowledge, information and belief formed after reasonable inquiry, that the foregoing Answers to Interrogatories are complete, true and correct.



______________________________________
Laura Gagliardi

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 14

## Production responses and produced correspondence

Original source pages follow; original page labels and Bates identifiers are retained.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ROMIT CHAKRABORTY, | ) | |
| | ) | Case No. 26-cv-00106 |
| Plaintiff, | ) | |
| | ) | Judge: Hon. Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge: Hon. Albert Berry, III |
| LAURA GAGLIARDI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST, SECOND, THIRD AND FOURTH SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

NOW COMES Defendant, LAURA GAGLIARDI, by and through her attorneys, JOHNSON & BELL, LTD., and for her Response to Plaintiff's First, Second, Third and Fourth Request for Production Pursuant to Rules 26, 33, 34 and 36 of the Federal Rules of Civil Procedure, states as follows:

REQUEST FOR PRODUCTION NO. 1: Produce all documents and native communications between Defendant and Dr. Martin Head-Gordon from October 1, 2024, to the present.

**RESPONSE: Objection, overly broad and unduly burdensome. Dr. Gagliardi's communications with Dr. Martin Head-Gordon regarding Plaintiff were in person at two separate conferences. There are no email communications with Dr. Martin Head-Gordon about Plaintiff.**

REQUEST FOR PRODUCTION NO. 2: Produce all documents and native communications between Defendant and University of Chicago Human Resources, or any other University administrative personnel, regarding Plaintiff's job title, employment classification, or departure from the university.

**RESPONSE: Pursuant to Illinois Supreme Court Rule 213(e), see emails contained within Defendant's Document Production and identified as bates 000001-000007.**

REQUEST FOR PRODUCTION NO. 3: Produce all documents, communications, contracts, consulting agreements, grant drafts, and partnership agreements between Defendant (or any laboratory/research group directed by Defendant) and PsiQuantum Corp. This request specifically

includes, but is not limited to, any communications or documentation concerning the National Quantum Algorithm Center (NQAC).

**RESPONSE: Objection, relevance. Any such documents were exchanged after Plaintiff's termination from PsiQuantum and long after his employment with the Gagliardi Group and are thus irrelevant to this lawsuit.**

REQUEST FOR PRODUCTION NO. 4: Produce all documents and native communications (including emails, text messages, and direct messages) between Defendant and Dr. Martin Head-Gordon from March 1, 2024, to September 30, 2024.

**RESPONSE: See Response to Request No. 1.**

REQUEST FOR PRODUCTION NO. 5: Produce all documents, native communications, and server log metadata concerning the removal, modification, or alteration of Plaintiff's name, title, and profile from the Gagliardi group website between August 1, 2023, and the present.

**RESPONSE: See Response to Request No. 2.**

REQUEST FOR PRODUCTION NO. 6: Produce all documents and native communications between Defendant and any third-party academic institution, potential employer, or professional reference regarding Plaintiff from January 1, 2024, to the present.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 7: Produce all communications between Defendant and Professor Martin Head-Gordon concerning Plaintiff.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 8: Produce all communications between Defendant and any academic referee, prospective employer, industry colleague, University of Chicago administrator, or PsiQuantum employee concerning Plaintiff's performance, teamwork, honesty, title, suitability for academia or industry, work on LLMs, termination from PsiQuantum, or professional reputation.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 9: Produce all documents relating to Defendant's January 3, 2025 statement that Plaintiff's title "Quantum-AI Researcher" was "totally made up by you."

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 10: Produce all documents, drafts, screenshots, archived pages, change logs, emails, or communications concerning Plaintiff's listing on the Gagliardi

Group website, including any classification of Plaintiff as a postdoctoral researcher, staff scientist, Quantum-AI Researcher, visitor, or other category.

**RESPONSE: See Response to Request No. 2.**

REQUEST FOR PRODUCTION NO. 11: Produce all documents supporting any contention that Plaintiff performed poorly, was distracted by LLMs, was not a good team player, was dishonest, or was unsuitable for academia or industry.

**RESPONSE: See Response to Request No. 2.**

REQUEST FOR PRODUCTION NO. 12: Produce all documents concerning Plaintiff's access to University of Chicago email, data, computational resources, group data, repositories, or research files from December 1, 2024 through January 31, 2025.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 13: Produce all calendar entries, notes, emails, memoranda, messages, or other records concerning any meeting or discussion in which Plaintiff's performance, title, research direction, group status, access, or departure from the University of Chicago was discussed.

**RESPONSE: See Response to Request No. 2.**

REQUEST FOR PRODUCTION NO. 14: Produce all nonprivileged documents Defendant relied upon, reviewed, cited, or intends to rely upon in support of any defence based on qualified privilege, opinion, lack of causation, lack of damages, or Plaintiff's alleged PsiQuantum "cause-based termination."

**RESPONSE: See the documents attached as Exhibits to Plaintiff's original Complaint and First Amended Complaint in this lawsuit.**

REQUEST FOR PRODUCTION NO. 15: Produce all nonprivileged communications between Defendant and PsiQuantum Personnel, University of Chicago administrators, UL Research Institutes personnel, or National Quantum Algorithm Center personnel concerning the NQAC Project.

**RESPONSE: Objection, relevance. Any such documents were exchanged after Plaintiff's termination from PsiQuantum and long after his employment with the Gagliardi Group and are thus irrelevant to this lawsuit.**

REQUEST FOR PRODUCTION NO. 16: Produce all communications between Defendant and any PsiQuantum Personnel concerning Plaintiff.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 17: Produce all communications between Defendant and any PsiQuantum Personnel that include any of the following terms: "Romit," "Chakraborty," "Quantum-AI," "LLM," "large language model," "foundation model," "active space," "quantum chemistry," "publication," "IP," "confidential," "termination," "postdoc," "staff scientist," or "title."

**<u>RESPONSE:</u> Objection, overly broad and unduly burdensome. Without waiving said objection, Dr. Gagliardi has no communications with PsiQuantum about Romit Chakraborty.**

REQUEST FOR PRODUCTION NO. 18: Produce all documents concerning Plaintiff's requests to publish, present, post, share, cite, describe, or otherwise use Publication/Research Materials.

**<u>RESPONSE:</u> None.**

REQUEST FOR PRODUCTION NO. 19: Produce all documents concerning any restriction, objection, condition, warning, reservation, or refusal relating to Plaintiff's publication, presentation, posting, sharing, citation, description, or professional use of Publication/Research Materials.

**<u>RESPONSE:</u> None.**

REQUEST FOR PRODUCTION NO. 20: Produce documents sufficient to show the date, scope, participants, institutional parties, and subject matter of any collaboration, grant, project, contract, proposal, award, or partnership involving Defendant, the University of Chicago, PsiQuantum, UL Research Institutes, the National Quantum Algorithm Center, or the NQAC Project.

**<u>RESPONSE:</u> Objection, relevance. Any such documents were exchanged after Plaintiff's termination from PsiQuantum and long after his employment with the Gagliardi Group and are thus irrelevant to this lawsuit.**

REQUEST FOR PRODUCTION NO. 21: Produce all public announcements, LinkedIn posts, reposts, drafts, screenshots, internal circulation emails, or communications concerning Defendant's public endorsement, repost, or announcement of a PsiQuantum-related collaboration.

**<u>RESPONSE:</u> Objection, relevance.**

REQUEST FOR PRODUCTION NO. 22: Produce all nonprivileged communications with University of Chicago administrators, technology transfer personnel, departmental personnel, research administrators, or publication-related personnel concerning Plaintiff's research, title, publication rights, professional use of research, data access, or departure from Defendant's group.

**<u>RESPONSE:</u> See Response to Request No. 2.**

REQUEST FOR PRODUCTION NO. 23: Produce all documents supporting any contention that Plaintiff's termination from PsiQuantum, rather than Defendant's communications or conduct, caused the harm alleged in the First Amended Complaint.

**RESPONSE: None.**

REQUEST FOR PRODUCTION NO. 24: Produce all documents supporting any contention that Defendant's communications with Professor Head-Gordon, PsiQuantum Personnel, University of Chicago Human Resources, or any other third party did not cause or contribute to Plaintiff's alleged professional, reputational, immigration-related, or emotional-distress damages.

**RESPONSE: None. Investigation continues.**

REQUEST FOR PRODUCTION NO. 25: Produce all documents identified, relied upon, reviewed, or referenced in responding to Interrogatory No. 13, including any contract, policy, confidentiality obligation, intellectual-property assignment, invention-disclosure document, grant or sponsor condition, employment agreement, institutional rule, publication policy, communication, or other document supporting any contention that Plaintiff may not publish, present, post, cite, describe, share, retain, display, submit, or otherwise use any Publication/Research Material for professional purposes.

**RESPONSE: Objection, this Request assumes that Plaintiff had Publications/Research Material, which Dr. Gagliardi denies. Without waiving said objection, none.**

Respectfully submitted,

JOHNSON & BELL, LTD.

By: /s/ Caroline K. Vickrey
One of the attorneys for Defendant,
Laura Gagliardi

Caroline K. Vickrey – ARDC #6210332
Georgia A. Arvanitis – ARDC #6352525
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 Fax
vickreyc@jbltd.com
arvanitisg@jbtd.com

**Bobbi Wilson**

**From:** Caroline K. Vickrey <vickreyc@jbltd.com>
**Sent:** Tuesday, June 9, 2026 11:00 AM
**To:** Georgia A. Arvanitis
**Subject:** FW: Romit departure

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, May 25, 2026 3:18 AM
**To:** Caroline K. Vickrey <vickreyc@jbltd.com>
**Subject:** FW: Romit departure

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-------------------------------------------------------------------------

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Date:** Sunday, May 24, 2026 at 5:51 AM
**To:** Monica Lugo <lugom@uchicago.edu>
**Subject:** FW: Romit departure

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-------------------------------------------------------------------------

**From:** Romit Chakraborty <romit@uchicago.edu>
**Date:** Wednesday, November 6, 2024 at 12:50 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>; Monica Lugo <lugom@uchicago.edu>
**Subject:** Re: Romit departure

Hi Mónica, Laura,

Thank you for everything in Chicago!
I hope I wasn't too big of a chore to be around

Best,
Romit

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, November 4, 2024 12:26 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Re: Romit departure

Great thank you!

------------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
--------------------------------------------------------------------------

---

**From:** Monica Lugo <lugom@uchicago.edu>
**Date:** Monday, November 4, 2024 at 12:24 PM
**To:** Romit Chakraborty <romit@uchicago.edu>, Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

I added the news.  Let me know if you'd like any changes.

All best,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

---

**From:** Monica Lugo <lugom@uchicago.edu>
**Sent:** Monday, November 4, 2024 9:59 AM
**To:** Romit Chakraborty <romit@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

Dear Romit,

You are now added to the Previous Members page. I am working on the news post. Could you please send me your title? If you still have the job description, that would be very helpful.

Thank you,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

---

**From:** Romit Chakraborty <romit@uchicago.edu>
**Sent:** Sunday, November 3, 2024 2:40 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

P.S. We're working on a professional web presence; this is best rn
https://www.psiquantum.com/research

Research — PsiQuantum

Explore PsiQuantum's innovative research in quantum error correction, algorithms, and architecture for quantum computing.

www.psiquantum.com

Have a good weekend!

---

**From:** Romit Chakraborty <romit@uchicago.edu>
**Sent:** Sunday, November 3, 2024 2:32 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Romit departure

Hi Laura, Monica,

Yes!
rchakraborty@psiquantum.com
Quantum Solutions @ PsiQuantum.

Sincerely,
Romit

---

**From:** Monica Lugo <lugom@uchicago.edu>
**Sent:** Saturday, November 2, 2024 6:35 PM

**To:** Laura Gagliardi <lgagliardi@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Re: Romit departure

Hi Laura,

Most certainly. Romit, could you send me information about your new job? I will add your LinkedIn page to the past members.

Thank you,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry
5735 S Ellis Ave. Chicago, IL 60637
Email: lugom@uchicago.edu

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Saturday, November 2, 2024 1:14:58 PM
**To:** Monica Lugo <lugom@uchicago.edu>; Romit Chakraborty <romit@uchicago.edu>
**Subject:** Romit departure

Hi Monica
Could you update the website and move Romit from current to past members?
He now works at PsiQuantum

Romit: when you have a new email address and professional page, please let us know.

Monica: could you please also add to the group news about Romit starting his new job.

Thank you
Laura

------------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering,
James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
------------------------------------------------------------------------

**Bobbi Wilson**

| | |
|---|---|
| **From:** | Caroline K. Vickrey <vickreyc@jbltd.com> |
| **Sent:** | Tuesday, June 9, 2026 11:03 AM |
| **To:** | Georgia A. Arvanitis |
| **Subject:** | FW: Need website update |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Friday, April 10, 2026 2:00 PM
**To:** Caroline K. Vickrey <vickreyc@jbltd.com>
**Subject:** FW: Need website update

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-------------------------------------------------------------------------

---

**From:** Sharon Bryant <sbryant1@uchicago.edu>
**Date:** Monday, January 6, 2025 at 9:24 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>, Ben Anderson <baanderson@uchicago.edu>, La Toya Cobbins <lcobbins@uchicago.edu>, Monica Lugo <lugom@uchicago.edu>
**Subject:** RE: Need website update

Hi Laura, thanks for your quick response. While I'm not aware of the history, the request came from Romit via the Provost's Office and it is reasonable to have the website accurately reflect his employment and title, so I would suggest amending the website rather than removing him completely (which might cause other issues as we know Romit is paying close attention to this).

I have a copy of his offer letter where it outlines: "Job Title: Quantum-AI Researcher" and that's where the title comes from.

I'd be happy to have a quick call to hear more about the concerns, if useful.

Thanks,
Sharon

**Sharon Bryant | The University of Chicago**
Director of Academic Affairs and Chief of Staff
Division of the Physical Sciences
5640 S. Ellis Avenue, room 399C
Chicago, IL 60637
sbryant1@uchicago.edu | 773.795.3665

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, January 6, 2025 9:02 AM
**To:** Sharon Bryant <sbryant1@uchicago.edu>; Ben Anderson <baanderson@uchicago.edu>; La Toya Cobbins <lcobbins@uchicago.edu>; Monica Lugo <lugom@uchicago.edu>
**Subject:** Re: Need website update

Sharon
I am not sure where the title "Quantum-AI Researcher" came from.
Romit has been a very difficult group member and he is pushing on this.
I will remove him from the website. Please let me know if this is acceptable.
Laura

----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
------------------------------------------------------------------------

---

**From:** Sharon Bryant <sbryant1@uchicago.edu>
**Date:** Monday, January 6, 2025 at 8:35 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>, Ben Anderson <baanderson@uchicago.edu>, La Toya Cobbins <lcobbins@uchicago.edu>
**Subject:** Need website update
Good morning Laura, Ben, and La Toya,

Happy new year! I am writing to request that this website (https://gagliardigroup.uchicago.edu/previous-members/) be updated to accurately reflect Romit Chakraborty's position as a staff member with title Quantum-AI Researcher. I'm not sure who is responsible for website updates, so I'm writing you all.

Please confirm when the change has been made.

Thank you,
Sharon

**Sharon Bryant | The University of Chicago**
Director of Academic Affairs and Chief of Staff
Division of the Physical Sciences
5640 S. Ellis Avenue, room 399C

Chicago, IL 60637
sbryant1@uchicago.edu | 773.795.3665

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

# EXHIBIT 15

## Public PsiQuantum collaboration announcement

Original source pages follow; original page labels and Bates identifiers are retained.

Premium

**Romit Chakraborty, Ph. D.**

Quantum x AI

Cupertino, California

+ Experience

**Profile viewers** 170

**View all analytics**

**Your Premium features**

**Laura Gagliardi** • 1st

--

8h •

Can't wait to start this journey!

**PsiQuantum**

79,565 followers

11h •

Utility-scale, fault-tolerant quantum computers have the potential to unlock transformative clean-energy technologies—but only if researchers and private-sector leaders form robust partnerships to help prepare for the arrival of these systems.

That's why PsiQuantum is partnering with Professor **Laura Gagliardi** at the **University of Chicago** and **UL Research Institutes** on a Grand Challenges project awarded by the National Quantum Algorithm Center (NQAC). Together, researchers will develop a proof-of-concept, fault-tolerant quantum computing

workflow to model electrocatalysts, which accelerate the chemical reactions underpinning key clean-energy technologies.

This new initiative marks the beginning of an exciting new chapter in PsiQuantum's history of collaboration with researchers at the cutting-edge of fault-tolerant quantum applications. PsiQuantum has officially joined the NQAC at the **Illinois Quantum and Microelectronics Park**, reflecting our company's ambition to forge cross-cutting research partnerships to help make the most of the utility-scale systems we will build and deploy.

Rishu Khurana and 22 others

Reactions

+15

Like

Comment

Repost

Send

Add a comment...

Ad •••

Your Company Page is waiting — see what's new

View Page

About Accessibility Help Center Privacy & Terms Ad Choices Advertising
Business Services Get the LinkedIn app More

LinkedIn LinkedIn Corporation © 2026


Romit Chakrabor...
Today Dr. Matthew Hennefarth defended his PhD thesis with title "Linearized Pair-Density Functional Theory" Matthew invented this method, coded it up and employed it to study excited state reactions and dynamics. It was wonderful to have him in the group for four years at University of Chicago Department of Chemistry. He will start working at PsiQuantum in a month. Thank you Gregory Engel and David Mazziotti for serving on his committee!
Reactions
Like
Comment
Repost
Send
Well done!
Congratulations!
Add a comment...
Book now
Messaging
Gamma Alpha Organisat...
Focused
Other

A-140

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

# EXHIBIT 16

## February 23, 2026 care-verification letter

Original source pages follow; original page labels and Bates identifiers are retained.

Elevate Mind and Wellness
9100 Wilshire Blvd
East Tower Suite 333 #1036,
Beverly Hills CA 90212
(P): 310-425-3558
(F): 651-666-1450

February 23, 2026

To Whom It May Concern,

I am writing to confirm that Romit Chakraborty ( ) is currently an established patient under my care.

Romit is being treated for an anxiety disorder as well as an attentional and executive-function disorder. Based on my clinical assessment, continued treatment and regular monitoring are medically indicated at this time. Romit is engaged in an active phase of care, and interruption or discontinuation of treatment at this stage would not be advisable, as either would carry a meaningful risk of clinical deterioration.

At present, it is anticipated that ongoing psychiatric follow-up will be required for a minimum of 12 months, with stabilization and treatment optimization constituting the current clinical objectives.

As a board-certified physician in the state of California (license #A168243), I am available for contact regarding Romit's care. Please do not hesitate to contact my office directly if any further clinical information is required, following procurement of written consent.

Sincerely,

Yasha Rastgar, MD
NPI: 1003270745

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

# EXHIBIT 17

## Complete October 12, 2026 Gagliardi deposition

Complete October 12, 2026 deposition transcript, including the reporter's certificate and index. Complaint citations use the transcript's printed page and line numbers.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
-------------------------------------------X
ROMIT CHAKRABORTY, Ph.D.,

PLAINTIFF,

-against- Case No.: 1:26-cv-00106

LAURA GAGLIARDI,

DEFENDANT.
-------------------------------------------X

DATE: October 12, 2026

TIME: 10:02 a.m Eastern

VIRTUAL DEPOSITION of the Defendant, LAURA GAGLIARDI, taken by the Plaintiff, pursuant to a Notice and to the Federal Rules of Civil Procedure, before Madeline Tavani, a Stenographic Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

ROMIT CHAKRABORTY, Ph.D.
Plaintiff Pro Se
2261 Market Street, Suite 72927
San Francisco, California 94114
Romit.Chakraborty@gmail.com

JOHNSON & BELL, LTD.
Attorneys for the Defendant
LAURA GAGLIARDI
33 W. Monroe Street, Unit 2700
Chicago, Illinois 60603
BY: CAROLINE VICKREY, ESQ.
vickreyc@jbltd.com

* * *

F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

* * * *

THE REPORTER: Can I see photo ID from the witness, please.

THE WITNESS: Do you mean me?

THE REPORTER: Yes.

THE WITNESS: You mean like a driving license is fine?

THE REPORTER: Yeah. That's okay.

THE WITNESS: (Indicating.)

THE REPORTER: Okay. I see it. Thank you.

Before we proceed, I will ask that all counsel stipulate on the record that I may swear in the deponent, even though I am not present in the physical presence of the deponent, and that there is no objection to it at this time, nor will there be an objection to it at a later date.

THE WITNESS: What do I have to -- I swear.

MS. VICKREY: We can do this. I'm going to wait for Mr. Chakraborty to cede, and then I will agree.

DR. CHAKRABORTY: I'll cede.

MS. VICKREY: I agree on behalf of the defendants, Gagliardi.

L A U R A   G A G L I A R D I, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

DIRECT EXAMINATION BY
DR. CHAKRABORTY:

THE REPORTER: Thank you.

State your name and address for the record.

THE WITNESS: I'm Laura Gagliardi.

And I live in 130 North Garland Court, Chicago, Illinois.

THE REPORTER: Thank you.

You may proceed, sir.

BY DR. CHAKRABORTY:

Q. I will identify each document and the exhibits PDF page.

Please distinguish what you recall from what you know did not happen and tell me if you need a break.

Please state your current position and your role in supervising my University of Chicago appointment.

A. I am a professor of chemistry and molecular engineering at the University of

Chicago.

Q. Your role --

MS. VICKREY: Can you state the -- can you state the second part of your question?

BY DR. CHAKRABORTY:

Q. Your role in supervising my University of Chicago appointment?

A. I'm a -- I provided funding for your position, you -- and I hired you in my group for -- with the funding that I provided you with.

Q. Before the appointment began, you proposed a postdoctoral appointment. Did the provost office intervene in the proposed postdoctoral appointment?

A. Sorry. I didn't hear what you said, and I don't know what you mean. Can -- maybe Caroline can explain the meaning of this question, or maybe you can rephrase it in a way that I understand.

And, by the way, I didn't hear you, so you have to speak more clearly, please. Closer to the microphone.

Q. Did the provost office intervene

in my postdoctoral appointment?

A. Well, after I made you the offer as a postdoc, it turned out there are some rules at the University of Chicago that someone cannot be appointed as a postdoc after having completed their PhD six years, or even longer, before that.

So it was after I had agreed to hire you as a postdoc, it turned out that this was not allowed by the university rules.

Q. What was the nature of that intervention?

A. I don't understand what it means, this question.

Q. What is the purpose of --

A. The rule is -- there is a rule that says nobody can be hired as a postdoc if they had PhD six years or earlier. That's the rule. You know, there is a rule. I have to follow the rule. Not I, the university has to follow the rules.

Q. Is that what the postdoc provost office told you about the proposed appointment?

A. What does this question mean? I mean, this question is irrelevant. There is a rule that says there is a red light; you cannot go past the red light. There is a rule that says you cannot hire this person as a postdoc because he completed his PhD six years before. That's -- I think we can move on because the rest is irrelevant.

Q. That's for me to decide.

Do you recognize the University of Chicago job posting for quantum AI researcher requisition JR 23432 that should be shared on my screen?

A. I don't know what it means.

MS. VICKREY: And I'm going to object as to the form and as to "do you recognize."

You can go ahead and answer. You can go ahead and answer that, Dr. Gagliardi, as you can.

A. What does it mean? I don't know. I don't know what "recognize" means.

BY DR. CHAKRABORTY:

Q. Well, this is the job posting for the job that I was hired for, which is the

job of quantum AI researcher. And this is the requisition corresponding to that job post.

Do you recognize this?

A. I guess.

MS. VICKREY: Wait. He's going to post it -- he's going to share this on the screen, so wait until he shares it so you can see.

BY DR. CHAKRABORTY:

Q. It is being shared. You should be able to see it.

A. Maybe -- maybe it is what was posted. Maybe it is.

DR. CHAKRABORTY: Madeline, is the -- is my exhibit screen not being shared?

A. Yes, it's shared. I can see it. Yes, it is there.

MS. VICKREY: I can't see it. I'm sorry. I've got to -- I can't see it.

Can you see it?

THE WITNESS: Yes, I can.

A. I think -- I mean, I have not checked the documents from three years ago

versus these. But presumably, this is how the job was posted.

BY DR. CHAKRABORTY:

Q. And the text here mentions quantum AI researcher, large language models, transformer-based technologies. Do you see that?

A. Yes, I do.

Q. Who prepared the job description? And what did you review or approve before it was posted?

A. I mean, this is a very generic job description that could go -- probably we prepared it together. We just -- it's just -- these are just words that we put there to have the job description.

Q. The job details classify the position as staffed. Did you understand that was his appointment category?

A. Yes, I did. And I -- you understand why I did it because I couldn't hire you as a postdoc. It was the only way to give you this favor of having you cover for the buffer of time to have a position so that you would not be without a job.

And I did it exclusively to do a favor to Martin Head-Gordon. I would have never hired you as a staff scientist if it had not been for Martin insisted, calling me all the time asking me to do him this favor.

Q. The job details classify the position as staffed. Did you understand that it was his appointment category?

A. Yes, I did.

Q. Did you -- what did you understand as the official position, title and responsibilities to be when the offer was made?

A. I don't know.

DR. CHAKRABORTY: I show you Exhibit No. 1. Exhibit page 4.

(Whereupon, the aforementioned exhibit was deemed marked as Exhibit 1 for identification as of this date.)

MS. VICKREY: I'm sorry. I can't -- I can't see this exhibit. If it's being shared, I can't see it on the screen.

THE WITNESS: Yes. It's shared, Caroline. It's shared.

MS. VICKREY: I'm sorry. I can't -- I can't see it, so I'd like to be able to see it.

DR. CHAKRABORTY: Madeline, can you see it?

THE REPORTER: Yes. I can see it.

Do you want to go off the record while she gets her screen figured out?

MS. VICKREY: Yeah.

(Off the record.)

A. So this is a document, yes, that was produced by the University of Chicago.

BY DR. CHAKRABORTY:

Q. So I will reask the question:

What did you understand is the official position, title and responsibilities to be when the offer was made?

A. I don't -- I don't know. I mean, I don't think I tell you what I understand and what I don't understand. I just -- there is this document and --

Q. This is a deposition, Ms. Gagliardi. You have to answer me.

A. I don't know the answer.

Q. When did Dr. Chakraborty accept -- when Dr. Chakraborty accepted the position, did you intend to treat him like a postdoctoral researcher?

A. Yes.

Q. Did you introduce him to members in your group as a postdoctoral researcher?

A. I can't recall. But, for me, the whole point was to hire him as a postdoc. We found this escamotage so that he can still be hired by U. Chicago. But, for me, he was a postdoc. Because, as I said, I would have never hired a staff scientist in my group out of the blue. These are very -- positions that require a strong commitment, especially financial commitment, and one does it only with people -- for those one has the full trust with whom has worked for a long time. We never had a working relationship.

So I just did it, again, so that you would not be unemployed during the period in which you were looking for faculty positions. We discussed it extensively, and you understood that this was really an

exceptional situation in which I tried to help you with your future career. I was trying to help you and Martin Head-Gordon. And verbally, you knew that this was the case, and you were very grateful to me that I gave you this opportunity. I don't think --

Q. So, Ms. Gagliardi -- Ms. Gagliardi, my understanding is that you were hiring me to help me out?

A. Yes.

Q. I move on to the next question.

Why did Pavni Shangi (phonetic), the graduate student in your group, refer to me as a postdoc?

A. Because you were perceived as a postdoc, and I don't know how people call other people. You were there to do research, the research that another postdoc would have done.

Again, I hired you to help you out, as you said. The title and everything else is irrelevant. I gave you an opportunity to stay in the U.S. for another period of time. That's the only thing that

matters. And, once again, if Martin Head-Gordon had not intervened extensively with multiple phone calls assuring me that this was a temporary thing, I would have never hired you in my group.

Q. Did you tell him, that's me, before acceptance that you intended to treat the position as equivalent to a postdoctoral appointment?

A. No. Because it was irrelevant. That was a name, a title. It carried no weight. The point was to give you an opportunity to perform some research that you could use to progress in your career. Whether the name is "postdoc," "staff scientist," it's irrelevant. Nobody cares about these names in universities. They just care about productivity, papers, work and your visibility in the community.

Q. Did you understand that he -- I was relying on the written description of staff researcher position --

A. No, no --

Q. -- when deciding --

A. I understood that you and I talked

about it extensively; that you knew that I just did it to find a way for you to stay in the country. And you knew that. So there is nothing to understand or do not understand.

We had a gentleman agreement in which I gave this way out and you would be a serious and dedicated researcher and honor the fact that I trusted you.

Q. Before referring Dr. Chakraborty's position in 2023, did you intend to hire him as postdoctoral researcher?

A. Yes.

Q. After that, after the provost intervention, did you participate in arranging his appointment as a staff researcher?

A. I -- initially, I thought that would be done; we would not consider the thing anymore. But then Martin called me many times -- and again, I wanted to try to help you and him. And honestly, I think that in all this process, I've been one of the most helpful people that you have encountered in your life. And being the one

that is now accused of this is -- is very sad, I would say. I tried to help you. I wanted to help you, Romit. But --
Q. I'm showing you SAC Exhibit 1. Exhibit PDF page 5. Please look at the closing of the offer letter where your name appears.
What part did you take in arranging the staff appointment?
A. I don't know. These are templates. I don't know.
Q. Did you review or approve the description of the position before --
A. These are -- these are -- yes, I approved -- yes. These are templates that we use.
Q. Did you communicate with Dr. Chakraborty about how the staff researcher role would differ from a postdoctoral appointment?
A. No. I just told him that, for me, it was the same. I just hired you in this role because this was the only possible way to get you a position. But we have already discussed it for 20 minutes or so. Don't

you think its enough? I mean...

Q. Which -- it's for me to conduct the deposition, Ms. Gagliardi.

Which aspects of his day-to-day role had you decided before he had accepted the offer?

A. I don't know. I don't know these questions, what they mean.

Q. What, if anything, did you tell the university administrators about how you intended to supervise and classify his work?

A. Nothing.

Q. After Dr. Chakraborty began work, what responsibilities did you assign to him?

DR. CHAKRABORTY: I'm showing you Exhibit 4. Exhibit PDF page 12.

(Whereupon, the aforementioned exhibit was deemed marked as Exhibit 4 for identification as of this date.)

BY DR. CHAKRABORTY:

Q. Please look at the proposed objective scope.

Which responsibilities did you actually assign to me after I joined?

MS. VICKREY: Is this -- is this

exhibit related to your question? Or
is this separate?
DR. CHAKRABORTY: It's the
proposal that I submitted with
Professor Gagliardi --
A. It is a proposal that we wrote to get computer time.

So I think that, usually, when a postdoc joins my group and for some reasons takes the role of staff scientist that is supposed be even more senior, I proposed some possible research directions.

And here if you see this bullet points 2, 3, 4, these are topics that are within the interest of my group. And we discussed that eventually, you should pursue research in one of these directions.

But again, as a postdoc or as staff scientist, I don't give you a prescription and say, "Do A, B, C, D every day," because you're not a first-year graduate student. You are supposed to be an independent researcher. We discussed generalized you perform your research and then we discuss results. That's usually

what happens with my postdocs or with my only staff scientist in my group. This is how it works.

And so these are topics of research that are relevant to the research directions of my group, of course.

Q. In what respects, if any, did you treat me differently from postdoctoral researchers in your group?

A. I didn't treat you differently. I just expected you to go do your work; produce exciting results; research and discuss them with me; discuss with me and other group members about how to go from one step of the research to the next step; how to make it a thorough, relevant; and so on. Because that's how researcher proceeds in all groups. And that's the kind of discussions we had.

Q. Who decided how this role would be described on the group website?

A. I don't know. We don't -- I don't know -- why is it relevant this question?

Q. How was Dr. Chakraborty listed in your group's website during his time in your

group?

A. I think research -- I don't remember. But probably, you were -- you were under postdocs but with the definition of staff scientist.

I mean, my group is structured. There is leadership, and the leadership is myself, Matthew Hermes, who is now a researcher professor, and Monica and Melanie. There are postdocs, and there are graduate students and undergrad. And you were under one of these categories.

DR. CHAKRABORTY: I'm showing you SAC Exhibit 9. Exhibit PDF page 42.

(Whereupon, the aforementioned exhibit was deemed marked as Exhibit 9 for identification as of this date.)

BY DR. CHAKRABORTY:

Q. Please look at your November 2 departure email requesting the group website.

Who decided how my role would be decided there?

A. Again, the website is structured, and there are past members are either

graduate students, postdocs. That's the list of people there.

And given all the premises that we discussed at length before, I suggested that you would go under postdocs. Your role has never been anything more than a postdoc.

Q. Right. Well, on day one when I was listed on the postdoctoral researchers, I ask for a correction; is that accurate? Did I ask for you to correct my professional title --

A. I don't remember.

Romit, why do we care so much about the titles? Don't you think we should talk about what you have achieved, independent of the title, when you were in my group? I think that's the only thing that matters at the end of the day. Nobody --

Q. We're going to come to that -- we're coming to come to that, Ms. Gagliardi. This is a deposition. You have to answer my questions --

A. Your questions are irrelevant.

Q. These aren't your questions and

your deposition; this is my deposition.

MS. VICKREY: Yes. And we'll just -- we'll just answer questions. That's -- that's the role today.

BY DR. CHAKRABORTY:

Q. I'm showing you supplement S1 Exhibit PDF, page 94. Please look at my request to correct the formal postdoc listing.

Did you receive that request?

A. Sure.

Q. What steps did you take in response to that question?

A. I just said that I'm not going to change the structure of my website because one person was hosted there; so I said we just remove you as a member of the group because I'm not restructuring my website for one person who, by the way, has been there for one year and has produced absolutely nothing, so...

Q. So, Professor Gagliardi, you propose that I be removed from your website entirely after my request --

A. Yes.

Q. -- to be listed as a quantum AI researcher --

A. Yes.

Q. -- as per my job description?

A. Yes.

By the way, to create that group of people, you know, would require a substantial reorganization of the website, which costs money, because, you know, Romit, everything, like also paying you for a year, requires a lot of money that comes from taxpayers because this is federal funding.

So I'm not going to ask someone to redesign my website and pay thousands of dollars to list you as a whatever you want to be called, which makes no difference in the big scheme of things, because you have been there for one year, you have produced zero scientific results, you have just been a problem for me and for the rest of the group for the entire duration of your stay. So the --

Q. Did you arrange the performance evaluations described in his employment documents?

A. Can you say it again? Sorry. I couldn't hear you.

Q. I'm showing SAC Exhibit No. 1, PDF page 4. Please look at the annual merit process paragraph.

What review did you understand was contemplated for this appointment?

A. I don't understand the question. These are standard --

Q. Did you arrange the performance evaluations described in his employment documents?

A. I don't understand this question.

Q. Was the written performance report due on the 1st of July, and was it ever completed?

A. I don't know. I think you were so busy finding new jobs and trying to struggle on your day-to-day, that we just -- I was just waiting for you to find the time to focus on the research, blossom. I was just -- just trying to give you time to move on. That's what --

Q. Was the written performance report due on July the 1st, 2024? And was it ever

completed?
A. I don't know. I can't recall. Sorry.
Q. Did you ever perform a written performance evaluation during Dr. Chakraborty's stint in your group?
A. No. Because usually, we do this within a year from the beginning, and you were not there for a whole year.
Q. What -- can you cite a particular document that --
A. No. I can't remember. Sorry. I can't remember. Sorry.
Q. You can't remember? Or you don't know?
A. I can't remember.
THE REPORTER: Can you guys please let each other finish. It's a lot of overlap. Thank you.
MS. VICKREY: Yeah. Laura, I know you know where he's going with the question. Just let him finish the question, and then you can answer. Just because it's easier for the court reporter, because she -- when you talk

over each other, it's harder for her to write it all down.

BY DR. CHAKRABORTY:

Q. Before Dr. Chakraborty accepted the position, what information did you give him about opportunities to attend conferences and represent and publish his research?

A. So concerning going to conferences, again, I'd like to state that going to a conference is not free. It comes with a cost. And I'm the one who raises the money for the salary of my group members for their travel and everything they do. And again, most of the money comes from American taxpayers.

So they -- what in my group is clear, everybody knows, is that people can attend maybe, on average, one conference a year, provided they have results to present at the conference. People don't just go to a conference for PR reasons; they have to go present results that maybe has already resulted in a paper or is going to be a paper soon. So that's how it works in my

group.

Q. Did you know whether Dr. Chakraborty had declined other opportunities to take his position -- take this position?

A. No, I don't -- I didn't know.

Q. When did you first learn that he believed the actual role deferred from what had been represented?

DR. CHAKRABORTY: I'm showing you SAC Exhibit 3. PDF page 9.

(Whereupon, the aforementioned exhibit was deemed marked as Exhibit 3 for identification as of this date.)

BY DR. CHAKRABORTY:

Q. Please look at the date and title of the discussion in your January 3rd, 2025, email.

When had you first learned that I believe my role or -- role or listing deferred from what had been representing?

MS. VICKREY: I'm going to object as to the form.

And if you can read that question back, just to make sure that Laura

hears it clearly.

BY DR. CHAKRABORTY:

Q. When did you first learn that he believed the actual role deferred from what had been represented?

A. I'm not sure I understand the question. I think that when you came, it was clear that, again, they -- all AI staff scientists was just to make sure that you could be hired. And we discussed it extensively, and I told you that you -- for me, you were a postdoc.

Later on, when all this conversation started, I realized that this was a big deal for you. Again, I'm not sure why, because at the end of the day, people judge your performance, not your title. Nobody cares about titles in our field. It's what you have done, what body of work can you show. But --

Q. What is your professional title --

MS. VICKREY: I'm sorry. Can you let her finish her answer, please. She was still talking.

You can continue. Laura, you can

continue.

A. That's what I said, that when this conversation started, I realized that this title was a big thing for you. And that as a solution, we decided to eliminate you completely from the website.

BY DR. CHAKRABORTY:

Q. So when you realized that the title was a problem for me, you decided to eliminate me from the website?

A. Yes. You had done nothing. You were there temporarily. It was a temporary thing. I mean, sometimes if people come and stay there one month, do I have to create a new part of the website to say somebody is here for a month? Maybe I can put you under "visitors." That's what I could have done. If you want, I can do that. As visiting scientist. I can put you under "visiting scientist" if you want. Listen --

Q. I'm going to move on to the next question, Ms. Gagliardi.

Is there any part of the offer letter's description of the position that you believed was inaccurate when the offer

was made?
A. What -- sorry. I didn't understand the question.
Q. I'm showing you the offer letter.
Is there any part of the offer letter's description of the position that you believed was inaccurate when the offer was made?
A. No. The -- what does it mean, "inaccurate"? It's a document; it's a bureaucratic document. It is what it is. It was what needed to be done to offer you this position.
Q. What -- the responsibilities -- if you look at the job description, as part of the job description, it lists attending conferences. The responsibilities include presenting work at scientific meetings and conferences.
What opportunities did you provide for that?
A. As I told you, I'm not -- a person has to have produced a sufficient body of work and then comes to me and says, "Do you think I could go present this work at this

conference?" We discuss, and if we both agree that it's appropriate, they do that.

In your case, you had no work to present; so why would I send you to a conference? By the way, carrying the expenses --

Q. -- come to the work, Ms. Gagliardi --

MS. VICKREY: I'm sorry, I'm sorry. Mr. Chakraborty, you're interrupting her answers. If you could please let her finish.

DR. CHAKRABORTY: If it's irrelevant, I should be able to interrupt her, respectfully.

MS. VICKREY: No. Let her finish her answers. Thank you.

You were saying about the conferences, Laura.

A. I just say that I send people to conferences when they have produced enough work that is worth presenting at the conference. Period.

So when people are about to submit a paper or they have already submitted a

paper, they have a material to give a talk or a poster, then they go to a conference. That's how it works in my group and in all scientific research groups.

BY DR. CHAKRABORTY:

Q. You're speaking of all of academia when you say that?

A. Well, scientists. I think with Martin Head-Gordon, it was the same. I don't think Martin Head-Gordon sent you to a conference just to sit there and listen to talks. I'm sure that if he sent you to a conference, it was for you to present results.

That's how it works in my group. I don't care what happens in this other groups. I just tell you what happens in my group.

Q. I think you just contradicted yourself, but I'll move on.

Is this a complete and accurate copy of the posting used for the recruitment? If you dispute any passage, identify it and correct the source record.

A. Sorry. I just see the beginning

of this. And I'm sure that if this is the official document, it is what it is.

Q. Did you communicate with Monica Lugo about Dr. Chakraborty's quantum AI title?

I'm showing you Exhibit -- SAC Exhibit 3. Exhibit PDF page 9. Please look at the sender and recipients of the 3rd January 2025 email.

A. This is an email that was sent. I'm sure this email is legit.

Q. Did you describe his position, quantum AI -- his quantum AI title as totally made up? I'll repeat:

Did you describe his quantum AI title as totally made up?

A. I mean, this is an email that I wrote. Maybe it was -- the statement there is inaccurate. But this is an email, yes. I mean, it's...

Q. Please finish.

A. That email was sent.

Q. What exactly did you mean by "totally made up"?

A. I mean, I think I was saying -- I

mean, that it was a way for us to hire you. Okay. If we had not come up with a -- a different job description than postdoc, we couldn't have hired you.

So we decided to hire you as a staff scientist. We called it quantum AI researcher, but it had no connection with reality. I had never worked with you. I would have never hired you as a staff scientist in my group if it were not to do you and Martin a favor. Like, really trying to help you. I was trying to help you, Romit.

Q. If I understand you correctly, you -- this position was totally made up in order to hire me as a postdoc, and you did it to help me --

A. Yes.

Q. -- and to help Martin Head-Gordon?

A. Yes, correct.

Not in order to hire you as a postdoc, because we couldn't hire you as a postdoc, so we found an alternative solution. But it was to help you and help Martin.

Of course, I was hoping that during the time in my group, you would blossom, produce great scientists. I was hoping, honestly, that I could support you and write a letter for you after you had been in my group, because I was hoping that you would produce a significant body of work.

Q. Respectfully, I'll move on.

What documents have you reviewed before making the statement "totally made up"?

A. It was this, the gentleman agreement that we had and of which you were very well aware.

Q. Did you tell a University of Chicago administrator that Dr. Chakraborty had been a very difficult group member?

A. I don't think so. I don't think I talked about -- what administrator? No, I don't think so.

Q. I'm showing you -- it should be on your screen. This is addressed to "Sharon." It's going out from your email, lgagliardi@uchicago.edu, Monday, January the

6th, at 9:02 a.m. Sharon Bryant.

"Sharon, I'm not sure whether the title quantum AI researcher -- where the title quantum AI researcher came from. Romit has been a very difficult group member, and he is pushing on this. I will remove him from the website. Please let me know if this is acceptable."

A. I'm just -- I'm sure I wrote that email, yes. I'm not saying that publicated.

Q. What specific conduct were you referring to?

A. Do I have to answer this question? I don't think it's relevant.

Q. Ms. Gagliardi, this is a federal deposition. You have to answer all questions.

What specific conduct were you referring to when you said that "Romit has been a very difficult group member"?

A. Are we changing topic now? We're not talking about the title anymore? Now we're talking about the real --

Q. We're talking about the question that I'm asking, Ms. Gagliardi. Would you

kindly reply to the question.

MS. VICKREY: You can answer, Dr. Gagliardi.

A. Okay. You -- so within the time, there was no scientific advancement in any of the directions that -- that we talked.

Every week, you came with a new idea, and then it was just very superficial discussion. There was no in-depth in any of the topics. Most of the group members found you not collaborative, quite confrontational person.

You always came to me and said that you had been distracted by trying to finish projects with Martin Head-Gordon by trying to apply for faculty position; that you had also mental health issues and you couldn't concentrate --

Q. I came to you and saying that I had mental health issues?

A. You told me that you were stressed; that things were not fine with you; that --

Q. Respectfully, Dr. Gagliardi, being stressed doesn't -- I don't ever recall

doing that -- but being stressed doesn't imply someone has mental health issues.

A. Okay. Well, you told me that -- sorry if I used the wrong word. That you were stressed; that you couldn't focus on your research; that there was a lot going in your life, so scientifically --

Q. I said -- finish, please.

A. No. Scientifically, there was no progress. You didn't get along particularly well with the other group members, so having you there was --

Q. -- about the group members that complained about me?

MS. VICKREY: I'm sorry. Mr. Chakraborty, can you please let her finish, because you continue to interrupt her answers, and it's -- it's really inappropriate.

THE WITNESS: What was the question? I couldn't hear you.

MS. VICKREY: We're just getting into an argument, and you're cutting off the answers, please --

DR. CHAKRABORTY: I'm not cutting

off her answers. I have to move on with my questions, and she's giving long and winding answers so I do have to wrap up.

MS. VICKREY: Well, that's her prerogative. She can give what answers she wants. It's a discovery deposition; she can give whatever answers she would like.

BY DR. CHAKRABORTY:

Q. Well, the last question was:

What specific conduct were you referring when you said "Romit was a difficult group member"? I believe that you've answered this question. Would you like to add something more to your answer?

A. I think I've answered it.

Q. Was this statement made in response to a request to correct his group website title?

A. I don't recall but presumably.

Q. Did you also propose removing his listing from the website entirely?

A. I think we have already discussed it ten times. I thought that was a

solution, yes. To the -- the different views, yes.

Q. What was your reason for proposing removal rather than correction?

A. I mean, I can repeat it in case it's unclear.

You know, my website is structured in such a way that there is leadership and postdocs, students. And past group members are listed as postdocs or students. You didn't want to be any of this category, so I decided to remove you; also because you had produced zero in my group.

So your premise here didn't make any difference, neither for you, nor for me. If you had not been here for your career, it would have been exactly the same. Because, you know, I list people when I can speak about their contribution, what they have done.

Well, you have person in your group, what has he done in your group? Absolutely nothing.

So it's just as well not to list them.

Q. Did you communicate with Professor Head-Gordon about Dr. Chakraborty's research performance?

A. We talked about your performance at the beginning of your stay, so I would say spring '24. And we were all hoping that you would be productive in my group, you would finish the papers with him. We were all hoping for the best for you. We wanted to support you. It was genuine.

Every time I bring someone in my group, I fight for them. I want them to be successful. It's my role. You know, if you are successful, it reflects good on me.

Q. Did you send Professor Head-Gordon an email stating that I was superficial in my pursuits?

A. I don't recall but maybe I did. I don't know. I don't recall. I don't think we talked about you by emails, but maybe it was more in person but -- yeah.

DR. CHAKRABORTY: I'm showing you SAC Exhibit No. 12. Exhibit page 60.

(Whereupon, the aforementioned exhibit was deemed marked as Exhibit 12 for identification as of this date.)

BY DR. CHAKRABORTY:

Q. Please look at RFA No. 5 and No. 6, admitting communications with Professor Head-Gordon, concerning me and my performance.

A. I don't know. Do you have a copy of this email? I may have -- maybe when I heard that you were fired by PsiQuantum, maybe I communicated with Martin at that point. But you see that it was after you had left my group.

MS. VICKREY: This is -- this is a document that just says "communications," Laura. So if you remember, we answered this.

THE WITNESS: I don't remember.

MS. VICKREY: Okay.

BY DR. CHAKRABORTY:

Q. You don't remember?

A. No.

Q. Did you remember -- do you remember sending an email to Professor

Martin Head-Gordon in end of March, beginning of April 2024, when I was an employee in your group and I just come back from Orlando, Florida? You sent an email to Martin Head-Gordon claiming that I was superficial in my pursuits?

A. I don't remember. Do you have a copy of this email?

Q. I will move on to the next question.

DR. CHAKRABORTY: I'm showing you SAC Exhibit No. 13, page 67 of the document.

(Whereupon, the aforementioned exhibit was deemed marked as Exhibit 13 for identification as of this date.)

BY DR. CHAKRABORTY:

Q. Please look at the interrogatory answer No. 4 and identify Martin July 2024 meetings.

A. So this is the -- so I can say I don't think I sent email to Martin. We just met at a conference. We were sitting at a dinner together, and we talked about you, and we were concerned about you, both of us,

because we thought you were not focused neither on finishing the papers with him -- and this is what something that he brought up -- nor doing anything that had substance in my group. But it was a conversation. And, Romit, again, we were all on your side.

Q. What specific statements did you make about his performance?

A. I don't remember, Romit. It was a conversation at a dinner. It was very formal. I just said that I was -- I don't know. I didn't see a very straight, focused approach. I don't remember the exact word that I used.

DR. CHAKRABORTY: I'm showing you SAC Exhibit 7. Exhibit PDF page 27.

(Whereupon, the aforementioned exhibit was deemed marked as Exhibit 7 for identification as of this date.)

BY DR. CHAKRABORTY:

Q. Please look at the paragraph where Professor Head-Gordon attributes the performance concerns to you.

A. Yes. That's what Martin wrote. Fine. Okay.

Q. What did you say to him?
A. I don't remember. I already told you three times.
This is what you wrote, and maybe what you wrote summarizes what I told him or what impression he had about what I told him.
Q. Which statements were based on your own observations, and which relied on information from ours?
A. I don't know --
MS. VICKREY: I'm going to object as to -- I'm going to object as to the form of that question. And it's compound.
But you can answer if you can.
A. I mean, the only thing is, Romit --
BY DR. CHAKRABORTY:
Q. I'll simplify it; I'll simplify it. If that helps, I will simplify it.
What observations did you make the statements that you made to Professor Head-Gordon about my performance?
A. Romit, we had maybe weekly

meetings, you and I. Every week, instead of talking about going deep into one project, it was about using LLMs, one week to do one thing, one week to do the other thing and so on.

So there was no depth; there was no real digging into something. There was not a scientific question that you really wanted to undertake in a laser-focused way as it -- you know, when we do scientific research, we have to be laser-focused; and we start from letter O, then we go deeper, deeper, deeper, deeper. Instead, every week, it was a change of topic. So I just saw that this was going nowhere --

Q. (Indecipherable.)

MS. VICKREY: I'm sorry. You interrupted her again. She was in the middle of a sentence.

BY DR. CHAKRABORTY:

Q. Go ahead. Finish, finish, finish, finish.

A. No. I just said that I also know that at the beginning, it's like these projects, one explores them on the surface

and then eventually finds a way to go deeper. And I was hoping that, at some point, going from the surface to something deeper would -- would happen. And I was just -- but it had not happened.

And I also knew that you -- you had a limited amount of time. It's not like if you are a PhD, you have five years in front of you. Here we were really trying to cover a buffer of time for you to get to the next stage in your career, so...

Q. What specific work products or records supported each negative assessment?

A. There was nothing. No productivity, nothing. Nothing deep, nothing substantial. I've never seen a project --

Q. Have you --

MS. VICKREY: Just let her finish, let her finish.

A. I've never seen a project where you said, "Okay. This is my -- the scientific gap that I'm trying to fill. This is my hypothesis. This is the way I'd like to proceed. These are the results that

I've obtained." That has never materialized.
Q. Have you ever programmed a LLM?
A. No.
Q. Have you ever been claimed in my presence that you don't have the expertise to judge my work?
A. I don't know. I have --
Q. Have you ever programmed a LLM?
A. It's irrelevant what I have done. I just know one thing: I have the expertise to --
Q. Have you written one line of scientific code in the past five years?
A. Sorry. I haven't heard what you said because you were interrupting me. Can you repeat it?
Q. Scratch that. Strike that question.
Have you completed a written performance evaluation of Dr. Chakraborty before making these statements?
A. No. Because, as I said, usually these performance evaluations are completed within one year. You had been in the group

for four months; so it was not the right time to complete the evaluation.

However, with my experience -- I've been a faculty for more than 20 years now -- I can immediately see, or also after four or five months, when a person is focused, driven towards a goal or when a person is just exploring things on the surface.

Q. I'm showing you SAC Exhibit No. 12. PDF page 60. Please look at RFA No. 10 --

A. I just see up to No. 10. Sorry. I don't see No. 12.

Q. No. 10.

A. Okay. No. 10.

Q. Written warnings, discipline, improvement plan and annual reviews.

A. Sure. You hadn't been there for a year, yes. You had been there for a few months.

Q. The A&P clause gives review eligibility on a July-the-1st date.

A. Sorry. What are we looking at? Which -- can you point to the --

MS. VICKREY: Wait for the question to be posed, because he hasn't asked a question yet.

BY DR. CHAKRABORTY:

Q. In Exhibit No. 1 of the SAC that's on the federal docket, I was eligible for a performance review on July the 1st. Did you ever complete that assessment?

MS. VICKREY: And I'm going to object as to the form of that question because it states facts not in evidence.

But you can go ahead and answer the question. It assumes a legal conclusion. But you can go ahead and answer.

A. No. I did not because you started -- when did you start in my group exactly, Romit? Which --

BY DR. CHAKRABORTY:

Q. -- Laura.

A. Sorry, I cannot hear you.

Q. I started November 27th of 2024. But this is your deposition.

A. Yes. So we're talking about July.

It's six months. I did not have enough, have enough material to complete an evaluation of your performance after six months. As I said, usually, we -- they take about a year.

Q. July is eight months from November.

A. Not really. If we do -- December 1st, you started on December 1st because November 27th for me is December 1st. This is -- so we're talking about seven months. It's not enough.

Q. The job posting that I'm sharing on the screen expressly includes large language models and AI-powered simulation tools. Which such tasks did you assign to him?

A. We talked about these concepts, and I said you are free to explore all of them. So you were -- you were free to explore.

Q. I'm showing you supplement S6, RLEASE-PROV of exhibits, page 136.

Does this page accurately reproduce this 12th April email that you

received from me?

MS. VICKREY: I'm sorry. Could you repeat that question?

BY DR. CHAKRABORTY:

Q. I'm showing you supplement S6, which is exhibits packet page 136. Please look at the 12th April 2024 email headers and the paragraph describing an agenda active space workflow using LLMs.

The question is: Does this page accurately reproduce the 12th April 2024 email that you received from me?

A. I don't know. Because but -- so if I recall, you want to attend this conference, and we discussed about it. And I don't -- and at some point, when the conference materialized, I told you that you had nothing to present, so I discouraged you from attending this conference.

Q. Have you written an LLM-based workflow before?

A. No.

Q. What is an LLM?

A. I don't -- I don't know.

This is not an interrogation about

my scientific knowledge. I don't think I'm supposed to --

Q. Well, if you're passing a judgment on my performance, I would assume that you have some knowledge of what an LLM is.

MS. VICKREY: Is that -- I'm going to object to the form of that question. It's compound.

A. I know what an LLM is, and I'm not going to respond to your quiz questions. I'm just saying that if you wanted to go to a conference and present some work, I would like to see this body of work.

Can you share now with me the body of work that you have produced? I don't seem to have ever seen this body of work during your stay, neither afterwards. I mean, if you --

BY DR. CHAKRABORTY:

Q. Are you claiming that this body of work was not shared --

MS. VICKREY: Okay. She was -- she was midsentence. Let her finish her answer. Every answer is being cut off. Please let her finish.

You can finish that sentence.

A. I have never seen reports of your work in a form that would deserve publication and that would be considered like something substantial has been achieved.

BY DR. CHAKRABORTY:

Q. Did you send the 10th of -- I'm sharing -- like, page 137.

Did you send the 10th of July reply saying: "Yes. This is fine. Tomorrow morning is fine"?

A. I'm not sure what this is about. I don't know the context of this. But if it was, like, for example, "let's meet tomorrow," yeah.

Q. Yes. Basically, like I'm sort of -- we have a meeting scheduled, you say you're available the day after, the -- when you send this email.

My respond was -- my response was: "Could I send you the slide on automated active space selection and using large language models by 12:00 a.m.?"

A. Maybe it's true. Sure. I think

this is reasonable.

Q. Did you subsequently receive the automated active space --

A. I can't remember, I can't remember, I can't remember.

DR. CHAKRABORTY: Okay. Laura, let her -- let him finish his question as well.

A. Sorry. Sorry, Romit.

BY DR. CHAKRABORTY:

Q. Did you use a slide I prepared about automated active space selection in a presentation?

A. I don't think so. I'm not even sure if I have ever seen those slides. I have never used them.

Q. This slide you presented in your state of the union address to your group?

A. Which ones?

Q. The state of the union address to your group as it relates to the dates that have been referenced.

A. You mean, when I -- so I would have to dig which state of the union, which year and so on. When I do the state of

union to my group, either show past results and they are, like, highlights of published work. Or I show concepts of things that could be done. So I would have to look. You have to tell me which year, which -- and so on.

And, sure, I may have said, "Romit is working on this." But saying that someone is working on something doesn't mean that they have accomplished anything. It's more -- you know, ideas, Romit, are very cheap.

Q. Could you repeat that?

A. Ideas are cheap. Facts are what I need. And, by the way, I can give you cheap ideas, but you are -- you as a postdoc, as a staff scientist, as a PhD, are the ones that have to implement, develop these ideas. Because you are the researchers. Okay?

So, sure, I may have said, "Romit will work on this." But by saying someone will work on this and someone has achieved anything, there is a big difference.

Q. To be clear, Professor Gagliardi, the date and the time and the location of

the presentation are clearly articulated in the email and are clear from the context.

Are you not clear about when the email was out and when you made your state of the union talk to your group?

MS. VICKREY: Objection as to -- objection as to foundation and emails and state of the union and timing of all the same.

If you could explain.

DR. CHAKRABORTY: Laura is asking me for a slide to put in her -- in her state of the union talk to her group, which is, basically, her summarizing the research accomplishments of our group to her own group. And the date and the time is -- it had -- it had to happen -- it had to happen after the 10th of July, 2024. And this slide was presented as part of that state of the union address.

A. Was it in July 2024 --

MS. VICKREY: There's no question pending. So just wait for there to be a question to be asked. And I just --

I'm objecting as to this testimony --

DR. CHAKRABORTY: -- wasn't clear on what presentation she used that slide for. And I'm clarifying what she didn't remember is that it had to be the July 2024 state of the union talk to her group, which is clear within the context.

MS. VICKREY: So what's your question?

DR. CHAKRABORTY: Laura said she couldn't remember which presentation she presented the slide at, so I'm clarifying --

THE WITNESS: Okay. Now --

MS. VICKREY: But wait -- but wait.

What is your question?

DR. CHAKRABORTY: My question was: Did you use the slide I prepared about automated active space selection in a presentation? I'm clarifying the date and the context of that presentation.

A. So I went back to my state of union to the group in 2024, and there is --

in one slide, there is a little panel in which it says that Romit is going to work on agentic workflow for automated active space selection using reinforcement learning.

But again, that -- these are big words, and you were supposed to work on that. But, you know, as long as there is no -- there are no results, this is irrelevant what you were going to work on.

BY DR. CHAKRABORTY:

Q. And you know what LLMs are, right?

A. Yes, I do.

Q. What did you mean by your statement in RFA No. 9 that I presented no publications, research, materials to you?

I'm showing you SAC Exhibit 12, exhibits page 63.

Please look at the explanation under RFA No. 29.

A. I mean, there has been no paper, no body of work that could be submitted to a peer-review journal.

Q. What definition of performed work did you use in your response to request for admission No. 16?

MS. VICKREY: I'm going to object as to the form of that question.

You can go ahead and answer, if you can.

A. I'm not sure I understand the question.

I just say that in my work, we quantify, research productivity if someone produces either enough results that deserve to be written into a paper that goes for a peer review -- so a paper -- you write a paper that can be sent to a journal, and the journal will ask other peers to review that work; or maybe you produce some software that can be used by an entire community to really perform a task that could not be performed before. And I never received any such material from you.

Q. Showing you Exhibit No. 7, PDF page 27.

Please look at this discussion of suitability for academia or industry.

What, if anything, did you personally tell Professor Martin Head-Gordon about my future suitability?

A. Nothing. Because I didn't know about your future suitability.

Q. Did you express any view about my suitability for future academic or industry employment?

A. No, I did not.

Q. When you received that email, what did you understand --

So I'm showing you supplement S6, RLEASE-PROV, exhibit PDF page 136.

Please look at the description of the LLM-based active space selection and computations using a back-end engine. What did you understand I was working on?

A. Agentic workflow for active space selection using LLM.

The point is that you have submitted an abstract. Romit, when someone submits an abstract for a conference, it doesn't mean that the work is done. We usually submit the abstracts like two or three months before the conference takes place with the hope that between the time one submits an abstract to the time where the conference occurs, the work has been

completed.

So the fact that you submitted an abstract, I was hoping that within the time you would get something done, and so it doesn't mean anything, the fact that you submit an abstract.

Q. Well, I'm noting that the date that this email was sent was the 12th of April. The abstract was accepted, and the remote conference was on the 6th of May.

A. Okay. Good.

Q. That is a few weeks, at least, between the abstract being accepted and remote presentation.

A. So do you have this body of work? Why don't we -- why don't you show it to me now, and we can evaluate if it's worth a publication or going to a conference or it's so deep --

Q. This isn't your group meeting room, Professor Gagliardi. This is a federal deposition. I ask the questions here.

What definition of "performed research" did you use in your response to

request for admission No. 27?

A. I don't understand this meeting -- this question. Sorry.

Q. What was the definition of "performed research" in your response to request for admission No. 27?

MS. VICKREY: I'm going to object as to the form of that question.

But you can go ahead and answer.

It's a legal conclusion, but you can go ahead and answer, Laura, if you can.

A. "Perform research" means -- for me, it means becoming familiar with the literature within a topic, know what other people have already done and try to find an innovative way to answer a question that has not yet been answered.

BY DR. CHAKRABORTY:

Q. Are you claiming that I wasn't abreast with the literature on LLMs and multireference quantum chemistry?

A. I don't know, Romit. I just -- I don't know. Because every time we talked, we talked about something else.

So I'm you -- you're smart, you've read the literature on top of things. But you have to -- at some point, you have to focus on something, stay focused on a project. And this never happened while you were in my group.

Q. I'm showing you supplement S3, exhibit page 115.

Please look at SR-1 in docket No. 62.

A. So do you want me to read the stuff in yellow?

MS. VICKREY: Just wait for a question to be asked.

BY DR. CHAKRABORTY:

Q. What portion of SR29-1 did you deny after admitting the receipt of the April 12th email?

MS. VICKREY: Wait. Can you -- I'm going object to the form of that question.

And just repeat it, please.

If the court reporter can read it back so we can hear it again.

DR. CHAKRABORTY: Strike that

question.

BY DR. CHAKRABORTY:

Q. Moving on.

Do you recognize the final slide for Laura's state of the union shown in the screenshot? I'm showing you the supplement S6, exhibits page 138. Please look at the slide for Laura's state of the union entry, PowerPoint recent files list.

Do you recognize that file name?

A. I don't remember. I know that I have -- in my slide, I have a little screenshot of what you were -- what we had agreed you would work on.

Q. Which parts of the active space selection work did you personally review before making each performance statement to Professor Martin Head-Gordon?

A. I didn't review anything because there was nothing to review. You never presented to me any real data. It just was talking. You were full of words.

Q. Between the 1st of July and the 10th of December 2024, did you communicate with anyone at PsiQuantum concerning my

then-current research?

I'm showing you supplement S3, PDF page 107. Please look at SR22-3 in docket 62 and its denial during the specified dates.

Did you have any specification concerning my then-current research?

A. No. I never talked to -- with anybody at PsiQuantum about you.

Q. Where are the written copies of the slides and electronic records for this work?

I'm showing you supplement S6, exhibits page 137. Please look at this exchange about the slide.

Where are the sent message attachments, presentation copies and any letter versions retained?

A. I don't understand this question. Sorry.

Q. Where is the slide?

MS. VICKREY: I'm sorry. What slide? What are we talking about?

DR. CHAKRABORTY: The slide that was sent to her as part of her state of

the union address that she included in her state of the union address to her group in July 2024. I can't access the slide anymore.

I'm asking her, who is the custodian? Where is that slide?

A. Do you want me to share the slide with you on the screen now?

BY DR. CHAKRABORTY:

Q. If you have it, it -- it would be great if you could share it as part of discovery, but I don't want you to share it on your screen right now. I'll move on to the next question.

A. Okay. I can share it with you after the -- this. I can send you the slide. At least, I can send you my slide, which utilized part of what you sent me. And this is the only thing that I have.

Q. Okay. Well, if you could, that would be great. I can't access it. It's not available to me anymore.

Before today, have you seen this RLEASE manuscript from PsiQuantum?

A. I've seen it when they put it

on -- on the archive.

Q. So you've seen the manuscript before today?

A. Yeah. It's public.

Q. Based on your knowledge, what relation, if any, does RLEASE have to my 2024 active space selection work?

A. Sorry. What was the question? Can you repeat it?

Q. Based on your knowledge, what relationship, if any relationship, does RLEASE have to my 2024 active space selection work?

A. Who is Arli?

MS. VICKREY: Yeah. If you could --

BY DR. CHAKRABORTY:

Q. RLEASE is the -- I'm showing you the PDF of the RLEASE -- RLEASE archive preprint.

A. What is Arli? Arli? What is Arli?

Q. RLEASE. Reinforcement learning for active space selection.

I'm showing you -- look at section

3.2 on the page, which describes the neural network predictor.

Then section 3.4, reinforcement learning. What relationship, if any, do you personally -- like, what relationship between the slide I shared and this paper?

A. You mean -- sorry. I don't know, I don't know. I have no idea what relationship this paper has with your work. I don't know.

Q. If you had the slide in front of us, you would have a clear idea, but I will move on to the next question.

Do you recognize the RLEASE graphic shown here?

A. No.

Q. Had you previously stated that you lack the expertise to evaluate my research?

A. No.

Q. You have not?

A. No.

Q. Did you tell Dr. Chakraborty that you had complained to Professor Head-Gordon about his performance?

A. No, I didn't say that. I just

said that we were concerned about you.
Q. Did you later advise Dr. Chakraborty to contact Professor Head-Gordon for professional assistance?
A. I mean, he was your postdoctoral adviser for five years. Of course, I would always say talk to the people who know you the best.
Q. I'm showing supplement S1, page 19. Please look at the 5th January message directing me to discuss my situation with Martin.
What professional assistance did you intend that referral to provide?
A. So Martin --
MS. VICKREY: I'm sorry. I'm sorry. Can you repeat that question. I'm having a tough time. It's going -- you're speaking very quickly.
Have the court reporter read it back one more time.
BY DR. CHAKRABORTY:
Q. What professional assistance did you intend that referral to provide?
A. I meant, so you had applied for

positions before, and I had never been a reference for you, neither your academic applications nor your industrial applications.

I said you should talk with your prior letter writers, your prior references like Martin and David Mazziotti, because they know you; they -- they can evaluate your body of work. And they -- they are the people who have supported you in the past and go and talk with them.

Q. When I first contacted you in June of 2023 for a possible early career independent fellowship, did you or did you not ask me to provide Professor Head-Gordon's letter of reference?

A. Yes.

Q. Did you see that letter of reference?

A. Yes.

Q. Between November 20th and December 21st, 2024, did you communicate with Professor Head-Gordon about Dr. Chakraborty?

A. Can you repeat the dates? Is it

when you were with me or the year before? I'm confused now.

Q. November 20th.

A. Of which year?

Q. June of 2023 and January of 2025. Between June of 2023 and January of 2025, did you communicate with Professor Head-Gordon about Dr. Chakraborty?

A. Yes. He was the one who really insisted that I would take you, even if it was a staff scientist position. Of course. Martin really wanted to help you.

Q. What statement --

MS. VICKREY: If we could -- Romit, if we could take a break at some point. Whenever -- whenever you -- whenever is a good place to take a break. Or we can do it now or in a few questions.

DR. CHAKRABORTY: Would you like to take a break? We can take a break.

MS. VICKREY: Sure. It's 10:15, so whenever -- if you want to finish this line of questioning or however you want.

DR. CHAKRABORTY: I'll finish. I can go on. Like, if you would like to take a break, you can request it, and I will take a break right then.

MS. VICKREY: Okay. Let's take a break, then.

DR. CHAKRABORTY: You're just offered me to finish this line of questioning. I will do that.

MS. VICKREY: Okay, okay. Go ahead.

BY DR. CHAKRABORTY:

Q. What statements did you make about his professional performance and suitability for employment?

I'm showing you Exhibit 13, PDF page 67. Please look at the concerns described in answer No. 4.

What were your exact words about his performance or future suitability?

MS. VICKREY: I will object as to asked and answered.

You can go ahead and answer again, Laura.

A. I'm so sorry. This is a

different --
BY DR. CHAKRABORTY:
Q. -- repeat the question --
A. It was the same. So, again, we met; we talked. We had met in March '24; we met again in July '24. And what I told him is that nothing had changed between March and July; that no body of work had been presented to me. Yes. Lack of any concrete results. But, again, it was a conversation over a dinner.
Q. What documents supported these statements?
A. Nothing, nothing, nothing. No document, no body of work, no papers. There was no production of results. I've never seen any result from you. And that's why I was dissatisfied.
Q. Do you know what a Fiedler vector is? Can you define it for us?
A. No.
Are we taking a break?
Q. One second, one second.
MS. VICKREY: Okay.

BY DR. CHAKRABORTY:
Q. Did you tell Dr. Chakraborty that you had complained to Professor Head-Gordon about his performance?
A. Maybe. I don't remember exactly. But I may have told you that I met Martin and we were both concerned.
DR. CHAKRABORTY: Okay. Well, thank you for answering.
Shall we take ten minutes?
MS. VICKREY: Yeah. Let's take ten minutes.
(Whereupon, a short break was taken.)
BY DR. CHAKRABORTY:
Q. In 2024 -- ready?
In 2024, did you know that Arvin Kakehani -- spelled A-R-V-I-N; Kakehani is spelled K-A-K-E-H-A-N-I -- was employed by PsiQuantum?
A. No. In '23 -- I think I started communicating with Arvin in '24.
Q. The question was: In 2024, did you know that Arvin Kakehani was employed by PsiQuantum?
A. Yes. In '24, yes.

Q. Before the 10th of December, 2024, did you communicate with Arvin Kakehani concerning the plaintiff?

A. Absolutely not.

Q. I'm showing you supplement S7, exhibit PDF page 154. Please look at the two highlighted incoming messages referring to "she."

MS. VICKREY: I'm going to object as to foundation.

I'm not sure that we know what we're looking at.

BY DR. CHAKRABORTY:

Q. Well, I will clarify the foundation.

These are text messages exchanged between me and Arvin Kakehani. They've been shared with you multiple times via email. And these are text messages between myself and Arvin Kakehani that are referring to my previous work at the University of Chicago where Laura Gagliardi was my supervisor.

And Arvin is referring to Professor Gagliardi as "she," when he says: "She asked when you will join." And I said:

"October 7th and 28th and how we said 28th at the end."

"She seemed to think that the project" -- Arvin is referring to the project that I was working at at the University of Chicago -- "is taking very long anyways, so she was like, 21 days really doesn't matter. Doesn't make a difference." It's a typo here, but -- "Difference if Romit wants to leave earlier, then he can. And she said that she has told you that."

MS. VICKREY: Okay. I'm objecting as to the foundation because you're not laying a foundation for these texts. But that's okay --

(Crosstalk.)

MS. VICKREY: Okay. Let me state my objection.

I'm objecting as to the foundation for these texts.

And I'm also going to object as to the form of this question.

But you can go ahead, Laura, and you can answer to the extent, you know,

pending that objection.

A. I mean, I don't recall. I -- it's not completely unlikely that once I knew that they made you an offer, I was very happy for you and for them, and I had this informal conversation.

I had nothing to do with your offer with PsiQuantum. They never asked me for a reference, for a review. I just learned it from you. You told me that you had this offer, and I was very happy for you. And I may have told them that, sure, you should start as soon as possible.

DR. CHAKRABORTY: I respond to the objection about the foundation, which was made clear twice.

Arvin Kakehani was an employee at PsiQuantum, and she communicated with -- Laura communicated with Arvin Kakehani multiple times before December 10th of 2024.

A. I don't --

MS. VICKREY: Okay. That's -- that's not a question. This is Mr. -- Mr. Chakraborty's statement. That's

not a question.
So we're -- Laura, you're just going to answer questions. Okay?
BY DR. CHAKRABORTY:
Q. Did you work as a paid consultant for PsiQuantum before December 10th, 2024?
A. Yes.
Q. Were you in active conversations with PsiQuantum to author a DARPA collaboration grant before December 10th, 2024?
A. Yes.
Q. Did you tell Arvin that my UChicago project was going to take a long time?
I'm showing you the supplement.
"She seemed to think that the project" -- it's highlighted: "She seemed to think that the project is going to take very long anyways, so she was like, 21 days really doesn't make a difference. If Romit wants to leave early, then he can, and she says that she has told you that."
MS. VICKREY: Okay. I'm going to object as to the form of the question.

It was compound.

BY DR. CHAKRABORTY:

Q. Are you the "she" in this text --

MS. VICKREY: Objection as to --

BY DR. CHAKRABORTY:

Q. I'll rephrase the question.

Are you the "she" that is being referred to in this text between me and Arvin Kakehani? I have laid the foundation. I'm asking if she's the "she" in this text.

A. I don't know.

MS. VICKREY: Objection. Objection as to foundation. She didn't write this text.

BY DR. CHAKRABORTY:

Q. I wrote this text, and this is between me and PsiQuantum personnel.

A. I don't know. I don't know. It was a conversation between you and Arvin. I have no idea.

Q. But did you communicate with Arvin Kakehani before December 10th, 2024?

A. Yes.

Q. What factual basis supports your denial in RFA26, which is being shared on

the screen, that you communicated with any PsiQuantum personnel concerning me at that time?

A. I was not asked to write a reference letter for you. I was not asked to express any opinion about you. I have no idea what they hired you for. I have nothing to do with your hire. I just -- I may have told him, great if he comes and works for you; he can start whenever he likes. That's the only thing I may have told him.

Q. Before July 1st and December 10th, 2024, did you communicate with Arvin Kakehani about my transition from University of Chicago to PsiQuantum?

A. I may have said what you referred to before, but I had nothing to do with your hiring with PsiQuantum.

Q. During the same period, what, if anything, did you discuss with Arvin about my then-current research?

A. About what? Sorry.

Q. During that period, the period between July the 1st and the 10th of

December 2024, what, if anything, did you discuss with Arvin about my then-current research?

A. "About my ten car"? I couldn't hear.

Q. About my then-current research. The research that I was doing at the University of Chicago.

A. Nothing.

Q. Had you completed the performance report contemplated by Dr. Chakraborty's appointment documents?

A. No. We -- we have discussed it before. No. Because you had been with me for not long enough to complete any -- any report.

MS. VICKREY: And I'm going to object as to asked and answered.

BY DR. CHAKRABORTY:

Q. Did you tell Arvin that a 21-day difference in my departure would not make a difference to the project?

A. Presumably so, yes.

Q. Did you tell Arvin I can leave early if I wanted to?

A. Apparently, I did, according to this. But I can't remember. I don't remember. But, yes, I --

Q. Did you --

A. -- may have.

MS. VICKREY: Let -- let her finish.

BY DR. CHAKRABORTY:

Q. I did.

A. Romit, when I heard that you had a job at PsiQuantum, I was really happy for you because I wanted the best for your future career. And I felt that I had fulfilled my role of giving you this buffer of time in which you could transition to your next position. So I was genuinely happy, and I told you focus on your next career, be successful there.

And so I said if you need to start one month earlier, absolutely fine. It makes no difference for our relationship, for our project. Because there had been no -- no production of anything so far.

Q. I'm moving on to the next question. I'm showing you supplement S7.

Exhibits page 151. Page ID AK-C01-004.

Please look at my 5th of August 2024 message saying that you asked Abhishek Mitra, a grad student then who just graduated, I believe, from your group, to speak to me.

Did you make that request to clarify? Did you ask Abhishek Mitra to speak to me about joining PsiQuantum?

A. No. Absolutely no.

Q. At the time -- at the time, were you aware (audio disruption) received an offer from PsiQuantum?

A. Sorry. You were cut. Can you repeat?

Can you hear? Is it my problem, or is it --

MS. VICKREY: No, no. He's broken up a little bit. It's frozen a little bit. We'll just wait for his Wi-Fi to click in.

THE REPORTER: You want to go off the record until he comes back?

MS. VICKREY: Yes.

(Off the record.)

BY DR. CHAKRABORTY:

Q. Can you see my exhibit screen?

A. Yes.

Q. Right. The question was, did you ask Abhishek Mitra to speak with me about joining PsiQuantum?

A. No.

Q. At the time of this email was sent, did anyone else in your group -- have anyone else received a job offer from PsiQuantum?

A. I don't remember. I know that -- I mean, two people from my group joined PsiQuantum: Abhishek and Matthew Hennefarth. But I don't remember the exact dates, honestly.

Q. Did they or did they not get the offer letter after I received one?

A. I don't know. Because I don't know when you received one, I don't know when they received one.

Q. Which records document any communications you've acknowledged with Arvin concerning me? And I'm showing you supplement S7, exhibits page 154. Please

return to the highlighted report of discussion.
Which emails, messages, meeting records or other documents record any communication you have acknowledged?
A. I -- I don't think I didn't have any email with -- you mean with PsiQuantum? Do you mean email with PsiQuantum?
Q. That's right.
A. I don't have any email with PsiQuantum about you joining them. Just at some point when I heard, I may have, in a text, told Arvin that I was very happy and that you could start as soon as you wanted.
Q. Could you confirm that text message?
A. I don't know. I mean, that text message was not my text message. I have no idea about your text message with Arvin.
Q. I was asking about your text messages with Arvin.
A. Can I see it? I don't see it.
Q. You should be knowledgeable about the text messages -- messages that you sent to Arvin. The question is can you --

A. I don't know, I don't remember. I don't keep track. I delete my messages within 24 hours. I don't remember. I -- I may have -- I don't know if it was a text or if it was in a phone call. I just said it's great that you have hired Romit; I'm very happy. Like probably I said when I heard that they had hired Abhishek or Matthew Hennefarth.

You know, as I said, my goal is for my people to grow in my group and transition to the next step in their career. And when this happens, I'm the happiest person in the world.

Q. And in your conversations with PsiQuantum and its personnel, did you introduce me as a postdoc? As a postdoc in your group?

A. I never talked about your role or anything. I don't know. I never talked with them about you formally. Again, I've already said it several times.

Q. I'm showing the second amended complaint, Exhibit No. 9. Exhibit page 44. Please look at your website message and its

recipient list.

What action did you intend those recipients to take?

A. Sorry. I'm not sure I understand this question. We have already seen this email maybe ten times this morning.

Q. Yeah, yeah. But what action did you intend then to take?

MS. VICKREY: I'm going to object as to form and unidentified people.

BY DR. CHAKRABORTY:

Q. Well, it's on your screen, and it's to Sharon Bryant, Ben Anderson, La Toya Cobbins, Monica Lugo UChicago.

"I'm not sure where the Quantum-AI Researcher came from. Romit has been a very difficult group member, and he's pushing on this. I will remove him from the website. Please let me know if this is acceptable."

The question is: What did you intend the recipients to do with your negative assessments?

A. I don't understand this question. I just was saying that, for me, dealing with this was a complication because, again, how

my website is structured, how my research group is structured. So you didn't want to be listed as a postdoc, fine. I would remove you from past members because --
Q. So you were expecting them to remove me from your group's website?
A. Not them. It's my group; it's my group website. I do whatever I like with it. I just ask if it was okay with them.
Q. Are you not a University of Chicago employee?
A. Yes.
Q. Okay. So I'm showing you SAC Exhibit 4. PDF page 272.
Please look at the production response identifying emails, identifying the other messages, meeting notes and documents concerning these communications and their custodians.
A. So what -- what do you want me to do with this? I'm not sure I understand what I'm supposed to say or to do.
Q. So your response to RFP No. 1 is that there are no email communications with Dr. Head-Gordon about Plaintiff?

A. I communicated --

MS. VICKREY: Wait. Wait for the question to be posed.

BY DR. CHAKRABORTY:

Q. Identify all messages, meeting notes and documents relating to these communications.

MS. VICKREY: Well, is that a question?

DR. CHAKRABORTY: Yes.

MS. VICKREY: Well, she's not going to identify documents in a -- in a deposition.

BY DR. CHAKRABORTY:

Q. During this deposition, Professor Gagliardi, you mentioned that you had communicated with Martin in writing about my superficiality.

MS. VICKREY: Objection.

A. -- say that. I never -- I communicated at conferences that we were at dinner and were talking about as you -- as I do about my other students or postdocs. I communicated with him only after I heard that you had been fired by PsiQuantum.

So I didn't communicate by email and about your performance before.

BY DR. CHAKRABORTY:

Q. Professor Gagliardi, are you stating on the record that end of March, beginning of April 2024, you did not communicate via email with Professor Head-Gordon about my superficiality?

A. I don't recall. I don't think so. I talked with him at the conference. I don't recall --

Q. You don't recall, or you don't --

MS. VICKREY: Wait. Let her finish, let her finish.

A. I think I never communicated by email to Martin until --

BY DR. CHAKRABORTY:

Q. To be clear, at the end of March, beginning of April 2024, you did not communicate with Professor Head-Gordon using his Berkeley email in writing about my superficiality?

A. I don't think so.

Q. Got it.

Professor Gagliardi, have you

previously employed other -- employed people under a cap-exempt H-1B visa?

MS. VICKREY: Objection as to relevance.

BY DR. CHAKRABORTY:

Q. Professor Gagliardi, you've been a professor at Minnesota (sic) for a number of years. You've employed probably hundreds of graduate students and postdoctoral candidates. You've employed staff scientists, both American and international. Have you hired people on a cap-exempt H-1B visa?

MS. VICKREY: Objection as to relevance.

But you can go ahead. You can answer.

DR. CHAKRABORTY: Professor Gagliardi stated on the record in docket No. 22 that she wasn't aware that I was on a cap-exempt H-1B visa.

MS. VICKREY: Is that a question?

BY DR. CHAKRABORTY:

Q. Were you or were you not aware that I was on a cap-exempt H-1B visa when I

started at the role?

MS. VICKREY: Same objection. Relevance.

You can go ahead and answer, Doctor.

A. I was not aware. I usually leave these questions to the people who handle with visas.

BY DR. CHAKRABORTY:

Q. I have -- this is -- this question has background.

I had to initiate the checkout meeting of, like, a couple previous meetings. You've had the checkout list included that I have an off-ramp meeting with my previous PI. And I took that meeting from the airplane at O'Hare, and it was a Zoom meeting at 3:00 p.m. Chicago time on October 26th of 2024, in which you categorically asked me what visa status I was on, to which I responded I was on an O-1A visa.

Do you -- do you recall that meeting?

A. No.

Q. You don't recall the meeting happened? Or are you saying that the meeting did not happen?
A. I don't recall.
Q. Did you receive -- so I'm showing you supplement S5, PDF page 133. Please look at the 3rd of October, 2023 O-1A petition support letter concerning my employment.
Did you receive or review the university's 3rd of October 2023, h-1B petition support letter concerning Dr. Chakraborty?
A. Yes. I guess so, yes.
Q. Do you recall writing a letter to the embassy regarding the processing of my H-1B visa --
A. No, I don't recall.
Q. Did you know that my university-sponsored H-1B petition was cap-exempt?
A. No. I don't even know what it means.
Q. I'm showing you SAC Exhibit 12. PDF page 59. And please look at RFA 1

again. I'm now asking separately about your understanding of the consequences of ending employment.

What did you understand at each relevant time about the immigration consequences of ending his appointment?

MS. VICKREY: Objection as to form and objection as to relevance.

DR. CHAKRABORTY: I laid out the form and the relevance.

BY DR. CHAKRABORTY:

Q. I was employed as a cap-exempt in a cap-exempt H-1B position.

The form is the following, I'm separately asking about RFA No. 1, which is on the federal docket. What did you understand at each relevant time about the immigration consequences of ending his employment?

MS. VICKREY: I'm stating my objections. And you can go ahead and answer, Doctor, if you can.

A. No, I cannot. I'm not an expert in visa issues. We have an office that does that, so I follow what they tell me to do.

And once again, Romit, there was not any malicious intention on my part. I just followed the rules. And there are some rules that they want us to follow to employ foreigners. I let the office deal with that, and I do what they tell me to do.

BY DR. CHAKRABORTY:

Q. With all due respect, malicious intent is something for the Court to determine at this point.

DR. CHAKRABORTY: But -- and do you, Attorney Vickrey, if you say -- if you state vague words like "form" and "construction" in stating an objection next time, I'll ask you to cite the relevant statute; is that clear?

MS. VICKREY: No, no. You will not be doing that. I can make my objections on the record.

BY DR. CHAKRABORTY:

Q. I will move on to the next question.

I'm showing you supplement S1. Exhibit PDF page 93. Please look at my January message describing my termination

and immigration jeopardy and the need for a new job. I'll follow up with a question:

When did you first learn that -- that my PsiQuantum employment had ended and that I faced immigration and career jeopardy?

A. When you told me.

Q. Would it be fair to say that it was the same date at which this email was sent to you?

A. Presumably, yes. I think so.

Q. Did I tell you that I faced serious professional and career jeopardy and significant immigration jeopardy in that email?

A. Apparently, it's written there, yes. You wrote -- this is the email that you sent to me.

MS. VICKREY: Objection as to relevance.

DR. CHAKRABORTY: I'm showing you SAC Exhibit No. 8, PDF page 35.

(Whereupon, the aforementioned exhibit was deemed marked as Exhibit 8 for identification as of this date.)

BY DR. CHAKRABORTY:

Q. Please look at my December 31st, 2024, request for support at the University of New Mexico application.

Did Chakraborty discuss any specific prospective positions, collaborations, fellowships or other professional opportunities with you?

A. Sorry. I don't understand this question.

Q. Did I discuss any specific prospective positions, collaborations, fellowships or any professional opportunities with you?

A. So you're asking if when you weren't working in my group, you discussed about you applying for future positions? Is this the question? Yes, you did.

Q. Well, at the -- in my time at the group, I mentioned several times in meetings where I was trying to present research to you. Never went through but I tried.

I stated, categorically, that I was in an expression of interest application as a PI at Oxford and I needed to keep

publishing in order to get that job. Were you aware of that?

A. Yes.

MS. VICKREY: I'm going to object to the form of that question and the assumptions that are embedded within that.

But you can go ahead and answer that question.

A. I knew that you were looking for faculty position, and I would have loved you to get faculty position.

BY DR. CHAKRABORTY:

Q. Why do you say that?

A. What? Can you repeat?

Q. Would you not love me to get a faculty position anymore?

A. Yes. I mean, listen, I want the people in my group to be successful with their career. But there is only so much I can do in terms of recommending them and --

Q. That answers the question, that answers the question --

MS. VICKREY: No, no. Don't. Do not cut her off. She was mid-sentence.

She was mid-sentence. Let her finish her sentence.

There was only so much that you can do, you were saying. You can continue.

A. Romit, whatever your next role is in your profession, I'm very happy for you. This doesn't mean that I will have anything to do with this because my recommendation letters carry weight, and I use them only when I have materials to work on.

So if you find a job tomorrow, whatever job it is, and you're happy with it, I'm very happy for you. I want your happiness. I've nothing against you as a person, just there is only so much that I can do for you.

Q. Were you or were you not aware of my site visit at Orlando to interview for the final round at the University of Central Florida at the end of March and beginning of April 2024?

A. I'm not sure. I don't remember. But I knew that you were looking for positions. I -- you may have told me. I

have forgotten. But it's irrelevant.

Again, I was supportive. I want -- I took you in my group so that you would have a period of time to get this position.

Q. I'm assuming that you're done with your answer and moving on.

Next question. Sharing the exhibit. I'm showing you supplement S1, page 95. Please look at my January request for official records of my university research. The question is:

What documentation of my 2024 active space selection work did you supply in response to my request for official research records?

A. I don't recall, I don't know. I don't -- I don't understand the question, and I don't recall.

Q. I'm showing SAC Exhibit 12, PDF page 59. Please look at RFA No. 3 and its denial concerning access before 24th of December, 2024.

What role, if any, did you have in ending my university IT or RCC access in

December 2024?

A. Sorry. Can you repeat the question?

Q. What role did you have in ending my university email IT or RCC access in December 2024?

A. I had no role. There is a procedure at the university when someone leaves, after a certain amount of time, their email address is no longer valid, and they not longer have access to the computational resources.

Q. I'm showing you supplement S2. Exhibit page 100.

Please look at your 20th of December, 2024, offer of a couple of days of RCC access to retrieve the data.

A. Uh-huh.

Q. Question: On December 2024, did you tell me that I could have RCC access for a couple of days to retrieve my data?

A. Yes. I think so.

Q. Did the data you allowed me to retrieve include my active space selection work?

A. I allowed you to retrieve whatever you had produced. I have no idea what you had produced, and I had said, "Take everything with you, whatever you have done when you were here. Do whatever you like with this material. It's all yours. Just leave me out of it. I don't want to have anything to do with it."

Q. The data that you referred to came from research that I had performed during my employment in your group, correct?

A. I have no idea because I don't know what this data were. I suppose, presumably, yes. You had generated when you were employed at UChicago. But what they were, I don't know.

Q. That research was performed using University of Chicago facilities and resources, correct?

A. I suppose so.

Q. I'm showing you supplement S2. Exhibit PDF page 100. Please keep the reference to this data in view. I'm asking about the underlying research.

When my RCC account was curtailed,

that research was performed using the University of Chicago facilities and resources, correct?

A. I guess.

Q. You wrote that subsequent -- subsequent work using those data would be exclusively yours -- and that's in quotes, starting with "Exclusively yours and not associated with the University of Chicago," correct?

A. Yes.

Q. I'm showing you supplement S2. Exhibit page 100. Please keep that full paragraph in view.

I'm asking what you intended about acknowledging where the underlying work was performed. Were you instructing me not to acknowledge that the underlying research had been performed at the University of Chicago?

A. I don't know. I just meant that I didn't want to have anything to do with that work, because I didn't know what you were doing. And so I put my name only on work that I can defend myself.

I -- I have never seen any body of

work because there was a lot of talking but never results of anything. And so I just said, "Go with it. Do whatever you like, but leave me alone. Leave me out of it." I mean, what else could I do?

Q. Respectfully, Professor Gagliardi, this email says: "Exclusively yours and not associated with the University of Chicago"?

A. Yeah. You were --

Q. Professor Gagliardi --

MS. VICKREY: Wait for there to be a question.

THE WITNESS: Mm-hmm.

BY DR. CHAKRABORTY:

Q. Are you aware that I'm an alumnus of the University of Chicago?

MS. VICKREY: Well, I'm sorry. Could you repeat that question.

BY DR. CHAKRABORTY:

Q. Are you aware that I'm an alumnus at the University of Chicago?

A. You did a PhD at University of Chicago with David Mazziotti. Yes, I know. Why is it relevant?

Q. I will -- the previous question

was not answered clearly.

Were you instructing me not to acknowledge that the underlying research had been performed at the University of Chicago?

A. Yes. I was instructing you that the underlying research had nothing to do with my group, with the funding that I provided you to do work in my group, because I couldn't -- I didn't see any significant body of work during your stay in my group. I didn't know what you were doing, what you would have done with this data afterwards. So I just wanted to disconnect myself completely from you scientifically.

Q. Professor Gagliardi, before I started at your group, I got the Microsoft Accelerated Foundation Models Research grant funded with a proposal that I authored completely myself. They didn't make any edits to the grant. That grant got funded with USPI, and I used computational resources from Microsoft research, as well as the University of Chicago's research and computing facility while I was at the University of Chicago. The research was

performed at the University of Chicago.

A. What is this research? If you show me --

MS. VICKREY: Wait for -- yeah. Wait for a question to be asked.

BY DR. CHAKRABORTY:

Q. When you asked for the University of Chicago not to be included in that work, what university policy authored that instruction -- authorized that instruction?

MS. VICKREY: Okay. Objection as to relevance.

You can go ahead and answer.

A. So maybe I have already repeated many time, but perhaps I should repeat it once again.

I hired you in my group. You were given an opportunity to do research in a very respected research environment. You wrote the proposal for these resources yourself, but I'm sure that if -- maybe the proposal had not come from my group, the University of Chicago, it would have been seen differently. It was an opportunity. You were given a place, a prestigious

institution, resources, a group where there was intellectual support for your work, where you could have discussed steps in your research on a daily basis.

You did nothing with this opportunity, because you have never produced a single piece of research that deserves to be called such. So you leave, you bring in whatever you have worked with -- let me finish -- you do whatever you want to do with that.

I don't want this work to be associated with my name because I have a reputation. I have some standards. And I could not verify that what you did had anything to do with my way of working. There has been no body of work that you have ever presented to me.

Q. In November 2024, when I -- a few weeks after I started at PsiQuantum, I offered to open a channel in order to discuss that work. What was your response to that overture?

A. I had no interest in this work. Just go away; leave me in peace. I've done

my work. I offered you an environment that allowed you to transition to your next job. You have done nothing in my group during those period that -- those months. Just leave me alone and move on and perform professionally in your next position. That was what I wanted to achieve.

Q. Are all -- are all the research projects that you've authored that eventually turn into publications completed within 11 months from start to finish?

A. No. But within 11 months from start to finish, the people present some intermediate results that we can discuss. I had never seen a single result from you. Just words, empty words. So there was nothing. There was not even the beginning of a project.

DR. CHAKRABORTY: I'm showing SAC Exhibit 14. Exhibit page PDF 27.

(Whereupon, the aforementioned exhibit was deemed marked as Exhibit 14 for identification as of this date.)

BY DR. CHAKRABORTY:

Q. Please look at the production

responses concerning communications and produced title e-mails.

Have you preserved emails, messages, notes and attachments related to these communications?

A. No.

Q. What accounts or locations contain the records of the communications and research matters that we've discussed?

A. I don't know.

Q. Is there any factual answer you gave today that you wish to correct or clarify?

A. I try to answer in the best of my ability.

Q. On October 24th of 2024, on my penultimate day at work, I gave an extensive research talk, one.

Two, throughout my time in your group, I gave regular literature presentations as part of the ongoing group literature presentations schedule.

Do you deny that fact? Do you deny these two facts?

A. I don't recall the exact dates.

I'm sure you have given presentations.

Q. Is it your contention that those presentations weren't research presentations and those presentations did not involve literature surveys?

A. I don't -- I know -- I don't know. I'm sure that if you presented a paper from the literature, you would have reviewed it professionally because you have the ability to do so.

About your research presentations, I don't recall. I would have to review it. And I don't think there was ever any content that was beyond a wish list.

Q. Well, Laura, having interacted with you one-on-one -- and, like, this is a subjective assertion -- I'm not very confident about your level of mathematical sophistication dealing with the topics that I've presented you, which has since been published. You're happy to review -- I'd be happy if you reviewed. It involves the intersection of face space methods and quantum mechanics, which involves C*-algebra, which is a topic that I know

that you're not familiar with. I'm happy for you to review them.

It is deeply hurtful to see you speak of my research and my accomplishments in the manner in which you've done during this deposition. It is also deeply insensitive.

And I will go through a couple of reviews regarding the contents of what was asked today. We're doing fairly well on time.

MS. VICKREY: Well, I'm going to object to that soliloquy because it wasn't a question. But that's fine if you want to talk to the witness that way.

DR. CHAKRABORTY: It's a comment on the record. I'm allowed to do it.

BY DR. CHAKRABORTY:

Q. It wasn't that hard, was it?

A. Sorry. Do I have to say anything?

MS. VICKREY: No.

BY DR. CHAKRABORTY:

Q. I'm showing you -- this is SAC Exhibit No. 3. Exhibit page 9. Please look

at the displayed January 3rd, 2025, date.

Is that when you sent the title statement, title statement meaning "The title Quantum-AI Researcher is totally made up by you"?

MS. VICKREY: Is there a question?

BY DR. CHAKRABORTY:

Q. Is that you that sent the title statement?

A. I send that email. I think I explained that, perhaps, the use of words was not perfect. What it meant is that we made up the Quantum-AI Researcher title to give you an opportunity to work in our group and not to be employed while you were trying to transition to the next position.

Q. You knew that I had a job offer in hand before I accepted the offer to start -- to start as staff researcher in quantum AI at the University of Chicago?

A. Can you repeat the question? Sorry. I couldn't hear you.

Q. Scratch that.

So after I left your group, my computer was assigned to Matthew Hennefarth,

was it not?
A. I don't know.
MS. VICKREY: Objection as to relevance.
BY DR. CHAKRABORTY:
Q. Did Matthew Hennefarth start as an employee of PsiQuantum circa May of 2025?
A. Yes.
MS. VICKREY: Objection.
Objection as to relevance.
BY DR. CHAKRABORTY:
Q. Did Abhishek Mitra start at PsiQuantum after I received a job offer from PsiQuantum?
A. I don't know.
MS. VICKREY: Objection as to relevance.
BY DR. CHAKRABORTY:
Q. Were you present at my October 24th research presentation on the penultimate day of my job at the University of Chicago?
A. I don't recall.
Q. At the talk, I presented a Fiedler letter vector method for selection selecting

active spaces. Do you recall that I made that statement at the research presentation?
A. No, I don't.
Q. Did you recall the numerical contents presented during that research presentation?
A. No.
Q. Do you recall the scientific content of the research presented on October 24th of 2024?
A. No.
Q. Do you recall being at the meeting?
A. I don't recall. I have -- I don't remember. Sorry. I would have to go back, look at my calendar. And even if I did, I don't remember. Sorry.
Q. I'm going back -- I'm showing you Exhibit 5, exhibit -- sorry. I'm showing you Exhibit 3. Exhibit PDF page 9. Please look at the 3rd January email and its recipients when you --
When did you send it? And what earlier immigration information had you received by that date?

A. Sorry. What -- what was the question again?

Q. This is the January 3rd email that you sent to me, copying Monica Lugo. The question is:

After learning of my immigration difficulties -- at this point, you had already learned of my immigration difficulties. Did you communicate with Monica Lugo about my Quantum-AI title?

A. I don't recall. Sorry. I don't know.

Q. This is one big scan. Thank you for bearing with me.

Showing you SAC Exhibit 12. Exhibit PDF page 62. Please look at RFA page 26 and its denial of communications with PsiQuantum personnel concerning me at any time.

What factual basis supports your denial in RFA 26 that you communicated with any PsiQuantum personnel concerning me at any time?

MS. VICKREY: I'm sorry. Can you -- can you just repeat that

question.

BY DR. CHAKRABORTY:

Q. What factual basis supports your denial in RFA 26 that you communicated with any PsiQuantum personnel concerning me at any time?

MS. VICKREY: And can you scroll down to RFA 26 if you're asking about that? Okay.

A. Do I -- so I think, as we discussed before, I may have exchanged an informal text or conversation by phone with Arvin saying: "I'm great that you hired Romit." That's the only communication that I had with PsiQuantum about you, Romit.

And I was genuinely happy that you moved to this job. I told you, I was very proud of you.

BY DR. CHAKRABORTY:

Q. Did you make adverse comments about my performance in your research group to Martin Head-Gordon, despite not creating any written record as it was required in the offer letter to Professor Martin Head-Gordon?

MS. VICKREY: Objection as to the assumption embedded within that question.

You can answer.

A. No. Not during while you were working with me. I was just saying that nothing -- I mean, there hadn't been a lot of work performed. But I also understood your situation, that you were transitioning. So I had a -- so I didn't really express any negative thoughts.

Q. You did not express any negative thoughts about me to Professor Head-Gordon?

A. I just said that you were not doing anything in my group. You were not working towards a project related to my interests and to the grant that I used to pay you. But I was hoping that you would finish the paper with Martin; that you would advance somewhere else.

Q. Prefacing this with a comment: Professor Head-Gordon is probably the top electronics structure theorist in the world.

What did you expect Professor Head-Gordon to do after that communication?

This isn't talking about, like, 80 percent good performance. This isn't speaking about 95 percent good performance. This is talking about 99.99 of the creme de la creme that do electronic structure.

What did you expect Professor Head-Gordon to do when you said that I wasn't working?

A. I don't know. I just know that Martin had asked me a favor, to hire you. I did him a favor, and you didn't do anything in my group. And I was paying you a lot of money with taxpayer money; and so I was disappointed, and I expressed to him my disappointment.

And I don't care if Martin is 100 percent and I'm at the bottom of the pyramid in your view. I just say that I -- when I hire people, I expect them to work on what they're hired for. And you were not advancing the research in a meaningful way in my group, and I was upset.

Q. After I got my PsiQuantum offer, I did a Zoom call with you in which you saw the offer letter. Do you remember the

amount of pay that I -- that that offer letter showed and your advice to me after that?

MS. VICKREY: Objection as to the form and compound.

You can go ahead and answer.

A. I don't remember the details. I just remember that I told you that this was great and you should accept this position.

BY DR. CHAKRABORTY:

Q. Do you recall making comments about my age to other group members and directly to me about my unsuitability for research because I was too old?

A. I don't recall. But it may have -- well, it has -- I mean, you know how things work in academia. They want to hire people who are in their second or third year post-doc. You had been a post-doc for a long time and this should be something not -- that would reflect favorably towards you. I just was trying to be objective and telling you what were the chances that you would get an academic job. And I thought PsiQuantum was an excellent opportunity for

you.

Q. Was PsiQuantum an excellent opportunity for you?

A. No. What does it mean? Which opportunity? I had no opportunity. This question, I don't --

MS. VICKREY: Objection -- yeah. Objection as to form and to relevance.

DR. CHAKRABORTY: Laura has had consultant agreements with PsiQuantum that pay about $600 an hour, and she's on a NQAC grant with PsiQuantum, she has on her LinkedIn 2026.

BY DR. CHAKRABORTY:

Q. Has PsiQuantum been a good opportunity for you?

MS. VICKREY: Objection to form.

You can go ahead answer.

A. Just to clarify, I had a consulting opportunity with PsiQuantum. I had three hours of consulting during my entire life with PsiQuantum, and the fee that they paid was much lower than what you said. It was half or less. So probably with PsiQuantum, I made, in my entire life,

$1,000, or something of that order.

The grant with PsiQuantum was a grant that we wrote through the University of Chicago. Having the name of PsiQuantum there probably helped getting the grant, but I think it was a minor part, and we are not really working with PsiQuantum on that grant. So I think I had enjoyed my interaction with PsiQuantum. It's nice to see the field advancing. But I don't think it made a big difference in my career.

BY DR. CHAKRABORTY:

Q. Before I got the offer at PsiQuantum, I got an offer at Svante, a Canadian firm, that does -- they gave me an offer to do research on LLMs and metal organic frameworks.

So soon after I was hired, did you or did you not interview at Svante?

A. No. I never had any connection with Svante.

Q. Did the PsiQuantum consultation occur after I had received a job offer from PsiQuantum?

A. No. They -- they are happening in

the summer of 2024, so if you had received the job offer, I didn't know about it.

Q. You weren't aware of the job offer that I received from PsiQuantum?

A. No. I learned it from you.

DR. CHAKRABORTY: Well, I think I'm done with my line of questioning. I'd like to thank you again for your participation.

MS. VICKREY: We're just going to take a quick break.

DR. CHAKRABORTY: Let's come back -- let's come back in ten minutes.

MS. VICKREY: In ten minutes. Thank you.

(Whereupon, a short break was taken.)

BY DR. CHAKRABORTY:

Q. In December of 2024, I reached out to you regarding a letter of support for the live University of New Mexico faculty position. What was your response to that?

A. I mean, I don't recall exactly this date. But, in general, when you ask me for a letter of support, I said that I would not be willing to write any letter of

support for you.

Q. Were you aware that I was looking for jobs at the intersection of quantum mechanics and artificial intelligent after I left your group?

A. I knew that you were looking for jobs. I don't know exactly which areas precisely, but I knew -- I knew that you had a job at PsiQuantum, also. That you found a job.

Q. The question -- by December, I had communicated that that engagement had ended. Were you aware that I was looking for a job?

A. Presumably. I don't know. Maybe. I knew that you wanted to find a job.

Q. Have you designated anyone at the University of Chicago to verify my employment duties and research activities during my staff research appointment?

A. I don't understand this question.

Q. You did not provide a letter of support so there's no one to verify that I was even an employee at the University of Chicago between 2023 and 2024.

Have you designated anyone at the

University of Chicago to verify my employment duties and research activities during my staff research appointment?

A. No.

Q. Who at the university can verify those matters from personal knowledge or institutional records?

A. I don't know. I don't know how things work. I mean, if you want me to write a letter saying that I certify that he was employed by the University of Chicago, I can do it myself. I'm not trying to deny that.

Q. Have you communicated any instruction limiting what that person, designated person -- which I assume there is none -- or anyone else at the university, if that person has not been designated, may say about my appointment or work?

A. No, I haven't talked with anyone.

MS. VICKREY: I'm going to object to the form of that question.

But your answer can stand.

DR. CHAKRABORTY: You're free to object as much as you want.

BY DR. CHAKRABORTY:
Q. Are any such instructions still in effect?
A. I have given no instruction to anybody. I haven't been asked by anybody anything in this regard.
Q. Earlier in this deposition, Professor Gagliardi, you mentioned that people in your group made negative assertions about me to you.
Who are these people, and what were the negative assertions?
A. The negative assertions were that you didn't do anything while you were in the group. I don't know who these people are because that was after you left the group survey, and this was one of the comments that came up. It was anonymous. And that I really protected and embraced you and treated you better than anyone else even if you had done nothing.
And during your period when we were having those discussions with Daniel King about active space and actions and other group members, there was a lot of

frustration every time we had a meeting with you.

Q. Were the frustrations reported in writing in any official capacity?

A. No. It was after the meeting. They said, "It's impossible to work with him, and there are no concrete ideas here."

Q. Have there been complaints against Daniel King made by anonymous people in your group?

A. Can you say again? I'm sorry.

Q. Have people complained to you anonymously about Daniel King?

MS. VICKREY: I'm going to object -- I'm going to object -- I'm going to object as to the relevance.

But you can go ahead and answer.

A. Not that I can recall.

DR. CHAKRABORTY: This deposition is over. Thank you for your attendance.

MS. VICKREY: Okay. And I just have -- I just have a few questions for you, Dr. Gagliardi.

CROSS-EXAMINATION BY

MS. VICKREY:
Q. With regard to the email that we discussed, you were asked a few questions about the email to Ms. Bryant, Mr. Anderson and Ms. Cobbins and Ms. Lugo, in which the statement: "I'm not sure where the title Quantum-AI Researcher came from."
Do you recall that email?
A. I guess we have looked at that many times this morning, yes.
MS. VICKREY: I'll do a screen share.
DR. CHAKRABORTY: I need to interrupt here.
Is Ms. Vickrey allowed to ask questions at a deposition that I scheduled and it's the plaintiff's deposition?
MS. VICKREY: Yes, I am. I'm allowed to ask questions.
DR. CHAKRABORTY: Ms. Tavani, can you confirm that?
THE REPORTER: I can't say what the law is, but I can say that it is customary if the attorney has

questions --

DR. CHAKRABORTY: All right. Go on, go on. Sorry.

BY MS. VICKREY:

Q. Okay. So this is from the exhibit packet, and it looks like it's page 44 of page 156.

So this is the email that was discussed earlier in your deposition, correct?

A. Correct.

BY MS. VICKREY:

Q. And when you were -- when you sent this email, was this part of a communication with your personal assistant -- well, first of all, is Monica Lugo your personal assistant?

A. Yes.

Q. Or your administrative assistant? Is that correct?

A. Correct.

Q. And was this communication sent --

DR. CHAKRABORTY: I will object to the form of this question. I will object to the form of this question.

Monica Lugo is -- is Monica Lugo not an HR employee at the University of Chicago? What is the official title? What is Monica Lugo's official title?

MS. VICKREY: Okay. I'll continue with my questions. You can ask questions at the end.

BY MS. VICKREY:

Q. And so?

DR. CHAKRABORTY: You have to --

MS. VICKREY: Well, let me -- why don't you let me finish my questions, and then you can ask your questions.

BY MS. VICKREY:

Q. Was this email sent -- tell me the context of this email and -- well, tell me the purpose of this email and why this email was being sent.

A. Well, it was when Romit asked to list him on the website as the Quantum-AI researcher, not under postdoc.

And again, my website, I have these two categories, previous students, previous postdocs; and he didn't want to be listed as a previous postdoc. So I said

this quantum researcher was made up. And then we corrected; we removed him from postdocs. So it was trying to resolve an inaccuracy that was reported on the website.
Q. And was the only purpose of this communication was to resolve the issue of the listing on the website?
A. Yes, of course. Yes.
Q. Okay. And was that issue eventually resolved to Mr. Chakraborty's satisfaction?
A. I mean, at least he didn't appear under postdocs. I'm not sure if it was satisfactory for him or not, but that was not wrong information on the website.
Q. Okay. And with respect to -- you understand that Mr. Chakraborty has brought a -- one of this claims is that you had intentionally inflicted emotional distress upon him, correct?
A. I don't think I've done it intentionally. I don't know how I could have done it. So I don't think -- I mean, as I said, once someone is in my group, I want the best for them and I want to help

them as much as I can, but there is only a limit to what I can do.

Q. Okay. And that was -- that was -- my question was whether or not you had ever intentionally inflicted emotional distress on Mr. Chakraborty.

A. No, no.

And, by the way, again, I fought for him with the other group members. When they told me that I had protected him and he was doing nothing, I was really furious at them, and I told them, "I wish you are never in this situation in which you don't have a job, you're looking for the next job. I helped him, and I hope you will find someone like me in your future career that helps you in the same way I tried to help him."

MS. VICKREY: Okay. Okay those are all the questions that I have.

RE-DIRECT EXAMINATION BY DR. CHAKRABORTY:

Q. Do you contend that your behavior after I informed you about my termination and after my November 2024 communication with you helped me in my career?

A. No. But, Romit, there is only so much that I can do, because I have integrity myself. And, you know, every year I put people in my group on the job market and I write letters. And if my letters are to be credible, I have to write only about facts and --

Q. For the record, you did not just refuse to write me a letter --

MS. VICKREY: I'm sorry --

BY DR. CHAKRABORTY:

Q. -- main academic referee --

MS. VICKREY: I'm sorry --

BY DR. CHAKRABORTY:

Q. -- do you contend that poisoning my main academic referee would help me in my career?

MS. VICKREY: I'm sorry, Mr. Chakraborty. But you cut her off again. And, respectfully, if you could let her finish her sentence. You've done it repeatedly throughout this deposition. Let her finish her answer.

DR. CHAKRABORTY: I've repeatedly let her finish during this deposition.

A. Sorry --

MS. VICKREY: You can finish -- you can finish your answer, Dr. Gagliardi.

A. I just said I was trying to help. I didn't influence Martin Head-Gordon's opinion on you at all. Martin, as you said, is top, supersmart; he can form his own opinion based on facts. And when he has seen facts, he has decided what to think about you. This is nothing to do with me. I don't think I'm that influencing to change the smartest guy on the planet, the opinion.

BY DR. CHAKRABORTY:

Q. Professor Gagliardi, respectfully, you also are very intelligent. And you know how academic references work, and you know how whisper networks in academia work.

When you were making those negative assertions about my performance to Martin, refusing to write for me and allocate any personnel at UChicago to attest to the work that I had done at the University of Chicago. And then asking that I be removed from the -- from a website

entirely, you think these actions were meant to help me in my career?

A. So first of all, I never --

MS. VICKREY: Objection. Argumentative. Asked and answered.

You can go ahead and answer again.

A. I think that several of the statements you made were wrong. I have commented about you with Martin in March and July 24th. That has nothing to do with his change of mind after the PsiQuantum thing. We were still hoping to help you in -- first.

Second, I never told anybody that they cannot write about you. I never had any communication like that.

So I have not -- listen, my goal is not to try to damage you. My goal is to be factual and when I express an opinion on a person, so try to -- try to -- so that the people believe what I say.

Did you want me to write a letter which was a negative letter? I could have done it, or I could have done an empty letter. I was honest with you, Romit.

Q. Ms. Gagliardi, are you finished?
A. Yes.
Q. SAC Exhibit No. 7 has listed my letter of reference from Professor Head-Gordon that was in Laura's possession -- Professor Gagliardi's possession before I started in her group. After that letter was given, I published at PCCP an article that finished up my work with Professor Head-Gordon, which became a hot paper at PCCP. And after Laura's comments, assertions about me to Martin, he found that I was unsuitable for jobs in academia or in industry. That's also in SAC Exhibit No. 7.
What do you think caused this change of opinion?
A. Not my opinion. I'm so sorry. You overestimate my ability to change Martin's idea. Martin couldn't care less about what he said. He just looked at facts. He looked at the fact that you got a good job at PsiQuantum, and after three weeks or four weeks, I don't know much, you were fired. And this is something that

really can be a game changer in what a person thinks about you.

Q. With all due respect, Professor Gagliardi, what you just said about my termination from PsiQuantum is factually inaccurate.

A. Okay. Maybe it's incorrect. You're right. I don't know the details. But I'm just saying that -- that my opinion on you has nothing to do with on what Martin Head-Gordon -- and by the way, you should discuss this with Martin, not with me. I have nothing to do with what Martin thinks about you.

Q. I stopped working for Martin fall of 2023, and he gave me that letter. I started working for you, and then Martin had that change of heart while you had those communications with Martin on and off the record, both via email and via -- like personal contact with him.

MS. VICKREY: Okay. This is argumentative, and there's no question pending.

So don't -- you don't -- please

don't answer.

BY DR. CHAKRABORTY:

Q. Here's the questions:

What changed his opinion about me to think from -- to go from: I was a very ambitious talented researcher, recommending me for faculty positions and then finding me unsuitable for academia and in industry?

A. So I don't know.

MS. VICKREY: I'm going to -- asked and answered. Asked and answered.

Argumentative.

You can answer again, Dr. Gagliardi.

A. I don't know because you should ask Martin. You should not ask me.

But I know one thing, that we look at facts. And the facts are that you were supposed to finish a lot of paper based on the work that you did before with Martin, and they were never finished. You didn't publish anything with me. You started a job at PsiQuantum and within a very short amount of time, you were fired. These are the

facts. And that is why --

Q. That is factually incorrect --

MS. VICKREY: Don't cut her off. Don't cut her off. Do not cut her off. She was still speaking.

DR. CHAKRABORTY: She's making factually inaccurate statements and not taking them back --

MS. VICKREY: She is still speaking -- she is still speaking, she is still speaking.

THE WITNESS: What is an inaccurate statement?

DR. CHAKRABORTY: I don't have --

MS. VICKREY: She is still speaking.

DR. CHAKRABORTY: I don't have an obligation to let her finish.

MS. VICKREY: Yes, you do. Yes, you do. She is still speaking. Let her finish.

A. Anyway, I think you should ask Martin why he has changed the opinion on you, not me. Because I have nothing to do with it.

BY DR. CHAKRABORTY:

Q. I finished all of my work with Martin, and what you said was factually inaccurate. You take that back.

MS. VICKREY: That's argumentative, and there's no question pending, so please do not answer.

DR. CHAKRABORTY: All right. This deposition is over. Thank you for your attendance.

Anything procedural that needs to be done at my end, I'll be happy to follow up. Otherwise, have a great day.

What time is it? It should be 9:45. It's been under three hours.

MS. VICKREY: Dr. Gagliardi, you have the ability to read through the transcript and make sure that everything was taken down properly by Madeline Tavani.

Or you can just waive your signature if you don't want to read it. Either way is perfectly fine. You can just waive it if you don't want to read

through.

Would you like to reserve or waive?

THE WITNESS: Well, I don't know. When do I have to make this decision? Right now?

MS. VICKREY: Yes. Right now. You can say that you want to waive, waive your signature. Or you can decide that you want to reserve it, and we can read through the transcript before it's finalized.

THE WITNESS: What do you advise?

MS. VICKREY: Either way. It's been a pretty good connection, I think.

Ms. Tavani, don't you think?

THE REPORTER: Yeah. It's been fine.

MS. VICKREY: Okay. I think it's fine to waive.

THE WITNESS: I would like to waive.

MS. VICKREY: Okay. We'll waive.

THE REPORTER: Ms. Vickrey, do you want a copy?

MS. VICKREY: We will take a copy if Mr. Chakraborty is ordering.

DR. CHAKRABORTY: I am ordering, yes.

MS. VICKREY: Yes, then, we will take a copy.

(Whereupon, at 12:48 a.m. Eastern the examination of this witness was concluded.)

____________________________
LAURA GAGLIARDI

Subscribed and sworn to before me
this _____ day of ________________ 20___.

__________________________
NOTARY PUBLIC

# E X H I B I T S

PLAINTIFF'S EXHIBITS:

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Offer letter | 12 |
| 4 | Research proposal | 19 |
| 9 | Emails | 22 |
| 3 | Email | 29 |
| 12 | Defendant's responses | 44 |
| 13 | Defendant's verified answers | 45 |
| 7 | Email | 46 |
| 8 | Email | 99 |
| 14 | Defendant's responses | 111 |

# I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. CHAKRABORTY | 6, 134 |
| MS. VICKREY | 129 |

INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS PAGE

(No information requested.)

QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(No questions marked.)

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF NEW YORK )

I, MADELINE TAVANI, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of October, 2026.

MADELINE TAVANI

BY DR. CHAKRABORTY: [81] 6/15 7/6 9/23 10/10 11/3 13/13 19/20 22/18 24/5 28/3 29/15 30/2 31/7 34/5 41/10 44/4 44/21 45/17 46/20 47/19 48/20 52/4 52/20 54/4 55/19 56/7 57/10 61/10 65/19 66/15 67/2 69/9 70/17 72/22 75/12 76/2 76/25 77/14 78/13 81/4 82/2 82/5 82/15 84/19 85/8 87/1 90/11 92/4 92/14 93/3 93/17 94/5 94/23 95/9 97/11 98/7 98/20 100/1 101/13 107/14 107/19 109/6 111/24 114/19 114/23 115/7 116/5 116/11 116/18 119/2 119/19 122/10 123/14 124/12 125/17 128/1 135/11 135/14 136/14 140/2 142/1
BY MS. VICKREY: [4] 131/4 131/12 132/8 132/14
DR. CHAKRABORTY: [48] 5/1 10/15 12/15 13/4 19/15 20/3 22/13 29/10 33/13 40/25 43/22 45/11 46/15 57/6 59/11 60/2 60/11 60/19 66/25 68/24 74/20 75/1 75/7 77/8 80/14 92/10 94/18 97/9 98/11 99/21 111/19 114/17 123/9 125/6 125/12 127/24 129/19 130/13 130/21 131/2 131/23 132/10 135/24 141/6 141/14 141/17 142/8 144/3
MS. VICKREY: [120] 4/21 5/2 7/3 9/15 10/6 10/20 12/20 13/1 13/9 19/25 24/2 27/20 29/22 30/22 33/9 33/16 39/2 40/15 40/22 41/5 44/15 44/20 47/12 48/17 49/19 52/1 52/9 54/2 55/6 55/22 59/6 59/23 60/9 60/16 62/1 65/7 66/13 66/19 68/22 70/15 72/16 74/14 74/22 75/5 75/10 75/21 76/24 77/11 78/9 79/13 79/18 80/23 81/24 82/4 82/12 84/17 85/6 86/18 86/24 90/9 92/2 92/8 92/11 92/19 93/13 94/3 94/14 94/22 95/2 97/7 97/20 98/17 99/19 101/4 101/24 107/11 107/17 109/4 109/11 114/12 114/22 115/6 116/3 116/9 116/16 118/24 119/7 120/1 122/4 123/7 123/17 125/10 125/14 127/21 129/14 129/22 130/11 130/19 132/5 132/11 134/18 135/10 135/13 135/18 136/2 137/4 139/22 140/10 141/3 141/9 141/15 141/19 142/5 142/17 143/7 143/14 143/19 143/23 144/1 144/5
THE REPORTER: [12] 3/24 4/4 4/7 4/9 6/7 6/13 13/6 27/17 86/22 130/23 143/17 143/24
THE WITNESS: [15] 4/3 4/5 4/8 4/19 6/10 10/23 12/24 40/20 44/19 60/15 107/13 141/12 143/4 143/13 143/21

$

$1,000 [1] 124/1
$600 [1] 123/11

'

'23 [1] 77/20
'24 [5] 43/6 76/5 76/6 77/21 77/25

-

-------------------------------------------X [2] 1/2 1/7
-against [1] 1/4
-algebra [1] 113/25

0

00106 [1] 1/5
004 [1] 86/1

1

10 [4] 51/12 51/13 51/15 51/16
100 [4] 104/14 105/22 106/13 121/16
107 [1] 68/3
10:02 [1] 1/10
10:15 [1] 74/22
10th [11] 56/8 56/10 59/19 67/24 78/1 80/21 81/6 81/10 82/22 83/13 83/25
11 [2] 111/11 111/12
111 [1] 145/8
115 [1] 66/8
12 [12] 1/9 19/16 43/23 44/2 51/11 51/14 61/16 96/24 103/20 118/15 145/4 145/6
129 [1] 145/12
12:00 a.m [1] 56/24
12:48 [1] 144/8
12th [5] 53/25 54/7 54/11 64/8 66/18
13 [4] 45/12 45/15 75/16 145/6
130 [1] 6/11
133 [1] 96/6
134 [1] 145/11
136 [3] 53/23 54/6 63/10
137 [2] 56/9 68/14
138 [1] 67/7
14 [3] 111/20 111/22 145/8
151 [1] 86/1
154 [2] 78/6 87/25
156 [1] 131/7
16 [1] 61/25
19 [2] 72/10 145/4
1:26-cv-00106 [1] 1/5
1A [2] 95/22 96/7
1B [8] 94/2 94/12 94/21 94/25 96/11 96/17 96/20 97/13
1st [10] 26/15 26/25 51/23 52/7 53/9 53/9 53/10 67/23 83/13 83/25

2

20 [3] 18/25 51/4 144/15
2023 [8] 17/11 73/13 74/5 74/6 96/7 96/11 126/24 139/16
2024 [44] 26/25 45/2 45/19 52/23 54/7 54/11 59/19 59/22 60/6 60/25 67/24 69/3 70/7 70/12 73/22 77/15 77/16 77/22 78/1 80/21 81/6 81/11 82/22 83/14 84/1 86/3 93/6 93/19 95/19 100/3 102/22 103/13 103/23 104/1 104/6 104/16 104/19 110/19 112/16 117/10 125/1 125/18 126/24 134/24
2025 [6] 29/17 35/9 74/5 74/6 115/1 116/7
2026 [3] 1/9 123/13 146/18
20th [3] 73/21 74/3 104/15
21 [2] 79/7 81/20
21-day [1] 84/20
21st [1] 73/22
22 [2] 94/20 145/5
2261 [1] 2/3
23432 [1] 9/12
23rd [1] 146/18
24 [1] 89/3
24th [5] 103/22 112/16 116/20 117/10 137/10
26 [4] 118/17 118/21 119/4 119/8
26th [1] 95/19
27 [5] 46/16 62/20 65/1 65/6 111/20
2700 [1] 2/7
272 [1] 91/14
27th [2] 52/23 53/10
28th [2] 79/1 79/1
29 [2] 61/19 145/5

3

3.2 [1] 71/1
3.4 [1] 71/3
30 [1] 3/14
31st [1] 100/2
33 [1] 2/7
35 [1] 99/22
3:00 p.m [1] 95/18
3rd [7] 29/17 35/8 96/7 96/11 115/1 117/21 118/3

4

42 [1] 22/14
44 [3] 89/24 131/6 145/6
45 [1] 145/6
46 [1] 145/7

5

59 [2] 96/25 103/21
5th [2] 72/10 86/2

6

60 [2] 43/23 51/11
60603 [1] 2/8
62 [3] 66/10 68/4 118/16
63 [1] 61/17
67 [2] 45/12 75/17
6th [2] 38/1 64/10

7

72927 [1] 2/3
7th [1] 79/1

8

80 [1] 121/1

9

93 [1] 98/24
94 [1] 24/7
94114 [1] 2/4
95 [2] 103/10 121/3
99 [1] 145/7
99.99 [1] 121/4
9:02 [1] 38/1
9:45 [1] 142/16

A

a.m [4] 1/10 38/1 56/24 144/8
Abhishek [6] 86/4 86/8 87/5 87/14 89/8 116/12
ability [4] 112/15 113/9 138/19 142/18
able [3] 10/12 13/3 33/14
about [116] 8/24 16/17 16/18 17/1 18/18 19/10 21/14 23/14 23/15 28/6 30/18 33/18 33/24 35/4 37/20 38/22 38/23 38/24 40/13 40/14 42/19 43/2

A


about... [94] 43/4 43/20 45/24 45/25 46/8 47/6 47/24 48/2 48/3 52/25 53/5 53/11 53/18 54/15 54/25 56/13 57/12 59/3 60/20 62/25 63/2 63/3 65/25 68/9 68/15 68/23 71/24 72/1 73/23 74/8 75/13 75/19 77/4 80/15 83/6 83/15 83/21 83/23 84/2 84/4 84/6 86/9 87/5 88/11 88/19 88/20 88/23 89/19 89/21 91/25 92/17 92/22 92/23 93/2 93/8 93/21 97/1 97/5 97/15 97/17 100/17 105/24 106/15 113/11 113/18 118/10 119/8 119/15 119/21 120/13 121/1 121/2 121/4 122/12 122/13 123/11 125/2 127/19 128/10 128/24 129/13 130/4 134/23 135/6 136/11 136/20 137/9 137/15 138/12 138/21 139/2 139/4 139/14 140/4
abreast [1] 65/21
absolutely [5] 24/20 42/23 78/4 85/20 86/10
abstract [7] 63/18 63/19 63/24 64/3 64/6 64/9 64/13
abstracts [1] 63/21
academia [6] 34/6 62/22 122/17 136/18 138/14 140/8
academic [6] 63/4 73/2 122/24 135/12 135/16 136/17
Accelerated [1] 108/17
accept [2] 14/1 122/9
acceptable [2] 38/8 90/19
acceptance [1] 16/7
accepted [6] 14/2 19/5 28/4 64/9 64/13 115/18
access [8] 69/3 69/21 103/22 103/25 104/5 104/11 104/17 104/20
accomplished [1] 58/10
accomplishments [2] 59/15 114/4
according [1] 85/1
account [1] 105/25
accounts [1] 112/7
accurate [2] 23/9 34/21
accurately [2] 53/24 54/11
accused [1] 18/1
achieve [1] 111/7
achieved [3] 23/15 56/6 58/22
acknowledge [2] 106/18 108/3
acknowledged [2] 87/23 88/5
acknowledging [1] 106/16
action [3] 90/2 90/7 146/14
actions [2] 128/24 137/1
active [17] 54/9 56/23 57/3 57/12 60/21 61/3 63/12 63/15 67/15 70/7 70/12 70/24 81/8 103/14 104/24 117/1 128/24
activities [2] 126/18 127/2
actual [2] 29/8 30/4
actually [1] 19/24
add [1] 41/16
address [7] 6/8 57/18 57/20 59/21 69/1 69/2 104/10
addressed [1] 37/23
administer [1] 3/9
administrative [1] 131/19
administrator [2] 37/17 37/20
administrators [1] 19/10
admission [3] 61/25 65/1 65/6
admitting [2] 44/6 66/17
advance [1] 120/20
advancement [1] 39/5
advancing [2] 121/21 124/10
adverse [1] 119/20
advice [1] 122/2
advise [2] 72/2 143/13
adviser [1] 72/6
aforementioned [9] 12/17 19/17 22/15 29/12 44/1 45/14 46/17 99/23 111/21
after [38] 3/14 8/2 8/6 8/8 17/14 17/14 19/13 19/24 24/24 37/5 44/13 51/5 53/3 56/19 59/18 66/17 69/16 87/18 92/24 104/9 110/20 115/24 116/13 118/6 120/25 121/23 122/2 124/18 124/23 126/4 128/16 129/5 134/23 134/24 137/11 138/8 138/11 138/23
afterwards [2] 55/17 108/12
again [33] 14/21 15/21 16/1 17/21 20/18 22/24 26/1 28/10 28/15 30/8 30/15 46/6 48/18 61/5 66/24 75/23 76/4 76/6 76/10 89/21 90/25 97/1 98/1 103/2 109/16 118/2 125/8 129/11 132/22 134/8 135/20 137/6 140/14
against [3] 1/4 102/15 129/8
age [1] 122/12
agenda [1] 54/8
agentic [2] 61/3 63/15
ago [1] 10/25
agree [3] 4/23 5/2 33/2
agreed [4] 3/3 3/18 8/8 67/14
agreement [2] 17/6 37/14
agreements [1] 123/10
ahead [20] 9/18 9/19 48/21 52/13 52/15 62/3 65/9 65/11 75/11 75/23 79/24 94/16 95/4 97/21 101/8 109/13 122/6 123/18 129/17 137/6
AI [20] 9/11 10/1 11/5 25/1 30/8 35/4 35/13 35/13 35/15 36/6 38/3 38/4 53/15 90/15 115/4 115/13 115/19 118/10 130/7 132/20
AI-powered [1] 53/15
airplane [1] 95/17
AK [1] 86/1
AK-C01-004 [1] 86/1
algebra [1] 113/25
all [30] 3/19 4/12 12/5 17/23 21/18 23/3 28/2 30/8 30/13 34/3 34/6 38/16 43/6 43/9 46/6 53/19 59/9 92/5 98/8 105/6 111/8 111/8 131/2 131/16 134/19 136/7 137/3 139/3 142/2 142/8
allocate [1] 136/22
allowed [7] 8/10 104/23 105/1 111/2 114/18 130/15 130/20
alone [2] 107/4 111/5
along [1] 40/10
already [10] 18/24 28/23 33/25 41/24 47/2 65/16 89/22 90/5 109/14 118/8
also [13] 25/10 39/17 41/22 42/12 48/23 49/6 51/5 79/22 114/6 120/8 126/9 136/16 138/14
alternative [1] 36/23
alumnus [2] 107/15 107/20
always [2] 39/13 72/7
am [6] 4/14 6/24 130/19 144/3 146/13 146/15
ambitious [1] 140/6
amended [1] 89/23
American [2] 28/15 94/11
amount [4] 49/7 104/9 122/1 140/24
Anderson [2] 90/13 130/4
annual [2] 26/4 51/18
anonymous [2] 128/18 129/9
anonymously [1] 129/13
another [2] 15/19 15/24
answer [45] 9/18 9/19 13/24 13/25 23/22 24/3 27/23 30/23 38/13 38/16 39/2 41/16 45/19 47/16 52/13 52/16 55/24 55/24 62/3 65/9 65/11 65/17 75/18 75/23 79/25 81/3 94/17 95/4 97/22 101/8 103/7 109/13 112/11 112/14 120/4 122/6 123/18 127/23 129/17 135/23 136/3 137/6 140/1 140/14 142/7
answered [10] 41/15 41/17 44/18 65/18 75/22 84/18 108/1 137/5 140/11 140/12
answering [1] 77/9
answers [11] 33/11 33/17 40/18 40/24 41/1 41/3 41/6 41/9 101/22 101/23 145/6
any [52] 21/7 31/23 32/5 34/23 39/5 39/9 42/11 42/15 62/17 63/3 67/21 68/6 68/17 70/6 70/11 71/4 76/9 76/17 83/1 83/6 84/15 84/15 87/22 88/4 88/7 88/10 98/2 100/5 100/11 100/13 103/24 106/25 108/9 108/19 112/11 113/13 118/19 118/22 118/23 119/5 119/6 119/23 120/10 120/12 124/20 125/25 127/14 128/2 129/4 136/22 137/16 146/14
anybody [4] 68/9 128/5 128/5 137/14
anymore [5] 17/20 38/22 69/4 69/22 101/17
anyone [9] 3/9 67/25 87/9 87/10 126/16 126/25 127/17 127/20 128/20
anything [24] 19/9 23/6 46/4 58/10 58/23 62/23 64/5 67/19 83/21 84/1 85/23 89/20 102/8 105/8 106/21 107/2 110/16 114/21 120/15 121/11 128/6 128/14 140/23 142/11
Anyway [1] 141/22
anyways [2] 79/7 81/20
Apparently [2] 85/1 99/16
appear [1] 133/12
appears [1] 18/7
application [2] 100/4 100/24
applications [2] 73/3 73/4
applied [1] 72/25
apply [1] 39/16
applying [1] 100/17
appointed [1] 8/5
appointment [19] 6/23 7/8 7/13 7/14 7/16 8/1 8/25 11/19 12/8 16/9 17/16 18/9 18/20 26/7 84/12 97/6 126/19 127/3 127/19
approach [1] 46/13
appropriate [1] 33/2
approve [2] 11/10 18/12
approved [1] 18/15
April [9] 45/2 53/25 54/7 54/11 64/9 66/18 93/6 93/19 102/22
April 12th [1] 66/18
April 2024 [5] 45/2 54/11 93/6 93/19 102/22

A

archive [2] 70/1 70/19
are [77] 3/19 8/3 11/15 14/14 18/10 18/14 18/14 18/15 20/14 20/14 20/22 21/4 21/5 22/10 22/10 22/25 22/25 23/24 26/9 33/24 38/21 42/10 43/14 49/8 49/25 50/24 51/24 53/19 55/20 58/2 58/11 58/14 58/14 58/16 58/17 58/19 59/1 59/2 59/3 61/5 61/8 61/11 65/20 68/10 68/16 68/23 73/9 76/22 78/16 78/19 78/20 82/3 82/7 91/10 91/24 93/4 96/2 98/3 101/6 107/15 107/20 111/8 111/8 122/18 124/6 124/25 128/2 128/11 128/15 129/7 134/12 134/19 135/5 136/16 138/1 140/19 140/25
areas [1] 126/7
aren't [1] 23/25
argument [1] 40/23
argumentative [4] 137/5 139/23 140/13 142/6
Arli [4] 70/14 70/21 70/21 70/22
arrange [2] 25/23 26/10
arranging [2] 17/16 18/9
article [1] 138/9
articulated [1] 59/1
artificial [1] 126/4
Arvin [25] 77/16 77/21 77/23 78/2 78/17 78/20 78/23 79/4 80/17 80/19 81/13 82/9 82/19 82/21 83/14 83/21 84/2 84/20 84/24 87/24 88/13 88/19 88/21 88/25 119/13
as [139] 3/10 3/13 3/19 6/1 6/4 8/3 8/5 8/9 8/18 9/6 9/16 9/16 9/20 11/18 11/22 12/3 12/7 12/11 12/18 12/19 14/7 14/9 14/12 15/15 15/16 15/22 16/8 17/12 17/16 19/18 19/19 20/18 20/18 22/16 22/17 24/17 25/1 25/4 25/15 29/13 29/14 29/23 31/4 31/18 32/15 32/22 35/13 35/16 36/5 36/9 36/16 36/21 36/22 42/10 42/24 44/2 44/3 45/15 45/16 46/18 46/19 47/13 47/13 48/10 50/23 52/10 53/4 57/8 57/21 58/16 58/16 58/17 59/6 59/7 59/20 60/1 61/7 61/7 62/2 65/8 68/25 69/11 75/21 78/10 78/24 79/14 79/20 79/22 80/13 80/13 81/5 81/25 82/4 82/13 84/18 88/14 88/14 89/10 89/17 89/17 90/10 91/3 92/22 92/22 94/3 94/14 97/7 97/8 97/12 99/19 99/24 99/25 100/25 102/15 108/22 108/23 109/11 111/22 111/23 112/21 115/19 116/3 116/6 116/10 116/16 119/10 119/23 120/1 122/4 123/8 127/25 127/25 129/16 132/20 132/25 133/24 134/1 134/1 136/7
ask [19] 4/11 23/9 23/10 25/13 62/13 64/22 73/15 86/8 87/5 91/9 98/15 125/23 130/15 130/20 132/6 132/13 140/17 140/17 141/22
asked [21] 52/3 59/25 66/14 75/22 78/25 80/8 83/4 83/5 84/18 86/3 95/20 109/5 109/7 114/10 121/10 128/5 130/3 132/19 137/5 140/11 140/11
asking [13] 12/5 38/25 59/11 69/5 82/10 88/20 97/1 97/15 100/15 105/23 106/15 119/8 136/24
aspects [1] 19/4
assertion [1] 113/17
assertions [5] 128/10 128/12 128/13 136/20 138/12
assessment [2] 49/13 52/8
assessments [1] 90/22
assign [3] 19/14 19/24 53/16
assigned [1] 115/25
assistance [3] 72/4 72/13 72/23
assistant [3] 131/15 131/17 131/19
associated [3] 106/9 107/8 110/13
assume [2] 55/4 127/16
assumes [1] 52/14
assuming [1] 103/6
assumption [1] 120/2
assumptions [1] 101/6
assuring [1] 16/3
attachments [2] 68/17 112/4
attend [3] 28/6 28/19 54/14
attendance [2] 129/21 142/10
attending [2] 32/16 54/19
attest [1] 136/22
attorney [2] 98/12 130/25
Attorneys [1] 2/6
attributes [1] 46/22
audio [1] 86/12
August [1] 86/3
August 2024 [1] 86/3
author [1] 81/9
authored [3] 108/18 109/9 111/9
authorized [2] 3/9 109/10
automated [5] 56/22 57/3 57/12 60/21 61/3
available [2] 56/19 69/22
average [1] 28/19
aware [12] 37/15 86/12 94/20 94/24 95/6 101/2 102/18 107/15 107/20 125/3 126/2 126/13
away [1] 110/25

B

back [13] 29/25 45/3 60/24 63/13 66/24 72/21 86/23 117/15 117/18 125/13 125/13 141/8 142/4
back-end [1] 63/13
background [1] 95/11
based [8] 11/6 47/8 54/20 63/12 70/5 70/10 136/9 140/20
basically [2] 56/17 59/14
basis [4] 82/24 110/4 118/20 119/3
be [74] 3/6 3/8 3/12 4/17 8/5 8/18 9/13 10/11 11/25 12/12 13/3 13/17 14/11 14/22 17/7 17/19 20/11 20/22 21/20 22/22 24/23 25/1 25/16 28/24 30/10 32/12 33/14 37/22 42/11 43/7 43/12 48/11 52/2 56/4 58/4 58/24 59/24 59/25 60/5 61/21 62/10 62/12 62/15 62/16 66/14 69/10 69/21 85/18 88/23 91/3 92/3 93/18 98/18 99/8 101/19 106/6 107/11 109/5 109/8 110/8 110/12 113/21 115/15 122/20 122/22 125/25 132/24 135/5 136/25 137/19 139/1 142/12 142/12 142/15
bearing [1] 118/14
became [1] 138/10
because [57] 9/6 9/8 11/21 14/12 15/16 16/10 18/23 20/21 21/17 24/15 24/18 25/9 25/12 25/17 27/7 27/24 27/25 30/16 36/22 37/6 40/17 42/12 42/17 46/1 50/16 50/23 52/2 52/11 52/17 53/9 54/13 58/19 63/1 65/24 67/19 73/7 79/14 84/14 85/12 85/22 87/19 90/25 91/4 102/9 105/12 106/22 107/1 108/8 110/6 110/13 113/9 114/13 122/14 128/16 135/2 140/16 141/24
becoming [1] 65/14
been [49] 6/2 12/4 17/23 23/6 24/19 25/18 25/19 29/9 29/21 30/5 37/6 37/18 38/5 38/20 39/14 42/16 42/17 50/5 50/25 51/4 51/19 51/20 56/5 57/22 61/20 63/25 65/18 73/1 76/8 78/17 84/14 85/22 90/16 92/25 94/6 106/19 108/4 109/23 110/17 113/20 120/7 122/19 123/15 127/18 128/5 129/8 142/16 143/15 143/17
before [42] 1/15 3/9 3/11 4/11 7/13 8/7 9/7 11/10 16/7 17/10 18/13 19/5 23/4 28/4 37/11 50/22 54/21 62/17 63/22 67/17 69/23 70/3 73/1 74/1 78/1 80/20 81/6 81/10 82/22 83/13 83/18 84/14 93/2 103/22 108/15 115/18 119/11 124/13 138/7 140/21 143/12 144/14
began [2] 7/13 19/13
beginning [9] 27/8 34/25 43/5 45/2 48/24 93/6 93/19 102/21 111/17
behalf [1] 5/2
behavior [1] 134/22
being [12] 10/11 10/16 12/22 17/25 39/24 40/1 55/24 64/13 82/7 82/25 117/12 132/18
believe [4] 29/20 41/14 86/5 137/21
believed [4] 29/8 30/4 31/25 32/7
BELL [1] 2/6
Ben [1] 90/13
Berkeley [1] 93/21
best [5] 43/9 72/8 85/12 112/14 133/25
better [1] 128/20
between [15] 3/4 63/23 64/13 67/23 71/6 73/21 74/6 76/7 78/17 78/19 82/8 82/17 82/19 83/25 126/24
beyond [1] 113/14
big [7] 25/17 30/15 31/4 58/23 61/5 118/13 124/11
bit [2] 86/19 86/20
blood [1] 146/15
blossom [2] 26/21 37/3
blue [1] 14/14
body [15] 30/19 32/23 37/7 55/13 55/14 55/16 55/20 61/21 64/15 73/9 76/8 76/15 106/25 108/10 110/17
both [5] 33/1 45/25 77/7 94/11 139/20
bottom [1] 121/17
break [12] 6/20 74/15 74/18 74/21 74/21 75/3 75/4 75/6 76/22 77/13 125/11 125/16
bring [2] 43/11 110/8
broken [1] 86/18
brought [2] 46/3 133/17
Bryant [3] 38/1 90/13 130/4
buffer [3] 11/24 49/10 85/14
bullet [1] 20/13
bureaucratic [1] 32/11
busy [1] 26/18

C

C01 [1] 86/1

C

calendar [1] 117/16
California [1] 2/4
call [3] 15/17 89/5 121/24
called [5] 6/1 17/20 25/16 36/6 110/8
calling [1] 12/4
calls [1] 16/3
came [9] 30/7 38/4 39/7 39/13 39/19 90/16 105/9 128/18 130/7
can [131] 3/24 4/21 7/3 7/4 7/19 7/19 7/20 8/18 9/7 9/18 9/19 9/20 10/9 10/18 10/22 10/23 13/4 13/6 14/10 26/1 27/10 27/17 27/23 28/18 29/24 30/20 30/22 30/25 30/25 31/16 31/18 31/19 39/2 40/16 41/6 41/8 42/5 42/18 45/21 47/16 47/16 50/16 51/5 51/25 52/13 52/15 55/14 56/1 58/15 62/3 62/4 62/12 62/15 64/17 65/9 65/11 65/12 66/19 66/23 66/24 69/15 69/16 69/17 70/9 72/17 73/8 73/25 74/18 74/21 75/2 75/3 75/23 76/20 79/11 79/24 79/25 81/22 83/10 84/24 86/14 86/16 87/2 88/22 88/25 94/16 94/16 95/4 97/21 97/22 98/18 101/8 101/15 101/21 102/4 102/4 102/17 104/2 106/24 109/13 111/14 115/21 118/24 118/25 119/7 120/4 122/6 123/18 127/5 127/12 127/23 129/11 129/17 129/18 130/21 130/24 132/6 132/13 134/1 134/2 135/2 136/2 136/3 136/8 137/6 139/1 140/14 142/22 142/24 143/8 143/9 143/11
can't [20] 10/20 10/21 12/21 12/21 12/22 13/2 13/2 14/8 27/2 27/12 27/13 27/14 27/16 57/4 57/4 57/5 69/3 69/21 85/2 130/23
Canadian [1] 124/15
candidates [1] 94/10
cannot [6] 8/5 9/4 9/5 52/22 97/23 137/15
cap [7] 94/2 94/12 94/21 94/25 96/21 97/12 97/13
cap-exempt [7] 94/2 94/12 94/21 94/25 96/21 97/12 97/13
capacity [1] 129/4
car [1] 84/4
care [5] 16/18 23/13 34/16 121/16 138/20
career [16] 15/2 16/14 42/16 49/11 73/13 85/13 85/18 89/12 99/5 99/13 101/20 124/11 134/16 134/25 135/17 137/2
cares [2] 16/16 30/18
CAROLINE [3] 2/8 7/19 12/25
carried [1] 16/11
carry [1] 102/10
carrying [1] 33/5
case [4] 1/4 15/5 33/3 42/5
categorically [2] 95/20 100/23
categories [2] 22/12 132/23
category [3] 11/19 12/8 42/11
caused [1] 138/16
cede [2] 4/23 5/1
Central [1] 102/20
certain [1] 104/9
certification [1] 3/6
certify [3] 127/10 146/8 146/13
CHAKRABORTY [28] 1/2 2/2 4/22 6/6 14/1 14/2 18/18 19/13 21/24 28/4 29/3 33/10 37/17 40/16 50/21 71/22 72/3 73/24 74/8 77/2 96/13 100/5 133/17 134/6 134/21 135/19 144/2 145/11
Chakraborty's [7] 17/10 27/6 35/4 43/2 80/25 84/11 133/10
chances [1] 122/23
change [7] 24/15 48/14 136/12 137/11 138/17 138/19 139/18
changed [3] 76/7 140/4 141/23
changer [1] 139/1
changing [1] 38/21
channel [1] 110/21
cheap [3] 58/12 58/14 58/15
checked [1] 10/25
checkout [2] 95/12 95/14
chemistry [2] 6/24 65/22
Chicago [38] 2/8 6/12 6/23 7/1 7/8 8/4 9/11 13/12 14/11 37/17 78/21 79/6 83/16 84/8 91/11 95/18 105/18 106/2 106/9 106/19 107/8 107/16 107/21 107/23 108/4 108/25 109/1 109/8 109/23 115/20 116/22 124/4 126/17 126/24 127/1 127/11 132/3 136/24
Chicago's [1] 108/23
circa [1] 116/7
cite [2] 27/10 98/15
Civil [1] 1/15
claimed [1] 50/5
claiming [3] 45/5 55/20 65/20
claims [1] 133/18
clarify [4] 78/14 86/8 112/13 123/19
clarifying [3] 60/4 60/14 60/22
classify [3] 11/17 12/6 19/11
clause [1] 51/22
clear [11] 28/18 30/8 58/24 59/2 59/3 60/2 60/7 71/12 80/16 93/18 98/16
clearly [4] 7/23 30/1 59/1 108/1
click [1] 86/21
Closer [1] 7/24
closing [1] 18/6
Cobbins [2] 90/14 130/5
code [1] 50/14
collaboration [1] 81/10
collaborations [2] 100/7 100/12
collaborative [1] 39/11
come [9] 23/20 23/21 31/13 33/7 36/2 45/3 109/22 125/12 125/13
comes [6] 25/11 28/11 28/15 32/24 83/9 86/23
coming [1] 23/21
comment [2] 114/17 120/21
commented [1] 137/9
comments [4] 119/20 122/11 128/17 138/12
commitment [2] 14/15 14/16
communicate [13] 18/17 35/3 43/1 67/24 73/22 74/7 78/2 82/21 83/14 93/1 93/7 93/20 118/9
communicated [13] 44/12 80/18 80/19 83/1 92/1 92/17 92/21 92/24 93/15 118/21 119/4 126/12 127/14
communicating [1] 77/21
communication [8] 88/5 119/14 120/25 131/14 131/22 133/6 134/24 137/16
communications [11] 44/6 44/17 87/23 91/18 91/24 92/7 112/1 112/5 112/8 118/17 139/19
community [2] 16/19 62/15
complained [4] 40/14 71/23 77/3 129/12
complaint [1] 89/24
complaints [1] 129/8
complete [5] 34/21 51/2 52/8 53/2 84/15
completed [9] 8/6 9/6 26/16 27/1 50/20 50/24 64/1 84/10 111/10
completely [4] 31/6 80/3 108/14 108/19
complication [1] 90/25
compound [4] 47/15 55/8 82/1 122/5
computational [2] 104/12 108/21
computations [1] 63/13
computer [2] 20/7 115/25
computing [1] 108/24
concentrate [1] 39/18
concepts [2] 53/18 58/3
concerned [3] 45/25 72/1 77/7
concerning [15] 28/9 44/7 67/25 68/7 78/3 83/2 87/24 91/18 96/8 96/12 103/22 112/1 118/18 118/22 119/5
concerns [2] 46/23 75/17
concluded [1] 144/9
conclusion [2] 52/15 65/10
concrete [2] 76/9 129/7
conduct [4] 19/2 38/11 38/18 41/12
conference [21] 28/11 28/19 28/21 28/22 33/1 33/5 33/23 34/2 34/11 34/13 45/23 54/15 54/17 54/19 55/12 63/19 63/22 63/25 64/10 64/18 93/10
conferences [7] 28/7 28/10 32/17 32/19 33/19 33/21 92/21
confident [1] 113/18
confirm [2] 88/15 130/22
confrontational [1] 39/11
confused [1] 74/2
connection [3] 36/7 124/20 143/15
consequences [3] 97/2 97/6 97/18
consider [1] 17/19
considered [1] 56/4
construction [1] 98/14
consultant [2] 81/5 123/10
consultation [1] 124/22
consulting [2] 123/20 123/21
contact [2] 72/3 139/21
contacted [1] 73/12
contain [1] 112/7
contemplated [2] 26/7 84/11
contend [2] 134/22 135/15
content [2] 113/13 117/9
contention [1] 113/2
contents [2] 114/9 117/5
context [5] 56/14 59/2 60/8 60/23 132/16
continue [5] 30/25 31/1 40/17 102/5 132/5
contradicted [1] 34/19
contribution [1] 42/19
conversation [8] 30/14 31/3 46/5 46/10 76/10 80/6 82/19 119/12
conversations [2] 81/8 89/15
copies [2] 68/10 68/17
copy [8] 3/12 3/15 34/22 44/9 45/8 143/25 144/1 144/6

C
copying [1] 118/4
correct [15] 23/10 24/8 34/24 36/20 41/19 105/11 105/19 106/3 106/10 112/12 131/10 131/11 131/20 131/21 133/20
corrected [1] 133/2
correction [2] 23/9 42/4
correctly [1] 36/14
corresponding [1] 10/2
cost [1] 28/12
costs [1] 25/9
could [31] 11/13 16/14 30/10 31/17 32/25 33/11 37/4 54/2 56/22 58/4 58/13 59/10 61/21 62/16 69/11 69/20 70/16 74/14 74/15 85/15 88/14 88/15 104/20 107/5 107/18 110/3 110/15 133/22 135/20 137/23 137/24
couldn't [12] 11/21 26/2 36/4 36/22 39/18 40/5 40/21 60/12 84/4 108/9 115/22 138/20
counsel [3] 3/4 3/15 4/12
country [1] 17/3
COUNTY [1] 146/4
couple [4] 95/13 104/16 104/21 114/8
course [5] 21/6 37/1 72/6 74/11 133/8
court [7] 1/1 3/11 6/12 27/24 66/23 72/20 98/9
cover [2] 11/23 49/10
create [2] 25/6 31/14
creating [1] 119/22
credible [1] 135/6
creme [2] 121/4 121/4
CROSS [1] 129/25
CROSS-EXAMINATION [1] 129/25
Crosstalk [1] 79/17
current [6] 6/21 68/1 68/7 83/22 84/2 84/6
curtailed [1] 105/25
custodian [1] 69/6
custodians [1] 91/19
customary [1] 130/25
cut [7] 55/24 86/14 101/25 135/19 141/3 141/4 141/4
cutting [2] 40/23 40/25
cv [1] 1/5

D
daily [1] 110/4
damage [1] 137/18
Daniel [3] 128/24 129/9 129/13
Daniel King [1] 128/24
DARPA [1] 81/9
data [9] 67/21 104/17 104/21 104/23 105/9 105/13 105/23 106/6 108/12
date [21] 1/9 4/18 12/19 19/19 22/17 29/14 29/16 44/3 45/16 46/19 51/23 58/25 59/16 60/22 64/7 99/9 99/25 111/23 115/1 117/25 125/23
dates [5] 57/21 68/5 73/25 87/16 112/25
David [2] 73/7 107/23
day [15] 19/4 19/4 20/21 23/7 23/18 26/19 26/19 30/16 56/19 84/20 112/17 116/21 142/14 144/15 146/18
days [5] 3/14 79/7 81/20 104/16 104/21
de [1] 121/4
deal [2] 30/15 98/5
dealing [2] 90/24 113/19
December [20] 53/8 53/9 53/10 67/24 73/22 78/1 80/21 81/6 81/10 82/22 83/13 84/1 100/2 103/23 104/1 104/6 104/16 104/19 125/18 126/11
December 10th [5] 80/21 81/6 81/10 82/22 83/13
December 1st [1] 53/10
December 2024 [5] 67/24 84/1 104/1 104/6 104/19
December 21st [1] 73/22
December 31st [1] 100/2
decide [2] 9/9 143/10
decided [9] 19/5 21/20 22/22 22/23 31/5 31/9 36/5 42/12 136/10
deciding [1] 16/24
decision [1] 143/5
declined [1] 29/3
dedicated [1] 17/8
deemed [9] 12/18 19/18 22/16 29/13 44/2 45/15 46/18 99/24 111/22
deep [3] 48/2 49/15 64/19
deeper [6] 48/12 48/13 48/13 48/13 49/2 49/4
deeply [2] 114/3 114/6
defend [1] 106/24
DEFENDANT [3] 1/7 1/12 2/6
Defendant's [3] 145/6 145/6 145/8
defendants [1] 5/3
deferred [3] 29/8 29/21 30/4
define [1] 76/20
definition [4] 22/4 61/23 64/24 65/4
delete [1] 89/2
denial [6] 68/4 82/25 103/22 118/17 118/21 119/4
deny [4] 66/17 112/23 112/24 127/12
departure [2] 22/20 84/21
deponent [2] 4/13 4/15
deposition [24] 1/12 3/6 3/7 3/12 13/23 19/3 23/22 24/1 24/1 38/16 41/8 52/24 64/22 92/13 92/15 114/6 128/7 129/19 130/16 130/18 131/9 135/23 135/25 142/9
depth [2] 39/9 48/6
describe [2] 35/12 35/15
described [4] 21/21 25/24 26/11 75/18
describes [1] 71/1
describing [2] 54/8 98/25
description [13] 11/9 11/13 11/16 16/21 18/13 25/4 31/24 32/6 32/15 32/16 36/3 63/11 145/3
deserve [2] 56/3 62/9
deserves [1] 110/7
designated [4] 126/16 126/25 127/16 127/18
despite [1] 119/22
details [4] 11/17 12/6 122/7 139/8
determine [1] 98/10
develop [1] 58/18
did [154]
didn't [30] 7/17 7/22 21/10 29/6 32/2 40/10 42/11 42/14 46/12 60/5 63/1 67/19 71/25 82/13 88/6 91/2 93/1 106/21 106/22 108/9 108/11 108/19 120/10 121/11 125/2 128/14 132/24 133/12 136/6 140/22
differ [1] 18/19
difference [10] 25/16 42/15 58/23 79/9 79/10 81/21 84/21 84/22 85/21 124/11
different [3] 36/3 42/1 76/1
differently [3] 21/8 21/10 109/24
difficult [5] 37/18 38/5 38/20 41/14 90/17
difficulties [2] 118/7 118/9
dig [1] 57/24
digging [1] 48/7
dinner [4] 45/24 46/10 76/11 92/22
DIRECT [2] 6/5 134/20
directing [1] 72/11
directions [4] 20/12 20/17 21/6 39/6
directly [1] 122/13
disappointed [1] 121/14
disappointment [1] 121/15
discipline [1] 51/17
disconnect [1] 108/13
discouraged [1] 54/18
discovery [2] 41/7 69/12
discuss [12] 20/25 21/13 21/13 33/1 72/11 83/21 84/2 100/5 100/11 110/22 111/14 139/12
discussed [15] 14/24 18/25 20/16 20/23 23/4 30/10 41/24 54/15 84/13 100/16 110/3 112/9 119/11 130/3 131/9
discussion [4] 29/17 39/9 62/21 88/2
discussions [2] 21/19 128/23
displayed [1] 115/1
dispute [1] 34/23
disruption [1] 86/12
dissatisfied [1] 76/18
distinguish [1] 6/18
distracted [1] 39/14
distress [2] 133/19 134/5
DISTRICT [2] 1/1 1/1
do [116] 4/3 4/19 4/21 9/10 9/16 10/4 11/6 11/8 12/1 12/5 13/7 15/18 17/4 20/20 21/11 23/13 27/7 28/14 31/14 31/18 32/24 33/2 36/10 38/13 41/3 44/9 44/24 45/7 48/3 48/4 48/10 53/8 57/25 61/12 64/15 66/11 67/4 67/10 69/7 71/4 71/14 74/18 75/9 76/19 80/7 83/8 83/18 88/8 90/21 91/8 91/20 91/21 91/22 92/23 95/23 95/23 96/15 97/25 98/6 98/6 98/11 101/14 101/21 101/24 102/4 102/9 102/17 105/5 105/8 106/21 107/3 107/5 108/6 108/8 109/18 110/10 110/10 110/16 112/23 112/23 113/10 114/18 114/21 117/1 117/8 117/12 119/10 120/25 121/5 121/7 121/11 121/25 122/11 124/16 127/12 128/14 130/8 130/11 134/2 134/22 135/2 135/15 136/11 137/10 138/16 139/10 139/13 141/4 141/19 141/20 141/24 142/7 143/5 143/13 143/24 146/7
doc [2] 122/19 122/19
docket [5] 52/6 66/9 68/3 94/20 97/16
Doctor [2] 95/5 97/22
document [11] 6/16 13/11 13/22 27/11 32/10 32/11 35/2 44/16 45/13 76/15 87/22

D
documentation [1] 103/13
documents [12] 10/25 25/25 26/12 37/10 76/12 84/12 88/4 91/17 92/6 92/12 145/14 145/14
does [11] 9/1 9/21 14/17 32/9 53/24 54/10 70/6 70/11 97/24 123/4 124/15
doesn't [9] 39/25 40/1 58/9 63/20 64/5 79/8 79/8 81/21 102/8
doing [9] 40/1 46/4 84/7 98/18 106/23 108/11 114/10 120/15 134/11
dollars [1] 25/15
don't [171]
done [28] 15/20 17/19 30/19 31/11 31/17 32/12 42/20 42/22 50/10 58/4 63/20 64/4 65/16 103/6 105/4 108/12 110/25 111/3 114/5 125/7 128/21 133/21 133/23 135/22 136/23 137/24 137/24 142/12
down [3] 28/2 119/8 142/20
DR [4] 6/6 39/24 84/11 134/21
Dr. [26] 9/20 14/1 14/2 17/10 18/18 19/13 21/24 27/6 28/4 29/3 35/4 37/17 39/3 43/2 50/21 71/22 72/3 73/24 74/8 77/2 91/25 96/13 129/24 136/4 140/15 142/17
Dr. Chakraborty [15] 14/1 14/2 18/18 19/13 21/24 28/4 29/3 37/17 50/21 71/22 72/3 73/24 74/8 77/2 96/13
Dr. Chakraborty's [4] 17/10 27/6 35/4 43/2
Dr. Gagliardi [6] 9/20 39/3 129/24 136/4 140/15 142/17
Dr. Head-Gordon [1] 91/25
driven [1] 51/7
driving [1] 4/6
due [4] 26/15 26/25 98/8 139/3
duly [2] 6/2 146/10
duration [1] 25/21
during [20] 14/22 21/25 27/5 37/2 55/17 68/4 83/20 83/24 92/15 105/10 108/10 111/3 114/5 117/5 120/5 123/21 126/19 127/3 128/22 135/25
duties [2] 126/18 127/2

E
e-mails [1] 112/2
each [7] 6/16 27/18 28/1 49/13 67/17 97/4 97/17
earlier [6] 8/19 79/10 85/20 117/24 128/7 131/9
early [3] 73/13 81/22 84/25
easier [1] 27/24
Eastern [2] 1/10 144/8
edits [1] 108/20
effect [3] 3/10 3/13 128/3
eight [1] 53/6
either [5] 22/25 58/1 62/9 142/24 143/14
electronic [2] 68/11 121/5
electronics [1] 120/23
eligibility [1] 51/23
eligible [1] 52/6
eliminate [2] 31/5 31/10
else [8] 15/23 65/25 87/9 87/10 107/5 120/20 127/17 128/20
email [58] 22/20 29/18 35/9 35/10 35/11 35/17 35/19 35/22 37/24 38/10 43/16 44/10 44/25 45/4 45/8 45/22 53/25 54/7 54/12 56/20 59/2 59/4 63/7 64/8 66/18 78/18 87/8 88/7 88/8 88/10 90/6 91/24 93/1 93/7 93/16 93/21 99/9 99/15 99/17 104/5 104/10 107/7 115/10 117/21 118/3 130/2 130/4 130/8 131/8 131/14 132/15 132/16 132/17 132/17 139/20 145/5 145/7 145/7
emails [6] 43/20 59/7 88/3 91/16 112/3 145/5
embassy [1] 96/16
embedded [2] 101/6 120/2
embraced [1] 128/19
emotional [2] 133/19 134/5
employ [1] 98/4
employed [10] 77/18 77/23 94/1 94/1 94/8 94/10 97/12 105/15 115/15 127/11
employee [6] 45/3 80/17 91/11 116/7 126/23 132/2
employment [11] 25/24 26/11 63/5 75/15 96/9 97/3 97/19 99/4 105/11 126/18 127/2
empty [2] 111/16 137/24
encountered [1] 17/25
end [10] 23/18 30/16 45/1 63/13 79/2 93/5 93/18 102/21 132/7 142/12
ended [2] 99/4 126/12
ending [5] 97/2 97/6 97/18 103/25 104/4
engagement [1] 126/12
engine [1] 63/13
engineering [1] 6/25
enjoyed [1] 124/8
enough [7] 19/1 33/21 53/1 53/2 53/12 62/9 84/15
entire [4] 25/21 62/15 123/22 123/25
entirely [3] 24/24 41/23 137/1
entry [1] 67/8
environment [2] 109/19 111/1
equivalent [1] 16/8
escamotage [1] 14/10
especially [1] 14/16
ESQ [1] 2/8
evaluate [3] 64/17 71/18 73/8
evaluation [4] 27/5 50/21 51/2 53/3
evaluations [3] 25/24 26/11 50/24
even [10] 4/13 8/7 20/11 57/14 74/10 96/22 111/17 117/16 126/23 128/20
eventually [4] 20/16 49/1 111/10 133/10
ever [13] 26/15 26/25 27/4 39/25 50/3 50/5 50/9 52/8 55/16 57/15 110/18 113/13 134/4
every [9] 20/20 39/7 43/11 48/1 48/13 55/24 65/24 129/1 135/3
everybody [1] 28/18
everything [5] 15/22 25/10 28/14 105/4 142/20
evidence [1] 52/12
exact [4] 46/13 75/19 87/15 112/25
exactly [6] 35/23 42/17 52/19 77/5 125/22 126/7
examination [7] 6/5 129/25 134/20 144/9 145/11 146/9 146/11
examined [1] 6/4
example [1] 56/15
excellent [2] 122/25 123/2
except [1] 3/19
exceptional [1] 15/1
exchange [1] 68/15
exchanged [2] 78/16 119/11
exciting [1] 21/12
exclusively [4] 12/1 106/7 106/8 107/7
exempt [7] 94/2 94/12 94/21 94/25 96/21 97/12 97/13
exhibit [74] 10/16 12/16 12/16 12/17 12/18 12/21 18/4 18/5 19/16 19/16 19/17 19/18 20/1 22/14 22/14 22/15 22/16 24/7 26/3 29/11 29/12 29/13 35/6 35/7 35/7 43/23 43/23 44/1 44/2 45/12 45/14 45/15 46/16 46/16 46/17 46/18 51/10 52/5 61/16 62/19 63/10 66/8 75/16 78/6 87/2 89/24 89/24 91/14 96/24 98/24 99/22 99/23 99/24 103/9 103/20 104/14 105/22 106/13 111/20 111/20 111/21 111/22 114/25 114/25 117/19 117/19 117/20 117/20 118/15 118/16 131/5 138/3 138/15 145/3
exhibits [9] 6/17 53/23 54/6 61/17 67/7 68/14 86/1 87/25 145/2
expect [3] 120/24 121/6 121/19
expected [1] 21/11
expecting [1] 91/5
expenses [1] 33/6
experience [1] 51/3
expert [1] 97/23
expertise [3] 50/6 50/11 71/18
explain [2] 7/19 59/10
explained [1] 115/11
explanation [1] 61/18
explore [2] 53/19 53/21
explores [1] 48/25
exploring [1] 51/8
express [5] 63/3 83/6 120/10 120/12 137/19
expressed [1] 121/14
expression [1] 100/24
expressly [1] 53/14
extensive [1] 112/17
extensively [4] 14/24 16/2 17/1 30/11
extent [1] 79/25

F
face [1] 113/23
faced [2] 99/5 99/12
facilities [2] 105/18 106/2
facility [1] 108/24
fact [5] 17/9 64/2 64/5 112/23 138/22
facts [10] 52/11 58/14 112/24 135/6 136/9 136/10 138/22 140/19 140/19 141/1
factual [5] 82/24 112/11 118/20 119/3 137/19
factually [4] 139/5 141/2 141/7 142/3
faculty [8] 14/23 39/16 51/4 101/11 101/12 101/17 125/20 140/7
fair [1] 99/8
fairly [1] 114/10
fall [1] 139/15

F

familiar [2] 65/14 114/1
far [1] 85/23
favor [6] 11/23 12/2 12/5 36/11 121/10 121/11
favorably [1] 122/21
federal [6] 1/14 25/12 38/15 52/6 64/22 97/16
fee [1] 123/22
fellowship [1] 73/14
fellowships [2] 100/7 100/13
felt [1] 85/13
few [6] 51/20 64/12 74/18 110/19 129/23 130/3
Fi [1] 86/20
Fiedler [2] 76/19 116/24
field [2] 30/18 124/10
fight [1] 43/12
figured [1] 13/8
file [1] 67/10
files [1] 67/9
filing [1] 3/5
fill [1] 49/23
final [2] 67/4 102/20
finalized [1] 143/12
financial [1] 14/16
find [6] 17/2 26/20 65/16 102/12 126/15 134/15
finding [2] 26/18 140/7
finds [1] 49/1
fine [11] 4/6 39/22 46/25 56/11 56/12 85/20 91/3 114/14 142/24 143/18 143/20
finish [40] 27/18 27/22 30/23 33/12 33/16 35/21 39/15 40/8 40/17 43/8 48/21 48/21 48/21 48/22 49/19 49/20 55/23 55/25 56/1 57/7 74/23 75/1 75/8 85/7 93/14 93/14 102/1 110/10 111/11 111/13 120/19 132/12 135/21 135/23 135/25 136/2 136/3 140/20 141/18 141/21
finished [4] 138/1 138/9 140/22 142/2
finishing [1] 46/2
fired [4] 44/11 92/25 138/25 140/25
firm [1] 124/15
first [10] 6/2 20/21 29/7 29/19 30/3 73/12 99/3 131/15 137/3 137/13
first-year [1] 20/21
five [4] 49/8 50/14 51/6 72/6
Florida [2] 45/4 102/21
focus [4] 26/21 40/5 66/4 85/17
focused [6] 46/1 46/12 48/9 48/11 51/7 66/4
follow [6] 8/21 8/22 97/25 98/4 99/2 142/13
followed [1] 98/3
following [1] 97/14
follows [1] 6/4
force [1] 3/13
foreigners [1] 98/5
forgotten [1] 103/1
form [25] 3/19 9/16 29/23 47/14 52/10 55/7 56/3 62/2 65/8 66/20 79/23 81/25 90/10 97/7 97/10 97/14 98/13 101/5 122/5 123/8 123/17 127/22 131/24 131/25 136/8
formal [2] 24/8 46/11
formally [1] 89/21
forth [1] 146/10
fought [1] 134/8
found [5] 14/10 36/23 39/19 126/9 138/13
foundation [10] 59/7 78/10 78/15 79/14 79/15 79/20 80/15 82/9 82/13 108/17
four [3] 51/1 51/6 138/24
frameworks [1] 124/17
Francisco [1] 2/4
free [4] 28/11 53/19 53/20 127/24
front [2] 49/9 71/11
frozen [1] 86/19
frustration [1] 129/1
frustrations [1] 129/3
fulfilled [1] 85/14
full [3] 14/18 67/22 106/13
funded [2] 108/18 108/20
funding [4] 7/9 7/11 25/12 108/7
furious [1] 134/11
further [2] 3/18 146/13
future [8] 15/2 62/25 63/2 63/4 75/20 85/13 100/17 134/16

G

GAGLIARDI [40] 1/6 1/13 2/7 5/3 6/10 9/20 13/24 15/8 15/9 19/3 20/5 23/21 24/22 31/22 33/8 38/15 38/25 39/3 39/24 58/24 64/21 78/22 78/24 92/16 93/4 93/25 94/6 94/19 107/6 107/10 108/15 128/8 129/24 136/4 136/15 138/1 139/4 140/15 142/17 144/11
Gagliardi's [1] 138/6
game [1] 139/1
gap [1] 49/23
Garland [1] 6/11
gave [8] 15/6 15/23 17/7 112/12 112/17 112/20 124/15 139/16
general [1] 125/23
generalized [1] 20/24
generated [1] 105/14
generic [1] 11/12
gentleman [2] 17/6 37/13
genuine [1] 43/10
genuinely [2] 85/16 119/16
get [11] 18/24 20/7 40/10 49/10 64/4 87/17 101/1 101/12 101/16 103/4 122/24
gets [1] 13/8
getting [2] 40/22 124/5
give [10] 11/23 16/12 20/19 26/22 28/5 34/1 41/6 41/8 58/15 115/14
given [7] 23/3 109/18 109/25 113/1 128/4 138/8 146/12
gives [1] 51/22
giving [2] 41/2 85/14
gmail.com [1] 2/4
go [43] 9/4 9/18 9/19 11/13 13/7 21/11 21/14 23/5 28/21 28/22 32/25 34/2 48/12 48/21 49/1 52/13 52/15 55/11 62/3 65/9 65/11 73/11 75/2 75/10 75/23 79/24 86/22 94/16 95/4 97/21 101/8 107/3 109/13 110/25 114/8 117/15 122/6 123/18 129/17 131/2 131/3 137/6 140/5
goal [4] 51/7 89/10 137/17 137/18
goes [1] 62/10
going [48] 4/22 9/15 10/6 10/7 23/20 24/14 25/13 27/21 28/9 28/11 28/24 29/22 31/21 37/24 40/6 47/12 47/13 48/2 48/15 49/3 52/9 55/6 55/10 61/2 61/9 62/1 64/18 65/7 66/20 72/18 78/9 79/22 81/3 81/14 81/19 81/24 84/17 90/9 92/12 101/4 114/12 117/18 125/10 127/21 129/14 129/15 129/16 140/10
good [8] 43/14 64/11 74/17 121/2 121/3 123/15 138/23 143/15
Gordon [33] 12/2 15/3 16/2 34/9 34/10 36/19 39/15 43/2 43/15 44/7 45/1 45/5 46/22 47/24 62/24 67/18 71/23 72/4 73/23 74/8 77/3 91/25 93/8 93/20 119/22 119/25 120/13 120/22 120/25 121/7 138/5 138/10 139/11
Gordon's [2] 73/16 136/6
got [8] 10/21 93/24 108/16 108/20 121/23 124/13 124/14 138/22
grad [1] 86/4
graduate [5] 15/14 20/22 22/11 23/1 94/9
graduated [1] 86/5
grant [10] 81/10 108/17 108/20 108/20 120/17 123/12 124/2 124/3 124/5 124/8
graphic [1] 71/15
grateful [1] 15/5
great [8] 37/3 69/11 69/21 83/9 89/6 119/13 122/9 142/13
group [101] 7/11 14/7 14/14 15/14 16/5 20/9 20/15 21/2 21/6 21/9 21/14 21/21 22/1 22/6 22/20 23/17 24/17 25/6 25/21 27/6 28/13 28/17 29/1 34/3 34/15 34/18 36/10 37/2 37/6 37/18 38/5 38/20 39/10 40/11 40/13 41/14 41/19 42/9 42/13 42/22 42/22 43/7 43/12 44/14 45/3 46/5 50/25 52/18 57/18 57/21 58/1 59/5 59/13 59/16 59/16 60/7 60/25 64/20 66/6 69/3 86/5 87/9 87/13 89/11 89/18 90/17 91/2 91/7 91/8 100/16 100/20 101/19 103/3 105/11 108/7 108/8 108/10 108/16 109/17 109/22 110/1 111/3 112/20 112/21 115/14 115/24 119/21 120/15 121/12 121/22 122/12 126/5 128/9 128/15 128/16 128/25 129/10 133/24 134/9 135/4 138/7
group's [2] 21/25 91/6
groups [3] 21/18 34/4 34/17
grow [1] 89/11
guess [4] 10/5 96/14 106/4 130/9
guy [1] 136/13
guys [1] 27/17

H

h-1B [8] 94/2 94/12 94/21 94/25 96/11 96/17 96/20 97/13
had [105] 8/8 8/19 12/4 14/19 16/2 17/6 19/5 19/5 21/19 29/3 29/9 29/19 29/21 30/5 31/11 33/3 36/2 36/7 36/8 37/5 37/14 37/18 39/14 39/17 39/20 42/12 42/16 44/14 46/4 47/6 47/25 49/5 49/7 50/25 51/20 54/18 59/17 59/17 59/18 60/5 67/13 71/11 71/17 71/23 72/25 73/1 76/5 76/7 76/8 77/3 80/5 80/7 80/11 83/18 84/10 84/14 85/10 85/13 85/22 89/8 92/16 92/25 95/12 95/14 99/4 104/7 105/2 105/3 105/3

H
had... [36] 105/10 105/14 106/18 108/3 108/6 109/22 110/15 110/24 111/15 115/17 117/24 118/7 119/15 120/10 121/10 122/19 123/5 123/9 123/19 123/21 124/8 124/20 124/23 125/1 126/8 126/11 126/12 128/21 129/1 133/18 134/4 134/10 136/23 137/15 139/17 139/18
hadn't [2] 51/19 120/7
half [1] 123/24
hand [2] 115/18 146/18
handle [1] 95/7
happen [5] 6/19 49/4 59/18 59/18 96/3
happened [3] 49/5 66/5 96/2
happening [1] 124/25
happens [4] 21/1 34/16 34/17 89/13
happiest [1] 89/13
happiness [1] 102/15
happy [14] 80/5 80/11 85/11 85/17 88/13 89/7 102/7 102/13 102/14 113/21 113/22 114/1 119/16 142/12
hard [1] 114/20
harder [1] 28/1
has [38] 8/22 14/18 14/18 23/5 24/19 24/20 28/23 32/23 38/5 38/19 40/2 42/22 50/1 56/5 58/22 61/20 63/25 65/17 71/9 79/11 81/23 90/16 95/11 110/17 113/20 122/16 123/9 123/13 123/15 127/18 130/25 133/17 136/9 136/10 137/10 138/3 139/10 141/23
hasn't [1] 52/2
have [178]
haven't [3] 50/15 127/20 128/5
having [8] 6/2 8/6 11/23 40/11 72/18 113/15 124/4 128/23
he [36] 9/6 10/8 14/10 14/12 16/20 19/5 29/7 30/3 34/12 38/6 42/22 46/3 47/6 52/2 72/5 74/9 78/24 79/11 81/22 83/9 83/10 83/10 86/23 127/10 132/24 133/12 134/10 136/8 136/9 136/10 138/12 138/21 138/21 138/22 139/16 141/23
he's [5] 10/6 10/7 27/21 86/18 90/17
Head [35] 12/2 15/3 16/2 34/9 34/10 36/19 39/15 43/2 43/15 44/7 45/1 45/5 46/22 47/24 62/24 67/18 71/23 72/4 73/16 73/23 74/8 77/3 91/25 93/8 93/20 119/22 119/25 120/13 120/22 120/25 121/7 136/6 138/5 138/10 139/11
Head-Gordon [32] 12/2 15/3 16/2 34/9 34/10 36/19 39/15 43/2 43/15 44/7 45/1 45/5 46/22 47/24 62/24 67/18 71/23 72/4 73/23 74/8 77/3 93/8 93/20 119/22 119/25 120/13 120/22 120/25 121/7 138/5 138/10 139/11
Head-Gordon's [2] 73/16 136/6
headers [1] 54/7
health [3] 39/17 39/20 40/2
hear [9] 7/17 7/22 26/2 40/21 52/22 66/24 84/5 86/16 115/22
heard [6] 44/11 50/15 85/10 88/12 89/7 92/24
hears [1] 30/1
heart [1] 139/18
help [20] 15/2 15/3 15/10 15/21 17/22 18/2 18/3 36/12 36/12 36/17 36/19 36/24 36/24 74/12 133/23 134/17 135/16 136/5 137/2 137/12
helped [3] 124/5 134/15 134/25
helpful [1] 17/24
helps [2] 47/21 134/16
Hennefarth [4] 87/15 89/9 115/25 116/6
her [50] 13/8 28/1 30/23 30/23 33/11 33/12 33/15 33/16 33/17 40/16 40/18 41/1 41/5 48/18 49/19 49/20 55/23 55/24 55/25 57/7 59/12 59/12 59/13 59/14 59/16 60/7 68/25 68/25 69/2 69/2 69/5 85/6 93/13 93/14 101/25 102/1 102/2 123/13 135/19 135/21 135/21 135/23 135/23 135/25 138/7 141/3 141/4 141/4 141/18 141/21
here [12] 11/4 20/13 31/16 42/14 42/16 49/9 64/23 71/15 79/9 105/5 129/7 130/14
Here's [1] 140/3
hereby [2] 3/3 146/7
herein [1] 3/5
hereinbefore [1] 146/10
hereunto [1] 146/17
Hermes [1] 22/8
highlighted [3] 78/7 81/18 88/1
highlights [1] 58/2
him [37] 12/5 14/3 14/6 14/9 16/6 17/11 17/22 18/21 19/14 27/22 28/6 38/7 43/8 46/2 47/1 47/5 47/7 53/17 57/7 76/6 83/9 83/12 90/18 92/24 93/10 121/11 121/14 129/7 132/20 133/2 133/14 133/20 134/9 134/10 134/15 134/17 139/21
hire [14] 8/9 9/5 11/22 14/9 17/11 36/1 36/5 36/16 36/21 36/22 83/8 121/10 121/19 122/17
hired [20] 7/10 8/18 9/25 12/3 14/11 14/13 15/21 16/5 18/22 30/10 36/4 36/9 83/7 89/6 89/8 94/12 109/17 119/13 121/20 124/18
hiring [2] 15/10 83/19
his [29] 9/6 11/19 12/8 17/16 19/4 19/11 21/25 25/24 26/11 28/7 29/4 35/12 35/13 35/15 41/19 41/22 46/8 57/7 71/24 75/14 75/20 77/4 86/20 93/21 97/6 97/18 136/8 137/10 140/4
hmm [1] 107/13
honest [1] 137/25
honestly [3] 17/22 37/4 87/16
honor [1] 17/8
hope [2] 63/23 134/15
hoping [9] 37/1 37/4 37/6 43/6 43/9 49/2 64/3 120/18 137/12
hosted [1] 24/16
hot [1] 138/11
hour [1] 123/11
hours [3] 89/3 123/21 142/16
how [22] 11/1 15/17 18/18 19/10 21/3 21/14 21/15 21/17 21/20 21/24 22/22 28/25 34/3 34/15 79/1 90/25 91/1 122/16 127/8 133/22 136/17 136/18
however [2] 51/3 74/24
HR [1] 132/2
huh [1] 104/18
hundreds [1] 94/8
hurtful [1] 114/3
hypothesis [1] 49/24

I
I'd [5] 13/2 28/10 49/24 113/21 125/8
I'll [14] 5/1 34/20 35/14 37/9 47/20 47/20 69/13 75/1 82/6 98/15 99/2 130/11 132/5 142/12
I'm [163]
I've [15] 10/21 17/23 41/17 49/16 49/21 50/1 51/4 69/25 76/16 89/21 102/15 110/25 113/20 133/21 135/24
ID [2] 4/1 86/1
idea [9] 39/8 71/8 71/12 82/20 83/7 88/19 105/2 105/12 138/20
ideas [5] 58/11 58/14 58/16 58/18 129/7
identification [9] 12/19 19/19 22/17 29/14 44/3 45/16 46/19 99/25 111/23
identify [5] 6/16 34/24 45/19 92/5 92/12
identifying [2] 91/16 91/16
ILLINOIS [3] 1/1 2/8 6/12
immediately [1] 51/5
immigration [8] 97/5 97/18 99/1 99/5 99/14 117/24 118/6 118/8
implement [1] 58/18
imply [1] 40/2
impossible [1] 129/6
impression [1] 47/6
improvement [1] 51/18
inaccuracy [1] 133/4
inaccurate [8] 31/25 32/7 32/10 35/19 139/6 141/7 141/13 142/4
inappropriate [1] 40/19
include [2] 32/17 104/24
included [3] 69/1 95/15 109/8
includes [1] 53/14
incoming [1] 78/7
incorrect [2] 139/7 141/2
Indecipherable [1] 48/16
independent [3] 20/23 23/16 73/14
Indicating [1] 4/8
industrial [1] 73/3
industry [4] 62/22 63/4 138/14 140/8
inflicted [2] 133/19 134/5
influence [1] 136/6
influencing [1] 136/12
informal [2] 80/6 119/12
information [7] 28/5 47/10 117/24 133/15 145/14 145/14 145/15
informed [1] 134/23
initially [1] 17/18
initiate [1] 95/12
innovative [1] 65/17
insensitive [1] 114/7
insisted [2] 12/4 74/10
instead [2] 48/1 48/13
institution [1] 110/1
institutional [1] 127/7
instructing [3] 106/17 108/2 108/5
instruction [4] 109/10 109/10 127/15 128/4
instructions [1] 128/2
integrity [1] 135/2
intellectual [1] 110/2
intelligent [2] 126/4 136/16

I

intend [7] 14/3 17/11 72/14 72/24 90/2 90/8 90/21
intended [3] 16/7 19/11 106/15
intent [1] 98/9
intention [1] 98/2
intentionally [3] 133/19 133/22 134/5
interacted [1] 113/15
interaction [1] 124/9
interest [3] 20/15 100/24 110/24
interested [1] 146/16
interests [1] 120/17
intermediate [1] 111/14
international [1] 94/11
interrogation [1] 54/25
interrogatory [1] 45/18
interrupt [3] 33/15 40/18 130/14
interrupted [1] 48/18
interrupting [2] 33/11 50/16
intersection [2] 113/23 126/3
intervene [2] 7/15 7/25
intervened [1] 16/2
intervention [2] 8/13 17/15
interview [2] 102/19 124/19
introduce [2] 14/6 89/17
involve [1] 113/4
involves [2] 113/22 113/24
irrelevant [10] 9/2 9/8 15/23 16/10 16/16 23/24 33/14 50/10 61/9 103/1
is [228]
isn't [3] 64/20 121/1 121/2
issue [2] 133/6 133/9
issues [4] 39/17 39/20 40/2 97/24
it [208]
it's [64] 10/18 11/14 12/22 12/24 12/25 16/16 19/2 20/3 27/18 27/24 28/1 30/19 32/10 32/10 33/2 33/13 35/20 37/24 38/14 40/18 40/18 41/7 42/6 42/24 43/13 47/14 48/24 49/7 50/10 53/1 53/12 55/8 56/25 58/10 64/17 64/18 65/10 69/21 70/4 72/18 74/22 79/9 80/2 81/18 86/19 89/5 90/12 90/13 91/7 91/7 99/16 103/1 105/6 114/17 124/9 129/6 130/17 131/6 139/7 142/16 143/12 143/14 143/17 143/19
its [7] 19/1 68/4 89/16 89/25 103/21 117/21 118/17

J

January [11] 29/17 35/9 37/25 72/10 74/5 74/6 98/25 103/10 115/1 117/21 118/3
January 2025 [1] 35/9
January 3rd [1] 118/3
January the [1] 37/25
jbltd.com [1] 2/9
jeopardy [4] 99/1 99/6 99/13 99/14
job [41] 9/11 9/24 9/25 10/1 10/2 11/2 11/9 11/12 11/16 11/17 11/25 12/6 25/4 32/15 32/16 36/3 53/13 85/11 87/10 99/2 101/1 102/12 102/13 111/2 115/17 116/13 116/21 119/17 122/24 124/23 125/2 125/3 126/9 126/10 126/13 126/15 134/14 134/14 135/4 138/23 140/23
jobs [4] 26/18 126/3 126/7 138/13
JOHNSON [1] 2/6
join [1] 78/25
joined [2] 19/24 87/13
joining [3] 86/9 87/6 88/11
joins [1] 20/9
journal [3] 61/22 62/12 62/13
JR [1] 9/12
judge [3] 3/11 30/17 50/7
judgment [1] 55/3
July [18] 26/15 26/25 45/19 51/23 52/7 52/25 53/6 56/10 59/19 59/22 60/6 67/23 69/3 76/6 76/8 83/13 83/25 137/10
July 2024 [3] 59/22 60/6 69/3
July 24th [1] 137/10
July the [1] 26/25
June [3] 73/12 74/5 74/6
just [90] 11/14 11/15 11/15 13/21 14/21 16/18 17/2 18/21 18/22 21/11 24/3 24/3 24/14 24/17 25/19 26/19 26/20 26/22 26/22 27/22 27/24 28/21 29/25 30/9 33/20 34/11 34/17 34/19 34/25 38/9 39/8 40/22 42/24 44/16 45/3 45/22 46/11 48/14 48/23 49/5 49/19 50/11 51/8 51/13 55/11 59/24 59/25 62/7 65/23 66/13 66/22 67/21 71/25 75/7 80/9 81/2 83/8 86/4 86/20 88/11 89/5 90/24 91/9 98/3 102/16 105/6 106/20 107/2 108/13 110/25 111/4 111/16 118/25 120/6 120/14 121/9 121/18 122/8 122/22 123/19 125/10 129/22 129/23 135/8 136/5 138/21 139/4 139/9 142/22 142/25

K

K-A-K-E-H-A-N-I [1] 77/18
Kakehani [11] 77/17 77/17 77/23 78/2 78/17 78/20 80/17 80/22 82/9 82/22 83/15
keep [4] 89/2 100/25 105/22 106/13
kind [1] 21/18
kindly [1] 39/1
King [3] 128/24 129/9 129/13
knew [12] 15/4 17/1 17/3 49/6 80/3 101/10 102/24 115/17 126/6 126/8 126/8 126/15
know [107] 6/19 7/18 8/20 9/14 9/21 9/22 12/14 13/19 13/25 15/17 18/10 18/11 19/7 19/7 21/22 21/23 25/7 25/9 26/17 27/2 27/15 27/20 27/21 29/2 29/6 38/8 42/7 42/18 43/13 43/19 44/9 46/12 47/11 48/10 48/23 50/8 50/11 54/13 54/24 55/9 56/14 58/11 61/7 61/11 63/1 65/15 65/23 65/24 67/11 71/7 71/8 71/10 72/7 73/8 76/19 77/16 77/23 78/11 79/25 82/11 82/18 82/18 87/12 87/19 87/20 87/20 88/17 89/1 89/4 89/10 89/20 90/19 96/19 96/22 103/17 105/13 105/16 106/20 106/22 107/23 108/11 112/10 113/6 113/6 113/25 116/2 116/15 118/12 121/9 121/9 122/16 125/2 126/7 126/14 127/8 127/8 128/15 133/22 135/3 136/16 136/17 138/24 139/8 140/9 140/16 140/18 143/4
knowledge [5] 55/1 55/5 70/5 70/10 127/6
knowledgeable [1] 88/23
knows [1] 28/18

L

la [2] 90/13 121/4
lack [2] 71/18 76/9
laid [2] 82/9 97/9
language [3] 11/5 53/15 56/24
large [3] 11/5 53/14 56/23
laser [2] 48/9 48/11
laser-focused [2] 48/9 48/11
last [1] 41/11
later [3] 4/18 30/13 72/2
LAURA [22] 1/6 1/13 2/7 6/10 27/20 29/25 30/25 33/19 44/17 52/21 57/6 59/11 60/11 65/11 75/24 78/22 79/24 80/19 81/2 113/15 123/9 144/11
Laura's [4] 67/5 67/8 138/5 138/11
law [1] 130/24
laying [1] 79/15
leadership [3] 22/7 22/7 42/8
learn [3] 29/7 30/3 99/3
learned [4] 29/19 80/10 118/8 125/5
learning [4] 61/4 70/23 71/4 118/6
least [3] 64/12 69/17 133/12
leave [10] 79/10 81/22 84/24 95/6 105/7 107/4 107/4 110/8 110/25 111/5
leaves [1] 104/9
left [4] 44/14 115/24 126/5 128/16
legal [2] 52/14 65/10
legit [1] 35/11
length [1] 23/4
less [2] 123/24 138/20
let [29] 27/18 27/22 30/23 33/12 33/16 38/7 40/16 49/19 49/20 55/23 55/25 57/7 57/7 79/18 85/6 85/6 90/19 93/13 93/14 98/5 102/1 110/9 132/11 132/12 135/21 135/23 135/25 141/18 141/20
let's [5] 56/15 75/5 77/11 125/12 125/13
letter [30] 18/6 32/4 37/5 48/12 68/18 73/6 73/16 73/18 83/5 87/18 96/8 96/12 96/15 116/25 119/24 121/25 122/2 125/19 125/24 125/25 126/21 127/10 135/9 137/22 137/23 137/25 138/4 138/8 139/16 145/4
letter's [2] 31/24 32/6
letters [3] 102/10 135/5 135/5
level [1] 113/18
lgagliardi [1] 37/25
license [1] 4/6
life [4] 17/25 40/7 123/22 123/25
light [2] 9/3 9/4
like [40] 4/5 13/2 14/3 25/10 28/10 36/11 41/9 41/16 48/24 49/7 49/25 55/13 56/5 56/9 56/15 56/17 58/2 63/21 71/5 73/7 74/20 75/2 75/2 79/7 81/20 89/7 91/8 95/13 98/13 105/5 107/3 113/16 121/1 125/8 131/6 134/16 137/16 139/20 143/2 143/21
likes [1] 83/11
limit [1] 134/2
limited [1] 49/7
limiting [1] 127/15
line [5] 50/13 74/24 75/8 125/7 145/17
LinkedIn [1] 123/13
list [9] 23/2 25/15 42/18 42/24 67/9 90/1 95/14 113/14 132/20

L

listed [7] 21/24 23/8 25/1 42/10 91/3 132/25 138/3
listen [4] 31/20 34/11 101/18 137/17
listing [4] 24/9 29/20 41/23 133/7
lists [1] 32/16
literature [7] 65/15 65/21 66/2 112/20 112/22 113/5 113/8
little [4] 61/1 67/12 86/19 86/19
live [2] 6/11 125/20
LLM [8] 50/3 50/9 54/20 54/23 55/5 55/9 63/12 63/16
LLM-based [2] 54/20 63/12
LLMs [5] 48/3 54/9 61/11 65/21 124/16
location [1] 58/25
locations [1] 112/7
long [8] 14/19 41/3 61/7 79/7 81/14 81/20 84/15 122/20
longer [3] 8/7 104/10 104/11
look [41] 18/5 19/21 22/19 24/7 26/4 29/16 32/15 35/7 44/5 45/18 46/21 51/11 54/7 58/4 61/18 62/21 63/11 66/9 67/7 68/3 68/14 70/25 72/10 75/17 78/6 86/2 89/25 91/15 96/7 96/25 98/24 100/2 103/10 103/21 104/15 111/25 114/25 117/16 117/21 118/16 140/18
looked [3] 130/9 138/21 138/22
looking [9] 14/23 51/24 78/12 101/10 102/24 126/2 126/6 126/13 134/14
looks [1] 131/6
lot [8] 25/11 27/18 40/6 107/1 120/7 121/12 128/25 140/20
love [1] 101/16
loved [1] 101/11
lower [1] 123/23
LTD [1] 2/6
Lugo [8] 35/4 90/14 118/4 118/10 130/5 131/16 132/1 132/1
Lugo's [1] 132/4

M

made [24] 8/2 12/13 13/18 32/1 32/8 35/14 35/16 35/24 36/15 37/11 41/18 47/23 59/4 80/4 80/16 115/4 115/13 117/1 123/25 124/11 128/9 129/9 133/1 137/8
Madeline [6] 1/16 10/15 13/4 142/21 146/6 146/21
mails [1] 112/2
main [2] 135/12 135/16
make [16] 21/16 29/25 30/9 42/14 46/8 47/22 75/13 79/8 81/21 84/21 86/7 98/18 108/19 119/20 142/19 143/5
makes [2] 25/16 85/21
making [6] 37/11 50/22 67/17 122/11 136/19 141/6
malicious [2] 98/2 98/8
manner [1] 114/5
manuscript [2] 69/24 70/2
many [3] 17/21 109/15 130/10
March [7] 45/1 76/5 76/7 93/5 93/18 102/21 137/9
marked [11] 12/18 19/18 22/16 29/13 44/2 45/15 46/18 99/24 111/22 145/17 145/18
market [2] 2/3 135/4
marriage [1] 146/15
Martin [47] 12/2 12/4 15/3 16/1 17/20 34/9 34/10 36/11 36/19 36/25 39/15 44/12 45/1 45/5 45/19 45/22 46/24 62/24 67/18 72/12 72/15 73/7 74/12 77/6 92/17 93/16 119/22 119/24 120/19 121/10 121/16 136/6 136/7 136/21 137/9 138/12 138/20 139/10 139/12 139/13 139/15 139/17 139/19 140/17 140/21 141/23 142/3
Martin's [1] 138/20
material [4] 34/1 53/2 62/18 105/6
materialized [2] 50/2 54/17
materials [2] 61/15 102/11
mathematical [1] 113/18
matter [2] 79/8 146/16
matters [4] 16/1 23/18 112/9 127/6
Matthew [5] 22/8 87/14 89/8 115/25 116/6
may [21] 3/8 3/12 4/13 6/14 44/10 58/7 58/20 64/10 77/6 80/12 83/9 83/11 83/17 85/5 88/12 89/4 102/25 116/7 119/11 122/15 127/18
maybe [23] 7/19 7/20 10/13 10/13 10/14 28/19 28/23 31/16 35/18 43/18 43/20 44/10 44/12 47/4 47/25 56/25 62/14 77/5 90/6 109/14 109/21 126/14 139/7
Mazziotti [2] 73/7 107/23
me [128] 4/3 6/20 9/9 12/4 12/5 13/24 14/8 14/11 15/5 15/10 15/10 15/15 16/3 16/6 17/20 18/21 19/2 19/24 21/8 21/13 21/13 25/20 30/12 31/9 31/10 32/24 36/16 36/17 38/7 39/13 39/21 40/3 40/14 42/15 43/14 44/7 50/16 53/10 54/1 54/12 55/14 58/5 59/12 64/16 65/14 66/11 67/21 69/7 69/18 69/22 72/11 73/15 74/1 75/8 76/9 78/17 79/18 80/8 80/10 82/8 82/17 83/2 84/14 86/6 86/9 87/5 87/24 89/17 90/19 90/24 91/6 91/20 95/20 97/25 98/6 99/7 99/18 101/16 102/25 104/20 104/23 105/7 106/17 107/4 107/4 108/2 109/3 110/9 110/18 110/25 111/5 118/4 118/14 118/18 118/22 119/5 120/6 120/13 121/10 122/2 122/13 124/15 125/23 127/9 128/10 132/11 132/12 132/15 132/16 134/10 134/16 134/25 135/9 135/16 136/11 136/21 137/2 137/22 138/12 139/12 139/16 140/4 140/7 140/7 140/17 140/23 141/24 144/14
mean [45] 4/3 4/5 7/18 9/1 9/2 9/21 10/24 11/12 13/19 19/1 19/8 22/6 31/13 32/9 35/17 35/20 35/23 35/25 36/1 42/5 47/17 55/18 57/23 58/9 61/13 61/20 63/20 64/5 71/7 72/5 80/2 87/13 88/7 88/8 88/17 101/18 102/8 107/5 120/7 122/16 123/4 125/22 127/9 133/12 133/23
meaning [2] 7/20 115/3
meaningful [1] 121/21
means [6] 8/14 9/14 9/22 65/13 65/14 96/23
meant [4] 72/25 106/20 115/12 137/1
mechanics [2] 113/24 126/4
meet [1] 56/15
meeting [16] 56/18 64/20 65/2 88/3 91/17 92/5 95/13 95/15 95/17 95/18 95/24 96/1 96/3 117/13 129/1 129/5
meetings [5] 32/18 45/20 48/1 95/14 100/20
Melanie [1] 22/10
member [6] 24/17 37/18 38/6 38/20 41/14 90/17
members [12] 14/6 21/14 22/25 28/13 39/10 40/11 40/13 42/9 91/4 122/12 128/25 134/9
mental [3] 39/17 39/20 40/2
mentioned [3] 92/16 100/20 128/8
mentions [1] 11/4
merit [1] 26/4
message [9] 68/16 72/10 86/3 88/16 88/18 88/18 88/19 89/25 98/25
messages [11] 78/7 78/16 78/19 88/3 88/21 88/24 88/24 89/2 91/17 92/5 112/4
met [5] 45/23 76/5 76/5 76/6 77/6
metal [1] 124/16
method [1] 116/25
methods [1] 113/23
Mexico [2] 100/4 125/20
microphone [1] 7/24
Microsoft [2] 108/16 108/22
mid [2] 101/25 102/1
mid-sentence [2] 101/25 102/1
middle [1] 48/19
midsentence [1] 55/23
mind [1] 137/11
Minnesota [1] 94/7
minor [1] 124/6
minutes [5] 18/25 77/10 77/12 125/13 125/14
Mitra [4] 86/4 86/8 87/5 116/12
Mm [1] 107/13
Mm-hmm [1] 107/13
models [4] 11/5 53/15 56/24 108/17
molecular [1] 6/25
Monday [1] 37/25
money [6] 25/9 25/11 28/13 28/15 121/13 121/13
Monica [9] 22/9 35/3 90/14 118/4 118/10 131/16 132/1 132/1 132/4
Monroe [1] 2/7
month [3] 31/14 31/16 85/20
months [11] 51/1 51/6 51/21 53/1 53/4 53/6 53/11 63/22 111/4 111/11 111/12
more [8] 7/23 20/11 23/6 41/16 43/21 51/4 58/11 72/21
morning [3] 56/12 90/6 130/10
most [3] 17/24 28/15 39/10
move [12] 9/8 15/12 26/22 31/21 34/20 37/9 41/1 45/9 69/13 71/13 98/21 111/5
moved [1] 119/17
moving [3] 67/3 85/24 103/7
Mr [2] 80/24 145/11
Mr. [10] 4/22 33/10 40/16 80/25 130/4 133/10 133/17 134/6 135/19 144/2
Mr. Anderson [1] 130/4
Mr. Chakraborty [7] 4/22 33/10 40/16 133/17 134/6 135/19 144/2
Mr. Chakraborty's [2] 80/25 133/10
Ms [5] 15/8 130/1 130/15 143/24 145/12

M


Ms. [14] 13/24 15/8 19/3 23/21 31/22 33/8 38/15 38/25 130/4 130/5 130/5 130/21 138/1 143/16
Ms. Bryant [1] 130/4
Ms. Cobbins [1] 130/5
Ms. Gagliardi [9] 13/24 15/8 19/3 23/21 31/22 33/8 38/15 38/25 138/1
Ms. Lugo [1] 130/5
Ms. Tavani [2] 130/21 143/16
much [9] 23/13 101/20 102/3 102/16 123/23 127/25 134/1 135/2 138/24
multiple [3] 16/3 78/18 80/20
multireference [1] 65/22
my [195]
myself [7] 22/8 78/19 106/24 108/13 108/19 127/12 135/3


N


name [8] 6/8 16/11 16/15 18/6 67/10 106/23 110/13 124/4
names [1] 16/17
nature [1] 8/12
need [5] 6/20 58/15 85/19 99/1 130/13
needed [2] 32/12 100/25
needs [1] 142/11
negative [9] 49/13 90/22 120/11 120/12 128/9 128/12 128/13 136/20 137/23
neither [4] 42/15 46/2 55/17 73/2
network [1] 71/2
networks [1] 136/18
neural [1] 71/1
never [34] 12/3 14/13 14/19 16/5 23/6 36/8 36/9 49/16 49/21 50/1 56/2 57/16 62/17 66/5 67/20 68/8 73/1 76/16 80/8 89/19 89/20 92/20 93/15 100/22 106/25 107/2 110/6 111/15 124/20 134/12 137/3 137/14 137/15 140/22
new [11] 1/17 6/3 26/18 31/15 39/7 99/2 100/4 125/20 146/3 146/4 146/7
next [19] 15/12 21/15 31/21 45/9 49/11 69/14 71/13 85/16 85/17 85/24 89/12 98/15 98/21 102/6 103/8 111/2 111/6 115/16 134/14
nice [1] 124/9
no [134] 1/4 4/16 12/16 16/10 16/11 16/23 16/23 18/21 25/16 26/3 27/7 27/12 29/6 32/9 33/3 33/16 36/7 37/20 39/5 39/9 40/9 40/9 43/23 44/5 44/5 44/23 45/12 45/19 48/6 48/7 48/23 49/14 50/4 50/23 51/10 51/12 51/13 51/14 51/15 51/16 52/5 52/17 54/22 59/23 61/8 61/8 61/14 61/14 61/19 61/20 61/21 61/25 62/19 63/6 65/1 65/6 66/9 68/8 71/8 71/16 71/19 71/21 71/25 75/18 76/8 76/14 76/15 76/15 76/16 76/21 77/20 82/20 83/6 84/13 84/14 85/21 85/23 85/23 86/10 86/10 86/18 86/18 87/7 88/18 89/24 91/23 91/24 94/20 95/25 96/18 96/22 97/15 97/23 98/17 98/17 99/22 101/24 101/24 103/21 104/7 104/10 105/2 105/12 110/17 110/24 111/12 112/6 114/22 114/25 117/3 117/7 117/11 120/5 123/4 123/5 124/20 124/25 125/5 126/22 127/4 127/20 128/4 129/5 129/7 134/7 134/7 135/1 138/3 138/15 139/23 142/6 145/15 145/18 146/15
nobody [4] 8/18 16/16 23/19 30/18
none [1] 127/17
North [1] 6/11
NORTHERN [1] 1/1
not [134] 4/14 6/19 8/10 8/21 10/16 10/24 11/25 12/4 14/22 16/2 17/4 17/19 20/21 24/14 24/18 25/13 27/9 28/11 30/6 30/15 30/17 32/22 36/2 36/10 36/21 38/2 38/10 38/22 39/11 39/22 40/25 42/16 42/24 46/1 48/8 49/5 49/7 51/1 52/11 52/17 53/1 53/8 53/12 54/25 55/9 55/21 56/13 57/14 59/3 62/5 62/16 63/6 65/18 69/22 71/20 73/15 78/4 78/11 79/14 80/3 80/24 81/1 83/4 83/5 84/15 84/21 87/17 88/18 90/4 90/15 91/7 91/10 91/21 92/11 93/6 93/19 94/24 95/6 96/3 97/23 98/2 98/18 101/16 101/25 102/18 102/23 104/11 106/8 106/17 107/7 108/1 108/2 109/8 109/22 110/15 111/17 113/4 113/17 114/1 115/12 115/15 116/1 119/22 120/5 120/12 120/14 120/15 121/20 122/21 124/6 124/19 125/25 126/21 127/12 127/18 129/18 130/6 132/2 132/21 133/13 133/14 133/15 134/4 135/8 137/17 137/18 138/18 139/12 140/17 141/4 141/7 141/24 142/7 146/13
Notary [4] 1/17 6/3 144/17 146/6
notes [3] 91/17 92/6 112/4
nothing [33] 17/4 19/12 24/21 31/11 42/23 49/14 49/15 49/15 49/16 54/18 63/1 67/20 76/7 76/14 76/14 76/14 80/7 83/8 83/18 84/9 102/15 108/6 110/5 111/3 111/17 120/7 128/21 134/11 136/11 137/10 139/10 139/13 141/24
Notice [1] 1/14
noting [1] 64/7
November [8] 22/19 52/23 53/7 53/10 73/21 74/3 110/19 134/24
November 2 [1] 22/19
November 2024 [2] 110/19 134/24
November 20th [2] 73/21 74/3
November 27th [2] 52/23 53/10
now [15] 18/1 22/8 38/21 38/22 51/5 55/14 60/15 64/17 69/8 69/13 74/2 74/18 97/1 143/6 143/7
nowhere [1] 48/15
NQAC [1] 123/12
number [1] 94/7
numerical [1] 117/4


O


O'Hare [1] 95/17
O-1A [2] 95/22 96/7
oath [1] 3/10
object [24] 9/16 29/22 47/12 47/13 52/10 55/7 62/1 65/7 66/20 75/21 78/9 79/22 81/25 84/18 90/9 101/4 114/13 127/21 127/25 129/15 129/15 129/16 131/23 131/25
objecting [3] 60/1 79/13 79/20
objection [29] 4/16 4/17 59/6 59/7 79/19 80/1 80/15 82/4 82/12 82/13 92/19 94/3 94/14 95/2 97/7 97/8 98/14 99/19 109/11 116/3 116/9 116/10 116/16 120/1 122/4 123/7 123/8 123/17 137/4
objections [3] 3/19 97/21 98/19
objective [2] 19/22 122/22
obligation [1] 141/18
observations [2] 47/9 47/22
obtained [1] 50/1
occur [1] 124/23
occurs [1] 63/25
October [9] 1/9 79/1 95/19 96/7 96/11 112/16 116/20 117/10 146/18
October 24th [3] 112/16 116/20 117/10
October 26th [1] 95/19
October 7th [1] 79/1
off [14] 13/7 13/10 40/24 41/1 55/25 86/22 86/25 95/15 101/25 135/19 139/19 141/3 141/4 141/4
off-ramp [1] 95/15
offer [32] 8/2 12/12 13/17 18/6 19/6 31/23 31/25 32/4 32/5 32/7 32/12 80/4 80/8 80/11 86/13 87/10 87/18 104/16 115/17 115/18 116/13 119/24 121/23 121/25 122/1 124/13 124/14 124/16 124/23 125/2 125/3 145/4
offered [3] 75/8 110/21 111/1
office [5] 7/15 7/25 8/24 97/24 98/5
official [8] 12/11 13/16 35/2 103/11 103/15 129/4 132/3 132/4
okay [43] 4/7 4/9 36/2 39/4 40/3 44/20 46/25 49/22 51/16 55/22 57/6 58/19 60/15 64/11 69/15 69/20 75/5 75/10 75/10 76/24 77/8 79/13 79/16 79/18 80/23 81/3 81/24 91/9 91/13 109/11 119/9 129/22 131/5 132/5 133/9 133/16 134/3 134/18 134/18 139/7 139/22 143/19 143/23
old [1] 122/14
once [5] 16/1 80/3 98/1 109/16 133/24
one [41] 14/16 14/17 17/23 17/25 20/17 21/14 22/12 23/7 24/16 24/19 24/20 25/18 28/12 28/19 31/14 48/2 48/3 48/3 48/4 48/25 50/11 50/13 50/25 61/1 63/24 72/21 74/9 76/23 76/23 85/20 87/18 87/20 87/21 112/18 113/16 113/16 118/13 126/22 128/17 133/18 140/18
ones [2] 57/19 58/17
ongoing [1] 112/21
only [20] 11/22 14/17 15/25 18/23 21/2 23/17 47/17 69/19 83/11 92/24 101/20 102/3 102/10 102/16 106/23 119/14 133/5 134/1 135/1 135/6
open [1] 110/21
opinion [10] 83/6 136/7 136/9 136/13 137/19 138/17 138/18 139/9 140/4 141/23
opportunities [5] 28/6 29/4 32/20 100/8 100/14
opportunity [13] 15/6 15/24 16/13 109/18 109/24 110/6 115/14 122/25 123/3 123/5 123/5 123/16 123/20
order [5] 36/16 36/21 101/1 110/21 124/1
ordering [2] 144/2 144/3
organic [1] 124/17

O


original [2] 3/7 3/15
Orlando [2] 45/4 102/19
other [18] 15/18 21/14 27/18 28/1 29/3 34/16 40/11 48/4 62/13 65/15 88/4 91/17 92/23 94/1 100/7 122/12 128/25 134/9
Otherwise [1] 142/13
our [5] 30/18 59/15 85/21 85/22 115/14
ours [1] 47/10
out [13] 8/3 8/9 13/8 14/14 15/10 15/22 17/7 37/24 59/4 97/9 105/7 107/4 125/18
outcome [1] 146/16
over [4] 28/1 76/11 129/20 142/9
overestimate [1] 138/19
overlap [1] 27/19
overture [1] 110/23
own [3] 47/9 59/16 136/8
Oxford [1] 100/25


P


p.m [1] 95/18
packet [2] 54/6 131/6
page [54] 6/17 12/16 18/5 19/16 22/14 24/7 26/4 29/11 35/7 43/23 45/12 46/16 51/11 53/23 53/24 54/6 54/10 56/9 61/17 62/20 63/10 66/8 67/7 68/3 68/14 71/1 72/9 75/17 78/6 86/1 86/1 87/25 89/24 91/14 96/6 96/25 98/24 99/22 103/10 103/21 104/14 105/22 106/13 111/20 114/25 117/20 118/16 118/17 131/6 131/7 145/3 145/11 145/14 145/17
paid [2] 81/5 123/23
panel [1] 61/1
paper [14] 28/24 28/25 33/25 34/1 61/20 62/10 62/11 62/12 71/6 71/9 113/7 120/19 138/11 140/20
papers [4] 16/18 43/8 46/2 76/15
paragraph [4] 26/5 46/21 54/8 106/14
part [14] 7/4 18/8 31/15 31/23 32/5 32/15 59/20 68/25 69/11 69/18 98/2 112/21 124/6 131/14
participate [1] 17/15
participation [1] 125/9
particular [1] 27/10
particularly [1] 40/10
parties [2] 3/5 146/14
parts [1] 67/15
passage [1] 34/23
passing [1] 55/3
past [7] 9/4 22/25 42/9 50/14 58/1 73/10 91/4
Pavni [1] 15/13
pay [4] 25/14 120/18 122/1 123/11
paying [2] 25/10 121/12
PCCP [2] 138/9 138/11
PDF [26] 6/17 18/5 19/16 22/14 24/7 26/3 29/11 35/7 46/16 51/11 62/19 63/10 68/2 70/19 75/16 78/6 91/14 96/6 96/25 98/24 99/22 103/20 105/22 111/20 117/20 118/16
peace [1] 110/25
peer [2] 61/22 62/11
peer-review [1] 61/22
peers [1] 62/13
pending [4] 59/24 80/1 139/24 142/7
penultimate [2] 112/17 116/21
people [33] 14/17 15/17 15/18 17/24 23/2 25/7 28/18 28/21 30/16 31/13 33/20 33/24 42/18 65/16 72/7 73/10 87/13 89/11 90/10 94/1 94/12 95/7 101/19 111/13 121/19 122/18 128/9 128/11 128/15 129/9 129/12 135/4 137/21
per [1] 25/4
perceived [1] 15/16
percent [3] 121/1 121/3 121/17
perfect [1] 115/12
perfectly [1] 142/24
perform [6] 16/13 20/24 27/4 62/16 65/13 111/5
performance [28] 25/23 26/10 26/14 26/24 27/5 30/17 43/3 43/4 44/8 46/8 46/23 47/24 50/21 50/24 52/7 53/3 55/4 67/17 71/24 75/14 75/20 77/4 84/10 93/2 119/21 121/2 121/3 136/20
performed [12] 61/23 62/17 64/24 65/5 105/10 105/17 106/1 106/17 106/19 108/4 109/1 120/8
perhaps [2] 109/15 115/11
period [9] 14/23 15/25 33/23 83/20 83/24 83/24 103/4 111/4 128/22
person [16] 9/5 24/16 24/19 32/22 39/12 42/21 43/21 51/6 51/8 89/14 102/16 127/15 127/16 127/18 137/20 139/2
personal [4] 127/6 131/15 131/16 139/21
personally [3] 62/24 67/16 71/5
personnel [7] 82/17 83/2 89/16 118/18 118/22 119/5 136/22
petition [3] 96/8 96/12 96/20
Ph.D [2] 1/2 2/2
PhD [6] 8/6 8/19 9/6 49/8 58/17 107/22
phone [3] 16/3 89/5 119/12
phonetic [1] 15/13
photo [1] 4/1
physical [1] 4/14
PI [2] 95/16 100/25
piece [1] 110/7
place [3] 63/23 74/17 109/25
plaintiff [5] 1/3 1/13 2/3 78/3 91/25
plaintiff's [2] 130/17 145/2
plan [1] 51/18
planet [1] 136/13
please [56] 4/2 6/18 6/21 7/24 18/5 19/21 22/19 24/7 26/4 27/17 29/16 30/23 33/12 35/7 35/21 38/7 40/8 40/16 40/24 44/5 45/18 46/21 51/11 54/6 55/25 61/18 62/21 63/11 66/9 66/22 67/7 68/3 68/14 72/10 75/17 78/6 86/2 87/25 89/25 90/19 91/15 96/6 96/25 98/24 100/2 103/10 103/21 104/15 105/22 106/13 111/25 114/25 117/20 118/16 139/25 142/7
point [12] 14/9 16/12 44/13 49/3 51/25 54/16 63/17 66/3 74/16 88/12 98/10 118/7
points [1] 20/14
poisoning [1] 135/15
policy [1] 109/9
portion [1] 66/16
posed [2] 52/2 92/3
position [33] 6/21 7/10 11/18 11/24 12/7 12/11 13/16 14/2 16/8 16/22 17/11 18/13 18/24 28/5 29/4 29/5 31/24 32/6 32/13 35/12 36/15 39/16 74/11 85/16 97/13 101/11 101/12 101/17 103/5 111/6 115/16 122/9 125/21
positions [8] 14/15 14/24 73/1 100/6 100/12 100/17 102/25 140/7
possession [2] 138/6 138/7
possible [4] 18/23 20/12 73/13 80/13
post [4] 10/3 10/7 122/19 122/19
post-doc [2] 122/19 122/19
postdoc [28] 8/3 8/5 8/9 8/18 8/23 9/6 11/22 14/9 14/12 15/15 15/17 15/19 16/15 20/9 20/18 23/6 24/8 30/12 36/3 36/16 36/22 36/23 58/16 89/17 89/17 91/3 132/21 132/25
postdocs [11] 21/1 22/4 22/10 23/1 23/5 42/9 42/10 92/23 132/24 133/3 133/13
postdoctoral [12] 7/14 7/16 8/1 14/4 14/7 16/8 17/12 18/20 21/8 23/8 72/5 94/9
posted [3] 10/14 11/2 11/11
poster [1] 34/2
posting [4] 9/11 9/24 34/22 53/13
powered [1] 53/15
PowerPoint [1] 67/9
PR [1] 28/22
precisely [1] 126/8
predictor [1] 71/2
Prefacing [1] 120/21
premise [1] 42/14
premises [1] 23/3
prepared [4] 11/9 11/14 57/11 60/20
preprint [1] 70/20
prerogative [1] 41/6
prescription [1] 20/20
presence [2] 4/15 50/6
present [11] 4/14 28/20 28/23 32/25 33/4 34/13 54/18 55/12 100/21 111/13 116/19
presentation [11] 57/13 59/1 60/3 60/12 60/22 60/23 64/14 68/17 116/20 117/2 117/6
presentations [7] 112/21 112/22 113/1 113/3 113/3 113/4 113/11
presented [12] 57/17 59/20 60/13 61/14 67/21 76/9 110/18 113/7 113/20 116/24 117/5 117/9
presenting [2] 32/18 33/22
preserved [1] 112/3
prestigious [1] 109/25
presumably [6] 11/1 41/21 84/23 99/11 105/14 126/14
pretty [1] 143/15
previous [7] 78/21 95/13 95/16 107/25 132/23 132/24 132/25
previously [2] 71/17 94/1
prior [2] 73/6 73/6
Pro [1] 2/3
probably [7] 11/13 22/3 89/7 94/8 120/22 123/24 124/5
problem [3] 25/20 31/9 86/16
procedural [1] 142/11
procedure [2] 1/15 104/8
proceed [3] 4/11 6/14 49/25

P


proceeds [1] 21/17
process [2] 17/23 26/5
processing [1] 96/16
produce [4] 21/12 37/3 37/7 62/14
produced [11] 13/12 24/20 25/18 32/23 33/21 42/13 55/15 105/2 105/3 110/6 112/2
produces [1] 62/9
production [4] 76/16 85/23 91/15 111/25
productive [1] 43/7
productivity [3] 16/18 49/15 62/8
products [1] 49/12
profession [1] 102/7
professional [9] 23/10 30/21 72/4 72/13 72/23 75/14 99/13 100/8 100/13
professionally [2] 111/6 113/9
professor [43] 6/24 20/5 22/9 24/22 43/1 43/15 44/6 44/25 46/22 47/23 58/24 62/24 64/21 67/18 71/23 72/3 73/15 73/23 74/7 77/3 78/24 92/15 93/4 93/7 93/20 93/25 94/6 94/7 94/18 107/6 107/10 108/15 119/24 120/13 120/22 120/24 121/6 128/8 136/15 138/4 138/6 138/10 139/3
programmed [2] 50/3 50/9
progress [2] 16/14 40/10
project [13] 48/2 49/17 49/21 66/5 79/4 79/5 81/14 81/18 81/19 84/22 85/22 111/18 120/16
projects [3] 39/15 48/25 111/9
properly [1] 142/20
proposal [6] 20/4 20/6 108/18 109/20 109/22 145/4
propose [2] 24/23 41/22
proposed [5] 7/14 7/15 8/24 19/21 20/11
proposing [1] 42/3
prospective [2] 100/6 100/12
protected [2] 128/19 134/10
proud [1] 119/18
PROV [2] 53/23 63/10
provide [5] 32/20 72/14 72/24 73/15 126/21
provided [4] 7/9 7/12 28/20 108/8
provost [4] 7/15 7/25 8/23 17/14
PsiQuantum [56] 44/11 67/25 68/9 69/24 77/19 77/24 80/8 80/18 81/6 81/9 82/17 83/2 83/16 83/19 85/11 86/9 86/13 87/6 87/11 87/14 88/7 88/8 88/11 89/16 92/25 99/4 110/20 116/7 116/13 116/14 118/18 118/22 119/5 119/15 121/23 122/25 123/2 123/10 123/12 123/15 123/20 123/22 123/25 124/2 124/4 124/7 124/9 124/14 124/22 124/24 125/4 126/9 137/11 138/23 139/5 140/24
public [5] 1/17 6/3 70/4 144/17 146/6
publicated [1] 38/10
publication [2] 56/4 64/18
publications [2] 61/15 111/10
publish [2] 28/7 140/23
published [3] 58/2 113/21 138/8
publishing [1] 101/1
purpose [3] 8/16 132/17 133/5
pursuant [1] 1/14
pursue [1] 20/16
pursuits [2] 43/17 45/6
pushing [2] 38/6 90/17
put [7] 11/15 31/16 31/19 59/12 69/25 106/23 135/3
pyramid [1] 121/17


Q


quantify [1] 62/8
quantum [22] 9/11 10/1 11/4 25/1 35/4 35/13 35/13 35/15 36/6 38/3 38/4 65/22 90/15 113/24 115/4 115/13 115/19 118/10 126/3 130/7 132/20 133/1
quantum AI [1] 35/13
Quantum-AI [6] 90/15 115/4 115/13 118/10 130/7 132/20
question [105] 7/5 7/20 8/15 9/1 9/2 13/14 15/12 20/1 21/23 24/13 26/8 26/13 27/22 27/23 29/24 30/7 31/22 32/3 38/13 38/24 39/1 40/21 41/11 41/15 45/10 47/14 48/8 50/19 52/2 52/3 52/10 52/14 54/3 54/10 55/7 57/7 59/23 59/25 60/10 60/18 60/19 62/2 62/6 65/3 65/8 65/17 66/14 66/21 67/1 68/19 69/14 70/8 71/13 72/17 76/3 77/22 79/23 80/24 81/1 81/25 82/6 85/25 87/4 88/25 90/5 90/20 90/23 92/3 92/9 94/22 95/10 98/22 99/2 100/10 100/18 101/5 101/9 101/22 101/23 103/8 103/12 103/18 104/3 104/19 107/12 107/18 107/25 109/5 114/14 115/6 115/21 118/2 118/5 119/1 120/3 123/6 126/11 126/20 127/22 131/24 131/25 134/4 139/23 142/6 145/17
questioning [3] 74/24 75/9 125/7
questions [25] 19/8 23/23 23/24 23/25 24/3 38/17 41/2 55/10 64/22 74/19 81/3 95/7 129/23 130/3 130/16 130/20 131/1 132/6 132/7 132/12 132/13 134/19 140/3 145/17 145/18
quick [1] 125/11
quickly [1] 72/19
quite [1] 39/11
quiz [1] 55/10
quotes [1] 106/7


R


raises [1] 28/12
ramp [1] 95/15
rather [1] 42/4
RCC [5] 103/25 104/5 104/17 104/20 105/25
RE [1] 134/20
RE-DIRECT [1] 134/20
reached [1] 125/18
read [9] 29/24 66/2 66/11 66/23 72/20 142/18 142/23 142/25 143/11
ready [1] 77/15
real [3] 38/23 48/7 67/21
reality [1] 36/8
realized [3] 30/14 31/3 31/8
really [17] 14/25 36/11 40/19 48/8 49/9 53/8 62/16 74/9 74/12 79/8 81/21 85/11 120/10 124/7 128/19 134/11 139/1
reask [1] 13/14
reason [1] 42/3
reasonable [1] 57/1
reasons [2] 20/9 28/22
recall [33] 6/18 14/8 27/2 39/25 41/21 43/18 43/19 54/14 80/2 93/9 93/11 93/12 95/23 96/1 96/4 96/15 96/18 103/17 103/19 112/25 113/12 116/23 117/1 117/4 117/8 117/12 117/14 118/11 122/11 122/15 125/22 129/18 130/8
receipt [1] 66/17
receive [4] 24/10 57/2 96/5 96/10
received [14] 54/1 54/12 62/17 63/7 86/12 87/10 87/18 87/20 87/21 116/13 117/25 124/23 125/1 125/4
recent [1] 67/9
recipient [1] 90/1
recipients [4] 35/8 90/3 90/21 117/22
recognize [7] 9/10 9/17 9/22 10/4 67/4 67/10 71/14
recommendation [1] 102/9
recommending [2] 101/21 140/6
record [16] 4/12 6/9 13/7 13/10 34/24 86/23 86/25 88/4 93/5 94/19 98/19 114/18 119/23 135/8 139/20 146/11
records [8] 49/13 68/11 87/22 88/4 103/11 103/16 112/8 127/7
recruitment [1] 34/23
red [2] 9/3 9/4
redesign [1] 25/14
refer [1] 15/14
referee [2] 135/12 135/16
reference [7] 73/2 73/16 73/19 80/9 83/5 105/23 138/4
referenced [1] 57/22
references [2] 73/6 136/17
referral [2] 72/14 72/24
referred [3] 82/8 83/17 105/9
referring [8] 17/10 38/12 38/19 41/13 78/7 78/20 78/23 79/4
reflect [1] 122/21
reflects [1] 43/14
refuse [1] 135/9
refusing [1] 136/21
regard [2] 128/6 130/2
regarding [3] 96/16 114/9 125/19
regular [1] 112/20
reinforcement [3] 61/4 70/23 71/3
related [4] 20/1 112/4 120/16 146/13
relates [1] 57/21
relating [1] 92/6
relation [1] 70/6
relationship [7] 14/20 70/11 70/11 71/4 71/5 71/9 85/21
relevance [12] 94/4 94/15 95/3 97/8 97/10 99/20 109/12 116/4 116/10 116/17 123/8 129/16
relevant [8] 21/5 21/16 21/23 38/14 97/5 97/17 98/16 107/24
relied [1] 47/9
relying [1] 16/21
remember [34] 22/3 23/12 27/12 27/13 27/14 27/16 44/18 44/19 44/22 44/24 44/25 45/7 46/9 46/13 47/2 57/4 57/5 57/5 60/5 60/12 67/11 77/5 85/2 85/3 87/12 87/15 89/1 89/3 102/23 117/15 117/17 121/25 122/7 122/8
remote [2] 64/10 64/14
removal [1] 42/4

R

remove [6] 24/17 38/7 42/12 90/18 91/4 91/6
removed [3] 24/23 133/2 136/25
removing [1] 41/22
reorganization [1] 25/8
repeat [17] 35/14 42/5 50/17 54/3 58/13 66/22 70/9 72/17 73/25 76/3 86/15 101/15 104/2 107/18 109/15 115/21 118/25
repeated [1] 109/14
repeatedly [2] 135/22 135/24
rephrase [2] 7/21 82/6
reply [2] 39/1 56/11
report [5] 26/14 26/24 84/11 84/16 88/1
reported [2] 129/3 133/4
reporter [4] 1/16 27/25 66/23 72/20
reports [1] 56/2
represent [1] 28/7
represented [2] 29/9 30/5
representing [1] 29/21
reproduce [2] 53/25 54/11
reputation [1] 110/14
request [12] 24/8 24/10 24/24 41/19 61/24 65/1 65/6 75/3 86/7 100/3 103/10 103/15
requested [2] 145/14 145/15
requesting [1] 22/20
require [2] 14/15 25/7
required [1] 119/23
requires [1] 25/11
requisition [2] 9/12 10/2
research [69] 15/19 15/19 16/13 20/12 20/17 20/24 21/5 21/5 21/12 21/15 22/2 26/21 28/8 34/4 40/6 43/2 48/11 59/15 61/15 62/8 64/25 65/5 65/13 68/1 68/7 71/18 83/22 84/3 84/6 84/7 91/1 100/21 103/12 103/16 105/10 105/17 105/24 106/1 106/18 108/3 108/6 108/17 108/22 108/23 108/25 109/2 109/18 109/19 110/4 110/7 111/8 112/9 112/18 113/3 113/11 114/4 116/20 117/2 117/5 117/9 119/21 121/21 122/14 124/16 126/18 126/19 127/2 127/3 145/4
researcher [25] 9/12 10/1 11/5 14/4 14/7 16/22 17/8 17/12 17/17 18/19 20/23 21/17 22/9 25/2 36/7 38/3 38/4 90/16 115/4 115/13 115/19 130/7 132/21 133/1 140/6
researchers [3] 21/9 23/8 58/19
reserve [2] 143/2 143/10
reserved [1] 3/20
resolve [2] 133/3 133/6
resolved [1] 133/10
resources [6] 104/12 105/19 106/3 108/22 109/20 110/1
respect [3] 98/8 133/16 139/3
respected [1] 109/19
respectfully [6] 33/15 37/9 39/24 107/6 135/20 136/15
respective [1] 3/4
respects [1] 21/7
respond [3] 55/10 56/21 80/14
responded [1] 95/21
response [11] 24/13 41/19 56/21 61/24 64/25 65/5 91/16 91/23 103/15 110/22 125/21
responses [3] 112/1 145/6 145/8
responsibilities [6] 12/12 13/17 19/14 19/23 32/14 32/17
rest [2] 9/8 25/20
restructuring [1] 24/18
result [2] 76/17 111/15
resulted [1] 28/24
results [14] 20/25 21/12 25/19 28/20 28/23 34/14 49/25 58/1 61/8 62/9 76/10 76/16 107/2 111/14
retained [1] 68/18
retrieve [4] 104/17 104/21 104/24 105/1
return [1] 88/1
review [16] 11/10 18/12 26/6 51/22 52/7 61/22 62/11 62/13 67/16 67/19 67/20 80/9 96/10 113/12 113/21 114/2
reviewed [3] 37/10 113/8 113/22
reviews [2] 51/18 114/9
RFA [11] 44/5 51/11 61/14 61/19 96/25 97/15 103/21 118/16 118/21 119/4 119/8
RFA26 [1] 82/25
RFP [1] 91/23
right [12] 23/7 51/1 61/11 69/13 75/4 87/4 88/9 131/2 139/8 142/8 143/6 143/7
RLEASE [10] 53/23 63/10 69/24 70/6 70/12 70/18 70/19 70/19 70/23 71/14
RLEASE-PROV [2] 53/23 63/10
role [23] 6/22 7/2 7/7 18/19 18/23 19/5 20/10 21/20 22/22 23/5 24/4 29/8 29/20 29/20 30/4 43/13 85/14 89/19 95/1 102/6 103/24 104/4 104/7
ROMIT [34] 1/2 2/2 18/3 23/13 25/9 36/13 38/5 38/19 41/13 46/6 46/9 47/18 47/25 52/19 57/9 58/7 58/11 58/20 61/2 63/18 65/23 74/15 79/10 81/21 85/10 89/6 90/16 98/1 102/6 119/14 119/15 132/19 135/1 137/25
Romit.Chakraborty [1] 2/4
room [1] 64/21
round [1] 102/20
rule [7] 8/17 8/17 8/20 8/20 8/21 9/3 9/5
rules [6] 1/15 8/4 8/11 8/22 98/3 98/4
RULINGS [1] 145/17

S

S1 [4] 24/6 72/9 98/23 103/9
S2 [3] 104/13 105/21 106/12
S3 [2] 66/7 68/2
S5 [1] 96/6
S6 [5] 53/22 54/5 63/9 67/7 68/13
S7 [3] 78/5 85/25 87/25
SAC [20] 18/4 22/14 26/3 29/11 35/6 43/23 45/12 46/16 51/10 52/5 61/16 91/13 96/24 99/22 103/20 111/19 114/24 118/15 138/3 138/14
sad [1] 18/2
said [45] 7/18 14/12 15/22 24/14 24/16 31/2 38/19 39/13 40/8 41/13 46/11 48/23 49/22 50/16 50/23 53/4 53/19 58/7 58/20 60/11 72/1 73/5 78/25 79/1 79/11 83/17 85/19 89/5 89/7 89/10 89/22 105/3 107/3 120/14 121/7 123/24 125/24 129/6 132/25 133/24 136/5 136/7 138/21 139/4 142/3
salary [1] 28/13
same [12] 3/10 3/13 3/15 18/22 34/9 42/17 59/9 76/4 83/20 95/2 99/9 134/17
San [1] 2/4
satisfaction [1] 133/11
satisfactory [1] 133/14
saw [2] 48/15 121/24
say [26] 18/2 20/20 26/1 31/15 33/20 34/7 43/6 45/21 47/1 56/18 62/7 71/25 72/7 91/22 92/20 98/12 99/8 101/14 114/21 121/18 127/18 129/11 130/23 130/24 137/21 143/8
saying [16] 33/18 35/25 38/10 39/19 55/11 56/11 58/8 58/21 86/3 90/24 96/2 102/4 119/13 120/6 127/10 139/9
says [9] 8/18 9/3 9/5 32/24 44/16 61/2 78/24 81/23 107/7
scan [1] 118/13
schedule [1] 112/22
scheduled [2] 56/18 130/17
scheme [1] 25/17
scientific [10] 25/19 32/18 34/4 39/5 48/8 48/10 49/23 50/14 55/1 117/8
scientifically [3] 40/7 40/9 108/14
scientist [13] 12/3 14/13 16/16 20/10 20/19 21/2 22/5 31/19 31/20 36/6 36/10 58/17 74/11
scientists [4] 30/9 34/8 37/3 94/11
scope [1] 19/22
Scratch [2] 50/18 115/23
screen [13] 9/13 10/8 10/16 12/23 13/8 37/23 53/14 69/8 69/13 83/1 87/2 90/12 130/11
screenshot [2] 67/6 67/13
scroll [1] 119/7
Se [1] 2/3
sealing [1] 3/5
second [6] 7/4 76/23 76/23 89/23 122/18 137/14
section [2] 70/25 71/3
see [30] 4/1 4/9 10/9 10/12 10/18 10/20 10/21 10/22 11/6 12/21 12/22 13/2 13/3 13/5 13/6 20/13 34/25 44/13 46/12 51/5 51/13 51/14 55/13 73/18 87/2 88/22 88/22 108/9 114/3 124/10
seem [1] 55/16
seemed [3] 79/3 81/17 81/18
seen [14] 49/16 49/21 55/16 56/2 57/15 69/23 69/25 70/2 76/17 90/5 106/25 109/24 111/15 136/10
selecting [1] 116/25
selection [13] 56/23 57/12 60/21 61/4 63/12 63/16 67/16 70/7 70/13 70/24 103/14 104/24 116/25
send [11] 33/4 33/20 43/15 56/8 56/10 56/20 56/22 69/16 69/17 115/10 117/23
sender [1] 35/8
sending [1] 44/25
senior [1] 20/11
sent [22] 34/10 34/12 35/10 35/22 45/4 45/22 62/12 64/8 68/16 68/25 69/18 87/9 88/24 99/10 99/18 115/2 115/8 118/4 131/13 131/22 132/15

S


sent... [1] 132/18
sentence [6] 48/19 56/1 101/25 102/1 102/2 135/21
separate [1] 20/2
separately [2] 97/1 97/15
serious [2] 17/8 99/13
service [1] 3/14
set [2] 146/10 146/17
seven [1] 53/11
several [3] 89/22 100/20 137/7
Shall [1] 77/10
Shangi [1] 15/13
share [7] 10/7 55/14 69/7 69/11 69/12 69/15 130/12
shared [11] 9/13 10/11 10/17 10/18 12/22 12/24 12/25 55/21 71/6 78/18 82/25
shares [1] 10/8
sharing [3] 53/13 56/9 103/8
Sharon [4] 37/23 38/1 38/2 90/13
she [42] 13/8 27/25 30/23 41/6 41/7 41/8 41/9 48/18 55/22 55/23 60/3 60/4 60/11 60/13 69/1 78/8 78/24 78/25 79/3 79/7 79/11 79/11 80/18 81/17 81/18 81/20 81/22 81/23 82/3 82/7 82/10 82/13 94/20 101/25 102/1 123/12 141/5 141/9 141/10 141/10 141/15 141/20
she's [5] 41/2 82/10 92/11 123/11 141/6
short [3] 77/13 125/16 140/24
should [17] 9/12 10/11 20/16 23/14 33/14 37/22 73/5 80/13 88/23 109/15 122/9 122/20 139/11 140/16 140/17 141/22 142/15
show [6] 12/15 30/20 58/1 58/3 64/16 109/3
showed [1] 122/2
showing [46] 18/4 19/15 22/13 24/6 26/3 29/10 32/4 35/6 37/22 43/22 45/11 46/15 51/10 53/22 54/5 61/16 62/19 63/9 66/7 67/6 68/2 68/13 70/18 70/25 72/9 75/16 78/5 81/16 85/25 87/24 89/23 91/13 96/5 96/24 98/23 99/21 103/9 103/20 104/13 105/21 106/12 111/19 114/24 117/18 117/19 118/15
shown [2] 67/5 71/15
sic [1] 94/7
side [1] 46/6
signature [2] 142/23 143/9
signed [3] 3/8 3/10 3/13
significant [3] 37/7 99/14 108/9
simplify [3] 47/20 47/20 47/21
simulation [1] 53/15
since [1] 113/20
single [2] 110/7 111/15
sir [1] 6/14
sit [1] 34/11
site [1] 102/19
sitting [1] 45/23
situation [4] 15/1 72/11 120/9 134/13
six [5] 8/6 8/19 9/7 53/1 53/3
slide [23] 56/22 57/11 57/17 59/12 59/19 60/4 60/13 60/20 61/1 67/4 67/8 67/12 68/15 68/21 68/23 68/24 69/4 69/6 69/7 69/17 69/17 71/6 71/11
slides [2] 57/15 68/11
smart [1] 66/1
smartest [1] 136/13
so [139] 7/23 8/8 10/8 10/9 11/24 13/2 13/11 13/14 14/10 14/21 14/21 15/8 17/3 18/25 20/8 21/4 21/16 23/13 24/16 24/21 24/22 25/13 25/22 26/17 28/9 28/17 28/25 31/8 33/4 33/24 36/5 36/23 37/19 37/21 39/4 40/7 40/11 41/3 42/11 42/14 42/24 43/5 44/17 45/21 45/21 48/4 48/6 48/14 49/11 51/1 52/25 53/11 53/20 54/13 54/18 57/14 57/23 57/25 58/4 58/6 58/20 59/24 60/9 60/13 60/24 62/11 63/9 64/2 64/4 64/15 64/19 66/1 66/11 66/24 70/2 72/15 72/25 74/23 75/25 76/4 79/7 81/2 81/20 84/23 85/16 85/19 85/23 91/2 91/5 91/13 91/20 91/23 93/1 93/9 93/23 96/5 96/14 97/25 99/11 100/15 101/20 102/3 102/12 102/16 103/3 104/22 105/20 106/23 107/2 108/13 109/14 110/8 111/16 113/10 115/24 119/10 120/10 120/10 121/13 123/24 124/8 124/18 125/1 126/22 131/5 131/8 132/9 132/25 133/3 133/23 135/1 137/3 137/17 137/20 137/20 138/18 139/25 140/9 142/7
software [1] 62/14
soliloquy [1] 114/13
solution [3] 31/5 36/24 42/1
some [15] 8/3 16/13 20/9 20/12 49/2 54/16 55/5 55/12 62/14 66/3 74/15 88/12 98/3 110/14 111/13
somebody [1] 31/15
someone [12] 8/5 25/13 40/2 43/11 58/9 58/21 58/22 62/8 63/18 104/8 133/24 134/15
something [13] 41/16 46/3 48/7 49/3 56/5 58/9 64/4 65/25 66/4 98/9 122/20 124/1 138/25
sometimes [1] 31/13
somewhere [1] 120/20
soon [4] 28/25 80/13 88/14 124/18
sophistication [1] 113/19
sorry [52] 7/17 10/21 12/20 13/1 26/1 27/3 27/12 27/13 30/22 32/2 33/9 33/10 34/25 40/4 40/15 48/17 50/15 51/13 51/24 52/22 54/2 57/9 57/9 65/3 68/20 68/22 70/8 71/7 72/16 72/17 75/25 83/23 86/14 90/4 100/9 104/2 107/17 114/21 115/22 117/15 117/17 117/19 118/1 118/11 118/24 129/11 131/3 135/10 135/13 135/18 136/1 138/18
sort [1] 56/17
source [1] 34/24
space [16] 54/9 56/23 57/3 57/12 60/21 61/3 63/12 63/15 67/15 70/7 70/12 70/24 103/14 104/24 113/23 128/24
spaces [1] 117/1
speak [6] 7/23 42/18 86/6 86/9 87/5 114/4
speaking [9] 34/6 72/19 121/2 141/5 141/10 141/10 141/11 141/16 141/20
specific [7] 38/11 38/18 41/12 46/7 49/12 100/6 100/11
specification [1] 68/6
specified [1] 68/4
spelled [2] 77/17 77/18
sponsored [1] 96/20
spring [1] 43/6
SR [1] 66/9
SR-1 [1] 66/9
SR22 [1] 68/3
SR22-3 [1] 68/3
SR29 [1] 66/16
SR29-1 [1] 66/16
SS [1] 146/3
staff [20] 12/3 14/13 16/15 16/22 17/16 18/9 18/18 20/10 20/19 21/2 22/5 30/8 36/6 36/9 58/17 74/11 94/10 115/19 126/19 127/3
staffed [2] 11/18 12/7
stage [1] 49/11
stand [1] 127/23
standard [1] 26/9
standards [1] 110/14
start [12] 48/12 52/18 80/13 83/10 85/19 88/14 111/11 111/13 115/18 115/19 116/6 116/12
started [12] 30/14 31/3 52/18 52/23 53/9 77/20 95/1 108/16 110/20 138/7 139/17 140/23
starting [1] 106/8
state [25] 1/17 6/3 6/8 6/21 7/3 7/4 28/10 57/18 57/20 57/24 57/25 59/4 59/8 59/13 59/20 60/6 60/24 67/5 67/8 68/25 69/2 79/18 98/13 146/3 146/7
stated [3] 71/17 94/19 100/23
statement [13] 35/18 37/11 41/18 61/14 67/17 74/13 80/25 115/3 115/3 115/9 117/2 130/6 141/13
statements [8] 46/7 47/8 47/23 50/22 75/13 76/13 137/8 141/7
states [2] 1/1 52/11
stating [4] 43/16 93/5 97/20 98/14
status [1] 95/20
statute [1] 98/16
stay [8] 15/24 17/2 25/21 31/14 43/5 55/17 66/4 108/10
Stenographic [1] 1/16
step [3] 21/15 21/15 89/12
steps [2] 24/12 110/3
still [10] 14/11 30/24 128/2 137/12 141/5 141/9 141/10 141/11 141/15 141/20
stint [1] 27/6
stipulate [1] 4/12
STIPULATED [2] 3/3 3/18
stopped [1] 139/15
straight [1] 46/12
Street [2] 2/3 2/7
stressed [4] 39/22 39/25 40/1 40/5
Strike [2] 50/18 66/25
strong [1] 14/15
structure [3] 24/15 120/23 121/5
structured [5] 22/6 22/24 42/7 91/1 91/2
struggle [1] 26/18
student [3] 15/14 20/22 86/4
students [7] 22/11 23/1 42/9 42/10 92/23 94/9 132/23
stuff [1] 66/12
subjective [1] 113/17
submit [3] 33/24 63/21 64/6

S

submits [2] 63/19 63/24
submitted [5] 20/4 33/25 61/21 63/18 64/2
Subscribed [1] 144/14
subsequent [2] 106/5 106/6
subsequently [1] 57/2
substance [1] 46/4
substantial [3] 25/8 49/16 56/5
successful [4] 43/13 43/14 85/18 101/19
such [6] 42/8 53/16 62/18 110/8 128/2 146/11
sufficient [1] 32/23
suggested [1] 23/4
suitability [6] 62/22 62/25 63/2 63/4 75/14 75/20
Suite [1] 2/3
summarizes [1] 47/5
summarizing [1] 59/14
summer [1] 125/1
superficial [3] 39/8 43/16 45/6
superficiality [3] 92/18 93/8 93/22
supersmart [1] 136/8
supervise [1] 19/11
supervising [2] 6/22 7/7
supervisor [1] 78/22
supplement [19] 24/6 53/22 54/5 63/9 66/7 67/6 68/2 68/13 72/9 78/5 81/16 85/25 87/25 96/6 98/23 103/9 104/13 105/21 106/12
supply [1] 103/14
support [10] 37/4 43/10 96/8 96/12 100/3 110/2 125/19 125/24 126/1 126/22
supported [3] 49/13 73/10 76/12
supportive [1] 103/2
supports [3] 82/24 118/20 119/3
suppose [2] 105/13 105/20
supposed [6] 20/11 20/22 55/2 61/6 91/22 140/20
sure [30] 24/11 29/25 30/6 30/9 30/15 34/12 35/1 35/11 38/2 38/9 51/19 56/13 56/25 57/15 58/7 58/20 62/5 74/22 78/11 80/12 90/4 90/15 91/21 102/23 109/21 113/1 113/7 130/6 133/13 142/19
surface [3] 48/25 49/3 51/9
survey [1] 128/17
surveys [1] 113/5
Svante [3] 124/14 124/19 124/21
swear [2] 4/13 4/20
sworn [4] 3/8 6/2 144/14 146/10

T

take [24] 18/8 24/12 29/4 29/4 53/4 74/10 74/15 74/17 74/21 74/21 75/3 75/4 75/5 77/10 77/11 81/14 81/19 90/3 90/8 105/3 125/11 142/4 144/1 144/6
taken [4] 1/13 77/13 125/16 142/20
takes [2] 20/10 63/22
taking [3] 76/22 79/6 141/8
talented [1] 140/6
talk [12] 23/15 27/25 34/1 59/5 59/13 60/6 72/7 73/5 73/11 112/18 114/15 116/24
talked [15] 16/25 37/20 39/6 43/4 43/20 45/24 53/18 65/24 65/25 68/8 76/5 89/19 89/20 93/10 127/20
talking [13] 30/24 38/22 38/23 38/24 48/2 52/25 53/11 67/22 68/23 92/22 107/1 121/1 121/4
talks [1] 34/12
task [1] 62/16
tasks [1] 53/16
Tavani [6] 1/16 130/21 142/21 143/16 146/6 146/21
taxpayer [1] 121/13
taxpayers [2] 25/12 28/16
technologies [1] 11/6
tell [19] 6/19 13/20 16/6 19/9 34/17 37/16 58/5 62/24 71/22 77/2 81/13 84/20 84/24 97/25 98/6 99/12 104/20 132/15 132/16
telling [1] 122/23
templates [2] 18/11 18/15
temporarily [1] 31/12
temporary [2] 16/4 31/12
ten [7] 41/25 77/10 77/12 84/4 90/6 125/13 125/14
termination [3] 98/25 134/23 139/5
terms [1] 101/21
testified [1] 6/4
testimony [2] 60/1 146/12
text [17] 11/4 78/16 78/19 82/3 82/8 82/10 82/14 82/16 88/13 88/15 88/17 88/18 88/19 88/20 88/24 89/4 119/12
texts [2] 79/15 79/21
than [6] 23/6 36/3 42/4 51/4 123/23 128/20
thank [11] 4/10 6/7 6/13 27/19 33/17 77/9 118/13 125/8 125/15 129/20 142/9
that [488]
that's [34] 4/7 8/20 9/7 9/9 15/25 16/6 20/25 21/17 21/18 23/1 23/17 24/4 24/4 26/23 28/25 31/2 31/17 34/3 34/15 41/5 46/24 52/5 76/17 79/16 80/23 80/24 80/25 83/11 88/9 106/7 114/14 119/14 138/14 142/5
their [8] 8/6 28/14 42/19 89/12 91/18 101/20 104/10 122/18
them [24] 21/13 42/25 43/12 43/12 48/25 53/20 57/16 73/11 80/5 80/12 88/11 89/21 91/5 91/7 91/9 101/21 102/10 114/2 121/19 133/25 134/1 134/12 134/12 141/8
then [27] 4/23 17/20 20/25 27/23 32/24 34/2 39/8 48/12 49/1 68/1 68/7 71/3 75/4 75/6 79/11 81/22 83/22 84/2 84/6 86/4 90/8 132/13 133/2 136/24 139/17 140/7 144/5
then-current [5] 68/1 68/7 83/22 84/2 84/6
theorist [1] 120/23
there [77] 4/16 4/17 8/3 8/17 8/20 9/2 9/3 9/4 10/19 11/16 13/22 15/18 17/3 22/7 22/10 22/10 22/23 22/25 23/2 24/16 24/19 25/18 27/9 31/12 31/14 31/23 32/5 34/11 35/18 39/5 39/9 40/6 40/9 40/12 42/8 48/6 48/6 48/7 49/14 51/19 51/20 58/23 59/24 60/25 61/1 61/7 61/8 61/20 67/20 76/15 85/18 85/22 91/24 98/1 98/3 99/16 101/20 102/3 102/16 104/7 107/1 107/11 110/1 110/17 111/16 111/17 112/11 113/13 115/6 120/7 124/5 127/16 128/25 129/7 129/8 134/1 135/1
there's [4] 39/23 126/22 139/23 142/6
these [38] 11/1 11/15 14/14 16/17 18/10 18/14 18/14 18/15 19/7 20/14 20/17 21/4 22/12 23/25 26/9 48/24 49/25 50/22 50/24 53/18 58/18 61/5 76/12 78/16 78/19 79/15 79/21 91/18 92/6 95/7 109/20 112/5 112/24 128/11 128/15 132/23 137/1 140/25
they [45] 8/19 16/17 19/8 28/14 28/17 28/20 28/22 30/8 33/2 33/21 33/25 34/1 34/2 42/19 53/4 58/2 58/10 69/25 73/8 73/8 73/8 73/9 73/9 80/4 80/8 83/7 87/17 87/17 87/21 89/8 97/25 98/4 98/6 104/11 105/15 108/19 122/17 123/23 124/15 124/25 124/25 129/6 134/10 137/15 140/22
they're [1] 121/20
They've [1] 78/17
thing [14] 15/25 16/4 17/20 23/17 31/4 31/13 47/17 48/4 48/4 50/11 69/19 83/11 137/11 140/18
things [7] 25/17 39/22 51/8 58/3 66/2 122/17 127/9
think [57] 9/7 10/24 13/20 15/7 17/22 19/1 20/8 22/2 23/14 23/17 26/17 30/7 32/25 34/8 34/10 34/19 35/25 37/19 37/19 37/21 38/14 41/17 41/24 43/19 45/22 55/1 56/25 57/14 77/20 79/3 81/17 81/19 88/6 93/9 93/15 93/23 99/11 104/22 113/13 115/10 119/10 124/6 124/8 124/10 125/6 133/21 133/23 136/10 136/12 137/1 137/7 138/16 140/5 141/22 143/15 143/16 143/19
thinks [2] 139/2 139/13
third [1] 122/18
this [225]
thorough [1] 21/16
those [13] 14/17 57/15 90/2 106/6 111/4 111/4 113/2 113/4 127/6 128/23 134/18 136/19 139/18
though [1] 4/14
thought [4] 17/18 41/25 46/1 122/24
thoughts [2] 120/11 120/13
thousands [1] 25/14
three [6] 10/25 47/3 63/22 123/21 138/23 142/16
through [6] 100/22 114/8 124/3 142/18 143/1 143/11
throughout [2] 112/19 135/22
time [48] 1/10 3/20 4/17 11/24 12/5 14/19 15/25 20/7 21/25 26/20 26/22 37/2 39/4 43/11 49/7 49/10 51/2 58/25 59/17 63/23 63/24 64/3 65/24 72/18 72/21 81/15 83/3 85/15 86/11 86/11 87/8 95/18 97/5 97/17 98/15 100/19 103/4 104/9 109/15 112/19 114/11 118/19 118/23 119/6 122/20 129/1 140/25 142/15
times [9] 17/21 41/25 47/3 78/18 80/20 89/22 90/6 100/20 130/10
timing [1] 59/8
title [28] 12/11 13/16 15/22 16/11 23/11 23/16 29/16 30/17 30/21 31/4 31/9 35/5 35/13 35/16 38/3 38/4 38/22 41/20 112/2 115/2 115/3

T

title... [7] 115/4 115/8 115/13 118/10 130/6 132/3 132/4
titles [2] 23/14 30/18
today [5] 24/4 69/23 70/3 112/12 114/10
together [2] 11/14 45/24
told [27] 8/24 18/21 30/11 32/22 39/21 40/3 47/2 47/5 47/6 54/17 76/6 77/6 79/11 80/10 80/12 81/23 83/9 83/12 85/17 88/13 99/7 102/25 119/17 122/8 134/10 134/12 137/14
tomorrow [3] 56/12 56/16 102/12
too [1] 122/14
took [2] 95/16 103/3
tools [1] 53/16
top [3] 66/2 120/22 136/8
topic [4] 38/21 48/14 65/15 113/25
topics [4] 20/14 21/4 39/10 113/19
totally [6] 35/14 35/16 35/24 36/15 37/11 115/4
tough [1] 72/18
towards [3] 51/7 120/16 122/21
Toya [1] 90/13
track [1] 89/2
transcript [2] 142/19 143/11
transformer [1] 11/6
transformer-based [1] 11/6
transition [5] 83/15 85/15 89/12 111/2 115/16
transitioning [1] 120/9
travel [1] 28/14
treat [4] 14/3 16/7 21/8 21/10
treated [1] 128/20
trial [1] 3/20
tried [4] 15/1 18/2 100/22 134/17
true [2] 56/25 146/11
trust [1] 14/18
trusted [1] 17/9
try [6] 17/21 65/16 112/14 137/18 137/20 137/20
trying [15] 15/3 26/18 26/22 36/11 36/12 39/14 39/16 49/9 49/23 100/21 115/15 122/22 127/12 133/3 136/5
turn [1] 111/10
turned [2] 8/3 8/9
twice [1] 80/16
two [6] 63/21 78/7 87/13 112/19 112/24 132/23
typo [1] 79/9

U

U.S [1] 15/24
UChicago [4] 81/14 90/14 105/15 136/22
uchicago.edu [1] 37/25
Uh [1] 104/18
Uh-huh [1] 104/18
unclear [1] 42/6
under [10] 22/4 22/12 23/5 31/16 31/19 61/19 94/2 132/21 133/13 142/16
undergrad [1] 22/11
underlying [5] 105/24 106/16 106/18 108/3 108/6
understand [32] 7/21 8/14 11/18 11/21 12/7 12/10 13/15 13/20 13/21 16/20 17/4 17/5 26/6 26/8 26/13 30/6 32/3 36/14 62/5 63/8 63/14 65/2 68/19 90/4 90/23 91/21 97/4 97/17 100/9 103/18 126/20 133/17
understanding [2] 15/9 97/2
understood [3] 14/25 16/25 120/8
undertake [1] 48/9
unemployed [1] 14/22
unidentified [1] 90/10
union [14] 57/18 57/20 57/24 58/1 59/5 59/8 59/13 59/21 60/6 60/25 67/5 67/8 69/1 69/2
Unit [1] 2/7
UNITED [1] 1/1
universities [1] 16/17
university [49] 6/22 6/25 7/8 8/4 8/10 8/22 9/10 13/12 19/10 37/16 78/21 79/6 83/15 84/8 91/10 96/20 100/3 102/20 103/11 103/25 104/5 104/8 105/18 106/2 106/9 106/19 107/8 107/16 107/21 107/22 108/4 108/23 108/25 109/1 109/7 109/9 109/23 115/20 116/21 124/3 125/20 126/17 126/23 127/1 127/5 127/11 127/17 132/2 136/24
university's [1] 96/11
university-sponsored [1] 96/20
unlikely [1] 80/3
unsigned [1] 3/12
unsuitability [1] 122/13
unsuitable [2] 138/13 140/8
until [3] 10/8 86/23 93/16
up [17] 35/14 35/16 35/24 36/2 36/15 37/12 41/4 46/4 51/13 86/19 99/2 115/5 115/13 128/18 133/1 138/9 142/13
upon [2] 3/15 133/20
upset [1] 121/22
us [5] 36/1 45/25 71/12 76/20 98/4
use [8] 16/14 18/16 57/11 60/20 61/24 64/25 102/10 115/11
used [9] 3/12 34/22 40/4 46/14 57/16 60/3 62/15 108/21 120/17
using [10] 48/3 54/9 56/23 61/4 63/13 63/16 93/20 105/17 106/1 106/6
USPI [1] 108/21
usually [7] 20/8 20/25 27/7 50/23 53/4 63/21 95/6
utilized [1] 69/18

V

vague [1] 98/13
valid [1] 104/10
vector [2] 76/19 116/25
verbally [1] 15/4
verified [1] 145/6
verify [5] 110/15 126/17 126/22 127/1 127/5
versions [1] 68/18
versus [1] 11/1
very [28] 11/12 14/14 15/5 18/1 37/15 37/18 38/5 38/20 39/8 46/10 46/12 58/11 72/19 79/6 80/4 80/11 81/20 88/13 89/6 90/16 102/7 102/14 109/19 113/17 119/17 136/16 140/5 140/24
via [4] 78/18 93/7 139/20 139/20
VICKREY [6] 2/8 98/12 130/1 130/15 143/24 145/12
vickreyc [1] 2/9
view [4] 63/3 105/23 106/14 121/18
views [1] 42/2
VIRTUAL [1] 1/12
visa [8] 94/2 94/13 94/21 94/25 95/20 95/22 96/17 97/24
visas [1] 95/8
visibility [1] 16/19
visit [1] 102/19
visiting [2] 31/18 31/19
visitors [1] 31/17

W

wait [16] 4/22 10/6 10/8 52/1 59/24 60/16 60/17 66/13 66/19 86/20 92/2 92/2 93/13 107/11 109/4 109/5
waiting [1] 26/20
waive [8] 142/22 142/25 143/3 143/8 143/9 143/20 143/22 143/23
waived [1] 3/7
want [36] 13/7 25/15 31/18 31/20 42/11 43/12 54/14 66/11 69/7 69/12 74/23 74/25 86/22 91/2 91/20 98/4 101/18 102/14 103/3 105/7 106/21 110/10 110/12 114/15 122/17 127/9 127/25 132/24 133/25 133/25 137/22 142/23 142/25 143/8 143/10 143/25
wanted [12] 17/21 18/3 43/9 48/9 55/11 74/12 84/25 85/12 88/14 108/13 111/7 126/15
wants [3] 41/7 79/10 81/22
warnings [1] 51/17
was [263]
wasn't [6] 60/2 65/20 94/20 114/14 114/20 121/8
way [25] 7/21 7/22 11/22 17/2 17/7 18/23 24/19 25/6 33/5 36/1 42/8 48/9 49/1 49/24 58/15 65/17 110/16 114/16 121/21 134/8 134/17 139/11 142/24 143/14 146/15
we [107] 4/11 4/21 9/7 11/13 11/14 11/15 14/10 14/19 14/24 17/6 17/19 18/16 18/24 20/6 20/15 20/23 20/25 21/19 21/22 23/3 23/13 23/14 24/16 26/19 27/7 30/10 31/5 33/1 33/1 36/2 36/3 36/5 36/6 36/22 36/23 37/14 38/21 39/6 41/24 43/4 43/6 43/8 43/9 43/20 44/18 45/22 45/23 45/24 45/25 46/1 46/6 47/25 48/10 48/11 48/12 48/12 49/9 51/24 53/4 53/8 53/18 54/15 56/18 62/7 63/20 64/16 64/17 65/24 65/25 66/24 67/13 68/23 72/1 74/14 74/15 74/18 74/21 76/4 76/5 76/5 76/5 76/22 77/7 77/10 78/11 79/1 84/13 84/13 90/5 92/21 97/24 111/14 115/12 119/10 124/3 124/6 128/22 129/1 130/2 130/9 133/2 133/2 137/12 140/18 143/11 144/1 144/5
we'll [4] 24/2 24/3 86/20 143/23
we're [12] 23/20 23/21 38/21 38/23 38/24 40/22 52/25 53/11 78/12 81/2 114/10 125/10
we've [1] 112/9
website [27] 21/21 21/25 22/21 22/24 24/15 24/18 24/23 25/8 25/14 31/6 31/10 31/15 38/7 41/20 41/23 42/7 89/25 90/18 91/1 91/6 91/8 132/20 132/22 133/4 133/7 133/15 136/25
week [5] 39/7 48/1 48/3 48/4 48/14

W

weekly [1] 47/25
weeks [4] 64/12 110/20 138/24 138/24
weight [2] 16/12 102/10
well [33] 8/2 9/24 23/7 34/8 37/15 40/3 40/11 41/5 41/11 42/21 42/24 55/3 57/8 64/7 69/20 77/8 78/14 90/12 92/8 92/11 100/19 107/17 108/22 113/15 114/10 114/12 122/16 125/6 131/15 132/11 132/16 132/19 143/4
went [2] 60/24 100/22
were [94] 14/23 15/5 15/9 15/16 15/18 22/3 22/4 22/12 23/16 26/17 27/9 30/12 31/12 33/18 36/10 37/14 38/11 38/18 39/21 39/22 40/5 41/12 43/6 43/8 44/11 45/23 45/25 46/1 46/6 47/8 49/9 50/16 53/20 53/20 61/6 61/9 66/6 67/13 67/22 72/1 74/1 75/19 77/7 81/8 86/11 86/14 91/5 92/21 92/22 94/24 94/24 101/1 101/10 102/4 102/18 102/18 102/24 105/5 105/13 105/15 105/16 106/17 106/22 107/9 108/2 108/11 109/17 109/25 115/15 116/19 120/5 120/9 120/14 120/15 121/20 122/23 126/2 126/6 126/13 128/12 128/13 128/14 128/23 129/3 130/3 131/13 136/19 137/1 137/8 137/12 138/25 140/19 140/22 140/25
weren't [3] 100/16 113/3 125/3
what [184]
what's [1] 60/9
whatever [11] 25/15 41/8 91/8 102/6 102/13 105/1 105/4 105/5 107/3 110/9 110/10
when [75] 12/12 13/17 14/1 14/2 16/24 20/8 23/7 23/16 27/25 29/7 29/19 30/3 30/7 30/13 31/2 31/8 31/25 32/7 33/21 33/24 34/7 38/19 41/13 42/18 44/10 45/2 48/10 51/6 51/7 52/18 54/16 56/19 57/23 57/25 59/3 59/4 63/7 63/18 69/25 73/12 74/1 78/24 78/25 85/10 87/20 87/21 88/12 89/7 89/13 94/25 99/3 99/7 100/15 102/11 104/8 105/5 105/14 105/25 109/7 110/19 115/2 117/22 117/23 121/7 121/18 125/23 128/22 131/13 131/13 132/19 134/9 136/9 136/19 137/19 143/5
whenever [5] 74/16 74/16 74/17 74/23 83/10
where [17] 18/6 27/21 38/3 46/21 49/21 63/24 68/10 68/16 68/21 69/6 78/22 90/15 100/21 106/16 110/1 110/3 130/6
WHEREOF [1] 146/17
Whereupon [12] 12/17 19/17 22/15 29/12 44/1 45/14 46/17 77/13 99/23 111/21 125/16 144/8
whether [4] 16/15 29/2 38/2 134/4
which [50] 9/25 14/23 15/1 17/7 19/2 19/4 19/23 25/9 25/16 37/14 47/8 47/9 51/25 52/19 53/16 54/6 57/19 57/24 57/24 58/5 58/5 59/14 60/7 60/12 61/2 67/15 69/18 71/1 74/4 80/15 82/25 85/15 87/22 88/3 95/19 95/21 97/15 99/9 113/20 113/24 113/25 114/5 121/24 123/4 126/7 127/16 130/5 134/13 137/23 138/10
while [7] 13/8 66/5 108/24 115/15 120/5 128/14 139/18
whisper [1] 136/18
who [17] 11/9 21/20 22/8 22/22 24/19 28/12 69/5 70/14 72/7 73/10 74/9 86/4 95/7 122/18 127/5 128/11 128/15
whole [2] 14/9 27/9
whom [1] 14/18
whose [1] 146/9
why [15] 11/21 15/13 21/23 23/13 30/16 33/4 64/16 64/16 76/17 101/14 107/24 132/11 132/17 141/1 141/23
Wi [1] 86/20
Wi-Fi [1] 86/20
will [28] 4/11 4/17 4/23 6/16 13/14 38/6 45/9 47/21 58/21 58/22 62/13 71/12 75/4 75/9 75/21 78/14 78/25 90/18 98/17 98/21 102/8 107/25 114/8 131/23 131/24 134/15 144/1 144/5
willing [1] 125/25
winding [1] 41/3
wish [3] 112/12 113/14 134/12
within [15] 3/6 20/15 27/8 39/4 50/25 60/7 64/3 65/15 89/3 101/6 111/11 111/12 120/2 140/24 146/7
without [1] 11/25
witness [10] 3/8 3/14 3/16 4/2 6/2 114/15 144/9 146/9 146/12 146/17
word [2] 40/4 46/13
words [8] 11/15 61/6 67/22 75/19 98/13 111/16 111/16 115/11
work [75] 16/18 19/11 19/13 21/11 30/19 32/18 32/24 32/25 33/3 33/7 33/22 37/8 49/12 50/7 55/12 55/13 55/15 55/16 55/21 56/3 58/3 58/21 58/22 61/2 61/6 61/9 61/21 61/23 62/7 62/14 63/20 63/25 64/15 67/14 67/16 68/12 70/7 70/13 71/9 73/9 76/8 76/15 78/21 81/5 102/11 103/14 104/25 106/6 106/16 106/22 106/23 107/1 108/8 108/10 109/8 110/2 110/12 110/17 110/22 110/24 111/1 112/17 115/14 120/8 121/19 122/17 127/9 127/19 129/6 136/17 136/18 136/23 138/9 140/21 142/2
worked [3] 14/18 36/8 110/9
workflow [4] 54/9 54/21 61/3 63/15
working [13] 14/19 58/8 58/9 63/14 79/5 100/16 110/16 120/6 120/16 121/8 124/7 139/15 139/17
works [5] 21/3 28/25 34/3 34/15 83/10
world [2] 89/14 120/23
worth [2] 33/22 64/17
would [63] 11/25 12/2 14/13 14/22 15/20 16/4 17/7 17/19 17/19 18/2 18/19 21/20 22/22 23/5 25/7 33/4 36/9 37/2 37/7 38/25 41/9 41/15 42/17 43/5 43/7 43/8 49/4 49/4 55/4 55/12 56/3 56/4 57/23 58/4 64/4 67/14 69/10 69/21 71/12 72/6 74/10 74/20 75/2 84/21 91/3 99/8 101/11 101/16 103/4 106/6 108/12 109/23 113/8 113/12 117/15 120/18 120/19 122/21 122/24 125/24 135/16 143/2 143/21
wrap [1] 41/4
write [13] 28/2 37/5 62/11 82/14 83/4 125/25 127/10 135/5 135/6 135/9 136/21 137/15 137/22
writers [1] 73/6
writing [4] 92/17 93/21 96/15 129/4
written [12] 16/21 26/14 26/24 27/4 50/13 50/20 51/17 54/20 62/10 68/10 99/16 119/23
wrong [3] 40/4 133/15 137/8
wrote [11] 20/6 35/18 38/9 46/24 47/4 47/5 82/16 99/17 106/5 109/20 124/3

Y

yeah [14] 4/7 13/9 27/20 43/21 56/16 70/4 70/15 77/11 90/7 90/7 107/9 109/4 123/7 143/17
year [16] 20/21 24/20 25/10 25/18 27/8 27/9 28/20 50/25 51/20 53/5 57/25 58/5 74/1 74/4 122/18 135/3
years [9] 8/6 8/19 9/7 10/25 49/8 50/14 51/4 72/6 94/8
yellow [1] 66/12
yes [71] 4/4 10/18 10/19 10/23 11/8 11/20 12/9 12/24 13/6 13/11 14/5 15/11 17/13 18/14 18/15 24/2 24/25 25/3 25/5 31/11 35/19 36/18 36/20 38/10 42/1 42/2 46/24 51/20 52/25 56/11 56/17 61/12 73/17 73/20 74/9 76/9 77/25 77/25 81/7 81/12 82/23 84/23 85/3 86/24 87/3 91/12 92/10 96/14 96/14 99/11 99/17 100/18 101/3 101/18 104/22 105/14 106/11 107/23 108/5 116/8 130/10 130/19 131/18 133/8 133/8 138/2 141/19 141/19 143/7 144/4 144/5
yet [2] 52/3 65/18
York [5] 1/17 6/3 146/3 146/4 146/7
you [899]
you're [20] 20/21 33/10 34/6 40/23 55/3 56/19 66/1 72/19 75/7 79/14 81/2 100/15 102/13 103/6 113/21 114/1 119/8 127/24 134/14 139/8
you've [11] 41/15 66/1 70/2 87/23 94/6 94/8 94/10 95/14 111/9 114/5 135/21
your [143] 6/8 6/21 6/22 7/2 7/4 7/7 7/10 14/7 15/2 15/14 16/14 16/19 17/25 18/6 20/1 20/24 21/9 21/11 21/25 21/25 22/19 23/5 23/24 23/25 24/1 24/23 25/21 26/19 27/6 29/17 30/17 30/17 30/21 33/3 37/23 37/24 40/6 40/7 41/16 42/3 42/14 42/16 42/21 42/22 43/4 43/5 45/3 46/6 47/9 49/11 52/24 53/3 55/10 55/17 56/2 57/17 57/18 57/21 59/4 59/5 60/9 60/18 61/13 61/24 63/2 64/20 64/25 65/5 69/13 70/5 70/10 71/9 72/5 73/2 73/3 73/5 73/6 73/9 75/19 80/7 82/24 83/8 83/18 85/12 85/16 85/17 86/5 87/9 88/19 88/20 89/15 89/18 89/19 89/25 90/12 90/21 91/6 91/23 93/2 97/1 102/6 102/7 102/14 103/7 104/15 105/11 108/10 108/16 110/2 110/3 110/22 111/2 111/6 112/19 113/2 113/11 113/18 115/24 118/20 119/3 119/21 120/9 121/18 122/2 125/8 125/21 126/5 127/23

Y

your... [15] 128/9 128/22 129/9 129/20 131/9 131/15 131/16 131/19 132/13 134/16 134/22 136/3 142/9 142/22 143/9
yours [4] 105/6 106/7 106/8 107/7
yourself [2] 34/20 109/21

Z

zero [2] 25/19 42/13
Zoom [2] 95/18 121/24

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 18

## University of Chicago subpoena response and selected institutional records

Includes the five-page subpoena response and UNIVERSITY OF CHICAGO 001–002, 006–007, 010, 022, 047–051, 054–061, 105–109, 153–154, 174–188. These are selected excerpts, not the full production. Original Bates labels and document context are retained. Unrelated identity, tax and medical records are not included; incidental identifiers and meeting-access credentials are redacted where marked.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ROMIT CHAKRABORTY, | ) | |
| | ) | Case No. 26-cv-00106 |
| Plaintiff, | ) | |
| | ) | Judge: Hon. Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge: Hon. Albert Berry, III |
| LAURA GAGLIARDI, | ) | |
| | ) | |
| Defendant. | ) | |

**SUBPOENA RESPONDENT UNIVERSITY OF CHICAGO'S RESPONSE TO PLAINTIFF'S DOCUMENT REQUESTS**

NOW COMES Subpoena Respondent University of Chicago ("Subpoena Respondent"), by and through its attorney, Caroline K. Vickrey, and for its Response to Plaintiff's Subpoena to Produce Documents, states as follows:

REQUEST FOR PRODUCTION NO. 1: Recruitment, appointment and staff/postdoctoral classification.

For June 1 through November 30, 2023, produce communications and records concerning Plaintiff's recruitment and appointment in the Gagliardi Group that state, propose, approve or explain his title, duties, staff or postdoctoral classification, or the choice between those classifications. Include the August 31, 2023 offer; final and materially different job-description versions; approval records; recruitment references exchanged with Head-Gordon; and records showing Gagliardi's receipt, review or representations concerning the offer, title or intended role. Include Plaintiff's identified University of New Mexico or Oxford opportunity communications only if actually conveyed to Gagliardi before acceptance. For May 1-31, 2023, include only University-held recruitment/reference communications between or among Gagliardi, Head-Gordon and Plaintiff concerning this appointment.

For June 1, 2023 through October 31, 2024, produce operative appointment instruments and actual amendments. For June 1, 2023 through February 28, 2025, produce the submitted employer H-1B support letter and petition/job-description pages for this University appointment identifying title, classification, duties, supervisor, salary category and employment dates, with materially different descriptions supplied or approved by Gagliardi. The complete immigration file, identity documents and general visa-processing correspondence are excluded.

Sources: Gagliardi's and Plaintiff's retained University mailboxes, the specific departmental/HR appointment file, and the responsible international-affairs file only for the employer representations specified above.

**<u>RESPONSE</u>: Subpoena Respondent objects to this Request generally as being overly broad, unduly burdensome and vague. With waiving said objection, Subpoena Respondent produces the attached Office of International Affairs records for Romit Chakraborty; the**

**Division and Department of Chemistry records for Romit Chakraborty, the Personnel File of Romit Chakraborty, and Human Resources records and emails regarding the Visa and onboarding process for Romit Chakraborty (Bates UNIVERSITY OF CHICAGO #0001-0188). Subpoena Respondent will provide additional emails related to the issues of the lawsuit upon identification of the specific email recipient or sender, and identification of specific search terms.**

REQUEST FOR PRODUCTION NO. 2: Performance assertions, documented work and Head-Gordon communications

For November 27, 2023 through January 31, 2025, produce Plaintiff-specific assigned objectives, contemporaneous evaluations, complaints, corrections and substantive feedback, including actual probation determinations or extensions and Annual Merit Process eligibility/review records, with the criteria or policy portions actually applied. Include the March-April 2024 performance/meeting exchange, the March 21, 2024 LAS/PBC research-direction exchange, and communications approving or evaluating Plaintiff's identified AI, large-language-model, active-space or AFMR work. Produce reports, slides or manuscript versions actually attached to those responsive communications; bulk code, datasets, repository contents and unrelated group research are excluded. Specifically identified recruitment-period approvals of that work are also included under Request 1.

For March 1, 2024 through January 31, 2025, produce University-held communications between Gagliardi and Head-Gordon concerning Plaintiff's performance, research interests, teamwork, honesty, professional suitability or employment, including responsive internal forwarding, replies and corrections. Include existing records of the March 2024 ACS and July 2024 France discussions, and communications underlying the Gagliardi-related assessments reported in Head-Gordon's January 6, 2025 "Re: Hard News" message. Request only existing invitations or notes connected to those discussions or the identified performance exchange; general meeting chronology and travel records are excluded.

Sources: Gagliardi's and Plaintiff's retained University mailboxes and the specific departmental/HR review file; University-held Matthew Hermes or other collaborator records only for the identified work communications or feedback. No search of Berkeley systems is requested.

**RESPONSE: Subpoena Respondent objects to this Request generally as being overly broad, unduly burdensome and vague. With waiving said objection, Subpoena Respondent produces the attached Office of International Affairs records for Romit Chakraborty; the Division and Department of Chemistry Records for Romit Chakraborty and the Personnel File of Romit Chakraborty (Bates UNIVERSITY OF CHICAGO #0001-0162). Subpoena Respondent will provide emails related to the issues of the lawsuit upon identification of the specific email recipient or sender, and identification of specific search terms.**

REQUEST FOR PRODUCTION NO. 3: Communications with PsiQuantum concerning Plaintiff

For October 28 through December 10, 2024, include University-held communications sent, received, forwarded or recorded by Gagliardi, Abhishek Mitra or the administrator handling a Plaintiff-specific referral that involve, report or attribute Mitra's statements about Plaintiff's competence, conduct, teamwork, duties or employment at PsiQuantum. Include December 11, 2024 through January 5, 2025 records forwarding, explaining, disputing or correcting those same statements or discussing them in connection with the December 10 employment decision.

Sources: Gagliardi's and Plaintiff's retained University mailboxes; University-held Mitra material and the specific referral administrator only for the communications above. No demand is made for PsiQuantum's internal systems, uncontrolled outside accounts, general collaboration/NQAC history, unrelated candidate placement or unrelated scientific/commercial material.

For July 1 through September 30, 2024, produce invitations, attendance records, agendas, existing notes and scheduling/follow-up communications identifying the date, participants, purpose or Gagliardi's role in the August 2024 consultation identified as involving Arvin Kakekhani and Tess Dennis, together with any retained recording or existing transcript of discussion of Plaintiff's transition, title, work or proposed responsibilities and necessary context.

**RESPONSE: Subpoena Respondent objects to this Request generally as being overly broad, unduly burdensome and vague. With waiving said objection, Subpoena Respondent produces the attached Office of International Affairs records for Romit Chakraborty; the Division and Department of Chemistry Records for Romit Chakraborty and the Personnel File of Romit Chakraborty (Bates UNIVERSITY OF CHICAGO #0001-0162). Subpoena Respondent will provide emails related to the issues of the lawsuit upon identification of the specific email recipient or sender, and identification of specific search terms.**

**REQUEST FOR PRODUCTION NO. 4: Title statement and Plaintiff-specific website changes**

Produce the complete "Correction of Official Title and AMP records" email thread containing Gagliardi's January 4, 2025, 07:51:18 UTC message (January 3 in Pacific time) stating that the title "Quantum-AI Researcher" was "totally made up by you," with available original headers, recipients, attachments and responsive forwarding, replies, verification or correction through April 30, 2025.

For November 1, 2023 through April 30, 2025, produce Plaintiff's submitted profile form; instructions and implementation records for his Gagliardi Group website entry; and existing Plaintiff-entry revisions or retained page versions with available editor/date metadata. Include Alfreda Grace's December 6, 2023 instruction to place the profile under the post-doc section and list Plaintiff as staff, the November 2-4, 2024 past-members/news changes, January 2025 title-correction handling, and the April 2, 2025 removal request and recorded disposition. Through September 24, 2026, include only existing records documenting the eventual implementation or refusal of that specific April 2 removal request. Unrelated webpages, photo submissions and general later professional-support correspondence are excluded.

Sources: Gagliardi's and Plaintiff's retained University mailboxes; Alfreda Grace and Monica Lugo only for Plaintiff's entry; and an identified central administrator only for actual handling of the specified correction/removal request.

**RESPONSE: Subpoena Respondent objects to this Request generally as being overly broad, unduly burdensome and vague. With waiving said objection, Subpoena Respondent produces the attached Office of International Affairs records for Romit Chakraborty; the Division and Department of Chemistry Records for Romit Chakraborty and the Personnel File of Romit Chakraborty (Bates UNIVERSITY OF CHICAGO #0001-0162). Subpoena**

**Respondent will provide emails related to the issues of the lawsuit upon identification of the specific email recipient or sender, and identification of specific search terms.**

REQUEST FOR PRODUCTION NO. 5: Identified account-access and research-use decisions

For October 24, 2024 through February 28, 2025, produce the initiation, approval and implementation records for Plaintiff's identified University account-access restrictions, restoration or extensions. Include the October 25/28 extension communications, tickets RITM07289387, RCC 69592, RITM07324427 and REQ06640910 and directly linked tickets for the same events; the December 13 expiration setting, reported December 16 lockout, and January 17 restoration/retrieval correspondence. Include existing audit entries showing affected service, effective date/time, directing or implementing person/process and recorded reason, and only policy portions actually invoked. Unrelated account activity is excluded.

Within that period, produce the November 15-16, 2024 publication exchange, January 2, 2025 "Purchase of a desktop" thread, January 17 referrals to Geertrui Spaepen and Mario Moreno Zepeda, and existing instructions or decisions concerning retrieval of Plaintiff's identified research or use of University affiliation/acknowledgment in its publication. Include only agreement/policy provisions actually invoked for those decisions. Produce University-held copies of the identified Plaintiff-Bhavnesh Jangid exchange reproduced in Exhibit 6 to the First Amended Complaint about December 2024 CNet/RCC/email access and whether Plaintiff was a postdoc, with contemporaneous institutional transmission or response. Research-file production, workstation images and general ownership disputes are excluded.

Sources: the named PSD IT, central identity-management and RCC ticket/event files; Gagliardi's and Plaintiff's retained University mailboxes; and the specifically identified administrators only for the stated retrieval/publication referral.

**RESPONSE: Subpoena Respondent objects to this Request generally as being overly broad, unduly burdensome and vague. With waiving said objection, Subpoena Respondent produces the attached Office of International Affairs records for Romit Chakraborty; the Division and Department of Chemistry Records for Romit Chakraborty and the Personnel File of Romit Chakraborty (Bates UNIVERSITY OF CHICAGO #0001-0162). Subpoena Respondent will provide emails related to the issues of the lawsuit upon identification of the specific email recipient or sender, and identification of specific search terms.**

REQUEST FOR PRODUCTION NO. 6: Source-specific retention, deletion and operational preservation

Sources: the responsible records/IT custodians for the identified sources and existing operational records of handling the two specified notices. Source information already established by produced records need not be duplicated.

Plaintiff's University mailbox and the University-held Gagliardi or other institutional account copies of the spring-performance and Head-Gordon communications identified in Request 2. Include existing operational preservation records for the specified Plaintiff-entry website history, account-access records and identified research-retrieval sources.

Within the same period, include nonprivileged receipt, acknowledgment or operational implementation of Plaintiff's August 13, 2025 and July 13, 2026 preservation notices only as they concern sources identified for search in Requests 1-5, including responsive University-held Gagliardi-PsiQuantum and Mitra text/chat/message copies, showing the existing recorded source, date and scope of operational action. For any such responsive source found unavailable or materially incomplete, including those text/chat/message sources, produce existing nonprivileged administrative records showing its status, applicable retention/deletion event and available retained-copy/export location. University control over personal phones or outside systems is not presumed. Privileged legal advice, protected hold content, unrelated holds, new search logs or certifications, forensic reports, backup restoration and reconstruction are excluded. No preservation failure or loss is presumed.

**RESPONSE: Subpoena Respondent objects to this Request generally as being overly broad, unduly burdensome and vague. Without waiving said objection, Subpoena Respondent will provide emails related to the issues of the lawsuit upon identification of the specific email recipient or sender, and identification of specific search terms.**

Respectfully submitted,

By: /s/ *Caroline K. Vickrey*
Attorney for Subpoena Respondent
University of Chicago

Caroline K. Vickrey – ARDC #6210332
Kaitlyn M. McCaskill– ARDC # 6353479
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 Fax
vickreyc@jbltd.com
mccaskillk@jbltd.com

View Worker: Romit Chakraborty (Terminated)



Research Professional, Analyst - REREPP1E

| | |
|---|---|
| **Email Address** | romit@uchicago.edu |
| **Supervisory Organization** | PSD Chemistry: Temporary Staff |
| **Supervisory Organization of Composite Header Grouping Icon** | Supervisory Organization |
| **Location** | Hyde Park Campus |

Ben Anderson
Manager

| | |
|---|---|
| **Company of Composite Header Grouping Icon** | Company |

## Job

### Job Details

Job Details

| | |
|---|---|
| **Employee ID** | [redacted]1 |
| **Supervisory Organization** | The University of Chicago >> PSD Chemistry: Faculty Support |
| **Position** | P99224855 Research Professional, Analyst - REREPP1E |
| **Business Title** | Research Professional, Analyst - REREPP1E |
| **Job Profile** | Research Professional, Analyst - REREPP1E |
| **Employee Type** | Staff |
| **Management Level** | Individual Contributor |
| **Time Type** | Full time |
| **FTE** | 100.00% |
| **Location** | Hyde Park Campus |
| **Hire Date** | 11/27/2023 |
| **Original Hire Date** | 09/17/2012 |
| **Continuous Service Date** | 11/27/2023 |
| **Length of Service** | 0 year(s), 10 month(s), 27 day(s) |
| **Time in Position** | 0 year(s), 10 month(s), 27 day(s) |
| **Termination Date** | 10/24/2024 |

Contact Information - Public

| | |
|---|---|
| **Email** | romit@uchicago.edu |

Work Address

929 East 57th Street
Room E 108
Chicago, IL 60638

UNIVERSITY OF CHICAGO 001

United States of America

**Website** https://scholar.google.com/citations?user=m4HIFRIAAAAJ&hl=en
https://www.linkedin.com/in/romit-chakraborty-ph-d-7419088/

**All Jobs**

| All Positions / Jobs | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Position ID | Start Date/Hire Date | Position Start Date | Position | Position Worker Type | Job Profile | Organization | Pay Rate Type | FTE | Weekly Hours | Total Salary & Allowances | Total Base Pay | Pay Group |
| P99224855 | 11/27/2023 | 11/27/2023 | P99224855 Research Professional, Analyst - REREPP1E - Romit Chakraborty | Staff | Research Professional, Analyst - REREPP1E | PSD Chemistry: Temporary Staff | Salary | 100.00% | 37.5 | $69,631.44 | $69,631.44 | Monthly |
| | | | | | | | | Total: 100.00% | 37.5 | $69,631.44 | | |

**Additional Data**

**View As Of** 10/16/2026

Additional HRMS Department Numbers

**HRMS Admin Department Number**
**HRMS Headcount Department Number** 22259

E-Verify Status

**E-Verify Status Date**
**E-Verify Status**
**E-Verify Status: Additional Notes**

Student Status

**Effective Date** 09/01/2018
**Student Status** N
**AIS Status** N
**Credential Level** Doctoral Degree
**Student Sub Status** Active
**Division of Program** PSD
**Form of Study** Enrollment
**Study Agreement**
**Service Indicator** Eligible to Enroll
**FERPA Flag** N
**Withdraw Code**

View Worker: Romit Chakraborty (Terminated)

| Business Process | Effective Date | Initiated On | Due Date | Completed On | Status |
|---|---|---|---|---|---|
| Close Position: Quantum-AI Researcher | 10/25/2024 | 10/08/2024 11:48:05 AM | | 10/08/2024 11:48:05 AM | Successfully Completed |
| Terminate: Romit Chakraborty (Terminated) | 10/24/2024 | 10/08/2024 11:31:06 AM | | 10/08/2024 11:48:05 AM | Successfully Completed |
| Passive Event: Romit Chakraborty (Terminated) on 10/08/2024 | 10/08/2024 | 10/08/2024 10:01:31 PM | 10/10/2024 | 10/08/2024 10:01:31 PM | Successfully Completed |
| Benefit Change - Retirement Plans (Mandatory) - 1 year of service : Romit Chakraborty (Terminated) on 10/08/2024 | 10/08/2024 | 10/08/2024 10:01:31 PM | 10/10/2024 | 10/08/2024 10:01:31 PM | Successfully Completed |
| Passive Event: Romit Chakraborty (Terminated) on 10/01/2024 | 10/01/2024 | 10/01/2024 10:01:36 PM | 10/03/2024 | 10/08/2024 12:51:13 PM | Canceled |
| Benefit Change - Retirement Plans (Mandatory) - 1 year of service : Romit Chakraborty (Terminated) on 10/01/2024 | 10/01/2024 | 10/01/2024 10:01:36 PM | 10/03/2024 | 10/08/2024 12:10:31 AM | Successfully Completed |
| Costing Allocation: Romit Chakraborty (Terminated) - P99224855 Research Professional, Analyst - REREPP1E | | 09/15/2024 06:30:14 PM | 09/16/2024 | 09/15/2024 06:30:14 PM | Successfully Completed |
| Compensation Change: Romit Chakraborty - P99224855 Research Professional, Analyst - REREPP1E | 07/01/2024 | 06/21/2024 03:39:30 PM | | 06/21/2024 03:39:30 PM | Successfully Completed |
| Costing Allocation: Romit Chakraborty (Terminated) - P99224855 Research Professional, Analyst - REREPP1E | | 06/26/2024 06:19:09 PM | 06/27/2024 | 06/26/2024 06:19:09 PM | Successfully Completed |
| Costing Allocation: Romit Chakraborty (Terminated) - P99224855 Research Professional, Analyst - REREPP1E | | 06/26/2024 06:19:08 PM | 06/27/2024 | 06/26/2024 06:19:08 PM | Successfully Completed |
| Assign Organizations: Romit Chakraborty (Terminated) | 06/23/2024 | 06/26/2024 02:08:13 PM | 06/27/2024 | 06/26/2024 02:08:13 PM | Successfully Completed |
| Costing Allocation: Romit Chakraborty (Terminated) - P99224855 Research Professional, Analyst - REREPP1E | | 06/17/2024 04:14:08 PM | 06/18/2024 | 06/17/2024 04:14:08 PM | Successfully Completed |
| Passive Event: Romit Chakraborty (Terminated) on 05/27/2024 | 05/27/2024 | 05/27/2024 10:01:16 PM | 05/29/2024 | 05/27/2024 10:01:16 PM | Successfully Completed |
| Benefit Change - Short Term Disability : Romit Chakraborty (Terminated) on 05/27/2024 | 05/27/2024 | 05/27/2024 10:01:16 PM | 05/29/2024 | 05/27/2024 10:01:16 PM | Successfully Completed |
| Costing Allocation: Romit Chakraborty (Terminated) - P99224855 Research Professional, Analyst - REREPP1E | | 04/30/2024 01:33:27 PM | 05/01/2024 | 04/30/2024 01:33:27 PM | Successfully Completed |
| Costing Allocation: Romit Chakraborty (Terminated) - P99224855 Research Professional, Analyst - REREPP1E | | 01/11/2024 11:21:59 AM | 01/12/2024 | 01/11/2024 11:21:59 AM | Successfully Completed |
| Payment Election: Romit Chakraborty (Terminated) on 12/26/2023 | 12/26/2023 | 12/26/2023 11:41:56 AM | 12/27/2023 | 12/26/2023 11:41:56 AM | Successfully Completed |
| Payment Election: Romit Chakraborty (Terminated) on 12/26/2023 | 12/26/2023 | 12/26/2023 11:41:30 AM | 12/27/2023 | 12/26/2023 11:41:30 AM | Successfully Completed |
| Payment Election: Romit Chakraborty (Terminated) on 11/30/2023 | 11/30/2023 | 11/30/2023 08:15:08 AM | 12/01/2023 | 11/30/2023 08:15:08 AM | Successfully Completed |
| Payment Election: Romit Chakraborty (Terminated) on 11/30/2023 | 11/30/2023 | 11/30/2023 08:14:43 AM | 12/01/2023 | 11/30/2023 08:14:43 AM | Successfully Completed |
| ID Change: Romit Chakraborty (Terminated) | | 11/30/2023 02:44:00 PM | | 11/30/2023 02:48:20 PM | Successfully Completed |
| Passports and Visa Change: Romit Chakraborty (Terminated) | | 11/29/2023 01:10:42 PM | 12/01/2023 | 11/29/2023 01:10:42 PM | Successfully Completed |
| ID Change: Romit Chakraborty (Terminated) | | 11/29/2023 10:22:34 AM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| ID Change: Romit Chakraborty (Terminated) | | 11/27/2023 12:23:43 PM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| Change Emergency Contacts for Onboarding: Romit Chakraborty | | 11/27/2023 12:23:43 PM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| Personal Information Change: Romit Chakraborty (Terminated) (United States of America) | | 11/27/2023 12:23:43 PM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| State Tax Election for Onboarding: Romit Chakraborty (Terminated) | 11/28/2023 | 11/27/2023 12:23:43 PM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| Federal Tax Election for Onboarding: Romit Chakraborty (Terminated) | 11/28/2023 | 11/27/2023 12:23:43 PM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| Benefit Change - Hire : Romit Chakraborty (Terminated) on 11/27/2023 | 11/27/2023 | 12/01/2023 10:51:20 AM | | 12/22/2023 07:44:31 AM | Successfully Completed |
| Service Dates Change: Romit Chakraborty (Terminated) | 11/27/2023 | 11/30/2023 10:57:27 AM | | 11/30/2023 01:46:24 PM | Successfully Completed |
| Assign Pay Group for Hire: Romit Chakraborty (Terminated) | 11/27/2023 | 11/29/2023 01:10:57 PM | | 11/29/2023 02:00:45 PM | Successfully Completed |
| Disability Self-Identification for Onboarding: Romit Chakraborty on 11/27/2023 | 11/27/2023 | 11/27/2023 12:23:43 PM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| Onboarding for Romit Chakraborty | 11/27/2023 | 11/27/2023 12:23:43 PM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| Veteran Status Identification: Romit Chakraborty (Terminated) | 11/27/2023 | 11/27/2023 12:23:43 PM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| Contact Change: Romit Chakraborty (Terminated) | 11/27/2023 | 11/27/2023 12:23:43 PM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| Complete Form I-9: Romit Chakraborty (Terminated) - Employment Authorized | 11/27/2023 | 11/27/2023 12:23:43 PM | | 11/29/2023 10:22:34 AM | Successfully Completed |
| Costing Allocation for Hire: Romit Chakraborty (Terminated) - P99224855 Quantum-AI Researcher | | 11/27/2023 12:22:58 PM | | 11/27/2023 12:23:43 PM | Successfully Completed |
| Propose Compensation Hire: Romit Chakraborty - P99224855 Research Professional, Analyst - REREPP1E | 11/27/2023 | 11/27/2023 10:58:19 AM | | 11/27/2023 12:06:12 PM | Successfully Completed |
| Assign Organizations: Romit Chakraborty (Terminated) | 11/27/2023 | 11/27/2023 10:57:42 AM | | 11/27/2023 12:06:12 PM | Successfully Completed |
| Hire: Romit Chakraborty | 11/27/2023 | 11/27/2023 10:56:58 AM | | 11/27/2023 12:06:12 PM | Successfully Completed |

UNIVERSITY OF CHICAGO 006

View Worker: Romit Chakraborty (Terminated)

| Business Process | Effective Date | Initiated On | Due Date | Completed On | Status |
|---|---|---|---|---|---|
| Edit Other IDs: Romit Chakraborty (Terminated) | | 11/27/2023 02:33:03 PM | 11/29/2023 | 11/27/2023 02:33:03 PM | Successfully Completed |
| Edit Other IDs: Romit Chakraborty (Terminated) | | 11/27/2023 12:06:12 PM | | 11/27/2023 12:22:58 PM | Successfully Completed |
| Personal Information Change: Romit Chakraborty (Terminated) (United States of America) | | 11/27/2023 10:56:58 AM | 11/29/2023 | 11/27/2023 10:56:58 AM | Successfully Completed |
| Add Academic Appointment: Romit Chakraborty (Terminated) | 09/11/2023 | 07/12/2023 02:26:43 PM | | 07/13/2023 09:01:25 AM | Rescinded |
| Propose Compensation Hire: Romit Chakraborty - P99216285 Postdoctoral Scholar-4 | 09/11/2023 | 07/12/2023 11:18:38 AM | | 07/12/2023 02:26:43 PM | Rescinded |
| Assign Organizations: Romit Chakraborty (Terminated) (Rescinded) | 09/11/2023 | 07/12/2023 11:17:58 AM | | 07/12/2023 02:26:43 PM | Rescinded |
| Hire: Romit Chakraborty (Rescinded) | 09/11/2023 | 07/12/2023 11:17:58 AM | | 07/12/2023 02:26:43 PM | Rescinded |
| Contact Change: Romit Chakraborty (Terminated)(Merged) | 08/16/2023 | 08/16/2023 10:10:30 AM | 08/18/2023 | 08/16/2023 10:10:30 AM | Successfully Completed |
| Edit Other IDs: Romit Chakraborty (Terminated) | | 07/13/2023 09:01:25 AM | | 08/11/2023 02:20:55 PM | Canceled |
| Payment Election: Romit Chakraborty (Terminated) on 01/22/2021 | 01/22/2021 | 01/22/2021 05:21:45 PM | 01/23/2021 | 01/22/2021 05:21:45 PM | Successfully Completed |
| Payment Election: Romit Chakraborty (Terminated) on 01/22/2021 | 01/22/2021 | 01/22/2021 05:21:38 PM | 01/23/2021 | 01/22/2021 05:21:38 PM | Successfully Completed |
| Edit Other IDs: Romit Chakraborty (Terminated) | | 12/27/2019 02:30:02 PM | 12/29/2019 | 12/27/2019 02:30:02 PM | Successfully Completed |
| Edit Other IDs: Romit Chakraborty (Terminated) | | 11/08/2019 11:51:36 AM | 11/10/2019 | 11/08/2019 11:51:36 AM | Successfully Completed |
| Edit Other IDs: Romit Chakraborty (Terminated) | | 08/07/2018 02:24:25 PM | 08/09/2018 | 08/07/2018 02:24:25 PM | Successfully Completed |
| Personal Information Change: Romit Chakraborty (Terminated) (United States of America) | | 07/12/2017 02:14:31 PM | 07/14/2017 | 07/12/2017 02:14:31 PM | Successfully Completed |
| Passports and Visa Change: Romit Chakraborty (Terminated) | | 07/07/2017 09:22:24 AM | 07/09/2017 | 07/07/2017 09:22:24 AM | Successfully Completed |
| Benefit Change - Termination : Romit Chakraborty (Terminated) on 07/01/2017 | 07/01/2017 | 07/10/2017 01:21:33 PM | | 07/10/2017 01:21:33 PM | Successfully Completed |
| Terminate: Romit Chakraborty (Terminated) | 06/30/2017 | 07/07/2017 05:20:45 PM | | 07/10/2017 01:21:33 PM | Successfully Completed |
| Period Activity Pay: Romit Chakraborty - P9045665 Research Asst B (exempt) Tuition Rem | 04/06/2017 | 04/06/2017 01:22:44 PM | | 04/06/2017 03:50:16 PM | Successfully Completed |
| Costing Allocation: Romit Chakraborty (Terminated) - P9045665 Research Asst B (exempt) Tuition Rem - Research - Research | | | | 04/06/2017 03:50:16 PM | Successfully Completed |
| Assign Pay Group for Data Change: Romit Chakraborty (Terminated) | 04/01/2017 | 04/03/2017 10:04:21 AM | | 04/03/2017 10:08:27 AM | Successfully Completed |
| Costing Allocation for Data Change: Romit Chakraborty (Terminated) - P9045665 Res Asst(B) Tuition Rem - 731900-68 | | 04/03/2017 10:04:11 AM | 04/05/2017 | 04/03/2017 10:04:21 AM | Successfully Completed |
| Data Change: Romit Chakraborty (Terminated) | 04/01/2017 | 04/03/2017 10:04:02 AM | 04/10/2017 | 04/03/2017 10:04:21 AM | Successfully Completed |
| End Additional Job: Romit Chakraborty (Terminated) | 01/02/2017 | 01/20/2017 03:25:48 PM | 01/27/2017 | 01/20/2017 03:25:48 PM | Successfully Completed |
| Primary Job Switch: Romit Chakraborty (Terminated) | 01/01/2017 | 01/13/2017 11:25:08 AM | 01/17/2017 | 01/13/2017 11:45:31 AM | Successfully Completed |
| Assign Pay Group for Data Change: Romit Chakraborty (Terminated) | 01/01/2017 | 12/28/2016 01:32:09 PM | | 12/28/2016 02:52:55 PM | Successfully Completed |
| Costing Allocation for Data Change: Romit Chakraborty (Terminated) - P9045665 Res Asst(B) Tuition Rem - 731900-68 | | 12/28/2016 01:31:45 PM | 12/30/2016 | 12/28/2016 01:32:09 PM | Successfully Completed |
| Data Change: Romit Chakraborty (Terminated) | 01/01/2017 | 12/28/2016 01:30:26 PM | 01/04/2017 | 12/28/2016 01:32:09 PM | Successfully Completed |
| Period Activity Pay: Romit Chakraborty - P9045665 Research Asst B (exempt) Tuition Rem | 12/29/2016 | 12/29/2016 10:50:11 AM | | 12/29/2016 11:32:24 AM | Successfully Completed |
| Costing Allocation: Romit Chakraborty (Terminated) - P9045665 Research Asst B (exempt) Tuition Rem - Research - Research | | | | 12/29/2016 11:32:24 AM | Successfully Completed |
| Close Position: Grader | 11/29/2016 | 11/28/2016 02:02:33 PM | | 11/28/2016 02:02:33 PM | Successfully Completed |
| End Additional Job: Romit Chakraborty (Terminated) | 11/28/2016 | 11/28/2016 02:02:33 PM | 12/05/2016 | 11/28/2016 02:02:33 PM | Successfully Completed |
| Period Activity Pay: Romit Chakraborty - P9045665 Research Asst B (exempt) Tuition Rem | 10/04/2016 | 10/04/2016 04:29:18 PM | | 10/05/2016 12:39:15 PM | Successfully Completed |
| Costing Allocation: Romit Chakraborty (Terminated) - P9045665 Research Asst B (exempt) Tuition Rem - Research - Research | | | | 10/05/2016 12:39:15 PM | Successfully Completed |
| Assign Pay Group for Data Change: Romit Chakraborty (Terminated) | 10/01/2016 | 09/29/2016 04:11:33 PM | | 09/30/2016 09:25:31 AM | Successfully Completed |
| Costing Allocation for Data Change: Romit Chakraborty (Terminated) - P9045665 Res Asst(B) Tuition Rem - 731900-68 | | 09/29/2016 04:11:14 PM | 10/01/2016 | 09/29/2016 04:11:33 PM | Successfully Completed |
| Data Change: Romit Chakraborty (Terminated) | 10/01/2016 | 09/29/2016 04:11:03 PM | 10/06/2016 | 09/29/2016 04:11:33 PM | Successfully Completed |

Compensation

**Compensation Package** Staff Package
**Compensation Grade** E5
**Total Base Pay Range** 3,875.00 - 6,458.00 USD Monthly
**Company** University of Chicago

Plan Assignments

| Effective Date | Plan Type | Compensation Plan | Assignment |
|---|---|---|---|
| 07/01/2024 | Salary | Salary Plan | 5,802.62 USD Monthly |
| 11/27/2023 | Merit | Staff Merit Plan | 1.00% Annual |

**Historical Activity Pay**

**Position** P99224855 Research Professional, Analyst - REREPP1E - Romit Chakraborty

Period Activity Assignments

| Academic Period | Organization | Total Scheduled Amount | Currency | View Assignment Details | View with Payment Details |
|---|---|---|---|---|---|
| 2016-2017 Academic Year | | 26,775.00 | USD | | |

**Pay Change History**

Pay Change History

| Effective Date | Compensation Action | Reason | Total Salary & Allowances | Total Base Pay | Currency | Frequency |
|---|---|---|---|---|---|---|
| 07/01/2024 | Merit Compensation Change | Merit > Merit > Annual Review | 5,802.62 | 5,802.62 | USD | Monthly |
| 11/27/2023 | Hire Compensation | Hire Employee > Hire Employee > Rehire | 5,661.09 | 5,661.09 | USD | Monthly |
| 07/01/2016 | Additional Job Compensation | Add Additional Employee Job > Add Additional Job > Additional Job | 2,881.00 | 2,881.00 | USD | Monthly |

Period Activity History

| Initiated On | Effective Date | Business Process | Status | Position | Reason | Period | Period Activity Total |
|---|---|---|---|---|---|---|---|
| 07/10/2017 08:31:04.168 AM | 06/30/2017 | Period Activity Assignment | Skipped | P9045665 Research Asst B (exempt) Tuition Rem | | | |
| 04/06/2017 01:22:44.875 PM | 04/06/2017 | Period Activity Assignment | Successfully Completed | P9045665 Research Asst B (exempt) Tuition Rem | Period Activity > Add Activity Pay > Additional Assignment | 2016-2017 Academic Year | 26,775.00 USD |
| 12/29/2016 10:50:11.381 AM | 12/29/2016 | Period Activity Assignment | Successfully Completed | P9045665 Research Asst B (exempt) Tuition Rem | Period Activity > Add Activity Pay > Additional Assignment | 2016-2017 Academic Year | 17,850.00 USD |
| 10/04/2016 04:29:18.966 PM | 10/04/2016 | Period Activity Assignment | Successfully Completed | P9045665 Research Asst B (exempt) Tuition Rem | Period Activity > Add Activity Pay > Additional Assignment | 2016-2017 Academic Year | 8,925.00 USD |
| 07/05/2016 03:24:37.693 PM | 07/01/2016 | Period Activity Assignment | Skipped | P9045665 Research Asst B (exempt) Tuition Rem | | | |
| 01/20/2015 04:55:56.217 PM | 01/01/2015 | Period Activity Assignment | Successfully Completed | P9042622 Ed-Related Stdnt Job (Exempt) - 794199 | Period Activity > Add Activity Pay > Hire | 2014-2015 Academic Year | 800.00 USD |

View Worker: Romit Chakraborty (Terminated)

| Document | Signature Type | Signed By | Signature Date | Signature Statement | Uploaded Document | Comment |
|---|---|---|---|---|---|---|
| New Hire Employment 2023-08-31.pdf | | Raven Jones | 08/31/2023 08:41:08 AM | | | |
| New Hire Employment 2023-08-31.pdf | Acknowledgment | Romit Chakraborty (Terminated) | 08/31/2023 03:01:48 PM | I agree to the terms of the offer. | FedEx+Scan+2023-08-31_12-28-16.pdf_uploaded | Document uploaded was printed scanned and signed by hand |

**Personal Notes**

| Date | Note | |
|---|---|---|

## Performance

**Performance Reviews**

**Help** There are no items to display
**Icon [Singular]** wd-graphic-empty-state-generic

## Career

**Professional Profile**

Education

**Certifications**

**Help** There are no items to display
**Icon [Singular]** wd-graphic-empty-state-generic

## Summary

**Public**

Education

Job Details

**Employee ID** [redacted]1

THE UNIVERSITY OF CHICAGO

8/31/2023

Romit Chakraborty
5527 S Everett Avenue
Chicago, Illinois 60637

Dear Romit,

I am delighted to formally extend this employment offer at the University of Chicago. We are committed to attracting and retaining high caliber talent to support our mission of excellence in creating and disseminating knowledge rooted in rigorous inquiry. Accordingly, you are being offered the position of Quantum-AI Researcher in the Chemistry department, reporting to Laura Gagliardi, Professor, with a tentative start date of 10/01/2023. Your annual pay will be $67,933.08 to be paid on a monthly pay cycle, equivalent of $5,661.09 per month.

Employment is contingent upon:

- Confirmation that you are legally authorized to work in the United States.
- Satisfactory completion of all applicable background and/or motor vehicle record checks, and drug screening test.
- Acknowledgment of mandated reporting requirements under the Illinois Abused and Neglected Child Reporting Act.
- Receipt of positive reference check results.

During your first six months of employment, you will be a probationary employee. At all times, your employment will be “at-will,” which means that you or the University can terminate your employment at any time for any lawful reason.

The University’s Annual Merit Process (AMP) is the formal process for reviewing employee performance and base pay levels, with a common review of July 1 for all monthly paid employees. You will be eligible for review during AMP and pay will be determined upon performance.

The University of Chicago offers a comprehensive benefits package, including health and welfare, retirement, and paid time off options, all of which are subject to change from time to time. Summary details of these plans are published on the University’s Human Resources website.

- Your eligibility for benefits begins on your first day of employment.
- Enrollment must be completed within your first 31 days of employment.
- Benefit counselors will be available during orientation to answer your benefits questions.
- Documentation for each of your dependents (e.g., copy of marriage certificate for spouse, birth certificate for children) is required before their coverage will be effective.

Additionally, as a valued University staff employee, you will have access to University resources such as fitness facilities and libraries, and you can participate in a variety of University-sponsored and Hyde Park neighborhood arts, cultural and educational events.

THE UNIVERSITY OF CHICAGO

Maintaining a positive work environment, and promoting a workplace free from discrimination and harassment, supports the academic and research mission of the University by ensuring all members of our community can contribute to their fullest potential. Our "Getting to Know UChicago" new hire orientation will help facilitate your transition to the University of Chicago. To prepare for this session, I encourage you to review http://staffnewhire.uchicago.edu/.

If you have any questions about benefits or onboarding, please contact Raven Jones, your Human Resources Partner, at rjones16@uchicago.edu.

Your signature on the final page of this employment offer letter confirms your acceptance of this offer of at-will employment. Please upload a signed copy of this employment offer on your candidate portal, to confirm your acceptance. After you confirm your acceptance, you will receive an email message from Raven Jones regarding next steps in the onboarding process.

Romit, your new colleagues and I are delighted to have you join Chemistry department. I know your skills, energy and commitment will help to ensure our continued success and create opportunities for your professional growth. I look forward to working with you. Please contact me at lgagliardi@uchicago.edu with any questions.

Sincerely,

Laura Gagliardi

Professor

Chemistry Department

Your signature will confirm the agreed upon base pay, start date and other terms of your employment as described in this employment offer letter. This offer shall remain open until 9/7/2023. Any acceptance received after this date will be considered invalid.

I have read and I understand this offer of employment, and I accept the offer. I understand that my employment is contingent upon satisfactory completion of all applicable background and/or motor vehicle record checks, drug screening test.

Date:

______________________________

Dept: Chemistry

______________________________

Job Title: Quantum-AI Researcher

______________________________

Printed Name:

______________________________

Signature:

______________________________

**From:** Christine Taylo
**To:** Ericka Evans
**Cc:** PSDDean Requests
**Subject:** RE: New Postdoc Romit Chakraborty
**Date:** Friday, July 14, 2023 1:57:32 PM

Hi Ericka,

Per our previous email chain, unfortunately, the Provost's Office did not approve our request to appoint Romit Chakraborty as a postdoctoral researcher.

PSD HR has shared some next steps to help Laura investigate the feasibility of hiring this person as staff.

As mentioned in TEAMS, I did inquire with Sharon about the processing time for an academic appointment. I have not yet heard a response, but will let you know what she says when she does.

Please let me know if you or Laura require more information from me.

Kind regards,


**_Christine Taylo_** (SHE/HER)
Assistant Director of Academic Affairs
The University of Chicago, Physical Sciences Division
P: (773) 702-7953 | E: ctaylo@uchicago.edu


**From:** Ericka Evans <erickaevans1@uchicago.edu>
**Sent:** Wednesday, July 12, 2023 11:24 AM
**To:** Christine Taylo <ctaylo@uchicago.edu>
**Cc:** PSDDean Requests <psddean-requests@uchicago.edu>
**Subject:** RE: New Postdoc Romit Chakraborty

Hello Christine,

He is in Workday now. He was a U of C grad student. Laura does not plan to hire him. I'm not sure if this will change when he starts, but she mentioned she doesn't want to hire him.


**Ericka Evans**
Business Operations Administrator|Department of Chemistry
The University of Chicago | Physical Sciences Division
Email: erickaevans1@uchicago.edu
T: 773/834/3381


**From:** Christine Taylo <ctaylo@uchicago.edu>
**Sent:** Tuesday, July 11, 2023 4:57 PM

**To:** Ericka Evans <erickaevans1@uchicago.edu>
**Cc:** PSDDean Requests <psddean-requests@uchicago.edu>
**Subject:** RE: New Postdoc Romit Chakraborty

Hi Ericka,

Thank you for sending this over and for providing all of this information.

Please enter them into Workday so that I can send them to the Provost's office for review.

I see that Laura confirmed that we will not request a postdoc extension for them. Per chance did she also mention if she plans to hire him in the future? It is not required that she do so, but I know the Provost's office will ask.

Kind regards,

***Christine Taylo*** (SHE/HER)
Assistant Director of Academic Affairs
The University of Chicago, Physical Sciences Division
P: (773) 702-7953 | E: ctaylo@uchicago.edu

---

**From:** Ericka Evans <erickaevans1@uchicago.edu>
**Sent:** Thursday, July 6, 2023 4:37 PM
**To:** PSDDean Requests <psddean-requests@uchicago.edu>
**Cc:** Christine Taylo <ctaylo@uchicago.edu>
**Subject:** New Postdoc Romit Chakraborty

Hello Christine,

Please see attached the hiring packet for Romit Chakraborty that we discussed via teams. 2023/2024, Romit will have 7 years of experience as a postdoc, and it will be 7 years after the award of the degree. Attached is a strong memo for the provost review.

Romit will be a H-1B transfer. The start date may change depending on how soon the approval is received because once the H-1B request is submitted to OIA, they will need 50-60 days to process the transfer.

Matthew Dugan is Laura's new FSR. I am currently waiting on the concurrence and will send that over when I have it. I know this can be lengthy so I'm sending what I have now to get the ball rolling.

Please let me know if anything else is needed!

**Ericka Evans**
Business Operations Administrator|Department of Chemistry

The University of Chicago | Physical Sciences Division
Email: erickaevans1@uchicago.edu
T: 773/834/3381

# Postdoc Mentoring Plan

Faculty Advisor: Laura Gagliardi, Chemistry
Candidate postdoc: Dr. Romit Chakraborty

*Background*

Dr. Chakraborty received his Ph.D. in Theoretical and Computational Chemistry from the University of Chicago in 2017. During his Ph.D. with Prof. Mazziotti he made important progress in understanding the pure N-representability problem of the 1-electron reduced density matrix (1-RDM). In his postdoctoral work with Prof. Head-Gordon, Dr. Chakraborty developed a powerful model for optimizing the structure of metal-organic frameworks with many applications from storage to computing.

The research to be conducted by Dr. Chakraborty involves studying MOF catalyzed reactions and the development of automated active space methodologies for catalysis using large language models.

Dr. Chakraborty brings valuable experience using various theoretical tools like DFT, ab initio (multi-reference) quantum chemical methods and developing the data analysis, workflow, and deep chemical understanding necessary to perform successful chemical applications. He will benefit from broadening his expertise by learning about many-particle methods for electronic structure calculations for catalysis and large language models.

*Scientific Development*

I will train Dr. Chakraborty in applying various electronic structure methods to molecular systems and reticular frameworks. He will also be encouraged to participate in departmental research seminars and to take a leadership role by working with several graduate students in the group.

Dr. Chakraborty and I will meet weekly to discuss his research progress and ideas. He will also present his results at group and project related meetings. He will be encouraged to attend and present at national and international conferences. He will be guided through practice talks. He will also be encouraged to publish his research in peer-reviewed journals.

*Professional Development*

Although Dr. Chakraborty will not have PI status, I will collaborate with him on proposals that I submit to support our research. I will discuss proposal preparation and grant administration with him. I will encourage Dr. Chakraborty to accept relevant requests to review manuscripts and grant proposals.

I will discuss career options with Dr. Chakraborty and guide him in identifying and applying for positions. When he begins preparing for interviews for positions, I will help him by providing guidance and having practice interviews with him.

THE UNIVERSITY OF CHICAGO | PHYSICAL SCIENCES

Wednesday, July 12, 2023

To: Provost s ffice

From: Christine Taylo, Assistant Director of Academic Affairs
Physical Sciences Division, Dean s ffice

Re: Romit Chakraborty

Professor aura Gagliardi would like to appoint Romit Chakraborty as a postdoctoral scholar effective / 11/2023 – / 10/2024. However, Romit Chakraborty will have had more than 7 years of total postdoctoral experience effective 1/1/2024.

In her memo, Professor Gagliardi explains that Dr. Chakraborty s 1 year term is a mission critical hire for her lab. I have also confirmed with her that she will not request an extension beyond the current term.

Please let us know if you require more information for this request.

THE UNIVERSITY OF CHICAGO | PHYSICAL SCIENCES

DRAFT APPR A

To: __________, Chair
Department of Chemistry

From: Christine Taylo, Assistant Director of Academic Affairs
Physical Sciences Division, Dean s ffice

Re: Romit Chakraborty

n behalf of Dean Angela . linto, your request to appoint the individual above as a Postdoctoral Researcher in the Physical Sciences Division has been approved. The terms of this appointment are as follows:

| | |
|---|---|
| **itle** | Postdoctoral Scholar |
| **nit** | Chemistry |
| **er** | / 11/2023 – / 10/2024 |
| **alar cco nt** | $60,000 |
| **t er nding** | n/a |

Please send me a copy of the fully executed offer letter and an updated C for our files.

If the PI chooses to reappoint this postdoctoral researcher, they must follow the Terms of Service section of the Postdoctoral Researcher Policy anual.

Enclosure

The University of Chicago
Department of Chemistry
5735 S. Ellis Avenue
Chicago, Illinois 60637

Date: July 6, 2023

To: Viresh Rawal
Chairman, Department of Chemistry

From: Laura Gagliardi
Professor, Department of Chemistry

Re: Postdoc Romit Chakraborty

I am writing to request permission to appoint Dr. Romit Chakraborty as a 7th year Postdoctoral Scholar in the Department of Chemistry at the University of Chicago. Dr. Chakraborty is currently a Postdoctoral Fellow at the Department of Chemistry at UC Berkeley and at the Materials Sciences Division at the Lawrence Berkeley National Laboratory, where he specializes in Energy Storage Applications for Nanoscale Materials. Given his exceptional qualifications and expertise, I believe that his appointment to the Gagliardi group will greatly benefit our research on electronic structure methods and their applications to the study of metal-organic frameworks (MOFs).

To implement my scientific vision, my lab is in the process of appointing Dr. Chakraborty in the Gagliardi group as an expert in applications of electronic structure theory for the study of gas binding in metal-organic frameworks. The appointment of someone with Dr. Chakraborty's experience is mission critical for the success of our research. The plan is for Dr. Chakraborty to join our group as a postdoctoral scholar, where they will contribute to the establishment of advanced electronic structure theory methodologies in our research on gas binding in metal-organic frameworks. This appointment is time-sensitive due to the unique opportunity we have to recruit Dr. Chakraborty, considering his expertise and availability, and his unique visa situation. Therefore, we have decided to pursue this avenue. Please note that there will be no further re-appointment of Dr. Chakraborty as a postdoctoral scholar beyond this year.

Dr. Chakraborty's academic background includes a PhD in Theoretical and Computational Chemistry from the University of Chicago, which has provided him with a solid foundation in fundamental quantum theory and practical electronic structure, particularly relevant to materials science. Throughout his graduate studies, he conducted rigorous research focusing on quantum simulations of chemistry, delving into the complexities of electron occupations and developing sparse ansatze for the fermionic wavefunction. Notably, his work involved formulating a geometric perspective on energy transfer from effective one-electron theories, providing valuable insights into detecting noise in quantum systems. His expertise in this area will significantly contribute to our ongoing investigations.

# The University of Chicago

Department of Chemistry
5735 S. Ellis Avenue
Chicago, Illinois 60637


In his current position at UC erkeley, Dr. Chakraborty has been actively involved in expanding simulation strategies for metal-organic frameworks ( Fs). His computational investigations have yielded important insights into enhancing hydrogen storage in the solid state, specifically through the binding of multiple hydrogens at the first coordination sphere of anadium (II) within Fs. These achievements demonstrate Dr. Chakraborty s exceptional skills in computational materials science, making him an ideal fit for our research group.

oreover, Dr. Chakraborty s experience in scientific writing and research coordination, gained through his work on grant proposals and reports for the Hydrogen Storage Consortium (Hy ARC), funded by the Department of Energy (D E), further strengthens his qualifications. His proficiency in scientific communication has been honed through mentoring and teaching endeavors, as evidenced by positive student evaluations of his discussion sections at the University of Chicago. Dr. Chakraborty s commitment to advancing sustainable and clean energy aligns perfectly with the objectives of our research program and makes him an excellent candidate for this position.

In light of his outstanding academic achievements and expertise, I strongly recommend Dr. Romit Chakraborty s appointment as a 7th year Postdoctoral Scholar in the Gagliardi group. His unique skill set in electronic structure methods and his extensive research experience in metal-organic frameworks will undoubtedly contribute to groundbreaking advancements in our field. I kindly request that you consider this request favorably.

Thank you for your attention to this matter.

aura Gagliardi

Appointment start date: 0/ 11/2023-0 /10/2024
Salary: $60,000
Account: ( 5-28468) ( 5-80152) 50/50
oving Reimbursement: $1,500
Status: H-1 visa transfer

The above recommendation has my endorsement.

_______________________________07/06/2023
iresh Rawal Date
Chairman, Department of Chemistry

# Postdoc Mentoring Plan

Faculty Advisor: Laura Gagliardi, Chemistry
Candidate postdoc: Dr. Romit Chakraborty

*Background*

Dr. Chakraborty received his Ph.D. in Theoretical and Computational Chemistry from the University of Chicago in 2017. During his Ph.D. with Prof. Mazziotti he made important progress in understanding the pure N-representability problem of the 1-electron reduced density matrix (1-RDM). In his postdoctoral work with Prof. Head-Gordon, Dr. Chakraborty developed a powerful model for optimizing the structure of metal-organic frameworks with many applications from storage to computing.

The research to be conducted by Dr. Chakraborty involves studying MOF catalyzed reactions and the development of automated active space methodologies for catalysis using large language models.

Dr. Chakraborty brings valuable experience using various theoretical tools like DFT, ab initio (multi-reference) quantum chemical methods and developing the data analysis, workflow, and deep chemical understanding necessary to perform successful chemical applications. He will benefit from broadening his expertise by learning about many-particle methods for electronic structure calculations for catalysis and large language models.

*Scientific Development*

I will train Dr. Chakraborty in applying various electronic structure methods to molecular systems and reticular frameworks. He will also be encouraged to participate in departmental research seminars and to take a leadership role by working with several graduate students in the group.

Dr. Chakraborty and I will meet weekly to discuss his research progress and ideas. He will also present his results at group and project related meetings. He will be encouraged to attend and present at national and international conferences. He will be guided through practice talks. He will also be encouraged to publish his research in peer-reviewed journals.

*Professional Development*

Although Dr. Chakraborty will not have PI status, I will collaborate with him on proposals that I submit to support our research. I will discuss proposal preparation and grant administration with him. I will encourage Dr. Chakraborty to accept relevant requests to review manuscripts and grant proposals.

I will discuss career options with Dr. Chakraborty and guide him in identifying and applying for positions.   hen he begins preparing for interviews for positions, I will help him by providing guidance and having practice interviews with him.

The University of Chicago
Department of Chemistry
5735 S. Ellis Avenue
Chicago, Illinois 60637

Dr. Romit Chakraborty 07/06/2023

romit@berkeley.edu

Dear Dr. Romit Chakraborty,

It is my pleasure to extend an offer for you to join my research team as a Postdoctoral Scholar. The primary purpose of this appointment is to engage in advanced research training in preparation for a permanent position in academia, industry, or government.

The appointment is made at 100 percent time for the period of one year on or about September 11, 2023, through September 10, 2024 with an annual salary of $60,000. The University will provide a one-time-payment of $1,500 for relocation assistance, payable at the end of the first month of your employment at the University. The payment is taxable and will be reported to the Internal Revenue Service (IRS) and on your W-2 form at the end of the calendar year. The funds can be used for any purpose, so you do not need to submit any receipts related to your move to Chicago.

The appointment is made in accordance with Academic policy: https://postdocs.uchicago.edu/

Reappointment shall be contingent upon various factors including but not limited to satisfactory performance (including compliance with all applicable University policies), work authorization, availability of funding, and programmatic need.

University policy requires you to maintain health insurance throughout your appointment period. However, if you already have health insurance that is comparable to the University–sponsored health plan, then you may elect to opt out. Information about benefits can be found at https://clients.garnett-powers.com/pd/uchicago/ Please note these employee benefits are subject to change from time to time and may be amended or eliminated by the University.

Under federal law The University of Chicago may employ only those individuals who are legally able to work in the United States. Documentation establishing this eligibility must be made available to the University during the first three business days of your appointment. It is your responsibility to ensure you present the appropriate documents.

It is a requirement of this position that you complete the online Responsible Conduct of Research (RCR) Training no later than three (3) days after your appointment start date. Information and instructions regarding this training can be found at this site: https://physicalsciences.uchicago.edu/resources/rcr-training/

The University of Chicago
Department of Chemistry
5735 S. Ellis Avenue
Chicago, Illinois 60637

Additional resources can be found at: Physical Sciences Postdoc Resources at: https://physicalsciences.uchicago.edu/resources/postdoc-resources/

Please contact Ericka Evans at (773)834-3381, erickaevans1@uchicago.edu) upon your arrival to complete the necessary paperwork to initiate your appointment. Release of your first paycheck depends on your timely completion and processing of all required employment forms.

If you agree to accept this position, please notify me in writing by signing your name were noted and returning the letter to me on or before July 12, 2023. I have enclosed a copy of this letter for your records. I look forward to you joining the Gagliardi Group and having you as a colleague at The University of Chicago.

If you have any questions regarding this offer, please contact Ericka Evans at (773)834-3381 erickaevans1@uchicago.edu) If you agree with everything stated in this letter, please sign this offer, and return it to me no later than July 12, 2023.

Laura Gagliardi

______________________________

[Signature of Faculty Sponsor]

I accept the offer described in this letter.

__________________________________________________

[Postdoctoral Scholar, print name here]

_____________________________________ _____________

[Postdoctoral Scholar, please sign name here] Date Signed

THE UNIVERSITY OF CHICAGO

Quantum-AI Researcher

Quantum-AI Researcher

Department

PSD Chemistry: Faculty Support

About the Department

The Chicago Center for Theoretical Chemistry at the University of Chicago is a leading research center focused on the development and application of theoretical and computational methods to chemical and biological problems. The center fosters collaboration among chemists, biologists, and physicists to advance our understanding of complex chemical systems and phenomena. In collaboration with The Pritzker School of Molecular Engineering at the University of Chicago, a pioneering institution that integrates science and engineering to address global challenges from the molecular level up. The school focuses on designing and testing new molecular materials, systems, and processes for the benefit of society and the advancement of technology.

Job Summary

The Quantum- AI Researcher will conduct electronic structure simulations for complex systems, with a focus on the development of tools for simulating clean-energy materials such as metal-organic frameworks. These tools are crucial in transitioning from fossil fuels to sustainable energy sources. The Researcher will involve the creation and usage of AI-powered simulation tools and multi-scale modeling techniques to tackle challenging problems in materials design in concert with state-of-the-art electronic structure methodology developed within the research unit. The incumbent will leverage the potential of large language models and transformer-based technologies to enhance electronic structure simulations of material systems. Given the high demand for material system simulations in real-world applications, efforts will be made to integrate detailed atomic-level simulations with larger, macroscopic observations. The Quantum-AI Researcher is expected to have significant implications for the simulation and design of clean energy materials.

Responsibilities

- Oversee data management and data sharing for the research group following best practices and compliance by the University.
- Maintain and distribute the software developed in the Gagliardi research group.
- Collaborate and recommend hardware and software to be purchased and used in the Gagliardi group and research labs.

- Collaborate with Gagliardi and the research group on new directions of research.
- Perform research and write papers in collaboration with research group members.
- Prepare, write, and provide updates on grant applications for research funding.
- Present work at scientific meetings, conferences, and other events.
- Mentor and train Gagliardi group members and students with their research.
- Performs experiments and collects and analyzes data. Participates in the promotion of a research project.
- Participates in the preparation and writing of grant applications and reports, and co-authors/authors scientific research manuscripts. Provides peer review of grant applications and scientific manuscripts.
- Collaborates on development of new research projects with academic and community-based organizations.
- Performs other related work as needed.

Minimum Qualifications

Education:

Minimum requirements include a PhD in related field.

—

Work Experience:

Minimum requirements include knowledge and skills developed through < 2 years of work experience in a related job discipline.

—

Certifications:

—

Preferred Qualifications

Experience:

- Quantum Chemistry and its applications in materials design problems.
- Familiarity with simulation protocols for metal-organic frameworks.
- Publications in high-quality peer-reviewed scientific journals.
- Experience working with multi-disciplinary teams.

Licenses and Certifications:

- Building AI assistants that harness the power of Large Language Models (LLMs).

Technical Skills or Knowledge:

- Python Programming.
- Knowledge of Electronic Structure Codes such as PySCF and MOLCAS.
- Knowledge of the underlying technology behind large language models.
- Engineering for large language models like ChatGPT.
- Integrating Application Programming Interfaces with varying functionalities.

Preferred Competencies

- Working with interdisciplinary teams.
- Excellent academic writing.
- Application Programming Interfaces for Large Language Models such as ChatGPT.

THE UNIVERSITY OF CHICAGO

- Density Functional Simulations for Material Systems.
- Excellent written and verbal communication.

Working Conditions

- Ability to work on the computer for long periods of time.
- Ability to work in person.

Application Documents

- Resume (required).
- Cover Letter (preferred).
- References (preferred).

When applying, the document(s) MUST be uploaded under the Resume / Cover Letter section of the application.

Job Family

Research

Career Track

Research Professional

Job Level

P1

Role Impact

Individual Contributor

FLSA Status

Exempt

Pay Frequency

Monthly

Scheduled Weekly Hours

37.5

Benefits Eligible

Yes

Drug Test Required

THE UNIVERSITY OF CHICAGO

No

Health Screen Required

No

Motor Vehicle Record Inquiry Required

No

Posting Statement

The University of Chicago is an Affirmative Action/Equal Opportunity/Disabled/Veterans and does not discriminate on the basis of race, color, religion, sex, sexual orientation, gender, gender identity, national or ethnic origin, age, status as an individual with a disability, military or veteran status, genetic information, or other protected classes under the law. For additional information please see the University's Notice of Nondiscrimination.

Staff Job seekers in need of a reasonable accommodation to complete the application process should call 773-702-5800 or submit a request via Applicant Inquiry Form.

We seek a diverse pool of applicants who wish to join an academic community that places the highest value on rigorous inquiry and encourages a diversity of perspectives, experiences, groups of individuals, and ideas to inform and stimulate intellectual challenge, engagement, and exchange.

All offers of employment are contingent upon a background check that includes a review of conviction history. A conviction does not automatically preclude University employment. Rather, the University considers conviction information on a case-by-case basis and assesses the nature of the offense, the circumstances surrounding it, the proximity in time of the conviction, and its relevance to the position.

The University of Chicago's Annual Security & Fire Safety Report (Report) provides information about University offices and programs that provide safety support, crime and fire statistics, emergency response and communications plans, and other policies and information. The Report can be accessed online at: http://securityreport.uchicago.edu. Paper copies of the Report are available, upon request, from the University of Chicago Police Department, 850 E. 61st Street, Chicago, IL 60637.

## Job Details

| | |
|---|---|
| **Job Requisition ID** | JR23432 |
| **Location** | Chicago, IL |
| **Posting Date** | 08/10/2023 - 1 day ago |
| **Job Family** | Research |
| **Time Type** | Full time |
| **Job Type** | Staff |
| **Supervisory Organization** | PSD Chemistry: Faculty Support |

## Similar Jobs

Research Professional
Research Professional
Research Professional
Research Professional

THE UNIVERSITY OF CHICAGO

Research Professional 1
Research Professional – Memory Center
Research Professional Specialist
Staff Scientist
Staff Scientist

THE UNIVERSITY OF CHICAGO | Campus and Student Life International Affairs

October 3, 2023

**ADDITIONAL $2,000 FEE IS *NOT* REQUIRED**

USCIS California Service Center
California Service Center
**PREMIUM PROCESSING**
**ATTN: CAP EXEMPT H-1B Premium Processing Unit**
24000 Avila Road, Room 2312
Laguna Niguel, CA 92607-1012

**Re: H-1B Consulate Processing Petition on behalf of Dr. Romit Chakraborty, PhD**

To Whom It May Concern:

On behalf of the University of Chicago, I am writing in support of the enclosed Form I-129, Petition for a Nonimmigrant Worker. Approval will allow the beneficiary to work as a Quantum-AI Researcher for the Department of Chemistry in the Physical Sciences Division at the University of Chicago.

**The Petitioner**

The University of Chicago, which was founded in 1892 and employs a staff of approximately 9,500, is a private, non-profit institution of higher education engaged in teaching and research. Fewer than 10% of employees are in H-1B or L status.

**The Position Offered**

The job titled **Quantum-AI Researcher**, is professional in nature and *requires the application of specialized knowledge* to perform the duties as required under **INA §214(i)(1)** and defined under **INA §214(h)(4)(ii)**. At a minimum, applicants for the position are expected to minimally have a PhD degree or the foreign equivalent in Chemistry, Biochemistry, Physics, or a related field; two years' experience or training in a related field is minimally required. For a detailed list of the requirements and duties, please see the enclosed University Job Description.

**The Beneficiary's Qualifications**

**Dr. Chakraborty** received a PhD degree in Chemistry on August 25, 2017, from The University of Chicago, Chicago, IL. Since then, **Dr. Chakraborty** has worked as a Postdoctoral Researcher Fellow for University of California, Berkeley, and Lawrence Berkeley National Laboratory. Copies of his PhD diploma, transcripts and CV are enclosed.

THE UNIVERSITY OF CHICAGO | Campus and Student Life International Affairs
1427 East 60th Street, Rm 251, Chicago, IL 60637
773.702.7752 | Fax 773.702.3058
international-affairs@uchicago.edu | https://internationalaffairs.uchicago.edu

THE UNIVERSITY OF CHICAGO | Campus and Student Life International Affairs

## Terms of Employment

The position of Quantum-Al Researcher is temporary and specialized in nature. If the petition is approved, it will enable **Dr. Chakraborty** to work and conduct advanced chemistry research conducting electronic structure simulations for complex system, with a focus on the development of tools for simulating clean energy materials as a Quantum-Al Researcher in the Department of Chemistry at the University of Chicago from **11/1/2023 through 10/31/2026**. His salary will be **$67,933** on an annual basis, plus he will be eligible for standard University benefits including health insurance.

## Eligibility for H-1B Status

**Dr. Chakraborty** has been in H-1B Status from 9/11/2020 to 9/10/2023 but had to leave the country. I am requesting to process this case as a Consulate Processing. He currently has time left in H-1B Status. Therefore, he is eligible for Consulate Processing for the period of H-1B status requested here.

## The University's Obligations as Petitioner

Throughout the period of **Dr. Chakraborty's** authorized stay, the University will meet all of its obligations as an H-1B petitioner. That will include, but not be limited to (1) complying with the terms of the enclosed Labor Condition Application, duly certified by the Department of Labor, and (2) covering the reasonable costs of return transportation to **India** in the unlikely event that **Dr. Chakraborty** is dismissed by the University of Chicago before **10/31/2026**, the end of the period covered by the petition.

In summary, I believe that the enclosed **Consulate Processing application** meets all H-1B requirements because the position is temporary, professional and specialized in nature as required under **INA §214(i)(1)** and defined under **INA §214(h)(4)(ii),** and the beneficiary has at least the minimum the qualifications to fill it. In the hope that you will agree, and on behalf of the University, I ask for your favorable consideration. If you need further information of any kind, please let me know.

Sincerely,

Reshecoa Flanders
International Scholar & Employee Adviser
Office of International Affairs
University of Chicago
shecoa@uchicago.edu

Encl.

**From:** Ericka Evans
**To:** Hannah Lawrence; Raven Jones
**Subject:** RE: Staff Scientist processing time?
**Date:** Friday, July 14, 2023 3:10:00 PM
**Attachments:** image001.png

---

Hello Hannah,

I actually consulted with OIA before I submitted the postdoctoral appointment to Christine. Romit is currently a postdoc at Berkeley on a cap exempt H-1B. Laura was a bit hesitate to hire him, because she wasn't aware that we would need to transfer his H-1B.

I just received an email from Christine and the Provost office did not approve the appointment because his experience exceeds the allowed limit. Laura initially stated she was not looking to hire him, and she was only interested in bringing him on as a postdoc. I will provide Laura with the information that Christine gave me, and update you once I know how Laura wishes to proceed.

**Ericka Evans**
Business Operations Administrator|Department of Chemistry
The University of Chicago | Physical Sciences Division
Email: erickaevans1@uchicago.edu
T: 773/834/3381

---

**From:** Hannah Lawrence <hkl@uchicago.edu>
**Sent:** Friday, July 14, 2023 1:52 PM
**To:** Ericka Evans <erickaevans1@uchicago.edu>; Raven Jones <rjones16@uchicago.edu>
**Subject:** RE: Staff Scientist processing time?

Ericka –
Moving Christine to BCC since we're moving forward with a staff position. I think we need to investigate this further, including consulting with OIA.

Given the salary budget, we should not proceed with a staff scientist job classification, but instead use a Research Professional. I'm not an expert on this, but we want to classify the job to align with the salary because H1B requirements will not allow us to pay someone below a certain level. I don't even know if sponsoring someone for a 1 year position makes sense or is allowable.

Please get us a job description and we'll consult with OIA.

When does the postdoc appointment expire? How much time do we have?

Thanks,
Hannah

---

**From:** Ericka Evans <erickaevans1@uchicago.edu>
**Sent:** Friday, July 14, 2023 11:39 AM
**To:** Raven Jones <rjones16@uchicago.edu>; Christine Taylo <ctaylo@uchicago.edu>
**Cc:** Hannah Lawrence <hkl@uchicago.edu>
**Subject:** RE: Staff Scientist processing time?

Hello All,

I was advised the salary for this position is generally $70,000 - $83,250. Laura mentioned she cant afford to pay $70k.

Please let me know if the salary can be $60k.

**Ericka Evans**
Business Operations Administrator|Department of Chemistry
The University of Chicago | Physical Sciences Division
Email: erickaevans1@uchicago.edu
T: 773/834/3381

---

**From:** Raven Jones <rjones16@uchicago.edu>
**Sent:** Friday, July 14, 2023 11:30 AM
**To:** Christine Taylo <ctaylo@uchicago.edu>
**Cc:** Hannah Lawrence <hkl@uchicago.edu>; Ericka Evans <erickaevans1@uchicago.edu>
**Subject:** Re: Staff Scientist processing time?

Hi Christine,

Moving Hannah to BCC. A staff position takes 1-2 weeks to post in Workday, after HR has received the job description and PPPC form from the PI/Dept to complete job leveling.

Once the position posts in Workday, we can hire the PDS after one week.

They will need I9 verification at the time of the hire date-- I believe the H1B application process can take 60-90days. If they do not have the appropriate documents, they will not be able to begin working until the forms are received.

I have looped in Ericka Evans to assist Gagliardi with the staff position.

Ericka-- Please see below and let me know if anything is needed on my end.

Sincerely,

**Raven Jones, MS-HRM**
**Human Resources Generalist**
rjones16@uchicago.edu
*The University of Chicago | Physical Sciences Division*

---

**From:** Christine Taylo <ctaylo@uchicago.edu>
**Sent:** Friday, July 14, 2023 10:48:05 AM
**To:** Raven Jones <rjones16@uchicago.edu>
**Cc:** Hannah Lawrence <hkl@uchicago.edu>
**Subject:** Staff Scientist processing time?

Hi Raven and Hannah,

Laura Gagliardi was hoping to hire someone as a postdoc who is just at the cut-off for postdoc eligibility. She specifically stated she had no intention to have them work for us for more than 1-year, but the Provost's Office notes that they recommend we hire them as a staff scientist.

I wanted to ask in advance of letting Laura know—what's the current processing time for a staff scientist hire? This person would require an H-1B visa too so I imagine that will add to the queue.

I will also ask Sharon for her advice on a research scientist position.

Kind regards,

***Christine Taylo*** (SHE/HER)
Assistant Director of Academic Affairs
The University of Chicago, Physical Sciences Division
P: (773) 702-7953 | E: ctaylo@uchicago.edu

---

**From:** The University of Chicago <noreply@interfolio.com>
**Sent:** Thursday, July 13, 2023 5:56 PM
**To:** Christine Taylo <ctaylo@uchicago.edu>
**Subject:** Romit Chakraborty

logo

Romit Chakraborty's case is now available for your review.

REVIEW CANDIDATE

Dear PSD,

Our office has reviewed the request to bring Romit Chakraborty in as a 7th year Postdoc Scholar and determined that we cannot approve the request. Since they are coming in as an external hire, we recommend that you hire them in as a Staff Scientist.

Best,
Janice Cobb

Powered by Interfolio | Support

**From:** Ericka Evans
**To:** Romit Chakraborty
**Cc:** Laura Gagliardi; Alfreda Grace
**Subject:** RE: INTERVIEW | Romit Chakraborty - Postdoctoral Research
**Date:** Tuesday, June 27, 2023 1:42:00 PM

Thanks for this information.

Since there is a visa involved, we will have to transfer the H-1B to the U of C. The Office of International Affairs will need 45-60 business days to process the transfer.

**Ericka Evans**
Business Operations Administrator|Department of Chemistry
The University of Chicago | Physical Sciences Division
Email: erickaevans1@uchicago.edu
T: 773/834/3381

**From:** Romit Chakraborty <romit@berkeley.edu>
**Sent:** Tuesday, June 27, 2023 1:13 PM
**To:** Ericka Evans <erickaevans1@uchicago.edu>
**Cc:** Laura Gagliardi <lgagliardi@uchicago.edu>; Alfreda Grace <gracea@uchicago.edu>
**Subject:** Re: INTERVIEW | Romit Chakraborty - Postdoctoral Research

Hi Ericka, Alfreda,

I'm on a cap-exempt H1B with Berkeley Lab at the moment.

best,
Romit

On Tue, Jun 27, 2023 at 11:11 AM Ericka Evans <erickaevans1@uchicago.edu> wrote:

> Hello Laura,
>
> Will the postdoc require or is the postdoc currently on a visa?
>
> **Ericka Evans**
> Business Operations Administrator|Department of Chemistry
> The University of Chicago | Physical Sciences Division
> Email: erickaevans1@uchicago.edu
> T: 773/834/3381
>
> **From:** Laura Gagliardi <lgagliardi@uchicago.edu>
> **Sent:** Tuesday, June 27, 2023 12:59 PM
> **To:** Romit Chakraborty <romit@berkeley.edu>
> **Cc:** Alfreda Grace <gracea@uchicago.edu>; Ericka Evans <erickaevans1@uchicago.edu>
> **Subject:** Re: INTERVIEW | Romit Chakraborty - Postdoctoral Research
>
> Dear Romit
>
> I am sorry for my slow response. I am at a conference. I will write to Juan but he is very busy. I hope we can talk in the next couple of days.
>
> Ericka: how long will it take to have a postdoctoral offer approved, if Juan and I decided to make it?
>
> Romit: do you have an other option in hand?
>
> Thank you
>
> Laura
> ------------------------------------------------------------------------
> Laura Gagliardi
> Richard and Kathy Leventhal Professor
> Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute,
> Director of the Chicago Center for Theoretical Chemistry
>
> Department of Chemistry

The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
------------------------------------------------------------------------

On Jun 27, 2023, at 12:54 PM, Romit Chakraborty <romit@berkeley.edu> wrote:

Dear Laura,

I hope you are doing well!

Thank you once again for the opportunity to work with you. I am thrilled at the possibility of further expanding my research horizons under you and Prof. de Pablo and remain interested in meeting with both of you at your convenience.

I want to bring to your attention an important matter regarding my visa status. My current visa sponsorship ends on September 10th, and to ensure a seamless transition, I need to apply for a transfer of my visa petition at least two months before this date if I wish to work for a new employer. This means a job offer is needed by early July to facilitate the process and avoid complications.

I understand the complexities involved in these procedures, and I appreciate your understanding and support as we navigate this together.

Best regards,
Romit

On Thu, Jun 22, 2023 at 3:52 PM Romit Chakraborty <romit@berkeley.edu> wrote:

> Dear Laura,
>
> Thank you for your suggestions and the fellowship information.
>
> Given your advice, I would like to take advantage of the co-advisory opportunity with you and Professor De Pablo. I'm eager to start at or just before September 10th, in time for the EFRC meeting.
>
> I am excited to meet Professor De Pablo and can prepare a concise presentation for DFT parameterized LBM and its applications. Looking forward to your guidance on the next steps!
>
> Best,
> Romit
>
> On Thu, Jun 22, 2023 at 5:45 AM Laura Gagliardi <lgagliardi@uchicago.edu> wrote:
>
>> Dear Romit,
>>
>> You are welcome to apply for a fellowship when they are open.
>> There is also this one
>>
>> https://cctch.uchicago.edu
>>
>> https://cctch.uchicago.edu/opportunities/
>>
>> But usually people who have just finished their PhD are preferred for these fellowships.
>>
>> If you prefer to work only with my group, I can make you an offer in which I am the solely PI. However perhaps working both with me and with Prof de Pablo may be a good way to widen your horizons and he can eventually write a reference letter for you.
>> He would like to have a zoom meeting with you if we decide to do this collaborative project.
>>
>> In October we have the all hands meeting of our EFRC, I think that if you could start no later than the first week in October it would be good.
>>
>> Let me know if you would like to have a meeting with de Pablo in which we discuss a joint project or if you prefer an offer solely from me.
>>
>> Best

Laura

------------------------------------------------------------------------

Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute,
Director of the Chicago Center for Theoretical Chemistry

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu

------------------------------------------------------------------------

On Jun 22, 2023, at 2:52 AM, Romit Chakraborty <romit@berkeley.edu> wrote:

Dear Laura,

I hope this message finds you thriving in Lake Como. I am excited and sincerely appreciative of the opportunity you've presented me.

Should I have to choose, my preference would certainly be to work with you given your expertise in electronic structure theory and MOFs. However, I'm also very interested in the work of Professor De Pablo. His extensive knowledge in Lattice Boltzmann Methods (LBM) could significantly complement my current research interests in multiscale modeling of capillary condensation in MOFs. In fact, an intriguing project idea that comes to mind is to integrate DFT binding energies with LBM tools for the modeling of type IV isotherm phenomena, commonly observed in water-harvesting MOFs. Such an endeavor would greatly benefit from the insights and experience of both you and Professor De Pablo.

In an ideal world, it would be fantastic if this could happen within the context of a prestigious fellowship such as the Kadanoff-Rice. I understand that timing might be a challenging variable here, so I wanted to share my availability. My current appointment with Martin is until September 10th. However, he is quite understanding, and it might be possible to negotiate an earlier start date if required. On the flip side, if I were to begin later, around mid-November, I could spend some interim time as a Lecturer with the MSSE at Berkeley.

Of course, your preferences are an essential part of this equation, and I'm eager to align my plans with your requirements.

Apologies for these additional considerations. I simply wanted to ensure we explore all potential avenues to make this collaboration as fruitful as possible. I eagerly await your feedback and further direction.

Best regards,
Romit

On Wed, Jun 21, 2023 at 11:06 PM Laura Gagliardi <lgagliardi@uchicago.edu> wrote:

> Dear Romit
>
> Would you prefer to work with both Juan and me or only me?
>
> If you are interested in a jointly advised postdoc, we need to schedule a meeting with Juan.
>
> Best
>
> Laura
>
> ------------------------------------------------------------------------
>
> Laura Gagliardi
> Richard and Kathy Leventhal Professor
> Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute,
> Director of the Chicago Center for Theoretical Chemistry
>
> Department of Chemistry
> The University of Chicago
> 5735 S Ellis Ave, Chicago, IL 60637

Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
------------------------------------------------------------------------

On Jun 21, 2023, at 7:16 PM, Romit Chakraborty <romit@berkeley.edu> wrote:

Dear Laura,

I should be open to that!

Sincerely,
Romit

On Wed, Jun 21, 2023 at 4:13 AM Laura Gagliardi <lgagliardi@uchicago.edu> wrote:

Dear Romit,

I talked with de Pablo. He is I'm principle interested in hiring a postdoc jointly with my group. So this could be a possibility.
However I checked the salaries of my postdocs and I also discussed with Juan about salaries and the highest salary we could offer you is 60 K/Year.
So before moving further, let me know if this is still something that would interest you or we should just let it go.

Best,

Laura

------------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute,
Director of the Chicago Center for Theoretical Chemistry

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
------------------------------------------------------------------------

On Jun 19, 2023, at 12:15 PM, Romit Chakraborty <romit@berkeley.edu> wrote:

Hi Laura,

Thanks for sharing the link to the MOF school!
I attach here my CV with a small update for a recently published paper.

Best regards,
Romit

On Mon, Jun 19, 2023 at 8:35 AM Laura Gagliardi <lgagliardi@uchicago.edu> wrote:

I am ready

------------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering,
James Franck Institute,
Director of the Chicago Center for Theoretical Chemistry

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu

------------------------------------------------------------------------

On Jun 19, 2023, at 10:02 AM, Romit Chakraborty
<romit@berkeley.edu> wrote:

Hello,

I am on standby for this meeting.

Best regards,
Romit

On Wed, Jun 7, 2023 at 7:28 AM Alfreda Grace
<gracea@uchicago.edu> wrote:

Hi there,

Alfreda Grace is inviting you to a scheduled Zoom meeting.

## Join Zoom Meeting

One tap mobile: US: +13092053325,,[redacted]#,,,,*[redacted]# or
+13126266799,,[redacted]#,,,,*[redacted]#

Meeting URL: [redacted]

Meeting ID: [redacted]
Passcode: [redacted]

### Join by Telephone

For higher quality, dial a number based on your current location.
Dial:
+1 309 205 3325 US
+1 312 626 6799 US (Chicago)
+1 646 558 8656 US (New York)
+1 646 931 3860 US
+1 301 715 8592 US (Washington DC)
+1 305 224 1968 US
+1 564 217 2000 US
+1 669 444 9171 US
+1 669 900 9128 US (San Jose)
+1 689 278 1000 US
+1 719 359 4580 US
+1 253 205 0468 US
+1 253 215 8782 US (Tacoma)
+1 346 248 7799 US (Houston)
+1 360 209 5623 US
+1 386 347 5053 US
+1 507 473 4847 US

Meeting ID: [redacted]

Passcode: [redacted]

International numbers

### Join from an H.323/SIP room system

H.323: 162.255.37.11 (US West)

162.255.36.11 (US East)
115.114.131.7 (India Mumbai)
115.114.115.7 (India Hyderabad)
213.19.144.110 (Amsterdam Netherlands)
213.244.140.110 (Germany)
103.122.166.55 (Australia Sydney)
103.122.167.55 (Australia Melbourne)
149.137.40.110 (Singapore)
64.211.144.160 (Brazil)
149.137.68.253 (Mexico)
69.174.57.160 (Canada Toronto)
65.39.152.160 (Canada Vancouver)
207.226.132.110 (Japan Tokyo)
149.137.24.110 (Japan Osaka)

Meeting ID: [redacted]
Passcode: [redacted]
SIP: [redacted]
Passcode: [redacted]

**Skype for Business (Lync)**

[redacted]

<RC_Academic.pdf>

**From:** Ericka Evans
**To:** Romit Chakraborty
**Cc:** Laura Gagliardi; Alfreda Grace
**Subject:** RE: Romit Chakraborty
**Date:** Thursday, July 27, 2023 1:41:00 PM
**Attachments:** image001.png

---

Thanks Romit but the Office of International Affairs doesn't process O-1 applications. If you are currently on an H-1B, the H-1B should be transferred.

Currently, we are still waiting on the job posting approval. When this is complete I will contact you concerning the H-1B.

**Ericka Evans**
Business Operations Administrator|Department of Chemistry
The University of Chicago | Physical Sciences Division
Email: erickaevans1@uchicago.edu
T: 773/834/3381

---

**From:** Romit Chakraborty <romit@berkeley.edu>
**Sent:** Thursday, July 27, 2023 1:03 PM
**To:** Ericka Evans <erickaevans1@uchicago.edu>
**Cc:** Laura Gagliardi <lgagliardi@uchicago.edu>; Alfreda Grace <gracea@uchicago.edu>
**Subject:** Re: Romit Chakraborty

Hi Ericka, cc Laura, Alfreda,

Thank you!

I wanted to mention this if it helped with the approval, or if it could make the process easier. I am eligible for an O1A visa, in addition to the cap-exempt H1B. Since the O1A visa requirements are more stringent than an H1B, I have confirmed my eligibility under this category with my immigration attorney, who can assist in its processing. The cost and timeline are similar for the two types. O1A has a shorter processing time for eligible candidates. I've included more info for you in the notes and details below.

Best regards,
Romit

Notes and Details:

| | Cap-Exempt H1B Visa | O1A Visa |
|---|---|---|
| Basic Filing Fees | Approx. $460 | Approx. $460 |
| Additional Fees | Premium Processing fee ($2,500) | Premium Processing fee ($2,500) |
| Attorney Fees | Typically 1,000 – 3,000 | Typically 2,000 – 5,000 or more |
| Timeline (w/o Premium Processing) | A few months to over a year | Typically a few months |
| Timeline (with Premium Processing) | Approx. 15 calendar days | Approx. 15 calendar days |

* Premium processing fee can be covered by the applicant (me).
* You may have to confirm with the hiring attorney the exact fee pricing.

On Thu, Jul 27, 2023 at 9:12 AM Ericka Evans <erickaevans1@uchicago.edu> wrote:

> Hello All,
>
> **Romit-** No problem! Currently we are working to get the position approved and posted to Workday. As you may know, processing H-1Bs are quite lengthy, and this adds an extra layer to the job posting approval process.
>
> If anything is needed from your end, I will contact you.
>
> **Ericka Evans**
> Business Operations Administrator|Department of Chemistry
> The University of Chicago | Physical Sciences Division
> Email: erickaevans1@uchicago.edu
> T: 773/834/3381
>
> ---
>
> **From:** Romit Chakraborty <romit@berkeley.edu>
> **Sent:** Thursday, July 27, 2023 10:25 AM
> **To:** Laura Gagliardi <lgagliardi@uchicago.edu>
> **Cc:** Alfreda Grace <gracea@uchicago.edu>; Ericka Evans <erickaevans1@uchicago.edu>

**Subject:** Re: Romit Chakraborty

Dear Laura, Alreda, Ericka,

Thank you for submitting the request!
Please do let me know if you need any further details.

Best regards,
Romit

On Thu, Jul 27, 2023 at 8:14 AM Laura Gagliardi <lgagliardi@uchicago.edu> wrote:

> Hi Romit
>
> We submitted the request to hire you to the Dean's office. Perhaps Ericka can gives us a short update on where things are.
>
> Thank you
>
> Laura
> ------------------------------------------------------------------------
> Laura Gagliardi
> Richard and Kathy Leventhal Professor
> Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute,
> Director of the Chicago Center for Theoretical Chemistry
>
> Department of Chemistry
> The University of Chicago
> 5735 S Ellis Ave, Chicago, IL 60637
> Email: lgagliardi@uchicago.edu
> Group Web Site: https://gagliardigroup.uchicago.edu
> ------------------------------------------------------------------------
>
> On Jul 27, 2023, at 10:04 AM, Romit Chakraborty <romit@berkeley.edu> wrote:
>
> Dear Laura, Alfreda,
>
> I was checking in very briefly about this. Would you require anything more at my end for this?
>
> Best regards,
> Romit
>
> On Tue, Jul 18, 2023 at 4:09 PM Romit Chakraborty <romit@berkeley.edu> wrote:
>
>> Dear Laura, Alfreda,
>>
>> Please find the PPPC form attached. Please feel to edit or suggest changes as needed. I've left the FAS section blank for now.
>> Hope this helps!
>>
>> Best regards,
>> Romit
>>
>> On Tue, Jul 18, 2023 at 4:02 PM Romit Chakraborty <romit@berkeley.edu> wrote:
>>
>>> Dear Laura, and Alfreda,
>>>
>>> Attaching Form 1: Job Posting Template.
>>> Apologies in advance for taking liberties here. Please feel free to edit as needed or suggest alterations. I will be sending out the PPPC form shortly.
>>>
>>> Best regards,
>>> Romit
>>>
>>> On Tue, Jul 18, 2023 at 12:26 PM Laura Gagliardi <lgagliardi@uchicago.edu> wrote:
>>>
>>>> Dear Romit
>>>>
>>>> Can you please fill in the forms below as much as you can and I will fill in the remaining parts.
>>>>
>>>> Thank you
>>>>
>>>> Laura

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute,
Director of the Chicago Center for Theoretical Chemistry

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
-----------------------------------------------------------------------

Begin forwarded message:

**From:** Ericka Evans <erickaevans1@uchicago.edu>
**Subject: RE: Romit Chakraborty**
**Date:** July 18, 2023 at 11:51:25 AM CDT
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Cc:** Alfreda Grace <gracea@uchicago.edu>

Hello Laura,

If you are okay with the benefits information that I provided, we can move forward with the hiring process. Please complete the attached JD & PPPC form. When the forms are received, I will verify the salary amount with the Office of International Affairs. Due to Romit being a H-1B visa holder, the salary has to be at a certain level.

Please let me know if you would like to view a research professional job description that was already posted as an example, and I can provide it to you.

**Ericka Evans**

Business Operations Administrator|Department of Chemistry

The University of Chicago | Physical Sciences Division

Email: erickaevans1@uchicago.edu

T: 773/834/3381

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Sent:** Monday, July 17, 2023 5:15 PM
**To:** Ericka Evans <erickaevans1@uchicago.edu>
**Cc:** Alfreda Grace <gracea@uchicago.edu>
**Subject:** Re: Romit Chakraborty

Hi Ericka

I have talked more with Romit. Do you have any follow-up information about the possibility of hiring him as a research professional?

Thank you

Laura

-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute,
Director of the Chicago Center for Theoretical Chemistry

Department of Chemistry

The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
--------------------------------------------------------------------

On Jul 14, 2023, at 3:19 PM, Ericka Evans <erickaevans1@uchicago.edu> wrote:

My apologies, Hannah advised given the salary budget, we should not proceed with a staff scientist job classification, but instead use a Research Professional if you wish to hire Romit.

**Ericka Evans**

Business Operations Administrator|Department of Chemistry

The University of Chicago | Physical Sciences Division

Email: erickaevans1@uchicago.edu

T: 773/834/3381

---

**From:** Ericka Evans
**Sent:** Friday, July 14, 2023 3:16 PM
**To:** Laura Gagliardi <lgagliardi@UCHICAGO.EDU>
**Cc:** Alfreda Grace <gracea@UCHICAGO.EDU>
**Subject:** Romit Chakraborty

Hello Laura & Alfreda,

Unfortunately, the Provost's Office did not approve our request to appoint Romit Chakraborty as a postdoctoral researcher. Romit's postdoctoral experience and the award of the PhD, exceeds the allowed limit.

As I previously mentioned, if you would like to bring Romit onboard, the only option is to hire him as a Research Scientist (OAA) or a Staff Scientist. Please let me know if you wish to proceed with either hiring process.

**Ericka Evans**

Business Operations Administrator|Department of Chemistry

The University of Chicago | Physical Sciences Division

Email: erickaevans1@uchicago.edu

T: 773/834/3381

**From:** Ericka Evans
**To:** Romit Chakraborty
**Subject:** Re: JR23432 Quantum-AI Researcher
**Date:** Friday, August 11, 2023 4:13:52 PM

No problem!

Thanks,
Ericka Evans

---

**From:** Romit Chakraborty <romit@berkeley.edu>
**Sent:** Friday, August 11, 2023 3:50:15 PM
**To:** Ericka Evans <erickaevans1@uchicago.edu>
**Subject:** Re: JR23432 Quantum-AI Researcher

Dear Ericka,

Great! I am keeping the HR in Berkeley in the loop so we can follow up quickly on this. Thank you for everything, Ericka!

Best regards,
Romit

On Fri, Aug 11, 2023 at 1:19 PM Ericka Evans <erickaevans1@uchicago.edu> wrote:

> You are welcome. I will email you sometime between 08/21- 08/25 for the H-1B documents.
>
> **Ericka Evans**
>
> Business Operations Administrator|Department of Chemistry
>
> The University of Chicago | Physical Sciences Division
>
> Email: erickaevans1@uchicago.edu
>
> T: 773/834/3381
>
> ---
>
> **From:** Romit Chakraborty <romit@berkeley.edu>
> **Sent:** Friday, August 11, 2023 3:07 PM
> **To:** Ericka Evans <erickaevans1@uchicago.edu>
> **Cc:** Laura Gagliardi <lgagliardi@uchicago.edu>; Alfreda Grace <gracea@uchicago.edu>
> **Subject:** Re: JR23432 Quantum-AI Researcher

Dear Ericka,

Thank you for making this super clear.
I'll keep my eyes peeled and ensure my referee letters are turned in!

Best regards,

Romit

On Fri, Aug 11, 2023 at 11:41 AM Ericka Evans <erickaevans1@uchicago.edu> wrote:

> Thanks for the update. The position must remain posted for 7 days. Afterwards, we can begin the hiring process. The hiring process must be successfully completed first, before we can begin the H-1B transfer. This includes passing a background and reference check.
>
> When the hiring process is completed, I can submit the H-1B transfer to the Office of International Affairs. I will send you a separate email to collect what will be needed from your end to process the transfer. This way, when you have successfully passed the background and reference check, I can move forward with the process.
>
> **Ericka Evans**
>
> Business Operations Administrator|Department of Chemistry
>
> The University of Chicago | Physical Sciences Division
>
> Email: erickaevans1@uchicago.edu
>
> T: 773/834/3381
>
> ---
>
> **From:** Romit Chakraborty <romit@berkeley.edu>
> **Sent:** Friday, August 11, 2023 12:25 PM
> **To:** Ericka Evans <erickaevans1@uchicago.edu>
> **Cc:** Laura Gagliardi <lgagliardi@uchicago.edu>; Alfreda Grace <gracea@uchicago.edu>
> **Subject:** Re: JR23432 Quantum-AI Researcher
>
> Dear Ericka, Laura, Alfreda,
>
> Thank you, so much (!!), for sharing the posting. I have turned in my application!

> Best regards,
>
> Romit
>
> On Fri, Aug 11, 2023 at 8:28 AM Ericka Evans <erickaevans1@uchicago.edu> wrote:
>
>> Hello Romit,
>>
>> The **JR23432 Quantum-AI Researcher** position is now posted in Workday. Please apply to the position using the link below. When you have done so, please email me.
>>
>> https://uchicago.wd5.myworkdayjobs.com/External/job/Chicago-IL/Quantum-AI-Researcher_JR23432
>>
>> **Ericka Evans**
>>
>> Business Operations Administrator|Department of Chemistry
>>
>> The University of Chicago | Physical Sciences Division
>>
>> Email: erickaevans1@uchicago.edu
>>
>> T: 773/834/3381

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 19

## UC Berkeley production: recruitment, references, and Oxford correspondence

A: UCB_000034–000035 (original PDF). B: UCB_000043. C: UCB_000051. D: UCB_000135. E: UCB_000137. F: UCB_000023 and UCB_000025. G: UCB_000130 and UCB_000136. H: UCB_000123 (complete three-page original PDF).

Email records B–G are printouts of the decoded text of the original native-produced EML files, including nested correspondence. Line wrapping is reformatted for legibility. The native identifier is retained; it is not a page number. Inline images and separately attached files are not reproduced unless separately identified here. Incidental meeting-access credentials, if present, are redacted.

**From:** Martin HEAD-GORDON <mhg@cchem.berkeley.edu>
**Sent:** Friday, June 30, 2023 12:35 AM PDT
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: letter of support for Romit Chakraborty

Ok — note I am on a train in the Alps to begin with, will be on the platform at Aigle at 10:30 if we have connection problems at 10:00

On Fri, Jun 30, 2023 at 09:23, Laura Gagliardi<lgagliardi@uchicago.edu> wrote:

I will call you at about 10 am from [redacted]

Laura Gagliardi
Sent from my iPhone

On Jun 30, 2023, at 8:27 AM, Martin HEAD-GORDON<mhg@cchem.berkeley.edu> wrote:

Hi Laura,

Those are reasonable concerns, and you should raise them with Romit, in addition to any discussion we have. I am also in Europe, and have a day of mostly train travel between Switzerland and Frankfurt today. I am not confident of zoom, but you can reach me by cell phone between 9:30 and roughly 5:00PM: [redacted]

Best wishes, Martin

On Thu, Jun 29, 2023 at 10:05 AM Laura Gagliardi<lgagliardi@uchicago.edu> wrote:

Dear Martin

Thank you for your email and the letter. I appreciate your confidence in Romit's abilities. However, I do have concerns regarding his current situation. Given his too extended postdoctoral (for US standards), it may prove challenging for him to secure an academic job in the United States.

Additionally, based on my interactions with Romit, it appears that his primary focus lies in obtaining a position that will maintain his visa status while simultaneously pursuing a faculty position. This raises concerns that during his time in my group, he may not be fully dedicated to acquiring new skills and knowledge, as his primary objective will likely remain on job hunting.

As a result, I am worried that after spending one or two years in my group, Romit may still be searching for employment, potentially hindering his ability to actively engage in the learning process during his time with us.

I am in Europe. Let me know if you would like to have a quick zoom at a time that is convenient for both of us.

Best,
Laura

------------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute,
Director of the Chicago Center for Theoretical Chemistry

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
------------------------------------------------------------------------

On Jun 29, 2023, at 2:36 AM, Martin HEAD-GORDON<mhg@cchem.berkeley.edu> wrote:

Dear Laura,

I attach my letter of recommendation for Romit. Note this is the letter I wrote supporting his application for "faculty" positions. He has done very good work at Berkeley, and has been

unfortunate to not yet secure a suitable faculty position -- he has certainly come very close with a bunch of zoom interviews and at least 3 on-site interviews. Now he is "termed out" at Berkeley (normally limited to 5 years, and I was able to get a special extension due to COVID), and in need of an excellent postdoc. Your group would be ideal -- Romit would have zero learning curve to contribute to your MOF directions -- and it would benefit him to contribute to materials design and function issues that lie beyond hydrogen storage.

As a postdoc candidate, he is off-scale -- he writes extremely well, has cooperated efficiently in large teams, and works with minimal supervision. He has even given presentations on my behalf!

I would be happy to chat with you by phone or zoom if you would like to talk about his application in more detail.

Best wishes, Martin

--
Martin Head-Gordon (he/him/his)
Kenneth S. Pitzer Distinguished Professor, Dept. of Chemistry, Univ. of California, Berkeley, and,
Senior Faculty Scientist, Chemical Sciences Division, Lawrence Berkeley National Laboratory
<chakraborty_romit_2023.pdf>

--
Martin Head-Gordon (he/him/his)
Kenneth S. Pitzer Distinguished Professor, Dept. of Chemistry, Univ. of California, Berkeley, and,
Senior Faculty Scientist, Chemical Sciences Division, Lawrence Berkeley National Laboratory

--
Martin Head-Gordon (he/him/his)
Kenneth S. Pitzer Distinguished Professor, Dept. of Chemistry, Univ. of California, Berkeley, and,
Senior Faculty Scientist, Chemical Sciences Division, Lawrence Berkeley National Laboratory

# Exhibit 19B — UCB_000043

Text printout of the native-produced email UCB_000043.eml; full decoded text body and nested correspondence. Formatting reflowed; source wording retained.

From: Martin HEAD-GORDON <mhg@cchem.berkeley.edu>
To: Laura Gagliardi <lgagliardi@uchicago.edu>
Cc:
Date: Mon, 17 Jul 2023 12:47:05 -0700
Subject: Re: Romit Chakraborty

Hi Laura,

As always, the benefit to some career move depends entirely on what comes from it, so in this case I think joining your group is likely to be very beneficial to Romit. He is already a strong candidate for faculty positions, and could become stronger in this way. As I mentioned before, I will continue to strongly support Romit's faculty applications into the future. Happy to talk more if this would be helpful.

Best wishes,

Martin

On Sat, Jul 15, 2023 at 7:32 AM Laura Gagliardi <lgagliardi@uchicago.edu> wrote:

> Dear Romit,
>
> On Monday I will have some additional information.
> In the event that there is an opportunity to hire you as a research
> scientist, I would like to inquire about your potential commitment to this
> position.
>
> Martin, could you advice on whether it would be a beneficial strategic
> move for Romit to eventually join my research group as a research scientist.
> Alternatively, do you think it would be more advantageous for him to focus
> on applying for faculty positions?
>
> Best
>
> Laura
> ----------------------------------------------------------------------
> Laura Gagliardi
> Richard and Kathy Leventhal Professor
> Department of Chemistry, Pritzker School of Molecular Engineering,
> James Franck Institute,
> Director of the Chicago Center for Theoretical Chemistry
>
> Department of Chemistry
> The University of Chicago
> 5735 S Ellis Ave, Chicago, IL 60637
> Email: lgagliardi@uchicago.edu <lgagliardi@uchicago.edu>
> Group Web Site: https://gagliardigroup.uchicago.edu

> ----------------------------------------------------------------------
>
> On Jul 15, 2023, at 9:07 AM, Romit Chakraborty <romit@berkeley.edu> wrote:
>
> Dear Laura,
>
> Thank you for trying on my behalf.
> Please do let me know if there is a glimmer of a possibility in this
> direction.
>
> Best regards,
> Romit
>
>
> On Fri, Jul 14, 2023 at 5:01 PM Martin HEAD-GORDON <mhg@cchem.berkeley.edu>
> wrote:
>
>> Dear Laura,
>>
>> Thanks for trying, on Romit's behalf, and I am very sorry that it could
>> not work out.
>>
>> Romit -- I can touch base with you on Sunday afternoon about other
>> options.
>>
>> All best wishes,
>>
>> Martin
>>
>> On Fri, Jul 14, 2023 at 4:14 PM Laura Gagliardi <lgagliardi@uchicago.edu>
>> wrote:
>>
>>> Dear Romit,
>>>
>>> Unfortunately I have to share with you the information below. We did not
>>> get approval from the provost to hire you as a postdoc. I am looking into
>>> other options, but it seems unlikely that I will be able to hire you as a
>>> research scientist, because the financial commitment is very different
>>> compared to a postdoctoral position, also because of your visa requirement.
>>> Moreover it would not make sense to hire you in such a position for a
>>> limited amount of time.
>>> I will have some more information on Monday, but given this situation it
>>> seems unlikely that I will be able to make you an offer.
>>>
>>> I am sorry for it.
>>>
>>> Best,
>>>
>>> Laura
>>> ----------------------------------------------------------------------
>>> Laura Gagliardi

>>> Richard and Kathy Leventhal Professor
>>> Department of Chemistry, Pritzker School of Molecular Engineering,
>>> James Franck Institute,
>>> Director of the Chicago Center for Theoretical Chemistry
>>>
>>> Department of Chemistry
>>> The University of Chicago
>>> 5735 S Ellis Ave, Chicago, IL 60637
>>> <https://www.google.com/maps/search/5735+S+Ellis+Ave,+Chicago,+IL+60637?entry=gmail&source=g>
>>> Email: lgagliardi@uchicago.edu <lgagliardi@uchicago.edu>
>>> Group Web Site: https://gagliardigroup.uchicago.edu
>>> ----------------------------------------------------------------------
>>>
>>> Begin forwarded message:
>>>
>>> *From: *Ericka Evans <erickaevans1@uchicago.edu>
>>> *Subject: **Romit Chakraborty*
>>> *Date: *July 14, 2023 at 3:15:44 PM CDT
>>> *To: *Laura Gagliardi <lgagliardi@uchicago.edu>
>>> *Cc: *Alfreda Grace <gracea@uchicago.edu>
>>>
>>> Hello Laura & Alfreda,
>>>
>>>
>>>
>>> Unfortunately, the Provost’s Office did not approve our request to
>>> appoint Romit Chakraborty as a postdoctoral researcher. Romit’s
>>> postdoctoral experience and the award of the PhD, exceeds the allowed limit.
>>>
>>>
>>>
>>>
>>>
>>>
>>> *Ericka Evans*
>>>
>>> Business Operations Administrator|Department of Chemistry
>>>
>>> The University of Chicago | Physical Sciences Division
>>>
>>> Email: *erickaevans1@uchicago.edu <erickaevans1@uchicago.edu>*
>>>
>>> T: 773/834/3381
>>>
>>>
>>>
>>>
>>>
>>
>> --
>> Martin Head-Gordon (he/him/his)

>> Kenneth S. Pitzer Distinguished Professor, Dept. of Chemistry, Univ. of
>> California, Berkeley, and,
>> Senior Faculty Scientist, Chemical Sciences Division, Lawrence Berkeley
>> National Laboratory
>>
>
>

--
Martin Head-Gordon (he/him/his)
Kenneth S. Pitzer Distinguished Professor, Dept. of Chemistry, Univ. of
California, Berkeley, and,
Senior Faculty Scientist, Chemical Sciences Division, Lawrence Berkeley
National Laboratory

# Exhibit 19C — UCB_000051

Text printout of the native-produced email UCB_000051.eml; full decoded text body and nested correspondence. Formatting reflowed; source wording retained.

From: Li Guo <llguo@lbl.gov>
To: Martin HEAD-GORDON <mhg@cchem.berkeley.edu>
Cc: Laura Gagliardi <lgagliardi@uchicago.edu>
Date: Wed, 23 Aug 2023 09:36:55 -0700
Subject: Re: Accelerating Onboarding

Hi Martin, Just note from IRSO/HR perspective, we have no time to prepare and file for his H1B visa extension at this point. thanks, Larry

On Wed, Aug 23, 2023 at 9:30 AM Martin HEAD-GORDON <mhg@cchem.berkeley.edu> wrote:

> Dear Laura and Romit,
>
> I will look again, but I do not think this is possible.
>
> Best wishes, Martin
>
> On Wed, Aug 23, 2023 at 6:29 AM Laura Gagliardi <lgagliardi@uchicago.edu>
> wrote:
>
>> Dear Martin,
>>
>> The process for Romit's visa transfer is going to take a long time. If
>> you could fins a way to extend his contract at Berkeley for a couple of
>> extra months, it would be very helpful. Otherwise Romit will have to go
>> back to India until his visa is ready.
>>
>> Thank you for your help. Let me know if you would like to talk about it
>> in zoom call.
>>
>> Best,
>>
>> Laura
>> ------------------------------------------------------------------------
>> Laura Gagliardi
>> Richard and Kathy Leventhal Professor
>> Department of Chemistry, Pritzker School of Molecular Engineering,
>> James Franck Institute,
>> Director of the Chicago Center for Theoretical Chemistry
>>
>> Department of Chemistry
>> The University of Chicago
>> 5735 S Ellis Ave, Chicago, IL 60637
>> Email: lgagliardi@uchicago.edu
>> Group Web Site: https://gagliardigroup.uchicago.edu
>> ------------------------------------------------------------------------
>>

>> On Aug 22, 2023, at 11:39 PM, Romit Chakraborty <romit@berkeley.edu>
>> wrote:
>>
>> Hi Martin,
>>
>> I hope you're doing well. I am looping you in on some logistical hiccups
>> as I navigate this transition to UChicago. The attached thread lays out the
>> timelines and some challenges.
>>
>> I've been pushing hard, trying to align everything with ongoing research.
>> Laura has been near-angelic from her end too. Best regards,
>>
>> Romit
>> ---------- Forwarded message ---------
>> From: Romit Chakraborty <romit@berkeley.edu>
>> Date: Tue, Aug 22, 2023 at 8:15 PM
>> Subject: Fwd: Accelerating Onboarding
>> To: <llguo@lbl.gov>
>>
>>
>> Dear Larry,
>>
>> I should forward this information to you regarding the transition to
>> UChicago.
>> Is there any way this can be facilitated at the Berkeley end?
>>
>> Best regards,
>> Romit
>>
>> ---------- Forwarded message ---------
>> From: Daniel Ashton <dashton@uchicago.edu>
>> Date: Tue, Aug 22, 2023 at 7:40 PM
>> Subject: RE: Accelerating Onboarding
>> To: Romit Chakraborty <romit@berkeley.edu>
>> Cc: Ericka Evans <erickaevans1@uchicago.edu>, Laura Gagliardi <
>> lgagliardi@uchicago.edu>, Reshecoa Flanders <shecoa@uchicago.edu>, Nick
>> Seamons <nseamons@uchicago.edu>
>>
>>
>> Good evening Romit.
>>
>>
>>
>> Once you have a valid offer letter, Ericka will submit the H-1B request
>> to OIA on your behalf. Processing, filing, adjudication, and receipt of
>> either the physical H-1B Receipt Notice or H-1B Approval Notices takes
>> about 50 days (with expedited Premium Processing). You must be in a valid
>> H-1B status if we're going to transfer/port your H-1B to UChicago (with you
>> remaining in the U.S.). Once your current status ends, you have a 10-day
>> grace period to remain in the U.S., or a 60-day grace period if you have
>> time remaining on your current I-797 Approval Notice and your job is being

>> cut short. Ultimately, it is your responsibility to maintain your H-1B
>> status until we can take over sponsorship.
>>
>>
>>
>> If we are unable to port/transfer your H-1B to UChicago in a timely
>> manner (with you remaining in the U.S.), then the only option would be an
>> OSEAS/consular processing H-1B application which would require you to
>> depart, wait for filing and approval of the H-1B application, apply for a
>> new H-1B entry visa (if applicable), and reenter.
>>
>>
>>
>> There are a lot of moving parts, and OIA would need to review the job
>> description, your CV/resume, your current H-1B Approval Notice, and know
>> the offered salary to better analyze what’s feasible. However, based on
>> what you’ve stated below I have concerns about whether you’ll be able to
>> remain in the U.S. and have your H-1B ported to UChicago—without you having
>> to depart/reenter.
>>
>>
>>
>> *Dan Ashton, JD*
>>
>> Associate Director, Scholar & Employee Services
>>
>> Office of International Affairs
>> <http://internationalaffairs.uchicago.edu/> | The University of Chicago
>> <http://uchicago.edu/>
>>
>> 1427 E. 60th Street, Suite 251| Chicago, IL 60637, USA
>>
>> Phone: 773.702.4302 | Fax: 773.702.3058 | dashton@uchicago.edu
>>
>>
>>
>> *From:* Romit Chakraborty <romit@berkeley.edu>
>> *Sent:* Tuesday, August 22, 2023 7:22 PM
>> *To:* Daniel Ashton <dashton@uchicago.edu>
>> *Cc:* Ericka Evans <erickaevans1@uchicago.edu>; Laura Gagliardi <
>> lgagliardi@uchicago.edu>
>> *Subject:* Accelerating Onboarding
>>
>>
>>
>> Dear Mr. Ashton, Ericka, and Laura,
>>
>> I hope you are doing well. My name is Romit Chakraborty, and I recently
>> was intimated on the Quantum-AI Researcher/Staff Scientist position with
>> Prof. Gagliardi with a verbal offer. I am excited about the opportunity to
>> contribute to her groundbreaking work.

>>
>> I am writing to discuss an essential logistical matter concerning my
>> transition from Berkeley to Chicago. Given the research we have discussed,
>> it may be crucial for me to start before October 10th. Additionally, my
>> current employment at Berkeley Lab is set to conclude on September 10th,
>> necessitating the filing of an H1B visa transfer petition before that date.
>>
>> Given the standard onboarding procedures, including background checks, my
>> start date is projected to be around November 1st. In light of this, I
>> would like your assistance in exploring avenues to expedite the onboarding
>> process, particularly regarding the initiation of the background check and
>> the H1B visa transfer petition. Achieving an earlier start date, ideally,
>> before October 10th.
>>
>> I understand that these procedures involve multiple steps and
>> coordination among various departments. I am fully committed to cooperating
>> in any way to speed up the required paperwork and am open to options such
>> as premium processing for the H1B transfer if necessary.
>>
>> Thank you for your attention to this matter. I'm looking forward to your
>> advice on how best to meet these timelines.
>>
>> Best regards,
>> Romit Chakraborty
>>
>>
>>
>
> --
> Martin Head-Gordon (he/him/his)
> Kenneth S. Pitzer Distinguished Professor, Dept. of Chemistry, Univ. of
> California, Berkeley, and,
> Senior Faculty Scientist, Chemical Sciences Division, Lawrence Berkeley
> National Laboratory
>

--
Larry Li Guo
IRSO Visa Advisor / HR Shared Services
Lawrence Berkeley National Laboratory
1 Cyclotron Road, MS65A0106, Berkeley, CA 94720
Phone (510) 486-6514
Fax (510) 486-7563

*Any PII - Personally Identifiable Information needs to be sent to IRSO
via: https://upload-irso.lbl.gov/home <https://upload-irso.lbl.gov/home>.
Please do NOT attach PII to email.** PLEASE LABEL YOUR UPLOADS WITH YOUR
NAME to Larry.*

# Exhibit 19D — UCB_000135

Text printout of the native-produced email UCB_000135.eml; full decoded text body and nested correspondence. Formatting reflowed; source wording retained.

From: Romit Chakraborty <romit@berkeley.edu>
To: Martin Head-Gordon <m_headgordon@berkeley.edu>
Cc:
Date: Fri, 29 Mar 2024 12:40:52 -0500
Subject: Re: Would you please consider writing to the chair at UCF?

Hi Martin,

Thank you for being so helpful with this application.
Yes, Laura mentioned your conversation, and I felt bad about you having to hear about this.
Research-wise, I have broken down the project into a short-term (6-month publication window) and long-term (1-year horizon). For context, I've been here 3.5-4 months. The Berkeley work has been on my mind, but I had to prioritise the on-site interview in the short term (Feb/March). I will resume the Berkeley papers and start meeting with Justin shortly.
To clarify, this person who attacked the research is not a member of Laura's group but a CS postdoc here. They made vague, untechnical, unqualified, and general assertions that could have sabotaged the project and comported themself in an undignified manner in a professional setting, which I did not reciprocate. I needed to defend myself since I am leading this work, and it was clear that we needed a change in our CS+LLM consultant. I have made concerted efforts to balance things out interpersonally with this person, and things are at an even keel as we correspond.
I will push back on the point about my temperament. I did not raise my voice and very seldom do, and rarely have a temper. My issue has more to do with dealing with people that I do not wish to deal with work-wise. I have thought about this seriously, which is one reason I want to be in academia rather than industry. I take your point about improving the response to these attacks in the future and will try to improve.
Thank you also for taking the time to reflect on this and writing your thoughts in a characteristically clear style. I am grateful for that.
I will follow up with the separations/ZPVE work when it is fit for your consumption.

Sincerely,
Romit

On Fri, Mar 29, 2024 at 11:50 AM Martin Head-Gordon <
m_headgordon@berkeley.edu> wrote:

> Hi Romit,
>
> I'm glad you thought your on-site interview went well, and I wish you
> success landing the position. I've sent a message to the Chair as you
> requested.
>
> I also want to let you know that I saw Laura last week at the ACS meeting,

> and she indicated early concerns about your work in Chicago:
> -- Too much time spent on the "long-shot" AI/MI project on automatic
> active space selection.
> -- A problematic interaction with another group member where voices,
> including yours, were raised at a meeting.
>
> While it is not time to push the panic button and drop any project, I
> think it is important to pass this on. The first point is about making a
> clear success of the time in her group, particularly in light of your
> senior role. The second point would potentially reflect on your
> suitability for an academic career based on temperament, so please be
> careful not to let that happen again if someone attacks your ideas (which
> certainly will happen again -- believe me, I know).
>
> Without creating a new variant of the problem associated with point #1
> above, I also wish to remind you about your commitment to your remaining
> two papers with me.
>
> All the best,
>
> Martin
>
> On Thu, Mar 28, 2024 at 11:56 AM Romit Chakraborty <romit@berkeley.edu>
> wrote:
>
>> Proposal_UCF.pptx
>> <https://drive.google.com/file/d/1xgCw9oD2LBZajRLKi26WsXcEbi7-djNA/view?usp=drive_web>
>> Hi Martin,
>>
>> I hope you are doing well.
>> This week, I interviewed on-site at the University of Central Florida in
>> Orlando, Florida. Thank you for the pro-tip about their attosecond
>> spectroscopy unit. I did get a lot of questions from the physics faculty in
>> attendance of my research and proposal talk.
>> They are looking for tenure-track faculty in molecular electronics and
>> machine learning, and I worked hard to make that call. The interviews went
>> well, and in my estimation, there are no glaring gaps in my profile or
>> proposal.
>> However, they are interviewing four candidates in person for one spot,
>> and it would be immensely helpful if you would write briefly to the chair
>> on my behalf. His name is Micheal Hampton (michael.hampton@ucf.edu).
>>
>> Thank you for considering this! I am attaching my most recent CV and the
>> slides for my proposal talk.
>>
>> Yours sincerely,
>> Romit
>>
>

# Exhibit 19E — UCB_000137

Text printout of the native-produced email UCB_000137.eml; full decoded text body and nested correspondence. Formatting reflowed; source wording retained.

From: Martin Head-Gordon <m_headgordon@berkeley.edu>
To: Laura Gagliardi <lgagliardi@uchicago.edu>
Cc:
Date: Thu, 04 Apr 2024 13:16:39 -0700
Subject: Re: Your research progress

Dear Laura,

Sure -- I trust that Romit will properly correct his approach to
involvement in your group in general, as well as his own specific projects.

I am sorry it has come to this, and hope for better news in due course.

Best wishes, Martin

On Wed, Apr 3, 2024 at 7:06 PM Laura Gagliardi <lgagliardi@uchicago.edu>
wrote:

> Dear Martin,
>
> Thank you for your email. Romit and I had a long discussion today and he
> is committed to finish the papers with you and advance the project with me.
>
> I hope there will be some updates in the next few weeks and when this
> happens, I will inform you.
>
> Best,
>
> Laura
>
>
>
> ------------------------------------------------------------------------
> Laura Gagliardi
> Richard and Kathy Leventhal Professor
> Department of Chemistry, Pritzker School of Molecular Engineering,
>
> James Franck Institute
>
>
> Department of Chemistry
> The University of Chicago
> 5735 S Ellis Ave, Chicago, IL 60637
> Email: lgagliardi@uchicago.edu
> Group Web Site: https://gagliardigroup.uchicago.edu
> ------------------------------------------------------------------------
> --
>
>

>
>
>
> *From: *Martin Head-Gordon <m_headgordon@berkeley.edu>
> *Date: *Wednesday, April 3, 2024 at 11:54 AM
> *To: *Romit Chakraborty <romit@berkeley.edu>
> *Subject: *Fwd: Your research progress
>
> Hi Romit,
>
>
>
> I was shocked as well as greatly disappointed to receive this message,
> particularly in light of its timing. So, let me tell you to please take
> this *much* more seriously than you evidently took the advice I sent you
> *less* than a week ago, as well as the advice I gave you in very
> straightforward words before you started at Chicago. Let me also say that
> I went out of my way to support you, and while you own responsibility for
> your actions, this also makes me look bad (i.e. it appears that my
> recommendation is not accurate). Therefore it also suggests that I have
> made an error in supporting you as I have. Therefore:
>
>
>
> I will not write any more faculty support letters for you until:
>
> (i) I talk to Laura about your job performance at Chicago after e.g. 4
> months have elapsed from today, and,
>
> (ii) Until you complete the remaining two papers that you committed to
> do with me, without neglecting your Chicago work in any way.
>
>
>
> While you are welcome to stay in touch with me, I ask you to not write
> back to me about this, apart from point (ii), because I must also give you
> one more piece of advice. It is simple: no excuses!
>
>
>
> Martin
>
> ---------- Forwarded message ---------
> From: *Laura Gagliardi* <lgagliardi@uchicago.edu>
> Date: Wed, Apr 3, 2024 at 9:37 AM
> Subject: Your research progress
> To: Romit Chakraborty <romit@berkeley.edu>, Ericka Evans <
> erickaevans1@uchicago.edu>
> Cc: Martin HEAD-GORDON <mhg@cchem.berkeley.edu>
>
>

>
> Dear Romit,
>
> I am writing to address a matter of concern regarding your recent absence
> from our scheduled meeting this morning. I must express my surprise and
> disappointment at your failure to attend, particularly without prior
> notification of your unavailability.
>
> Furthermore, I feel compelled to discuss the trajectory of your
> performance within our group. It has become evident to me that your overall
> engagement and contribution have not met the expectations set forth for
> your role. While I acknowledge your commitment to your faculty job search
> and associated interviews, it is essential to prioritize and balance your
> responsibilities effectively.
>
> Regrettably, your participation in our group projects has been lacking in
> depth and dedication. Despite your initial interest, your involvement has
> remained superficial, resulting in a noticeable disengagement from our
> scientific activities as a whole.
>
> In light of these observations, I am requesting that you take proactive
> steps to address these concerns. I expect you to prepare a comprehensive
> document outlining your proposed scientific activities and contributions to
> our group for the next six months. This plan should demonstrate a renewed
> commitment to our shared objectives and reflect a genuine effort to enhance
> your involvement within our team.
>
> Thank you for your attention to this matter.
>
> Laura
>
> ----------------------------------------------------------------------
> Laura Gagliardi
> Richard and Kathy Leventhal Professor
> Department of Chemistry, Pritzker School of Molecular Engineering,
> James Franck Institute,
> Director of the Chicago Center for Theoretical Chemistry
>
> Department of Chemistry
> The University of Chicago
> 5735 S Ellis Ave, Chicago, IL 60637
> Email: lgagliardi@uchicago.edu
> Group Web Site: https://gagliardigroup.uchicago.edu
> ----------------------------------------------------------------------
> --
>
>
>

# Exhibit 19F — UCB_000023

Text printout of the native-produced email UCB_000023.eml; full decoded text body and nested correspondence. Formatting reflowed; source wording retained.

From: Katie Winter <katie.winter@chem.ox.ac.uk>
To: Romit Chakraborty <romit@berkeley.edu>
Cc:
Date: Tue, 27 Jun 2023 10:43:19 +0000
Subject: Expression of Interest Outcome

Dear Romit,

I'm pleased to inform you that your expression of interest to the Chemistry Management Board has been approved. You are welcome to apply for the following Fellowships:

* EPSRC Open Fellowship - Deadline 28th September 2023 (internal deadline 21st September 2023) OR April 2024
* ERC Starting Grant - Deadline 24th October 2023 (internal deadline 10th October 2023)

Your finance contact will be Anna Gromelska (anna.gromelska@chem.ox.ac.uk<mailto:anna.gromelska@chem.ox.ac.uk>), please contact her early to discuss your applications.

I will set up a teams meeting either towards the end of this week or early next week so please could you send me your availability.

You are also eligible to apply for the MSCA postdoctoral fellowship so if this is something of interest then we can discuss further in our meeting.

Kind regards,

Katie

Dr Katie Winter (she/her)
Research Facilitator - Chemistry
University of Oxford
IGC - GC15

01865 282748

# Exhibit 19F — UCB_000025

Text printout of the native-produced email UCB_000025.eml; full decoded text body and nested correspondence. Formatting reflowed; source wording retained.

From: Katie Winter <katie.winter@chem.ox.ac.uk>
To: Romit Chakraborty <romit@berkeley.edu>
Cc:
Date: Tue, 27 Jun 2023 17:12:36 +0000
Subject: Re: Expression of Interest Outcome

Dear Romit,
I will send an invite for Thursday (afternoon uk time).
The EoI process gives you departmental support to apply for fellowships for a year and not physical access to the university until you have been awarded a fellowship, from one of the funding bodies.
We can chat more on Thursday.
Many thanks,
Katie

Sent from my iPhone

On 27 Jun 2023, at 16:46, Romit Chakraborty <romit@berkeley.edu> wrote:

Dear Katie,

Thank you so much for delivering the fantastic news! I am available later this week and early next week for a teams call.
I have a quick follow-up question for you if you will be able to engage me. The EOI application mentions departmental support for one year, covering the fellowship deadlines. Does this support mean that I will be able to conduct research at Oxford with the university for one year starting September of 2023?

Best regards,
Romit

On Tue, Jun 27, 2023 at 3:43 AM Katie Winter
<katie.winter@chem.ox.ac.uk<mailto:katie.winter@chem.ox.ac.uk>> wrote:
Dear Romit,

I’m pleased to inform you that your expression of interest to the Chemistry Management Board has been approved. You are welcome to apply for the following Fellowships:

* EPSRC Open Fellowship – Deadline 28th September 2023 (internal deadline 21st September 2023) OR April 2024
* ERC Starting Grant – Deadline 24th October 2023 (internal deadline 10th October 2023)

Your finance contact will be Anna Gromelska (anna.gromelska@chem.ox.ac.uk<mailto:anna.gromelska@chem.ox.ac.uk>), please contact her early to discuss your applications.

I will set up a teams meeting either towards the end of this week or early next week so please could you send me your availability.

You are also eligible to apply for the MSCA postdoctoral fellowship so if this is something of interest then we can discuss further in our meeting.

Kind regards,

Katie

Dr Katie Winter (she/her)
Research Facilitator – Chemistry
University of Oxford
IGC – GC15

01865 282748

# Exhibit 19G — UCB_000130

Text printout of the native-produced email UCB_000130.eml; full decoded text body and nested correspondence. Formatting reflowed; source wording retained.

From: Katie Winter <katie.winter@chem.ox.ac.uk>
To: Romit Chakraborty <romit@berkeley.edu>
Cc:
Date: Mon, 19 Feb 2024 15:44:26 +0000
Subject: FW: EPSRC Workshop for Academics

Dear Romit,
Good to hear from you.
We are actually running the workshop below on EPSRC and TFS this Wednesday, please find remote joining instructions below.
You would not be able to apply for the Postdoctoral fellowship and the Open fellowship at the same time so you would need to choose which one is more suitable.
For reference the PDRA Fellowship is postdoc level (no funds for staff allowed)and requires a host laboratory while the Open is independent and you would be running your own group.
Kind regards,
Katie

-----Original Appointment-----
From: Rachel MacCoss <rachel.maccoss@chem.ox.ac.uk>
Sent: 15 January 2024 2:03 pm
To: Rachel MacCoss; academics@maillist.chem.ox.ac.uk; Katie Winter; Joanne Ashby; Anna Gromelska; Bosa Petrovic; Stefanie Dawson
Cc: Fernanda Duarte; Susan Perkin; Mark Wilson; Angela Russell; Tom Brown; Luet Wong; Michael Cotterell; Martin Smith; Philipp Kukura; Michael Willis; Ludmilla Steier; Harry Anderson; Dirk Aarts; Grant Ritchie; Michail Stamatakis; Veronique Gouverneur; Stephen Fletcher; Dermot O'Hare; Matthew Langton; Andrew Baldwin; Justin Benesch; Meera Mehta; Adam Kirrander; Laura-Jean Holdcroft; Volker Deringer; Charlotte Williams; Darren Dixon; Robert Hoye; Mark Brouard; Edward Anderson; Kylie Vincent; Jason Davis; Stephan Rauschenbach; Igor Roncevic; juan carlos jimenez; Michael Neidig; Simon Clarke; Christopher Schofield
Subject: EPSRC Workshop for Academics
When: 21 February 2024 1:30 pm-3:30 pm (UTC+00:00) Dublin, Edinburgh, Lisbon, London.
Where: Wolfson Seminar Room

Dear All,

With all the recent changes to applying to EPSRC, I have asked Katherine Rooke, previously from our Research Facilitation team and now Senior Portfolio Manager for Fellowships at EPSRC, to come and deliver a workshop. It will be held in the Wolfson on 21st Feb at 1:30pm. If you need to call in, do let me know.

Katherine will discuss R4RI CVs, Fellowships and interdisciplinary responsive mode. She will also touch on changes due to the move to TFS. If there is anything else you would like to be covered, please do let me know.

This will be aimed at PIs/academic staff, but we will also invite individuals that we know are working towards early career fellowships. Feel free to flag up anyone in your group you feel this will also be relevant for and "accept" if planning to attend.

All the best,

Rachel

---

Dr Rachel N MacCoss

Senior Research Facilitator - Chemistry

University of Oxford

01865 272617

rachel.maccoss@chem.ox.ac.uk<mailto:rachel.maccoss@chem.ox.ac.uk>@OxChemRF

I work M-W, F.

---

Microsoft Teams meeting
Join on your computer, mobile app or room device
[redacted]
Meeting ID: [redacted]
Passcode: [redacted]
Download Teams<https://www.microsoft.com/en-us/microsoft-teams/download-app> | Join on the web<https://www.microsoft.com/microsoft-teams/join-a-meeting>
[redacted]

---

# Exhibit 19G — UCB_000136

Text printout of the native-produced email UCB_000136.eml; full decoded text body and nested correspondence. Formatting reflowed; source wording retained.

From: Romit Chakraborty <romit@berkeley.edu>
To: Katie Winter <katie.winter@chem.ox.ac.uk>
Cc:
Date: Fri, 29 Mar 2024 14:22:32 -0500
Subject: Re: EPSRC Workshop for Academics

Hi Katie,

Thank you for writing back.
I worked hard on the ERC proposal, but it didn't make it through
unfortunately.
I am working hard on the EPSRC proposal and will update you shortly.

Sincerely,
Romit

On Thu, Mar 28, 2024 at 2:10 PM Katie Winter <katie.winter@chem.ox.ac.uk>
wrote:

> Hi Romit,
> The call is open and does not have a deadline, UKRI advise to submit when
> ready.
> How are you getting on with preparing your documents?
> Did you hear anything from the ERC regarding your starting grant?
> Kind regards,
> Katie
>
> Sent from my iPhone
>
> On 28 Mar 2024, at 18:30, Romit Chakraborty <romit@berkeley.edu> wrote:
>
> 
> Hi Katie,
>
> I hope you are well.
> Is there a tacit deadline for this? When should I be looking to turn in
> the proposal?
>
> Sincerely,
> Romit
>
> On Mon, Feb 19, 2024 at 11:16 AM Katie Winter <katie.winter@chem.ox.ac.uk>
> wrote:
>
>> Hi Romit,
>>
>> I am happy to look at any of your application sections, please send them
>> when ready.
>>

>> Kind regards,
>>
>> Katie
>>
>>
>>
>> *From:* Romit Chakraborty <romit@berkeley.edu>
>> *Sent:* 19 February 2024 4:29 pm
>> *To:* Katie Winter <katie.winter@chem.ox.ac.uk>
>> *Subject:* Re: FW: EPSRC Workshop for Academics
>>
>>
>>
>> Hi Katie,
>>
>>
>>
>> Thank you a bunch for sharing the details of the EPSRC and TFS workshop.
>> I really appreciate it. I have missed being able to meet you on Zoom/Teams
>> lately.
>>
>>
>>
>> Also, I wanted to ask if there is any intermediate stage of the
>> application after which it would be a good idea to touch base. Please let
>> me know.
>>
>>
>>
>> Thanks again!
>>
>>
>>
>> Best,
>>
>> Romit
>>
>>
>>
>> On Mon, Feb 19, 2024 at 9:44 AM Katie Winter <katie.winter@chem.ox.ac.uk>
>> wrote:
>>
>> Dear Romit,
>>
>> Good to hear from you.
>>
>> We are actually running the workshop below on EPSRC and TFS this
>> Wednesday, please find remote joining instructions below.
>>
>> You would not be able to apply for the Postdoctoral fellowship and the
>> Open fellowship at the same time so you would need to choose which one is

>> more suitable.
>>
>> For reference the PDRA Fellowship is postdoc level (no funds for staff
>> allowed)and requires a host laboratory while the Open is independent and
>> you would be running your own group.
>>
>> Kind regards,
>>
>> Katie
>>
>>
>>
>> -----Original Appointment-----
>> *From:* Rachel MacCoss <rachel.maccoss@chem.ox.ac.uk>
>> *Sent:* 15 January 2024 2:03 pm
>> *To:* Rachel MacCoss; academics@maillist.chem.ox.ac.uk; Katie Winter;
>> Joanne Ashby; Anna Gromelska; Bosa Petrovic; Stefanie Dawson
>> *Cc:* Fernanda Duarte; Susan Perkin; Mark Wilson; Angela Russell; Tom
>> Brown; Luet Wong; Michael Cotterell; Martin Smith; Philipp Kukura; Michael
>> Willis; Ludmilla Steier; Harry Anderson; Dirk Aarts; Grant Ritchie; Michail
>> Stamatakis; Veronique Gouverneur; Stephen Fletcher; Dermot O'Hare; Matthew
>> Langton; Andrew Baldwin; Justin Benesch; Meera Mehta; Adam Kirrander;
>> Laura-Jean Holdcroft; Volker Deringer; Charlotte Williams; Darren Dixon;
>> Robert Hoye; Mark Brouard; Edward Anderson; Kylie Vincent; Jason Davis;
>> Stephan Rauschenbach; Igor Roncevic; juan carlos jimenez; Michael Neidig;
>> Simon Clarke; Christopher Schofield
>> *Subject:* EPSRC Workshop for Academics
>> *When:* 21 February 2024 1:30 pm-3:30 pm (UTC+00:00) Dublin, Edinburgh,
>> Lisbon, London.
>> *Where:* Wolfson Seminar Room
>>
>>
>>
>> Dear All,
>>
>>
>>
>> With all the recent changes to applying to EPSRC, I have asked Katherine
>> Rooke, previously from our Research Facilitation team and now Senior
>> Portfolio Manager for Fellowships at EPSRC, to come and deliver a
>> workshop. It will be held in the *Wolfson on 21st Feb at 1:30pm*. If
>> you need to call in, do let me know.
>>
>>
>>
>> Katherine will discuss R4RI CVs, Fellowships and interdisciplinary
>> responsive mode. She will also touch on changes due to the move to TFS.
>> If there is anything else you would like to be covered, please do let me
>> know.
>>
>>

>>
>> This will be aimed at PIs/academic staff, but we will also invite
>> individuals that we know are working towards early career fellowships.
>> Feel free to flag up anyone in your group you feel this will also be
>> relevant for and "accept" if planning to attend.
>>
>>
>>
>> All the best,
>>
>> Rachel
>>
>>
>>
>> ________________________________
>>
>> Dr Rachel N MacCoss
>>
>> Senior Research Facilitator - Chemistry
>>
>> University of Oxford
>>
>> 01865 272617
>>
>> rachel.maccoss@chem.ox.ac.uk@OxChemRF
>>
>>
>>
>> I work M-W, F.
>>
>>
>>
>>
>>
>>
>> ________________________________________________________________________________
>>
>> Microsoft Teams meeting
>>
>> *Join on your computer, mobile app or room device*
>>
>> Click here to join the meeting
[redacted]
>>
>> Meeting ID: [redacted]
>> Passcode: [redacted]
>>
>> Download Teams
>> <https://www.microsoft.com/en-us/microsoft-teams/download-app> | Join on

>> the web <https://www.microsoft.com/microsoft-teams/join-a-meeting>
>>
>> Learn More <https://aka.ms/JoinTeamsMeeting> | Meeting options
[redacted]
>>
>>
>> ________________________________________________________________________________
>>
>>

RESEARCH SERVICES
University Offices, Wellington Square, Oxford **OX1 2JD**

02 November 2023

**COMMITMENT OF THE HOST INSTITUTION FOR ERC CALLS 2024**

The Chancellor, Masters and Scholars of the University of Oxford (the 'University of Oxford'), which is the applicant legal entity, confirms its intention to sign a supplementary agreement with Romit Chakraborty in which the obligations listed below will be addressed should the proposal be retained.

**Performance obligations of the *applicant legal entity* (Host Institution) that will become the coordinator of the HE ERC Grant Agreement (hereafter referred to as the Agreement), should the proposal be retained and the preparation of the Agreement be successfully concluded:**

The applicant legal entity (Host Institution) commits itself to ensure that the action tasks described in Annex 1 of the Agreement are performed under the guidance of the principal investigator who is expected to devote:

- in the case of a Starting Grant at least 50% of her/his working time to the ERC-funded project (action) and spend at least 50% of her/his working time in an EU Member State or Associated Country;

The applicant legal entity (Host Institution) commits itself to respect the following conditions for the principal investigator and their team:

a) host and engage the principal investigator for the whole duration of the action;

b) take all measures to implement the principles set out in the Commission recommendation on the European Charter for Researchers and the Code of Conduct for the Recruitment of Researchers — in particular regarding working conditions, transparent recruitment processes based on merit and career development — and ensure that the principal investigator, researchers and third parties involved in the action are aware of them;

c) enter — before grant signature — into a Supplementary Agreement with the principal investigator, that specifies the obligation of the applicant legal entity to meet its obligations under the Agreement;

d) provide the principal investigator with a copy of the signed Agreement;

e) guarantee the principal investigator scientific independence, in particular for the:
   i) use of the budget to achieve the scientific objectives;
   ii) authority to publish as senior author and invite as co-authors those who have contributed substantially to the work;



Email: researchgrants@admin.ox.ac.uk Web: https://globalresearch.admin.ox.ac.uk/

iii) preparation of scientific reports for the action;
iv) selection and supervision of the other team members, in line with the profiles needed to conduct the research and in accordance with the beneficiary's usual management practices;
v) possibility to apply independently for funding;
vi) access to appropriate space and facilities for conducting the research;

f) provide — during the implementation of the action — research support to the principal investigator and the team members (regarding infrastructure, equipment, access rights, products and other services necessary for conducting the research);

g) support the principal investigator and provide administrative assistance, in particular for the:
i) general management of the work and their team;
ii) scientific reporting, especially ensuring that the team members send their scientific results to the principal investigator;
iii) financial reporting, especially providing timely and clear financial information;
iv) application of the beneficiary's usual management practices;
v) general logistics of the action;
vi) access to the electronic exchange system;

h) inform the principal investigator immediately (in writing) of any events or circumstances likely to affect the Agreement;

i) ensure that the principal investigator enjoys adequate:
i) conditions for annual, sickness and parental leave;
ii) occupational health and safety standards;
iii) insurance under the general social security scheme, such as pension rights;

j) allow the transfer of the Agreement to a new beneficiary, if requested by the principal investigator and provided that the objectives of the action remain achievable (portability; see Article 41 of the Agreement);

k) respect the fundamental principle of research integrity and ensure that persons carrying out research tasks under the action follow the good research practices and refrain from the research integrity violations described in the European Code of Conduct for Research Integrity. If any such violations or allegations occur, verify and pursue them and bring them to the attention of the Agency.



Email: researchgrants@admin.ox.ac.uk Web: https://globalresearch.admin.ox.ac.uk/

For the applicant legal entity (Host Institution) - University of Oxford:

Ms Katie Price
Head of Research Funding Team
Research Services

katie.price@admin.ox.ac.uk

Stamp of the applicant legal entity (Host Institution)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 20

## PsiQuantum hiring and collaboration: selected original produced pages

Selected original source pages follow. Original Bates labels and filed-page identifiers are retained; these excerpts are not the complete production.

**Sent:** 6/12/2024 4:11:47 PM
**From:** Arvin Kakekhani <Kakekhani>
**To:** lgagliardi@uchicago.edu
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Invitation to discuss quantum chemistry with PsiQuantum

---

Dear Dr. Gagliardi,

I hope this message finds you well. I am Arvin Kakekhani, a computational materials physicist; my previous works in academia and industry integrated DFT, MD calculations, and machine learning across topics from catalysis to batteries, and photovoltaics. I was a PhD student with Sohrab Ismail-Beigi, and postdocs with Jens Nørskov and Andrew Rappe. I currently lead a team at PsiQuantum, where we aim to link quantum computing outputs to practical applications in materials physics and chemistry.

In this regard, I have been impressed by of your research, to give just one example, your article entitled “Localized Quantum Chemistry on Quantum Computers” has been very inspiring to me. I would like to discuss potential collaborations and explore consultancy opportunities with you.

PsiQuantum, based in Palo Alto, is poised to build the first fault-tolerant quantum computer with significant funding, including a recent $600M deal with the Australian government. We are indeed the largest independent quantum company in the world.

Could you please share your availability for an introductory meeting this week or next? I am flexible and can adjust to your schedule.

Looking forward to our discussion.

--
Best regards,
Arvin Kakekhani
Staff Quantum Solutions Scientist
Email: akakekhani@psiquantum.com

**Sent:** 6/21/2024 3:10:20 PM
**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**To:** "Arvin Kakekhani" <akakekhani@psiquantum.com>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Re: Invitation to discuss quantum chemistry with PsiQuantum

---

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Dear Arvin
Thank you for the meeting yesterday. If you want to discuss more about the potential consulting, I am available this weekend.

Best
Laura
----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering,
James Franck Institute

Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu
Group Web Site: https://gagliardigroup.uchicago.edu
------------------------------------------------------------------------

---

**From:** Arvin Kakekhani <akakekhani@psiquantum.com>
**Date:** Monday, June 17, 2024 at 11:35 AM
**To:** Monica Lugo <lugom@uchicago.edu>, Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Invitation to discuss quantum chemistry with PsiQuantum

Sounds, good. Can I forward the meeting to a couple of colleagues to attend the meeting if they can?

Best,
Arvin

---

**From:** Monica Lugo <lugom@uchicago.edu>
**Date:** Monday, June 17, 2024 at 9:33 AM
**To:** Arvin Kakekhani <akakekhani@psiquantum.com>, Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Invitation to discuss quantum chemistry with PsiQuantum

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Great.  I'll send you a zoom invite shortly.

Best,
Mónica

**Mónica Lugo**
Executive Assistant to Professor Laura Gagliardi
Managing Director CD4DC & CCTCh
The University of Chicago | Department of Chemistry

**Sent:** 6/25/2024 1:22:40 PM
**From:** Arvin Kakekhani <akakekhani@psiquantum.com>
**To:** "Laura Gagliardi" <lgagliardi@uchicago.edu>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Re: Invitation to discuss quantum chemistry with PsiQuantum

---

Hi Laura,

This is the opening for the full time employee (in the field of molecular quantum chemistry) that I mentioned the other day. I appreciate it if you can pass it to your students and postdocs that might be interested in this:

https://www.psiquantum.com/apply?gh_jid=6031700003

Best regards,
Arvin

---

**From:** Arvin Kakekhani <akakekhani@psiquantum.com>
**Date:** Saturday, June 22, 2024 at 1:40 AM
**To:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Subject:** Re: Invitation to discuss quantum chemistry with PsiQuantum

Hi Laura,

Sunday 1:15 pm central time works for me.

I will send an invite for then.

Best regards,
Arvin

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Date:** Friday, June 21, 2024 at 8:05 PM
**To:** Arvin Kakekhani <akakekhani@psiquantum.com>
**Subject:** Re: Invitation to discuss quantum chemistry with PsiQuantum

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

How about Saturday between 1 and 3 pm ct or at 6 pm ct? Sunday I am available between 9 am and 2 pm ct.
Thank you.
Laura Gagliardi
Sent from my iPhone

> On Jun 21, 2024, at 9:57 PM, Arvin Kakekhani <akakekhani@psiquantum.com> wrote:
>
> Hi Laura,
>
> It was great talking to you. For sure! When is a good time for you? Can you kindly provide few time slots?
>
> Best,
> Arvin
>
> ---
>
> **From:** Laura Gagliardi <lgagliardi@uchicago.edu>
> **Date:** Friday, June 21, 2024 at 3:10 PM

**Sent:** 7/15/2024 4:02:09 PM
**From:** Arvin Kakekhani <akakekhani@psiquantum.com>
**To:** "Laura Gagliardi" <lgagliardi@uchicago.edu>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Re: Invitation to discuss quantum chemistry with PsiQuantum

---

Just sent the zoom link. Looking forward to talking with you!

Best,
Arvin

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Date:** Monday, July 15, 2024 at 3:57 PM
**To:** Arvin Kakekhani <akakekhani@psiquantum.com>
**Subject:** Re: Invitation to discuss quantum chemistry with PsiQuantum

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Yes let us talk at 6.15 Chicago time. Phone or zoom?
Laura Gagliardi
Sent from my iPhone

On Jul 16, 2024, at 6:49 AM, Arvin Kakekhani <akakekhani@psiquantum.com> wrote:

Hi Laura,

I am available now for like 45 minutes. Then I must drive home (takes 1 hour in Bay area traffic), but then I can talk until 10 AM Singapore time.

So maybe the best chance for today is if we can talk in the next 45 mins to 1 hr. Is it possible?
Best,
Arvin

---

**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**Date:** Monday, July 15, 2024 at 3:08 PM
**To:** Arvin Kakekhani <akakekhani@psiquantum.com>
**Subject:** Re: Invitation to discuss quantum chemistry with PsiQuantum

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Dear Arvin
Thank you for reaching out to me. I am in Singapore at a conference.
How long will you be available this evening for? I just woke up here and I have to be at the conference in 3 hours.

Best
Laura

-------------------------------------------------------------------
Laura Gagliardi

**Sent:** 7/15/2024 4:04:32 PM
**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**To:** "Arvin Kakekhani" <akakekhani@psiquantum.com>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Accepted: Prof. Gagliardi & PsiQuantum meeting

---

[EXTERNAL EMAIL] DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

**Sent:** 7/15/2024 4:01:47 PM
**From:** Arvin Kakekhani <akakekhani@psiquantum.com>
**To:** "Laura Gagliardi" <lgagliardi@uchicago.edu>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Prof. Gagliardi & PsiQuantum meeting

---

Arvin Kakekhani is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
[redacted]

Meeting ID: [redacted]

---

One tap mobile
+16699006833,,[redacted]# US (San Jose)
+16694449171,,[redacted]# US

---

Dial by your location
• +1 669 900 6833 US (San Jose)
• +1 669 444 9171 US
• +1 719 359 4580 US
• +1 253 205 0468 US
• +1 253 215 8782 US (Tacoma)
• +1 346 248 7799 US (Houston)
• +1 312 626 6799 US (Chicago)
• +1 360 209 5623 US
• +1 386 347 5053 US
• +1 507 473 4847 US
• +1 564 217 2000 US
• +1 646 558 8656 US (New York)
• +1 646 931 3860 US
• +1 689 278 1000 US
• +1 301 715 8592 US (Washington DC)
• +1 305 224 1968 US
• +1 309 205 3325 US
• +49 69 5050 0952 Germany
• +49 695 050 2596 Germany
• +49 69 7104 9922 Germany
• +49 69 3807 9883 Germany
• +49 69 3807 9884 Germany
• +49 69 5050 0951 Germany
• +61 2 8015 6011 Australia
• +61 3 7018 2005 Australia
• +61 7 3185 3730 Australia
• +61 8 6119 3900 Australia
• +61 8 7150 1149 Australia
• +44 203 481 5240 United Kingdom
• +44 203 901 7895 United Kingdom
• +44 208 080 6591 United Kingdom
• +44 208 080 6592 United Kingdom
• +44 330 088 5830 United Kingdom
• +44 131 460 1196 United Kingdom

- +44 203 481 5237 United Kingdom
- +358 3 4109 2129 Finland
- +358 9 4245 1488 Finland
- +358 9 7252 2471 Finland

Meeting ID: [redacted]

Find your local number: https://psiquantum.zoom.us/u/abCo03Ns5

**Sent:** 8/12/2024 9:39:02 AM
**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**To:** "Arvin Kakekhani" <akakekhani@psiquantum.com>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Accepted: Prof. Gagliardi & PsiQuantum meeting

---

[EXTERNAL EMAIL] DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

**Sent:** 8/12/2024 9:38:17 AM
**From:** Arvin Kakekhani <akakekhani@psiquantum.com>
**To:** "Laura Gagliardi" <lgagliardi@uchicago.edu> "Tess Denniss" <tdenniss@psiquantum.com>
**Cc:** "Philipp Ernst" <pernst@psiquantum.com>
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Prof. Gagliardi & PsiQuantum meeting

---

Kicking off our first meeting by explaining PsiQuantum's problems of interest for this collaboration, getting some quick feedback, and planning the next rounds of knowledge sharing.

Arvin Kakekhani is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
[redacted]

Meeting ID: [redacted]

---

One tap mobile
+16699006833,,[redacted]# US (San Jose)
+16694449171,,[redacted]# US

---

Dial by your location
• +1 669 900 6833 US (San Jose)
• +1 669 444 9171 US
• +1 719 359 4580 US
• +1 253 205 0468 US
• +1 253 215 8782 US (Tacoma)
• +1 346 248 7799 US (Houston)
• +1 312 626 6799 US (Chicago)
• +1 360 209 5623 US
• +1 386 347 5053 US
• +1 507 473 4847 US
• +1 564 217 2000 US
• +1 646 558 8656 US (New York)
• +1 646 931 3860 US
• +1 689 278 1000 US
• +1 301 715 8592 US (Washington DC)
• +1 305 224 1968 US
• +1 309 205 3325 US
• +49 69 5050 0952 Germany
• +49 695 050 2596 Germany
• +49 69 7104 9922 Germany
• +49 69 3807 9883 Germany
• +49 69 3807 9884 Germany
• +49 69 5050 0951 Germany
• +61 2 8015 6011 Australia
• +61 3 7018 2005 Australia
• +61 7 3185 3730 Australia
• +61 8 6119 3900 Australia
• +61 8 7150 1149 Australia
• +44 330 088 5830 United Kingdom
• +44 131 460 1196 United Kingdom
• +44 203 481 5237 United Kingdom
• +44 203 481 5240 United Kingdom

# Prof. Gagliardi & PsiQuantum meeting

| | |
|---|---|
| **_Reserved4:** | 0 |
| **_Reserved5:** | 0 |
| **AllDayEvent:** | False |
| **AlternateRecipientAllowed:** | False |
| **AutoForwarded:** | False |
| **BodyFormat:** | 1 |
| **CC:** | Philipp Ernst ; |
| **ConferenceServerAllowExternal:** | False |
| **ConversationTopic:** | Prof. Gagliardi & PsiQuantum meeting |
| **CreationTime:** | 8/12/2024 9:38:20 AM |
| **DeferredDeliveryTime:** | 1/1/0001 12:00:00 AM |
| **DeleteAfterSubmit:** | False |
| **DownloadPictures:** | False |
| **Duration:** | 0 |
| **End:** | 8/12/2024 5:30:00 PM |
| **EndInEndTimeZone:** | 1/1/0001 12:00:00 AM |
| **EndUTC:** | 1/1/0001 12:00:00 AM |
| **ExpiryTime:** | 1/1/0001 12:00:00 AM |
| **Flags:** | 0 |
| **FlagDueBy:** | 1/1/0001 12:00:00 AM |
| **FlagIcon:** | 0 |
| **FlagStatus:** | 0 |

| | |
|---|---|
| **FolderPath:** | C:\Users\yahaira\OneDrive - Hixson Nagatani LLP\Desktop\PSIQ SUBP RESP |
| **ForceUpdateToAllAttendees:** | False |
| **HidePaperClip:** | False |
| **HTMLBody:** | Kicking off our first meeting by explaining PsiQuantumâ€™s problems of interest for this collaboration, getting some quick feedback, and planning the next rounds of knowledge sharing.<br><br>Arvin Kakekhani is inviting you to a scheduled Zoom meeting.<br><br>Join Zoom Meeting<br>[redacted]<br><br>Meeting ID: [redacted]<br><br>---<br><br>One tap mobile<br>+16699006833,,[redacted]# US (San Jose)<br>+16694449171,,[redacted]# US<br><br>---<br><br>Dial by your location<br>â€¢ +1 669 900 6833 US (San Jose)<br>â€¢ +1 669 444 9171 US<br>â€¢ +1 719 359 4580 US<br>â€¢ +1 253 205 0468 US<br>â€¢ +1 253 215 8782 US (Tacoma)<br>â€¢ +1 346 248 7799 US (Houston)<br>â€¢ +1 312 626 6799 US (Chicago)<br>â€¢ +1 360 209 5623 US<br>â€¢ +1 386 347 5053 US<br>â€¢ +1 507 473 4847 US<br>â€¢ +1 564 217 2000 US<br>â€¢ +1 646 558 8656 US (New York)<br>â€¢ +1 646 931 3860 US<br>â€¢ +1 689 278 1000 US<br>â€¢ +1 301 715 8592 US (Washington DC)<br>â€¢ +1 305 224 1968 US<br>â€¢ +1 309 205 3325 US<br>â€¢ +49 69 5050 0952 Germany<br>â€¢ +49 695 050 2596 Germany<br>â€¢ +49 69 7104 9922 Germany<br>â€¢ +49 69 3807 9883 Germany<br>â€¢ +49 69 3807 9884 Germany<br>â€¢ +49 69 5050 0951 Germany |

| | |
|---|---|
| | â€¢ +61 2 8015 6011 Australia<br>â€¢ +61 3 7018 2005 Australia<br>â€¢ +61 7 3185 3730 Australia<br>â€¢ +61 8 6119 3900 Australia<br>â€¢ +61 8 7150 1149 Australia<br>â€¢ +44 330 088 5830 United Kingdom<br>â€¢ +44 131 460 1196 United Kingdom<br>â€¢ +44 203 481 5237 United Kingdom<br>â€¢ +44 203 481 5240 United Kingdom<br>â€¢ +44 203 901 7895 United Kingdom<br>â€¢ +44 208 080 6591 United Kingdom<br>â€¢ +44 208 080 6592 United Kingdom<br>â€¢ +358 3 4109 2129 Finland<br>â€¢ +358 9 4245 1488 Finland<br>â€¢ +358 9 7252 2471 Finland<br><br>Meeting ID: [redacted]<br><br>Find your local number: https://psiquantum.zoom.us/u/abtiTs4RPm |
| **Importance:** | 3 |
| **InternetCodepage:** | 0 |
| **IsOnlineMeeting:** | False |
| **IsRecurring:** | False |
| **IsPrivate:** | False |
| **LastModificationTime:** | 8/27/2024 4:41:57 AM |
| **Location:** | [redacted]<br>addon |
| **Modified:** | False |
| **NetMeetingAutoStart:** | False |
| **NoAging:** | False |
| **OriginatorDeliveryReportRequested:** | False |
| **OutlookInternalVersion:** | 0 |
| **ReadReceiptRequested:** | False |

| | |
|---|---|
| **ReceivedTime:** | 1/1/0001 12:00:00 AM |
| **RecipientReassignmentProhibited:** | False |
| **ReminderMinutesBeforeStart:** | 0 |
| **ReminderOverrideDefault:** | False |
| **ReminderPlaySound:** | False |
| **ReminderSet:** | False |
| **ReminderTime:** | 1/1/0001 12:00:00 AM |
| **ReplyTime:** | 1/1/0001 12:00:00 AM |
| **ResponseRequested:** | False |
| **SendAsICal:** | False |
| **SenderEmailAddress:** | akakekhani@psiquantum.com |
| **SenderEmailType:** | EX |
| **SenderName:** | Arvin Kakekhani |
| **Sensitivity:** | 0 |
| **Sent:** | False |
| **SentOn:** | 1/1/0001 12:00:00 AM |
| **SentOnBehalfOfEmailAddress:** | /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EF28A51647954285BF919EF42EB86C96-66F21D5A-23 |
| **SentOnBehalfOfName:** | Arvin Kakekhani |
| **Size:** | 77312 |
| **Start:** | 8/12/2024 4:00:00 PM |

| | |
|---|---|
| **StartInStartTimeZone:** | 1/1/0001 12:00:00 AM |
| **StartUTC:** | 1/1/0001 12:00:00 AM |
| **Subject:** | Prof. Gagliardi & PsiQuantum meeting |
| **Submitted:** | False |
| **To:** | Arvin Kakekhani ; Laura Gagliardi ; Tess Denniss ; |
| **UnRead:** | False |
| **BusyStatus:** | 1 |
| **MeetingStatus:** | 0 |
| **NetMeetingType:** | 0 |
| **ResponseStatus:** | 0 |
| **MeetingRequestWasSent:** | False |
| **ApptColor:** | 0 |
| **IntendedBusyStatus:** | 0 |
| **ApptCounterProposalDuration:** | 0 |
| **ApptAuxFlags:** | 0 |
| **ApptCounterProposal:** | False |
| **ApptProposalNum:** | 0 |
| **AllowNewTimeProposal:** | False |
| **RecurrenceType:** | 0 |
| **ApptUnsendableRecips:** | 0 |
| **AutoStartWhen:** | 0 |
| **AppointmentSequenceNumber:** | 0 |
| **CommonStart:** | 1/1/0001 8:00:00 AM |

**Sent:** 9/4/2024 4:17:35 PM
**From:** Arvin Kakekhani <akakekhani@psiquantum.com>
**To:** "Laura Gagliardi" <lgagliardi@uchicago.edu>
**Cc:** "Philipp Ernst" <pernst@psiquantum.com> "Tess Denniss" <tdenniss@psiquantum.com> "Abhishek Mitra" <amitra@psiquantum.com>
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Laura&PsiQuantum Meeting

---

Arvin Kakekhani is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
[redacted]

Meeting ID: [redacted]

---

One tap mobile
+16694449171,,[redacted]# US
+16699006833,,[redacted]# US (San Jose)

---

Dial by your location
• +1 669 444 9171 US
• +1 669 900 6833 US (San Jose)
• +1 346 248 7799 US (Houston)
• +1 719 359 4580 US
• +1 253 205 0468 US
• +1 253 215 8782 US (Tacoma)
• +1 386 347 5053 US
• +1 507 473 4847 US
• +1 564 217 2000 US
• +1 646 558 8656 US (New York)
• +1 646 931 3860 US
• +1 689 278 1000 US
• +1 301 715 8592 US (Washington DC)
• +1 305 224 1968 US
• +1 309 205 3325 US
• +1 312 626 6799 US (Chicago)
• +1 360 209 5623 US
• +49 69 3807 9883 Germany
• +49 69 3807 9884 Germany
• +49 69 5050 0951 Germany
• +49 69 5050 0952 Germany
• +49 695 050 2596 Germany
• +49 69 7104 9922 Germany
• +61 7 3185 3730 Australia
• +61 8 6119 3900 Australia
• +61 8 7150 1149 Australia
• +61 2 8015 6011 Australia
• +61 3 7018 2005 Australia
• +44 208 080 6591 United Kingdom
• +44 208 080 6592 United Kingdom
• +44 330 088 5830 United Kingdom
• +44 131 460 1196 United Kingdom
• +44 203 481 5237 United Kingdom

**Sent:** 9/7/2024 11:21:51 AM
**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**To:** "Arvin Kakekhani" <akakekhani@psiquantum.com>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Accepted: Laura&PsiQuantum Meeting

---

[EXTERNAL EMAIL] DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

**Sent:** 9/20/2024 5:09:12 PM
**From:** Arvin Kakekhani <akakekhani@psiquantum.com>
**To:** "Laura Gagliardi" <lgagliardi@uchicago.edu> "Abhishek Mitra" <amitra@psiquantum.com>
**Cc:** "Etinosa Osaro (I)" <eosaro@psiquantum.com>
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Laura & PsiQuantum Meeting

---

Arvin Kakekhani is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
[redacted]

Meeting ID: [redacted]

---

One tap mobile
+16699006833,,[redacted]# US (San Jose)
+16694449171,,[redacted]# US

---

Dial by your location
• +1 669 900 6833 US (San Jose)
• +1 669 444 9171 US
• +1 253 215 8782 US (Tacoma)
• +1 346 248 7799 US (Houston)
• +1 719 359 4580 US
• +1 253 205 0468 US
• +1 301 715 8592 US (Washington DC)
• +1 305 224 1968 US
• +1 309 205 3325 US
• +1 312 626 6799 US (Chicago)
• +1 360 209 5623 US
• +1 386 347 5053 US
• +1 507 473 4847 US
• +1 564 217 2000 US
• +1 646 558 8656 US (New York)
• +1 646 931 3860 US
• +1 689 278 1000 US
• +49 69 7104 9922 Germany
• +49 69 3807 9883 Germany
• +49 69 3807 9884 Germany
• +49 69 5050 0951 Germany
• +49 69 5050 0952 Germany
• +49 695 050 2596 Germany
• +61 8 7150 1149 Australia
• +61 2 8015 6011 Australia
• +61 3 7018 2005 Australia
• +61 7 3185 3730 Australia
• +61 8 6119 3900 Australia
• +44 203 481 5240 United Kingdom
• +44 203 901 7895 United Kingdom
• +44 208 080 6591 United Kingdom
• +44 208 080 6592 United Kingdom
• +44 330 088 5830 United Kingdom

**Sent:** 9/21/2024 5:05:40 AM
**From:** Laura Gagliardi <lgagliardi@uchicago.edu>
**To:** "Arvin Kakekhani" <akakekhani@psiquantum.com>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Accepted: Laura & PsiQuantum Meeting

---

[EXTERNAL EMAIL] DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

| | |
|---|---|
| **ReminderOverrideDefault:** | False |
| **ReminderPlaySound:** | False |
| **ReminderSet:** | False |
| **ReminderTime:** | 1/1/0001 12:00:00 AM |
| **ReplyTime:** | 1/1/0001 12:00:00 AM |
| **ResponseRequested:** | False |
| **SendAsICal:** | False |
| **SenderEmailAddress:** | akakekhani@psiquantum.com |
| **SenderEmailType:** | EX |
| **SenderName:** | Arvin Kakekhani |
| **Sensitivity:** | 0 |
| **Sent:** | False |
| **SentOn:** | 1/1/0001 12:00:00 AM |
| **SentOnBehalfOfEmailAddress:** | /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EF28A51647954285BF919EF42EB86C96-66F21D5A-23 |
| **SentOnBehalfOfName:** | Arvin Kakekhani |
| **Size:** | 63488 |
| **Start:** | 9/21/2024 1:30:00 PM |
| **StartInStartTimeZone:** | 1/1/0001 12:00:00 AM |
| **StartUTC:** | 1/1/0001 12:00:00 AM |
| **Subject:** | Laura & PsiQuantum Meeting |
| **Submitted:** | False |

| | |
|---|---|
| **Sensitivity:** | 0 |
| **Sent:** | False |
| **SentOn:** | 1/1/0001 12:00:00 AM |
| **SentOnBehalfOfEmailAddress:** | /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EF28A51647954285BF919EF42EB86C96-66F21D5A-23 |
| **SentOnBehalfOfName:** | Arvin Kakekhani |
| **Size:** | 92672 |
| **Start:** | 9/7/2024 2:00:00 PM |
| **StartInStartTimeZone:** | 1/1/0001 12:00:00 AM |
| **StartUTC:** | 1/1/0001 12:00:00 AM |
| **Subject:** | Laura&PsiQuantum Meeting |
| **Submitted:** | False |
| **To:** | Arvin Kakekhani ; Laura Gagliardi ; |
| **UnRead:** | False |
| **BusyStatus:** | 1 |
| **MeetingStatus:** | 0 |
| **NetMeetingType:** | 0 |
| **ResponseStatus:** | 0 |
| **MeetingRequestWasSent:** | False |
| **ApptColor:** | 0 |
| **IntendedBusyStatus:** | 0 |
| **ApptCounterProposalDuration:** | 0 |
| **ApptAuxFlags:** | 0 |

**Sent:** 7/17/2024 2:31:46 AM
**From:** Arvin Kakekhani <Kakekhani>
**To:** "Philipp Ernst" <pernst@psiquantum.com>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Recommending Romit Chakraborty for a new hire
**Attachments:** RC_CV_June_24 (2).pdf

---

Below is the draft ( I plan to CC you), Philipp; what do you think?

Hi Stratton,

Thanks so much for agreeing for the CQCM team to acquire new hires. I hope and am planning to return this trust and investment by strategic results that can help us connect quantum algorithms to real materials/drugs and creating more customer projects and delivering on them.

In this regard, I would like to bring the profile of Romit Chakraborty to your attention. I highly recommend hiring him for the role of quantum solutions computational chemist. We have panel-interviewed him and the consensus is toward hiring him, with “Strong Yes” from Philipp, Tess, and I.

If I want to summarize him in a word, it would be: a genius. I have gone through some of the best academic institutions, and I have not used this word to describe people around me for more than a handful of times, so not using this word lightly. Additionally, he is a great quantum chemist trained in some of the best groups in the University of Chicago and UC Berkeley. During his long academic journey, he has covered 3 very different but conceptually connected field in quantum chemistry. We need this wide range of capabilities in mid-term for CQCM strategic goals, and a specific skill he has (highest level DFT calculation for large-scale materials/chemical simulations, which he did during his 6-years postdoc at UC Berkeley) immediately, as a response to an imminent EDDC project.

Kindly let me know if you have any questions, and what should our next steps be here.

Best regards,
Arvin

# Romit Chakraborty, Ph.D.

STAFF SCIENTIST IN QUANTUM AI · UNIVERSITY OF CHICAGO

*Department of Chemistry, University of California, Berkeley*
*Materials Science Division, Lawrence Berkeley National Laboratory*

romit@berkeley.edu | www.rchakraborty.dev

## Education

**University of Chicago** — *Chicago, IL, USA*
STAFF SCIENTIST IN QUANTUM AI — *Present*
- Advisor: Prof. Laura Gagliardi

**University of California, Berkeley, and Lawrence Berkeley National Laboratory** — *Berkeley, CA, USA*
POSTDOCTORAL RESEARCH FELLOW IN COMPUTATIONAL MATERIALS — *2017-Present*
- Advisor: Prof. Martin Head-Gordon

**University of Chicago** — *Chicago, IL, USA*
MS, PH.D. IN THEORETICAL AND COMPUTATIONAL CHEMISTRY — *2012-2017*
- Advisor: Prof. David A. Mazziotti

**IIT Bombay** — *Bombay, India*
M.SC UNDERGRADUATE DEGREE — *2009-2012*
- Undergraduate Thesis: Relativistic Quantum Mechanics of the Pionium Atom in Uniform Magnetic Fields

**St Stephen's College, Delhi** — *Delhi, India*
B.SC HONS. IN CHEMISTRY, WITH PHYSICS AND MATHEMATICS — *2006-2009*

## Research Experience

**University of California, Berkeley and Lawrence Berkeley National Laboratory** — *Berkeley, CA*
POSTDOC ADVISOR: PROF. MARTIN HEAD-GORDON — *2018 - Present*
- **Quantum Chemical Simulations of Gas Sorption in Metal-Organic Frameworks**: Given the urgent need for a transition away from fossil fuels as our primary energy source, the discovery and characterization of clean energy materials form an important part of the emergent energy economy. To this end, quantum chemical simulations afford a quick and cost-effective means of illuminating the properties of clean energy materials computationally. My work at Berkeley has involved the simulations of Metal-Organic Frameworks (MOFs), designer materials composed of metal nodes connected with organic struts that can be highly effective in storing and separating industrially relevant gases. Using density functional theory augmented with the current state-of-the-art Energy Decomposition Analysis (EDA) I have probed the nature of hydrogen interactions with Open Metal Sites (OMS) in MOFs and deconvoluted these interactions into contributions arising from permanent electrostatics, dispersion, polarization, and charge transfer. With a detailed understanding of interactions that bind hydrogen to these open metal sites, I have been able to predict pathways to the ligation of two or more equivalents of hydrogen per OMS that can multiply the volumetric capacity of sorbent materials. Along with these research findings, I have also familiarised myself with the current standards for developing and deploying high-performance electronic structure code.

**University of Chicago** — *Chicago, IL*
GRADUATE ADVISOR: PROF. DAVID A. MAZZIOTTI — *2013 - 2017*
- **One-Electron Theories from a Generalized Pauli Exclusion Principle**: Quantum technologies that elucidate entanglement based on one-particle occupations are a promising avenue of research. I leveraged conditions that are more stringent than the Pauli exclusion principle and which ensure that electron occupations arise out of pure quantum states to make sparse ansatzes for the fermionic wavefunction, derive sufficient conditions for openness in a many-body quantum system, and formulate a geometric perspective on energy transfer, from effective one-electron theories. The ability of these Generalized Pauli Conditions (GPCs) to ameliorate errors in noisy intermediate-scale quantum (NISQ) hardware has been verified on IBM's quantum computer by the demonstration of GPC satisfaction by pure quantum states in 2018 and more recently by the violation of GPCs by ensemble density matrices in 2023. What's crucial here is that if these conditions are met, we deal with purely quantum states involving N particles that we can discern based solely on their occupations. Additionally, these conditions can be applied to larger systems of quantum bits, thanks to a mathematical tool called the Higuchi inequalities.

## Publications

+ *Equal Contributors*

**Chakraborty, R.**, Talbot, J. J., Shen, H., Yabuuchi, Y., Jiang, H., Carsch, K.M., Furukawa, H., Long, J.R., Head-Gordon, M. ***2023***. Quantum Chemical Modeling of Hydrogen Binding in Metal-Organic Frameworks: Validation, Insight, Predictions and Challenges. *Selected as a Hot Article*. Phys. Chem. Chem. Phys.26 (8), 6490-6511

Carsch, K.M.,**Chakraborty, R.**, Head-Gordon, M, Long, J.R. et. al. . ***2023***. Selective Adsorption of Oxygen from Humid Air in a Metal–Organic Framework with Trigonal Pyramidal Copper(I) Sites. J. Am. Chem. Soc. 2024, 146, 5, 3160–3170

Talbot J.J., **Chakraborty, R.**, Shen, H., Head-Gordon, M. ***2023***. A Free Energy Decomposition Analysis: Insight into Binding Thermodynamics from Absolutely Localized Molecular Orbitals. *J. Phys. Chem. Lett.*, 14, 5432-5440.

Funke L.M., **Chakraborty R.**, Carsch, K.M., Head-Gordon, M., Long, J.R., Reimer, J.A..***2023***. Assessment of Adsorbate $\pi$-backbonding in Cu(I) Metal–Organic Frameworks via Multinuclear NMR Spectroscopy and Density Functional Theory Calculations. *J. Phys. Chem. C* 127 (15): 7513–7519

**Chakraborty, R.**, Carsch, K.M., Jaramillo, David E, Yabuuchi Tuto, Furukawa H, Long, J.R., Head-Gordon M. ***2022***. Prediction of Multiple Hydrogen Ligation at a Vanadium(II) Site in a Metal-Organic Framework. *J. Phys. Chem. Lett.*, 13(44): 10471-10478.

Barnett, B.R., Evans, H.A, Su, G.M., Jiang, H.Z.H., **Chakraborty, R.**, Banyeretse, D., Hartman, T.J., Martinez, M.B., Trump, B.A., Tarver, J.D., Dods, M.N., Funke, L.M., Borgel, J., Reimer, J.A., Drisdell, W.A., Hurst, K.E., Gennett, T., FitzGerald, S.A., Brown, C.M., Head-Gordon, M., Long, J.R. ***2021***. Observation of an Intermediate to H2 Binding in a Metal–Organic Framework. 2021. *J. Am. Chem. Soc.*, 143(36): 14884-14894.

Epifanovsky E., Gilbert A.T.B., Feng X., Lee J., Mao Y., Mardirossian N., ..., **Chakraborty, R.**, ..., Head-Gordon, M., Herbert J.M., Krylov, A.I. Software for the frontiers of quantum chemistry: An overview of developments in the Q-Chem 5 package. ***2021***. *J. Chem. Phys.*, 155(8):084801

Jaramillo, D.E., Jiang, H.Z.H., Evans, H.A., **Chakraborty, R.**, Furukawa, H., Brown, C.M., Head-Gordon, M., Long, J.R. ***2021***. Ambient-temperature hydrogen storage via vanadium (II)-dihydrogen complexation in a metal–organic framework. *J. Am. Chem. Soc.*, 143(16):6248:6256

Stauch T.+, **Chakraborty, R.+**, Head-Gordon, M. 2019. Quantum Chemical Modeling of Pressure Induced Spin Crossover in Octahedral Metal Ligand Complexes. ***2019***. *ChemPhysChem*, 20(21):2742-2747

**Chakraborty, R.**, Mazziotti, D.A. ***2018***. Sparsity of the wavefunction from the generalized Pauli exclusion principle. *J. Chem. Phys.* 148 (5), 054106.

**Chakraborty, R.**, Mazziotti, D.A. 2017. Noise-assisted energy transfer from the dilation of the set of one electron reduced density matrices. ***2017***. *J. Chem. Phys.* 146 (18), 184101.

**Chakraborty, R.**, Mazziotti, D.A. ***2016***. Role of the generalized Pauli constraints in the quantum chemistry of excited states. *Int. J. Quantum Chem.* 116 (10), 784-790.

**Chakraborty, R.**, Mazziotti, D.A. ***2015***. Structure of the one electron reduced density matrix from the generalized Pauli exclusion principle. *Int. J. Quantum Chem.* 115 (19), 1305-1310.

**Chakraborty, R.**, Mazziotti, D.A. ***2015***. Sufficient condition for the openness of a many electron quantum system from the violation of a generalized Pauli exclusion principle. *Physical Review A* 91 (1), 010101

Datta, S. N., Ghosh A., **Chakraborty, R.**. ***2015***. Variational aspects of the Klein–Gordon equation. *Ind. J. Phys.* 89 (2), 181-187.

**Chakraborty, R.**, Mazziotti, D.A. ***2014***. Generalized Pauli conditions on the spectra of one electron reduced density matrices of atoms and molecules. *Phy. Rev. A* 89 (4), 042505.

### In Preparation

**Chakraborty, R.**, Head-Gordon, M. ***2023***. Competitive Adsorption Models for gas binding to open metal sites in metal-organic frameworks from absolutely localized molecular orbitals.

**Chakraborty, R.**, Talbot, J.J., Head-Gordon M.,***2023***. Enormous Errors in Scaled Harmonic ZPVE for Hydrogen Binding: Characterization and Alternative Strategies.

https://scholar.google.com/citations?hl=en&user=m4HlFRIAAAAJ&view_op=list_works&sortby=pubdate

## Awards, Fellowships, & Grants

| | | |
|---|---|---|
| Fall, 2023 | **Accelerate Foundation Models Research**, Microsoft Research | *$ 20,000* |
| 2017-2023 | **Materials Simulation for Maintenance of HyMARC (Hydrogen Storage Advanced Materials Consortium Grant)**, Department of Energy (DOE), USA | *$72,000/yr* |
| Smr, 2023 | **Successful Expression of Interest for Independent Early Career Fellowships**, University of Oxford, UK | |
| Smr, 2023 | **Berkeley Lab DEI Award**, BPA-DEI Award for Advancing DEI in Research and Practice, USA | |
| Fall, 2015 | **Arts Science and Culture Graduate Fellowship**, University of Chicago, USA | *$ 3,000* |
| Smr, 2009 | **Lindau Graduate Fellowship**, German Research Foundation (DFG) | *$ 10,000* |

## Presentations

### Invited Talks

ACS Fall 2023. *Advancing High-capacity Hydrogen Storage in Metal-organic Frameworks via Density Functional Predictions*. Talk: Session on Computational Materials Science, San Francisco, CA.

ACS Fall 2022. *Tale of Two MOFs*. Invited talk: Session on Computational Materials Science, Chicago, IL.

ACS Fall 2021. *Quantum Chemical Insights on Gas Binding in Nanoporous Frameworks*. Session on Orbital Methods for Quantum Mechanics, University of Washington, Seattle.

RDMs in Quantum Physics and Role of Fermionic Exchange Symmetry. 2016. *Sufficient condition for the openness of a many-electron quantum system from the violation of a generalized Pauli exclusion principle*. Invited talk: Reduced Density Matrices in Quantum Mechanics, University of Oxford, United Kingdom.

Spring 2016. *One-electron Theories from a Generalized Pauli Exclusion Principle*. Invited talk: Alan Aspuru-Guzik Group, Harvard University, Boston, MA.

Summer 2015. *Structure of the Wavefunction from a Generalized Pauli Exclusion Principle*. Invited Talk. MidWest Theoretical Chemistry Conference, University of Michigan, Ann Arbor, MI

## Teaching Experience

| | | |
|---|---|---|
| Winter 2015 | **Advanced Statistical Mechanics**, Graduate Teaching Assistant | *UChicago* |
| Winter 2014 | **Advanced Quantum Mechanics**, Graduate Teaching Assistant | *UChicago* |
| 2012-2013 | **General Chemistry I, II, and III**, Teaching Assistant | *UChicago* |

## Outreach & Professional Development

### Peer Review

***Nature Communications, 2022***
***Journal of Chemical Theory and Computation, 2023***
***Molecular Physics, 2018, 2019, 2020***
***Journal of Physics: Condensed Matter, 2017***

### Professional Memberships

American Chemical Society
California Section of the American Chemical Society (2023-2026)

**Sent:** 7/17/2024 9:13:56 AM
**From:** Arvin Kakekhani <akakekhani@psiquantum.com>
**To:** "Stratton Sclavos" <ssclavos@psiquantum.com>
**Cc:** "Philipp Ernst" <pernst@psiquantum.com>
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Recommending Romit Chakraborty for a new hire

---

Hi Stratton,

Thanks so much for agreeing for the CQCM team to acquire new hires. I hope and am planning to return this trust and investment by strategic results that can help us connect quantum algorithms to real materials/drugs and creating more customer projects and delivering on them.

In this regard, I would like to bring the profile of Romit Chakraborty to your attention. I highly recommend hiring him for the role of quantum solutions computational chemist. We have panel-interviewed him and the consensus is toward hiring him, with “Strong Yes” from Philipp, Tess, and I.

If I want to summarize him in a word, it would be: a genius. I have gone through some of the best academic institutions, and I have not used this word to describe people around me for more than a handful of times, so not using this word lightly. Additionally, he is a great quantum chemist trained in some of the best groups in the University of Chicago and UC Berkeley. During his long academic journey, he has covered 3 very different but conceptually connected fields in quantum chemistry. We need this wide range of capabilities in mid-term for CQCM strategic goals, and a specific skill he has (highest level DFT calculation for large-scale materials/chemical simulations, which he did during his 6-years postdoc at UC Berkeley) immediately, as a response to an imminent EDDC project.

Kindly let me know if you have any questions, and what should our next steps be here.

Best regards,
Arvin

**Sent:** 7/22/2024 12:52:23 PM
**From:** Erin Courson(C) <ecourson@psiquantum.com>
**To:** "Nicole Mcneal" <nmcneal@psiquantum.com>
**Cc:** "Kris Werner" <kwerner@psiquantum.com> "HR" <hr@psiquantum.com> "Recruiting" <Recruiting@psiquantum.com> "Arvin Kakekhani" <akakekhani@psiquantum.com>
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Offer Request - Romit Chakraborty
**Attachments:** RC_CV_June_24.pdf , Offer Request - Romit Chakraborty.pdf

---

Hi Nicole, please find the attached offer request for Romit Chakraborty. Please let me know if you have any questions or need anything else.
Thanks!
Erin

PsiQuantum

**2024 Offer Analysis – Hiring Manager Offer Request (All fields required)**

| | |
|---|---|
| **Unique ID (UID)**<br>An **approved** requisition in Greenhouse is required to move forward. | 2024-PLAN-SNM-15 |
| ****Hiring Manager:** | Arvin Kakekhani |
| **Candidate name:**<br>Candidate's resume **must be** in Greenhouse to proceed with offer. | Romit Chakraborty |
| **Job title:** | Senior Quantum Solutions Computational Chemist |
| ****Level:** | IC4 |
| **Location of role:**<br>A location outside the SF Bay Area will require a base salary adjustment. | HQ-Palo Alto |
| **Start Date:**<br>Check w/recruiting to see valid start dates. | ASAP |
| **If a people manager, who will report to this position?** | |
| ****Department Code:** | 6300 |
| ****Department Name:** | Quantum Solutions |
| ****Department VP:** | Philipp Ernst |
| **Immigration Support:**<br>Work with your recruiter on this. If immigration support is needed, it may delay the candidate's start date. The earlier HR is notified of the need, the better. | Yes |
| **Export Control License Needed: Y/N** | **N** |
| **Base salary Recommendation:**<br>Very helpful if the candidate has been asked what range they are looking for. | $141,500—$180,500 USD (Arvin Kakekhani recommends the upper half of this range) |
| **Location of candidate:** | Chicago |
| **Relocation bonus needed? (Y/N):**<br>Understanding size of immediate household would be helpful. | Y (candidate is relocating by himself) |
| **Comparable internal employees:**<br>These employees should be of a similar level and job responsibilities. | Karthik Seetharam, Prakash Verma, Cristian Cortes |
| **Notes:** Add any information that would be helpful in the analysis of the offer | Romit has 7 years of post PhD work experience in some of the best academic groups in the US |

**Submission Process**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

# EXHIBIT 21

## November 2024 publication correspondence
## Previously filed transcriptions

Dkt. 62, pages 19–21, as retained in the existing exhibit packet. These filed pages contain the full text bodies identified there as Sources B and C, with surrounding Sources A, D and E and their stated limitations. These are copies of filed transcription pages, not native email files.

Chakraborty v. Gagliardi | 1:26-cv-00106 | 7

**Source communications**

These transcriptions reproduce the identified message text and selected identifying headers; line wrapping is normalized. Source A reproduces Plaintiff's authored portion only; forwarded registration correspondence is omitted. Sources B and C reproduce their full text bodies. Attachments are not reproduced, and the transcriptions do not certify delivery. Source A's registration-form attachment is not represented as a research manuscript. Sources B and C concern a paper idea, not an attached completed paper.

**Source A**

12:08:34 -0500
From: Romit Chakraborty <romit@uchicago.edu>
To: Laura Gagliardi <lgagliardi@uchicago.edu>
Subject: Fwd: Registration Form UNITN
Message-Id: <CA+CwXuqtvVXQM8jvmWTJiBDStGCuwLFeW4oPmrkB3N-xtmtEUg@mail.gmail.com>

Hi Laura,
I want to give a short talk at this workshop.
https://indico.ectstar.eu/event/204/

(the overview is similar to the summary at the active space meeting this week + computations using a back-end engine), was accepted as part of the proceedings.
Chakraborty v. Gagliardi | 1:26-cv-00106 | 8

Travelling to Trento for this would be excessive, so The workshop is between May 6 and 10, and it would be good preparation for my group meeting talk on May 16th. Do you think this is a good idea?
Sincerely,
Romit

**Source B**

Date: Fri, 15 Nov 2024 20:04:55 -0800
From: Romit Chakraborty <romit@uchicago.edu>
To: Laura Gagliardi <lgagliardi@uchicago.edu>
Subject: Short meeting this Sunday
Message-Id:
<CA+CwXurJhG5c3Qg4SMg=96skUx7M3DpP7A81yGvYbc1GzXCbKA@mail.gmail.com>

Hi Laura,

My sincere apologies for not producing a paper.
I hope that you are well. I do have an idea for a paper. Are you free at

any point over the weekend or any other weekend?
Sunday would be ideal since I am free in the evening.

Sincerely,
Romit

**Source C**

Date: Sat, 16 Nov 2024 17:28:24 +0000
From: Laura Gagliardi <lgagliardi@uchicago.edu>
To: Romit Chakraborty <romit@uchicago.edu>
Subject: Re: Short meeting this Sunday
Message-Id:
<DS0PR11MB65422F9C0A27C30B7A4A50B7AB252@DS0PR11MB6542.namprd11.prod.outlook.com>

Hi Romit,
I think you should focus on your current work. We do not just want to have a quick publication for the sake of it.
It was good having you in the group and I wish you all the best with your next chapter of your career.
Laura
-----------------------------------------------------------------------
Laura Gagliardi
Richard and Kathy Leventhal Professor
Department of Chemistry, Pritzker School of Molecular Engineering, James Franck Institute
Department of Chemistry
The University of Chicago
5735 S Ellis Ave, Chicago, IL 60637
Email: lgagliardi@uchicago.edu<mailto:lgagliardi@uchicago.edu>
Group Web Site: https://gagliardigroup.uchicago.edu
-------------------------------------------------------------------------
From: Romit Chakraborty <romit@uchicago.edu>
Chakraborty v. Gagliardi | 1:26-cv-00106 | 11
Date: Friday, November 15, 2024 at 10:05 PM
To: Laura Gagliardi <lgagliardi@uchicago.edu>
Subject: Short meeting this Sunday

Hi Laura,
My sincere apologies for not producing a paper.
I hope that you are well. I do have an idea for a paper. Are you free at any point over the weekend or any other weekend?
Sunday would be ideal since I am free in the evening.

Case 1:26-cv-00106 Document #: 62 Filed: 11/02/26 Page 21 of 47 PageID #:43

Sincerely,
Romit

**Source D**

Gagliardi-authored portion of the June 30, 2024 message; signature and quoted earlier correspondence omitted. Original spelling is preserved.
Date: Sun, 30 Jun 2024 09:21:28 +0000
From: Laura Gagliardi <lgagliardi@uchicago.edu>
Chakraborty v. Gagliardi | 1:26-cv-00106 | 12
To: Romit Chakraborty <romit@uchicago.edu>, "hteimoori@microsoft.com" <hteimoori@microsoft.com>, ": msfmr@microsoft.com" <msfmr@microsoft.com>
Cc:
Subject: Re: Microsoft AFMR Program - Azure credits
Message-Id:
<DS0PR11MB6542C9A6A4BE9A109AC9A0ADABD22@DS0PR11MB6542.namprd11.prod.outlook.com>

Dear Hassan and Others,
Could you please give us some time for the migration of our generated results?
This can be coordinate with Romit from our time.
Thank you
Laura

**Source E**

Exhibit 4 to the Second Amended Complaint: proposal titled "Computational Intelligence in Active Space Selection: A Frontier Hypothesis for Multireference Simulations," PDF pages 28–29, exhibit labels EX0012–EX0013; preceding portal screenshot at PDF page 27, EX0011, identifies Gagliardi_Azure_v2.pdf. The proposal names Professor Laura Gagliardi and Romit Chakraborty and identifies Plaintiff's affiliation as Lawrence Berkeley National Laboratory and University of California, Berkeley. It addresses large language models, active-space selection, PySCF integration, benchmarking and reinforcement learning. The exhibit is already identified in the case record; its presence there does not establish a particular earlier transmittal or completed implementation.

SR27-4, SR27-5 and SR29-7 are not limited to the later employment period. They test authorship, review and receipt of this specific earlier proposal separately. No funded award, completed computation or publication refusal is presumed from its text.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROMIT CHAKRABORTY, Ph.D., Plaintiff
v.
LAURA GAGLIARDI, Defendant

Case No. 1:26-cv-00106
Judge Jorge L. Alonso
Magistrate Judge Albert Berry III

## EXHIBIT 22

## UNM January 6, 2025 acceptance of updated application materials

Printout of Samuel Mascarenas's January 6, 2025 email retrieved from Plaintiff's mailbox, including its quoted January 5–6 and December 20 correspondence. This is the complete text body of that message, not a reproduction of an entire mailbox thread. Inline logos and the application attachments referred to in the quoted messages are not included. Formatting is reflowed; source wording is retained.

# Exhibit 22 — UNM correspondence

Mailbox-source text printout; message dated January 6, 2025, 20:42:03 UTC. The source’s quoted local times are retained as displayed.

From: Samuel Mascarenas <samascarenas@unm.edu>
To: Romit Chakraborty <romit.chakraborty@gmail.com>
Date: January 6, 2025, 20:42:03 UTC
Subject: Re: APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico

Thanks Romit!

These have been added to your application and these new materials are what the search committee will be evaluating. Have a great rest of your day!

-Sam

Sam Mascarenas, MBA (he/him/his)

Department Human Resources Rep

Office of the Vice President for Research

The University of New Mexico

Scholes Hall, Suite 327

MSC05 3480

1 University of New Mexico

Albuquerque, NM 87131

Office: 505-277-2949

samascarenas@unm.edu | research.unm.edu

From: Romit Chakraborty <romit.chakraborty@gmail.com>

Sent: Monday, January 6, 2025 1:16 PM

To: Samuel Mascarenas <samascarenas@unm.edu>

Cc: Greg Trejo <gtrejo@unm.edu>

Subject: Re: APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico

You don't often get email from romit.chakraborty@gmail.com. [Learn why this is important](https://aka.ms/LearnAboutSenderIdentification)

[EXTERNAL]

Dear Sam,

Thank you for accommodating my request!

Please find my materials attached.

Sincerely,

Romit

Romit Chakraborty, Ph.D.

Senior Quantum Solutions Computational Chemist

PsiQuantum | Palo Alto,
California

M.S. (2013),
Ph.D. (2017),
University of Chicago

On Mon, 6 Jan 2025 at 11:57, Samuel Mascarenas <samascarenas@unm.edu> wrote:

Hello,

Please send me the documents ASAP as they were due by end of day yesterday.

Thanks!!

-Sam

Sam Mascarenas, MBA (he/him/his)

Department Human Resources Rep

Office of the Vice President for Research

The University of New Mexico

Scholes Hall, Suite 327

MSC05 3480

1 University of New Mexico

Albuquerque, NM 87131

Office: 505-277-2949

samascarenas@unm.edu |
[research.unm.edu](http://research.unm.edu/)

From: Romit Chakraborty <romit.chakraborty@gmail.com>

Sent: Sunday, January 5, 2025 9:53 PM

To: Samuel Mascarenas <samascarenas@unm.edu>

Cc: Vice President for Research <vpr@unm.edu>; Greg Trejo <gtrejo@unm.edu>

Subject: Re: APPLICATION INQUIRY [Open Rank in Quantum Information Science & Engineering-The University of New Mexico

Some people who received this message don't often get email from romit.chakraborty@gmail.com. [Learn why this is important](https://aka.ms/LearnAboutSenderIdentification)

[EXTERNAL]

Hi Samuel (cc: Greg)

Happy New Year!

I responded to your earlier email with the intention of updating my application materials. I received an automatic notification of your return on Jan 6th, Monday. I have updated my application materials, informed my referees about this update, and duly allocated
time over the holiday interim for this adjustment. However, I found out just now that I was no longer able to upload the updated materials on the application portal.

Would you kindly allow me the reasonable accommodation of updating my application materials over email attachment? I shall follow through on that shortly, if permitted.

Sincerely,

Romit

Romit Chakraborty,
MS, Ph.D. UChicago

Senior Quantum Solutions Computational Chemist

PsiQuantum

Palo Alto, California

On Fri, 20 Dec 2024 at 11:25, Samuel Mascarenas <samascarenas@unm.edu> wrote:

Good Afternoon, Applicant!

Thank you for applying to The University of New Mexico's Open Rank in Quantum Information Science & Engineering, req27555. You applied for this position last year, but your application is still in the pool and so it will be evaluated by the search committee.
Before the evaluation process begins, we wanted to make sure that you were still interested in the position. Please notify us by end of day January 5th 2025 to let us know if you are still interested. If we do not hear from you by January 5th, we
will remove you from the pool. Also, if you are interested in updating any of your application materials, please send me your updated information by end of business day on January 5th. (If you have already reached out to me with your updated documents, and
I have responded back to you confirming receipt then you will be evaluated by the search committee with your new materials, and you can disregard this email.)

You can refer to the job posting here. [Requisition: 27555 - Open Rank in Quantum Information Science & Engineering - UNM Jobs Career Site :: The University of New Mexico](https://unm.csod.com/ux/ats/careersite/18/home/requisition/27555?c=unm&referralToken=rSMwBIyAoEG5X8M5fUVt9A)

Thank you, and I hope you have a happy holiday season!

-Sam

Sam Mascarenas, MBA (he/him/his)

Department Human Resources Rep

Office of the Vice President for Research

The University of New Mexico

Scholes Hall, Suite 327

MSC05 3480

1 University of New Mexico

Albuquerque, NM 87131

Office: 505-277-2949

samascarenas@unm.edu |
[research.unm.edu](http://research.unm.edu/)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

Romit Chakraborty, Ph.D. v. Laura Gagliardi

Case No. 1:26-cv-00106

# EXHIBIT 23

# JANUARY 2025 PROFESSIONAL-RECORD AND ASSISTANCE EMAILS

23A-B: Title-correction request, attached-offer metadata, and response, supplementing the response in Exhibit 3. The metadata does not establish that a recipient opened the attachment.

23C: Selected excerpts from Plaintiff's January 4, 2025 request for work records, employment assistance, and support following the reported termination and immigration crisis.

23D: Defendant's January 5, 2025 reply declining future assistance and requesting cessation of email communications.

Source: Plaintiff's personal Gmail records. These are text printouts of identified messages or selected excerpts, not native EML files or independently certified business records. Original account records remain available for authentication.

## 23A — Correction request and offer-attachment record

Date: January 3, 2025, 7:52:36 p.m. PST (January 4, 03:52:36 UTC)

From: Romit Chakraborty <romit.chakraborty@gmail.com>

To: Monica Lugo <lugom@uchicago.edu>

Cc: Laura Gagliardi <lgagliardi@uchicago.edu>

Subject: Correction of Official Title and AMP records

Message ID: 1942f718aa52a48c

Attachment: New+Hire+Employment+2023-08-31.pdf; application/pdf; 96,793 bytes

The authored message is reproduced below with list formatting normalized. The attached two-page August 31, 2023 offer was recovered and checked: it identifies the Quantum-AI Researcher role and Annual Merit Process. The offer is already reproduced in Exhibit 1; it is not duplicated here.

Dear Mónica (cc: Laura),

I hope you’re doing well.
I’m reaching out for assistance on two matters tied to my prior affiliation with the Gagliardi Group at the University of Chicago and as separate from my time as a graduate student at the University.

Official Title Update
Currently, the Gagliardi Group website lists me as a former postdoctoral researcher. I served in a staff capacity under "Quantum-AI Researcher" rather than holding a postdoctoral appointment. May I kindly request that my listing be updated to reflect that role? I attach a copy of my offer letter to confirm the details.

Annual Merit Process (AMP) Records
My offer letter references the University’s Annual Merit Process (AMP), typically around July 1. I do not recall completing or receiving any AMP-related documents. If the University compiled any record of my participation (or non-participation) in the AMP, I would appreciate guidance on reviewing or requesting it.

I maintain a personal log of my research output, but I’d like to confirm if there are any official documents from my time in the Gagliardi group.

Thank you very much for any help you can provide. If there’s a different department I should contact for these requests, please let me know. I’m happy to supply further documentation or information if it would be helpful. And my sincere apologies for creating this additional work for you!

Regards,
Romit

Romit Chakraborty, Ph.D.
Senior Quantum Solutions Computational Chemist
PsiQuantum
Palo Alto, California

## 23B — Gagliardi’s response

Date: January 3, 2025, 11:51:18 p.m. PST (January 4, 07:51:18 UTC)

From: Laura Gagliardi <lgagliardi@uchicago.edu>

To: Romit Chakraborty <romit.chakraborty@gmail.com>; Monica Lugo <lugom@uchicago.edu>

Subject: Re: Correction of Official Title and AMP records

Message ID: 194304c290fe269a

Complete newly authored reply below. The institutional signature block and duplicate quotation of the request reproduced in 23A are omitted. The source also appears in Exhibit 3. The January 3 date used in the pleading follows the Pacific-time display; the corresponding Chicago date is January 4.

Dear Romit,

You were hired as a staff scientist because you were too senior to be hired as a postdoc.

However, on our website we have only two categories: postdocs and graduate student and this is why you are under postdocs.

The title "Quantum-AI Researcher" is totally made up by you.

We didn’t do an annual merit review because you stayed less than one year so there are no related documents.

Best

Laura

# EXHIBIT 23C - SELECTED EMAIL EXCERPTS

*Text printout of selected passages from the original message. Whitespace and typography normalized; quoted prior messages omitted. This is not a native email export or a certified copy.*

Date (UTC): January 4, 2025, 09:42:06 UTC

Original Date header: Sat, 4 Jan 2025 01:42:06 -0800

From: Romit Chakraborty <romit.chakraborty@gmail.com>

To: Laura Gagliardi <lgagliardi@uchicago.edu>

Subject: Re: Correction of Official Title and AMP records

*Selected message body passages*

Then, on December 10, after only six weeks at the job, I was suddenly terminated in a 15-minute unscheduled meeting. My work laptop was confiscated on the spot and access to digital records was revoked, citing performance and teamwork issues - claims that had never been documented or hinted at before.

The weeks since this happened have been tremendously strenuous and stressful since this has immigration consequences that jeopardise my legal status in the US and impose temporal and procedural constraints on the legal remedies I can pursue.

Thank you for understanding why I'm searching for these records and for any support or assistance you can offer in this dire time.

You also have many connections in the industry, and I need a new job.

*Source: original email in Plaintiff's personal Gmail; message headers and body reviewed.*

# EXHIBIT 23D - SELECTED EMAIL EXCERPTS

*Text printout of selected passages from the original message. Whitespace and typography normalized; quoted prior messages omitted. This is not a native email export or a certified copy.*

Date (UTC): January 5, 2025, 10:21:30 UTC

Original Date header: Sun, 5 Jan 2025 10:21:30 +0000

From: Laura Gagliardi <lgagliardi@uchicago.edu>

To: Romit Chakraborty <romit.chakraborty@gmail.com>

Subject: Re: Correction of Official Title and AMP records

*Complete reply body preceding signature block*

Dear Romit, I am sorry for your situation. I wish you all the best, but I will not be able to help you in the future. Please discuss your situation with Martin and whomever you think is appropriate but stop emailing me. Once you have recovered what you need from the U Chicago email address, we will have no further communication. Thank you for your understanding. Laura

*Source: original email in Plaintiff's personal Gmail; message headers and body reviewed.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

# EXHIBIT 24

## March and July 2024 faculty-candidacy and reference communications

The selected messages preserve both the continuing academic candidacy and favorable industry-related assistance. No UCF offer, hiring decision, or reason for a decision is supplied here.

Source: messages retrieved from Plaintiff's personal Gmail account. This is a text printout, not a native EML or an independently certified business record. Metadata identifies the message used. The account records and any native originals remain the sources for authentication.

## 24A — Notice to Gagliardi of the UCF candidacy

Date: July 19, 2024, 00:11:33 UTC (July 18, 7:11:33 p.m. CDT)

From: Laura Gagliardi <lgagliardi@uchicago.edu>

To: Romit Chakraborty <romit@uchicago.edu>

Subject: Re: Got an offer from Svante

Message ID: 190c8547f48259ae

Complete text of this message and its quoted request; line wrapping normalized. Quoted local date displays are retained. This does not establish when the separate July conversation with Head-Gordon occurred.

Hi Romit

I am flying back to Chicago now. We can talk on Saturday.

Laura Gagliardi

Sent from my iPhone

On Jul 19, 2024, at 7:38 AM, Romit Chakraborty <romit@uchicago.edu> wrote:

Hi Laura,

I'm sorry for doing this over email while you are away at a conference.

I got an offer at Svante with a start date in January, and they are looking for a quick response (by Monday, latest by Wednesday). This position is in Vancouver, Canada, and I am ambivalent about it. It is a permanent Staff Scientist position at a good firm, but it will complicate my self-sponsored petition for residency in the US. I liked interviewing with them (which you recommended) since it taught me a thing or two about practical machine learning.

Would you be free to talk about this sometime before Monday? Any time that works for you should work for me!

Sincerely,

Romit

P.S. I have a final-round interview with PsiQuantum tomorrow morning. I might get an offer at UCF for a tenure-track position although I'm not a 100% on this. Martin has advised me to negotiate a start date in January to complete the Chicago projects.

## 24B — Continuing UCF candidacy and separate industry reference

Date: July 23, 2024, 16:02:01 UTC (11:02:01 a.m. CDT)

From: Martin Head-Gordon <m_headgordon@berkeley.edu>

To: Romit Chakraborty <romit@berkeley.edu>

Cc: romit.chakraborty@gmail.com

Subject: Re: reference check / update

Message ID: 190e05434ab9541d

Complete message and quoted thread below; line wrapping normalized. Plaintiff's startup/office-space account and the absence of a formal offer are both retained, as is Head-Gordon's separate PsiQuantum reference-check statement.

Hi Romit,

Sounds good -- interesting that UCF is still in play!

Cheers, Martin

On Tue, Jul 23, 2024 at 11:51 AM Romit Chakraborty <romit@berkeley.edu> wrote:

P.S. I would've reached out to you earlier about this, but I had a minor accident after my final round on Friday that has affected my ability to type.

On Tue, Jul 23, 2024 at 10:08 AM Romit Chakraborty <romit@berkeley.edu> wrote:

Hi Martin,

I hope you are doing well.
a) Yes. A month ago, the University of Central Florida asked for detailed information about allocating startup funds and office space. I have been in touch with the chair since but have not received anything concrete by way of an offer. This round of industry applications was not planned and materialized organically while I was preparing materials for this year's academic cycle. I did this with Laura's knowledge and support. I will discuss the details of a) and b) with her tomorrow.
b) The clear answer is that I don't know. I still need to get the formal offer from PsiQuantum. There are several factors, such as my immigration status (which I will know once I hear the terms from PsiQuantum), whether or not I get a formal offer from the University of Central Florida, the negotiated start date at each of these places, career viability for a full-blown plunge into fault-tolerant quantum computing, that will factor into this decision. I would like to meet you briefly about this if you are available.

If it's a matter of reference check, I'm fully committed to getting an offer from PsiQuantum for the position I interviewed for. I will be able to do the job. On the other hand, I have kept pace with my research work here to be in contention for an academic round in the fall.

Sincerely,
Romit

On Tue, Jul 23, 2024 at 9:32 AM Martin Head-Gordon <m_headgordon@berkeley.edu> wrote:

Hi Romit,

Just a quick note to say that I have a reference check call for you with PsiQuantum soon, and do I infer from this that (a) Central Florida has not (yet) come through, and (b) you may not be doing an academic search this year? What are your current thoughts?

Cheers, Martin

--
Martin Head-Gordon
Kenneth S. Pitzer Distinguished Professor, Dept. of Chemistry, Univ. of California, Berkeley, and,
Senior Faculty Scientist, Chemical Sciences Division, Lawrence Berkeley National Laboratory

## 24C — March 26 notice of the Florida faculty site interview

Date: March 26, 2024, 18:54:51 UTC (1:54:51 p.m. CDT)

From: Romit Chakraborty <romit.chakraborty@gmail.com>

To: Laura Gagliardi <lgagliardi@uchicago.edu>

Subject: Re: Meet with Prof. Berend Smit today March 26 at 4.30 pm

Message ID: 18e7c1d7fd6be796

Selected excerpt: complete interview-related exchange. Institutional signature blocks and the preceding group-meeting scheduling correspondence are omitted. The text says Florida, not UCF; Plaintiff identifies the visit as his UCF interview, also described in Exhibit 19D.

Hi Laura,

It’s going well. They are interviewing four candidates for one spot.

Best,

Romit

On Tue, Mar 26, 2024 at 1:30 PM Laura Gagliardi <lgagliardi@uchicago.edu> wrote:

How did it go?

Laura

From: Romit Chakraborty <romit.chakraborty@gmail.com>
Date: Tuesday, March 26, 2024 at 1:28 PM
To: Laura Gagliardi <lgagliardi@uchicago.edu>
Subject: Re: Meet with Prof. Berend Smit today March 26 at 4.30 pm

Hi Laura,

I’m wrapping up my site visit in Florida this week, and will be back tomorrow.

Best,

Romit

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

# EXHIBIT 25

## Contemporaneous research communications: March 21, April 12, and July 10, 2024

These records identify actual communications, participants, and dates. Proposed work, reported work, and completed or publishable results are not treated as interchangeable.

Source: messages retrieved from Plaintiff's personal Gmail account. This is a text printout, not a native EML or an independently certified business record. Metadata identifies the message used. The account records and any native originals remain the sources for authentication.

## 25A — March 21 technical research discussion

Date: March 21, 2024, 18:13:36 UTC (1:13:36 p.m. CDT)

From: Matthew Hermes <mrhermes@uchicago.edu>

To: Romit Chakraborty <romit@uchicago.edu>

Cc: Daniel King <king1305@uchicago.edu>; Laura Gagliardi <lgagliardi@uchicago.edu>

Subject: Regarding LAS with PBC and translational symmetry

Message ID: 18e6238488739c1e

Complete message body below; line wrapping normalized. No attachment.

Hey Romit,

As we discussed last night, fully integrating LASSCF and post-LASSCF with PBC and translational symmetry is a large project, and it's not the case that I just have a set of programmable equations for it ready to go. I have some ideas about some of the things that have to happen, and I know that the first step is to make sure that LASSCF is transparently compatible with Γ-point PBC supercell calculations. For instance, a small molecule with open boundary conditions, versus a small molecule in a large empty supercell, should yield approximately the same result. The first step of my workflow to this would be to literally just try to build and run a LASSCF method instance using a PBC HF instead of the default OBC HF and see what happens.

Once we can make a generic PBC Γ-point LASSCF calculation work, we can try to replicate or extend Daniel's band-structure work to the case of an actual straight hydrogen chain. At this point we still wouldn't have translational symmetry, but we can use Daniel's procedure anyway and this will give us a point of reference for future work.

At some point in the project, we will have to impose translational symmetry which will probably involve the UnitaryGroupGenerator.pack and unpack functions I was talking about last night.

At some point in the project, we will have to confront the fact that crystalline orbitals (COs) with non-trivial translational symmetry are complex-valued, which complicates a bunch of low-level functions and also complicates some of the programmable equations [for example, the ERIS (pq|rs) and (qp|rs) are no longer interchangeable].

At some point in the project, we will probably have to implement the Wannierization (or at any rate the localization) of the active orbitals. The LASSCF formalism technically permits you to define clusters in any arbitrary way including completely nonlocal COs, but that's probably not the use case we want to target.

But those ^ three points are all unmoored, errant, random thoughts of mine, and I don't have any textbooks or papers off the top of my head to help explain them. My actual suggestion for how to proceed is the first two paragraphs: let's just target "Daniel's band structures, but for an actually straight hydrogen chain" to start out.

In the meantime, section 1 of the SI of DOI:10.1021/acs.jctc.0c00222 describes how the LASSCF energy is expanded in a power series of unitary group generator amplitudes in the default synchronous algorithm. It contains at least one error in the derivation, which a reader following along very diligently will be able to catch. Understanding this document should provide a good basis for understanding what I'm packing and unpacking.

- MRHermes

## 25B — April 12 workflow and conference communication

Date: April 12, 2024, 17:08:34 UTC (12:08:34 p.m. CDT)

From: Romit Chakraborty <romit@uchicago.edu>

To: Laura Gagliardi <lgagliardi@uchicago.edu>

Subject: Fwd: Registration Form UNITN

Message ID: 18ed3484e5df2214

Attachment: QSG 2024 -FORM UNITN - invoice data.docx (registration form; not reproduced)

The full authored request and forwarded registration message are reproduced. Only the registration office's address/telephone/social-media signature block is omitted. The forwarded registration message does not independently state that scientific work was completed or accepted for publication.

Hi Laura,

I want to give a short talk at this workshop.
https://indico.ectstar.eu/event/204/
An abstract I submitted, an agentic workflow for active space selection using LLMs (the overview is similar to the summary at the active space meeting this week + computations using a back-end engine), was accepted as part of the proceedings.
Travelling to Trento for this would be excessive, so I would like to present remotely. The workshop is between May 6 and 10, and it would be good preparation for my group meeting talk on May 16th. Do you think this is a good idea?

Sincerely,
Romit

---------- Forwarded message ---------
From: Workshop Quantum Science Generation <qsgworkshop@unitn.it>
Date: Fri, 12 Apr 2024 at 05:08
Subject: Registration Form UNITN
To: Romit Chakraborty <romit.chakraborty@gmail.com>

Dear Romit,

I'm writing regarding your registration to QSG 2024: in order to complete your registration and receive the payment information you have to fill the attached file:

After that you will receive in a few days, the invoice and payment instructions from the accounting department by email.

Coul you please send me the fill document today, please!

For future questions don't hesitate to contacs us.

Best regards

Francesca

## 25C — July 10 slide scheduling exchange

Date: July 10, 2024, 19:06:21 UTC (2:06:21 p.m. CDT)

From: Laura Gagliardi <lgagliardi@uchicago.edu>

To: Romit Chakraborty <romit@uchicago.edu>

Subject: Re: My meetings today

Message ID: 1909e0a3359b327f

Selected excerpt: complete newest reply and immediately preceding request. Institutional signature blocks and earlier meeting-location correspondence, including Zoom access credentials, are omitted. This exchange schedules a slide; it is not a transmission receipt for the slide.

Yes this is fine. Tomorrow morning is fine.

Laura

From: Romit Chakraborty <romit@uchicago.edu>
Date: Wednesday, July 10, 2024 at 2:03 PM
To: Laura Gagliardi <lgagliardi@uchicago.edu>
Subject: Re: My meetings today

Hi Laura,

I need to catch up on some sleep in the afternoon.

Could I send you the slide on automated active space selection using large language models by 12 AM?

Sincerely,

Romit

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

# EXHIBIT 26

## 2024 staff performance-review and salary-cycle notices

These contemporaneous notices identify an existing staff-review process and salary cycle. They do not themselves resolve Plaintiff's eligibility under every unit-specific rule, who completed any evaluation, or why a particular review did not occur.

Source: messages retrieved from Plaintiff's personal Gmail account. This is a text printout, not a native EML or an independently certified business record. Metadata identifies the message used. The account records and any native originals remain the sources for authentication.

## 26A — Contemporaneous PSD performance-review announcement

Date: April 2, 2024, 19:22:02 UTC (2:22:02 p.m. CDT)

From: Luisana Romero <lromero1@uchicago.edu>

To: psdallstaff@lists.uchicago.edu

Subject: [psdallstaff] PSD Performance Management has Launched

Message ID: 18ea04bbe3860b2f

Complete message content; table structure and wrapping normalized. Link display words are retained, but the Box sharing URL and Zoom credentials are omitted. The linked forms are not reproduced or characterized as verified in this exhibit. The message was present in Plaintiff’s inbox.

Dear Staff,

The 2023-2024 Performance Review Process has begun. Employees can access forms and resources designed to help understand the performance process and prepare for goal-setting conversations with their managers here. We are following a similar process as last year.

Your unit will likely communicate with you their own deadlines, so I encourage you to reach out to your supervisor with questions related to the timeline for your individual evaluation.

You are also invited to attend the optional zoom session held on Monday, April 8th at 11:00 am to learn more and help answer questions about this process. The information session is optional. You do not need to register in advance. Simply click the link below on Monday when you are ready to join the information session.

Date & Time: April 8, 11:00 AM
Session Type: Employees – The virtual session will showcase the Performance Management process, available resources, and Q&A.
Zoom Link: Click Here

If you have any questions regarding the process or forms, please reach out directly to your unit’s HR Partner.

Thank you for everything you do to support the PSD.

Luisana Romero, PHR
Human Resources Generalist
The University of Chicago | Physical Sciences Division
E: Lromero1@uchicago.edu
T: 773 702 9440

## 26B — Chemistry salary-statement notice

Date: July 3, 2024, 14:46:48 UTC (9:46:48 a.m. CDT)

From: Ben Anderson <ben_anderson@uchicago.edu>

To: No To mailbox displayed in the retrieved message; body addressed “Chemistry Staff”

Cc: Raven Jones <rjones16@uchicago.edu>

Subject: Salary statements - available in Workday July 10th

Message ID: 19079100ea445535

Complete message body; line wrapping normalized. The message was present in Plaintiff’s inbox. Its payment dates are distinct from the July 1 effective date shown in the Workday record.

Chemistry Staff,

Please note that salary statements will be available for review in Workday on July 10th.

Salary increases go into effect July 12th for non-exempt employees and July 31st for exempt employees. Please note that not all individuals will receive a merit increase including those that are new-to-role or recently promoted. Contact your HR Partner if you notice any errors.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

Romit Chakraborty, Ph.D. v. Laura Gagliardi

Case No. 1:26-cv-00106

**EXHIBIT 27**

**SELECTED PSIQUANTUM PRODUCTION RECORDS**

PSIQ SUBP RESP 0001 and 0003: Checkr report and staff-role verification. The report distinguishes candidate-supplied title from the employer response and does not identify Gagliardi as the source of that response.

PSIQ SUBP RESP 1367 and 1380-1383: March 2025 Hennefarth hiring correspondence, including staff-scientist experience, proposed offer justification, HR questions, and the initial offer table. These records do not establish approval of the proposed increase or the candidate's citizenship.

PSIQ SUBP RESP 2101: December 9, 2024 progress-report and scientific-notes transmittal. Referenced scientific attachments are not reproduced here; transmission does not establish their scientific quality.

PSIQ SUBP RESP 2371 and 2398: March 10, 2025 formal employment-end records.

PSIQ SUBP RESP 2425-2426: December 12 HR confirmation of a final termination decision and effective-date extension, with the contemporaneous December 10 employee correspondence.

These are selected original production pages. The professional contacts and chronology do not themselves establish a negative reference or Gagliardi's participation in the termination decision.

checkr

Report completed on Aug 1, 2024 6:25 PM UTC

Consumer Report for
Romit Chakraborty
romit.chakraborty@gmail.com

Requestor Company
PsiQuantum

Status
Clear

California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.

Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.

## Report Summary

| | | |
|---|---|---|
| SSN Trace | Jul 30, 2024 | Complete |
| Sex Offender Search | Jul 30, 2024 | Clear |
| National Search | Jul 30, 2024 | Complete |
| Federal Search | Jul 30, 2024 | Complete |
| County Searches | Aug 1, 2024 | Clear |
| Employment Verification | Jul 31, 2024 | Clear |
| Education Verification | Jul 30, 2024 | Clear |

## Employment Verification

Clear

University of Chicago, Chicago, IL, US

Clear

Position
Quantum AI Staff Researcher
Nov, 2023 - Present

Manager
Laura Gagliardi,
lgagliardi@uchicago.edu · 7738168338

| | Candidate Input | Employer Response |
|---|---|---|
| Position | Quantum AI Staff Researcher | Research Professional, Analyst - REREPP1E |
| From date | Nov, 2023 | 09/17/2012 |
| To date | Present | Present |
| Contract type | Full-time | N/A |

University of California, Berkeley, Berkeley, CA, US

Clear

Position
Last position held
Oct, 2017 - Sep, 2023

Manager
Prof. Martin Head-Gordon,
mhg@cchem.berkeley.edu · 5106425957

| | Candidate Input | Employer Response |
|---|---|---|
| Position | Last position held | Postdoc - Employee |
| From date | Oct, 2017 | 09/21/2017 |
| To date | Sep, 2023 | 09/10/2023 |
| Contract type | Full-time | N/A |

**Sent:** 12/9/2024 1:35:19 PM
**From:** Romit Chakraborty <rchakraborty@psiquantum.com>
**To:** "Arvin Kakekhani" <akakekhani@psiquantum.com>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Progress Report
**Attachments:** Progress_Report (2).pdf , AML_for_Forces.pdf

---

Hi Arvin,

Please find attached. The second doc contains notes on AML for forces.

Sincerely,
Romit

P.S. My car registration still hasn't shown up, and I need to get stuff done in the afternoon. Any chance you'd be okay with me working from home this afternoon?

**Sent:** 3/10/2025 2:25:42 PM
**From:** Tara Shapowal <tshapowal@psiquantum.com>
**To:** "HR" <hr@psiquantum.com>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** [Termination Documents] Romit Chakraborty
**Attachments:** Outlook-5ifnk033.png , FINAL 3-10 - Termination Letter - Chakraborty, Romit.docx , FINAL 3-10 - Separation Letter - Chakraborty, Romit.docx

---

Hi Kris,
Please review and approve the updated letters for Romit Chakraborty. Today is his official last day, extended out from 12/20/24.
Offering a 2-week severance.
Link to Romit's personnel file: Chakraborty, Romit
Thanks,

**Tara Shapowal-Lau**
Director, HR Operations

C +1 267 897 0349
E tshapowal@psiquantum.com

PsiQuantum

**Sent:** 3/10/2025 10:44:13 AM
**From:** PsiQuantum Stock Administration <stockadmin@psiquantum.com>
**To:** "Tara Shapowal" <tshapowal@psiquantum.com>
**Cc:** "HR" <hr@psiquantum.com>
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Re: Carta Update_Romit Chakraborty
**Attachments:** Outlook-uszhhfiu.png , image001.png

---

Hi Tara,

Confirming Romit has been terminated in Carta as of today, 3/10/25.

Best,
Crystal

**Crystal Huang**
Sr. Manager, Investor Affairs & Stock Administration

C +1 510 449 3301
E crystal@psiquantum.com

PsiQuantum

---

**From:** Tara Shapowal <tshapowal@psiquantum.com>
**Date:** Friday, March 7, 2025 at 3:51 PM
**To:** PsiQuantum Stock Administration <stockadmin@psiquantum.com>
**Cc:** HR <hr@psiquantum.com>
**Subject:** Carta Update_Romit Chakraborty

Hi Crystal,

Confirming we terminated **Romit Chakraborty.**

Official last day: 3/10/25
Type: Involuntary

Please update Carta.

Thanks,

**Tara Shapowal-Lau**
Director, HR Operations

C +1 267 897 0349
E tshapowal@psiquantum.com

PsiQuantum

**PsiQuantum**
Palo Alto, California

On Thu, 12 Dec 2024 at 17:27, Romit Chakraborty <romit.chakraborty@gmail.com> wrote:

Dear Tara,

Thank you for extending my termination date to January 10, 2025. To ensure clarity about the transition:

1. Could you please confirm my last day on payroll, as this date determines the start of my 60-day grace period relating to my O-1A visa? The conversation with Nathan Grow from WR immigration was had.
2. Please specify the duration of health insurance and other benefits coverage
3. Kindly confirm access to the benefits portal, particularly for legal services coverage
4. Please acknowledge receipt of my December 12th records request per California Labor Code § 1198.5

Thank you so much for your help during this transition.

Best regards,
Romit
Romit Chakraborty**, Ph.D.**
**Quantum AI**

On Thu, 12 Dec 2024 at 16:48, Tara Shapowal <tshapowal@psiquantum.com> wrote:

Hi Romit,
I wanted to acknowledge receipt of your email below and appreciate you sharing your thoughts. However, the decision to terminate your employment is final. We understand this is a challenging situation for you and would like to support you during this time. To provide you with more time for this transition, we will move the effective date of your termination from December 20, 2024 to January 10, 2025. If you have any questions, please feel free to reach out to me.
We also recommend you have a conversation with Nate at WR Immigration to understand your immigration next steps. You should have received an email from him.
Best,
**Tara Shapowal-Lau**
Director, HR Operations

C +1 267 897 0349
E tshapowal@psiquantum.com

**From:** Romit Chakraborty <romit@uchicago.edu>
**Sent:** Tuesday, December 10, 2024 9:42 PM
**To:** HR <hr@psiquantum.com>; Tara Shapowal <tshapowal@psiquantum.com>
**Cc:** Christine Keelan <ckeelan@psiquantum.com>; Nicole Chatelin-Tembrevilla <ntembrevilla@psiquantum.com>; Sarah Mangano <smangano@psiquantum.com>
**Subject:** Re Termination: Humbly Asking for Understanding and a Path Forward at PsiQuantum

**[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Dear Tara,
(cc: Christine, Nicole, Sarah, HR)

I hope this message finds you well.

I am writing to you about the recent decision to end my employment at PsiQuantum, scheduled for December 20th and communicated today, on December 10th. I am grateful for the opportunity I've had to contribute to PsiQuantum's mission so far, and I hope to clarify the circumstances while reaffirming my dedication to the company's success.

When I joined PsiQuantum on October 28th, it was with genuine enthusiasm for the company's groundbreaking vision and deep confidence in its leadership—particularly in Arvin's exceptional expertise and forward-looking approach to quantum computing for chemistry. These qualities inspired my decision to join and continue to guide my commitment to PsiQuantum's goals.

Over the past six weeks, I have relocated, adapted my career trajectory, and fully immersed myself in the team's work and vision. I delivered results on assigned tasks, presented my progress at team meetings, and remained consistently available for the regular one-on-one sessions described as non-negotiable with my manager—sessions I looked forward to for guidance and alignment but did not have the opportunity to hold recently (past 2-3 weeks). While I understand that workloads can be heavy and schedules tight, I believe these discussions would have provided valuable clarity and direction.

On December 5th, I was asked—on short notice—to provide a performance summary. Although the timeline was tight, I fully met the expectations, submitted a thorough report by the adjusted deadline of December 9th, discussed my progress and data during that day's meeting, and immediately shared all underlying code and data to foster transparency and collaboration.

I appreciate that concerns have been raised regarding performance and teamwork at the termination meeting today. This was the first time I heard about them. I would have welcomed more explicit guidance or defined expectations so I could address these issues proactively. I believe there is an opportunity for understanding, alignment, and growth with open dialogue. While I understand that concerns about my performance and teamwork were shared with me today—after the decision to terminate my employment had already been made—I never received the clear expectations or guidance that would have allowed me to address these issues proactively, meet the team's standards, and fully demonstrate my potential.

As you know, my transition from the University of Chicago to PsiQuantum involved securing an O-1A visa. This was a significant investment of time and effort for both the company and me. A sudden termination leaves me with a very limited 60-day window—compounded by a holiday period when most companies are not actively hiring—to secure new sponsorship. This situation puts my legal status and professional future in the U.S. in jeopardy. I humbly ask that you re-evaluate the decision, reflecting on the mutual investments made, the lack of predefined standards on performance and teamwork that were cited as the reason, and seek a solution that respects everyone's interests.

I remain fully committed to PsiQuantum's objectives. I am ready to embrace additional training, more frequent alignment meetings, or structured performance benchmarks to ensure all expectations are met. I truly believe that, through open communication and a collaborative spirit, I can contribute meaningfully to the company's success and support the values that make PsiQuantum exceptional.

Thank you for your time, understanding, and any help you can give in reviewing this decision and facilitating a constructive follow-up discussion. With goodwill, I hope we can identify a positive path forward for all involved.

Sincerely,
Romit

**Sent:** 3/12/2025 2:48:39 PM
**From:** April Ragona <aragona@psiquantum.com>
**To:** "Philipp Ernst" <pernst@psiquantum.com> "Arvin Kakekhani" <akakekhani@psiquantum.com>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** RE: [Offer Approval]- Hennefarth_M
**Attachments:** image002.png , image003.png

---

Hello,

Is the more senior role listed on his resume? @Arvin Kakekhani I'll be on the lookout for the justification for the higher salary request. Currently, we do not have approval to go in at a higher salary. I can review once the justification is received.

Thank you,

**April Ragona**
Senior Human Resources Business Partner

C +1 520 203 6638
E aragona@psiquantum.com

PsiQuantum

---

**From:** Philipp Ernst <pernst@psiquantum.com>
**Sent:** Wednesday, March 12, 2025 1:16 PM
**To:** April Ragona <aragona@psiquantum.com>; Arvin Kakekhani <akakekhani@psiquantum.com>
**Subject:** Re: [Offer Approval]- Hennefarth_M

Hi April,

I'd like to proceed with this, please. Do we have the green light for the higher offer? What does it take?

Also, I'd like Arvin to do the negotiation with Matthew, please, to get it across the line?

@Arvin Kakekhani can you give April the arguments for why the salary should be higher?

April, anything you need from me to go forward here?

Thanks a lot,
Philipp

---

**From:** Philipp Ernst <pernst@psiquantum.com>
**Date:** Wednesday, March 12, 2025 at 8:55 AM
**To:** April Ragona <aragona@psiquantum.com>
**Cc:** Arvin Kakekhani <akakekhani@psiquantum.com>
**Subject:** FW: [Offer Approval]- Hennefarth_M

Hi April,

Can you help with this?

The guy is awesome, acknowledged to be the best from a top group who had a more senior role there than usual for PhD student, essentially as a staff scientist to my understanding.

On top, we have cut equity vs the other person from that group we have hired and we don't yet have the new valuation and strike price, so this is much more fuzzy.

**Sent:** 3/13/2025 1:34:44 AM
**From:** Arvin Kakekhani <akakekhani@psiquantum.com>
**To:** "April Ragona" <aragona@psiquantum.com> "Philipp Ernst" <pernst@psiquantum.com>
**Cc:**
**Bcc:**
**Importance:** 3 (Normal)
**Subject:** Re: [Offer Approval]- Hennefarth_M
**Attachments:** image002.png , image003.png

---

Hi April,

Matthew represents exceptional value, and we strongly believe he warrants the proposed higher salary. Philipp and I prioritize fairness among team members while carefully managing PsiQuantum's costs. Still, to attract top-tier talent like Matthew, adjustments based on the candidate's market value and demonstrated capabilities are necessary.

Here's a concise justification supporting Matthew's proposed salary ($175k base, $15k sign-on):

1. Exceptional Scientific Track Record:
   - Matthew's undergraduate research at UCLA produced 7 high-quality publications, an achievement typically surpassing that of most doctoral graduates at top institutions.
   - At UCLA, he was promoted to Staff Scientist, a senior title rarely awarded even at the postdoctoral stage.
2. Groundbreaking PhD Research:
   - Matthew will complete his PhD in quantum chemistry in only 3 years and 10 months, compared to the typical 5–6 years, because of his extraordinary productivity and maturity.
   - He has authored 5 highly impactful publications, **creating an entirely new quantum chemistry method** (Linearized Pair-Density Functional Theory (LPDFT)), significantly advancing computational efficiency.
   - It's worth noting that even **most professors never achieve the creation of a totally new quantum chemistry methodology throughout their entire careers.**
   - Our own team member, Abhishek (Matthew's former senior lab colleague), has confirmed Matthew's scientific maturity, indicating his skills surpass those of a typical PhD graduate and match that of a staff scientist.

Given these considerations**, Matthew's anticipated productivity and business impact could be 1.5–2x that of a typical recent PhD hire.** The proposed salary adjustment (from $167k to $175k, less than a 5% increase) is thus highly justified relative to the expected significant increase in ROI (potentially 150–200%).

We sincerely appreciate HR's diligence and partnership in ensuring fairness and responsible budget management. At the same time, I kindly request your trust in our carefully considered recommendations, enabling smoother hiring processes that ultimately benefit PsiQuantum's growth.

Thanks again for your support!

--
Best regards,
Arvin Kakekhani
Manager, Quantum Solutions Science
Email: akakekhani@psiquantum.com

---

**From:** April Ragona <aragona@psiquantum.com>
**Date:** Wednesday, March 12, 2025 at 2:48 PM
**To:** Philipp Ernst <pernst@psiquantum.com>, Arvin Kakekhani <akakekhani@psiquantum.com>
**Subject:** RE: [Offer Approval]- Hennefarth_M

Hello,

Is the more senior role listed on his resume? @Arvin Kakekhani I'll be on the lookout for the justification for the higher salary request. Currently, we do not have approval to go in at a higher salary. I can review once the justification is received.

Thank you,

**April Ragona**
Senior Human Resources Business Partner

C +1 520 203 6638
E aragona@psiquantum.com

PsiQuantum

**From:** Philipp Ernst <pernst@psiquantum.com>
**Sent:** Wednesday, March 12, 2025 1:16 PM
**To:** April Ragona <aragona@psiquantum.com>; Arvin Kakekhani <akakekhani@psiquantum.com>
**Subject:** Re: [Offer Approval]- Hennefarth_M

Hi April,

I'd like to proceed with this, please. Do we have the green light for the higher offer? What does it take?

Also, I'd like Arvin to do the negotiation with Matthew, please, to get it across the line?

@Arvin Kakekhani can you give April the arguments for why the salary should be higher?

April, anything you need from me to go forward here?

Thanks a lot,
Philipp

**From:** Philipp Ernst <pernst@psiquantum.com>
**Date:** Wednesday, March 12, 2025 at 8:55 AM
**To:** April Ragona <aragona@psiquantum.com>
**Cc:** Arvin Kakekhani <akakekhani@psiquantum.com>
**Subject:** FW: [Offer Approval]- Hennefarth_M

Hi April,

Can you help with this?

The guy is awesome, acknowledged to be the best from a top group who had a more senior role there than usual for PhD student, essentially as a staff scientist to my understanding.

On top, we have cut equity vs the other person from that group we have hired and we don't yet have the new valuation and strike price, so this is much more fuzzy.

Is there anything we can do?

Thanks,
Philipp

**From:** Kris Werner <kwerner@psiquantum.com>
**Date:** Tuesday, March 11, 2025 at 9:00 PM
**To:** Philipp Ernst <pernst@psiquantum.com>, Erin Courson(C) <ecourson@psiquantum.com>, Nicole Mcneal <nmcneal@psiquantum.com>
**Cc:** April Ragona <aragona@psiquantum.com>, Recruiting <Recruiting@psiquantum.com>, Arvin Kakekhani <akakekhani@psiquantum.com>
**Subject:** RE: [Offer Approval]- Hennefarth_M

Hi all. This is a new grad. We have leadership approved standard rates for new grads. He has no PostDoc experience nor any industry experience so he has no qualified experience we can use to upgrade the offer. We can add a $10-15k sign on but that is the best the company would be able to do. Erin, please make this our final offer.

**Kris Werner (she/her)**
Global Head of Human Resources
Ph.D., M.B.A., P.C.C.

C +1 9169906135
E kwerner@psiquantum.com

PsiQuantum

---

**From:** Philipp Ernst <pernst@psiquantum.com>
**Sent:** Tuesday, March 11, 2025 12:07 PM
**To:** Erin Courson(C) <ecourson@psiquantum.com>; Nicole Mcneal <nmcneal@psiquantum.com>
**Cc:** April Ragona <aragona@psiquantum.com>; Kris Werner <kwerner@psiquantum.com>; Recruiting <Recruiting@psiquantum.com>; Arvin Kakekhani <akakekhani@psiquantum.com>
**Subject:** Re: [Offer Approval]- Hennefarth_M

Hi all,

The guy is the strongest candidate out of all we had so far – we want him.

Let’s go to 175k base and 15k sign-on.

Thanks,
Philipp

---

**From:** Erin Courson(C) <ecourson@psiquantum.com>
**Date:** Tuesday, March 11, 2025 at 7:49 PM
**To:** Nicole Mcneal <nmcneal@psiquantum.com>
**Cc:** April Ragona <aragona@psiquantum.com>, Kris Werner <kwerner@psiquantum.com>, Recruiting <Recruiting@psiquantum.com>, Arvin Kakekhani <akakekhani@psiquantum.com>, Philipp Ernst <pernst@psiquantum.com>
**Subject:** Re: [Offer Approval]- Hennefarth_M

Hi Nicole,

Matthew is asking for a revised offer of $182k base which I have told him we likely cannot match. Alternatively, can we add a sign on bonus? Arvin would like to give a sign-on bonus of $15k for Matthew. Please let me know if we have approval to add this on. I think this would likely be enough to get him to sign.

Thanks!
Erin

---

**From:** Nicole Mcneal <nmcneal@psiquantum.com>
**Sent:** Friday, March 7, 2025 1:09 PM
**To:** Erin Courson(C) <ecourson@psiquantum.com>
**Cc:** April Ragona <aragona@psiquantum.com>; Kris Werner <kwerner@psiquantum.com>; Recruiting <Recruiting@psiquantum.com>; Arvin Kakekhani <akakekhani@psiquantum.com>; Philipp Ernst <pernst@psiquantum.com>
**Subject:** [Offer Approval]- Hennefarth_M

Hi Erin,

If all requirements have been met, please make the following offer.

**OFFER TEMPLATE**

| | | |
|---|---|---|
| UID: | 0 | |
| Title: | Quantum Solutions Computational Chemist | |
| Level: | ICT3 | |
| Location: | HQ-Palo Alto | |
| candidate: | Matthew Hennefarth | |
| Hiring Manager: | Arvin Kakekhani | |
| Base: | 166-167 | USD |
| Variable: | 8% | |
| Equity: | 6,667 | |
| Sign On: | - | |
| Relo: | 10k | |
| Start Date: | Early June 2025 is ideal for us | |

Thanks
Nicole

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

## Romit Chakraborty, Ph.D. v. Laura Gagliardi

## Case No. 1:26-cv-00106

## EXHIBIT 28

## MIGRATION AND ACCELERATOR RECORDS

28A - May 11, 2026 relocation and international-work correspondence

28B - May 20, 2026 return of apartment keys and remaining property

28C - September 24, 2026 semifinalist invitation and program terms

28D - September 25, 2026 in-person attendance and possible alternative arrangements

28E - September 28, 2026 signed emergency visa-appointment support letter

28F - October 7, 2026 visa efforts, fees, lodging, and remote-participation request

28G - New Delhi VAC scheduling image archived October 3, 2026

28H - October 16, 2026 confirmation of remote participation

28I - October 28, 2026 report that a consular appointment had been secured

28J - November 6, 2026 finalist decision

28K - November 6, 2026 confirmation that the decision also applied to Duality

28L - November 10, 2026 response promising later individualized feedback

Email and notification printouts reproduce the substantive text of selected messages from Plaintiff's personal and company email accounts. Message dates and headers are retained. Repeated quoted chains, signature blocks, graphics, and social links are omitted; line wrapping is normalized. Meeting credentials and Slack account-action URLs are omitted as marked. The signed letter is reproduced with its passport number redacted. The scheduling image is reproduced in full.

## 28A May 11, 2026 relocation and international-work correspondence

Date: Mon, 11 May 2026 12:35:33 -0700

From: Romit Chakraborty <romit.chakraborty@gmail.com>

To: hrishivora@mercor.com

Subject: Re: Mercor Offer | Next Steps

Message-ID: <CA+CwXur5CVf__UGwzV0AyZzkcebVxorvgSir4TwEFNHbzDSR1g@mail.gmail.com>

Source mailbox message ID: 19e1889a2323060b

Selected message text; quoted chains and signature blocks omitted.

Hi Hrishi,

Thank you for the offer. I am very interested in joining Project Blackwell and contributing to the STEM evaluations.

Regarding logistics: I am actually scheduled for an international relocation to India next week (May 20th). To ensure strict compliance with U.S. work authorization laws during my move, I will need to onboard and operate as an international independent contractor, with an effective start date of May 21st or later once I am physically established overseas.

I am incredibly eager to bring my Ph.D. background in quantum chemistry and AI evaluation directly to Project Blackwell. I know finding deep-domain experts for these high-level STEM evaluations can be challenging, and I am confident I can make an immediate, high-leverage impact the moment my international setup is complete.

Let me know the best way to structure the onboarding and contract acceptance on the work.mercor.com portal to reflect my upcoming international residency. If it is helpful to quickly chat through these logistics to keep the momentum going, please feel free to call me at +1 773-816-8338.

Best, Romit

## 28B May 20, 2026 return of apartment keys and remaining property

Date: Wed, 20 May 2026 04:36:28 -0700

From: Romit Chakraborty <romit.chakraborty@gmail.com>

To: Danielle DeVictoria <ddevictoria@prometheusreg.com>

Subject: Re: Automatic reply: Unit 692 - Goodbye Neighbor

Message-ID: <CA+CwXupuMsCphOW5YF+8H4H5UgFGH-e1WE3Ymj9wV+6JS06Kug@mail.gmail.com>

Source mailbox message ID: 19e452c435ffac7c

Selected message text; quoted chains and signature blocks omitted.

Hi Danielle, I dropped off my keys today but was unable to move my bed frame and two desks out of the unit. I am formally abandoning these items and granting you full permission to dispose of them immediately. I waive any notice periods regarding abandoned property so the unit can be cleared and cleaned

## 28C September 24, 2026 semifinalist invitation and program terms

Date: Thu, 24 Sep 2026 15:29:53 -0700

From: Admissions Office <admissions@alchemistaccelerator.com>

To: romit@pointreyessound.com

Cc: rafaelperes@uchicago.edu, Ian Bergman <ian@alchemistaccelerator.com>, Shyama Majumdar <shyama@uchicago.edu>, Anna Wislocki <anna.wislocki@chicagobooth.edu>, Rahul Singal <rahulsingal@uchicago.edu>, Alchemist Chicago <chicago@alchemistaccelerator.com>

Subject: Congratulations — you've been selected as an Alchemist Chicago semifinalist (Oct 19–23 bootcamp)

Message-ID: <CAB1BwoEkcQGdiHPBHHzAEpJaX61f6aPqj+kmN6yzWDr_mO9KVA@mail.gmail.com>

Source mailbox message ID: 1a0d58ab0542e892

Selected message text; quoted chains and signature blocks omitted.

Dear Romit,

Congratulations — you're in!

You've been selected as a semifinalist for the Duality quantum accelerator, a part of Alchemist Chicago. We were impressed by your team and by what you're building, and are excited to have you with us.

Duality is jointly delivered by Alchemist and the Polsky Center for Entrepreneurship and Innovation at the University of Chicago, and is designed for deeply technical founders building the next generation of quantum, deep tech, and foundational technology startups.

Here's what happens next:

1. You have a spot at the Duality bootcamp, October 19–23, 2026. Five days in Chicago with ~30 startups from around the world: entrepreneurial training from world-class University of Chicago faculty, IP strategy support, and co-working at the Polsky Center. You'll also network with the Alchemist team, alumni, and VCs.

If you're based outside Chicago, we cover travel and lodging for one person ($1,500 domestic / $2,000 international).

2. Up to 8 of the 30 semifinalists will be selected to join the Duality and Alchemist Flagship program. The Bootcamp is where startups earn their place in Duality and will advance based on team strength, market opportunity, technology differentiation, traction, and readiness to scale, making the week not just a training ground, but a proving ground. Selected companies receive $50,000 SAFE investment through Duality, hands-on support with commercialization and fundraising, 1:1 coaching, Alchemist founder retreats and investor showcases in San Francisco, and access to our network of operators, investors, domain experts, and the Duality and Alchemist founder community. Selected startups will continue to work directly with the University of Chicago team, including access to UChicago student talent and domain expertise. All quantum and quantum enabling hardware companies will receive lab space and desk as well as discounted pricing on shared equipment and other core facilities at the University of Chicago Science Incubator in Hyde Park Labs.

3. By accepting your place at the bootcamp, you're acknowledging the investment terms should you be selected for the final cohort. Duality invests $50,000 through a SAFE with a $10M valuation cap and a 20% discount, plus a Common Stock Purchase Agreement for 4% of outstanding shares. If selected, you'd sign the SAFE Side Letter, SAFE, the Common Stock Purchase Agreement, and a Board Resolution. We're happy to share the documents with you in advance for your review, or discuss these terms with you — just ask.

If you know that these terms don't work for you, we'd ask that you not accept the offer.

To accept, reply to this email by 9:00 AM PT on Monday, September 28, 2026.

We’ll host a Q&A session on September 25 at 9:00 AM PT to answer any questions you have — you can also just reply here with questions.

JOIN Q&A HERE [Meeting link and access credentials omitted.]

Congratulations again. We can't wait to meet you in person in Chicago.

Cheers,

Shyama & Ian

# 28D September 25, 2026 in-person attendance and possible alternative arrangements

Date: Fri, 25 Sep 2026 15:08:04 +0000

From: Shyama Majumdar <shyama@uchicago.edu>

To: Romit Chakraborty <romit@pointreyessound.com>, "admissions@alchemistaccelerator.com" <admissions@alchemistaccelerator.com>, "Singal, Rahul" <rahul.singal@chicagobooth.edu>

CC: "ian@alchemistaccelerator.com" <ian@alchemistaccelerator.com>

Subject: RE: Congratulations — you've been selected as an Alchemist Chicago semifinalist (Oct 19–23 bootcamp)

Message-ID: <IA1PR11MB736869ACE968D4D99E2FF654B2802@IA1PR11MB7368.namprd11.prod.outlook.com>

Source mailbox message ID: 1a0d91c05e8a4bf8

Selected message text; quoted chains and signature blocks omitted.

Romit,

I am copying my colleague @Singal, Rahul<mailto:rahul.singal@chicagobooth.edu> who can send you the requested docs.

Rahul, can you send these asap?

At this time participation in the bootcamp in person is mandatory since its pre-requisite to participating in the final flagship program.

Shyama

## 28D September 25, 2026 in-person attendance and possible alternative arrangements continued

Date: Fri, 25 Sep 2026 19:26:37 +0000

From: Shyama Majumdar <shyama@uchicago.edu>

To: Romit Chakraborty <romit@pointreyessound.com>, Rahul Singal <rahulsingal@uchicago.edu>

CC: Alchemist Admissions <admissions@alchemistaccelerator.com>, "ian@alchemistaccelerator.com" <ian@alchemistaccelerator.com>

Subject: Re: Congratulations — you've been selected as an Alchemist Chicago semifinalist (Oct 19–23 bootcamp)

Message-ID: <IA1PR11MB736812E5FF2DD97A5F5AF20EB2802@IA1PR11MB7368.namprd11.prod.outlook.com>

Source mailbox message ID: 1a0da08b565fdb6f

Selected message text; quoted chains and signature blocks omitted.

Hi Romit,

Please disregard the previous blank email. That was by accident.

We hope you are able to get a visa, if not we might be able to make some alternate arrangements for you. We have to figure out what that will look like though. Please bear in mind that if you are selected into the main program later, it will be imperative that you are able to attend all of the in person sessions and we won’t be able to make remote arrangements at that point.

Rahul is working on getting you the docs, good luck!

Shyama

## 28E September 28, 2026 signed emergency visa-appointment support letter

Source: September 28, 2026 email from Rahul Singal to Plaintiff, with the attachment titled Emergency Visa Appointment Request - Romit Chakraborty.pdf.

Email subject: Re: Congratulations - you've been selected as an Alchemist Chicago semifinalist (Oct 19-23 bootcamp)

Source mailbox message ID: 1a0e9a2045356361

The original one-page signed letter follows. The passport number has been redacted; the remaining letter and signature are retained. The letter requests an expedited appointment. It does not record approval of an appointment or issuance of a visa.

POLSKY Center for Entrepreneurship and Innovation
THE UNIVERSITY OF CHICAGO

**Date:** September 28, 2026
**Subject:** Emergency Visa Appointment Request for Romit Chakraborty

To Whom it may concern,

The University of Chicago's Polsky Center for Entrepreneurship and Innovation respectfully requests consideration for an expedited B-1/B-2 visa appointment for **Romit Chakraborty (Passport Number: [redacted] Founder & Chief Scientist of Point Reyes Sound Inc.).**

**Point Reyes Sound Inc.** has been selected to participate in the Alchemist Chicago, an initiative powered by the Polsky Center for Entrepreneurship and Innovation at the University of Chicago. The company has been identified as one of a limited number of startups being considered for pre-seed funding opportunities and the establishment of a U.S. subsidiary, where commercially and legally feasible.

**Mr. Romit Chakraborty** has been invited to travel to the United States to participate in a series of time-sensitive business meetings **beginning on October 19, 2026, in Chicago**. As part of the program, participating founders are invited to travel to multiple times to Chicago, Illinois, and San Francisco, California for a curated immersion.

The purpose of this travel arises from an urgent business matter, the timing of which could not have been reasonably anticipated in advance. The planned meetings involve multiple parties, including investors and institutional representatives, and are tied to fixed schedules that cannot be readily rescheduled.

Accordingly, we respectfully request consideration for an expedited visa appointment to enable **Mr. Romit Chakraborty** to fulfill these critical business obligations and avoid the significant loss of opportunity that would otherwise result from his inability to attend.

Should you require any additional information, please do not hesitate to contact me.

Sincerely,

Rahul Singal

**Rahul Singal**
*Associate Director, Accelerators and Investments*
**THE UNIVERSITY OF CHICAGO** | Polsky Center for Entrepreneurship and Innovation
5235 South Harper Court, 9th Floor, Chicago, IL, 60637
C: 312.522.0596
E: rahulsingal@uchicago.edu

## 28F October 7, 2026 visa efforts, fees, lodging, and remote-participation request

Date: Wed, 7 Oct 2026 05:16:42 -0700

From: Romit Chakraborty <romit@pointreyessound.com>

To: Rahul Singal <rahulsingal@uchicago.edu>

Subject: Re: Congratulations — you've been selected as an Alchemist Chicago semifinalist (Oct 19–23 bootcamp)

Message-ID: <CAAFhve-rHKD1WaQbR5s=KPN2cS7aV9K3m60G70pjkoNs+MLfOA@mail.gmail.com>

Source mailbox message ID: 1a1164b83cea99a0

Selected message text; quoted chains and signature blocks omitted.

Hi Rahul,

Thank you for sharing the emergency visa appointment letter. Thank you also for confirming the stipend and venue address. I have booked travel arrangements and am committed to attending; my DS-160 is submitted and an emergency appointment request has been transmitted, but I am still awaiting a consular appointment, whose availability and timing are outside my control.

1. I submitted the stipend form and signed the W-9 on October 5. Could you confirm receipt, arrange the PaymentWorks invitation, and advise the expected payment date? Timely payment would help cover the travel costs already committed. 2. I would also like to add comments to my existing submission: should I edit it through a response link, or can your team append them? Please also confirm whether the stipend may support Point Reyes Sound’s patent filing and IP protection costs alongside travel.

Best, Romit

## 28F October 7, 2026 visa efforts, fees, lodging, and remote-participation request continued

Date: Wed, 7 Oct 2026 08:50:12 -0700

From: Romit Chakraborty <romit@pointreyessound.com>

To: Rahul Singal <rahulsingal@uchicago.edu>

Cc: Shyama Majumdar <shyama@uchicago.edu>

Subject: Re: Congratulations — you've been selected as an Alchemist Chicago semifinalist (Oct 19–23 bootcamp)

Message-ID: <CAAFhve_=myV-MCJMK56F6oA4sqXpU43DwHuMF4FaP_B8Tjn4Qw@mail.gmail.com>

Source mailbox message ID: 1a1170f0063faed6

Selected message text; quoted chains and signature blocks omitted.

Hi Rahul (cc: Shyama),

We'll only ask for out-of-pocket reimbursement for travel, understood. I have already paid the non-refundable visa fees and booked lodging. We handled immigration promptly. It would help immensely if we could arrange to attend remotely while we keep our fingers crossed.

Regards, Romit

## 28G New Delhi VAC scheduling image archived October 3, 2026

Source: Plaintiff's archived New Delhi VAC scheduling image, archived October 3, 2026. The archive date is not an independently verified screenshot-capture timestamp.

The displayed screen is labeled Applicant Schedule OFC Appointment and New Delhi VAC, with No Slots Available. It concerns the VAC/OFC scheduling step shown, rather than a consular-interview calendar or availability at every Indian post.




The complete source image is reproduced without cropping or alteration.

## 28H October 16, 2026 confirmation of remote participation

Date: Fri, 16 Oct 2026 21:23:12 +0000

From: Slack <notification@slack.com>

To: romit@pointreyessound.com

Subject: Shyama Majumdar sent you a message

Message-ID: <010101a14698f61b-e736d24a-d840-4337-a76b-65dc864a2117-000000@us-west-2.amazonses.com>

Source mailbox message ID: 1a14698f8441c9e8

Selected message text; quoted chains and signature blocks omitted.

Hi Romit Chakraborty,

You have a new direct message from the Alchemist Chicago workspace [Workspace link omitted.].

---

@Shyama Majumdar [Slack archive link omitted.]

Shyama Majumdar (14:05, 16th October)

Yes, we will make remote participation available for you

[Notification preferences and account-action URLs omitted.]

## 28I October 28, 2026 report that a consular appointment had been secured

Date: Wed, 28 Oct 2026 10:12:50 -0700

From: Romit Chakraborty <romit@pointreyessound.com>

To: Rahul Singal <rahulsingal@uchicago.edu>

Cc: "Wislocki, Anna" <anna.wislocki@chicagobooth.edu>, Shyama Majumdar <shyama@uchicago.edu>

Subject: Re: Alchemist Chicago Bootcamp Starts Monday! Orientation Details and Action Items

Message-ID: <CAAFhve9SQF_d4rdNTN2Sw1YMD-K0OfQv0EJsPbG1zhoEnV9cOw@mail.gmail.com>

Source mailbox message ID: 1a1838043d69811b

Selected message text; quoted chains and signature blocks omitted.

Hi Rahul, Shyama, and Anna,

We’ve secured a consular appointment! As the programme’s in-person dates are confirmed, I’ll update the application and supporting request accordingly, so we’re well prepared to join you in person if selected. Happy to share the confirmation or provide any further information whenever helpful. Thanks again for organising a stellar week of engagements!

Best, Romit

## 28J November 6, 2026 finalist decision

Date: Fri, 6 Nov 2026 13:10:04 -0600

From: Admissions Office <admissions@alchemistaccelerator.com>

To: romit@pointreyessound.com

Cc: Shyama Majumdar <shyama@uchicago.edu>, Alchemist Chicago <chicago@alchemistaccelerator.com>, Anna Wislocki <anna.wislocki@chicagobooth.edu>, Rahul Singal <rahulsingal@uchicago.edu>

Subject: Point Reyes Sound, Inc. - Alchemist Chicago Finalist Decision

Message-ID: <CAB1BwoFRSpxd7VnUmRBHrhi9t3rfmaKhWEe-nEr4OBgnrxYFfA@mail.gmail.com>

Source mailbox message ID: 1a1b245325969b1e

Selected message text; quoted chains and signature blocks omitted.

Dear Romit,

Thank you for participating in the Alchemist Chicago Bootcamp. Everyone was impressed with the team and your clear drive.

After careful consideration, we won’t be able to offer Point Reyes Sound, Inc. a spot as a finalist in Alchemist Chicago. This was a difficult decision. Your startup sparked thoughtful discussion within the review committee, and there was genuine interest in what you’re building. Ultimately, the decision came down to the strength and size of the Bootcamp batch this year and the limited number of teams we can support as finalists.

If you’d like feedback to support your continued progress, please reach out. We’d be glad to share insights from the review process.

*Continued Support*

You remain part of the Alchemist Chicago founder community, whatever the decision:

- Invitations to the Alchemist Founder Series: candid, mostly virtual conversations with founders who’ve been in your shoes - Meetings with the Polsky team and inclusion in the Polsky newsletter

We believe there is potential in what you’re building and encourage you to reapply when the next Alchemist Chicago cycle opens; we’d love to see your progress. It was a privilege to work with you, and we wish you the very best moving forward.

Warm regards,

The Alchemist Chicago Team

## 28K November 6, 2026 confirmation that the decision also applied to Duality

Date: Fri, 6 Nov 2026 23:17:33 +0000

From: Shyama Majumdar <shyama@uchicago.edu>

To: Romit Chakraborty <romit@pointreyessound.com>, Admissions Office <admissions@alchemistaccelerator.com>

CC: Alchemist Chicago <chicago@alchemistaccelerator.com>, "Wislocki, Anna" <anna.wislocki@chicagobooth.edu>, Rahul Singal <rahulsingal@uchicago.edu>

Subject: Re: Point Reyes Sound, Inc. - Alchemist Chicago Finalist Decision

Message-ID: <CH8PR11MB4073636265A3A42571679A287FB2762@CH8PR11MB407363.namprd11.prod.outlook.com>

Source mailbox message ID: 1a1b3273ed7f277c

Selected message text; quoted chains and signature blocks omitted.

Hi Romit,

It does apply to the Duality track as well. Wishing you the best and please consider reapplying in the future as your company progresses.

Shyama

## 28L November 10, 2026 response promising later individualized feedback

Date: Tue, 10 Nov 2026 12:01:00 -0700

From: Alchemist Chicago <chicago@alchemistaccelerator.com>

To: Romit Chakraborty <romit@pointreyessound.com>

Cc: Shyama Majumdar <shyama@uchicago.edu>, Admissions Office <admissions@alchemistaccelerator.com>, "Wislocki, Anna" <anna.wislocki@chicagobooth.edu>, Rahul Singal <rahulsingal@uchicago.edu>

Subject: Re: Point Reyes Sound, Inc. - Alchemist Chicago Finalist Decision

Message-ID: <CA+CBjBVFERobJg_ZG6XBNTuWwgx2HWVEO=QZ1K61dFC_yCHhPw@mail.gmail.com>

Source mailbox message ID: 1a1c6d5fb354de9f

Selected message text; quoted chains and signature blocks omitted.

Hi Romit,

Thank you again for participating in the Alchemist Chicago Bootcamp. We appreciated your time and the work you put into the program.

We will get back to you over the coming month with feedback. Thank you for your patience.

Warm regards,

The Alchemist Chicago Team